1  MICHAEL J. MONGAN (SBN 250374)
   michael.mongan@wilmerhale.com
2  WILMER CUTLER PICKERING
      HALE AND DORR LLP
3  50 California Street, Suite 3600
   San Francisco, CA 94111
4  Telephone: (628) 235-1000
   EMILY BARNET (*pro hac* forthcoming)
5  emily.barnet@wilmerhale.com
   WILMER CUTLER PICKERING
6     HALE AND DORR LLP
7  7 World Trade Center
   250 Greenwich St
8  New York, NY 10007
   Telephone: (212) 230-8800
9
   *Attorneys for Plaintiff Anthropic PBC*
10

KELLY P. DUNBAR (*pro hac* forthcoming)
kelly.dunbar@wilmerhale.com
JOSHUA A. GELTZER (*pro hac* forthcoming)
joshua.geltzer@wilmerhale.com
KEVIN M. LAMB (*pro hac* forthcoming)
kevin.lamb@wilmerhale.com
SUSAN HENNESSEY (*pro hac* forthcoming)
susan.hennessey@wilmerhale.com
LAUREN MOXLEY BEATTY (SBN 308333)
(application pending)
lauren.beatty@wilmerhale.com
LAURA E. POWELL (*pro hac* forthcoming)
laura.powell@wilmerhale.com
SONIKA R. DATA (*pro hac* forthcoming)
sonika.data@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ANTHROPIC PBC,<br><br>   Plaintiff,<br><br> v.<br><br>U.S. DEPARTMENT OF WAR, et al.,<br><br>   Defendants. | Case No.  3:26-cv-1996<br><br>**NOTICE OF MOTION AND MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, OR SECTION 705 STAY; MEMORANDUM FOR PRELIMINARY INJUNCTION**<br><br>Judge:<br><br>Hearing Date:<br>Time:<br>Courtroom: |

PLEASE TAKE NOTICE as soon as it may be heard in the United States District Court for the Northern District of California, 450 Golden Gate Ave., San Francisco, CA 94102, that Plaintiff Anthropic PBC will, and hereby does, move this Court for a temporary restraining order pursuant to Federal Rule of Civil Procedure 65(b), for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a), or for a stay under 5 U.S.C. § 705.

As set forth in the accompanying Memorandum of Points and Authorities, absent immediate injunctive relief, (1) Secretary of War Peter B. Hegseth's Order and Letter (the Secretarial Order and Secretarial Letter) designating Anthropic a supply chain risk and purporting to prohibit every "contractor, supplier, or partner that does business with" the military to cease commercial activity with Anthropic and (2) President Donald J. Trump's Directive (the Presidential Directive) barring federal agencies from working with Anthropic as well as (3) the actions of the federal agency Defendants and their heads to implement that Directive will continue to impair Anthropic's First Amendment and due process rights, injure its reputation, harm its business relationships, and cause economic injury for which it cannot obtain compensation from the government.

Because of the ongoing and escalating injuries Anthropic is experiencing, Anthropic seeks preliminary relief sufficient to preserve the status quo, while recognizing that the Court may determine—based on the parties' submissions and the timing of the proceedings—whether entry of a temporary restraining order, a preliminary injunction, a stay under 5 U.S.C. § 705, or a combination thereof is appropriate. This approach is intended to afford the Court flexibility to calibrate the form and duration of preliminary relief, in light of the Court's schedule.

Immediately upon filing Anthropic's complaint on March 9, 2025, Anthropic provided a courtesy copy of the complaint to Earl G. Matthews, General Counsel of the U.S. Department of War; Eric Hamilton, Deputy Assistant Attorney General for the Federal Programs Branch of the Civil Division of the U.S. Department of Justice; and Pamela Johann, Chief of the Civil Division of the U.S. Attorney's Office for the Northern District of California. Subject to this Court's calendar and availability, Anthropic proposed to Defendants a schedule under which Defendants file any response to this Motion by Wednesday, March 11, at 9:00 p.m. PT, with a reply for Anthropic by Thursday, March 12, at 9:00 p.m. PT, and a hearing on Friday, March 13, or, alternatively, as soon

1  as it may be heard by this Court. Anthropic will endeavor to meet and confer with Defendants

2  regarding an agreed-upon schedule; should the parties reach agreement on a proposed schedule,

3  Anthropic will notify the Court.

4

5  Date: March 9, 2026                    /s/ Michael J. Mongan

6  KELLY P. DUNBAR (*pro hac*            MICHAEL J. MONGAN (SBN 250374)
   forthcoming)                          michael.mongan@wilmerhale.com
7  kelly.dunbar@wilmerhale.com           WILMER CUTLER PICKERING
   JOSHUA A. GELTZER (*pro hac*             HALE AND DORR LLP
8  forthcoming)                          50 California Street, Suite 3600
   joshua.geltzer@wilmerhale.com         San Francisco, CA 94111
9  KEVIN M. LAMB (*pro hac* forthcoming) Telephone: (628) 235-1000
   kevin.lamb@wilmerhale.com
10 SUSAN HENNESSEY (*pro hac*            EMILY BARNET (*pro hac* forthcoming)
   forthcoming)                          emily.barnet@wilmerhale.com
11 susan.hennessey@wilmerhale.com        WILMER CUTLER PICKERING
   LAUREN MOXLEY BEATTY (SBN                HALE AND DORR LLP
12 308333) (application pending)         7 World Trade Center
   lauren.beatty@wilmerhale.com          250 Greenwich St
13 LAURA E. POWELL (*pro hac*            New York, NY 10007
   forthcoming)                          Telephone: (212) 230-8800
14 laura.powell@wilmerhale.com
   SONIKA R. DATA (*pro hac* forthcoming) *Attorneys for Plaintiff Anthropic PBC*
15 sonika.data@wilmerhale.com
16 WILMER CUTLER PICKERING
      HALE AND DORR LLP
17 2100 Pennsylvania Avenue NW
   Washington, DC 20037
18 Telephone: (202) 663-6000

19

20

21

22

23

24

25

26

27

28

1

2

**TABLE OF CONTENTS**

**Page**

3

INTRODUCTION ............................................................................................................1

4

FACTUAL BACKGROUND ..........................................................................................3

5

     A.     Anthropic's Mission Of Building AI Models That Are Safe By Design.......................3

6

     B.     The Federal Government's Prioritization Of AI Adoption............................................4

7

     C.     The Department of War's Use Of Claude For National Security Purposes .................4

8

     D.     After Operating Pursuant To Anthropic's Usage Policy Throughout Their
9
              Partnership, The Department Shifts Course And Threatens Punitive Actions .............6

     E.     The President And The Secretary Retaliate Against Anthropic ...................................8

10

11

     F.     The Presidential Directive And Secretarial Order Trigger Immediate Harm.............10

12

ARGUMENT ..................................................................................................................12

13

     I.     Anthropic Is Likely To Succeed On The Merits........................................................12

14

           A.     The Challenged Actions Violate The First Amendment By Retaliating
15
                   Against Anthropic For Expressing Its Judgment About The Safety Of Its
16
                   Model And The Responsible Use Of AI.........................................................12

17

           B.     The Secretarial Order Violates The Administrative Procedure Act Because
                   It Exceeds The Secretary's Authority And Lacks Any Reasoned Basis .........15

18

19

           C.     The Challenged Actions Violate Due Process By Purporting To Blacklist
                   Anthropic Without Notice Or An Opportunity To Be Heard .........................20

20

           D.     The Challenged Actions Violate The Separation Of Powers And Exceed
                   The Scope Of The Executive's Authority........................................................21

21

22

     II.     The Challenged Actions Inflict Irreparable Harm On Anthropic By Punishing It
           For Speech And Damaging Its Reputation And Business Relationships ...................22

23

     III.    The Remaining Equitable Factors Decisively Favor Anthropic ................................24

24

CONCLUSION...............................................................................................................25

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Al Haramain Islamic Found. v. U.S. Dep't of Treasury*,
    686 F.3d 965 (9th Cir. 2011) ................................................................................20

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ..............................................................................12

*Arizona Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) .........................................................................22, 24

*Babaria v. Blinken*,
    87 F.4th 963 (9th Cir. 2023) ................................................................................12

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) ................................................................................................14

*BE & K Const. Co. v. NLRB*,
    536 U.S. 516 (2002) ..............................................................................................13

*Bennett v. Spear*,
    520 U.S. 154 (1997) ..............................................................................................16

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ................................................................................24

*Cinderella Career & Finishing Schs. Inc. v. FTC*,
    425 F.2d 583 (D.C. Cir. 1970) ..............................................................................21

*Crime Justice & Am., Inc. v. Honea*,
    876 F.3d 966 (9th Cir. 2017) ................................................................................15

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) .........................................................................................18, 19

*DHS v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ..................................................................................................19

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ................................................................................24

*Elrod v. Burns*,
    427 U.S. 347 (1976) ..............................................................................................22

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ..............................................................................................20

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) .................................................................................................16

*Goldie's Bookstore, Inc. v. Sup. Ct. of Calif.*,
  739 F.2d 466 (9th Cir. 1984) ...................................................................................23

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) ...................................................................................22

*Immigrant Defs. L. Ctr. v. Noem*,
  145 F.4th 972 (9th Cir. 2025) ..................................................................................12

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
  585 U.S. 878 (2018) .................................................................................................13

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
  341 U.S. 123 (1951) .................................................................................................22

*Kelly v. Hegseth*,
  2026 WL 391777 (D.D.C. Feb. 12, 2026) ...............................................................14

*Logan v. Zimmerman Brush Co.*,
  455 U.S. 422 (1982) .................................................................................................20

*Lozman v. City of Riviera Beach*,
  585 U.S. 87 (2018) ...................................................................................................12

*Matthews v. Harney Cnty.*,
  819 F.2d 889 (9th Cir. 1987) ...................................................................................21

*Media Matters for Am. v. Paxton*,
  138 F.4th 563 (D.C. Cir. 2025) ..........................................................................13, 14

*Mendocino Env't. Ctr. v. Mendocino Cnty.*,
  14 F.3d 457 (9th Cir. 1994) .....................................................................................14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..............................................................................................16, 18

*Nat'l Parks Conservation Ass'n v. EPA*,
  788 F.3d 1134 (9th Cir. 2015) .................................................................................19

*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024) .................................................................................................12

*Nat'l Urb. League v. Ross*,
  508 F. Supp. 3d 663 (N.D. Cal. 2020) .....................................................................16

*Nken v. Holder*,
  556 U.S. 418 (2009) .................................................................................................24

*O'Brien v. Welty*,
    818 F.3d 920 (9th Cir. 2016) ........................................................................12, 14, 15

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
    465 F.3d 977 (9th Cir. 2006) ........................................................................16

*Perkins Coie LLP v. U.S. Dep't of Justice*,
    783 F. Supp. 3d 105 (D.D.C. 2025) ........................................................................13

*Pleasant Grove City, Utah v. Summum*,
    555 U.S. 460 (2009)........................................................................15

*Ralls Corp. v. Comm. on Foreign Inv.*,
    758 F.3d 296 (D.C. Cir. 2014) ........................................................................20

*Regents of Univ. of Cal. v. Am. Broad. Companies*,
    747 F.2d 511 (9th Cir. 1984) ........................................................................23

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,
    944 F.2d 597 (9th Cir. 1991) ........................................................................22

*Riley's Am. Heritage Farms v. Elsasser*,
    32 F.4th 707 (9th Cir. 2022) ........................................................................14

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
    515 U.S. 819 (1995)........................................................................15

*Snyder v. Phelps*,
    562 U.S. 443 (2011)........................................................................13

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) ........................................................................22, 24

*Susman Godfrey LLP v. Exec. Off. Pres.*,
    789 F. Supp. 3d 15 (D.D.C. 2025)........................................................................21

*Trifax Corp. v. District of Columbia*,
    314 F.3d 641 (D.C. Cir. 2003) ........................................................................20

*W. Virginia State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943)........................................................................2

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*,
    784 F. Supp. 3d 127 (D.D.C. 2025)........................................................................14

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)........................................................................12

*Wisconsin v. Constantineau*,
    400 U.S. 433 (1971)........................................................................20

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)...................................................................................................21, 22

**Federal Statutes**

5 U.S.C. § 704.............................................................................................................................16

5 U.S.C. § 705.............................................................................................................................12

5 U.S.C. § 706.............................................................................................................................15

10 U.S.C. § 3252................................................................................................................ *passim*

44 U.S.C. § 3552....................................................................................................................9, 17

**Regulations**

15 C.F.R. § 791.4.......................................................................................................................18

48 C.F.R. § 9.402..................................................................................................................21, 22

DFARS § 239.7301....................................................................................................................17

**Executive Actions**

Exec. Order No. 14179, 90 Fed. Reg. 8741 (Jan. 23, 2025).......................................................4

Exec. Order No. 14319, 90 Fed. Reg. 35389 (July 23, 2025).....................................................4

Exec. Order No. 14320, 90 Fed. Reg. 35393 (July 23, 2025).....................................................4

**Constitutional Provisions**

U.S. Const. amend. I..................................................................................................... *passim*

U.S. Const. amend. V.................................................................................................................20

**INTRODUCTION**

Plaintiff Anthropic PBC is a leading frontier artificial intelligence (AI) developer. This case is about whether the government can punish Anthropic, through an unprecedented campaign of retaliation, for speaking publicly about its strongly held beliefs about the limits of its own technology and the responsible use of AI, and for refusing to abandon those beliefs in the face of extraordinary government pressure.

Anthropic pursues its founding mission—developing advanced AI that is used safely and responsibly to benefit the public—through research, commercial deployments, and advocacy. To do this, Anthropic collaborates with partners in the private and public sectors, including the Department of War and other agencies tasked with protecting our democracy. Until very recently, that Department has lauded Anthropic's AI model. And to this day, the Department continues to use that model in its most sensitive and important missions.

Consistent with its perspectives on AI safety and its expertise regarding its own technology, Anthropic has long articulated and required certain restrictions on the use of its model, including that it may not be used for autonomous lethal warfare or mass surveillance of Americans. And when it began partnering with Anthropic, the Department abided by those two longstanding restrictions. Last fall, however, the Department demanded that Anthropic abandon them. Anthropic continued to express its strongly held views that its model could not safely or responsibly be used for those two purposes—while also working to propose compromise solutions and assure the Department that, if it chose to shift to another AI developer, Anthropic would collaborate on an orderly transition.

But when Anthropic declined to accept the Department's proposed usage terms by its imposed deadline, the Executive Branch swiftly retaliated. Criticizing Anthropic for its "RADICAL LEFT" views, its "ideology," and its "rhetoric," the President and the Secretary of War sought to punish Anthropic for expressing fidelity to its founding principles. First, the President purported to direct every federal agency to immediately cease all use of Anthropic's technology. Then the Secretary designated Anthropic "a Supply-Chain Risk to National Security" and purported to bar companies that do business with the military from conducting commercial activity with Anthropic. Other federal agencies quickly implemented the President's directive.

This Court should grant emergency relief to protect Anthropic from those extraordinary and unlawful actions. By retaliating against Anthropic for its speech and its principled judgments on how its technology should be used, and by depriving the company of important liberty and property interests without any meaningful process, all Defendants violated the First Amendment and the Due Process Clause of the Fifth Amendment and acted beyond their authority. In addition, the Secretary's edict far exceeds his authority to designate a "supply chain risk" under 10 U.S.C. § 3252, and is unaccompanied by any reasoned explanation, in violation of the Administrative Procedure Act.

These flagrant violations of basic constitutional and statutory requirements have already harmed Anthropic severely and irreparably. The government has infringed on Anthropic's right to speak freely; it has disparaged the company's good name by stigmatizing it with an unlawful designation as a national security risk; it has deprived Anthropic of government contracts and damaged its relationships with business partners in the private sector; and it has put millions, possibly billions, of dollars at risk. Absent immediate relief from this Court, those harms will continue to mount. In contrast, Defendants have no legitimate interest in allowing their unlawful actions to remain in effect while this litigation proceeds. The relief sought by Anthropic would not require Defendants to use Anthropic's services or prevent them from transitioning to other AI providers. Nor would it prevent them from using Anthropic's technology in ongoing military actions.

Rarely is the government so transparent in punishing a company for expressing its principles. Defendants are seeking to blacklist a company that adhered to its long-held beliefs instead of yielding to the demands and adopting the positions of the Executive. But the importance of this case extends far beyond one company. Defendants' manifest purpose is to chill other American companies and individuals who might dare to do the same. This Court should grant preliminary relief. The "fixed star in our constitutional constellation" is "that no official" can use the power of his office to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (Jackson, J.).

**FACTUAL BACKGROUND**

**A.    Anthropic's Mission Of Building AI Models That Are Safe By Design**

Anthropic is a U.S. public benefit corporation headquartered in San Francisco. It was founded in 2021 based on the animating principle that the most capable AI systems should also be the safest. From its inception, Anthropic has focused on developing frontier AI models that are reliable and safe. Declaration of Jared Kaplan ("Kaplan Decl.") ¶¶ 8-10. That commitment is embedded in Anthropic's corporate charter and governance. As a public benefit corporation, Anthropic balances stockholder interests with its public benefit purpose of responsibly developing and maintaining advanced AI for the long-term benefit of humanity. *Id.* ¶ 8. For Anthropic, decisions to prioritize secure model design, safe deployment, and responsible use are not discretionary—they are rooted in its public benefit mission and are an expression of the company's values.

Anthropic's flagship model, Claude, is an industry-leading large language model (LLM) capable of interpreting and responding to a wide range of user inputs (or "prompts") in an intelligent, human-like manner. *Id.* ¶¶ 14-16. Through training on massive datasets, LLMs like Claude acquire predictive capabilities that allow them to perform complex tasks in a fraction of the time it would take humans. *Id.* ¶¶ 15-16.

Like all LLMs, Claude has technical limitations. LLMs can generate inaccurate or misguided outcomes or behave unpredictably in certain contexts. They can produce responses that diverge from the goals of the people who trained them or reflect skewed or mistaken judgments embedded in their training data. *Id.* ¶ 18. To address the novel risks of AI, Anthropic maintains a comprehensive Usage Policy designed to limit users to safe and responsible applications of its models. *Id.* ¶¶ 18, 21-22. For commercial and civilian users, the Usage Policy prohibits engaging in surveillance, compromising computer networks, and designing weapons or other systems to cause harm or loss of human life. *Id.* ¶ 22. As discussed below, Anthropic also includes an addendum to its Usage Policy tailored to government users, which is designed to strike a balance between enabling beneficial national security uses and mitigating potential harms. *Id.* ¶¶ 27-28.

In keeping with Anthropic's founding commitments, the company and its leadership are leading voices on issues related to AI safety and policy. For example, the company frequently

weighs in on pending legislation and has voiced support for bills that align with its core beliefs about AI safety. Declaration of Sarah Heck ("Heck Decl.") ¶¶ 5-6. Anthropic's CEO has also written publicly about the risks of powerful AI and has advocated for and against certain AI-related policy measures. Declaration of Michael J. Mongan ("Mongan Decl.") Exs. 1-2.

**B.      The Federal Government's Prioritization Of AI Adoption**

Championing American AI models and integrating them into federal operations are policy priorities of the Trump Administration. In July 2025, the Administration released an action plan calling for the United States to "drive adoption of American AI systems, computing hardware, and standards throughout the world." Mongan Decl. Ex. 3. Recent Executive Orders reinforce this policy's significance. *See* Exec. Order No. 14179, 90 Fed. Reg. 8741 (Jan. 23, 2025); Exec. Order No. 14319, 90 Fed. Reg. 35389 (July 23, 2025); Exec. Order No. 14320, 90 Fed. Reg. 35393 (July 23, 2025). Accordingly, the federal government has significantly expanded its AI use, contracting with companies like Anthropic, Google, and OpenAI to make their models available to federal agencies. Mongan Decl. Exs. 4-7. Among these contracts was Anthropic's first-of-its-kind agreement with the General Services Administration (GSA) to deliver Claude for Government to all three branches of the government for just $1 per agency. Declaration of Thiyagu Ramasamy ("Ramasamy Decl.") ¶ 7.

The Department of War (the "Department") has embraced AI, awarding major contracts to Anthropic, Google, OpenAI, and xAI to scale AI capabilities across defense and intelligence missions. Mongan Decl. Ex. 8. The Department has touted the transformative ability of these models "to support our warfighters and maintain strategic advantage over our adversaries," while bringing "the best U.S.-based frontier AI talent" to bear on critical national security challenges. *Id*. AI models have been integrated into the Office of the Secretary of War and Combatant Commands and used to support sensitive military operations. *Id.*, Exs. 9-10.

**C.      The Department of War's Use Of Claude For National Security Purposes**

Among other priorities, Anthropic has committed to making its technology available to defend the United States, advance our national security interests, and defeat authoritarian adversaries. Kaplan Decl. ¶¶ 24-26. Consistent with this commitment, Anthropic has become a

1    leader in putting AI to use for national security work. Anthropic was the first AI company to

2    proactively align its models with the government's national security needs, including by building a

3    "Claude Gov" model tailored specifically for U.S. national security customers. *Id.* ¶ 27; Mongan

4    Decl. Ex. 11. Anthropic's government-specific addendum to the Usage Policy enables certain

5    national security uses that would not be allowed under the ordinary Usage Policy. Kaplan Decl.

6    ¶¶ 27-28. But it also includes two key restrictions the Department now insists it needs removed,

7    which forbid the use of Anthropic's models for lethal autonomous warfare or for mass surveillance

8    of Americans. *Id.* ¶¶ 29, 32-33.

9        Anthropic's partnership with the Department began in November 2024, when Anthropic

10   worked with a defense technology partner to provide AI-enabled intelligence and defense

11   capabilities to national security agencies. Ramasamy Decl. ¶ 5. In July 2025, Anthropic and the

12   Department entered into a two-year agreement, worth up to $200 million, to supply Anthropic's

13   technology. *Id.* ¶ 6. For Anthropic, these contracts are an embodiment of the company's belief in the

14   "existential importance of using AI to defend the United States and other democracies." Mongan

15   Decl. Ex. 12.

16       These partnerships were preceded by—and contingent on—rigorous security scrutiny of

17   Anthropic by the U.S. Government. In 2025, GSA and the Department authorized Claude's use with

18   "FedRAMP High," the federal government's highest cloud-security authorization for unclassified

19   systems, and the Department's "Impact Level 4 and 5" workloads, which permit handling of

20   controlled unclassified information and certain national security mission data. *Id.*, Ex. 13;

21   Ramasamy Decl. ¶ 10. Those actions allowed Anthropic's cloud security systems to handle

22   unclassified and controlled unclassified information. Then, after an 18-month vetting process, the

23   Defense Counterintelligence and Security Agency granted Anthropic a Top Secret facility security

24   clearance and personnel clearances, enabling Anthropic employees to become further embedded in

25   classified national security projects. Ramasamy Decl. ¶ 9.

26       Over time, officials in the Department and elsewhere have praised Anthropic's technology.

27   Senior officials have described Claude as the "top model" and have relayed to Anthropic that they

28   "want to move as fast as possible with [it]." *Id.* ¶ 12. Intelligence Community leaders have reported

extensive use, stating that their employees are "hammering away" with Claude's assistance. *Id*. And combatant commanders have praised the technology. Heck Decl. ¶ 13. By the Department's own account, Claude has outperformed competing models for the tasks it was deployed to perform. *Id.* ¶ 8. Today, Claude is reportedly the Department's most widely deployed frontier AI model. Kaplan Decl. ¶ 26.

### D. After Operating Pursuant To Anthropic's Usage Policy Throughout Their Partnership, The Department Shifts Course And Threatens Punitive Actions

Anthropic has never offered a model to any customer without an accompanying Usage Policy. Kaplan Decl. ¶ 21. The Department is no exception. From the outset of Anthropic's partnership with the Department, all Anthropic tools have included the Usage Policy and, for some deployments, the government addendum described above. *Id.* ¶¶ 27-29. These define the conditions under which Claude can be used safely and reliably, aligning with Anthropic's mission and views about the capabilities and limitations of its own models. *Id.* ¶¶ 22, 36, 38-39.

To be clear, Anthropic's Usage Policy does not provide Anthropic with visibility into how the Department uses Claude, and Anthropic has never employed the Usage Policy or addendum to influence or interfere with military operations. *Id.* ¶ 37; Ramasamy Decl. ¶ 15. Anthropic recognizes the possibility that the Department might choose to work with a company that has different usage restrictions, and Anthropic would respect that choice. Heck Decl. ¶ 11; Kaplan Decl. ¶ 37. Until very recently, however, the Department chose Anthropic: operating under the existing restrictions while increasingly embedding Anthropic models, expanding their use, and praising Claude's performance as superior to that of models from other developers. Kaplan Decl. ¶ 29; Ramasamy Decl. ¶¶ 5-6, 12; Heck Decl. ¶ 8.

From 2024 through September 2025, Anthropic and the Department of War worked together extensively, under the Usage Policy or its addendum, without event. Then, in September 2025, Anthropic and the Department began negotiating Claude's deployment on the Department's "GenAI.mil" AI platform for deploying and managing generative-AI tools across defense missions. Ramasamy Decl. ¶ 13. Anthropic entered negotiations intent on expanding access to Claude. Over time, however, the Department demanded that Anthropic discard its Usage Policy and addendum

altogether, insisting instead on allowing the Department, its contractors, and its subcontractors to use Claude for "all lawful uses." Kaplan Decl. ¶ 32. Anthropic ultimately agreed, with two critical exceptions, to allow use of Claude for "all lawful uses." Those exceptions were the restrictions on lethal autonomous warfare and mass surveillance of Americans. *Id.* ¶ 33.

Anthropic communicated to the Department repeatedly why it could not remove these narrow, but important, guardrails. Based on its extensive experience with model training and evaluation, Anthropic concluded that, at least for now, Claude is not safe for mass surveillance of Americans or lethal autonomous warfare. *Id.* ¶¶ 34-36. The risk of model error or unreliable performance, coupled with underdeveloped AI legal frameworks, cemented Anthropic's conviction. *Id.* In Anthropic's view, allowing Claude's use on classified systems to surveil Americans en masse or to run autonomous weapons systems intended to kill human targets without human oversight poses immense danger and is antithetical to Anthropic's safety mission. *Id.* ¶¶ 34-36, 38-39; Heck Decl. ¶ 14.

Anthropic CEO Dr. Dario Amodei repeatedly communicated Anthropic's views about the importance of maintaining these guardrails to Department officials. He explained that, to his knowledge, neither guardrail has ever obstructed military operations. Heck Decl. ¶ 13. He also made clear that Anthropic remained willing to explore further modifications to its Usage Policy to meet the Department's specific needs, short of removing the two guardrails he viewed as fundamental to AI safety and the company's core identity. *Id.* ¶¶ 18; Ramasamy Decl. ¶ 16. Throughout these discussions, Dr. Amodei emphasized that the Department should select the right vendor to meet its needs. Heck Decl. ¶ 11. And he assured the Department that if Anthropic was not that vendor, the company would respect the Department's decision and work to orderly offboard from its systems. *Id.*

This back-and-forth continued over several months, including on February 24, 2026, when Dr. Amodei met with Secretary Hegseth. At that meeting, Secretary Hegseth praised Claude's "exquisite capabilities," acknowledged that Dr. Amodei's concerns were "understandable," and stated that the Department "would love to work with" Anthropic. *Id.* ¶¶ 12, 15. He then presented an ultimatum: unless Anthropic agreed to permit "all lawful uses" of its system by 5 p.m. on February 27, 2026, the Department would either designate Anthropic a supply chain risk—a label that, to

1   Anthropic's knowledge, has never before been applied to an American company—or invoke the

2   Defense Production Act to commandeer Claude as an asset essential to national security. *Id*. ¶ 16. In

3   other words, it threatened to treat Anthropic either as a risk to U.S. national security or as essential to

4   U.S. national security. Despite this pressure to abandon its position on the limitations of its AI model

5   and accede to the Secretary's demand, the company continued to push for a resolution, and the

6   Department continued to engage in earnest. *Id*. ¶ 18.

7          On February 26, amidst a steady stream of reporting and Administration statements

8   indicating the Department's intention to punish Anthropic, Dr. Amodei issued a public statement

9   explaining Anthropic's stance. Mongan Decl. Ex. 12, 26-27. He affirmed the company's

10  commitment to supporting "the national security of the United States" but stated that it could not "in

11  good conscience accede" to the Department's request, because Claude could not "safely and

12  reliably" be used for lethal autonomous warfare or mass surveillance of Americans. *Id*., Ex. 12.

13         Nevertheless, Anthropic remained intent on finding a path forward right up until Secretary

14  Hegseth's threatened deadline. On the afternoon of February 27, 2026, prior to the deadline, Dr.

15  Amodei provided proposed edits to the Department's latest offer, accompanied by a detailed

16  explanation. Heck Decl. ¶ 18. While still engaging in good faith, Dr. Amodei remained firm in

17  retaining the two guardrails core to Anthropic's principles. *Id*. The Department did not respond in

18  kind with written edits. *Id*.

19         **E.    The President And The Secretary Retaliate Against Anthropic**

20         That same afternoon, the President and Secretary Hegseth converted their threats into public

21  directives impugning and punishing Anthropic. On February 27, 2026, President Trump issued a

22  statement on social media (the "Presidential Directive") "directing EVERY Federal Agency in the

23  United States Government to IMMEDIATELY CEASE all use of Anthropic's technology." Mongan

24  Decl. Ex. 14. The Directive branded Anthropic as a "Radical Left AI company" whose employees

25  are "Leftwing nut jobs" threatening "AMERICAN LIVES." *Id*. And the President threatened that

26  "Anthropic better get their act together" or he would "use the Full Power of the Presidency to make

27  them comply, with major civil and criminal consequences to follow." *Id*.

28

1     Later that evening, Secretary Hegseth issued a "final" decision on social media (the

2    "Secretarial Order"). *Id*., Ex. 15. He called Anthropic "arrogan[t]," accused it of "betrayal," and

3    declared its conduct "fundamentally incompatible with American principles." *Id*. He "direct[ed] the

4    Department of War to designate Anthropic a Supply-Chain Risk to National Security" and declared

5    that "[e]ffective immediately, no contractor, supplier, or partner that does business with the United

6    States military may conduct any commercial activity with Anthropic." *Id.* But he also stated that

7    "Anthropic will continue to provide the Department of War its services for a period of no more than

8    six months." *Id.* And hours later, the Department reportedly relied on Claude—embedded in the

9    military's Maven Smart System—to select targets and identify coordinates for hundreds of airstrikes

10    across Iran. Mongan Decl. Ex. 23.

11     The following week, as agencies across the federal government moved to implement the

12    purported Presidential Directive, the company continued negotiating in good faith with senior

13    Department officials. Heck ¶ 19. Those discussions were still ongoing when, at 8:48 p.m. on March

14    4, Secretary Hegseth sent Anthropic a letter notifying it of the Secretarial Order's "supply chain risk

15    designation." *Id*. ¶ 19. That letter (the "Secretarial Letter"), dated March 3, 2026, asserted that the

16    Department of War had "determined" that Anthropic's technology "presents a supply chain risk" and

17    that exercising the authority granted by 10 U.S.C. § 3252 against Anthropic is "necessary to protect

18    national security." Mongan Decl. Ex. 22. The letter pronounced that this determination covers all

19    Anthropic "products" and "services," including any that "become available for procurement." *Id*.

20    And it asserted, without elaboration, that "less intrusive measures are not reasonably available" to

21    mitigate the risks that Anthropic's products and services supposedly pose to national security. *Id*.

22     The Secretarial Letter cites 10 U.S.C. § 3252, which addresses a specific national-security

23    threat: that adversaries of the United States could compromise information systems used for national

24    security purposes. *See id.* § 3252(d)(4), (5). Congress authorized the Department to take actions to

25    mitigate "supply chain risk[s]"—*i.e.*, "the risk that an adversary may sabotage, maliciously introduce

26    unwanted function, or otherwise subvert" an information system used for national security

27    applications. *Id.* § 3252(a), (d)(4), (5); 44 U.S.C. § 3552(b)(6). In specific authorized circumstances,

28    the Secretary may exclude a company from competing for certain Department contracts if the

1  company fails to meet qualifications or evaluation criteria bearing on supply chain risk, or the

2  Secretary may withhold consent from another contractor to subcontract with the company on certain

3  contracts. *Id.* § 3252(d)(2)(A)–(C). But Congress imposed procedural safeguards on the use of this

4  authority. It required (among other things) written determinations of national security necessity and a

5  lack of less intrusive measures to address the relevant risk, consultation with relevant agency

6  officials, and notice to specified congressional committees. *Id.* § 3252(b)(1)-(3). There is no

7  evidence that the Secretary did any of those things before reaching the "final" decision announced in

8  the Secretarial Order. Even the Secretarial Letter, sent days later, contains no mention of

9  consultation with relevant agency officials or notice to Congress.

### F.    The Presidential Directive And Secretarial Order Trigger Immediate Harm

11  The Presidential Directive, the Secretarial Order, the Secretarial Letter that followed it, and

12  other agency actions taken in response to the Presidential Directive (collectively, the "Challenged

13  Actions") have inflicted immediate and irreparable harm on Anthropic. Within hours of the

14  Presidential Directive and the Secretarial Order, their effects began to materialize. Other agencies

15  quickly fell in line with the President's purported demand that every federal agency cease using

16  Anthropic's technology. For example, GSA declared that it was "stand[ing] with the President in

17  rejecting attempts to politicize work dedicated to America's national security." Mongan Decl. Ex.

18  16. Shortly thereafter, a GSA official stated that the agency was terminating its government-wide

19  agreement with Anthropic. *Id.*, Ex. 17. According to public reporting, the Department of Health and

20  Human Services and the State Department began winding down their use of Claude that same day.

21  *Id.*, Ex. 18. On March 2, the Department of the Treasury and the Federal Housing Finance Agency

22  announced that they were terminating all use of Anthropic's tools. *Id.*, Exs. 19-20.

23  At the same time, customers across the private sector contacted Anthropic seeking clarity

24  about what the government's directives required of them and whether they could continue working

25  with the company. Declaration of Paul Smith ("Smith Decl.") ¶¶ 15-20. The Department itself

26  contributed to the uncertainty by affirmatively contacting Anthropic customers and directing them to

27  end their relationships with the company or at least reassess their reliance on Anthropic's models. *Id.*

28  ¶ 14; Ramasamy Decl. ¶ 30.

Soon, customers began signaling concrete changes to their business relationships with Anthropic. Multiple customers indicated that they may cancel their contracts in light of the Challenged Actions. Ramasamy Decl. ¶ 33; Smith Decl. ¶¶ 15-20. Other prospective customers have delayed or paused national security contracts or sales discussions preceding contract negotiation. Ramasamy Decl. ¶ 33; Smith Decl. ¶ 16. In at least one instance, a customer at a strategic command center directed a subcontractor to work with xAI or Google instead of Anthropic. Ramasamy Decl. ¶ 33. Federal contractors with which Anthropic had developed partnerships have indicated they may suspend that work or remove Claude from their platforms. *Id*.; Smith ¶ 14.

The uncertainty also extended beyond customers with direct defense relationships. Law firms have urged all government contractors to "audit[] their Anthropic exposure now" and "prepare to deploy alternatives." Mongan Decl. Exs. 24, 25. Multiple financial institutions have sought new contractual protections allowing them unilateral termination rights. Smith Decl. ¶ 16; Ramasamy Decl. ¶ 30. One of the world's largest pharmaceutical companies sought to shorten the intended duration of its contract. Smith Decl. ¶ 17. In multiple instances, customers emphasized the importance of their partnership with Anthropic and warned that losing access to Claude would significantly delay their work—by months or even years—but felt they could not resist the government's directive. Ramasamy Decl. ¶ 28; Smith Decl. ¶ 14.

Anthropic investors have experienced similar confusion. One investor forwarded market analysis describing the designation as a "sanction" and opining that prospective federal contractors should not do business with the company. Declaration of Krishna Rao ("Rao Decl.") ¶ 4. At least one major investing firm reported that the Department contacted several of its portfolio companies about their use of Claude, sparking growing uncertainty. *Id*.

Across Anthropic's full book of business, adjusting for how different customers are likely to interpret the scope of the Challenged Actions, the Challenged Actions could reduce Anthropic's 2026 revenue by hundreds of millions or even multiple billions of dollars. Rao Decl. ¶ 6; Ramasamy Decl. ¶¶ 31-32.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARGUMENT**

A party seeking a temporary restraining order or a preliminary injunction must show that (1) it "is likely to succeed on the merits"; (2) it "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) preliminary relief "is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Babaria v. Blinken*, 87 F.4th 963, 976 (9th Cir. 2023) (noting that the standards for TROs and preliminary injunctions are "substantially identical" (internal quotation marks omitted)); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (alternative "'sliding scale' approach"). Under the Administrative Procedure Act (APA), moreover, the "reviewing court" may stay the "effective date of an agency action," 5 U.S.C. § 705, and "'stays' under the APA turn on the same factors as preliminary injunctions," *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 983 (9th Cir. 2025). Anthropic satisfies the standards for each form of preliminary relief.

**I.    Anthropic Is Likely To Succeed On The Merits**

**A.    The Challenged Actions Violate The First Amendment By Retaliating Against Anthropic For Expressing Its Judgment About The Safety Of Its Model And The Responsible Use Of AI**

The First Amendment prohibits government officials from wielding "the power of the State to punish or suppress disfavored expression," *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024), or "retaliating against individuals for engaging in protected speech," *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018). Unconstitutional retaliation occurs where (1) a person has "engaged in a constitutionally protected activity"; (2) the adverse government action would "chill a person of ordinary firmness from continuing to engage in the protected activity"; and (3) constitutionally "protected activity was a substantial or motivating factor in the [government's] conduct." *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016) (internal quotation marks omitted). The Challenged Actions easily satisfy each of those elements.

First, Anthropic engaged in constitutionally protected activity. Anthropic's public statements about the importance of AI safety are protected speech. Since its founding, Anthropic has advocated for the responsible use of AI models, including by maintaining a Usage Policy that embodies the company's commitment to the same, posting public essays and blog posts, and supporting or

1    opposing legislation. Kaplan Decl. ¶¶ 8-12, 21-22; Mongan Decl. Ex. 1. The company and its

2    leadership have frequently contributed to the public discourse about safe use of AI models, including

3    as recently as a February 26 announcement by its CEO that it could not "in good conscience accede

4    to" the Department's request because the uses contemplated by the Department were "outside the

5    bounds of what today's technology can safely and reliably do." Mongan Decl. Ex. 12.

6        Additionally, just as "collective bargaining" with the government is speech protected by the

7    First Amendment, *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878,

8    893-94 (2018), Anthropic's communications with the Department about the importance of its safety

9    limitations are protected by the First Amendment. Anthropic's attempts to persuade the government

10   to understand and accept those limitations are also petitioning activity, independently safeguarded by

11   the First Amendment's Petition Clause. *See BE & K Const. Co. v. NLRB*, 536 U.S. 516, 525 (2002)

12   ("the right to petition extends to all departments of the Government").

13       Anthropic's advocacy on a "matter[] of public concern is at the heart of the First

14   Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) (internal quotation marks

15   and ellipsis omitted). Through its speech and petitioning activity, Anthropic expressed its views

16   about the limitations of its own technology and the responsible use of AI models, including

17   advocating for narrow but critical restrictions on using Claude for lethal autonomous warfare or

18   mass surveillance of Americans. Anthropic's perspectives on these matters reflect the company's

19   founding mission and identity, as well as its longstanding public advocacy regarding the importance

20   of AI safety. Kaplan Decl. ¶¶ 38-39; Heck Decl. ¶ 6.

21       The Department itself understood Anthropic's advocacy as expressive. Secretary Hegseth,

22   for example, disparaged Anthropic's position as "rhetoric of 'effective altruism'" and "corporate

23   virtue-signaling," reflecting "Silicon Valley ideology." Mongan Decl. Ex. 15. Anthropic disagrees

24   with those characterizations; but, right or wrong, they undeniably are complaints about Anthropic's

25   expression and ideas. The Secretarial Order thus "openly acknowledges that [Anthropic] engaged in

26   speech." *Perkins Coie LLP v. U.S. Dep't of Justice*, 783 F. Supp. 3d 105, 151-52 (D.D.C. 2025).

27       Second, the Challenged Actions would "deter a person of ordinary firmness in [Anthropic's]

28   position from speaking again." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir.

2025) (internal quotation marks omitted). That "'bar is not a high one,'" *Kelly v. Hegseth*, No. CV 26-81 (RJL), 2026 WL 391777, *10 (D.D.C. Feb. 12, 2026), and may be satisfied where a government action is "designed to … chill" "expression," *Mendocino Env't. Ctr. v. Mendocino Cnty.*, 14 F.3d 457, 464 (9th Cir. 1994). The Challenged Actions here seek to pressure Anthropic to "get [its] act together[] and be helpful," Mongan Decl. Ex. 14: *i.e.*, to suppress its own views and fall in line with the government's. *See generally Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (First Amendment prohibits "threat of invoking legal sanction[]" where government's goal is "to achieve the suppression" of disfavored ideas). Like executive orders aimed at deterring law firms from continuing expressive activities, the Challenged Actions "shout[] through a bullhorn": anyone who advocates for "causes disfavored by President Trump" or Secretary Hegseth "will be punished[.]" *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 151 (D.D.C. 2025).

Apart from the clear design to chill speech, the seriousness of the sanctions imposed on Anthropic shows that the Challenged Actions would chill the speech of an ordinary company. The Challenged Actions purport to terminate all of Anthropic's existing government contracts, bar it from future government contracting, and threaten its commercial partners with contract terminations. These punitive actions are already inflicting far-ranging, irreparable injury on Anthropic, *see* Ramasamy Decl. ¶¶ 29-33; Rao Decl. ¶¶ 4-10; Smith Decl. ¶¶ 11-20; *see also infra* Part IV, and they far exceed the severity of other government acts deemed retaliatory. *See, e.g.*, *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 723 (9th Cir. 2022) ("threatened or caused pecuniary harm," including from "cancel[lation]" of government contract, is sufficient); *Media Matters for Am.*, 138 F.4th at 581 (being "target of a government … investigation, a press release, and a sweeping [investigative demand]" suffices).

Third, Anthropic's "protected activity was a substantial or motivating factor in the [government's] conduct." *O'Brien*, 818 F.3d at 932. Indeed, the protected activity was the only justification the government offered. The Presidential Directive deemed Anthropic "A RADICAL LEFT, WOKE COMPANY" run by "Leftwing nut jobs." Mongan Decl. Ex. 14. The Secretarial Order called out the company's "rhetoric" and "virtue-signaling," and characterized the Secretary's

1  actions as resisting the "ideological whims" of the company. *Id.*, Ex. 15. The two-page Secretarial

2  Letter provided no reasoned explanation for the purported "supply chain risk" designation—tacit

3  confirmation that the real explanation was a desire to punish Anthropic for its views. *Id.*, Ex. 22. At

4  bottom, the Secretary threatened Anthropic based on its advocacy of usage limitations; then the

5  President and the Secretary made good on those threats just after Anthropic publicly announced that

6  they "do not change [its] position." *Id.*, Ex. 12.[1]

7          The government retaliated against Anthropic for its protected expression, and that alone is

8  enough to violate the First Amendment. That the government did so because of Anthropic's specific

9  viewpoint about AI safety compounds the constitutional problem. *See Pleasant Grove City, Utah v.

10  Summum*, 555 U.S. 460, 469 (2009) ("restrictions based on viewpoint are prohibited"); *Rosenberger

11  v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995) ("Viewpoint discrimination is …

12  an egregious form of content discrimination."). The government has no legitimate interest in

13  silencing speech based on its content and viewpoint, let alone a compelling one. *See Crime Justice &

14  Am., Inc. v. Honea*, 876 F.3d 966, 973 (9th Cir. 2017) (government interest is legitimate only if it is

15  "unrelated to the suppression of expression"). And the government had obvious less restrictive

16  alternatives to the Challenged Actions: It could have continued operating under the existing terms

17  that had governed the Department's use of Anthropic's tools, including the two usage restrictions. Or

18  it could have agreed to Anthropic's offer of an orderly offboarding and procured AI models from

19  other companies. What it could not do, but did anyway, is punish Anthropic for its speech.

20      **B.    The Secretarial Order Violates The Administrative Procedure Act Because It
              Exceeds The Secretary's Authority And Lacks Any Reasoned Basis**

21

22          The APA requires a court to "hold unlawful and set aside" final agency action that is

23  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or is "in

24  excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without

25  observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D). Those bedrock

26  administrative law principles require, among other things, "that agency action be reasonable and

27  _____

28  [1] Given the overwhelming evidence of retaliatory motivation, defendants will not be able to carry
    their "burden" to show that the President and the Secretary "'would have taken the same action even
    in the absence of the protected conduct.'" *O'Brien*, 818 F.3d at 932.

reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48-49 (1983). The Secretarial Order is subject to those requirements but repeatedly defies them.

The Secretarial Order is a final agency action. 5 U.S.C. § 704; *see Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Secretary Hegseth announced "[t]his decision is final," Mongan Decl. Ex. 15, marking the consummation of the decisional process. "Effective immediately," the Order purports to direct that "no contractor, supplier, or partner that does business with the United States military may conduct any commercial activity with Anthropic." *Id.* The Order's demand of "immediate compliance with [its] terms," will have—and is having—"immediate" (though unlawful) "effect[s] on" Anthropic's "day-to-day operations." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982, 987 (9th Cir. 2006); *see also Bennett*, 520 U.S. at 178 (action "by which rights or obligations have been determined, or from which legal consequences will flow" (internal quotation marks omitted)). That suffices to establish finality and render the Order subject to APA review, which it cannot survive.[2]

*The Order Exceeds the Secretary's Statutory Authority.* In 10 U.S.C. § 3252, Congress carefully defined supply chain risks and authorized the Secretary of War to take specific actions to address them. *Id.* § 3252(a), (d)(2). Congress also imposed procedural requirements the Secretary must observe before taking any such actions. *See id.* § 3252(b). The result is a circumscribed grant of authority—and one the Secretarial Order exceeds many times over.

First, Section 3252 does not give the Secretary carte blanche to threaten Department contractors who "partner" or "conduct any commercial activity with Anthropic"—even outside the terms of a program covered by a Department contract—as the Order purports to do. Mongan Decl. Ex. 15. Instead, the statute permits the Secretary to "exclud[e]" a "source" (*i.e.*, a contractor or subcontractor) that fails to meet specific standards pertaining to supply chain risk "in the course of conducting a covered procurement"—that is, a procurement by the Department. 10 U.S.C.

---

[2] The March 4 Secretarial Letter implements and provides Anthropic additional notice of the designation announced in the February 27 Secretarial Order, but it does not purport to rescind or amend the Order. *Nat'l Urb. League v. Ross*, 508 F. Supp. 3d 663, 703 (N.D. Cal. 2020) ("A final agency action does not become non-final after it is implemented.").

§ 3252(d)(2). In other words, if a company presents a supply chain risk, the Secretary can say (subject to limits discussed below) that he does not want the company working on certain contracts with the Department. But the Secretary has no authority to punish contractors for partnering with that company outside the context of a Department of War contract.

Second, the Order goes beyond the scope of the Secretary's authority even with respect to Department contracts. Congress narrowly defined procurements subject to Section 3252. A "covered procurement" is limited to the acquisition of: (i) "a covered system," which is an information technology system used for specific intelligence and military purposes; or (ii) a "covered item of supply," which is an "item of information technology" used in a covered system. *Id.* § 3252(d)(3), (5), (6); *see* 44 U.S.C. § 3552(b)(6)(A)(i); DFARS § 239.7301(1)(v). Taken together, those definitions impose a straightforward constraint: the Secretary may only exclude sources from Department procurements for information technology systems used in specified national-security settings. But the Secretarial Order ignores that limitation. It purports to exclude Anthropic from *all* Department contracts and subcontracts—indeed, from any contract with an entity that "does business with the United States military." Mongan Decl. Ex. 15. And it does so without regard to whether the contract involves a covered national security system.

Third, the Secretary failed to make the determinations Congress require him to make *in advance* of a supply chain designation. *See* 10 U.S.C. § 3252(b). Section 3252 authorizes the Secretary to make a supply chain designation "only after" determining in writing that a designation is "necessary to protect national security by reducing supply chain risk." *Id.* § 3252(b), (b)(2)(A). The Secretary must also determine in writing that "less intrusive measures are not reasonably available to reduce such supply chain risk." *Id.* § 3252(b)(2)(B). There is no indication that the Secretary made these written determinations in advance of the Secretarial Order. The Secretarial Letter, received by Anthropic six days later, cannot rectify that defect: Section 3252(b)(2) expressly requires the determinations to be made before any designation.

Fourth, the Secretarial Order ignores Section 3252's additional procedural requirements. Before making a supply chain designation, the Secretary must (i) "consult[]" with relevant Department personnel and (ii) provide "the appropriate congressional committees" both the "risk

1     assessment that serve[d] as the basis" for those determinations and a "discussion of less intrusive

2     measures that were considered and why they were not reasonably available to reduce supply chain

3     risk." *Id.* § 3252(b)(1), (b)(3)(A)-(B). Again, there is no indication the Secretary took either step in

4     advance of issuing the February 27 Secretarial Order.[3]

5          *The Order Is Arbitrary and Capricious.* The APA required the Secretary to provide a

6     "reasoned explanation," *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019), in support of any

7     determination that Anthropic is an "adversary" or creates a risk of malign adversary activity, 10

8     U.S.C. § 3252(d)(4); that such a designation is "necessary to protect national security," *id.*

9     § 3252(b)(2)(A); and that "less intrusive" means "are not reasonably available" to address supply

10    chain risks, *id.* § 3252(b)(2)(B). The Secretary offered no discussion or reasoned explanation about

11    any of these predicates in his February 27 Order.

12         Nor could he have. Anthropic is not an "adversary" of the United States. The Executive

13    Branch has typically reserved such designations for enemies of the United States, including China,

14    Russia, Iran, North Korea, and Cuba. *See* 15 C.F.R. § 791.4(a). Anthropic, by contrast, is an

15    American company incorporated and headquartered in the United States. Its commitment to national

16    defense is evident in its early leadership in this space. Kaplan Decl. ¶¶ 25-27. Although the

17    Secretarial Order pointed to the dispute over Anthropic's Usage Policy as a basis for the designation,

18    Mongan Decl. Ex. 15, that disagreement is irrelevant to Section 3252 and provides no valid basis for

19    labeling Anthropic an "adversary" or a supply chain risk. Instead, as explained above, the Secretarial

20    Order lays bare a desire to retaliate against Anthropic for protected expression. But retaliatory

21    animus is not a "factor[] … Congress … intended" the Department to consider. *State Farm*, 463 U.S.

22    at 43.

23         Nor could the Secretary reasonably determine that a designation is "necessary to protect

24    national security by reducing supply chain risk." 10 U.S.C. § 3252(b)(2)(A). A "supply chain risk" is

25

26    [3] The Secretarial Order cannot be justified as an exercise of the Secretary's authority to exclude a
source that either "fails to meet qualification standards" relating to supply chain risk or "fails to
27    achieve an acceptable rating with regard to an evaluation factor" relating to the same. 10 U.S.C.
§ 3252(a), (d)(2)(A), (B). Anthropic has not failed to meet any such qualification standards or
28    evaluation factors, and the Secretary has never asserted otherwise.

1   "the risk that an adversary may sabotage, maliciously introduce unwanted function, or otherwise

2   subvert" an information system used for national security purposes. *Id.* § 3252(d)(4). The Secretary

3   offered no explanation for how other contractors' use of Claude could permit an adversary to

4   sabotage or otherwise subvert a national security system.

5   The Secretarial Order is also "internally inconsistent," a hallmark of "arbitrary and

6   capricious" agency action. *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir.

7   2015). It purports to label Anthropic a "Risk to National Security," but mandates that Anthropic

8   remain on the Department's classified systems for six more months. Compounding the

9   inconsistency, the Order "immediately" requires other Department contractors to stop doing business

10  with Anthropic. None of this adds up. Either Anthropic poses the sort of extraordinary risk justifying

11  an immediate and unprecedented supply chain risk designation, or it is safe for six more months of

12  classified use involving highly sensitive military matters; it cannot be both.

13  Finally, the Secretarial Order did not and could not determine that "less intrusive measures"

14  were "not reasonably available to reduce … supply chain risk." 10 U.S.C. § 3252(b)(2)(B). Even if

15  the phrase "supply chain risk" encompassed the Secretary's stated objection to Anthropic—that its

16  Usage Policy is unduly restrictive—any finding that "less intrusive measures" were "not reasonably

17  available" would be untenable. *Id.* The Secretary could have agreed to Anthropic's offer to support

18  an orderly offboarding and replaced Claude with other AI models not subject to Anthropic's policy,

19  a less intrusive step that would have entirely addressed the Secretary's stated concern.

20  The March 4 Secretarial Letter does not remedy any of these deficiencies. An agency must

21  defend its action based on "the grounds that the agency invoked when it took the action." *DHS v.*

22  *Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020). And while an "agency may elaborate later on

23  that reason (or reasons)," it "may not provide new ones." *Id.* at 21. The Secretary's "final" decision

24  on February 27 offered *no* valid grounds for "designat[ing] Anthropic a Supply-Chain Risk to

25  National Security." Mongan Decl. Ex. 15. There was nothing for the subsequent Letter to elaborate

26  on. In any event, the Letter contains no additional reasoning: it asserts that the statutory predicates

27  have been satisfied, without evidence or explanation. *Id.*, Ex. 22. That is not "[r]easoned

28  decisionmaking." *Dep't of Com.*, 588 U.S. at 785.

1

2

### C.  The Challenged Actions Violate Due Process By Purporting To Blacklist Anthropic Without Notice Or An Opportunity To Be Heard

3

4        The Due Process Clause guarantees that "[n]o person shall … be deprived of life, liberty, or

5   property without due process of law." U.S. Const. amend. V. To resolve a due process claim, courts

6   perform a "familiar two-part inquiry," asking (a) whether the plaintiff has been "deprived of a

7   protected interest," and (b) "if so, what process" was due. *Logan v. Zimmerman Brush Co.*, 455 U.S.

8   422, 428 (1982); *see also Ralls Corp. v. Comm. on Foreign Inv.*, 758 F.3d 296, 318 (D.C. Cir. 2014).

9        The Challenged Actions deprive Anthropic of at least three constitutionally protected

10  interests. First, the Challenged Actions impair Anthropic's liberty interest in its "good name,

11  reputation, honor, [and] integrity," by publicly singling out the company as a threat to national

12  security and then attaching sweeping legal consequences to that designation. *Wisconsin v.

13  Constantineau*, 400 U.S. 433, 437 (1971); *see also FCC v. Fox Television Stations, Inc.*, 567 U.S.

14  239, 256 (2012) (government must provide process before issuing "findings" that "could have an

15  adverse impact on [an organization's] reputation"). Second, by purporting to direct that "no

16  contractor, supplier, or partner that does business with the United States military may conduct any

17  commercial activity with Anthropic," Mongan Decl. Ex. 15, the Secretarial Order deprives

18  Anthropic of its property interest in its contractual relationships with its customers and the

19  government. *See Al Haramain Islamic Found. v. U.S. Dep't of Treasury*, 686 F.3d 965, 973, 979-80

20  (9th Cir. 2011) (designation as "specially designated global terrorist" severely burdened property

21  rights by purporting to bar business dealings with designee). Finally, by purporting to exclude

22  Anthropic from contracting with any federal agency (apparently indefinitely), the Presidential

23  Directive accomplishes a de facto debarment that infringes on Anthropic's liberty interest in

24  pursuing its chosen trade. *See Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643-44 (D.C. Cir.

25  2003) ("Debarring a corporation from government contract bidding constitutes a deprivation of

26  liberty that triggers the procedural guarantees of the Due Process Clause.").

27        Anthropic had "the right to know the factual basis for" these actions and to have a

28  meaningful "opportunity to rebut" them. *Ralls Corp.*, 758 F.3d at 318. It was afforded neither. No

government official identified to Anthropic any risk or concern that could be the basis for a proper

Section 3252 designation—not during its 18-month vetting process for Top Secret facility security

clearance and personnel clearances, not during FedRAMP authorization at the highest security levels, not during discussions in which the Secretary praised Claude's "exquisite capabilities" and said the Department "would love to work with" Anthropic, and not when the Secretary first threatened Anthropic's CEO with a designation. Heck Decl. ¶¶ 12, 15; Ramasamy Decl. ¶¶ 9-10. When the Presidential Directive and Secretarial Order finally issued, Anthropic first learned of them from social media "and was not provided the opportunity to clear its name." *Susman Godfrey LLP v. Exec. Off. Pres.*, 789 F. Supp. 3d 15, 51 (D.D.C. 2025). The Secretarial Letter, which arrived a week later, did not cure this problem: it was delivered after the deprivation had already occurred and still provided Anthropic no understanding of the factual basis for the designation.[4]

And to the extent any process did occur out of public view, it is clear that its outcome was fatally predetermined. Where a "disinterested observer may conclude that [a decisionmaker] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it," due process is violated. *Cinderella Career & Finishing Schs. Inc. v. FTC*, 425 F.2d 583, 591 (D.C. Cir. 1970); *Matthews v. Harney Cnty.*, 819 F.2d 889, 893 (9th Cir. 1987) (due process is violated where the decisionmaker had "irrevocably decided" on outcome before party was heard). The timing and terms of the Challenged Actions establish that Anthropic's perceived "ideology" drove the decisionmaking—instead of a fair application of the law to the facts. Due process demands "not only … every element of fairness but" the "appearance of … fairness." *Cinderella*, 425 F.2d at 591. The Challenged Actions fail on both counts.

### D.    The Challenged Actions Violate The Separation Of Powers And Exceed The Scope Of The Executive's Authority

The Challenged Actions are unlawful for an additional reason: they are *ultra vires*. The Executive's authority to act "must stem either from an act of Congress or from the Constitution itself," *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). No statute authorizes the President or his agency heads to blacklist a private company. To the contrary, the federal debarment framework expressly prohibits the use of debarment "for purposes of punishment," 48 C.F.R.

---

[4] The Letter described an opportunity for Anthropic to submit a "request for reconsideration," but reiterated that the Section 3252 designation was "effective immediately." With the designation already in effect, and no factual basis to address, that purported process amounts to a charade.

§ 9.402(b), and the President cannot circumvent that limitation by proclamation. *See Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 136 (1951). Because the executive actions challenged here are incompatible with the will of Congress, the Executive's authority "is at its lowest ebb," *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring), and can be sustained only if rooted in inherent constitutional authority or longstanding executive practice. Yet nothing in Article II or in the history of executive action permits the Executive Branch to coerce a private company into abandoning its safety policies by threatening it with a government-wide boycott.

## II.    The Challenged Actions Inflict Irreparable Harm On Anthropic By Punishing It For Speech And Damaging Its Reputation And Business Relationships

The Challenged Actions inflict immediate and irreparable harm on Anthropic, in the form of constitutional, reputational, and economic injuries. Anthropic has already suffered profound damage to its reputation in the eyes of customers, commercial and other partners, and the public. Its business relationships with partners in the defense sector have been damaged as government contractors pause or delay national security contracts. Its relationships with other customers are imperiled, owing to uncertainty stemming from the overreach of the Secretarial Order. Absent preliminary relief, it will continue to suffer enormous and irreversible injury in the days and weeks ahead.

*Constitutional Injuries.* Because the Challenged Actions violate the First Amendment and the Due Process Clause, irreparable harm "follows inexorably." *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (opinion of Brennan, J.) (First Amendment violations "constitute[] irreparable injury"). Nothing more is needed.

*Reputational Injuries.* The Challenged Actions also risk imminent, ongoing damage to Anthropic's reputation and institutional standing—intangible harms that generally qualify as irreparable because they cannot be easily remedied later. *E.g.*, *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir. 1991); *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). The Challenged Actions convey an unmistakable, official message: Anthropic is a threat; Anthropic is disfavored by the Administration; and businesses that associate with it do so at their peril. Smith Decl. ¶ 5; *see Stuhlbarg Int'l Sales Co. v. John D. Brush*

& Co., 240 F.3d 832, 841 (9th Cir. 2001); *Regents of Univ. of Cal. v. Am. Broad. Companies*, 747 F.2d 511, 519-20 (9th Cir. 1984).

In branding Anthropic as a "Radical Left AI company" and its employees as "Leftwing nut jobs," for example, the Presidential Directive stigmatizes the company. Smith Decl. ¶ 9; Mongan Decl. Ex. 14. That stigma is not confined to government procurement. Because Anthropic's business depends on an interconnected network of relationships—government agencies, commercial partners, cloud providers, and customers—damage to its reputation in one domain predictably spills into others. Smith Decl. ¶ 5. And once the government has publicly cast doubt on a company's trustworthiness and "patrioti[sm]," that reputational harm is not easily contained or remedied. *Id.* ¶ 10; Mongan Decl. Ex. 15. Every day the Challenged Actions remain in place, they deepen the reputational damage. *See* Smith Decl. ¶¶ 5-10, 21.

*Loss of Core Business Relationships in the Defense Sector.* The Challenged Actions also directly damage Anthropic's relationships with private partners in the defense sector. That includes both Department of War contractors with which Anthropic partners on government work and commercial partners embedded in the national-security sector. Ramasamy Decl. ¶¶ 31-33. These relationships were developed over years through sustained investment, trust-building, and engagement, and they are integral to Anthropic's ability to support the company's growth as well as U.S. national-security objectives. Smith Decl. ¶¶ 12, 21. The Challenged Actions risk rupturing those relationships. Shortly after the Presidential Directive, the Department affirmatively contacted some of Anthropic's partners, leaving them concerned about continuing to work with the company. *Id.* ¶ 14; Ramasamy Decl. ¶ 30. Some partners delayed or paused several national security contracts or business engagements already in active development with Anthropic. Ramasamy Decl. ¶ 33. In a sector where counterparties are risk-averse and dependent on government contracting, the appearance of regulatory or political disfavor can be sufficient to coerce disengagement. Ramasamy Decl. ¶ 33; Smith Decl. ¶¶ 8-10. These are not the kind of economic for which "adequate compensatory relief will be available in the course of litigation." *Goldie's Bookstore, Inc. v. Sup. Ct. of Calif.*, 739 F.2d 466, 471 (9th Cir. 1984).

*Economic Harm.* The threatened loss of prospective customers or goodwill "certainly supports a finding of" irreparable harm. *Stuhlbarg*, 240 F.3d at 841. Although the Secretary has no authority to restrict private companies from doing business with Anthropic outside the context of Department of War contracts, *see supra* Part I.A.2, the Challenged Actions have created pervasive uncertainty about whether any continued engagement with Anthropic is lawful or advisable. Smith Decl. ¶¶ 14-20; Rao ¶ 4. In particular, the Secretary's statement that "no contractor, supplier, or partner that does business with the United States military may conduct any commercial activity with Anthropic" has created "deep fear, confusion, and doubt" among many customers and partners about the repercussions of associating with the company. Smith Decl. ¶¶ 14-20; Mongan Decl. Ex. 15. The resulting threat to Anthropic's business has been immediate. Anthropic has received inquiries from more than one hundred enterprise customers representing hundreds of millions of dollars of annual revenue. Smith Decl. ¶¶ 16-20; Rao Decl. ¶ 6. Many of these customers have indicated they may cancel or seek new terms in their contracts with Anthropic. Smith Decl. ¶¶ 16-20. All told, the Challenged Actions threaten to substantially shrink or altogether eliminate Anthropic's public sector business revenues—which amount to hundreds of millions of dollars. Ramasamy Decl. ¶¶ 32-33.

Across Anthropic's entire business, for 2026, the Challenged Actions put even more of the company's revenues at risk, to the tune of hundreds of millions, or even multiple billions, of dollars. Rao Decl. ¶ 6. That scale of disruption risks setting in motion a cycle in which lost revenue undermines investor confidence, which in turn constrains the resources needed to sustain Anthropic's ability to develop the next generation of AI models. *Id.* ¶¶ 7-9. And because sovereign immunity precludes Anthropic from obtaining compensatory relief from the government, that economic harm is irreparable. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021); *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

## III.    The Remaining Equitable Factors Decisively Favor Anthropic

The remaining factors—the balance of equities and the public interest—"merge" in litigation against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Because Anthropic has established a likelihood of success on its constitutional and statutory claims, it has "also established that both the public interest and the balance of the equities favor" preliminary relief. *Arizona Dream*

*Act Coalition*, 757 F.3d at 1069. It is neither "equitable" nor "in the public's interest" to permit violations of "federal law"; "the public interest and the balance of the equities favor prevent[ing] the violation of a party's constitutional rights." *Id.*

Beyond that, weighed against the imminent and irreparable injury to Anthropic, the government will not be harmed by preliminary relief. The government has not identified any legitimate, non-retaliatory interest served by the Challenged Actions. And Anthropic has committed to assist the Department in an orderly transition in the event that the Department elects to no longer contract with Anthropic. Heck Decl. ¶ 11. Preliminary relief would not require the Department to deal with Anthropic, even though the Secretary has made clear that the Department prefers to continue using Claude for up to six months. Nor would preliminary relief require any other federal agency to deal with Anthropic on terms the agency does not prefer. It would simply enjoin Defendants from implementing a government-wide ban on using Anthropic's technology and the Secretarial Order's purported bar on military contractors and partners doing business with Anthropic. Enjoining those unlawful actions—and preserving the status quo prior to the Challenged Actions—would impose no injury on the government.

Finally, the broader public interest would be served by enjoining the government's unlawful, retaliatory acts. The Challenged Actions put every company and potential government contractor on notice that speaking out about the limitations of its own product or services, or declining to accede to a government demand that the company abandon its foundational principles, can lead to swift and punishing retaliation. The public has a profound interest in ensuring that the government cannot abuse federal contracting authority to punish private companies in that way.

## CONCLUSION

This Court should grant the emergency relief specified in the attached proposed order.

Date: March 9, 2026                    */s/ Michael J. Mongan*

KELLY P. DUNBAR (*pro hac forthcoming*)
kelly.dunbar@wilmerhale.com
JOSHUA A. GELTZER (*pro hac forthcoming*)
joshua.geltzer@wilmerhale.com
KEVIN M. LAMB (*pro hac* forthcoming)
kevin.lamb@wilmerhale.com
SUSAN HENNESSEY (*pro hac forthcoming*)
susan.hennessey@wilmerhale.com
LAUREN MOXLEY BEATTY (SBN 308333) (application pending)
lauren.beatty@wilmerhale.com
LAURA E. POWELL (*pro hac forthcoming*)
laura.powell@wilmerhale.com
SONIKA R. DATA (*pro hac* forthcoming)
sonika.data@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAEL J. MONGAN (SBN 250374)
michael.mongan@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
Telephone: (628) 235-1000

EMILY BARNET (*pro hac* forthcoming)
emily.barnet@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich St
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Plaintiff Anthropic PBC*