MICHAEL J. MONGAN (SBN 250374)
michael.mongan@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
Telephone: (628) 235-1000

EMILY BARNET (*pro hac* forthcoming)
emily.barnet@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich St
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Plaintiff Anthropic PBC*

KELLY P. DUNBAR (*pro hac* forthcoming)
kelly.dunbar@wilmerhale.com
JOSHUA A. GELTZER (*pro hac* forthcoming)
joshua.geltzer@wilmerhale.com
KEVIN M. LAMB (*pro hac* forthcoming)
kevin.lamb@wilmerhale.com
SUSAN HENNESSEY (*pro hac* forthcoming)
susan.hennessey@wilmerhale.com
LAUREN MOXLEY BEATTY (SBN 308333)
(application pending)
lauren.beatty@wilmerhale.com
LAURA E. POWELL (*pro hac* forthcoming)
laura.powell@wilmerhale.com
SONIKA R. DATA (*pro hac* forthcoming)
sonika.data@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANTHROPIC PBC,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>U.S. DEPARTMENT OF WAR, et al.,<br><br>　　　　　　Defendants. | Case No. 3:26-cv-01996<br><br>**DECLARATION OF SARAH HECK** |

I, Sarah Heck, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Sarah Heck. I am the Head of Policy at Anthropic PBC ("Anthropic"), where I have worked since June 2024. Before joining Anthropic, I held senior roles at Stripe, the White House's National Security Council, and the U.S. Department of State.

2. In my role as Head of Policy, I lead Anthropic's public policy engagement, government relationships, strategic partnerships, and government communications, including engagements and initiatives that address the intersection of artificial intelligence ("AI"), national security, and economic policy. This includes being involved in communications between Anthropic and the government.

3. As the Head of Policy, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Anthropic personnel, and could testify thereto.

**Anthropic Has Maintained A Strong Relationship With The Federal Government**

4. Partnerships with private and public sector entities are central to Anthropic's mission, business model, public policy goals, and overall success. Our partners range from Fortune 500 companies and U.S. government agencies to small businesses and local municipalities. These partnerships are core to Anthropic and essential to advancing its policy objectives of promoting the responsible deployment of AI, supporting democratic institutions, and ensuring that powerful AI systems are developed and used safely and in ways that benefit society.

5. One of Anthropic's most important partnerships is with the federal government. Anthropic has consistently supported the U.S. government's goal of maintaining global AI dominance and its efforts to ensure that American AI systems are widely adopted across the federal government and throughout the private sector at home and abroad. Anthropic publicly supported the Trump administration's efforts to promote AI adoption throughout the federal government as part of its AI Action Plan for America. Anthropic has also partnered with the National Institute of Standards and Technology's Center for AI Standards and Innovation (CAISI) to undertake collaborative research evaluating and mitigating safety risks. It has advocated in support of the bipartisan Future of AI Innovation Act, which supports CAISI's initiatives and

promotes strong partnerships between private and public stakeholders to advance AI research and innovation.

6. Importantly, in developing its relationship with the government, Anthropic has strived to build a reputation as a nonpartisan advocate dedicated to building a safer AI ecosystem. In addition to supporting the bipartisan Future of AI Innovation Act, Anthropic recently donated over $20 million to Public First Action, a bipartisan nonprofit co-founded and co-led by Republican and Democratic former lawmakers, which supports public education about AI, promotes safeguards, and works to ensure America leads in the AI race. Anthropic has also actively engaged with bipartisan legislative efforts on Capitol Hill, including advocacy in support of the CREATE AI Act of 2025 and the GAIN Act of 2025—both bipartisan safety bills that align with the company's policy priorities. And the company deliberately maintains a bipartisan lobbying effort, with an in-house team that includes former senior staffers from both sides of the aisle and a roster of Republican-aligned and Democratic-aligned outside lobbying firms. Anthropic invests in and undertakes this public policy work because it is committed to AI safety and the policies that underpin it. Based on my experience, collaboration across the political spectrum is critical to policy progress.

7. Anthropic has also been committed to developing its AI systems to advance U.S. national security interests and has partnered with national security components of the government, including the Department of War ("DoW" or the "Department") and intelligence agencies, to do so. To that end, Anthropic also formed a National Security and Public Sector Advisory Council composed of former senior defense and intelligence officials, in part to strengthen the company's understanding of government needs and become a more effective partner.

8. Throughout my engagements with the federal government in my capacity as Anthropic's Head of Policy, various officials and government staff have repeatedly conveyed that the government values its partnership with Anthropic and acknowledged that competitors' AI models lag behind Anthropic's capabilities. A wide range of senior intelligence community officials have emphasized to us that Claude's capabilities are unique, and that Claude is "widely recognized as the leading model for coding and autonomous tool use." Department of War staff

themselves have described Claude as "far and away the best model" in briefings attended by the Policy team and warned that losing this capability would set the Department back several years. These characterizations are consistent with the ones set forth in the Declaration of Thiyagu Ramasamy.

9.   Anthropic appreciates this recognition and has, in turn, repeatedly and publicly expressed its willingness to continue providing Claude for the full range of lawful national security applications, subject to two narrow usage restrictions that reflect the company's expert, considered judgment on the nature of the AI model and its safe and reliable use: namely, restrictions on the use of Claude for mass surveillance of Americans and for lethal autonomous warfare.

**Secretary Of War Pete Hegseth Issued An Ultimatum Threatening Consequences If Anthropic Adhered To Its Fundamental Commitments**

10.   Over the last few months, Anthropic and DoW had been discussing an agreement to continue their partnership. I understand that the crux of the discussions focused on two specific limitations that would restrict DoW's ability to use Claude for purposes of mass surveillance of Americans and lethal autonomous warfare. During that time, I engaged with DoW on behalf of Anthropic and was included in discussions between Anthropic CEO Dario Amodei and Emil Michael, Under Secretary of War for Research and Engineering and Chief Technology Officer. The conversations throughout this process remained respectful, and the parties remained committed to finding a path forward to harness Anthropic's technology to fulfill the Department's important national security goals.

11.   Both parties agreed that neither wanted to enter into a begrudging partnership. At one point, Dr. Amodei stressed to Under Secretary Michael that if Anthropic's position on these two guardrails meant that Anthropic was not the right vendor for the Department's needs, then he would respect that decision. Dr. Amodei further emphasized that, if Anthropic and the Department failed to come to an agreement, Anthropic stood ready to assist in an orderly offboarding from the Department's systems.

12. On February 24, 2026, I attended a meeting held between Secretary of War Pete Hegseth and Dr. Amodei, among others. At that meeting, Secretary Hegseth said that Claude had "exquisite capabilities." He then objected to Anthropic's unwillingness to remove the two usage restrictions noted above.

13. During the meeting, Dr. Amodei reiterated that Anthropic maintains a strong partnership with national security agencies, including the DoW and intelligence community. He stated that Anthropic has had no intention of dictating national security operations. Dr. Amodei emphasized that the company's commitment to the safe use of its AI models, as reflected in the agreement, has permitted—and would continue to permit—DoW to use Anthropic's products for all lawful uses, save for those two important exceptions. Dr. Amodei noted that these two exceptions have never obstructed DoW's operations to his knowledge, and Combatant Commanders he has spoken to have been pleased with Anthropic's partnership and models.

14. As to autonomous uses, Dr. Amodei clarified that, while Anthropic has been open to certain autonomous applications of its technologies, at this stage, AI systems cannot yet capably or reliably perform lethal autonomous warfare without appropriate oversight.

15. Secretary Hegseth stated that Dr. Amodei's concerns were "understandable" and further stated that "they don't do mass domestic surveillance." While Secretary Hegseth expressed that DoW "would love to work with [Amodei]," he stated that DoW had many other vendors to choose from that have never raised these types of concerns and would never hold any veto power over DoW.

16. At the end of the meeting, Secretary Hegseth presented Anthropic with what appeared to be an ultimatum: if Anthropic did not agree to "all lawful uses" of its system by 5 p.m. on Friday, February 27, 2026, DoW would issue a statement at 5:01 p.m. that they would designate Anthropic a supply-chain risk—preventing Anthropic from partnering with DoW, anyone affiliated with the Department, or any other agency—or invoke the Defense Production Act to compel Anthropic to comply with the Secretary's demands.

17. During this meeting, Secretary Hegseth never stated that Anthropic's AI models were unsafe, much less subject to compromise by a foreign adversary. I am unaware of anyone at

1  DoW ever suggesting Anthropic's models are somehow insecure or have been compromised.
2  Moreover, I understand that these two restrictions have never previously been a barrier to the
3  DoW's adoption and use of our models to date. Nor has anyone else articulated such a use to me.

4        18. Conversations continued even after Dr. Amodei's meeting with Secretary Hegseth.
5  They remained cordial and amicable. Dr. Amodei continued to seek a resolution prior to Secretary
6  Hegseth's deadline during the afternoon of Friday, February 27, 2026, during which he provided
7  Under Secretary Michael his redline edits on DoW's latest offer, alongside a detailed explanation
8  of the same, still attempting to engage in earnest while ensuring that Anthropic's two guardrails
9  core to its principles would be retained. Under Secretary Michael did not respond in kind with
10 written edits. At that same time, President Trump directed all agencies, by posting on Truth
11 Social, to cease use of Anthropic's AI system immediately. Shortly thereafter, Secretary Hegseth
12 posted on X.com designating Anthropic a supply chain risk. Throughout these discussions, Dr.
13 Amodei remained firm in expressing Anthropic's unmovable guardrails as essential to the
14 Company's mission to offer safe, reliable AI tools.

**Secretary Hegseth Notified Anthropic Of His "Supply Chain Risk" Designation**

16       19. The following week, as agencies across the federal government moved to implement
17 the Presidential Directive, Dr. Amodei continued negotiating in good faith with senior Department
18 officials. Those discussions were still ongoing when, at 8:48 p.m. ET on March 4, Dr. Amodei
19 received a letter from Secretary Hegseth, expanding on the Secretarial Order's "supply chain risk
20 designation." That letter (the "Secretarial Letter"), dated March 3, asserted that the Department of
21 War had "determined" that Anthropic's technology "presents a supply chain risk" and that
22 exercising the authority granted by 10 U.S.C. § 3252 against Anthropic is "necessary to protect
23 national security." The letter pronounced that this determination covers all Anthropic "products"
24 and "services," including any that "become available for procurement." And it asserted that "less
25 intrusive measures are not reasonably available" to mitigate the risks that Anthropic's products
26 and services supposedly pose to national security.

27               \*     \*     \*

1     I declare under penalty of perjury that the above is true and correct to the best of my
2 knowledge.
3 Executed on March 9, 2026.

                */s/ Sarah Heck*
                Sarah Heck
                Head of Policy, Anthropic

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

Pursuant to Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from the other signatories.

By:    */s/ Michael J. Mongan*
        Michael J. Mongan