MICHAEL J. MONGAN (SBN 250374)
michael.mongan@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
Telephone: (628) 235-1000

EMILY BARNET (*pro hac* forthcoming)
emily.barnet@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich St
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Plaintiff Anthropic PBC*

KELLY P. DUNBAR (*pro hac* forthcoming)
kelly.dunbar@wilmerhale.com
JOSHUA A. GELTZER (*pro hac* forthcoming)
joshua.geltzer@wilmerhale.com
KEVIN M. LAMB (*pro hac* forthcoming)
kevin.lamb@wilmerhale.com
SUSAN HENNESSEY (*pro hac* forthcoming)
susan.hennessey@wilmerhale.com
LAUREN MOXLEY BEATTY (SBN 308333)
(application pending)
lauren.beatty@wilmerhale.com
LAURA E. POWELL (*pro hac* forthcoming)
laura.powell@wilmerhale.com
SONIKA R. DATA (*pro hac* forthcoming)
sonika.data@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANTHROPIC PBC, <br><br>　　　　　Plaintiff, <br><br>　v. <br><br>U.S. DEPARTMENT OF WAR, et al., <br><br>　　　　　Defendants. | Case No. 3:26-cv-01996 <br><br>**DECLARATION OF PAUL SMITH** |

I, Paul Smith, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Paul Smith. I am the Chief Commercial Officer ("CCO") of Anthropic PBC ("Anthropic"), where I have worked since 2025. As Anthropic's CCO, I am responsible for driving the trusted enterprise adoption of Anthropic's AI systems and for maintaining long-term customer confidence to deploy Anthropic's large language model ("LLM"), Claude, in their highly-regulated and business-critical environments.

2. Prior to joining Anthropic, I spent the last thirty years in senior commercial leadership roles at major enterprise technology companies, focusing on building and scaling their global go-to-market strategies. Most recently, I served as the President of Global Customer and Field Operations at ServiceNow, where I oversaw worldwide sales and customer operations. Prior to that role, I held senior leadership roles at Salesforce and Microsoft.

3. As the CCO for Anthropic, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Anthropic personnel, and could testify thereto.

4. I understand that Anthropic and the Department of War (the "Department") had been discussing a direct agreement to deploy our AI models on classified systems. Despite ongoing negotiations, on February 27, 2026, President Trump posted on Truth Social, directing all agencies to cease use of Anthropic's AI system immediately. Secretary of War Pete Hegseth then posted on X.com that he was designating Anthropic "a supply chain risk," which he claimed would prohibit contractors, suppliers, and partners that conduct business with the United States military from engaging commercially with Anthropic. On March 4, 2026, Anthropic received two letters signed by Secretary Hegseth and dated March 3, 2026, that notified the company of its purported designation. I refer to these actions collectively below as the "Government's Actions."

**The Government's Actions And Statements Have Tarnished Anthropic's Reputation**

5. The Government's Actions attempt to blacklist Anthropic. They send a clear message to the market: do not associate with Anthropic, or else. The Government's Actions signal that Anthropic is *persona non grata* in the eyes of the government, a message that threatens to reverberate across the broader market. Like any complex, large business, Anthropic depends on an

1  interconnected network of relationships—including with government agencies, prime contractors,
2  commercial partners, cloud providers, investors, current or prospective employees, customers, and
3  the public. Reputation underpins each of these relationships, and harm to Anthropic's reputation in
4  one context inevitably damages its reputation in others.

5        6.      Anthropic has highly prioritized enterprise adoption of Claude, and the majority of
6  our revenue comes through enterprise customer contracts. Among its offerings, Anthropic makes
7  its Claude models available to customers via an application programming interface–also called an
8  API–for customer integration into their own products. Some customers in turn sell these Claude-
9  integrated products to the U.S. government. In fact, our customers sell Claude-integrated products
10  and services that span the economy in industries including healthcare, education, financial
11  services, manufacturing, retail, software, and energy, just to name a few.

12        7.      The unfounded designation of Anthropic as a purported "supply chain risk" is a
13  direct attack on the company's reputation. I understand that the statutes governing "supply chain
14  risk" relate to foreign adversaries that may harm U.S. national security and, specifically, pose a
15  risk to the Department's information systems, not to U.S. companies that do not present such a
16  threat.

17        8.      The practical effect of the Government's Actions is to brand Anthropic as akin to a
18  foreign adversary and, in turn, to signal to all American companies that, if they work with
19  Anthropic, they have chosen an unacceptable counterparty. This designation, should it stand,
20  carries a powerful stigma and risks Anthropic's partnerships with all kinds of firms, not only ones
21  that do business with the government.

22        9.      The manner in which the government has claimed to designate Anthropic a supply
23  chain risk significantly exacerbates the risk of reputational harm to the company. The President's
24  social media post exclaimed that Anthropic's employees were "Leftwing nut jobs" whose
25  "selfishness is putting AMERICAN LIVES at risk, our Troops in danger, and our National
26  Security in JEOPARDY." The post further labeled Anthropic as an "out-of-control, Radical Left
27  AI company run by people who have no idea what the real World is all about." Secretary
28  Hegseth's statements echoed these false and derogatory claims, asserting that Anthropic had

"attempted to strong-arm the United States military into submission - a cowardly act of corporate virtue-signaling that places Silicon Valley ideology above American lives," and characterizing Anthropic's position on permissible uses of Claude as "fundamentally incompatible with American principles."

10. The accusations at the heart of the Government's Actions do not reflect in any way what Anthropic does or who we are. Yet these statements reinforce a false narrative that Anthropic is untrustworthy and unpatriotic, and they endeavor to signal to customers and counterparties that we are a company to be avoided.

## The Government's Actions, If Allowed To Stand, Will Have Significant Consequences On Anthropic's Business Partnerships

11. The Government's Actions will have far-reaching detrimental effects on Anthropic's partnerships, not only with Department contractors that currently partner with Anthropic, but also with other Anthropic partners that work with different components of the executive branch and, more broadly, with commercial partners whose interests are unrelated to the national security sector.

12. First, the designation has already harmed our relationships with the Department's contractors, which have been integral to our development as a frontier AI lab supporting U.S. national security objectives. Anthropic was founded and has been led with the core mission of developing safe and beneficial AI that can be used to advance U.S. national security. The Government's Actions put that mission at risk. Over the last several years, our company has invested significant time and resources in building trust with national security stakeholders and demonstrating that our models can effectively serve the military and intelligence community. The government is now demanding that Anthropic sever those relationships entirely, instantly unsettling carefully cultivated partnerships in the national security arena. As just one example, Anthropic has maintained a multi-year relationship with a defense technology provider that permits Anthropic to offer Claude to Department end-users working on classified datasets. Following the Government's Actions, that defense technology provider has indicated it intends to move all U.S. government work to other generative AI model providers as soon as possible.

13. Second, the Government's Actions are likely to impair Anthropic's ability to engage with other components of the federal government and their contractors. On the same day President Trump and Secretary Hegseth issued their directives, the General Services Administration ("GSA") announced that it was removing Anthropic from USAi.gov, the centralized platform for federal agencies to access and adopt AI tools. That decision cuts off Anthropic's government procurement opportunities with numerous federal entities, including the U.S. Departments of Veterans Affairs, Health and Human Services ("HHS"), State, Labor, Interior, as well as the federal judiciary. A few days later, on March 2, 2026, Secretary of Treasury Scott Bessent announced on X.com that the Department of Treasury would terminate all use of Anthropic's AI models in compliance with President Trump's directive. The Department of State and HHS subsequently issued internal statements announcing the same. The Lawrence Livermore National Laboratory, a nuclear weapons research and development center funded by the Department of Energy, likewise informed Anthropic that it was shutting down Claude, expressing hope that it might one day be permitted to return to the facility.

14. Worse still, government contractors for other components of the federal government have been directed to cut ties with Anthropic and to stop using Claude. One partner, which has a multi-million-dollar annual contract, immediately switched from Claude to a competing generative AI model for a deployment by their end customer, the U.S. Food and Drug Administration. That switch instantly eliminated an anticipated revenue pipeline worth more than one hundred million dollars. The government told one electronics testing firm that it must stop using Anthropic for any work related to its government contract. A software security company was likewise instructed by its government client to immediately terminate access to Anthropic's AI models. Despite acknowledging that there was no legal basis for the directive—only political pressure—the company stated that it had no choice but to comply. These developments make clear that Anthropic's relationships with entities outside the national security sector are already beginning to erode as a result of the government's pressure. This harm will only intensify with the issuance of Secretary Hegseth's recent letters that attempt to implement his February 27 directive posted on X.com.

15. Third, based on my understanding, the Government's Actions attempt to expand their impacts beyond Anthropic's ability to provide services to the Department—or even other government agencies—by sowing doubt and uncertainty across Anthropic's commercial partnerships more broadly. In doing so, the Government's Actions cast a long shadow of uncertainty across our business, eroding Anthropic's carefully cultivated relationships with companies in industries including healthcare, education, financial services, manufacturing, retail, software, and energy, just to name a few, and causing our customers to question whether they can engage with Anthropic in any commercial context.

16. Indeed, this risk is already materializing. Even before the March 4 letters, in response to the government's February 27, 2026, public threats, many large enterprise customers signaled that publicly doing business with Anthropic had become more costly than working with Anthropic's competitors. This reluctance has taken several forms, including delays in contract discussions; customers and prospects declining to continue evaluating Claude alongside competing LLMs; cancelled sales meetings; withdrawal from planned co-marketing efforts and demands for new contractual protections. For example, our negotiations with three leading financial services institutions have been impacted since the Government's Actions, one of which is valued at one hundred million dollars and had been on the verge of closing. Two of the other firms have made clear that they cannot close their anticipated deals, valued together at over eighty million dollars, unless they obtain newly requested provisions allowing for unilateral contract termination. A national grocery chain cancelled a sales meeting, explicitly noting that it needed to assess the business impacts of the Administration's public statements. Customers across industries as varied as healthcare and cybersecurity have also withdrawn from joint press releases.

17. Other contract negotiations with multiple companies have likewise become more challenging. One current financial services customer paused negotiations on a contract worth fifteen million dollars while their legal team engaged in supply-chain-risk-designation "diligence." One of the world's largest pharmaceutical companies is seeking to shorten the intended duration of its contract by ten months. A current financial technology customer explicitly tied cutting a $10

million contract to $5 million, noting that "the DoW situation" had made them unwilling to commit to spending more on Claude.

18. Since the Government's Actions, several customers have begun pivoting their evaluation or deployment of LLMs from Claude to models offered by Anthropic's competitors. These competitive losses include a state higher-education system comprising more than 20 schools, a customer in the business-to-business collaboration software industry, and a telecommunications/media customer that is switching its pilot from Claude Code to a competing AI coding tool.

19. Consistent with examples provided above, many companies are also now seeking contractual provisions to protect against uncertainty, when they had not previously done so. For example, as previously noted, a household-name financial services company is now stalling negotiations over a deal valued at well over $50 million, seeking to add a termination-for-convenience provision to its contract. And a legal-technology company in the midst of a million-dollar contract negotiation sought to change the structure of its contract from committed spending to a pay-for-use structure, citing its investment in government relationships and the perceived risk created by the Government's Actions. Some have described these provisions as a precautionary measure in the event the government orders them to stop working with Anthropic. Other customers requesting these provisions have stated they would intend to exercise their newly obtained termination rights in the event of a formal government directive designating Anthropic a supply chain risk—we expect they will now do so, in light of the Government's Actions. And, from the beginning of this dispute, all have taken steps that reflect deep distrust and a growing fear of associating with Anthropic while the Government's Actions loom.

20. All told, Anthropic has received inquiries regarding the Government's Actions from over one hundred enterprise customers expressing deep fear, confusion, and doubt about Anthropic and the repercussions of associating with our company. For example, a multi-billion-dollar software company expressed uncertainty about its ability to continue using Claude because it maintains a shared codebase across work for the Department and other clients. A large customer that spends hundreds of millions of dollars annually with Anthropic asked whether Claude might

be removed from its cloud service provider, and indicated it would require significant additional technical work to serve government customers if a broad ban were imposed that prevented its end customers from using Claude. A Fortune 20 company stated that its lawyers were "freaked out" about working with Anthropic because it does significant government business. And the list goes on.

21.   Importantly, this harm is extremely challenging to reverse if the designation of Anthropic persists. These relationships were built over years through sustained investment, trust, and repeated engagement. If severed, they will be extraordinarily difficult—and in some cases impossible—to rebuild, particularly for companies whose core business depends on government contracting.

*    *    *

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

Executed on March 9, 2026.

/s/ Paul Smith
Paul Smith
Chief Commercial Officer, Anthropic

1  **ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

2  Pursuant to Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this
3  document has been obtained from the other signatories.

4                                           By:   */s/ Michael J. Mongan*
5                                                 Michael J. Mongan