**PERKINS COIE LLP**
Sopen B. Shah (Wisconsin Bar No. 1105013)*
SShah@perkinscoie.com
33 East Main Street, Suite 201
Madison, WI 53703
Telephone: 608.663.7460
Facsimile: 608.663.7499

Addison W. Bennett (SBN 333567)
ABennett@perkinscoie.com
2525 East Camelback Road, Suite 500
Phoenix, AZ 85016
Telephone: 602.351.8000
Facsimile: 602.648.7000

Sarah Grant (Washington Bar No. 63879)*
SarahGrant@perkinscoie.com
1301 Second Avenue, Suite 4200
Seattle, WA 98101
Telephone: 206.359.8000
Facsimile: 206.259.9000

*Counsel for* Amici Curiae

*Application for admission *pro hac vice* forthcoming

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHROPIC PBC, | Case No. 3:26:cv-01996 |
| Plaintiff, | **[PROPOSED] BRIEF OF *AMICI CURIAE* THE FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, THE ELECTRONIC FRONTIER FOUNDATION, THE CATO INSTITUTE, CHAMBER OF PROGRESS, AND THE FIRST AMENDMENT LAWYERS ASSOCIATION IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, OR SECTION 705 STAY** |
| v. | |
| UNITED STATES DEPARTMENT OF WAR, et al., | |
| Defendants. | |
| | The Honorable Rita F. Lin |
| | Date: |
| | Time: |
| | Ctrm.: |
| | Complaint Filed: March 9, 2026 |

1

## TABLE OF CONTENTS

2  TABLE OF AUTHORITIES .................................................................................................. ii

3  STATEMENT OF INTEREST OF *AMICI CURIAE* .................................................... 1

4  INTRODUCTION .............................................................................................................. 3

5  ARGUMENT ...................................................................................................................... 5

6      I.    The Pentagon's treatment of Anthropic violates the First Amendment ........................ 5

7      A.    Anthropic's design choices, including the safeguards for Claude, are
            protected by the First Amendment .............................................................................. 5

8      B.    The government's actions are transparently retaliatory and coercive ................... 9

9      II.   Vindicating Anthropic's First Amendment rights will protect all Americans ............ 12

10     III.  Use of AI for domestic surveillance raises independent First Amendment
            concerns ........................................................................................................................ 14

11  CONCLUSION .................................................................................................................. 15

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRIEF OF *AMICI CURIAE*
                                        CASE NO. 3:26-cv-01996

1

## TABLE OF AUTHORITIES

2

CASES

3

*Aref v. Lynch*,
    833 F.3d 242 (D.C. Cir. 2016) ........................................................................... 11

4

*Backpage.com, LLC v. Dart*,
    807 F.3d 229 (7th Cir. 2015) ............................................................................ 12

5

6

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) ............................................................................................. 9

7

8

*Bd. of Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*,
    518 U.S. 668 (1996) .......................................................................................... 12

9

10

*CAIR Found. v. Desantis*,
    No. 25-cv-516, 2026 WL 613468 (N.D. Fla. Mar. 4, 2026) ............................. 11

11

*Hartman v. Moore*,
    547 U.S. 250 (2006) .......................................................................................... 12

12

13

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ............................................................................................... 9

14

15

*Houston Cmty. Coll. Sys. v. Wilson*,
    595 U.S. 468 (2022) ....................................................................................... 9, 10

16

17

*Jenner & Block LLP v. U.S. Dep't of Just.*,
    784 F. Supp. 3d 76 (D.D.C. 2025) ...................................................................... 9

18

*Lee v. Garland*,
    120 F.4th 880 (D.C. Cir. 2024) ......................................................................... 12

19

20

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) .................................................................................. 5, 7, 10

21

22

*NAACP v. Button*,
    371 U.S. 415 (1963) ........................................................................................... 9

23

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024) ....................................................................................... 9, 12

24

25

*NetChoice, LLC v. Bonta*,
    152 F.4th 1002 (9th Cir. 2025) ........................................................................... 7

26

27

*Okwedy v. Molinari*,
    333 F.3d 339 (2d Cir. 2003) ............................................................................. 11

28

*Rosado v. Bondi*,
No. 26-cv-1532 (N.D. Ill. Feb. 11, 2026) ................................................................. 11

*Susman Godfrey LLP v. Exec. Off. of President*,
789 F. Supp. 3d 15 (D.D.C. 2025) ............................................................................ 11

*Texas v. Johnson*,
491 U.S. 397 (1989) ........................................................................................ 12, 13, 14

*W. Virginia State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ........................................................................................ 8, 12, 13

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*,
784 F. Supp. 3d 127 (D.D.C. 2025) ........................................................................ 9, 10

*X Corp. v. Bonta*,
116 F.4th 888 (9th Cir. 2024) ................................................................................... 8, 9

*X.AI LLC v. Bonta*,
No. 25-cv-12295, 2026 WL 626926 (C.D. Cal. Mar. 4, 2026) .................................... 7

STATUTES

10 U.S.C. § 3252 ............................................................................................................. 3

OTHER AUTHORITIES

Annie Bang & Ryan Gallagher, *Pentagon Feud with Anthropic Shines Light on AI's Role in Mass Surveillance*, Bloomberg (Mar. 5, 2026) ..................................... 15

*Autonomous Weapons Systems and International Humanitarian Law: Selected Issues*, International Committee of the Red Cross (Dec. 2025) ..................................... 13

Bennett Cyphers, *How the Federal Government Buys Our Cell Phone Location Data*, EFF (June 13, 2022) ......................................................................................... 14

*Claude's new constitution*, Anthropic (Jan. 22, 2026),
https://www.anthropic.com/news/claude-new-constitution ..................................... 3, 6

Cora Currier, Justin Elliott, and Theodoric Meyer, *Mass Surveillance in America: A Timeline of Loosening Laws and Practices*, ProPublica (June 7, 2013) ............... 14

Elizabeth Stoycheff, *Under Surveillance: Examining Facebook's Spiral of Silence Effects in the Wake of NSA Internet Monitoring*, 93 Journalism & Mass Commc'n Q. 296 (2016) ...................................................................................... 14

Gilad Abiri, *Public Constitutional AI*, 59 GA. L. REV. 601, 660 (2025) ........................ 7

Greg Lukianoff, *The Pentagon's Anthropic ultimatum and the case for the 'separation of power and truth*,' The Eternally Radical Idea (Mar. 3, 2026) ........................ 4

*Introducing Claude*, Anthropic (Mar. 14, 2023) ............................................................................ 3

Jennifer Valentino-Devries and Siobhan Gorman, *What You Need to Know on New
    Details of NSA Spying*, Wall Street Journal (Aug. 20, 2013) .................................... 14

Jonathon W. Penney, *Chilling Effects: Repression, Conformity, and Power in the
    Digital Age* (2025) ...................................................................................................... 14

*Letter from Kristi Noem, Sec'y of Homeland Security, to Maureen Martin,
    Harvard Univ.* (May 22, 2025) .................................................................................. 11

Letter from national security, business, civil society, and technology leaders to
    Senate and House Armed Services Committee leadership (Mar. 5, 2026) ............................. 13

President Donald J. Trump, Truth Social (Feb. 26, 2026) ...................................... 10, 13

S. Select Comm. to Study Governmental Operations with Respect to Intelligence
    Activities, *Book II: Intelligence Activities and the Rights of Americans*, S. Rep.
    No. 94-755 (1976) ...................................................................................................... 14

Secretary of War Pete Hegseth, X (Feb. 27, 2026) .................................... 3, 4, 7, 10, 12

Seymour Hersh, *Huge C.I.A. Operation Reported in U.S. Against Antiwar Forces,
    Other Dissidents in Nixon Years*, N.Y. Times (Dec. 21, 1974) ................................ 14

Simon Lerman, et al., *Large-Scale Online Deanonymization with LLMs* (Feb. 18,
    2026) ........................................................................................................................ 15

Statement from Dario Amodei on our discussions with the Department of War,
    Anthropic (Feb. 26, 2026) .................................................................................. 3, 4, 8, 9

*Tracing the thoughts of a large language model*, Anthropic (Mar. 27, 2025) ........................... 5, 6

Under Secretary of War Emil Michael, X (Feb. 26, 2026) .......................................... 10

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici* form an ideologically diverse set of advocates, thought leaders, and practitioners who offer a valuable perspective about the grave threats to freedom of speech at stake in this action.

The **Foundation for Individual Rights and Expression (FIRE)** is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended these rights nationwide in cases implicating these freedoms, without regard to speakers' political views. Through litigation and advocacy, FIRE works to protect expressive rights in the digital realm. It frequently participates as an *amicus curiae* in litigation presenting First Amendment concerns.

The **Electronic Frontier Foundation (EFF)** is a non-profit public interest organization that works to ensure new technology enhances, rather than erodes, civil liberties. With tens of thousands of dues-paying members, EFF has advocated for thirty-five years in favor of user rights and protections. EFF has participated, either directly or as amicus, in litigation to ensure our nation's surveillance programs operate in accordance with federal law and the Constitution.

The **Cato Institute** is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to help restore the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, and produces the annual Cato Supreme Court Review.

**Chamber of Progress** is a tech-industry coalition devoted to a progressive society, economy, workforce, and consumer climate. It seeks to protect internet freedom and free speech, promote innovation and economic growth, and empower technology customers and users. As an advocate for preserving free online speech, Chamber of Progress opposes governmental attempts to force or restrict access to speech.[1]

---

[1] A list of Chamber of Progress partners is available at Partners (2026), https://progresschamber.org/partners/.

BRIEF OF *AMICI CURIAE*
CASE NO. 3:26:cv-01996

The **First Amendment Lawyers Association (FALA)** is a nonprofit organization comprised of attorneys across the United States with a shared commitment to preserving and advancing the rights guaranteed by the First Amendment. Since its founding in the 1960s, FALA has actively participated in cases concerning free expression, freedom of the press, and restrictions on speech in public spaces. FALA members are often on the front lines of First Amendment litigation, and the organization frequently appears as *amicus* to protect against government encroachment on constitutional expression.

**INTRODUCTION**

The Pentagon designated Anthropic a supply chain risk because the Pentagon believes that Anthropic is insufficiently "patriotic" and "fundamentally incompatible with American principles."[2] The reason? Anthropic refused to remove safeguards from its artificial intelligence tools to help the Pentagon develop fully autonomous weapons or conduct mass domestic surveillance. Anthropic believes "deeply in the existential importance of using AI to defend the United States and other democracies," but it also believes there are "[s]ome uses" that are "simply outside the bounds of what today's technology can safely and reliably do."[3] Consistent with that viewpoint, Anthropic designed Claude, its "next-generation AI assistant,"[4] to embrace a broad set of values and safeguards—in Anthropic's words, "Claude's Constitution."[5] Anthropic also created and adopted a Usage Policy and a government-specific addendum to it. That policy, which applied to Anthropic's dealings with the Pentagon, does not permit Claude to support fully autonomous weapons or mass domestic surveillance.[6]

But the Pentagon recently changed its mind. It demanded that Anthropic allow its technology to be used for *any* purportedly "lawful purpose," which the Pentagon evidently believes includes fully autonomous weapons and mass domestic surveillance. When Anthropic refused to change Claude's safeguards to let slip the dogs of war without limitation, the Pentagon designated Anthropic a "supply chain risk" in an unprecedented attempt to strangle an *American* company for its supposed threat to national security interests. *See* 10 U.S.C. § 3252. This potentially ruinous sanction threatens not only Anthropic's business but also that of its partners and customers. If left in place, that sanction imposes a culture of coercion, complicity, and silence, in which the public

---

[2] Secretary of War Pete Hegseth, X (Feb. 27, 2026) ("Secretary of War Pete Hegseth, X"), https://x.com/SecWar/status/2027507717469049070.

[3] Statement from Dario Amodei on our discussions with the Department of War, Anthropic (Feb. 26, 2026) ("Statement from Dario Amodei"), https://www.anthropic.com/news/statement-department-of-war.

[4] *Introducing Claude*, Anthropic (Mar. 14, 2023), https://www.anthropic.com/news/introducing-claude.

[5] *See Claude's new constitution*, Anthropic (Jan. 22, 2026), https://www.anthropic.com/news/claude-new-constitution.

[6] Statement from Dario Amodei.

understands that the government will use any means at its disposal to punish those who dare to disagree.

The Pentagon's temper tantrum is a textbook violation of Anthropic's First Amendment rights. Humans at Anthropic created its Usage Policy and its government-specific addendum. And Claude is fundamentally expressive. It is a "system that talks, explains, summarizes, argues, and refuses—a system that sits in the middle of human inquiry."[7] The Pentagon's demand that Anthropic remove safeguards on that system—to *change* what Claude must and may say, analyze, and refuse—asks Anthropic to make a trade on a core freedom of expression. In sum, Anthropic must change its point of view and espouse its agreement with Department of Defense policy if it wants to contract with the government and avoid the supply chain risk designation that threatens its business, including its ability to contract and engage expressively with third parties. Anthropic must agree both to refrain from speaking and to utter compelled speech: e.g., by acceding to the government's demand to remove any safeguards—chosen *by humans*—that would restrict how the Pentagon can use Claude, and to change Claude's permitted outputs in response to the Pentagon's requests.

The Pentagon admits its sanction is retaliation for Anthropic's speech and an effort to threaten or coerce it into compliance, an independent violation of the First Amendment. The Secretary of Defense and other government officials involved in the designation have not even tried to hide that they are trying to put Anthropic out of business merely for its dissent, not for any actual supply chain risk. (Indeed, as Anthropic pointed out, why would the Pentagon so desperately try to do business with a "security risk"?)[8] The officials have shamelessly bragged that the purpose of sanctioning Anthropic is to punish Anthropic for its "ideolog[y]" and to make room for more "patriotic" businesses.[9] The First Amendment does not allow the government to put someone out of business because he or she does not pass the governing party's ideological litmus test. "On the

---

[7] *See* Greg Lukianoff, *The Pentagon's Anthropic ultimatum and the case for the 'separation of power and truth*,' The Eternally Radical Idea (Mar. 3, 2026), https://eternallyradicalidea.com/p/the-pentagons-anthropic-ultimatum.

[8] Statement from Dario Amodei.

[9] Secretary of War Pete Hegseth, X.

BRIEF OF *AMICI CURIAE*
CASE NO. 3:26-cv-01996

spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Moody v. NetChoice, LLC*, 603 U.S. 707, 741–42 (2024).

This Court must enjoin the Pentagon's actions. Permitting the government to dictate Anthropic's speech would violate the First Amendment, chill Anthropic's and other businesses' rights, and stifle the marketplace of ideas about AI's transformative power, how to harness it responsibly, and the potential privacy and civil-liberty risks associated with its use by the national security apparatus.

## ARGUMENT

**I.      The Pentagon's treatment of Anthropic violates the First Amendment.**

The Pentagon's designation of Anthropic as a supply chain risk violates the First Amendment in two independent ways. First, Anthropic's choices about Claude's output are expressive and receive First Amendment protection. The Pentagon has no justification—beyond mere policy disagreement—for its demand that Anthropic *change* its safeguards to enable Claude to process data in a particular way or provide certain analyses or output. Second, by designating Anthropic a supply chain risk, the Pentagon is openly and shamelessly retaliating against Anthropic for Anthropic's protected speech.

> **A.      Anthropic's design choices, including the safeguards for Claude, are protected by the First Amendment.**

Claude is fundamentally expressive. It is a "large language model" that takes in tremendous amounts of data and engages in a pattern of "reasoning" to respond to user prompts.[10] It can deliver a range of outputs, including providing written responses to questions and generating structured databases. Everything it does—from responding to requests, to processing data, to helping the user work through tasks—involves this back-and-forth exchange of expression and ideas.

Humans—developers at Anthropic—created Claude. They developed the "detailed Usage Policy to address the unique risks of AI, encourage safe and responsible uses of its models, and

---

[10] *See Tracing the thoughts of a large language model*, Anthropic (Mar. 27, 2025), https://www.anthropic.com/research/tracing-thoughts-language-model.

prohibit a wide range of behaviors contrary to [Anthropic's] mission and values." Anthropic Compl. ¶ 66. Anthropic designed the AI system and identified data to "train" the model.[11] Anthropic is *especially* careful about how its model is trained; for example, a document Anthropic calls "Claude's Constitution" governs Claude's systems and training.[12] That document, which Anthropic amends from time to time, is "a crucial part of [Anthropic's] model training process, and its content directly shapes Claude's behavior."[13] For example, in response to undersigned counsel's question whether "there any tasks that you won't perform due to safety concerns," Claude's Opus 4.6 model responded that it will not "[c]reat[e] malware, exploits, or malicious code — even for stated educational purposes," "[p]rovid[e] detailed instructions for making weapons (especially chemical, biological, nuclear, or explosive)," "[g]enerat[e] content that sexualizes or could be used to harm minors," or "[h]elp[] with surveillance, stalking, or targeting individuals." Claude also said that "[w]ith health topics, [it's] careful not to encourage self-destructive behaviors and [wi]ll flag when someone should talk to a professional." The morals and values that Anthropic programmers attempt to instill in Claude reflect Anthropic's officers' and employees' expressive choices.

For the government, Anthropic created a bespoke product: "Claude Gov," a variation of Claude that is subject to an "addendum to the Usage Policy." *See* Anthropic Compl. ¶¶ 70–71. While Claude Gov "recognize[s] the government's unique needs and capabilities" and accordingly allows some governmental applications that "would not be permitted" for civilians, many of Claude's Constitution's restrictions and values still apply to Claude Gov: Claude "has not been trained or tested" to "deploy lethal autonomous warfare," for example. *Id*. ¶¶ 71, 76. And Anthropic is unwilling to allow Claude Gov to be deployed for "mass surveillance of Americans." *Id.* ¶ 77. In sum, Claude Gov also draws on Anthropic's fundamental values with some tweaks and accommodations to support governmental uses.

Anthropic's decisions about Claude's and Claude Gov's safeguards reflect Anthropic's beliefs and expressive choices. This conclusion is nothing new; it is well-established that the speech

---

[11] *Id*.

[12] *See Claude's new constitution*, Anthropic (Jan. 22, 2026).

[13] *Id*.

and expressive choices of businesses, including those operating online "platforms," plainly "receive the First Amendment's protection." *Moody*, 603 U.S. at 728–29. The Supreme Court has been clear that "whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles of the First Amendment do not vary." *Id.* at 733 (citing *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011)). The government may not "forc[e]" a person or business—no matter the means of its expression—to "present views it wished to spurn," control its "expressive choices," or require it to associate with speakers and "messages it would prefer to exclude." *Id.* at 731–33. The government therefore can no more force AI models to operate absent safeguards and/or answer questions that the model's creator would prefer it not to than it could force newspapers to print or censor articles on specified topics. *Id.* at 743. Although emerging technologies can sometimes present complicated applications of these principles, that is not the case here: *everything* that Claude does is speech-driven, so *all* of its interactions with its users implicate these First Amendment protections.

That Claude's users interact with what appears to be an autonomous AI model does not change the analysis. Claude works only because Anthropic instills it with a set of "human editorial directions," which are inherently expressive and receive First Amendment protection—indeed, its algorithmic responses are "not unlike traditional media curated by human editors." *See NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1014 (9th Cir. 2025); *see also X.AI LLC v. Bonta*, No. 25-cv-12295, 2026 WL 626926, at *5–6 (C.D. Cal. Mar. 4, 2026) (applying First Amendment scrutiny to the claims of an AI company); Gilad Abiri, *Public Constitutional AI*, 59 GA. L. REV. 601, 660 (2025) ("[R]equiring AI companies to train their models on a specific set of constitutional principles and precedents could be viewed as a form of compelled speech."). If those human inputs change, so too do Claude's outputs.

When the Pentagon demands that Claude embrace "patriotic" values, what it really means is that Anthropic must jettison at least some of Claude's guiding principles—its Usage Policy—to produce outcomes of the Pentagon's choosing.[14] For example, if the Pentagon wanted Claude to

---

[14] Secretary of War Pete Hegseth, X (Feb. 27, 2026).

autonomously plan and carry out missile strikes in military operations, absent technical safeguards and contractual constraints on use in fully autonomous weapons,[15] the Pentagon hypothetically could task Claude to ingest relevant intelligence collected by the U.S. national security apparatus, identify targets that will advance the administration's military aims—whatever those may be—determine which weapons system(s) will be most effective to strike the targets, and remotely initiate such strikes, all without human intervention in the process. Anthropic has made it clear that in its view, "frontier AI systems are simply not reliable enough to power fully autonomous weapons," and that employing Claude in such a way would "put[] America's warfighters and civilians at risk," to say nothing of those who are targeted. Despite the obvious risks, the severity of the consequences, and Anthropic's ethical concerns, the government believes it nonetheless is entitled to either bully the company into removing its safeguards or cripple its ability to do business.

The Pentagon may wish that Claude would answer every question the Pentagon deems "patriotic" or give the most purportedly "patriotic" answer to every question, but it cannot *compel* Anthropic to make Claude do so. As an even simpler example, imagine that a user at the Pentagon asks Claude, "is it patriotic to oppose the war in Iran?" Must Claude answer, "no, it is important that we all support the war," in order to remain in the Pentagon's good graces? These examples make clear what the Pentagon requires of Anthropic: provide an unrestricted version of Claude that advances the Pentagon's policies and that does not object to the administration's policy views. The First Amendment cannot support such a demand.

Requiring Claude to express ideas that Anthropic does not wish to express is classic compelled speech, which lies in the heartland of First Amendment's prohibitions. *See W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943) (the government may not "compel" a person "to utter what is not in his mind"); *see also X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024) (The "First Amendment's guarantee of freedom of speech" generally prohibits government-mandated "compelled speech."). In addition, the Pentagon would require Anthropic to silence itself—for instance, to eliminate the safeguard that might prevent a request to monitor social media

---

[15] Statement from Dario Amodei.

for comments critical of the government and use other available data to unmask commenters who post anonymously. *See X Corp.*, 116 F.4th at 900 (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796–97 (1988) (First Amendment also prohibits "compelled silence"). Moreover, by designating Anthropic as a supply chain risk, and imposing the consequences that designation carries, the government is punishing Anthropic for its beliefs—for instance, its stated viewpoint that "AI can undermine, rather than defend, democratic values" if not used responsibly.[16] The Pentagon evidently does not agree with that sentiment, but the Constitution protects Anthropic's expression of these principles through Claude just the same. *See NAACP v. Button*, 371 U.S. 415, 444–45 (1963).

The Pentagon's speech-silencing, speech-altering, and speech-compelling demands simply cannot pass constitutional muster. National security does not justify an exception to strict scrutiny, which applies here. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) (refusing to apply lesser scrutiny to content-based speech-restrictive laws merely because their goal was to advance national security); Anthropic Compl. ¶¶ 153–54. "The First Amendment forbids that sort of speech manipulation by the government, even in an arguably national security-related setting." *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 103 (D.D.C. 2025); *see also Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 148 (D.D.C. 2025).

**B.    The government's actions are transparently retaliatory and coercive.**

It is textbook First Amendment law that: *first*, "government officials" may not "subject[] individuals to 'retaliatory actions' … for having engaged in protected speech," *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)); and *second*, the government may not use a "threat of invoking legal sanctions and other means of coercion ... to achieve the suppression" of future disfavored speech, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 70 (1963); *see also Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 185 (2024). The Pentagon here did both.

---

[16] Statement from Dario Amodei.

*First*, "[a] plaintiff pursuing a First Amendment retaliation claim must show … that the government took an 'adverse action' in response to his speech [or protected conduct] that 'would not have been taken absent the retaliatory motive.'" *Wilson*, 595 U.S. at 477 (quoting *Nieves*, 587 U.S. at 399). As discussed above, *see* pp.5–9, Anthropic's choices about Claude's permitted responses, including the outputs it creates (or does not create) in response to user input, are "unquestionably protected conduct under the First Amendment." *Wilmer*, 784 F. Supp. 3d at 150; *see Moody*, 603 U.S. at 728–29. And the Pentagon's decision to punish Anthropic for its refusal to deploy Claude to match the Pentagon's policy preferences constitutes retaliation "on its face." *Wilmer*, 784 F. Supp. 3d at 151.

This Court need not guess at the government's retaliatory motives because the Pentagon has already announced them. In Secretary Hegseth's announcement of his "final" decision designating Anthropic as a supply chain risk, he chided Anthropic for purportedly failing to create an AI model that is sufficiently "patriotic."[17] He criticized Anthropic's "ideological whims," its policy of "effective altruism," its supposed "virtue signaling," and ultimately its "stance" on Claude's design as "fundamentally incompatible with American principles."[18] And he made clear that these criticisms were all based on Anthropic's Usage Policy for Claude. In response, he announced the Department's intent to "transition to a … more patriotic service."[19] Under Secretary of Defense Emil Michael supported the decision by claiming that Anthropic's CEO "is a liar and has a God-complex."[20] President Trump endorsed Secretary Hegseth's decision and labeled Anthropic "RADICAL," "WOKE," and "Leftwing nut jobs."[21]

---

[17] Secretary of War Pete Hegseth, X.

[18] *Id.*

[19] *Id.*

[20] Under Secretary of War Emil Michael, X (Feb. 26, 2026), https://x.com/USWREMichael/status/2027211708201058578.

[21] President Donald J. Trump, Truth Social (Feb. 26, 2026), https://truthsocial.com/@realDonaldTrump/posts/116144552969293195.

Until recently, it was rare for government leaders to so openly and proudly boast about retaliating against someone for their protected speech. Now it is commonplace.[22] Evidently only those who agree to be complicit in this administration's assertion of unfettered power are safe. The rest—the "left," the "woke," and anyone unwilling to toe the party line[23]—are "virtually shunn[ed] … as persona non grata." *Susman Godfrey LLP v. Exec. Off. of President*, 789 F. Supp. 3d 15, 50 (D.D.C. 2025); *cf. CAIR Found. v. Desantis*, No. 25-cv-516, 2026 WL 613468, at *1 (N.D. Fla. Mar. 4, 2026) (observing "the troubling trend of using an executive office to make a political statement at the expense of others' constitutional rights").

*Second* and relatedly, the Pentagon's retaliation against Anthropic will surely silence future speech from those who fear the government attempting to harm their business or extinguish it entirely. *See Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (government's "retaliatory action" violates First Amendment where it is "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again"). The government's actions send the unmistakable message to the entire business community, if not the entire nation, that it "would be wise to dissociate from" Anthropic as well. *CAIR Found.*, 2026 WL 613468, at *4 (cleaned up). Anthropic, other AI providers, and anyone who interacts with this administration reasonably would believe that not complying with the government's demands will lead to "punishment" for "fail[ing] to accede to [an] official's request." *Okwedy v. Molinari*, 333 F.3d 339, 342 (2d Cir. 2003).

By the administration's own admission, it is using its tremendous coercive power to promote what it views as "patriotic" and punish what it views as "incompatible with American

---

[22] As one example, the government has engaged openly in a campaign of retaliation against the creators of an application that reports public sightings of Immigration and Customs Enforcement officers *and* the news organizations that merely cover the application. *See* Compl., *Rosado v. Bondi*, No. 26-cv-1532 (N.D. Ill. Feb. 11, 2026), ECF No. 1. The administration has also engaged in a similar retaliatory campaign against Harvard University, imposing on it as many sanctions as possible with the *stated goal* of "warning [] all universities"—public and private—that they must change their policies in order to remain in the administration's good graces. *See Letter from Kristi Noem, Sec'y of Homeland Security, to Maureen Martin, Harvard Univ.* (May 22, 2025), available at Secretary Kristi Noem (@Sec_Noem), X (May 22, 2025, 2:01 PM), https://x.com/Sec_Noem /status/1925612991703052733.

[23] *Id.*

principles"[24] to force Anthropic to alter its expressive position and its speech. But "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty" has that power. *Barnette*, 319 U.S. at 642. And here too, it does not matter that the Pentagon claims a national security rationale. In the "nature and posture in th[is] specific case," the Court can easily conclude, without undermining national security, that Secretary Hegseth's supply chain risk determination is a sham aimed at punishing a private company for a policy disagreement about responsible and ethical uses of AI tools. *See Lee v. Garland*, 120 F.4th 880, 891 (D.C. Cir. 2024).[25] As Anthropic observed, the Pentagon would never try so hard to contract with an actual "security risk." Labeling Anthropic a supply chain risk to put it out of business is akin to "killing a person by cutting off his oxygen supply rather than shooting him," and the "only remedy is an injunction against the [government's] violating [the company's] First Amendment rights." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231, 238–39 (7th Cir. 2015).

## II.    Vindicating Anthropic's First Amendment rights will protect all Americans.

To state a fundamental truth that the current administration seems not to understand: In a free society, "patriotism" is not measured by one's willingness to be blindly obedient to those in power. Dissent and good-faith debate about matters of critical societal importance are as American as apple pie. The First Amendment guarantees that "concepts virtually sacred to our Nation as a whole" do not "go unquestioned in the marketplace of ideas." *Texas v. Johnson*, 491 U.S. 397, 418 (1989). Our society thrives because of the "joust of principles protected by the First Amendment."

---

[24] Secretary of War Pete Hegseth, X (Feb. 27, 2026).

[25] Anthropic is especially likely to overcome government's asserted national security objections because it focuses its challenge on the Pentagon's supply chain-risk determination rather than the Pentagon's choice to terminate the parties' direct contractual relationship. *See* Anthropic Compl. ¶ 152. But although the Pentagon arguably has more leeway to determine whether to contract with a business, even that decision is highly suspect because of its obvious retaliatory motive. In the retaliation context, "[s]ome official actions adverse to ... a speaker might well be unexceptionable if taken on other grounds" but become unlawful when "retaliation is … the but-for cause of the official action." *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *see Vullo*, 602 U.S. at 203 (Jackson, J., concurring) ("Vullo's alleged conduct, if not done for retaliatory reasons, might otherwise be legitimate[.]"). And this contract termination also raises serious concerns under the unconstitutional conditions doctrine, as "the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech' even if he has no entitlement to that benefit." *Bd. of Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 674 (1996) (citation omitted).

*Id.*; *see also Barnette*, 319 U.S. at 637 ("To enforce those rights today is not to choose weak government over strong government. It is only to adhere as a means of strength to individual freedom of mind in preference to officially disciplined uniformity for which history indicates a disappointing and disastrous end.").

Robust debate is especially important when government policy will have profound societal consequences. And this case implicates at least two areas of extraordinary consequence: *first*, the rapid evolution and transformational impact of AI; and *second*, the immense powers of our government's national security apparatus. The lines Anthropic seeks to draw in its arrangement with the Pentagon and the ideas that Anthropic aims to contribute to the marketplace more broadly are hardly "radical" or "selfish."[26] Rather, Anthropic's concerns about Claude being used for mass domestic surveillance and fully autonomous weapons are well-founded given the history of government mass surveillance efforts[27] and the myriad risks associated with lethal autonomous weapons.[28]

To protect this marketplace of ideas, the government must not be permitted to punish people merely because it deems them or their conduct "unpatriotic." *See Johnson*, 491 U.S. at 418 ("To say that the government has an interest in encouraging proper treatment of the flag, however, is not to say that it may criminally punish a person for burning a flag as a means of political protest."). The chilling effects of the government's unconstitutional retaliation against Anthropic, if allowed to stand, will extend far beyond this case. Others will alter their expressive activity to conform and avoid scrutiny. Those holding or seeking government contracts will learn that they should always adhere to the party line, even if that means being complicit in potentially unlawful or unethical conduct. Other businesses and even ordinary citizens may feel compelled to publicly *embrace* administration policy to which they object to avoid being branded by the government as

---

[26] President Donald J. Trump, Truth Social (Feb. 26, 2026).

[27] *See* Section III, *infra*.

[28] *See, e.g.*, Letter from national security, business, civil society, and technology leaders to Senate and House Armed Services Committee leadership (Mar. 5, 2026), https://perma.cc/6M33-M2Y9; *Autonomous Weapons Systems and International Humanitarian Law: Selected Issues*, International Committee of the Red Cross (Dec. 2025), https://perma.cc/X3T3-TTL5.

"RADICAL" or "WOKE" and harassed or punished accordingly.[29] And yet others may decide not to engage with the government or speak publicly at all in order to minimize the risk of catching the administration's ire. Such coerced ideological uniformity is both flatly unconstitutional and ultimately self-defeating. The "conviction that our toleration of criticism … is a sign and source of our strength" is a value that sustains our Republic. *Johnson*, 491 U.S. at 419.

### III.    Use of AI for domestic surveillance raises independent First Amendment concerns.

*Amici* share Anthropic's concerns underlying its Usage Policy that "AI-driven mass surveillance presents serious, novel risks to our fundamental liberties" and that law has not "caught up with the rapidly growing capabilities of AI."[30] The privacy and civil liberties risks associated with evolving government surveillance capabilities—especially those used with questionable legal authority—are not a new concern. [31] Government monitoring of American citizens' communications with inadequate oversight is a recurring theme in this country's history.[32] And social science research shows the chilling effects of these activities.[33]

Artificial intelligence only exacerbates the risks of weaponized domestic surveillance. The government acquires vast troves of personal information from commercial entities, including

---

[29] President Donald J. Trump, Truth Social (Feb. 26, 2026).

[30] Statement from Dario Amodei.

[31] *See, e.g.*, Seymour Hersh, *Huge C.I.A. Operation Reported in U.S. Against Antiwar Forces, Other Dissidents in Nixon Years* at 1, N.Y. Times (Dec. 21, 1974), https://www.nytimes.com/1974/12/22/archives/huge-cia-operation-reported-in-u-s-against-antiwar-forces-other.html; S. Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, *Book II: Intelligence Activities and the Rights of Americans*, S. Rep. No. 94-755, at 12 (1976) (concluding that "surveillance … was also often conducted by illegal or improper means"), https://perma.cc/54FE-26TQ; Jennifer Valentino-Devries and Siobhan Gorman, *What You Need to Know on New Details of NSA Spying*, Wall Street Journal (Aug. 20, 2013), https://www.wsj.com/articles/SB10001424127887324108204579025222244858490;    Bennett Cyphers, *How the Federal Government Buys Our Cell Phone Location Data*, EFF (June 13, 2022), https://perma.cc/2GMA-MBPG.

[32] *See generally* Cora Currier, Justin Elliott, and Theodoric Meyer, *Mass Surveillance in America: A Timeline of Loosening Laws and Practices*, ProPublica (June 7, 2013), https://projects.propublica.org/graphics/surveillance-timeline.

[33] *See, e.g.*, Jonathon W. Penney, *Chilling Effects: Repression, Conformity, and Power in the Digital Age* at 99 (2025); Elizabeth Stoycheff, *Under Surveillance: Examining Facebook's Spiral of Silence Effects in the Wake of NSA Internet Monitoring*, 93 Journalism & Mass Commc'n Q. 296, 307 (2016).

individuals' physical location, social media, and web browsing data.[34] Powerful large language models (LLMs) can quickly analyze these massive datasets and draw inferences from a constellation of scattered datapoints to construct a comprehensive picture of an individual's private life, including their political affiliations, religious beliefs, personal communications, medical conditions, and sexual activities. For example, an agency could use an LLM to infer an individual's association with a particular mosque based upon frequent visits to the mosque's website, engagement with the mosque's social media posts, and their cell phone's physical proximity to the mosque during religious services. LLMs are also capable of deanonymizing online speech by using public information to infer the real identities of people using anonymous online accounts.[35] With the help of an LLM, the government can do this on massive scale, well beyond what was imaginable even a few years ago.

It is easy to conceive how an agency, a government employee with improper intent, or a malicious third party that finds a vulnerability, could exploit these capabilities to monitor public discourse, preemptively squelch dissent, or cause myriad other harms. Against this background and absent meaningful changes to the governing national security laws and judicial oversight structure, it is entirely reasonable for Anthropic—or any other company—to insist on its own guardrails regarding how the government uses its tools to surveil Americans.

## CONCLUSION

It is the government's actions here, not Anthropic's, that are radical. This Court should enjoin the Pentagon's unconstitutional and retaliatory designation of Anthropic as a supply chain risk as promptly as possible.

---

[34] *See, e.g.*, Annie Bang & Ryan Gallagher, *Pentagon Feud with Anthropic Shines Light on AI's Role in Mass Surveillance*, Bloomberg (Mar. 5, 2026), https://www.bloomberg.com/news/articles/2026-03-05/pentagon-feud-with-anthropic-shines-light-on-mass-surveillance.

[35] Simon Lerman, et al., *Large-Scale Online Deanonymization with LLMs* (Feb. 18, 2026), https://arxiv.org/html/2602.16800v1.

DATED:  March 9, 2026

Respectfully submitted,

*/s/ Addison W. Bennett*

PERKINS COIE LLP
Sopen B. Shah (Wisconsin Bar No. 1105013)*
33 East Main Street, Suite 201
Madison, WI 53703
Telephone: 608.663.7460
SShah@perkinscoie.com

Addison W. Bennett (SBN 333567)
2525 East Camelback Road, Suite 500
Phoenix, AZ 85016
Telephone: 602.351.8000
ABennett@perkinscoie.com

Sarah Grant* (Washington Bar No. 63879)
1301 Second Avenue, Suite 4200
Seattle, WA 98101
Telephone: 206.359.8000
SarahGrant@perkinscoie.com

*Counsel for* Amici Curiae

*Application for admission *pro hac vice*
forthcoming

BRIEF OF *AMICI CURIAE*
CASE NO. 3:26:cv-01996