1  CROWELL & MORING LLP
   Warrington S. Parker III (SBN 148003)
2    WParker@crowell.com
   3 Embarcadero Center
3  26th Floor
   San Francisco, CA 94111
4  Telephone: 415.986.2800
   Facsimile: 415.986.2827
5
   CROWELL & MORING LLP
6  Sharmistha Das (*pro hac vice* forthcoming)
     SDas@crowell.com
7  Matthew F. Ferraro (SBN 296622)
     MFerraro@crowell.com
8  Alexandra Barbee-Garrett (*pro hac vice* forthcoming)
     ABarbee-Garrett@crowell.com
9  Stephanie Crawford (*pro hac vice* forthcoming)
     SCrawford@crowell.com
10
   1001 Pennsylvania Avenue, NW
11 Washington, DC 20004
   Telephone: 202.624.2500
12 Facsimile: 202.628.5116

13 Attorneys for *Amici Curiae*
   Industry Trade Associations

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ANTHROPIC PBC,<br><br>  Plaintiff,<br><br>  v.<br><br>U.S. DEPARTMENT OF WAR, et al.,<br><br>  Defendants. | Case No. 3:26-cv-01996-RFL<br><br>**BRIEF OF *AMICI CURIAE* INDUSTRY TRADE ASSOCIATIONS IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date:   March 24, 2026<br>Time:   1:30 PM<br>Ctrm.:  Courtroom 15 - 18th Floor<br>Judge:  Hon. Rita F. Lin<br><br>Date Action Filed: March 9, 2026 |

## **TABLE OF CONTENTS**

**Page**

IDENTITY AND INTEREST OF *AMICI CURIAE* ........................................................................ 1

INTRODUCTION ........................................................................................................................... 3

SUMMARY OF ARGUMENT ....................................................................................................... 5

ARGUMENT ................................................................................................................................... 6

    I.     The Administration's Failure to Use Established Process Threatens the Foundations of Federal Technology Procurement. .................................................... 6

    II.    The Ambiguity and Internal Contradictions of the Administration's Actions Harm the Entire Technology Community. ................................................. 8

    III.   The Administration's Actions Threaten *Amici*'s First Amendment Rights. ............. 9

CONCLUSION .............................................................................................................................. 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*National Rifle Association of America v. Vullo*,
　602 U.S. 175 (2024) (Jackson, J., concurring) .................................................................. 10

**Statutes**

10 U.S.C. § 3252 ............................................................................................................................ 4

41 U.S.C. §§ 1321–1328 ................................................................................................................ 2

41 U.S.C. § 4713 ............................................................................................................................ 4

**Other Authorities**

48 C.F.R. § 9.402(b) ...................................................................................................................... 7

*Acronis AG FASCSA Exclusion Order*, Dep't of Def. (Mar. 10, 2026),
　https://sam.gov/exclusion/05a1c5a1-3c2f-4238-9823-511b84faa499/view ............................... 2

*Acronis AG FASCSA Exclusion Order*, Off. Dir. Nat'l Intel. (July 11, 2025),
　https://sam.gov/exclusion/189befb2-b60a-4f2a-b519-2fdaedcf4577/view ................................ 2

*Acronis SCS Inc FASCSA Exclusion Order*, Dep't of Def. (Mar. 10, 2026),
　https://sam.gov/exclusion/3952a973-fb68-431a-9cf7-dc9f0b98117e/view ................................ 2

*Advancing Artificial Intelligence Education for American Youth*,
　Exec. Order No. 14277, 90 Fed. Reg. 17519 (Apr. 23, 2025) ..................................................... 3

*Ensuring a National Policy Framework for Artificial Intelligence*,
　Exec. Order No. 14365, 90 Fed. Reg. 58499 (Dec. 11, 2025) ..................................................... 3

Letter from Software & Information Industry Association, TechNet, Computer &
　Communications Industry Association, and Business Software Alliance to The Hon. Donald J.
　Trump, President of the United States (Mar. 4, 2026), https://www.technet.org/wp-
　content/uploads/2026/03/Letter-to-the-President-March-4-2026.pdf .......................................... 6

Mark Ashby et al., *Defense Acquisition in Russia and China*, RAND Corp. (2021),
　https://www.rand.org/content/dam/rand/pubs/research_reports/RRA100/RRA113-
　1/RAND_RRA113-1.pdf .............................................................................................................. 3

Mem. from Dep't of War Chief Info. Off. to Senior Pentagon Leadership et al., *Removal of
　Anthropic, PBC Products in DoW Systems*, Dep't War (Mar. 6, 2026),
　https://www.cbsnews.com/news/pentagon-ai-anthropic-memo-remove-from-key-systems/ ...... 9

President Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 27, 2026, 3:47 PM),
 https://truthsocial.com/@realDonaldTrump/posts/116144552969293195 ................................... 4

*Promoting the Export of the American AI Technology Stack*,
 Exec. Order No. 14320, 90 Fed. Reg. 35393 (July 23, 2025) ........................................................ 3

*Removing Barriers to American Leadership in Artificial Intelligence*,
 Exec. Order No. 14179, 90 Fed. Reg. 8741 (Jan. 23, 2025) .......................................................... 3

Secretary Pete Hegseth (@SecWar), X (Feb. 27, 2026, 5:14 PM),
 https://x.com/SecWar/status/2027507717469049070 ................................................................... 4

CROWELL
& MORING LLP
ATTORNEYS AT LAW

# IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

TechNet is a national, bipartisan network of technology CEOs and senior executives that promotes the growth of the innovation economy by advocating for a federal and state policy agenda across the country. TechNet's diverse membership includes more than 100 dynamic American companies ranging from startups to the world's most iconic companies, representing more than five million employees and countless customers.[2] TechNet advances public policies that foster innovation and competition, which ensure that the United States remains the world's technology innovation leader.

The Software & Information Industry Association ("SIIA") is the principal trade association for those in the business of information. SIIA's membership includes nearly 400 software companies, platforms, data and analytics firms, developers of artificial intelligence ("AI") models and applications, cloud services companies, and digital publishers that serve nearly every segment of society, including business, education, government, healthcare, and consumers. SIIA is dedicated to creating a healthy environment for the creation, dissemination, and productive use of information.[3]

The Computer & Communications Industry Association ("CCIA") is an international, not-for-profit association that represents a broad cross-section of communications, technology, and Internet industry firms that collectively employ more than 1.6 million workers, invest more than $100 billion in research and development, and contribute trillions of dollars in productivity to the global economy.[4] For more than 50 years, CCIA has promoted open markets, open systems, and open networks, including as a party to or *amicus* in litigation.

The Information Technology Industry Council ("ITI") is the premier global advocate for technology, representing the world's most innovative companies, including those that are driving American leadership in AI. ITI promotes public policies and industry standards that advance

---

[1] No party or counsel for a party authored this brief in whole or in part, and no one other than *Amici*, their members, or their counsel funded the preparation or submission of this brief.

[2] TechNet, Members, https://www.technet.org/our-story/members/ (last visited Mar. 13, 2026).

[3] SIIA, Members, https://www.siia.net/membership/ (last visited Mar. 13, 2026).

[4] CCIA, Members, https://ccianet.org/about/members/ (last visited Mar. 13, 2026).

competition and innovation worldwide. ITI's membership and staff provide policymakers with the broadest perspective and thought leadership from technology, hardware, software, services, and related industries.[5]

*Amici* industry trade associations submit this brief because the government actions that Anthropic PBC ("Anthropic") challenges in this lawsuit carry immediate and concrete consequences for *amici*'s members and for the legal framework on which the entire government contracting community depends. Many of *amici*'s members contract with the U.S. government, including the Department of War ("DoW"),[6] to provide mission-critical digital products and services, including AI technology. In the run-up to this litigation, *amici* urged DoW to resolve its disagreements with Anthropic through established procurement channels and to work through the Federal Acquisition Security Council ("FASC") to consider whether the company presents a legitimate supply-chain risk.[7] *Amici* believe the designation of a major domestic AI firm, without a thorough and sound risk profile assessment as required by the law, as a supply-chain risk engenders uncertainty throughout the broader industry, because treating an American technology company as a foreign adversary, rather than an asset, has a chilling effect on U.S. innovation and further emboldens China's efforts to export its own government-backed AI technology. *Amici* urge DoW to use existing statutory and procurement processes to resolve its dispute with Anthropic. *Amici* respectfully request that this Court grant a preliminary injunction to consider the issues and afford the parties that opportunity.

---

[5] ITI, Membership, https://www.itic.org/about/membership (last visited Mar. 13, 2026).

[6] The U.S. Department of War is the secondary name for the U.S. Department of Defense.

[7] FASC is an interagency body established by the Federal Acquisition Supply Chain Security Act of 2018, 41 U.S.C. §§ 1321–1328, 4713. Its membership includes representatives from the Office of Management and Budget, the General Services Administration, the Department of Homeland Security, the Office of the Director of National Intelligence, the Department of Justice, and other agencies. The FASC is charged with evaluating supply chain threats to federal information systems and recommending exclusion or removal orders when genuine risks are identified. Since its establishment, only three exclusion orders associated with one company (and its affiliate) have resulted from FASC processes. *Acronis AG FASCSA Exclusion Order*, Off. Dir. Nat'l Intel. (July 11, 2025), https://sam.gov/exclusion/189befb2-b60a-4f2a-b519-2fdaedcf4577/view; *Acronis AG FASCSA Exclusion Order*, Dep't of Def. (Mar. 10, 2026), https://sam.gov/exclusion/05a1c5a1-3c2f-4238-9823-511b84faa499/view; *Acronis SCS Inc FASCSA Exclusion Order*, Dep't of Def. (Mar. 10, 2026), https://sam.gov/exclusion/3952a973-fb68-431a-9cf7-dc9f0b98117e/view.

# INTRODUCTION

*Amici*'s concern is plain: if, as the result of a contractual disagreement, the federal government can instantly blacklist a U.S. company from government work on the pretext that the company poses a security risk, then the procurement framework that Congress built over decades becomes contingent on political favor rather than the rule of law. A system in which agencies may bypass governing statutes and regulations at presidential or secretarial command is not the system Congress designed, nor the one this Court should endorse.

Congress' comprehensive statutory procurement framework is the product of considered legislative judgment.[8] Competitive bidding and the rule of law are the mechanisms by which the government harnesses the innovation of private industry. Indeed, they are what distinguishes American procurement from the command-and-control models of our adversaries.[9] And they are what gives companies like *amici*'s members the confidence to invest the resources, obtain the security clearances, and build the partnerships necessary to serve the national defense.

The government's own stated policy depends on this architecture. The government has rightly championed global adoption of U.S.-developed AI systems as a national priority. To that end, President Trump has issued multiple Executive Orders prioritizing American AI dominance.[10] That vision is premised on the availability of a competitive market and innovative domestic technology sector that is incentivized to do business with the government on stable, legally grounded business terms.

The Administration's actions in this case imperil those policy priorities. Following a contract dispute between DoW and Anthropic, President Trump posted on social media on

---

[8] This framework includes the Federal Property and Administrative Services Act ("FPASA"), the Competition in Contracting Act of 1984 ("CICA"), the Contract Disputes Act ("CDA"), the Office of Federal Procurement Policy Act ("OFPPA"), and a series of narrowly drawn supply chain statutes, under which the executive promulgated the Federal Acquisition Regulation ("FAR") and the Defense Federal Acquisition Regulation Supplement ("DFARS").

[9] Mark Ashby et al., *Defense Acquisition in Russia and China*, RAND Corp. (2021), https://www.rand.org/content/dam/rand/pubs/research_reports/RRA100/RRA113-1/RAND_RRA113-1.pdf.

[10] *See, e.g.*, *Removing Barriers to American Leadership in Artificial Intelligence*, Exec. Order No. 14179, 90 Fed. Reg. 8741 (Jan. 23, 2025); *Advancing Artificial Intelligence Education for American Youth*, Exec. Order No. 14277, 90 Fed. Reg. 17519 (Apr. 23, 2025); *Promoting the Export of the American AI Technology Stack*, Exec. Order No. 14320, 90 Fed. Reg. 35393 (July 23, 2025); *Ensuring a National Policy Framework for Artificial Intelligence*, Exec. Order No. 14365, 90 Fed. Reg. 58499 (Dec. 11, 2025).

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-3-

BRIEF OF AMICI CURIAE
INDUSTRY TRADE ASSOCIATIONS
CASE NO. 3:26-CV-01996-RFL

February 27, 2026, that, because Anthropic wanted DoW to adhere to Anthropic's Terms of Service, he was "directing EVERY Federal Agency in the United States Government to IMMEDIATELY CEASE all use of Anthropic's technology" ("Presidential Directive").[11] Roughly 90 minutes later, Secretary of War Pete Hegseth announced on social media that he was directing DoW "to designate Anthropic a Supply-Chain Risk to National Security," and, "[e]ffective immediately, no contractor, supplier, or partner that does business with the United States military may conduct any commercial activity with Anthropic" ("Secretarial Order").[12] Six days later, the Pentagon delivered two formal determinations to Anthropic, invoking two statutes rarely or never used before to designate an American company a supply-chain risk to national security, 10 U.S.C. § 3252 and 41 U.S.C. § 4713 (the Federal Acquisition Supply Chain Security Act ("FASCSA")). In this lawsuit, Anthropic specifically challenges the Determination under 10 U.S.C. § 3252. *See* ECF No. 1-3 at 2-3.

When the Administration issued the Presidential Directive, the Secretarial Order, and the Determinations, DoW had not completed any of the statutory procedural requirements. The consequences have been swift: contracts terminated, partnerships frozen, compliance workflows thrown into disarray, and a compliance crisis imposed on companies that may not be able to identify the requirements they must meet, let alone identify whether work product assisted by Anthropic's Claude has been incorporated into their offerings. The Determinations have sent a ripple of uncertainty throughout the broader industry that risks undermining the credibility of the U.S. AI sector and the Administration's own national and economic security objectives.

*Amici* do not appear before this Court to defend Anthropic's contract positions, to second-guess DoW's requirements, or to opine on the merits of any particular AI safety restriction. DoW may contract with providers on whatever terms it prefers and procure services from companies willing to meet those terms. But it must do so within the framework Congress built and within its statutory and constitutional authority. The question this case presents is whether the executive

---

[11] President Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 27, 2026, 3:47 PM), https://truthsocial.com/@realDonaldTrump/posts/116144552969293195.

[12] Secretary Pete Hegseth (@SecWar), X (Feb. 27, 2026, 5:14 PM), https://x.com/SecWar/status/2027507717469049070.

CROWELL & MORING LLP
ATTORNEYS AT LAW

BRIEF OF AMICI CURIAE
INDUSTRY TRADE ASSOCIATIONS
CASE NO. 3:26-CV-01996-RFL

may discard that framework when a contractor declines to renegotiate the terms of an existing agreement. Under settled law, the answer is no.

## SUMMARY OF ARGUMENT

*Amici* request that the Court enjoin the Determination under 10 U.S.C. § 3252 on three principal grounds. *First*, the Presidential Directive, the Secretarial Order, and the Determinations threaten the entire enterprise of federal procurement from the technology industry by disregarding the carefully constructed legal structure that *amici*'s companies rely upon to make sensible business and investment choices. If an executive branch agency may convert a contract dispute into a supply-chain risk designation, then the legal procurement framework protects no one. The rule of law in government contracting becomes contingent on political favor, and the innovative members of the domestic technology sector on which the nation's defense and economic security depend will rationally recalculate whether government work is worth the risk.

*Second*, to this day, the reach and effect of the government's actions are so unclear that they are causing immediate and substantial harm to the technology industry. In the face of government action that did not comply with the law's procedural requirements and rested on internally contradictory rationales, hundreds if not thousands of companies are trying to parse the meaning of social media posts, inconsistent and shifting Administration statements, and vague directions, issued under almost never-invoked statutes.

*Third*, the conduct in question raises serious concerns that DoW has violated Anthropic's First Amendment rights, including compelling the company to alter its expressive product and retaliating against the company for its perceived viewpoint. These, too, underscore that the Determination exceeds DoW's statutory and constitutional authority. *Amici*'s companies also have an interest in preserving their rights to constitutionally protected speech.

**ARGUMENT**

**I. The Administration's Failure to Use Established Process Threatens the Foundations of Federal Technology Procurement.**

The federal government's ability to access the world's most advanced commercial technology depends on a procurement system that offers private companies stable rules, predictable terms, and the assurance that disputes will be resolved through established channels. That procurement system is the product of decades of bipartisan judgment that competition and procedural regularity are not meaningless bureaucratic formalities but essential preconditions for government procurements that serve the American people and incentivize private industry to invest the enormous resources required to serve the national defense. *See, e.g.*, *supra* n.8 (citing statutory and regulatory authorities governing federal procurement). As several *amici* wrote to the President, "[e]xisting federal procurement processes create that landscape," enabling "the government to identify the right solutions and resolve disputes in a way that incentivizes private innovation and competition" while "preventing a single point of failure in our national defense infrastructure[.]"[13] Maintaining that competitive edge "requires a policy environment that encourages, rather than restricts, the growth of multiple American AI leaders."[14]

The federal procurement framework that Congress built over decades accordingly reflects a considered judgment about how a democratic government should acquire the commercial technology it needs to defend the nation. For *amici*'s members, like all government contractors, that framework rests on competitive bidding, procedural regularity, and mutual trust between the government and the private sector, and *amici*'s members depend on those due process protections to make business decisions. Before the government may exclude a company from federal contracting, whether through debarment, suspension, or supply-chain risk designation, the law requires procedural safeguards: notice of the factual basis for the action, an opportunity to respond, and a written determination grounded in law and fact. These protections are embedded

---

[13] Letter from Software & Information Industry Association, TechNet, Computer & Communications Industry Association, and Business Software Alliance to The Hon. Donald J. Trump, President of the United States at 2 (Mar. 4, 2026), https://www.technet.org/wp-content/uploads/2026/03/Letter-to-the-President-March-4-2026.pdf.
[14] *Id.*

in federal acquisition regulations, which expressly provide that debarment may "*not*" be used "for purposes of punishment." 48 C.F.R. § 9.402(b) (emphasis added). They are also embedded in 10 U.S.C. § 3252, which requires written determinations, consultation with procurement officials, and congressional notification before any covered procurement action may be taken.

Moreover, one of America's greatest competitive advantages over a centralized adversary like China is its decentralized, competitive market—a diverse landscape of domestic and global providers, each with different architectural strengths, competing to deliver the best solutions at the best price. The framework of mutual trust established by law is what allows the United States to draw on the extraordinary innovative capacity of its technology industry—an advantage that our adversaries, with their centralized and state-directed models, cannot replicate. It is what prevents a single point of failure in our national defense infrastructure.

The Determination's designation of Anthropic as a supply-chain risk upends that framework. Anthropic invested in obtaining the federal government's highest unclassified cloud security certification, FedRAMP High authorization, and a Top-Secret facility clearance and personnel clearances issued by the Defense Counterintelligence and Security Agency to embed its engineers in classified programs. Companies do not make these compliance and security investments on the strength of political goodwill. They choose to pursue federal government business in reliance on the federal government abiding by the framework of rights, obligations, and procedures required by law. If upheld, the Determination would break those commitments by applying to a domestic company the supply-chain risk label that Congress designed to protect the United States from foreign adversaries that may sabotage national security systems or critical infrastructure. *See, e.g.*, ECF No. 54-1 at 3-8 (brief of *amicus curiae* Alan Z. Rozenshtein). But, as a consequence of a disagreement over a contract's terms and without following the process that Congress set out, DoW has introduced a new and unbounded risk into every company's calculus about whether to do business with the federal government. In doing so, the government risks chilling domestic innovation and ceding ground to China's state-directed AI enterprise at the precise moment American leadership matters most.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-7-

BRIEF OF AMICI CURIAE
INDUSTRY TRADE ASSOCIATIONS
CASE NO. 3:26-CV-01996-RFL

The government did not follow the process required by the statutes or the Constitution upon which the American technology sector depends. No factual findings were provided to Anthropic. No opportunity to respond was afforded before the restrictions imposed by the Determination took effect. And, although the Secretarial Order was announced on social media on February 27, the formal notification letter—offering no reasoned analysis—did not reach Anthropic until March 4.

The Administration's failure to use the established process matters not only to Anthropic but also to every company in the federal contracting ecosystem. A supply-chain risk designation carries profound commercial consequences: it excludes the designated company from government contracts, compels contractors throughout the supply chain to evaluate whether their continued commercial relationships with the company are permissible, and brands the company with a label that Congress reserved for entities posing a risk of foreign adversary sabotage. If a supply-chain risk designation can be imposed on an American company that holds a security clearance without adhering to the procedural protections Congress required, those protections are a dead letter. The due process guarantee ceases to function as a meaningful constraint, and no company doing business with the government is safe from the same treatment.

## II. The Ambiguity and Internal Contradictions of the Administration's Actions Harm the Entire Technology Community.

The practical impact on *amici*'s members is already substantial. Anthropic's primary offering, Claude, is not a standalone product that can be cleanly excised from the technology stack—the collection of infrastructure, operations, and data used to create technology applications, products, and services for customers. It is used to write code incorporated into different applications at all levels of the supply chain. Many companies will be unable to remove Claude or even identify whether code has been written with Claude once it is incorporated into their offerings. Other companies use Claude to test the security and capability of existing products and services, including testing for compliance with required government security standards for many of *amici*'s members' offerings.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-8-

BRIEF OF AMICI CURIAE
INDUSTRY TRADE ASSOCIATIONS
CASE NO. 3:26-CV-01996-RFL

The Secretarial Order's direction to cease "any commercial activity" with Anthropic puts at risk the compliance programs these companies have built at the government's direction. It adds to the Determination's disruption because the Secretarial Order announces a broader restriction than the Determination implements. *Amici*'s members are making real-time business decisions of enormous commercial consequence in the shadow of these undefined terms. Is the announced ban on "commercial activity" still coming down the pike, and does it encompass Claude-generated code already incorporated into an already-shipping product? Does a cloud platform that hosts Claude alongside dozens of other AI models qualify as a "partner that does business with the United States military" and, if so, is it prohibited from hosting Claude even for purely commercial customers with no defense connection? And while DoW gave itself a six-month transition period, it provided no comparable transition for the contractors, suppliers, and partners who must now decipher the Secretarial Order's reach and restructure their operations on an immediate basis, or whenever the Determinations are incorporated into their contracts.[15]

## III. The Administration's Actions Threaten *Amici*'s First Amendment Rights.

*Amici* note that the First Amendment concerns articulated by Anthropic and other *amici*, *see, e.g.*, ECF No. 27, reinforce the conclusion that the Administration's actions exceed DoW's authority and cannot stand. *Amici*'s members engage in a wide range of speech: through expressive products and services, algorithmic speech, competition for commercial and government business, government contracting, and terms of use. First, if the government's actions amount to compelling a contractor to alter the message embodied in an expressive product, like Claude, those actions raise serious compelled-speech concerns. Second, if the government retaliated against Anthropic based on the perceived viewpoint of the company and its leadership (and the public record contains extensive evidence that it did) that retaliation is constitutionally impermissible regardless of whether the government characterizes its actions as procurement decisions. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 203-04 (2024)

---

[15] *See* Mem. from Dep't of War Chief Info. Off. to Senior Pentagon Leadership et al., *Removal of Anthropic, PBC Products in DoW Systems* at 2, Dep't War (Mar. 6, 2026), https://www.cbsnews.com/news/pentagon-ai-anthropic-memo-remove-from-key-systems/.

(Jackson, J., concurring).  *Amici*'s members also have First Amendment rights that they wish to exercise, and have an absolute right to exercise, without the threat of unlawful governmental interference.

**CONCLUSION**

*Amici* respectfully urge the Court to grant Plaintiff's motion for a preliminary injunction. The government has ample, well-established tools to resolve procurement disputes and to contract with providers on whatever terms it prefers.  What it may not do is misuse extraordinary national security authorities designed for foreign adversary sabotage to punish a cleared American contractor for a negotiation disagreement, dispense with procedural protections Congress enacted, and upend the legal framework on which the entire technology contracting community depends. The Court should preserve the *status quo* while this matter is adjudicated.

Dated:  March 13, 2026　　　　　　　　　　　CROWELL & MORING LLP

By:  */s/ Warrington S. Parker III*
　　　Warrington S. Parker III
　　　　WParker@crowell.com
　　　3 Embarcadero Center, 26th Floor
　　　San Francisco, CA 94111
　　　Telephone:  415.986.2800
　　　Facsimile:   415.986.2827

CROWELL & MORING LLP
Sharmistha Das (*pro hac vice* forthcoming)
　SDas@crowell.com
Matthew F. Ferraro
　MFerraro@crowell.com
Alexandra Barbee-Garrett (*pro hac vice* forthcoming)
　ABarbee-Garrett@crowell.com
Stephanie Crawford (*pro hac vice* forthcoming)
　SCrawford@crowell.com
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  202.624.2500
Facsimile:   202.628.5116

Attorneys for *Amici Curiae*
Industry Trade Associations