Scott Kronland (SBN 171693)
Stacey M. Leyton (SBN 203827)
Connie K. Chan (SBN 284230)
Marisa C. Lowe (SBN 366248)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
Fax: (415) 362-8064
skronland@altber.com
sleyton@altber.com
cchan@altber.com
mlowe@altber.com

Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION
OF GOVERNMENT EMPLOYEES
80 F Street, NW
Washington, DC 20001
Tel: (202) 639-6426
Sanghr@afge.org

*Attorneys for Amicus Curiae American
Federation of Government Employees*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| ANTHROPIC PBC,<br><br>             Plaintiff,<br><br>    v.<br><br>U.S DEPARTMENT OF WAR, et al.,<br><br>             Defendants. | Case No. 3:26-cv-01996<br><br>**BRIEF OF *AMICUS CURIAE* AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br><br>Judge:    Hon. Rita F. Lin<br>Ctrm:     15, 18th Floor<br>Date:     March 24, 2026<br>Time:     1:30 P.M. |

1

**TABLE OF CONTENTS**

INTRODUCTION AND INTEREST OF AMICUS CURIAE ....................................................... - 1 -

ARGUMENT ............................................................................................................. - 2 -

    I.     This Administration Systematically Retaliates Against Political Dissenters and Opponents in Violation of the First Amendment. ................................................... - 2 -

    II.    Courts Should Not Allow the Government's Pretextual Invocation of "National Security" to Shield Unconstitutional Retaliation Against Protected Speech. ........ - 5 -

        A.     Courts must ensure the national security "label" is not abused. ............... - 5 -

        B.     The record establishes unconstitutional retaliatory motives. .................... - 9 -

        C.     The presumption of regularity should not apply. ..................................... - 10 -

    III.    Judicial Scrutiny Is Necessary to Preserve Critical Free Speech. ....................... - 14 -

CONCLUSION ......................................................................................................... - 15 -

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*Allen v. Iranon*,
    283 F.3d 1070 (9th Cir. 2002) ..............................................................................................3

5

*Allen v. Scribner*,
6   812 F.2d 426 (9th Cir.), *amended*, 828 F.2d 1445 (9th Cir. 1987) ...................................10

7

*Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*,
    __ F.Supp.3d __, 2026 WL 80796 (D.D.C. Jan. 11, 2026) ................................................5

8

*Am. Assoc. of Univ. Professors v. Trump*,
9   __F.Supp.3d__, 2025 WL 3187762 (N.D. Cal. Nov. 14, 2025) .........................................4

10

*Am. Assoc. of Univ. Profs. v. Rubio*,
11   802 F.Supp.3d 120 (D. Mass. 2025) ...............................................................................2, 4, 5

12

*Am. Fed'n of Gov't Emps., AFL-CIO v. Noem*,
13   785 F.Supp.3d 833 (W.D. Wash. 2025) ......................................................................3, 5, 8

14

*Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan*,
    870 F.2d 723 (D.C. Cir. 1989) ...........................................................................................11

15

*Am. Fed'n of Gov't Emps, AFL-CIO v. Trump*,
16   792 F.Supp.3d 985 (N.D. Cal. 2025) ...................................................................................3

17

*Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*,
    799 F.Supp.3d 967 (N.D. Cal. 2025) .................................................................................12

18

*Am. Fed'n of Gov't Emps. Loc. 2305 v. U.S. Dep't of Veterans Affs.*,
19   No. 1:25-cv-00583-MRD-PAS, ECF No. 30 (D.R.I. Mar. 13, 2026) .................................3

20

*Am. Foreign Serv. Ass'n v. Trump*,
21   783 F.Supp.3d 248 (D.D.C. 2025) .......................................................................................3

22

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
    824 F.3d 858 (9th Cir. 2016) ................................................................................................3

23

*Associated Press v. Budowich*,
24   780 F.Supp.3d 32 (D.D.C. 2025) .........................................................................................4

25

*Baker v. Carr*,
26   369 U.S. 186 (1962) ..............................................................................................................2

27

*Bd. of Govs. of Fed. Rsrv. Sys. v. United States (In re Grand Jury Subpoenas)*,
    No. 1:26-mc-00012-JEB, ECF No. 23 (D.D.C. Mar. 13, 2026) .......................................4

28

*Boumediene v. Bush*,
    553 U.S. 723 (2008) .................................................................................................... 7

*Chastleton Corp. v. Sinclair*,
    264 U.S. 543, 547-48 (1924) ...................................................................................... 2

*Cole v. Young*,
    351 U.S. 536 (1956) ............................................................................................. 6, 7, 8

*Conley v. United States*,
    5 F.4th 781 (7th Cir. 2021) ........................................................................................ 10

*Cruz v. Bondi*,
    146 F.4th 730 (9th Cir. 2015) ................................................................................... 10

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ........................................................................................... 9, 10, 11

*Fed. Educ. Ass'n v. Trump*,
    795 F.Supp.3d 74 (D.D.C. 2025), *stay denied pending appeal*, 2025 WL 2738626 (D.C. Cir. Sept. 25, 2025) ................................................................................................................. 3, 11

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006) .................................................................................................... 7

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004) (plurality opinion) ..................................................................... 7

*Hartman v. Moore*,
    547 U.S. 250 (2006) .................................................................................................... 9

*Holder v. Humanitarian L. Project*,
    561 U.S. 1 (2010) .................................................................................................... 7, 8

*Jenner & Block*,
    784 F Supp.3d at 102 .................................................................................................. 9

*Jenner & Block LLP v. U.S. Dep.*
    *t of Justice*, 784 F.Supp.3d 76, 93-99 (D.D.C. 2025) ............................................... 4

*Kelly v. Hegseth*,
    __F.Supp.3d __, 2026 WL 391777 (D.D.C. Feb. 12, 2026) ........................................ 4

*Korematsu v. United States*,
    323 U.S. 214 (1944) .................................................................................................... 6

*Marrazzo v. Kennedy Jr.*,
    Case No. 8:25-cv-04144 (D. Md.) .............................................................................. 4

*Media Matters for America v. Fed. Trade Comm'n*,
  805 F.Supp.3d 105 (D.D.C. 2025), *stay denied pending appeal*, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) ................................................................................................................. 4

*Mitchell v. Forsyth*,
  472 U.S. 511, 523 (1985)) ................................................................................................ 6

*N.Y. Times Co. v. United States*,
  403 U.S. 713 (1971) (Black, J. concurring) .................................................................... 7

*Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*,
  763 F.Supp.3d 36 (D.D.C. 2025) ................................................................................... 11

*Nat'l Treasury Emps. Union v. Vought*,
  774 F.Supp.3d 1 (D.D.C. 2025) ........................................................................... 3, 11, 12

*National Treasury Employees v. Trump*,
  780 F.Supp.3d 237 (D.D.C. 2025), *stay granted*, 2025 WL 1441563 (May 16, 2025) ............. 1, 3, 11

*O'Brien v. Welty*,
  818 F.3d 920 (9th Cir. 2016) ............................................................................... 2, 3, 10

*People's Mojahedin Org. of Iran v. U.S. Dep't of State*,
  182 F.3d 17 (D.C. Cir. 1999) ........................................................................................... 8

*Perkins Coie LLP v. U.S. Dep't of Just.*,
  783 F.Supp.3d 105 (D.D.C. 2025) .......................................................................... 4, 9, 12

*Pinard v. Clatskanie Sch. Dist. 6J*,
  467 F.3d 755, 770 (9th Cir. 2006)), ................................................................................. 2

*President & Fellows of Harvard Coll. v. HHS*,
  798 F.Supp.3d 77 (D. Mass. 2025) ............................................................................... 4, 5

*President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec.*,
  788 F.Supp.3d 182 (D. Mass. 2025) ............................................................................ 4, 12

*Ex parte Quirin*,
  317 U.S. 1 (1942) ............................................................................................................. 6

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
  758 F.3d 296 (D.C. Cir. 2014) ......................................................................................... 8

*Rattigan v. Holder*,
  689 F.3d 764 (D.C. Cir. 2012) ......................................................................................... 8

*In re Search of One Device and Two Individuals under Rule 41*,
  784 F.Supp.3d 234 (D.D.C. 2025) ................................................................................. 13

*Soranno's Gasco, Inc. v. Morgan*,
  874 F.2d 1310 (9th Cir. 1989) ....................................................................................... 10

*Susman Godfrey LLP v. Exec. Off. of President*,
   789 F.Supp.3d 15 (D.D.C. June 27, 2025) ............................................. 3, 5, 8, 9

*In the Matter of the Search of the Real Property and Premises of Hannah Natanson*,
   2026 WL 510727 (E.D. Va. Feb. 24, 2026) ....................................................... 13

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ....................................................................................... 6, 7, 10

*United States v. Chemical Found., Inc.*,
   272 U.S. 1 (1926) ................................................................................................. 10, 11

*United States v. Comey*,
   __ F.Supp.3d __, 2025 WL 3202693 (E.D. Va. Nov. 17, 2025) ..................... 13

*United States v. Gaffney*,
   2025 WL 2910986 (D.D.C. Oct. 14, 2025) ........................................................ 13

*United States v. Robel*,
   389 U.S. 258 (1967) ............................................................................................. 7

*United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*,
   407 U.S. 297 (1972) ............................................................................................. 5

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*,
   784 F.Supp.3d 127 (D.D.C. 2025), *amended sub nom. Wilmer Cutler Pickering Hale & Dorr LLP v.*
   *Exec. Off. of the President*, 2025 WL 2105262 (D.D.C. June 26, 2025) ......................................... 4, 9

*Zaid v. Exec. Off. of Pres.*,
   __F.Supp.3d__, 2025 WL 3724884 (D.D.C. Dec. 23, 2025) ........................ 5, 9

*Ziglar v. Abbassi*,
   582 U.S. 120 (2017) ............................................................................................. 6

**Statutes**

10 U.S.C. §§111-13 ....................................................................................................... 1

Defense Production Act .................................................................................................. 8

BRIEF OF AMICUS CURIAE AFGE                                        Case No. 3:26-cv-01996

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION AND INTEREST OF AMICUS CURIAE**

The American Federation of Government Employees ("AFGE") is the largest federal employee union in the United States, representing approximately 800,000 federal workers across more than 70 federal departments and agencies, including a substantial number employed by the Department of War.[1] AFGE has a direct and immediate interest in this case: the constitutional questions it presents are not abstract, but reflect a pattern of government conduct that AFGE itself has experienced.

Specifically, in March 2025, President Trump issued an executive order stripping collective bargaining rights from employees at numerous federal agencies, invoking a false national security pretext as the basis for doing so.  Exec. Order No. 14,251, 90 Fed. Reg. 14553 (Mar. 27, 2025).[2]  The executive order's accompanying fact sheet demonstrated that the President's actions were taken against AFGE for its protected activity, including because AFGE had filed substantial litigation (in this Court and others) challenging the administration's policies.  The fact sheet specifically targeted AFGE for "describ[ing] itself as 'fighting back' against Trump" and complained that the affected federal employee unions "have declared war on President Trump's agenda."[3]  The administration subsequently issued a further executive order in August 2025 targeting the U.S. Agency for Global Media after AFGE and allied unions publicly challenged efforts to dismantle that agency.  Exec. Order No. 14,343, 90 Fed. Reg. 42683 (Aug. 28, 2025).  AFGE thus has firsthand institutional knowledge of how the Trump administration is deploying pretextual national security designations in an effort to retaliate against protected First Amendment activity.

---

[1] While the parties refer to the agency as the Department of War and Pete Hegseth as Secretary of War, *amicus* notes that the statutory names are the Department of Defense and Secretary of Defense. *See* 10 U.S.C. §§111-13.

[2] The collective bargaining executive orders are presently the subjects of litigation in this Court, the District Court of the District of Columbia, the Ninth Circuit, and the D.C. Circuit.  The court in *National Treasury Employees v. Trump*, 780 F.Supp.3d 237, 259-60 (D.D.C. 2025), *stay granted*, 2025 WL 1441563 (May 16, 2025), pointed out that in order to invoke the national security justification, the Trump administration had implausibly characterized the "primary function" of agencies such as the Department of Treasury, Department of Energy, and Food and Drug Administration as "national security work."

[3] The White House, Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements, Mar. 27, 2025, https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/.  While the fact sheet did not identify AFGE by name, AFGE is "[t]he largest Federal union." *Id.*

As an organization dedicated to advocacy for its members and the American public they serve, AFGE has a concrete institutional interest in how courts evaluate First Amendment retaliation claims when the government invokes a purported national security justification, and a responsibility to ensure that the Court understands the broader implications of allowing retaliation against First Amendment activity to go unchecked.

AFGE also represents Department of War employees who are directly affected by the challenged action. The Secretary of War's supply chain risk designation does not only affect Anthropic, but threatens to disrupt artificial intelligence ("AI") systems integrated into ongoing military operations, with direct consequences for civilian defense workers whom AFGE represents.

## ARGUMENT

This case presents the latest chapter in the Trump administration's concerted campaign to wield the power of the executive branch against its purported enemies. It calls, once again, for the courts to serve as the "major bulwark" of our constitutional right to free speech against the government's retribution campaigns. *Am. Assoc. of Univ. Profs. v. Rubio*, 802 F.Supp.3d 120, 197-98 (D. Mass. 2025) ("*AAUP*"). The "Court is not at liberty to shut its eyes to an obvious mistake, when the validity of the law depends upon the truth of what is declared." *Baker v. Carr*, 369 U.S. 186, 214 (1962) (quoting *Chastleton Corp. v. Sinclair*, 264 U.S. 543, 547-48 (1924)). If courts permit the government to evade First Amendment scrutiny by simply invoking national security, the First Amendment's protections against retaliation will become meaningless and the government will have free rein to silence its critics as long as it can conceive of a pretextual justification.

### I.    This Administration Systematically Retaliates Against Political Dissenters and Opponents in Violation of the First Amendment.

The government's retaliatory actions against Anthropic must not be viewed in isolation. Anthropic is only the latest target in the Trump administration's long-running, concerted campaign to abuse the power of the executive branch to punish and suppress political dissent and opposition and coerce submission to the Trump administration's preferred views.

To establish that constitutionally protected activity "was a substantial or motivating factor in the defendant's conduct," *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016) (quoting *Pinard v. Clatskanie*

*Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006)), plaintiffs may present both direct and circumstantial evidence, including evidence that the "defendant's purported reasons for its conduct are pretextual or false," *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 870 (9th Cir. 2016). Such circumstantial evidence can include evidence of a "pattern of … retaliatory [conduct]." *Allen v. Iranon*, 283 F.3d 1070, 1079 (9th Cir. 2002).

    The Trump administration's well-documented pattern of retaliatory conduct against perceived adversaries and dissidents is strong additional evidence of Defendants' retaliatory motive against Anthropic and undercuts any suggestion that the government "would have taken the same action even in the absence of the protected conduct." *O'Brien*, 818 F.3d at 932. And further, it highlights the critical importance of the judicial role in protecting individual rights against governmental abuses.

    By some counts, the administration's unprecedented "campaign of retribution" has already targeted more than 470 individuals and institutions.[4] The administration's targets have included labor unions that filed lawsuits challenging the Trump administration's policies,[5] federal employees who criticized the government,[6] law firms that represented Trump's political adversaries,[7] universities that

---

[4] *See, e.g.*, Peter Eisler, Ned Parker, Linda So & Joseph Tanfani, *Trump's campaign of retribution: At least 470 targets and counting*, Reuters (Nov. 26, 2025), https://www.reuters.com/investigates/special-report/usa-trump-retribution-tracker/; Sam Levine, *'Who will stand up and oppose it?': Trump's relentless campaign of retribution in his second term*, The Guardian (Jan. 21, 2026), https://www.theguardian.com/us-news/2026/jan/21/trump-retribution-campaign (Trump has "pursued a campaign of retribution unlike any other president in US history," delivering on his campaign promise to "those who have been wronged and betrayed: I am your retribution").

[5] *See, e.g.*, *Am. Fed'n of Gov't Emps. Loc. 2305 v. U.S. Dep't of Veterans Affs.*, No. 1:25-cv-00583-MRD-PAS, ECF No. 30, at 12-19 (D.R.I. Mar. 13, 2026) (enjoining cancellation of VA employees' collective bargaining agreement upon finding AFGE likely to succeed on its First Amendment retaliation claim); *Am. Fed'n of Gov't Emps., AFL-CIO v. Noem*, 785 F.Supp.3d 833 (W.D. Wash. 2025) (same, as to TSA employees' collective bargaining agreements); *Am. Fed'n of Gov't Emps, AFL-CIO v. Trump*, 792 F.Supp.3d 985 (N.D. Cal. 2025) (First Amendment retaliation claim by federal employee union challenging Executive Order 4251, which excludes numerous agencies and subdivisions from longstanding collective bargaining requirements), *stayed*, 148 F.4th 648 (9th Cir. 2025), *vacated*, __F.4th__, 2026 WL 534591 (9th Cir. Feb. 26, 2026); *Am. Foreign Serv. Ass'n v. Trump*, 783 F.Supp.3d 248 (D.D.C. 2025), *stayed*, 2025 WL 1742853 (D.C. Cir. Jun. 20, 2025); *Nat'l Treasury Emps. Union*, 780 F.Supp.3d 237; *Fed. Educ. Ass'n v. Trump*, 795 F.Supp.3d 74 (D.D.C. 2025), *stay denied pending appeal*, 2025 WL 2738626 (D.C. Cir. Sept. 25, 2025).

[6] *See, e.g.*, Maxine Joselow, *FEMA suspends staff who signed a letter criticizing Trump*, N.Y. Times (Aug. 26, 2025), https://www.nytimes.com/2025/08/26/climate/fema-suspends-staff-who-criticized-trump-cuts.html; Kanishka Singh, *US EPA fires some employees who signed letter criticizing Trump administration*, Reuters (Aug. 29, 2025), https://www.reuters.com/legal/litigation/us-epa-fires-some-employees-who-signed-letter-criticizing-trump-administration-2025-08-29/.

[7] *See, e.g.*, *Susman Godfrey LLP v. Exec. Off. of President*, 789 F.Supp.3d 15, 41-48 (D.D.C. June 27,

---

BRIEF OF AMICUS CURIAE AFGE                                    Case No. 3:26-cv-01996

hosted viewpoints the administration deems too "left" or "woke,"[8] news outlets and media companies that hosted disfavored speech,[9] political opponents,[10] student activists,[11] and countless others who have had the courage to exercise their constitutionally protected rights and voice their disagreement with the current administration's policies and demands (or associate with those who do so). The government's punitive retaliation has taken wide-ranging forms, including actual and threatened revocation of collective bargaining rights,[12] firings and suspensions,[13] prosecutions and investigations,[14] termination

---

2025); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F.Supp.3d 127, 150-52 (D.D.C. 2025) ("*WilmerHale*"), *amended sub nom. Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 2025 WL 2105262 (D.D.C. June 26, 2025); *Jenner & Block LLP v. U.S. Dep.t of Justice*, 784 F.Supp.3d 76, 93-99 (D.D.C. 2025); *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F.Supp.3d 105, 150-65 (D.D.C. 2025).

[8] *See, e.g.*, *Am. Assoc. of Univ. Professors v. Trump*, __F.Supp.3d__, 2025 WL 3187762, at *14-15 (N.D. Cal. Nov. 14, 2025); *President & Fellows of Harvard Coll. v. HHS*, 798 F.Supp.3d 77, 117-23 (D. Mass. 2025); *President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec.*, 788 F.Supp.3d 182, 201-05 (D. Mass. 2025).

[9] *See, e.g.*, *Media Matters for America v. Fed. Trade Comm'n*, 805 F.Supp.3d 105, 111-12, 129-37 (D.D.C. 2025) (enjoining civil investigative demand issued to media watchdog organization likely in retaliation for publication of disfavored speech), *stay denied pending appeal*, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025); *Kimmel returns to air as President threatens legal action*, N.Y. Times (Oct. 9, 2025), https://www.nytimes.com/live/2025/09/23/us/trump-news; *see also, e.g.*, *Associated Press v. Budowich*, 780 F.Supp.3d 32, 39 (D.D.C. 2025) (enjoining public officials from barring Associated Press from press room after it continued to refer to the Gulf of Mexico as such on First Amendment retaliation grounds).

[10] *See, e.g.*, *Bd. of Govs. of Fed. Rsrv. Sys. v. United States (In re Grand Jury Subpoenas)*, No. 1:26-mc-00012-JEB, ECF No. 23, at 2 (D.D.C. Mar. 13, 2026) (finding that "the D.C. U.S. Attorney's Office has recently opened a criminal investigation into [Jerome] Powell" and issued subpoenas with the "purpose [] to harass and pressure Powell either to yield to the President or to resign and make way for a Fed Chair who will"); Joyce Vance, *Comey Indictment Shows Danger of Subservient Prosecutors*, Brennan Ctr. for Just. (Oct. 2, 2025), https://www.brennancenter.org/our-work/analysis-opinion/comey-indictment-shows-danger-subservient-prosecutors; Jonah E. Bromwich & Michael S. Schmidt, *Letitia James Case Shows Ruthlessness of Justice Dep't in Trump's Grip*, N.Y. Times (Oct. 24, 2025), https://www.nytimes.com/2025/10/24/nyregion/trump-james-shame-campaign.html.

[11] *See, e.g.*, *AAUP*, 802 F.Supp.3d at 135-72, 181-89, 197.

[12] *See, e.g.*, *supra* note 5.

[13] *See supra* note 6; *see also, e.g.*, *Marrazzo v. Kennedy Jr.*, Case No. 8:25-cv-04144 (D. Md.) (former National Institutes of Health director allegedly terminated in retaliation for raising objections to new NIH policies).

[14] *See supra* note 10; *see also, e.g.*, *Kelly v. Hegseth*, __F.Supp.3d __, 2026 WL 391777, at *8-11 (D.D.C. Feb. 12, 2026) (Senator Mark Kelly likely to succeed on First Amendment claim that Secretary Hegseth's censures and threats of criminal prosecution were in retaliation for voicing disfavored opinions on military action and policy).

of funding and government contracts,[15] revocation of security details and security clearances,[16] and other retaliatory and coercive sanctions and threats.

In many of these cases, as here, the Trump administration has invoked "national security" or some other facially legitimate and neutral government interest (such as enforcement of federal civil rights laws) as the purported justification for the challenged actions. But numerous courts have deemed the government's asserted justifications to be pretextual (or likely so) and have found the government's conduct to be retaliatory or likely so, in violation of the First Amendment. *See, e.g.*, *AFGE*, 785 F.Supp.3d at 859-60, 862-63; *Susman Godfrey*, 789 F.Supp.3d at 45-48; *Harvard*, 798 F.Supp.3d at 136 ("[A] review of the administrative record makes it difficult to conclude anything other than that Defendants used antisemitism as a smokescreen for a targeted, ideologically-motivated assault on this country's premier universities …."); *see infra* at 8-9. These courts have served as a critical bulwark against "[t]he President's palpable misunderstanding that the government simply cannot seek retribution for speech he disdains …." *AAUP*, 802 F.Supp.3d at 197.

## II. Courts Should Not Allow the Government's Pretextual Invocation of "National Security" to Shield Unconstitutional Retaliation Against Protected Speech.

### A. Courts must ensure the national security "label" is not abused.

The government's far-ranging and far-flung invocation of "national security" as justification to retaliate against labor unions, law firms, individuals, universities, and (now) AI companies that are unwilling to bend to its every demand presents precisely the "danger of abuse" about which the Supreme Court has long warned. *United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 314 (1972) (describing the concern that "the President, on his motion, could declare—name your favorite

---

[15] *See supra* notes 7, 8; *see also, e.g.*, *Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, __ F.Supp.3d __, 2026 WL 80796, *15-21 (D.D.C. Jan. 11, 2026) (professional organization for pediatric medicine likely to succeed on First Amendment claim that HHS terminated its grants in retaliation for organization's vaccine advocacy).

[16] *See supra* note 7; *see also, e.g.*, *Zaid v. Exec. Off. of Pres.*, __ F.Supp.3d __, 2025 WL 3724884, at *7-8 (D.D.C. Dec. 23, 2025) (attorney who previously represented whistleblowers against the federal government likely to succeed on First Amendment claim that government's revocation of his security clearance was retaliatory); Rebecca Rosman, *Trump revokes classified access for Joe Biden, Hillary Clinton and others*, NPR (Mar. 22, 2025), https://www.npr.org/2025/03/22/nx-s1-5337218/trump-revokes-security-clearances-biden-clinton; Eric Tucker, Aamer Madhani & Matthew Lee, *Trump administration revokes security clearances of 37 current and former government officials*, Associated Press (Aug. 19, 2025), https://apnews.com/article/trump-security-clearances-revoked-ad7f95a222ad9277452d2de995b70619.

poison—draft dodgers, Black Muslims, the Ku Klux Klan, or civil rights activists to be a clear and present danger to the structure or existence of the Government" (quoting 114 Cong. Rec. 14750)). "There are limitations, of course, on the power of the Executive under Article II of the Constitution and in the powers authorized by congressional enactments, even with respect to matters of national security .... And national-security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'" *Ziglar v. Abbasi,* 582 U.S. 120, 143 (2017) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 523 (1985)).

Given this potential for (and actual) abuse, courts must closely scrutinize the national security label. *See Ex parte Quirin*, 317 U.S. 1, 19 (1942) ("[T]he duty which rests on the courts, in time of war as well as in time of peace, [is] to preserve unimpaired the constitutional safeguards of civil liberty…."). The judicial branch is competent and indeed well positioned to employ the same type of inquiry that courts regularly adopt in order to test parties' claims, including by considering extrinsic evidence of motive, the over- or under-inclusivity of the scope of an action, and the evidence (or lack thereof) underlying the government's asserted justification. *See Cole v. Young*, 351 U.S. 536, 557 n.20 (1956) ("When the President expressly confines his action to the limits of statutory authority, the validity of the action must be determined solely by the congressional limitations which the President sought to respect ….").

Even in times of emergency and war, courts have recognized that they must perform their role of protecting fundamental rights rather than blindly defer to purported national security rationales. Indeed, in one of the most extreme national security deference cases, *Korematsu v. United States*, 323 U.S. 214 (1944)—now deemed "gravely wrong the day it was decided," *Trump v. Hawaii*, 585 U.S. 667, 710 (2018)—the Court did not abdicate review entirely, instead relying upon later-debunked "evidence of disloyalty" to support the government's national security rationale, *Korematsu*, 323 U.S. at 223.[17] During the post-9/11 era, as the country faced a period of heightened and difficult-to-ascertain security

---

[17] It has subsequently been revealed that in defending the internment order the Solicitor General failed to disclose to the courts, including the Supreme Court, "a key intelligence report that undermined the rationale behind the internment … despite warnings from Department of Justice attorneys that failing to alert the Court 'might approximate the suppression of evidence.'"  Neal Katyal, *Confession of Error: The Solicitor General's Mistakes During the Japanese-American Internment Cases* (Apr. 7, 2017), https://www.justice.gov/archives/opa/blog/confession-error-solicitor-generals-mistakes-during-japanese-american-internment-cases.

threats, the Supreme Court nonetheless carved out constitutional limits, making clear that deference to the government's national security judgments does not mean abdication of judicial review. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 509 (2004) (plurality opinion) ("We have long since made clear that a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens."); *Hamdan v. Rumsfeld*, 548 U.S. 557, 567 (2006); *Boumediene v. Bush*, 553 U.S. 723, 732–33 (2008).

And even in recent cases in which the Supreme Court has sided with the government, the Court has nonetheless reaffirmed that "[o]ur precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010). The Court has looked to whether the government has presented "persuasive evidence" that "adequately substantiate[s] their determination," *id.* at 36, "legitimate grounding in national security concerns," and "a legitimate national security interest," *Trump v. Hawaii*, 585 U.S. at 706, 708. Invocation of a national security rationale alone does not require courts to overlook or set to the side contradictory evidence.

This principle carries special force where, as here, national security is invoked to justify restrictions on First Amendment rights. "The word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment." *N.Y. Times Co. v. United States*, 403 U.S. 713, 719 (1971) (Black, J. concurring). As the Court in *United States v. Robel*, 389 U.S. 258, 264 (1967), explained:

> Yet, this concept of 'national defense' cannot be deemed an end in itself, justifying any exercise of [] power designed to promote such a goal. Implicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart. For almost two centuries, our country has taken singular pride in the democratic ideals enshrined in its Constitution, and the most cherished of those ideals have found expression in the First Amendment. It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties . . . which makes the defense of the Nation worthwhile.

Courts "do not defer to the Government's reading of the First Amendment, even when [national security and foreign relations] interests are at stake." *Holder*, 561 U.S. at 34.

The judiciary thus has an Article III duty to scrutinize the bases and boundaries of national security claims. In *Cole*, the Court considered the federal government's firing of an employee purportedly "in the interest of the national security of the United States." 351 U.S. at 538. The Court

first interpreted and defined the term "national security," and then found that the government failed to determine that the petitioner's position was affected by "national security" as defined, holding that the petitioner's removal was improper. *Id.* at 543. Similarly, in *Holder*, while acknowledging that the case "implicate[d] sensitive and weighty interests of national security and foreign affairs," the Court evaluated the record evidence, including affidavits of the executive branch's conclusions, the executive's "evaluation of the facts," and "specific findings" by Congress in upholding the material-support statutes for designated foreign terrorist organizations. 561 U.S. at 29, 33-34. Similarly, courts have refused to abdicate their judicial responsibility and have scrutinized due process concerns, constitutional claims, and compliance with statutory criteria even over the government's protests that national security renders its claims unreviewable. *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 313 (D.C. Cir. 2014) (holding that national security deference does not foreclose judicial review of a due process claim stemming from divestment orders pursuant to the Defense Production Act); *Rattigan v. Holder*, 689 F.3d 764, 770 (D.C. Cir. 2012) (holding that FBI employee's claim that officials retaliated against him for his discrimination complaints in violation of Title VII was reviewable, although the resulting security clearance investigation was not); *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 23-24 (D.C. Cir. 1999) (holding that the court could review certain statutory criteria for foreign terrorist organization designations while deferring on one national security assessment criterion).

District courts across the nation have applied these principles by giving serious judicial scrutiny to the Trump administration's national security invocations—in many cases, finding them hollow. In *AFGE v. Noem*, for example, the district court found "strong evidence" that Secretary Noem's decision to end collective bargaining and rescind existing collective bargaining agreement was "to punish AFGE and its members because AFGE has chosen to push back against the Trump Administration's attacks to federal employment in the courts," and that the government's "threadbare" assertion of a "national security" justification "exposes the retaliatory nature of the decision." 785 F.Supp.3d at 858-60, 862-63. In *Susman Godfrey*, the district court likewise found that the government "rest[ed its defense] only on a threadbare invocation of 'the national security and other interests of the United States'" and "offer[ed] no evidence to remotely support the idea that there is any interest (national-security-related or

otherwise)." 789 F.Supp.3d at 47.  Similarly, in *WilmerHale*, the court found that "[o]ther than a passing reference to WilmerHale's involvement in election and immigration litigation, the Order does not explain how WilmerHale's conduct has threatened national security ....  This is not a legitimate Government interest, and the Order's unsupported assertion of national security will not save it!"  784 F.Supp.3d at 157; *see also Jenner & Block*, 784 F Supp.3d at 102 ("The speech-based justification doesn't even feign at national security, nor do the defendants articulate a cogent argument that it does."). In *Perkins Coie LLP*, the district court found that the national security justifications for various provisions of the executive order were contradicted by the President's Truth Social posts and were neither "credible" nor "plausible."  783 F.Supp.3d at 158-59. The court in *Zaid* found the government's national security claims were "not credible or supported by the record," and instead found that the President's remarks, timing, and other retaliatory decisions proved that "Zaid's representation of whistleblowers and other clients adverse to the government was the sole reason for summarily revoking his security clearance." 2025 WL 3724884 (D.D.C. Dec. 23, 2025), at *8.

The same result follows here.  Where the government has provided no such "legitimate grounding" for its designation of Anthropic as a national security risk and, in fact, continues to use Anthropic's products and services after the designation, the national security label is exposed as precisely the kind of pretextual cover the courts have consistently refused to credit.  It does not preclude judicial review.  Rather, it invites it.

### B. The record establishes unconstitutional retaliatory motives.

The Court need not look beyond the face of the February 27 Presidential Directive and Secretarial Order to find the government's true unconstitutional, retaliatory motive: punishing Anthropic for its "Silicon Valley ideology," commitment to their Terms of Service, stated positions on mass domestic surveillance and fully autonomous weapons, and refusal to bend to the government's demands. ECF 1, Exs. 1-2.  The government has supplied its own "contemporaneous explanation" and "stated reasons"—and they are unconstitutional on their face.  *Dep't of Com. v. New York*, 588 U.S. 752, 780-81 (2019).  Protected expression and refusal to capitulate to government pressure are precisely the kind of motivating factors that establish a First Amendment retaliation claim.  *See Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[T]he law is settled that as a general matter the First Amendment prohibits

government officials from subjecting an individual to retaliatory actions ... for speaking out.").

Even if the government had expressly invoked *only* a national security rationale, the Court may "look behind the face" of an order to consider whether the policy is a result of unconstitutional grounds. *Trump v. Hawaii*, 585 U.S. at 704. And here the "story . . . does not match the explanation." *Dep't of Com.*, 588 U.S. at 784. The "disconnect between the decision made and the explanation given" is stark: among many reasons, the government provided no credible, reasoned national security explanation for Anthropic's designation as a supply-chain risk; Anthropic is not an "adversary" of the United States by any definition; the order covers contracts with all entities doing business with the U.S. military, not just national security settings; and the Department of War continues to use Anthropic's products and services after designating the company a national security risk—precisely the kind of internal inconsistency that exposes a stated rationale as pretextual and warrants searching inquiry. *See id.* at 785.[18]

### C. The presumption of regularity should not apply.

"[T]he presumption of regularity," which directs "courts [to] presume that [public officials] have properly discharged their official duties," *United States v. Chemical Found., Inc.*, 272 U.S. 1, 14-15 (1926)), is a "general working principle" that ordinarily applies when courts review the actions of public officials and agencies, *Cruz v. Bondi*, 146 F.4th 730, 739 (9th Cir. 2015). But that presumption has always been rebuttable in the face of "clear evidence to the contrary." *Chemical Foundation*, 272 U.S. at 14-15; *see also Conley v. United States*, 5 F.4th 781, 791 (7th Cir. 2021) (presumption is "an analytic tool," not a "rubberstamp"). And it is well established that courts may consider all record evidence of the motivations behind government actions. *Cruz*, 146 F.3d at 740. In particular, the Supreme Court has instructed that courts may "look behind the face" of challenged statements to evaluate whether the stated rationale is defensible. *Trump v. Hawaii*, 585 U.S. at 704. Thus, for example, in *Department of*

---

[18] The pretextual nature of Defendants' purported justifications also rebuts any argument that Defendants "would have taken the same action even in the absence of the protected conduct." *O'Brien*, 818 F.3d at 932. Even if the challenged actions were authorized by statute (which they were not, *see* ECF 6 at 15-19), the relevant question in a First Amendment retaliation claim is not whether Defendants "*could*" have taken the same adverse actions, but rather whether the defendants "*would* have reached the same decision in the absence of the protected conduct." *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1315 (9th Cir. 1989) (first emphasis in original; second emphasis added) (reversing summary judgment where there were triable issues of fact as to whether government's suspension of regulated entity's permit was due to plaintiff's exercise of First Amendment rights, notwithstanding assertion of government's authority to suspend permit); *see Allen v. Scribner*, 812 F.2d 426, 435 (9th Cir.), *amended*, 828 F.2d 1445 (9th Cir. 1987) (similar).

*Commerce*, the Supreme Court declined to "ignore the disconnect between the decision made and the explanation given" and advised that "deferential" review does not mean that courts should "exhibit a naiveté from which ordinary citizens are free." 588 U.S. at 785 (internal quotation omitted).

Anthropic has submitted "clear evidence" that contradicts the federal government's rationale—including, but not limited to, direct evidence of bad faith, circumstantial evidence of pretext, under-inclusiveness, and departure from normal procedures. *Chemical Found.*, 272 U.S. at 14-15; *see* ECF 6 at 12-19; *supra* at 10.

Moreover, while the Court need not reach this issue, this administration's consistent disregard of statutory and constitutional constraints, and repeated invocation of pretextual bases for retaliatory actions, should render the presumption of regularity no longer applicable as a general matter. For example, in a decision enjoining the executive order that stripped federal employees of representation, the district court observed that, although "[g]enerations of presidential administrations and public officials have validated this underlying premise … the President of the United States may have forfeited the right to such a presumption of regularity." *Fed. Educ. Ass'n*, 795 F.Supp.3d at 90-92.[19] The district court cited more than 25 circuit and district court decisions (as of August 2025) that held the Trump administration's "brazen" and "blatantly unconstitutional" actions, "hallucinat[ory]" statutory interpretation, "perfect lawlessness," procedural irregularities, and pretextual explanations rendered the continued presumption unsupportable. *Id.* at 90-91 (internal quotations omitted).

The conclusion that this administration has lost the presumption of regularity is far from an outlier. Less than two weeks after President Trump's 2025 inauguration, in rejecting the federal government's assertion that its rescission of an unlawful memorandum mooted the case, a court wrote that "Defendants' plea for a presumption of good faith rings hollow when their own actions contradict their representations." *Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*, 763 F.Supp.3d 36, 50 (D.D.C. 2025). Months later, the court that enjoined the Trump administration's numerous retaliatory acts (including its suspension of hundreds of millions of grant funds) against Harvard for its protected

---

[19] In 1989, the "familiar presumption of regularity" proved "decisive" in the D.C. Circuit's rejection of a challenge to a previous executive order removing collective bargaining rights form certain subdivisions of the U.S. Marshals Service. *Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989). In this more recent case, however, the district court found the presumption had been rebutted by the plaintiff's evidence. *Nat'l Treasury Emps. Union*, 780 F.Supp.3d at 254.

activities announced that "the Court will not apply any presumption of regularity to conduct that is so unusual and therefore irregular on its face." *Harvard*, 788 F.Supp.3d at 205.  At a hearing over the potential removal of Kilmar Abrego Garcia, another court told the federal government, "You have taken the presumption of regularity and you've destroyed it …."[20]  Decrying the federal government's misleading statements in declarations, another wrote, "the Court is left with little confidence that the defense can be trusted to tell the truth about anything." *Nat'l Treasury Emps. Union v. Vought*, 774 F.Supp.3d 1, 57 (D.D.C. 2025).[21]  And in the first case testing President Trump's executive order targeting a law firm, the court warned that the federal government's noncompliance with injunctive relief "raised some concern about the general presumption by courts 'that executive officials will act in good faith.'" *Perkins Coie*, 783 F.Supp.3d at 134 n.21.  In a case brought by AFGE challenging the mass termination of federal probationary employees—on the false pretextual ground of poor performance—this Court similarly acknowledged the presumption of regularity but called the federal government's administrative record "a sham" that "does not facilitate judicial review: It frustrates it." *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 799 F.Supp.3d 967, 979 (N.D. Cal. 2025).

Judicial skepticism about the regularity of official acts has extended to criminal cases, a context in which the government typically enjoys even greater deference.  In a recent decision denying the federal government's request to seal, the court rejected "[t]he government['s] conten[tion] that courts must be highly deferential to the government's determination that unsealing would impede its investigation," commenting:

> Blind deference to the government?  That is no longer a thing.  Trust that had been earned over generations has been lost in weeks.  Numerous career prosecutors have had to resign instead of taking actions that they believe violated their oath of office, or worse, were fired for upholding that oath.

---

[20] Alan Feuer & Minho Kim, *Judge Signals She Will Protect Abrego Garcia From Hasty Second Deportation*, N.Y. Times (July 11, 2025), https://www.nytimes.com/2025/07/11/us/politics/abrego-garcia-deportation-judge-protection-trump.html#:~:text=A%20frustrated%20federal%20judge%20signaled,month%20to%20face%20criminal%20charges.

[21] D.C. Circuit panels initially granted an emergency stay pending appeal, 2025 WL 1721068, and then vacated an injunction, 149 F.4th 762.  The D.C. Circuit then granted rehearing en banc, 2025 WL 3659406, vacating the panel's judgment pending rehearing.

25

*In re Search of One Device and Two Individuals under Rule 41*, 784 F.Supp.3d 234, 244 & n.10 (D.D.C. 2025).  As the same judge wrote in another case, "'the irregular is now the regular'" in "these . . . 'unprecedented' times" such that presumptions of regularity and good faith no longer apply.  *United States v. Gaffney*, 2025 WL 2910986, at *5 n.7 (D.D.C. Oct. 14, 2025) (citations omitted).  Granting in part a journalist's motion for return of her property that had been seized in a search, a magistrate judge denounced the federal government's failure to disclose governing authority when it sought the original search warrant, invoking the presumption of regularity but lamenting that "[t]he government's conduct has disturbed that baseline posture of deference."  *In the Matter of the Search of the Real Property and Premises of Hannah Natanson*, 2026 WL 510727, at *5-6 (E.D. Va. Feb. 24, 2026).  Even in the context of grand jury proceedings entitled to "a strong presumption of regularity," that presumption has been "call[ed] into question" by "unusual" and unexplained departures from regular procedures.  *United States v. Comey*, __ F.Supp.3d __, 2025 WL 3202693, at *3, *9 (E.D. Va. Nov. 17, 2025).

Indeed, a multi-author article published in fall 2025 collected over 150 cases illustrating courts' expressions of concern about or refusal to grant the presumption of regularity, reporting that such cases fell into three categories:

1. Courts' concerns over noncompliance with judicial orders (26 cases)
2. Courts' distrust of government information and representations (over 60 cases)
3. Courts' findings of "arbitrary and capricious" administrative action (68 cases)[.][22]

And since that article's last update in November 2025, courts have continued to express such skepticism and to comment on the administration's defiance of precedent, contravention of the obligation of candor and honesty, and unlawfulness.  *See supra* at 11-13.  Thus, even if the federal government were ordinarily entitled to the presumption of regularity, this is not an ordinary administration and that presumption should no longer be applied by this Court.

---

[22] Ryan Goodman, Siven Watt, Audrey Balliette, Margaret Lin, Michael Pusic, & Jeremy Venook, *The "Presumption of Regularity in Trump Administration Litigation*, Just Security (Nov. 20, 2025), https://www.justsecurity.org/120547/presumption-regularity-trump-administration-litigation/; *see also* Walter Olson, *Do the Feds Still Merit the Court's Presumption of Regularity?*, Cato at Liberty (Jan. 8, 2026), https://www.cato.org/blog/should-feds-today-benefit-presumption-regularity-court; Alan Z. Rozenshtein, *What Happens When Courts Can't Trust the Executive Branch?*, Lawfare (Apr. 10, 2025), https://www.lawfaremedia.org/article/what-happens-when-courts-can-t-trust-the-executive-branch.

### III.    Judicial Scrutiny Is Necessary to Preserve Critical Free Speech.

Given the Trump administration's unprecedented use of government coercion to retaliate against perceived political foes, and its easy willingness to use false pretenses including national security as justification, the judicial role in protecting free speech and other fundamental rights is of paramount importance. Because the government can almost always invoke a false rationale such as national security, the courts must look beyond the government's unsubstantiated national security claims and consider their actual, and often blatant, motives—or risk complete evisceration of the First Amendment's protections.

In the AI space, allowing Defendants' retaliatory acts to remain in effect would threaten free and unrestrained dialogue among not only Anthropic officials and employees but among all those working in the sector at this critical moment of rapid AI development and deployment. Only the AI companies and the government are privy to matters of AI deployment and contracts with the government. If the government can hamper or destroy those AI companies' commercial viability in retaliation for their expressions of disagreement, chill will be the inevitable result. Given the stakes at issue in the present dispute—mass domestic surveillance and fully autonomous weapons development—and the dramatic potential effect that AI will continue have on the lives of all individuals (for better or for worse), that result could prove disastrous for our society, as highlighted by numerous amicus briefs filed in this case.

Indeed, the Trump administration's wide-ranging campaign of retaliation has had an unprecedented chilling effect not only on AI companies and their employees but on a wide range of societal actors. News organizations have cancelled hosts, pulled political interviews, and sought to delay investigative segments critical of this administration.[23] Federal employees at all levels who have spoken out about issues such as public health, emergency preparedness, and environmental risk, including AFGE members, have been terminated, sending a warning to all those who might waver from

---

[23] *See, e.g., Kimmel  returns to air as President threatens legal action*, N.Y. Times (Oct. 9, 2025), https://www.nytimes.com/live/2025/09/23/us/trump-news; Associated Press, *Stephen Colbert says CBS pulled candidate interview ahead of early voting in Texas*, PBS (Feb. 17, 2026), https://www.pbs.org/newshour/politics/stephen-colbert-says-cbs-pulled-candidate-interview-ahead-of-early-voting-in-texas; David Folkenflik, *CBS News chief Bari Weiss Pulls '60 Minutes' story, sparking outcry*, NPR (Dec. 22, 2025), https://www.npr.org/2025/12/22/g-s1-103282/cbs-chief-bari-weiss-pulls-60-minutes-story.

the Trump administration's line in order to alert the public to imminent risk.[24]  And the federal labor unions whose mission is to protect federal workers—including but not limited to AFGE—have been sent the message that if they exercise their right to petition federal courts regarding unlawful acts of the administration, they will be derecognized and their members will lose their collective bargaining relationships.  *See supra* at 1.

Defendants' retaliatory actions thus do not affect Anthropic alone; they send a message to every AI company, every government contractor, every government worker, and every American who dares to disagree with this administration.  The Court's intervention to disrupt that unconstitutional message is not only warranted—it is necessary.

## CONCLUSION

The Court should grant Anthropic's preliminary injunction motion.

Respectfully submitted,

Dated: March 13, 2026

By: */s/ Stacey M. Leyton*

Scott Kronland
Stacey M. Leyton
Connie K. Chan
Marisa C. Lowe
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151

Rushab Sanghvi
AMERICAN FEDERATION
OF GOVERNMENT EMPLOYEES
80 F Street, NW
Washington, DC 20001
Tel: (202) 639-6426

*Attorneys for Amicus Curiae*
*pAmerican Federation of Government Employees*

---

[24] *See supra* note 6.