Sadaf M. Doost
SBN 346104
Bassel H. El-Rewini, *pro hac vice* motion pending
Abolitionist Law Center
990 Spring Garden, Suite 306
Philadelphia, PA 19123
(412) 654-9070
sadaf@alcenter.org
bassel@alcenter.org

Meetali Jain
SBN 214237
Tech Justice Law Project
611 Pennsylvania Ave., Southeast # 337
Washington, DC 20003
(510) 570-4116
meetali@techjusticelaw.org

Katherine Gallagher, *pro hac vice* motion pending
Astha Sharma Pokharel, *pro hac vice* motion pending
Beth Stephens, *pro hac vice* motion pending
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
kgallagher@ccrjustice.org
asharmapokharel@ccrjustice.org
bethstephens217@gmail.com

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANTHROPIC PBC, | Case No.: 3:26-cv-01996 |
| Plaintiff, | BRIEF OF *AMICI CURIAE* HUMAN RIGHTS AND TECHNOLOGY JUSTICE ORGANIZATIONS IN SUPPORT OF NEITHER PARTY |
| v. | |
| U.S. DEPARTMENT OF WAR, *et al.*, | Date: |
| Defendants. | Time: |
| | Crtrm: |
| | Judge: Honorable Rita F. Lin |
| | Complaint Filed: March 9, 2026 |

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES.....................................................................iii

INTEREST OF *AMICI CURIAE*.................................................................1

PRELIMINARY STATEMENT..................................................................1

ARGUMENT.........................................................................................1

   I.    Even Without Full Autonomy, Militarized AI Poses Catastrophic

       and Irreversible Human Rights Risks..........................................2

      a.  Human input does not sufficiently mitigate lethal

          AI mistakes.......................................................................3

      b.  AI's ability to facilitate war crimes and other grave

          international law violations...................................................5

   II.   The Department of War and Anthropic Are Jointly Engaged

       in War Crimes..................................................................6

   III.  Attacks against Civilians and Civilian Infrastructure Constitute

       War Crimes under U.S. and International Law................................8

CONCLUSION.....................................................................................11

APPENDIX.....................................................................................13

1

2

3                                **TABLE OF AUTHORITIES**

4   **CASES**

5   *Defense for Children International-Palestine v. Biden*, 714 F. Supp. 3d 1160 (N.D. Cal. 2024)6

6   ICJ, Application of the Convention on the Prevention and Punishment of the Crime of Genocide in
7       the Gaza Strip (S.A. v. Israel), Order, (26 Jan. 2024).............................................................. 6

8   **STATUTES**

9   18 U.S.C. § 2441.............................................................................................................................. 8, 9

10  **OTHER AUTHORITIES**

11  Anthropic, Claude's Constitution (Jan. 21, 2026), ..................................................................... 11

12  Anurag Rao & Mariano Zafra, *Strikes create toxic clouds over Tehran*, Reuters (Mar. 10, 2026)  7, 8

13  Ashwini K.P. (Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination3

14  Beyza Unal & Ulysse Richard, *Governance of Artificial Intelligence in the Military Domain*, U.N.
15      Office for Disarmament Affairs (2024) ................................................................................... 2

16  Caroline Orr Bueno, *The Pentagon-Anthropic Feud is Quietly Obscuring the Real Fight over Military
        AI*, Fast Company (Mar. 5, 2026) ......................................................................................... 4

17  Chris Stokel-Walker, *AIs can't stop recommending nuclear strikes in war game simulations*, New
18      Scientist (Feb. 25, 2026) ...................................................................................................... 3

19  Convention Relative to the Protection of Civilian Persons in Time of War, done at Geneva August 12,
20      1949 (6 UST 3516) ............................................................................................................ 8, 9

21  Dep't of War, *Artificial Intelligence Strategy for the Department of War* (2026) ..................... 4

22  Donald J. Trump, Truth Social (Mar. 7, 2026) ............................................................................. 7

23  Dr Noa Mor, Professor Omri Abend, Professor Renana Keydar and Professor Yuval Shany, "Claude's
24      new Constitution: two evaluative continua," ........................................................................ 11

25  Elizabeth Dwoskin, *Israel Built an 'AI factory' for War. It Unleashed it In Gaza*, Washington Post
26      (Dec. 29, 2024) ................................................................................................................. 5, 6

27  G.A. Res. 79/239 (Dec. 24, 2024)................................................................................................. 4, 9

28  Hague Convention (IV) Respecting the Law and Customs of War on Land and Its Annex:
        Regulations Concerning the Law and Customs of War on Land, (Oct. 18, 1907) ............... 10

International Committee of the Red Cross, *Fundamental principles of IHL*...............................3

International Committee of the Red Cross, *Submission to the United Nations Secretary-General on Artificial Intelligence in the Military Domain* (2025).......................................................4, 6, 11

*In maps: 14 days of attacks in Iran and the Middle East*, BBC (Mar. 13, 2026) ...................7, 8

Independent International Commission of Inquiry on the occupied Palestinian territory, including East Jerusalem, and Israel, *Legal analysis of the conduct of Israel in Gaza pursuant to the Convention on the Prevention and Punishment of the Crime of Genocide*, U.N. Doc. A/HRC/60/CRP.3 (2025)....................................................................................................................6

International Committee of the Red Cross ("ICRC"), *What Is International Humanitarian Law?* (2022).......................................................................................................................................1

Julian E. Barnes et. al., *U.S. at Fault in Strike on School in Iran, Preliminary Inquiry Says*, The New York Times (Mar. 11, 2026) ................................................................................................7

Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion, 1996 I.C.J. 226.........10

Middle East Eye, *More than 24,000 civilian units damaged in Iran, Red Crescent Says* (Mar. 13, 2026) ...............................................................................................................................7

N. Ostrovsky and B. Perrigo, "How Do You Teach an AI to Be Good?  Anthropic Just Published Its Answer", TIME (Jan. 21, 2026)............................................................................................11

Nils Melzer, *Interpretive Guidance on the Notion of Direct Participation in Hostilities*, ICRC (2009). ...........................................................................................................................................10

Organisation for Economic Co-operation and Development, *OECD Recommendation of the Council on Artificial Intelligence* .......................................................................................................11

Peter Asaro, *On Banning Autonomous Weapon Systems: Human Rights, Automation, and the Dehumanization of Lethal Decision-making*, 94 Int'l Rev. Red Cross 687 (2012)................2

Press Briefing, U.S. Dep't of War, Secretary of War Pete Hegseth and Chairman of the Joint Chiefs Air Force Gen. Dan Caine Hold a Press Briefing (Mar. 13, 2026)..........................................7

Press Briefing, U.S. Dep't of War, Secretary of War Pete Hegseth and Chairman of the Joint Chiefs of Staff Gen. Dan Caine Hold a Press Briefing (Mar. 2, 2026)...............................................9

Press Release, *Office of the High Commissioner for Human Rights, UN Experts Denounce Aggression on Iran and Lebanon, Warn of Devastating Regional Escalation*, U.N. Press Release (Mar. 12, 2026) ...........................................................................................................................................3

Press Release, Secretary-General, 'Humanity's Fate Cannot Be Left to Algorithm,' Warns Secretary-General in Security Council Debate on Artificial Intelligence, U.N. Press Release SG/SM/22830 (Sep. 24, 2025)....................................................................................................................2, 3

Robert Booth & Dan Milmo, *Iran War Heralds Era of AI-Powered Bombing Quicker Than "Speed of Thought,"* The Guardian (Mar. 3, 2026)........................................................................2, 3, 5, 6

Scott Shane et al., *Trove of Stolen Data Is Said to Include Top Secret U.S. Hacking Tools*, The New York Times (Oct. 19, 2016)..................................................................................................4

Tara Copp, Elizabeth Dwoskin & Ian Duncan, *Anthropic's AI tool Claude central to U.S. campaign in Iran, amid a bitter feud*, Washington Post (Mar. 4, 2026) ..................................................8

U.N. Secretary-General, *Artificial Intelligence in the Military Domain and Its Implications for International Peace and Security*, ¶ 16-17, U.N. Doc A/80/78* (June 5, 2025).....................2

UN experts denounce aggression on Iran and Lebanon, warn of devastating regional escalation, UN Office of the High Commissioner for Human Rights (Mar. 12, 2026)....................................8

UN News, *'Perfect storm': Lebanon crisis deepens as civilians bear the brunt* (Mar. 12, 2026)8

United Nations Guiding Principles on Business and Human Rights: Implementing the United Nations "Protect, Respect and Remedy" Framework, HR/PUB/11/4 (2011) ......................................10

Yuval Abraham, *'Lavender': The AI Machine Directing Israel's Bombing Spree in Gaza*, +972 Magazine (Apr. 3, 2024).....................................................................................................5, 6

## INTEREST OF AMICI CURIAE

*Amici Curiae* are non-profit organizations focused on advancing and protecting the rights guaranteed both in US and international law, including in the context of armed conflict and the use of technology. *Amici* are: Abolitionist Law Center, Access Now, the Center for Constitutional Rights, and Tech Justice Law. See Appendix for detailed descriptions of *Amici*.

## PRELIMINARY STATEMENT

Defendants' retaliation against Anthropic for refusing to permit use of its products to support lethal autonomous weapons and mass domestic surveillance must be considered within the broader unlawfulness of the parties' collaboration. Plaintiff Anthropic objects to the Defendants' demand that it permit the use of its "Claude" artificial intelligence ("AI") models for autonomous lethal warfare. Anthropic argues convincingly that Claude cannot be used safely or reliably for such purpose. But neither party acknowledges that Claude's semi-autonomous deployment is also unsafe and unreliable in lethal warfare. And the use of Claude—or any other militarized, semi-autonomous AI —is not just undesirable: as deployed by the Department of War, it is also illegal under both U.S. and international law protecting civilians during warfare because it does not allow humans adequate time to evaluate the lawfulness of the targets it selects. [1]  Any decision on the requested temporary restraining order should make clear that both the Department of War ("DOW") and Anthropic are constrained by these most fundamental laws of war.[2]

## ARGUMENT

"Humanity's fate cannot be left to an algorithm."

-United Nations Secretary-General António Guterres[3]

---

[1] While this brief addresses AI-enabled international humanitarian law violations in armed conflict abroad, *Amici* also have significant concerns about how Defendants deploy AI-enabled products domestically and the legality of such uses for both U.S.- and non-U.S. persons; addressing such concerns falls beyond the scope of this brief

[2] *Amici* use the terms "laws of war" and "international humanitarian law" or "IHL" interchangeably to describe the body of law applicable in the context of armed conflict. *See* International Committee of the Red Cross ("ICRC"), *What Is International Humanitarian Law?* 1 (2022), https://www.icrc.org/sites/default/files/document/file_list/what_is_ihl.pdf.

[3] Press Release, Secretary-General, 'Humanity's Fate Cannot Be Left to Algorithm,' Warns Secretary-General in Security Council Debate on Artificial Intelligence, U.N. Press Release

I.    **Even Without Full Autonomy, Militarized AI Poses Catastrophic and Irreversible**
**Human Rights Risks.**

Anthropic acknowledges that its AI model Claude cannot be safely used for fully autonomous lethal warfare. Compl. ¶¶1, 3, 76, See also id. ¶¶4, 87, 141-42. It does not take full autonomy, however, for militarized AI to pose grave risks to human life and welfare. AI increases the speed and scale of warfare far beyond human capabilities. It does so by dramatically accelerating the "kill chain," a military term used to describe the process required to move from identifying a potential target as a combatant, and thus a permissible target under international humanitarian law, to tracking and eventually killing them.[4]  Traditionally, this process could take days or weeks; with the use of AI, the "kill chain" can be completed in mere seconds.[5]  And it can be executed simultaneously, a vast number of times, without being constrained by the number of human analysts or soldiers.[6]

This acceleration occurs because, as Anthropic acknowledges, AI models like Claude "enable collection and analysis of information at speeds and scales not previously contemplated[.]" Compl. ¶77. During armed conflict, this includes real-time data collection.[7]  The result is that militarized AI identifies potential enemy movements and predicts future threats before human analysts could react.[8]

_____

SG/SM/22830 (Sep. 24, 2025),
https://press.un.org/en/2025/sgsm22830.doc.htm?_gl=1*y6m0kr*_ga*MTY3MjE5MDU0OC4xNzcz
MzQ4NjI0*_ga_TK9BQL5X7Z*czE3NzMzNTg2MTMkbzIkZzAkdDE3NzMzNTg2MTMkajYwJG
wwJGgw ("SG's Statement on AI").

[4] *See* Peter Asaro, *On Banning Autonomous Weapon Systems: Human Rights, Automation, and the Dehumanization of Lethal Decision-making*, 94 Int'l Rev. Red Cross 687, 694 (2012), https://international-review.icrc.org/sites/default/files/irrc-886-asaro.pdf; *see also* U.N. Secretary-General, *Artificial Intelligence in the Military Domain and Its Implications for International Peace and Security*, ¶ 16-17, U.N. Doc A/80/78* (June 5, 2025), https://docs.un.org/en/A/80/78 (describing concerns about military use of AI). On the issue of permissible targets under international humanitarian law, see *infra*, Sec. III.

[5] *See* Robert Booth & Dan Milmo, *Iran War Heralds Era of AI-Powered Bombing Quicker Than "Speed of Thought"*, The Guardian (Mar. 3, 2026), https://www.theguardian.com/technology/2026/mar/03/iran-war-heralds-era-of-ai-powered-bombing-quicker-than-speed-of-thought.

[6] *Id.*

[7] *See* Beyza Unal & Ulysse Richard, *Governance of Artificial Intelligence in the Military Domain*, U.N. Office for Disarmament Affairs 14 (2024), https://unodaweb.unoda.org/public/2024-06/OP42.pdf.

[8] *Id.* at 4; *see also* Compl. ¶59, where Anthropic describes AI models' "predictive power."

1  It then recommends kills based on those predictions—all still operating at a speed faster than human
2  thought.[9]

3          In short, in the context of armed conflict, the use of AI enhances a military's capacity to
4  deliver maximum death and destruction at a speed and scale beyond human capabilities – and beyond
5  the critical analysis needed to ensure compliance with the binding legal requirements of the principle
6  of distinction and the principle of proportionality.[10]   See Sec. III. This severely threatens compliance
7  with domestic or international law and human rights obligations, even if humans play some role in the
8  decision-making, because (1) keeping humans as final decision-makers does not effectively mitigate
9  the errors made by AI models; and (2) when governments exercise this capability without sufficient
10 respect for civilian life, as the DOW is currently doing, mass civilian death ensues. [11]

11         **a. Human input does not sufficiently mitigate lethal AI mistakes.**

12         As Anthropic acknowledges, AI models such as Claude "are not perfect. Despite developers'
13 best efforts, models can … confidently provid[e] incorrect information … As a result, the outputs
14 may or may not be factually accurate[.]" Compl. ¶62. External research suggests that AI models err
15 on the side of violent escalation: a recent study found that leading models, including Anthropic's
16 Claude Sonnet 4, opted to deploy nuclear strikes in 95% of simulated war game scenarios.[12]  AI
17 models have also been shown to disproportionately err in ways that harm already marginalized or
18 vulnerable groups, such as racial minorities.[13] These errors are devastating even when AI is not

19

20 [9] *See* Booth & Milmo, *supra* n. 5.
[10] *See* SG's Statement on AI, *supra* n. 3. The ICRC identifies four fundamental principles of IHL:
21 humanity, distinction, proportionality and military necessity. *See* ICRC, Fundamental principles of
   IHL, https://casebook.icrc.org/a_to_z/glossary/fundamental-principles-ihl. As set out herein, the
22 delegation of lethal targeting decisions is incompatible with full compliance with these principles.
23 [11] *See* Press Release, *Office of the High Commissioner for Human Rights, UN Experts Denounce
   Aggression on Iran and Lebanon, Warn of Devastating Regional Escalation,* U.N. Press Release
24 (Mar. 12, 2026), https://www.ohchr.org/en/press-releases/2026/03/un-experts-denounce-aggression-
   iran-and-lebanon-warn-devastating-regional; *see infra* Sec. II.
25 [12] Chris Stokel-Walker, *AIs can't stop recommending nuclear strikes in war game simulations*, New
26 Scientist (Feb. 25, 2026) https://www.newscientist.com/article/2516885-ais-cant-stop-
   recommending-nuclear-strikes-in-war-game-simulations/.
27 [13] Ashwini K.P. (Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination,
28 Xenophobia and Related Intolerance), *Contemporary Forms of Racism, Racial Discrimination,
   Xenophobia, and Related Intolerance*, ¶¶ 13-18, U.N. Doc. A/HRC/56/68 (June 3, 2024),

1  deployed autonomously. Both scientific studies and the already-visible impacts of militarized AI belie
2  the suggestion that human supervisors meaningfully or sufficiently mitigate AI's lethal errors.

3      First, studies have repeatedly demonstrated that humans fall victim to "automation bias" —
4  people supervising AI systems are prone to accept AI-generated recommendations, even when these
5  recommendations are wrong.[14] More fundamentally, in the context of warfare, verifying AI
6  recommendations is in tension with militaries' purpose in employing these automated systems.
7  Indeed, the militarization of AI reflects a principle the DOW succinctly stated in its AI strategy:
8  "speed wins."[15] But meaningful human oversight of AI decision-making requires slowing down.

9      When AI systems synthesize terabytes of data across multiple streams to instantaneously
10  recommend an attack, a human generally cannot make a split-second correction.[16] In most cases, it
11  will not be obvious whether Claude is correctly identifying a military target, let alone one that
12  minimizes civilian damage in accord with the laws of war, or whether it is "confidently providing
13  incorrect information." Compl. ¶62. Ensuring Claude has not recommended an attack that will only,
14  or disproportionately, kill civilians would require human review of the underlying intelligence that
15  led Claude to make its recommendation. But if officers stop to review and evaluate the data
16  themselves, they must compromise on their fundamental purpose in militarizing AI as the DOW itself
17  has explained it: to maximize the speed of the kill chain.

18

19  https://docs.un.org/en/A/HRC/56/68; *see also* G.A. Res. 79/239 at 2 (Dec. 24, 2024),
https://docs.un.org/en/a/res/79/239 (expressing concern about algorithmic bias in military AI).
20  [14] ICRC, *Submission to the United Nations Secretary-General on Artificial Intelligence in the Military Domain* 5 (2025), https://www.icrc.org/sites/default/files/2025-
21  04/ICRC_Report_Submission_to_UNSG_on_AI_in_
22  Military_domain.pdf ("ICRC AI Submission"). In one study, researchers found that 39 of 40 participants followed faulty automated recommendations, even when they had the ability to
23  independently verify their accuracy. Caroline Orr Bueno, *The Pentagon-Anthropic Feud is Quietly Obscuring the Real Fight over Military AI*, Fast Company (Mar. 5, 2026),
24  https://www.fastcompany.com/91502340/the-pentagon-anthropic-feud-is-quietly-obscuring-the-real-fight-over-military-ai.
25  [15] Dep't of War, *Artificial Intelligence Strategy for the Department of War* (2026),
26  https://media.defense/2026/Jan/12/2003855671/-1/-1/0/ARTIFICIAL-INTELLIGENCE-STRATEGY-FOR-THE-DEPARTMENT-OF-WAR.PDF.
27  [16] 1 Terabyte of data can hold "the contents of about one million books." Scott Shane et al., *Trove of*
28  *Stolen Data Is Said to Include Top Secret U.S. Hacking Tools*, The New York Times (Oct. 19, 2016), https://www.nytimes.com/2016/10/20/us/harold-martin-nsa.html.

1    In practice, the pace of AI-enabled warfare has demonstrated that militaries are more often
2  simply deferring to AI's directions. Indeed, in the U.S.-Israeli war in Iran, discussed below, reporting
3  has indicated that bombing is proceeding *"quicker than 'the speed of thought,"* creating "**fears**
4  **human -decision-makers could be sidelined.**"[17] One expert observed that "[t]he advantage is in the
5  speed of decision-making"; as a result, even though human decision makers remain looped in, they
6  have "a much narrower time band … to evaluate the [AI's] recommendation."[18]  In Israel's military
7  assault on Gaza, which relied extensively on AI,[19] human soldiers were technically responsible for
8  evaluating AI-selected targets, but they spent just seconds on the task—sometimes, the only review of
9  the AI output was confirming a target was male.[20]

10    Thus, merely adding human oversight does not solve the risk of Anthropic's probability-
11  driven AI model providing a "wrong answer" with lethal—and unlawful—consequences. And
12  because the scale of AI-enabled military assaults are so immense, these lethal errors add up. It is not
13  enough to say that Claude might "only" incorrectly recommend the targeting of civilians in a small
14  percentage of cases; every rubber-stamped recommendation is a violation of the law, and because of
15  the sheer number of recommendations Claude makes, Anthropic is potentially facilitating mass war
16  crimes, or even crimes against humanity.

17    **b. AI's ability to facilitate war crimes and other grave international law violations.**

18    Even when AI models work exactly as intended, they vastly escalate the threat posed by
19  governments that disregard international humanitarian and human rights law. In general, the speed
20  and reasoning capabilities of AI models discourage militaries from making their own evaluation of
21  the proportionality and potential civilian impact of attacks, among other legal requirements. The AI
22  targeting system currently used by DOW, which Anthropic acknowledges at Compl. ¶¶2, 8, 125 relies
23  on Claude, reportedly generates its own explanation of the legal grounds for each recommended

---

[17] *See supra* Booth & Milmo, *supra* n. 5.

[18] *Id.*

[19] Elizabeth Dwoskin, *Israel Built an 'AI factory' for War. It Unleashed it In Gaza*, Washington Post (Dec. 29, 2024), https://www.washingtonpost.com/technology/2024/12/29/ai-israel-war-gaza-idf/.

[20] Yuval Abraham, *'Lavender': The AI Machine Directing Israel's Bombing Spree in Gaza*, +972 Magazine (Apr. 3, 2024),  https://www.972mag.com/lavender-ai-israeli-army-gaza/.

airstrike.[21] This feature invites the U.S. military to attack without independent human consideration of a strike's impact on civilians or its legitimacy under IHL.  See Section III. This abdication of the DOW's responsibility to assess the impact of its strikes has already led to the commission of war crimes in Iran.[22] See Section II.

Moreover, as AI escalates governments' capacity for warfare, it escalates governments' capacity for war crimes and other atrocities. For example, in Gaza, Israel extensively used AI to generate unprecedented numbers of "targets," enabling a military campaign on Palestinians that international bodies, a U.S. federal court, and human rights watchdogs have repeatedly concluded is or plausibly may constitute genocide.[23]  Further, militaries are increasingly hiding behind the malleability of AI to disguise international criminal law violations as apparently neutral outputs of a technical system, thereby masking their own role and circumventing accountability. This strategy was used by Israel to devastating effect on the population of Gaza. After October 7, 2023, the country's military reportedly lowered the threshold for designating someone a "militant" so that their AI programs would produce more targets to bomb, leading to kill lists containing Palestinians who would have been treated as civilians prior to the assault.[24]  Accordingly, even when AI is not fully autonomous, it can threaten human lives and human rights on a mass scale.

**II.     The Department of War and Anthropic Are Jointly Engaged in War Crimes.**

---

[21] *See* Booth & Milmo, *supra* n. 5.

[22] *See* ICRC AI Submission, *supra* n. 14 (noting that individuals remain accountable for determining the lawfulness of attacks).

[23] *See, e.g.,* ICJ, Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip (S.A. v. Israel), Order, (26 Jan. 2024), https://www.icj-cij.org/node/203447, 54, 78; Independent International Commission of Inquiry on the occupied Palestinian territory, including East Jerusalem, and Israel, *Legal analysis of the conduct of Israel in Gaza pursuant to the Convention on the Prevention and Punishment of the Crime of Genocide*, U.N. Doc. A/HRC/60/CRP.3 (2025); *Defense for Children International-Palestine v. Biden*, 714 F. Supp. 3d 1160, 1163 (N.D. Cal. 2024). On Israel's use of AI, *see* Dwoskin, *supra* n. 19.

[24] One military source revealed to a journalist that "[a]t its peak, the system managed to generate 37,000 people as potential human targets." "But the numbers changed all the time… There were times when a Hamas operative was defined more broadly, and then the machine started bringing us all kinds of civil defense personnel, police officers …" *See* Abraham, *supra* n. 20.

1    The threat of militarized AI is not theoretical: Anthropic and the Department of War are

2  already jointly committing war crimes at the time of this filing. On February 28, 2026, the United

3  States and Israel unleashed "Operation Epic Fury" on Iran, aided by highly advanced artificial

4  intelligence tools. Within the first hour, the United States struck the Shajarah Tayyebeh elementary

5  school—an all-girls primary school in southern Iran—with a Tomahawk missile and killed 175

6  people, most of them children.[25] By the second week, President Trump threatened collective

7  punishment, stating "[u]nder serious consideration for complete destruction and certain death,

8  because of Iran's bad behavior, are areas and groups of people that were not considered for targeting

9  up until this moment in time[.]"[26]  Since then, U.S.-Israeli attacks on civilians and civilian

10  infrastructure have continued ruthlessly and indiscriminately. As of March 13, the U.S. announced

11  that jointly, alongside Israel, the two states have struck over 15,000 "enemy targets," killing over

12  1,400—at least 1,200 of whom are estimated to be civilians—and injuring over 18,500 more. [27] Over

13  24,000 civilian units have been targeted or damaged, including health facilities, schools, and

14  residential and business units.[28]  The bombing of oil refineries has subjected entire cities to acidic

15  rainfall exposing their populations to the risk of chemical burns and serious lung damage. [29] And as

16  U.S.-Israeli forces continue attacks in Iran, Israeli forces have expanded their assault to Lebanon. As

17  of March, 12, 2023, in Lebanon over 680 people have been killed, including nearly 100 children, and

18

---

19  [25] Julian E. Barnes et. al., *U.S. at Fault in Strike on School in Iran, Preliminary Inquiry Says*, The
20  New York Times (Mar. 11, 2026), https://www.nytimes.com/2026/03/11/us/politics/iran-school-
     missile-strike.html.
21  [26] Donald J. Trump, Truth Social (Mar. 7, 2026),
22  https://truthsocial.com/@realDonaldTrump/posts/116187586876366061.
     [27] Press Briefing, U.S. Dep't of War, Secretary of War Pete Hegseth and Chairman of the Joint
23  Chiefs Air Force Gen. Dan Caine Hold a Press Briefing (Mar. 13, 2026),
     https://www.war.gov/News/Transcripts/Transcript/Article/4434484/secretary-of-war-pete-hegseth-
24  and-chairman-of-the-joint-chiefs-air-force-gen-da/; *In maps: 14 days of attacks in Iran and the
     Middle East*, BBC (Mar. 13, 2026) https://www.bbc.com/news/articles/c4g0pnnj8xyo.
25  [28] Middle East Eye, *More than 24,000 civilian units damaged in Iran, Red Crescent Says* (Mar. 13,
26  2026), https://www.middleeasteye.net/live-blog/live-blog-update/more-24000-civilian-units-
     damaged-iran-red-crescent-says.
27  [29] Anurag Rao & Mariano Zafra, *Strikes create toxic clouds over Tehran*, Reuters (Mar. 10, 2026)
28  https://www.reuters.com/graphics/IRAN-CRISIS/MAPS/znpnmelervl/2026-03-10/strikes-create-
     toxic-clouds-over-tehran/.

1 more than 800,000 displaced including 11,600 pregnant. [30] These acts—which include willful killing
2 of civilians and willful infliction of serious bodily injury to civilians—constitute war crimes, as
3 defined in U.S. federal law. 18 U.S.C. § 2441 and grave breaches of the Fourth Geneva Convention.
4 See Section III.

5     Anthropic's Claude is so deeply embedded in the U.S. military's Maven Smart System
6 ("Maven") that Defendants DOW and Secretary Peter Hegseth demanded Anthropic provide up to six
7 months of services to DOW even after Anthropic was banned by Defendants and deemed a "supply
8 chain risk." Compl. ¶125. Indeed, according to Anthropic, "Claude is reportedly the Department's
9 most widely deployed and used frontier AI model—and the only one currently on classified systems."
10 Compl.¶68. When the U.S. and Israel began bombing Iran, Claude was still being used, including to
11 identify, suggest, and prioritize hundreds of targets and provide location coordinates to carry out
12 attacks on those targets. [31]

13     Claude's use by DOW in Iran exemplifies the grave threat to human life, and breaches of
14 human rights and international humanitarian law posed by militarized AI, even without full
15 autonomy. The intensity of U.S.-Israeli attacks on Iran, which UN experts have condemned as
16 "flagrant violations of international law," [32] was made possible by Claude's extreme acceleration of
17 the "kill chain." The high rate of estimated civilian death may reflect the "errors" to which Claude is
18 admittedly prone when processing vast amounts of surveillance data. [33] Compl. ¶77. And the ability
19 for U.S. officers to make the final call on strikes has not mitigated Claude's dangers, because
20 Defendant Hegseth has prioritized maximizing attack speeds via AI rather than, in his words, "stupid"

21
22
---
23 [30] *Id.;* UN News, *'Perfect storm': Lebanon crisis deepens as civilians bear the brunt* (Mar. 12, 2026), https://news.un.org/en/story/2026/03/1167120.
24 [31] Tara Copp, Elizabeth Dwoskin & Ian Duncan, *Anthropic's AI tool Claude central to U.S.*
25 *campaign in Iran, amid a bitter feud*, Washington Post (Mar. 4, 2026) https://www.washingtonpost.com/technology/2026/03/04/anthropic-ai-iran-campaign/.
26 [32] *UN experts denounce aggression on Iran and Lebanon, warn of devastating regional escalation,* UN Office of the High Commissioner for Human Rights (Mar. 12, 2026)
27 https://www.ohchr.org/en/press-releases/2026/03/un-experts-denounce-aggression-iran-and-lebanon-
28 warn-devastating-regional.
[33] *See In maps, supra* n. 27.

1  rules of engagement.[34] Even with Anthropic's proposed AI protections still in place, Claude's
2  deployment is still enabling, and even promoting, egregious human rights and humanitarian law
3  violations.

4  **III.    Attacks against Civilians and Civilian Infrastructure Constitute War Crimes under U.S.**
5  **and International Law.**

6          Significantly, neither party acknowledges that even Claude's semi-autonomous deployment
7  for lethal warfare is not only unsafe and unreliable, see Sec. I & II, but can also be illegal. Both U.S.
8  and international law governing armed conflict prohibit the targeting of civilians or civilian
9  infrastructure, attacks that cause incidental loss of life on injury to civilians clearly excessive in
10  relation to the overall military advantage, or that leads to extensive destruction not justified by
11  military necessity. Violations of these prohibitions constitute war crimes, and, if carried out as part of
12  a widespread or systematic attack on civilians, could constitute crimes against humanity. As the UN
13  General Assembly overwhelmingly affirmed in 2024, these prohibitions apply to "all stages of the life
14  cycle of artificial intelligence, including systems enabled by artificial intelligence, in the military
15  domain."[35]

16          The U.S. War Crimes Act of 1996, 18 U.S.C. § 2441, as amended (2023), makes punishable
17  the commission of war crimes, defined in part as grave breaches of the four Geneva Conventions of
18  1949, to which the United States is a party.[36]  The list of crimes include wilful killing, wilfully
19  causing serious injury to body and health, and extensive destruction of civilian property not justified
20  by military necessity.[37] The provisions of the Hague Regulations incorporated into the War Crimes

21

22  [34] Press Briefing, U.S. Dep't of War, Secretary of War Pete Hegseth and Chairman of the Joint
23  Chiefs of Staff Gen. Dan Caine Hold a Press Briefing (Mar. 2, 2026),
   https://www.war.gov/News/Transcripts/Transcript/Article/4418959/secretary-of-war-pete-hegseth-
24  and-chairman-of-the-joint-chiefs-of-staff-gen-dan/.
25  [35] G.A. Res. 79/239 at 2 (Dec. 24, 2024), https://docs.un.org/en/a/res/79/239.
   [36] A "war crime" is "any conduct – (1) defined as a grave breach in any of the international
26  conventions signed at Geneva 12 August 1949 […]; (2) prohibited by Articles 23, 25, 27 or 28 of the
   Annex to the Hague; Convention IV, Respecting the Laws and Customs of War on Land […]." 18
27  U.S.C. § 2441(c) (1),(2). *See also* Convention Relative to the Protection of Civilian Persons in Time
28  of War, done at Geneva August 12, 1949 (6 UST 3516) ("Fourth Geneva Convention").
   [37] *See* Fourth Geneva Convention, art. 147 (grave breaches).

Act, 18 U.S.C. § 2441(c)(2), regulate the means and methods of warfare. These provisions are intended to codify the cardinal principles of IHL, namely (1) the principle of distinction, which requires that combatants distinguish between military and civilian targets and minimize harm to noncombatants, and (2) the principle of proportionality, which requires that harm to civilians and their property be proportionate to the military advantage achieved.[38] The prohibited conduct punishable by the War Crimes Act includes the use of weapons calculated to cause unnecessary suffering, the destruction of property not necessitated by war, the attack of undefended towns or buildings, and the siege or bombardment of buildings dedicated to religion, art, historic monuments, schools, and hospitals provided they are not being used for military purposes.[39]

Notably, many international law violations, including grave breaches of the Geneva Conventions, provide for "universal jurisdiction." This means that any State - and, in certain circumstances, also the International Criminal Court - has jurisdiction to prosecute U.S. persons, including members of the U.S. military, corporate officers or, in many jurisdictions, corporate or juridical entities that commit or are complicit in such war crimes. The soldiers who commit these crimes, the officers who issue their orders, the civilian officials who authorize the actions, and the corporations who enable the crimes are all vulnerable to arrest and prosecution abroad.[40]

---

[38] *See* Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion, 1996 I.C.J. 226, ¶78 ; *see also* Nils Melzer, *Interpretive Guidance on the Notion of Direct Participation in Hostilities*, ICRC (2009).

[39] Hague Convention (IV) Respecting the Law and Customs of War on Land and Its Annex: Regulations Concerning the Law and Customs of War on Land, (Oct. 18, 1907), arts. 23(e) and (g), 25 and 27.

[40] While this brief focuses on violations of IHL, human rights law also constrains the conduct of both state and non-state actors. Of particular relevance is the United Nations Guiding Principles on Business and Human Rights: Implementing the United Nations "Protect, Respect and Remedy" Framework, HR/PUB/11/4 (2011) https://www.ohchr.org/sites/default/files/documents/publications/guidingprinciplesbusinesshr_en.pdf ("UNGPs"), which is an authoritative global standard of 31 guidelines for states and companies to prevent, address, and remedy human rights abuses committed in business operations. S*ee, e.g.,* UNGP 7 (requiring that States take greater steps to constrain companies' activities in conflict-affected areas, where the risk of gross abuses is seen as especially high); UNGP 17 (companies have an ongoing obligation to act with due diligence to avoid infringing on the rights of others, and identify and assess risks to rights-holders so that potential adverse impacts can be prevented or mitigated). Anthropic's obligation to comply with international human rights law is independent of the assessment of legality

1    Humans are ultimately responsible for making determinations about who or what is the

2  intended target of an attack, and whether such attack complies with the principles of distinction and

3  proportionality.[41] Anthropic recognizes that "Claude is simply not capable of performing [lethal

4  military] tasks responsibly without human oversight." Compl. ¶76. As DOW is deploying Claude in

5  practice, however, the AI model's human handlers have mere seconds to evaluate targets, depriving

6  them of the ability perform the case-by-case assessments of the targets and consequences of the use of

7  lethal force which are required under these fundamental principles, and as codified in the War Crimes

8  Act and the Geneva Conventions. DOW's deployment of Claude to compress kill chains to seconds is

9  thus inconsistent with U.S. and international law. That it may comply with Anthropic's policy is of no

10 moment about its legality, and indeed, such a permissive policy could be evidence of Anthropic's

11 complicity in war crimes.[42]

12                                    **CONCLUSION**

13    The arguments raised by the parties fail to acknowledge the broader legal frameworks that

14 bind them both. The parties may not use AI—whether fully autonomous or not—to facilitate or

15 commit war crimes. Any decision on the parties' dispute must make clear that their collaboration is

16

17 ─────────────────────

18 or willingness to comply by others, including States. Additionally, there has been a sharp increase in
the promulgation of formal and informal human rights standards for the development and use of AI

19 systems in recent years. *See, e.g.*, Organisation for Economic Co-operation and Development, *OECD
Recommendation of the Council on Artificial Intelligence*,

20 https://legalinstruments.oecd.org/en/instruments/oecd-legal-0449.
  [41] *See* ICRC AI Submission, *supra*. n. 14.

21 [42] Indeed, Anthropic's woefully inadequate response to its international and domestic legal

22 obligations has been to develop a foundational safety framework for its LLM, or what it calls
"Claude's Constitution." *See* Anthropic, Claude's Constitution (Jan. 21, 2026), https://www-

23 cdn.anthropic.com/d0636f72a9493d279ed36b33987da3430bcb5911/claudes-
constitution_webPDF_26-02.02a.pdf.  The constitution prioritizes that Claude should be "broadly

24 safe" and subject to "human oversight" but explicitly does not apply to military use. *Id*. at 2.
  Anthropic has confirmed that it does not have an alternate constitution for the US government "at this

25 time." *See* N. Ostrovsky and B. Perrigo, "How Do You Teach an AI to Be Good?  Anthropic Just

26 Published Its Answer", TIME (Jan. 21, 2026),https://time.com/7354738/claude-constitution-ai-
alignment/. *See also*   Dr Noa Mor, Professor Omri Abend, Professor Renana Keydar and Professor

27 Yuval Shany, "Claude's new Constitution: two evaluative continua," https://afp.oxford-

28 aiethics.ox.ac.uk/article/professor-yuval-shany-discusses-claudes-new-constitution-latest-article-0.

─────────────────────

1  constrained by these fundamental principles of domestic and international law. Further, *Amici* ask the

2  court to request information from the parties that could clarify the contributions to war crimes made

3  by Anthropic, its employees, and companies such as Palantir which integrate Claude into military

4  products.

5

6  Dated: March 13, 2026

7                                                      */s/ Sadaf M. Doost*
                                                        SBN 346104
8                                                      Bassel H. El-Rewini, pro hac vice
                                                        motion pending
9                                                      Abolitionist Law Center
                                                        990 Spring Garden, Suite 306
10                                                     Philadelphia, PA 19123
                                                        (412) 654-9070
11                                                     sadaf@alcenter.org
                                                        bassel@alcenter.org
12

13

14                                                     Katherine Gallagher, pro hac vice
                                                        motion pending
15                                                     Astha Sharma Pokharel, pro hac vice
                                                        motion pending
16                                                     Beth Stephens, pro hac vice motion
                                                        pending
17                                                     Center for Constitutional Rights
                                                        666 Broadway, 7th Floor
18                                                     New York, NY 10012
                                                        (212) 614-6464
19                                                     kgallagher@ccrjustice.org
20                                                     asharmapokharel@ccrjustice.org
                                                        bethstephens217@gmail.com
21

22                                                     Meetali Jain
                                                        SBN 214237
23                                                     Tech Justice Law Project
                                                        611 Pennsylvania Ave., Southeast #
24                                                     337
                                                        Washington, DC 20003
25                                                     (510) 570-4116
                                                        meetali@techjusticelaw.org
26

27

28

---

BRIEF OF *AMICI CURIAE* HUMAN RIGHTS & TECHNOLOGY JUSTICE ORGANIZATIONS - 12
CIVIL ACTION NO: 3:26-cv-01996

# APPENDIX

Abolitionist Law Center ("ALC") is a nonprofit legal organization and community organizing project fighting to dismantle state and corporate violence through legal action, research, public education, and advocacy on the local, state, national, and international levels. Since 2023, ALC has investigated and reported on the emerging role of artificial intelligence in state sponsored violence and oppression.

Access Now is an international non-profit organization and US-registered 501(c)3 tax-exempt organization working to strengthen the digital rights of people and communities at risk. Access Now routinely engages courts in the United States and abroad, advocating for privacy, freedom of expression, and civic space in the digital age.

The Center for Constitutional Rights ("CCR") is a national not-for-profit legal, educational, and advocacy organization dedicated to advancing and protecting the rights guaranteed by the United States Constitution and international law. CCR has been responsible for some of the most significant advancements in the recognition of international law in federal courts over the last four decades, and has sought to hold state and nonstate actors liable for torture, extrajudicial killings, war crimes, and crimes against humanity. CCR has an interest in the proper interpretation of international law as it applies to the use of evolving technologies in the context of armed conflict.

Tech Justice Law ("TJL") is a nonpartisan nonprofit organization that works to ensure artificial intelligence systems are safe by design, subject to human oversight, and transparent. TJL frequently participates directly and as amicus curiae in litigation presenting AI safety concerns. Through litigation and advocacy, TJL advances human rights principles in global tech accountability efforts, recognizing that AI systems and digital platforms often facilitate surveillance, repression, and state violence worldwide.