BRETT A. SHUMATE
Assistant Attorney General
Civil Division
ERIC J. HAMILTON (CA Bar No. 296283)
Deputy Assistant Attorney General
JEAN LIN (NY Bar No. 4074530)
Special Litigation Counsel
JAMES W. HARLOW (Md. Bar, no number issued)
KRISTINA A. WOLFE (VA Bar. No. 71570)
Senior Trial Counsel
CHRISTIAN DIBBLEE (DC Bar No. 90002557)
Trial Attorney
Federal Programs Branch
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
(202) 514-6786
james.w.harlow@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ANTHROPIC PBC, | Case No. 3:26-cv-01996-RFL |
| Plaintiff, | DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES |
| v. | |
| U.S. DEPARTMENT OF WAR, *et al.,* | |
| Defendants. | Hearing Date: March 24, 2026 |
| | Time: 1:30 PM |
| | Judge:  Hon. Rita F. Lin |
| | Place: San Francisco Courthouse |
| | Courtroom 15 |

Case No. 3:26-cv-1996-RFL                    Opp'n to Pl.'s Mot. for Preliminary Injunction

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

STATUTORY BACKGROUND ...................................................................................... 3

FACTUAL BACKGROUND ........................................................................................... 4

    I. ANTHROPIC REJECTS THE DEPARTMENT OF WAR'S STANDARD "ANY LAWFUL USE" POLICY ............. 4

    II. PRESIDENTIAL DIRECTIVE TO CEASE USE OF ANTHROPIC'S TECHNOLOGY AND THE SECRETARY'S RESPONSE ...................................................................................................... 6

    III. SECRETARIAL DETERMINATION THAT ANTHROPIC'S BEHAVIOR POSES A SUPPLY CHAIN RISK ......... 6

    IV. FEDERAL AGENCIES DISCONTINUE USE OF CLAUDE AND ANTHROPIC SUES TO RETAIN ACCESS ...... 9

LEGAL STANDARD ........................................................................................................ 10

ARGUMENT ....................................................................................................................... 11

    I. ANTHROPIC IS NOT LIKELY TO SUCCEED ON THE MERITS ................................................... 11

        A. Anthropic's First Amendment claim is unlikely to succeed ........................................ 11

            1. Refusal to accept the Government's contractual term is not speech ............................... 12

            2. Anthropic's speech was not the motivating factor for the challenged actions ................. 13

            3. Even assuming a retaliatory motive, the Government would have acted the same .......... 15

        B. Anthropic's APA challenge to the Secretary's actions is not likely to succeed ........................ 16

            1. The Secretary's social media post is not a distinct, final agency action ......................... 16

            2. The Secretarial Determination was lawful and reasonable ............................................. 17

        C. Anthropic is not likely to succeed on its due process challenge ................................... 20

        D. The President and the Secretary acted well within their authority .............................. 22

    II. ANTHROPIC WILL NOT SUFFER IRREPARABLE HARM BEFORE A RULING ON THE MERITS ............... 24

    III. THE BALANCE OF EQUITIES STRONGLY DISFAVORS A PRELIMINARY INJUNCTION ......................... 27

    IV. ANY PRELIMINARY RELIEF SHOULD BE NARROWLY TAILORED ............................................... 29

    V. ANY INJUNCTION SHOULD BE STAYED PENDING APPEAL AND BE ACCOMPANIED BY A BOND ........ 30

CONCLUSION ..................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury,*
686 F.3d 965 (9th Cir. 2012) ................................................................................ 11, 18, 21

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,*
— F.4th —, 2026 WL 534591 (9th Cir. Feb. 26, 2026) .......................................... 11, 15, 26

*Am. Forest Res. Council v. United States,*
77 F.4th 787 (D.C. Cir. 2023) .............................................................................. 23

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
526 U.S. 40 (1999) ................................................................................................ 21

*Arcamuzi v. Cont'l Air Lines, Inc.,*
819 F.2d 935 (9th Cir. 1987) ................................................................................ 26

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents,*
824 F.3d 858 (9th Cir. 2016) ................................................................................ 14

*Baird v. Bonta,*
81 F.4th 1036 (9th Cir. 2023) ............................................................................... 10, 11, 24

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth,*
529 U.S. 217 (2000) .............................................................................................. 30

*Bennett v. Spear,*
520 U.S. 154 (1997) .............................................................................................. 16, 17

*Boquist v. Courtney,*
32 F.4th 764 (9th Cir. 2022) ................................................................................. 11

*Burch v. City of Chubbuck,*
146 F.4th 822 (9th Cir. 2025) ............................................................................... 14

*Califano v. Yamasaki,*
442 U.S. 682 (1979) .............................................................................................. 29

*Caribbean Marine Servs. Co. v. Baldrige,*
844 F.2d 668 (9th Cir. 1988) ................................................................................ 24

*China Unicom (Americas) Operations Ltd. v. FCC,*
124 F.4th 1128 (9th Cir. 2024) ............................................................................. 18

*CIA v. Sims*,
  471 U.S. 159 (1985)................................................................................................................ 15

*City of Dallas v. Stanglin*,
  490 U.S. 19 (1989).................................................................................................................. 12

*Cleveland Bd. of Educ. v. Loudermill*,
  470 U.S. 532 (1985)................................................................................................................ 22

*Collins v. Yellen*,
  594 U.S. 220 (2021)................................................................................................................ 23

*Compassion Over Killing v. U.S. FDA*,
  849 F.3d 849 (9th Cir. 2017)................................................................................................. 18

*Coyne-Delany Co. v. Capital Dev. Bd.*,
  616 F.2d 341 (7th Cir. 1980).................................................................................................. 13

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)................................................................................................................ 17

*Dep't of Educ. v. California*,
  604 U.S. 650 (2025)........................................................................................................... 16, 30

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020)..................................................................................................................... 17

*Dep't of the Navy v. Egan*,
  484 U.S. 518 (1988)...................................................................................................... 15, 19, 24

*Dittman v. California*,
  191 F.3d 1020 (9th Cir. 1999).............................................................................................21-22

*Earth Island Inst. v. Carlton*,
  626 F.3d 462 (9th Cir. 2010)................................................................................................. 24

*Elrod v. Burns*,
  427 U.S. 347 (1976)................................................................................................................ 25

*Engquist v. Ore. Dep't of Agric.*,
  478 F.3d 985 (9th Cir. 2007), *aff'd on other grounds*, 553 U.S. 591 (2008)....................... 22

*Env't Prot. Info. Ctr. v. Carlson*,
  968 F.3d 985 (9th Cir. 2020).................................................................................................. 10

*Erickson v. United States*,
  67 F.3d 858 (9th Cir. 1995).................................................................................................... 21

*Ewing v. Mytinger & Casselberry, Inc.*,
   339 U.S. 594 (1950) ............................................................................................................ 22

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ............................................................................................................ 18

*Federated Indians of Graton Rancheria v. Haaland*,
   762 F. Supp. 3d 888 (N.D. Cal. 2025) ........................................................................... 24, 26

*First Nat'l Bank & Tr., Wibaux, Mont. v. Dep't of Treasury*,
   63 F.3d 894 (9th Cir. 1995) ................................................................................................ 22

*Fox Ins. Co. v. Ctrs. for Medicare & Medicaid Servs.*,
   715 F.3d 1211 (9th Cir. 2013) ............................................................................................ 21

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ............................................................................................................ 16

*Giboney v. Empire Storage & Ice Co.*,
   336 U.S. 490 (1949) ............................................................................................................ 13

*Gilligan v. Morgan*,
   413 U.S. 1 (1973) ................................................................................................................ 27

*Goldman v. Weinberger*,
   475 U.S. 503 (1986) ............................................................................................................ 27

*Guzman v. Shewry*,
   552 F.3d 941 (9th Cir. 2009) .............................................................................................. 21

*Hartman v. Moore*,
   547 U.S. 250 (2006) ............................................................................................................ 11

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
   736 F.3d 1239 (9th Cir. 2013) ............................................................................................ 25

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017) .............................................................................................. 25

*Holder v. Humanitarian L. Project*,
   561 U.S. 1 (2010) .................................................................................................... 11, 19, 28

*Immigrant Defs. L. Ctr. v. Noem*,
   145 F.4th 972 (9th Cir. 2025) ........................................................................................ 10, 27

*In re Excel Innovations, Inc.*,
   502 F.3d 1086 (9th Cir. 2007) ............................................................................................ 24

*Indus. Customers of Nw. Utilities v. Bonneville Power Admin.*,
    408 F.3d 638 (9th Cir. 2005) ...................................................................................... 16

*Lackey v. Stinnie*,
    604 U.S. 192 (2025) .................................................................................................. 19

*Las Vegas Nightlife, Inc. v. Clark Cnty.*,
    38 F.3d 1100 (9th Cir. 1994) ..................................................................................... 12

*Logan v. Zimmerman Brush Co.*,
    455 U.S. 422 (1982) .................................................................................................. 22

*Mendocino Envt'l Ctr. v. Mendocino Cnty.*,
    192 F.3d 1283 (9th Cir. 1999) ................................................................................... 13

*Minn. State Bd. for Cmty. Colls. v. Knight*,
    465 U.S. 271 ............................................................................................................. 13

*Mississippi v. Johnson*,
    4 Wall. 475 (1867) ................................................................................................... 16

*Munaf v. Geren*,
    553 U.S. 674 (2008) .................................................................................................. 10

*Murphy Co. v. Biden*,
    65 F.4th  (9th Cir. 2023), *cert denied*, 144 S. Ct. 1111 (2024) ............................... 23

*Mustafa v. Clark Cnty. Sch. Dist.*,
    157 F.3d 1169 (9th Cir. 1988) ................................................................................... 21

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
    585 U.S. 755 (2018) .................................................................................................. 12

*Nicopure Labs, LLC v. FDA*,
    944 F.3d 267 (D.C. Cir. 2019) .................................................................................. 12

*Niz-Chavez v. Garland*,
    593 U.S. 155 (2021) .................................................................................................. 19

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................................. 10, 30

*Nuclear Regul. Comm'n v. Texas*,
    605 U.S. 665 (2025) ......................................................................................... 22, 23, 24

*O'Brien v. Welty*,
    818 F.3d 920 (9th Cir. 2016) ..................................................................................... 13

*Palantir USG, Inc. v. United States*,
   129 Fed. Cl. 218 (Fed. Cl. 2016) ........................................................................................ 11

*Peck v. Thomas*,
   697 F.3d 767 (9th Cir. 2012) .............................................................................................. 18

*Perkins v. Lukens Steel Co.*,
   310 U.S. 113 (1940) ..................................................................................................... *passim*

*Physicians' Servs. Med. Grp., Inc. v. San Bernardino Cnty.*,
   825 F.2d 1404 (9th Cir. 1987) ............................................................................................ 21

*Pleasant Grove City, Utah v. Summum*,
   555 U.S. 460 (2009) ........................................................................................................... 30

*PricewaterhouseCoopers Pub. Sector, LLP v. United States*,
   126 Fed. Cl. 328 (2016) ..................................................................................................... 23

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
   547 U.S. 47 (2006)............................................................................................................. 13

*Savantage Fin. Servs., Inc. v. United States*,
   595 F.3d 1282 (Fed. Cir. 2010) .................................................................................... 11, 18

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947)........................................................................................................... 17

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020)........................................................................................................... 23

*Siegert v. Gilley*,
   500 U.S. 226 (1991)........................................................................................................... 21

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011)........................................................................................................... 12

*Stuhlbarg International Sales Company Inc. v. John D. Brush & Company*,
   240 F.3d 832 (9th Cir. 2001).............................................................................................. 26

*Thakur v. Trump*,
   163 F.4th 1198 (9th Cir. 2025)........................................................................................... 26

*TikTok Inc. v. Garland*,
   604 U.S. 56 (2025)............................................................................................................. 15

*Town of Castle Rock v. Gonzalez*,
   545 U.S. 748 (2005)........................................................................................................... 21

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) ................................................................................................................ 28

*Trump v. Int'l Refugee Assistance Project*,
   582 U.S. 571 (2017) ................................................................................................................ 28

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   578 U.S. 590 (2016) ................................................................................................................ 16

*United Aeronautical Corp. v. U.S. Air Force*,
   80 F.4th 1017 (9th Cir. 2023) ........................................................................................... 16, 27

*United Mine Workers of Am. v. Pennington*,
   381 U.S. 657 (1965) ................................................................................................................ 13

*United States ex rel. Wilson v. Maxxam, Inc.*,
   No. C 06-7497 CW, 2009 WL 322934 (N.D. Cal. Feb. 9, 2009) ............................................ 13

*United States v. O'Brien*,
   391 U.S. 367 (1968) ................................................................................................................ 12

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
   5 F.4th 997 (9th Cir. 2021) ...................................................................................................... 17

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................................................ *passim*

*Zinermon v. Burch*,
   494 U.S. 113 (1990) ................................................................................................................ 22

**Constitutional Provisions**

U.S. Const. amend. V ................................................................................................................... 20

**Statutes**

5 U.S.C. § 705 .............................................................................................................................. 10

5 U.S.C. § 706 ........................................................................................................................ 15, 17

10 U.S.C. § 3252 ................................................................................................................... *passim*

15 U.S.C. § 9901 .......................................................................................................................... 19

28 U.S.C. § 1491 .......................................................................................................................... 16

40 U.S.C. § 11101 .......................................................................................................................... 4

44 U.S.C. § 3552 ............................................................................................................................ 4

Ike Skelton National Defense Authorization Act for Fiscal Year 2011,

   Pub. L. No. 111-383, § 806, 124 Stat. 4137 (Jan. 7, 2011) ....................................................... 4

**Rules**

Fed. R. Civ. P. 65 .................................................................................................................... 30

**Regulations**

48 C.F.R. Subpart 239.73 ........................................................................................................... 9

48 C.F.R. § 49.502 ................................................................................................................... 23

48 C.F.R. § 239.7304 ........................................................................................................... 4, 16

48 C.F.R. § 239.7305 ................................................................................................................. 9

Exec. Order No. 14,179, 90 Fed. Reg. 8741 (Jan. 23, 2025) ...................................................... 4

**Other Authorities**

1 Annals of Cong. 463 (1789) ................................................................................................... 23

*Adversary*, New Oxford American Dictionary (3d ed. 2010) ..................................................... 19

*Adversary*, Webster's New World College Dictionary 20 (4th ed. 2008) .................................... 19

Anthropic, *Acceptable Use Policy*,

   https://perma.cc/7UC7-8T7U (version of Sep. 15, 2023) ...................................................... 14

Anthropic, *Introducing the Anthropic Institute* (Mar. 11, 2026),

   https://www.anthropic.com/news/the-anthropic-institute  .................................................... 25

CBS News, *Why Anthropic CEO Dario Amodei spends so much time warning of AI's potential dangers*

   (Nov. 16, 2025), https://perma.cc/S87T-BJ38 (Interview Tr.) ............................................... 14

Michael C. Dorf, *Is the Government Punishing Anthropic for Speech?* (Mar. 11, 2026),

   https://perma.cc/7UWM-3K8V ............................................................................................ 12

S. Rep. 111-201 (2010) ......................................................................................................... 3, 4

Sec'y of War, *Artificial Intelligence Strategy for the Department of War*,

   https://perma.cc/52KE-X7VQ?type=image ............................................................................. 5

**INTRODUCTION**

It is black-letter law that, "[l]ike private individuals and businesses, the Government enjoys the unrestricted power . . . to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940).  For national security reasons, the terms of service for Plaintiff Anthropic PBC's artificial intelligence (AI) technology have become unacceptable to the Executive Branch.  Anthropic concedes the Government's right not "to use Anthropic's services" and to "transition[] to other AI providers."  ECF No. 6 (PI Mot.), at 10.[1]  It nonetheless seeks a preliminary injunction to effectively bar the Government from doing just that.  The facts and the law do not support such extraordinary relief.

Early this year, the Secretary of War directed the Department of War ("DoW" or "Department") to incorporate into any AI service contracts a provision that permits DoW to use the technology for any lawful purpose.  If it were any other way, an AI provider might gain influence over how DoW conducts operations and which missions it chooses.  Anthropic, whose Claude AI model is embedded in DoW's unclassified and classified systems, refused to accept the term during new contract negotiations, citing its Usage Policy that imposes various limitations on the use of Claude.  And throughout the negotiations, Anthropic's behavior more generally caused the Department to question whether Anthropic represented a trusted partner with whom the Department was willing to contract in this highly sensitive area.  In particular, DoW became concerned that allowing Anthropic continued access to DoW's technical and operational warfighting infrastructure would introduce unacceptable risk into DoW supply chains.  After all, AI systems are acutely vulnerable to manipulation, and Anthropic could attempt to disable its technology or preemptively alter the behavior of its model either before or during ongoing warfighting operations, if Anthropic—in its discretion—feels that its corporate "red lines" are being crossed.  DoW deemed that an unacceptable risk to national security.

As a result of these concerns, on February 27, 2026, the President directed all federal agencies to stop using Anthropic's technology with a six-month phaseout period (the Presidential Directive), which the agencies have begun to implement consistent with any contractual terms.  Additionally, the same day,

---

[1] Pincites are to the page number stamped in the header by CM/ECF.

the Secretary announced on social media that the Department would no longer use Anthropic. The Secretary further directed his subordinates to undertake the process for designating Anthropic a supply chain risk under 10 U.S.C. § 3252. On March 3, after receiving recommendations from the relevant officials, the Secretary so designated Anthropic, as authorized by section 3252(a) (the Secretarial Determination). The effect of this Determination is to exclude Anthropic from procurements involving national security systems.

Anthropic now seeks to preliminarily enjoin the Government from taking any action to "implement, effectuate, or further the purposes" of the Presidential Directive and Secretarial Determination, ECF No. 6-34 at 2—that is, to force the Government to continue to use its products and services and to enjoin the designation. At the outset, although Anthropic has lumped them together, it is important to distinguish the Presidential Directive from the Secretary's actions—each is distinct and grounded in unique authority. The Directive flows from the President's Article II power to supervise the Executive Branch, as confirmed by judicial precedent, while the Secretary acted pursuant to statute.

This Court should deny Antrhopic's motion because Anthropic is not likely to succeed on the merits. Anthropic is not likely to succeed in showing that the Presidential Directive, the Secretary's social media post, and the Secretarial Determination were retaliation for Anthropic's expressions "about the safety of its model and the responsible use of AI." PI Mot. 12. The record reflects that the President and the Secretary were motivated by concerns about Anthropic's potential future conduct if it retained access to the Government's IT infrastructure. Those concerns are unrelated to Anthropic's speech, and no one has purported to restrict Anthropic's expressive activity. By its own account, Anthropic has long expressed its "values" and "founding commitments," and "the company and its leadership are leading voices on issues related to AI safety and policy." PI. Mot. 11. That was true before and during the time the Government was using its products and services. It was only when Anthropic refused to release the restrictions on the use of its products—which refusal is conduct, not protected speech—that the President directed all federal agencies to terminate their business relationships with Anthropic. As authorized by statute, the Secretary also responsibly took steps to protect national security from the supply chain risk posed by Anthropic. Thus, none of the distinct actions of the President and the Secretary was retaliation for Anthropic's expression; they were simply the consequences of Anthropic's commercial conduct,

including its decision to reject the Department's requested amendment to the terms of service. Indeed, had Anthropic accepted the Government's "all lawful use" contractual term, the challenged actions would not have occurred.

Equally unlikely to succeed are Anthropic's claims under the Administrative Procedure Act (APA) and for ultra vires review. The President's Directive—which itself does not cancel any contractual relationships—reflects nothing more than a routine exercise of the President's Article II authority to direct his Executive Branch subordinates about how to exercise their own statutorily conferred discretion. And the Secretary properly exercised his authority under 10 U.S.C. § 3252. Their judgments on matters of national security and procurement policies are entitled to double and substantial deference, and the Secretary's Determination readily survives the highly deferential and extremely limited arbitrary and capricious review. As for its Fifth Amendment due process claim, Anthropic fails to make the threshold showing that it has been deprived of a protected liberty or property interest. And even if it had, Anthropic still has the opportunity to receive any process it is due by seeking agency reconsideration, not to mention that it is already pursuing this litigation.

Anthropic also fails to establish that it is likely to suffer an irreparable harm in the absence of injunctive relief or that the balance of equities favors emergency relief. Anthropic's claims of harm—mostly centering on its potential loss of business—are speculative and legally insufficient to constitute irreparable injury. And the public interest strongly disfavors Anthropic's requested relief, which—applying equally to the Presidential Directive and the Secretarial Determination—would prevent not only the Department of War but also the Government broadly from removing Anthropic's technology from the Government's systems and force the Government to continue a business relationship it no longer deems appropriate. That runs counter to the considered judgment of those officials entrusted with protecting national security and to the President's authority as the Chief Executive to set procurement priorities for the Executive Branch in a manner consistent with law.

## STATUTORY BACKGROUND

As early as 2011, Congress recognized the "increasing risk that [information technology] systems and networks critical to [DoW] could be exploited through the introduction of counterfeit or malicious code and other defects introduced by suppliers of systems or components." S. Rep. 111-201, at 162 (2010).

It "conclude[d] that the Secretary should have the authority needed to address this risk," including the ability to "exclude a particular source from consideration where necessary to avoid an unacceptable supply chain risk." *Id.* The resulting legislation was contained within the Ike Skelton National Defense Authorization Act for Fiscal Year 2011, Pub. L. No. 111-383, § 806, 124 Stat. 4137, 4260 (Jan. 7, 2011) (later codified as amended at 10 U.S.C. § 3252).

The statute empowers the Secretary of War "to protect national security by reducing supply chain risk." 10 U.S.C. § 3252(b)(2)(A). "The term 'supply chain risk' means the risk that an adversary may sabotage, maliciously introduce unwanted function, or otherwise subvert the design, integrity, manufacturing, production, distribution, installation, operation, or maintenance of a covered system so as to surveil, deny, disrupt, or otherwise degrade the function, use, or operation of such system." 10 U.S.C. § 3252(d)(4). The Secretary (along with the heads of the military departments) may designate a "supply chain risk" and take "covered procurement action[s]" for qualifying procurements of "a national security system" or "an item of information technology . . . purchased for inclusion in a" national security system. 10 U.S.C. § 3252(a)(1), (d)(1)(A), (d)(3), (d)(5), (d)(6); *see also* 44 U.S.C. § 3552(b)(6) (defining "national security system"); 40 U.S.C. § 11101 (defining "item of information technology"). Covered procurement actions include "[t]he decision to withhold consent for a contractor to subcontract with a particular source or to direct a contractor . . . to exclude a particular source from consideration for a subcontract." 10 U.S.C. § 3252(d)(2)(C). Before carrying out a covered procurement action, the Secretary must "consult[] with procurement or other relevant officials" in the Department of War and "mak[e] a determination in writing" that, among other things, the use of § 3252 authority is necessary to protect national security and that less intrusive measures are not reasonably available to reduce the supply chain risk. *Id.* § 3252(b). The Secretary must notify appropriate congressional committees of the determination. *Id.* § 3252(b)(3); *see* 48 C.F.R. § 239.7304 (implementing regulations).

**FACTUAL BACKGROUND**

**I.     ANTHROPIC REJECTS THE DEPARTMENT OF WAR'S STANDARD "ANY LAWFUL USE" POLICY**

Shortly after taking office in 2025, the President issued an Executive Order declaring that: "It is the policy of the United States to sustain and enhance America's global AI dominance in order to promote . . . national security." Exec. Order No. 14,179, § 2, 90 Fed. Reg. 8741 (Jan. 23, 2025). To that

end, on January 6, 2026, the Secretary of War "direct[ed] the Department of War to accelerate America's Military AI Dominance by becoming an 'AI-first' warfighting force across all components." Sec'y of War, *Artificial Intelligence Strategy for the Department of War*, at 1 https://perma.cc/52KE-X7VQ?type=image. Achievement of that goal requires utilizing AI "models free from usage policy constraints that may limit lawful military applications." *Id.* 5. Accordingly, the Secretary "direct[ed] the Under Secretary of War for Acquisition and Sustainment to incorporate standard 'any lawful use' language into any DoW contract through which AI services are procured" and set a six-month deadline to do so. *Id.*

One AI service used by the Department is Anthropic's Claude model. The usage of Claude, however, is "subject to Terms of Service that incorporate its Usage Policy." Decl. of Jared Kaplan (ECF No. 6-1) ¶¶ 21-22. That Usage Policy reflects Anthropic's corporate "judgment" about how to enable "beneficial uses of AI while mitigating" what Anthropic believes to be "potential harms." *Id.* As Anthropic explains, "[t]he Usage Policy generally prohibits uses" that the company believes "pose unacceptable risks, including surveillance, compromising computer systems or networks, and designing weapons or other systems to cause harm or loss of human life." *Id.* ¶ 22. The Department accessed Claude through a contract with Palantir Technologies (which in turn partnered with Anthropic), as well as a separate agreement with Anthropic. *See* Decl. of Thiyagu Ramasamy (ECF No. 6-3) ¶¶ 5-6; ECF No. 6-14. Currently, Claude is the Department's most widely deployed AI model—and the only one embedded in the Department's classified systems—with a "government-specific addendum to the Usage Policy" "for national security users." Kaplan Decl. ¶¶ 26-27.

Pursuant to the Secretary's January directive, the Department requested that Anthropic "permit 'all lawful uses' of Claude." Ramasamy Decl. ¶ 16; *see, e.g.*, Kaplan Decl. ¶ 32; ECF No. 6-33 ("Here's what we're asking: Allow the Pentagon to use Anthropic's model for all lawful purposes."). The Secretary also delivered the request personally to Anthropic's CEO on February 24. *See* Decl. of Sarah Heck (ECF No. 6-2) ¶¶ 12-16. Although Anthropic characterized the dispute as about the use of Anthropic's models for lethal autonomous warfare and mass surveillance of Americans, *see* Kaplan Decl. ¶ 33, the Department made clear that it "has no interest in using AI to conduct mass surveillance of Americans (which is illegal) nor [does it] want to use AI to develop autonomous weapons that operate without human involvement," ECF No. 6-33. The principle behind the "all lawful uses" contract language is that the Department "will

not let ANY company dictate the terms regarding how [it] make[s] operational decisions." *Id.* Yet Anthropic refused to include the term, fully aware that it "meant Anthropic was not the right vendor for the Department's needs." Heck Decl. ¶ 11; *see* Kaplan Decl. ¶ 37 (recognizing "that because of Claude's limitations and safeguards, DoW may opt to work with another company that better suits its needs").

## II.     PRESIDENTIAL DIRECTIVE TO CEASE USE OF ANTHROPIC'S TECHNOLOGY AND THE SECRETARY'S RESPONSE

On February 27, the concerns building with the Government about Anthropic's behavior boiled over. That day, President Trump stated in a social media post that, by effectively insisting the Department of War "obey" the company's terms of service, Anthropic was "putting AMERICAN LIVES at risk, our Troops in danger, and our National Security in JEOPARDY." ECF No. 6-20. The President explained that the Executive Branch did not "want"—nor "need"—to do business with Anthropic under such circumstances. *Id.* The President thus directed every Federal Agency to cease use of Anthropic's technology, with a six month phase out period. *Id.*

In a social media post that followed, the Secretary echoed that the Department of War will not allow Anthropic to "seize veto power over the operational decisions of the United States military" through its terms of service; rather, the Department "must have full, unrestricted access to Anthropic's models for every LAWFUL purpose in defense of the Republic." ECF No. 6-21. The Secretary believed that Anthropic's "unelected tech executives" were attempting to "strong-arm the United States military into submission" when it is the "Commander-in-Chief and the American people alone" who decide the military's course. *Id.* "In conjunction with the President's directive for the Federal Government to cease all use of Anthropic's technology," the Secretary "direct[ed] the Department of War to designate Anthropic a Supply-Chain Risk to National Security." *Id.*

## III.     SECRETARIAL DETERMINATION THAT ANTHROPIC'S BEHAVIOR POSES A SUPPLY CHAIN RISK

After the Secretary's post, the Department proceeded with the statutory process to determine whether Anthropic posed a supply chain risk. On March 3, 2026, the Secretary received "the joint recommendation of the Under Secretary of War for Acquisition and Sustainment . . . and the Department of War Chief Information Officer" "that there is supply chain risk to DoW covered systems related to the

use of Anthropic . . . products or services." DoW-PI-002–003[2]; *see* 10 U.S.C. § 3252(d)(5) (defining "covered system"). In their view, there was a "significant risk" that, "by maintaining the ability and necessity to continuously update the product or service," Anthropic could "subvert the design and/or functionality of their product or service," including "alignment to the vendor's preferred terms of service." DoW-PI-002. That ability "put[s] the Department's lawful use of the capability at risk" and thereby "introduces national security risks to the DoW's supply chain." DoW-PI-002.

The Under Secretary of War for Research and Engineering, with the assistance of the Chief Digital and Artificial Intelligence Office (CDAO),[3] analyzed the risk posed by Anthropic in a memorandum entitled "Urgent Supply Chain Risk Analysis: Anthropic's Refusal to Permit Lawful AI Use." *See* DoW-PI-005–008; Decl. of Emil Michael ¶¶ 7-9. "Unlike traditional software," the Under Secretary explained, "AI models are probabilistic systems which are understood to 'drift' or degrade as new data is introduced and require constant tuning, the integrity of which[] is fundamentally based on the trustworthiness of the vendor"—*i.e.*, Anthropic—"to ensure the model continues to perform accurately and fairly." DoW-PI-006. Put simply, "AI systems are acutely vulnerable to manipulation" by those with "[p]rivileged access" who can "introduce unwanted function, or otherwise subvert the design, integrity, and operation of the model." DoW-PI-006. In real world terms, "Anthropic's ability to unilaterally alter system guardrails and model weights without DoW consent could fundamentally change the system's function and creates a significant operational risk," "such as a critical defense system failing to engage due to an unapproved, vendor-side modification." DoW-PI-006. And based on recent events, "DoW cannot trust Anthropic to ensure the integrity of its models." DoW-PI-006.

The Under Secretary further assessed that "Anthropic's risk level escalated from a potentially manageable technical and business negotiation to an unacceptable national security threat over the course of the DoW's contract negotiation with them." DoW-PI-007. "[T]here was a baseline risk given the

---

[2] Documents with the Bates prefix of "DoW-PI" are filed at Exhibit 1 to the Harlow Declaration.
[3] CDAO's mission "is to accelerate DoW's adoption of AI to ensure that [its] warfighters have the best capabilities to dominate on the battlefield and have full trust that the technologies they are using to create decision advantage are secure and trustworthy." Michael Decl. ¶ 7. CDAO was realigned under the Under Secretary for Research and Engineering in 2025. *Id.* ¶ 8. "Because of its institutional and subject matter expertise, CDAO inherited responsibility for section 3252 supply chain risk assessments relating to AI issues." *Id.* ¶ 8.

potential harm actions" made possible by Anthropic's "privileged access as the AI model's developer, curator, and maintainer." DoW-PI-007; *see also* Michael Decl. ¶¶ 9-10 (explaining that the "relatively opaque nature of large language model (LLM) technology" and the fact that Anthropic "employs a large number of foreign nationals to build and support its LLM products" contributes to this baseline risk). That "risk level increased when Anthropic insisted on terms of service that would constrain the DoW beyond what is in the law." DoW-PI-007; *see also* Michael Decl. ¶ 11 (explaining Anthropic's insistence on "imposing restrictions on DoW's lawful military capability development, operations, and intelligence missions" would "impair the capabilities of the U.S. military relative to our adversaries"). It "further increased when Anthropic asserted in the negotiations that it have an approval role in the operational decision chain, which would require the DoW to accept significant operational risk." DoW-PI-007.

These concerns were bolstered by Anthropic's recent behavior. As the Under Secretary explained, during recent "active military operations, Anthropic leadership [had] questioned the use of their technology in [DoW] warfighting systems" despite the use being "clearly permitted under the Terms of Service of their existing contract with [DoW's] Prime contractor," Palantir. DoW-PI-007; *see also* Michael Decl. ¶ 15. "This led to alarm by the DoW and the prime contractor who provides Anthropic software, and raised material doubts as to whether they would cause their software to stop working or cause some other disastrous action that would put our warfighters lives in danger." DoW-PI-005; *cf.* Kaplan Decl. ¶ 39 (declaration from one of petitioner's co-founders explaining that Anthropic's attempts to limit the Department's use of its software reflect petitioner's own "technical judgment" and "principles"). Indeed, if such interference took place "during an operation, whether by shutting off access to the model or altering its functionality," it "could cause serious harm to national security and loss of human life." Michael Decl. ¶ 16. Atop all that, "during the final weeks of negotiations," Anthropic "began engaging in an increasingly hostile manner through the press," a manner at odds with "the ongoing private negotiations with DoW leadership," which amplified doubts that Anthropic "can[] be trusted." DoW-PI-006–07; *see also* Michael Decl. ¶ 13.

Anthropic's "collective set of actions," the Under Secretary concluded, "represents a fully mature supply chain risk—including increased potential for model poisoning, insider threat risk, data exfiltration, and denial of service." DoW-PI-007; Michael Decl. ¶ 16 (explaining the actions demonstrate potential to

"undermine lawful U.S. national security activities and objectives"). "[T]his risk is not limited only to Anthropic and its model's standalone presence in DoW systems or as a subcontractor to DoW." Michael Decl. ¶ 17. "When Anthropic's model is layered into other applications, there is a substantial risk that any company-imposed restrictions or alterations to the model would be transferred and impact mission applications, including in weapon systems development, and other products or services that ultimately perform DoW activities." *Id.* For example, "if Anthropic's technology is used as a plug-in to a larger application, it may limit the functionality of that larger system to the internal limitations built into or added to the Anthropic system." *Id.* ¶ 18. "This would directly impair other covered systems by reducing their functionality to the same level as Anthropic's system." *Id.* By "posing a direct, intolerable, and material risk to our warfighting capability," Anthropic "warrants designation . . . as a supply chain risk." DoW-PI-007.

On March 3, the Secretary accepted the joint "recommendation provided by the Under Secretary of War for Acquisition and Sustainment," "the Department of War Chief Information Officer," and the Under Secretary of War for Research and Engineering. DoW-PI-001. The Secretary determined that "[t]he use of any of" Anthropic's "products or services in any DoW covered system presents a supply chain risk and the use of the authority in section 3252(a) is necessary to protect national security by reducing that supply chain risk." DoW-PI-001. He directed that "[a]ll actions authorized in accordance with 48 C.F.R. § 239.7305" should be implemented for "[a]ll DoW procurements for which 48 C.F.R. Subpart 239.73 is applicable." DoW-PI-001 (adopting Scoping Analysis); DoW-PI-022 (Scoping Analysis). This means Anthropic is excluded from supplying products or services, as a contractor or a subcontractor, for procurements involving national security systems. *See* 10 U.S.C. § 3252(d)(2)-(3), (d)(5)-(6); 48 C.F.R. § 239.7305. Through letters also dated March 3, the Secretary notified both Congress, *see* DoW-PI-023–028; 10 U.S.C. § 3252(b)(3), and Anthropic of his Determination, *see* ECF No. 6-22; DoW-PI-029–032.

**IV.    FEDERAL AGENCIES DISCONTINUE USE OF CLAUDE AND ANTHROPIC SUES TO RETAIN ACCESS**

Since the Presidential Directive, federal agencies have taken steps to exercising their respective authorities to discontinue the use of Anthropic's products and services. *See, e.g.*, ECF Nos. 6-22, 6-23, 6-25, 6-26. Because it is "technically and operationally infeasible" to immediately remove Anthropic's

technology from all DoW systems, "particularly in the midst of active operations[,]" the Secretary has provided a 180-day transition period to "migrate to alternative LLM products without impacting operational readiness." Michael Decl. ¶ 22. That transition process has been initiated. Michael Decl. ¶¶ 23-26; DoW-PI-033–034.

On March 9, Anthropic filed this suit against the Department of War (and the Secretary), 16 other federal agencies (and their heads), as well as the Executive Office of the President. *See generally* Compl. Anthropic alleges five counts: (1) an APA claim challenging the Secretarial Determination and the Secretary's social media post; (2) a First Amendment claim based on the Presidential directive and the Secretary's actions; (3) an *ultra vires* claim against the Presidential Directive and its implementation; (4) a Fifth Amendment due process claim challenging the Presidential Directive and the Secretary's actions; and (5) and an omnibus APA claim against all agency defendants. *See id.* ¶¶ 113-87. Simultaneously, Anthropic moved for a preliminary injunction and 5 U.S.C. § 705 stay, although the motion does not rely on Count V. *See* PI Mot. Among other things, Anthropic asks the Court to prevent all defendants from taking any action to "implement, effectuate, or further the purposes of" the Presidential Directive, the Secretary's February 27 social media post, and the Secretarial Determination. ECF No. 6-34 at 2.

## LEGAL STANDARD

A "preliminary injunction is an extraordinary and drastic remedy" that "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted). A district court may enter a preliminary injunction only "upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the movant must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer an irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the proposed injunction is in the public interest. *Id.* at 20; *see, e.g.*, *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). When "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). These same factors apply to determine whether a stay under the APA, 5 U.S.C. § 705, is warranted. *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995 (9th Cir. 2025).

**ARGUMENT**

## I.    ANTHROPIC IS NOT LIKELY TO SUCCEED ON THE MERITS

Likelihood of success "is a threshold inquiry and is the most important factor." *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020). "[A] court need not consider the other factors if a movant fails to show a likelihood of success on the merits." *Baird*, 81 F.4th at 1040. Moreover, in seeking to overturn the President and the Secretary of War's assessment of the risks of using its products, Anthropic must overcome the "unique deference" owed by courts to the Executive Branch in national security matters, *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012), and the "significant weight" afforded to such judgments, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 36 (2010). What is more, agencies "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process," and "determining an agency's minimum needs" for AI models squarely falls within that broad discretion and is not a matter "for [the] court to second guess." *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (citations omitted); *cf. Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 260-61 (Fed. Cl. 2016) ("[e]ffective contracting demands broad discretion" and thus contracting decisions are subject to a "highly deferential rational basis review"). Against this headwind of double deference, Anthropic has not clearly shown that it is likely to succeed on any of its claims.

### A. Anthropic's First Amendment claim is unlikely to succeed

To bring a First Amendment retaliation claim, a plaintiff must allege, among other things, that it engaged in constitutionally protected activity and that the protected activity was a substantial motivating factor in the defendant's conduct—*i.e.*, "that there was a nexus between the defendant's actions and an intent to chill speech." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, — F.4th —, 2026 WL 534591, at *6 (9th Cir. Feb. 26, 2026) (*AFGE*). "Upon making a prima facie showing, 'the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of.'" *Id.* (quoting *Boquist v. Courtney*, 32 F.4th 764, 777-78 (9th Cir. 2022), and *Hartman v. Moore*, 547 U.S. 250, 260 (2006)). "If there is a finding that retaliation was not the but-for cause of the adverse action, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind." *Id.*; *see Boquist*, 32 F.4th at 778;

*Hartman*, 547 U.S. at 260.

### 1.    Refusal to accept the Government's contractual term is not speech

The parties' dispute stems from Anthropic's refusal to agree to the Government's "all lawful use" contractual term. The refusal is conduct, not speech. Anthropic says that agreeing to the Government's contractual term would be against its "mission to advance the safe and beneficial development and use of AI." Kaplan Decl. ¶ 39. But Anthropic was free to reject DoW's term for that reason, and it did, along with the reason that agreeing to the term would be bad for business. *See id.* ¶ 38 (discussing that the "all lawful use" term would compromise Anthropic's "core identity and competitive advantage," "erode internal and external trust, weaken the company's culture, and threaten its ability to attract and retain the expertise and commitment necessary to build innovative, cutting-edge AI systems"). But that does not transform the parties' commercial dispute, or the consequences that flow from it, into a dispute about speech. *Cf. Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 291 (D.C. Cir. 2019) (Government's ban on the free distribution of manufacturer's products does not "restrict the manufacturer's ability to communicate" and thus, does not implicate any "communication of information" protected by the First Amendment).

To conclude otherwise "would extend First Amendment protection to every commercial transaction on the ground that it communicates to the customer information about a product or service." *Id.* And yet, the Supreme Court has long rejected the "view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). Indeed, "[i]t is possible to find some kernel of expression in almost every activity a person undertakes[.]" *City of Dallas v. Stanglin*, 594 U.S. 19, 25 (1989). Anthropic's refusal might be "accompanied by expressions of principle[,] [b]ut the refusal itself is not speech." *See* Michael C. Dorf, *Is the Government Punishing Anthropic for Speech?* (Mar. 11, 2026), https://perma.cc/7UWM-3K8V (likening Anthropic's argument to a manufacturer's refusal to agree to new terms of service that the manufacturer believes will violate its principles about animal conservation); *cf. Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 769 (2018) ("[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (same); *Las Vegas Nightlife, Inc. v. Clark Cnty.*, 38 F.3d 1100, 1102 (9th Cir. 1994) (the government can regulate "ordinary commercial activity"

without "offending the First Amendment").

Importantly, in the context of contract negotiations, "it has never been deemed an abridgment of freedom of speech" merely because the conduct at issue "was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). Because the Government unquestionably has authority "to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases," *Perkins*, 310 U.S. at 127, it makes no sense to suggest that the Government risks a First Amendment violation every time it rejects a vendor's contractual term. *Cf. Coyne-Delany Co. v. Capital Dev. Bd.*, 616 F.2d 341, 342 (7th Cir. 1980) (per curiam) ("[N]o one has a 'right' to sell to the government that which the government does not wish to buy."). The First Amendment is not a license to unilaterally impose contract terms on the Government, and Anthropic cites nothing to support such a radical conclusion.

Anthropic also briefly mentions the Petitions Clause, alleging that Anthropic's "attemp[t] to persuade the government to understand and accept" its terms of service is a protected petition. PI Mot. 21. But the Petition Clause protects "concerted efforts to influence public official[s]" about policy, *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965), not a vendor's business negotiations with the Government, *see United States ex rel. Wilson v. Maxxam, Inc.*, No. C 06-7497 CW, 2009 WL 322934, at *6 (N.D. Cal. Feb. 9, 2009) (forest management company's statements in a management plan during "business negotiations with the government" to buy company's land were not covered by Petitions Clause). The Petitions Clause does not even require the Government "to listen or respond" to petitions. *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 286 (citation modified). Anthropic was free, and continues to be free, to petition the Government.

### 2. Anthropic's speech was not the motivating factor for the challenged actions

Anthropic acknowledges that the Government "took the Challenged Actions only after Anthropic refused to change its position on acceptable uses of Claude." Compl. ¶ 149. Anthropic's expressive activity thus was not "a substantial or motivating factor" for the Presidential Directive or the Secretary's actions. *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016); *see also Mendocino Envt'l Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) ("[i]ntent to inhibit speech" is "an element" of a First

Amendment retaliation claim). This is evident from the timeline of events. *See Burch v. City of Chubbuck*, 146 F.4th 822, 838 (9th Cir. 2025) (examining "timeline of events" to determine casual connection); *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 870 (9th Cir. 2016) (same). Anthropic admits that it has advocated "since its inception" on issues of AI safety and policy, including the conditions in its terms of service. Compl. ¶ 73. Anthropic's Usage Policy from as early as 2023 prohibited using Claude for "covertly tracking, targeting, or surveilling individuals." Anthropic, *Acceptable Use Policy*, https://perma.cc/7UC7-8T7U (version of Sep. 15, 2023). According to Anthropic's own declarations, the Government first accessed Claude in March 2025, *see* Kaplan Decl. ¶ 29, contracted with Anthropic for Claude in July 2025, *see* Ramasamy Decl. ¶ 6, and gave Anthropic a Top Secret security clearance that same year, *see id.* ¶ 9, all of which occurred after Anthropic's public expressions on AI usage and policy. And Anthropic never alleges that the Government at any time attempted to stifle Anthropic's expressive activity.[4] The allegedly adverse actions occurred only after Anthropic rejected the Government's standard contractual term and insisted on its own term.

At bottom, had Anthropic agreed to the Government's term, the challenged actions would not have occurred. The Presidential Directive indicates the President's belief that Anthropic had "tr[ied] to STRONG-ARM the Department of War and force them to obey [Anthropic's] Terms of Service," and that those attempts would put "AMERICAN LIVES at risk, our Troops in danger, and our National Security in JEOPARDY." ECF No. 6-20 at 2. The Secretary's social media post that same day echoed those sentiments and emphasized that a private vendor cannot "seize veto power over the operational decisions of the United States military." ECF No. 6-21 at 2. As for the Secretarial Determination, the underlying joint recommendation identified a supply chain risk based on the "restrictions on the use of [Anthropic's] products and services" as required by Anthropic's terms of service. DoW-PI-001. The Department assessed that those restrictions "introduce[d] national security risks," including the potential for Anthropic "to subvert the design and/or functionality of their product or services," *id.*, a concern that was heightened by Anthropic's course of conduct during the parties' negotiations.

---

[4] The Government did not, for example, object to Dr. Amodei's 60 Minutes interview in 2025 about the potential dangers of AI. *See* CBS News, *Why Anthropic CEO Dario Amodei spends so much time warning of AI's potential dangers* (Nov. 16, 2025), https://perma.cc/S87T-BJ38 (Interview Tr.).

The Presidential Directive and the Secretary's exercise of section 3252 authority thus were not borne out of "a desire to punish Anthropic for its views," PI Mot. 23, but rather out of concern that a private vendor is seeking to dictate the military's use of AI in the national security realm. The "utmost deference" afforded by courts to the Executive in national security matters would mean nothing if a court could focus only on a vendor's public statements—that accompanied the conduct deemed to cause national security concern—to find a First Amendment violation. *Cf. Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988); *see CIA v. Sims*, 471 U.S. 159, 180 (1985) ("[I]t is the responsibility of the [Executive Branch], not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether [the conduct at issue] may lead to [national security harm]."); *AFGE*, 2026 WL 534591, at *7 (court should not consider challenged statements "in the worst possible light" but must consider them alongside the Government's national security reasons).

**3.    Even assuming a retaliatory motive, the Government would have acted the same**

As noted, even when a plaintiff has made a prima facie showing, and there is "proof of some retaliatory animus in the official's mind," the claim still fails if the retaliation against speech "was not the but-for cause of the adverse action." *AFGE*, 2026 WL 534591, at *6 (citation omitted). The above discussion makes clear that "even without the impetus to retaliate," the President and the Secretary "would have taken the action[s] complained of" because both of their social media posts clearly articulated a national security concern for continuing to use Anthropic's products and services. *Id.* And the Secretarial Determination and its supporting documents conclude that Anthropic's restrictions "introduce[d] national security risks" and make no mention of Anthropic's speech. Because the challenged actions have "a legitimate grounding in national security concerns, quite apart from any retaliatory animus," the President and the Secretary would have taken the same actions regardless. *Id.*, at *6 (citation omitted); *cf. TikTok Inc. v. Garland*, 604 U.S. 56, 79-80 (2025) (holding that because Congress would have passed the law based on content-neutral national security reasons "alone," the Court had no need to analyze the law under an alternative allegedly content-based rationale). That is fatal to Anthropic's First Amendment claim.

**B. Anthropic's APA challenge to the Secretary's actions is not likely to succeed**

Anthropic challenges under the APA, 5 U.S.C. § 706, the Secretary's February 27 social media post (which Anthropic inaptly styles a "Secretarial Order"), and the March 3 Secretarial Determination under 10 U.S.C. § 3252—but not the Presidential Directive.[5] *See* PI Mot. 23-27; Compl. ¶¶ 113-33 (Count I). Both challenges lack merit.

**1. The Secretary's social media post is not a distinct, final agency action**

Contrary to Anthropic's assertion (PI Mot. 24), the Secretary's social media post on February 27 is *not* a final agency action subject to APA review. An "agency action" is "final" when it "mark[s] the consummation of the agency's decisionmaking process" and is one "by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). The Secretary's social media post satisfies neither requirement.

The post was more "the beginning" than the consummation of DoW's decisionmaking process under 10 U.S.C. § 3252. *Indus. Customers of Nw. Utilities v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005). The facts bear this out. Days *after* the Secretary's post, ECF No. 6-21, the Under Secretary of War for Acquisition and Sustainment and the Department of War Chief Information Officer submitted a "joint recommendation" based on "consult[ations] with procurement and other relevant officials within DoW." DoW-PI-002–003. The recommendation packet also includes a risk analysis memorandum. DoW-PI-005–008; *see* 10 U.S.C. § 3252(b)(1); 48 C.F.R. § 239.7304. It is only on March 3, upon receipt of that recommendation packet, that the Secretary actually exercised his authority under 10 U.S.C. § 3252 to find that "covered procurement actions" are "necessary to protect national security by reducing th[e] supply chain risk" from Anthropic's products or services. DoW-PI-001. Although "directing" his

---

[5] The Presidential Directive itself, of course, is not subject to APA review because the President is not an "agency" within the meaning of the APA, *Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992), and "this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties," *id.* at 802-03 (quoting *Mississippi v. Johnson*, 4 Wall. 475, 501 (1867)). As for the agencies' implementation of the Presidential Directive, Anthropic does not move for a preliminary injunction on that basis. This is not surprising because a challenge to an agency's termination of any contractual relationship with Anthropic falls outside this Court's jurisdiction under the APA. *See Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam). Anthropic must instead proceed in accordance with the review scheme available for contract disputes with the Government. *See, e.g.*, 28 U.S.C. § 1491; *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1022-23 (9th Cir. 2023).

subordinates to take future steps in the February 27 social media post, ECF No. 6-21, any such direction was "subsumed in" the final Secretarial Determination, so the post necessarily did not consummate DoW's decisionmaking process, *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1008 (9th Cir. 2021).

Nor is the social media post "the source of any binding legal obligations" on Anthropic or any other contractor. *Id.* at 1009. Those legal obligations were only fixed by the March 3 Secretarial Determination. In other words, no entity "would face liability for noncompliance" with the post. *Id.* Proving that point, Anthropic identifies "no provision" of law for which "noncompliance" with the post "might result in a consequence beyond those contained in" the Secretarial Determination. *Id.*; *see* PI Mot. 25. Because the post did not "alter the legal regime to which" Anthropic "is subject," it does not qualify as a "final agency action" amenable to judicial review under the APA. *Bennett*, 520 U.S. at 178.

Even if the Court finds the Secretary's post to be a final agency action, that would not get Anthropic very far. An "agency can 'deal with the problem afresh' by taking *new* agency action." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 201 (1947)). The March 3 Secretarial Determination would constitute a new agency action, evaluated on its own record, and "not limited to [the] prior reasons" of the social media post. *Id.* And to the extent the post presaged the Determination, that "is hardly improper"; the Secretary may have "policy preferences and ideas" and then "work with" his subordinates "to substantiate" the bases "for a preferred policy." *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019).

### 2.      The Secretarial Determination was lawful and reasonable

The Secretarial Determination is not contrary to law. *See* 5 U.S.C. § 706(A), (C). It does not exceed "the scope of the Secretary's authority" under 10 U.S.C. § 3252. PI Mot. 25. The statute authorizes the Secretary to determine that a covered procurement action is necessary to protect national security. The Secretary did so, and his Determination properly seeks to mitigate the supply chain risk. Consistent with the statute, the Determination also specifies that it is applicable only to Anthropic's "products or services that meet the definition of a 'covered item of supply' or that are part of a 'covered procurement,' as those terms are defined at 10 U.S.C. § 3252(d)." DoW-PI-001. Thus, on its face, the Determination does *not* "purport[] to" sweep "outside" those statutory parameters. PI Mot. 24.

*Second*, the Secretarial Determination complied with all procedural requirements. *See* PI Mot. 25-26. The record reveals that, before issuing the Determination, the Secretary "consult[ed] with procurement [and] other relevant officials" in the Department of War, made the requisite "determination in writing," and "provid[ed] . . . notice of the determination . . . to the appropriate congressional committees." 10 U.S.C. § 3252(b)(1)-(3); *see* DoW-PI-002–028; Michael Decl. ¶¶ 7-8 (identifying the relevant officials after DoW's 2025 reorganization to include subject matter expert CDAO and the Office of the Chief Information Officer).

*Third*, the Determination readily clears the arbitrary and capricious standard, which is "highly deferential" and "extremely limited." *Compassion Over Killing v. U.S. FDA*, 849 F.3d 849, 854 (9th Cir. 2017). Under that standard, "[a]gency action is presumed to be valid and must be upheld if a reasonable basis exists for the agency decision." *Peck v. Thomas*, 697 F.3d 767, 772 (9th Cir. 2012). "A court may not substitute its own policy judgment for that of the agency"; rather, it "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423-24 (2021). And lying at the intersection of national security and government procurement, the Secretarial Determination is entitled to "unique deference," *Al Haramain*, 686 F.3d at 980, given "the broad discretion of agency officials" in those areas, *Savantage*, 595 F.3d at 1286; *see China Unicom (Americas) Operations Ltd. v. FCC*, 124 F.4th 1128, 1153-54 (9th Cir. 2024) (in arbitrary and capricious challenge, a court may "not interfere with the agency's latitude . . . to select the policies deemed in the public interest, . . . particularly "when national security is implicated").

Anthropic argues that it could not qualify as "an 'adversary'" for purposes of posing a "supply chain risk" because "[t]he Executive Branch has typically reserved such designations for enemies of the United States" that are foreign countries. PI Mot. 26. However, section 3252 does not textually limit the pool of potential adversaries to foreigners or hostile nations. On the contrary, both foreign and domestic actors (and state and non-state actors alike) are capable of the adversarial activities identified by Congress—"sabotage, maliciously introduce unwanted function, or otherwise subvert the design, integrity, manufacturing, production, distribution, installation, operation, or maintenance of a covered system so as to surveil, deny, disrupt, or otherwise degrade the function, use, or operation of such system."

Case No. 3:26-cv-1996-RFL                18                Opp'n to Pl.'s Mot. for Preliminary Injunction

10 U.S.C. § 3252(d)(4). That is consistent with the word's plain meaning, which broadly encompasses any "opponent in a contest, conflict, or dispute." *Adversary*, New Oxford American Dictionary (3d ed. 2010); *see* American Heritage Dictionary of the English Language 25 (5th ed. 2011) (adversary includes "an opponent"); Webster's New World College Dictionary 20 (4th ed. 2008) (same); *see Niz-Chavez v. Garland*, 593 U.S. 155, 169 (2021) (consulting dictionaries to discern statute's "ordinary" meaning). And "[a]textual judicial supplementation" with Anthropic's proposed foreign-nation qualifier "is particularly inappropriate" because "Congress has shown that it knows how to adopt the omitted language." *Lackey v. Stinnie*, 604 U.S. 192, 205 (2025) (citation omitted); *see, e.g.*, 15 U.S.C. § 9901(c)(2), (c)(4) (defining "foreign adversary" and "foreign adversary country").

Anthropic's argument that there was no factual "basis for labeling [it] an 'adversary'" fares no better. PI Mot. 26. As the Under Secretary of War for Research and Engineering explains, Anthropic's "privileged access as the AI model's developer, curator and maintainer" creates "a baseline risk" of "potential harmful actions" from "this privileged technical access." DoW-PI-007; *see also* Michael Decl. ¶ 9 (explaining that the "relatively opaque nature" of "LLM technology" also creates a "baseline risk"). And recent events led the Department to conclude that it "cannot trust Anthropic to ensure the integrity of its models." DoW-PI-006. For instance, "Anthropic insisted on terms of service that would constrain the DoW beyond what is in the law." DoW-PI-007; *see also* Michael Decl. ¶ 11. The company also insisted upon "an approval role in the operational decision chain, which would require the DoW to accept significant operational risk." DoW-PI-007; *see also* Michael Decl. ¶¶ 11-12. Equally alarming was how, after recent "active military operations, Anthropic leadership questioned the use of their technology in [DoW] warfighting systems," despite the use being "clearly permitted under the Terms of Service of their existing contract with [DoW's] Prime contractor." DoW-PI-007; *see also* Michael Decl. ¶ 15. And "during the final weeks of negotiations," Anthropic "began engaging in an increasingly hostile manner." DoW-PI-007. The Secretary therefore reasonably determined that, in opposition to a DoW operational decision, Anthropic staff might sabotage, maliciously introduce unwanted function, or otherwise subvert the design, integrity, or operation of a national security system to degrade its function, use or operation—a national security assessment this Court must afford "significant weight." *Humanitarian L. Project*, 561 U.S. at 36; *cf. Egan*, 484 U.S. at 529 ("assessing the potential risk" to classified information of an entity's "future

Case No. 3:26-cv-1996-RFL                    19                    Opp'n to Pl.'s Mot. for Preliminary Injunction

actions" involves a "[p]redictive judgment" that "must be made by those with the necessary expertise in protecting classified information").

Anthropic attacks as internally inconsistent the designation of Anthropic as a "supply chain risk" while allowing up to "six more months of classified use" of Claude. PI Mot. 27. But there's nothing inconsistent about acknowledging the reality that it will take time for DoW to offramp Anthropic and standup new AI models. *See* Michael Decl. ¶ 22 (explaining that it is "technically and operationally infeasible to remove [Anthropic's] technology from all DoW systems immediately, particularly in the midst of active operations"). The 180-day transition period allows DoW to "migrate to alternative LLM products without impacting operational readiness." *Id.* And nothing in the statute's text suggests the authority cannot reach products and services that DoW cannot immediately discontinue. As the Secretary noted, the six months timeframe is "to allow for a seamless transition." ECF No. 6-21. The Department cannot simply flip a switch at a time when Anthropic currently is the only AI model cleared for use on DoW's classified systems and high-intensity combat operations are underway.

Finally, Anthropic claims the Secretary's "finding that 'less intrusive measures' were 'not reasonably available'" was "untenable" because "[t]he Secretary could have agreed to Anthropic's offer to support an orderly offboarding and replaced Claude with other AI models not subject to Anthropic's policy." PI Mot. 27. That simply validates the Secretarial Determination. Anthropic's proposed "less intrusive measure" accepts that DoW must remove Claude from DoW systems, which DoW is doing with a six-month phase out period. And in any event, "DoW *considered* whether less restrictive means than exclusion and removal could mitigate the supply chain risk and national security harm." Michael Decl. ¶ 20 (emphasis added). But "[t]he only potential mitigation to [Anthropic's] collective set of risks— acquisition of LLM products with the usage terms and technical and service delivery specifications DoW requires—was not an option to which Anthropic would agree." *Id.*; *see also id.* ¶ 21. Accordingly, the Court should reject Anthropic's arbitrary and capricious challenge to the Secretarial Determination.

In sum, Anthropic's APA challenges are unlikely to succeed.

### C. Anthropic is not likely to succeed on its due process challenge

The Due Process Clause protects against the deprivation "of life, liberty, or property, without due process of law." U.S. Const. amend. V. The threshold "inquiry in every due process challenge is whether

the plaintiff has been deprived of a protected interest" in liberty or property. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). Anthropic's Due Process claim fails at this first step.

*First*, Anthropic's cursory invocation of reputational harm does not suffice. Generally, "harm to reputation alone is insufficient to implicate an individual's liberty interest." *Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1179 (9th Cir. 1988); *see also Siegert v. Gilley*, 500 U.S. 226, 233 (1991) (same). *Second*, Anthropic's "contractual relationships with its customers and the government," PI Mot. 28, do not constitute protected property interests. "To have a property interest in a benefit, a person clearly must . . . have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005). Without more, a government contract for services does not create such a claim. *See Physicians' Servs. Med. Grp., Inc. v. San Bernardino Cnty.*, 825 F.2d 1404, 1410 (9th Cir. 1987) ("contract to supply medical services to the state does not confer any constitutionally protectible interest on" the plaintiff); *Erickson v. United States*, 67 F.3d 858, 862 (9th Cir. 1995) ("[P]hysicians do not have a property interest in continued participation in Medicare."); *see also Fox Ins. Co. v. Ctrs. for Medicare & Medicaid Servs.*, 715 F.3d 1211, 1223 (9th Cir. 2013) (labeling as "questionable" the proposition that a plaintiff "has a protectable property interest in its government contract"). Accordingly, neither the Presidential Directive nor the Secretary's corresponding social media post implicates a property interest.

As for Anthropic's contracts with other customers, the Government "played no role" in those contracts, so any impact on them stems from the customers' actions and choices, not the Government's. *Guzman v. Shewry*, 552 F.3d 941, 957 n.12 (9th Cir. 2009). And the Government has not designated Anthropic in such a way that broadly prohibits anyone from "conducting any business whatsoever" with Anthropic. *Al Haramain,* 686 F.3d at 980 (cited by PI Mot. 20). The Secretarial Determination excludes Anthropic only from procurements involving "covered system[s]," 10 U.S.C. § 3252(d)(3), (d)(5), and the Presidential Directive applies only to federal agencies, *see* ECF No. 6-20 at 2. Private individuals and enterprises (not legally subject to government control) remain free to transact with Anthropic for any purpose unrelated to providing a service to the Government.

*Third*, Anthropic complains that the Presidential Directive "accomplishes a de facto debarment" infringing on Anthropic's "liberty interest in pursuing its chosen trade." PI Mot. 28. But the Directive does not effect "a complete prohibition of the right to engage in a calling." *Dittman v. California*, 191

F.3d 1020, 1029 (9th Cir. 1999) (citation omitted).  The Government has not, for example, "yanked the license of [Anthropic] in an occupation that requires licensure." *Engquist v. Ore. Dep't of Agric.*, 478 F.3d 985, 998 (9th Cir. 2007) (citation omitted), *aff'd on other grounds*, 553 U.S. 591 (2008).  Indeed, Anthropic maintains substantial commercial relationships outside the Government, and it remains free to contract with those partners and pursue its AI business.

Even if Anthropic had properly invoked a protected interest, "the question remains what process is due." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).  "Due process . . . is a flexible concept that varies with the particular situation." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990).  A "statutory provision for a postdeprivation hearing" can satisfy "due process," *id.* at 128, particularly where there is "the necessity of quick action by the State or the impracticality of providing any predeprivation process," *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982).  For that reason, section 3252 does not mandate pre-deprivation process—the constitutionality of which scheme Anthropic does not challenge.  And because determinations under section 3252 involve sensitive national security matters and potentially classified information, Congress expressly authorized the Secretary "to limit disclosure of information" about any determination.  *Id.* § 3252(c).  Due process is then satisfied post-determination by the opportunity for Anthropic to seek reconsideration before DoW within 30 days of receipt of the Determination, *see* DoW-PI-030–032, and to pursue judicial review under the APA, *see First Nat'l Bank & Tr., Wibaux, Mont. v. Dep't of Treasury*, 63 F.3d 894, 899 (9th Cir. 1995) (holding that APA review in district court adequately safeguards "due process rights"); *cf. Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 599 (1950) ("It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination.").

### D. The President and the Secretary acted well within their authority

As a last gasp, Anthropic asserts that the Presidential Directive, the Secretary's February 27 social media post, and the Secretarial Determination "are *ultra vires*" and violate the separation of powers.  PI Mot. 29.  However, "[u]ltra vires review is . . . unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review, or if a statutory review scheme forecloses all other forms of judicial review." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (internal quotation omitted).  And this *is* a usual case.  Given the APA and

Case No. 3:26-cv-1996-RFL                    22                    Opp'n to Pl.'s Mot. for Preliminary Injunction

contract-specific statutory review schemes, Anthropic cannot proceed under an *ultra vires* theory.

Even if it could, an *ultra vires* claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Id.* at 681-82 (quotation omitted). It does not apply to constitutional claims, nor does it apply "simply because an agency has arguably reached a conclusion which does not comport with the law." *Id.* at 681 (quotation omitted). "Rather, it applies only when an" Executive Branch official "has taken action entirely in excess of [their] delegated powers and contrary to a specific prohibition in a statute." *Id.* (quotation omitted). Anthropic's *ultra vires* claim falls far short of that high bar.

As for the Presidential Directive, *ultra vires* review is only available for claims alleging that the President clearly exceeded delegated statutory authority. *See Murphy Co. v. Biden*, 65 F.4th 112, 1129-31 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 1111 (2024); *see also, e.g.*, *Am. Forest Res. Council v. United States*, 77 F.4th 787, 798 (D.C. Cir. 2023) (concluding *ultra vires* claim that the President exceeded authority delegated under the Antiquities Act was reviewable). Anthropic identifies no statute that the President purportedly exceeded—let alone that the President acted "entirely in excess" of, *Nuclear Regul. Comm'n*, 605 U.S. 681–82—when he directed his subordinates to exercise their discretion to stop using Anthropic's products and services due to national security concerns. And federal agencies themselves have broad discretion to assess their procurement needs and determine how best to meet them. *See, e.g.*, *Perkins*, 310 U.S. at 127; *PricewaterhouseCoopers Pub. Sector, LLP v. United States*, 126 Fed. Cl. 328, 364 (2016); 48 C.F.R. § 49.502 (termination for government's convenience).

And under Article II, the President may guide his subordinates' lawful exercise of discretion regarding procurement policies. Article II vests "[t]he entire 'executive Power'" in the President. *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020). And if "any power whatsoever is in its nature Executive, it is the power of . . . overseeing, and controlling those" in the Executive Branch. *Id.* (quoting 1 Annals of Cong. 463 (1789)). Article II accordingly permits "the President [to] maintain a degree of control over [his] subordinates" and "ensure that these subordinates serve the people effectively and in accordance with the [President's] policies." *Collins v. Yellen*, 594 U.S. 220, 252 (2021). It is, therefore, well within the President's authority to determine that the Executive Branch does not "need" or "want" to use Anthropic's products and services, when, in the President's judgment, their continued use puts "our National Security in JEOPARDY." ECF No. 6-20. The President fairly could require his subordinates to "CEASE all use

of Anthropic's technology" with a phase out period in accordance with applicable law. *Id.* If anything, it is Anthropic's proposed relief that, if granted, would contravene separation of powers principles. This Court would require the Executive Branch to continue using Anthropic's products and services, even when the Executive Branch no longer wants to do so. ECF No. 6-34. Such an order would encroach on the Executive's "power . . . to determine those with whom it will deal[,]" *Perkins*, 310 U.S. at 127, and "intrude upon the authority of the Executive in military and national security affairs," *Egan,* 484 U.S. at 530.

As for the Secretary's actions, Anthropic's *ultra vires* argument is meritless. As noted, review of the company's *ultra vires* claim is unavailable because the APA provides Anthropic "with a meaningful and adequate opportunity for judicial review[.]" *Nuclear Regul. Comm'n*, 605 U.S. at 681 (citation omitted). Further, Anthropic concedes the Department's authority "to work with another company that better suits its needs." Kaplan Decl. ¶ 37. And the Secretarial Determination was expressly authorized by 10 U.S.C. § 3252. Necessarily then, the Secretary did not act "entirely in excess of [his] delegated powers." *Nuclear Regul. Comm'n*, 605 U.S. at 681-82.

## II.    ANTHROPIC WILL NOT SUFFER IRREPARABLE HARM BEFORE A RULING ON THE MERITS

Because Anthropic fails to establish a likelihood of success on the merits of its claims, the Court "need not consider the other [*Winter*] factors" and can deny Anthropic's motion on that basis alone. *Baird*, 81 F.4th at 1040 (quotation omitted). In any event, Anthropic fails to meet the other factors as well. To obtain a preliminary injunction, Anthropic must also "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. A "showing of a mere possibility of irreparable harm is not sufficient," *Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010), nor is "[s]peculative injury," *Federated Indians of Graton Rancheria v. Haaland*, 762 F. Supp. 3d 888, 897-98 (N.D. Cal. 2025); *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007). Rather, "a plaintiff must *demonstrate* immediate threatened injury." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Anthropic has not carried its burden.

*First*, Anthropic argues that because the Presidential Directive and the Secretarial Determination purportedly "violate the First Amendment and the Due Process Clause," "irreparable harm 'follows inexorably[.]'" PI Mot. 30. But that is just another way of saying that an injunction is appropriate because Anthropic is likely to prevail on the merits. But as already discussed, it cannot make that showing. *Cf.*

*Hernandez v. Sessions*, 872 F.3d 976, 994-95 (9th Cir. 2017) (plaintiffs had carried their burden of showing "the government's current policies are likely unconstitutional").

Moreover, as a factual matter, despite Anthropic's claims of being chilled in its First Amendment expression, *see* PI Mot. 22, Compl. ¶ 146, there is no evidence of a chilling effect on Anthropic's speech. And the status quo does not result in any "loss of First Amendment freedoms, for even minimal periods of time," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), because the designation in no way hinders Anthropic's ability to espouse whatever views it wishes. None of Anthropic's declarations suggest otherwise; they merely catalogue the business implications of the challenged actions, *see, e.g.*, Decl. of Krishna Rao (ECF No. 6-5) ¶ 9 (effect on investor confidence); Decl. of Paul Smith (ECF No. 6-4) ¶ 11 (effect on Anthropic's partnerships"). Anthropic has also since announced (1) the creation of a new institute designed "to tell the world what we're learning about the[] challenges [of AI]" and (2) the expansion of its public policy team "to help inform and shape AI governance around the world." Anthropic, *Introducing the Anthropic Institute* (Mar. 11, 2026), https://www.anthropic.com/news/the-anthropic-institute. As for its Due Process claim, Anthropic has received notice of the Secretarial Determination and given an opportunity to seek reconsideration.

*Second*, Anthropic contends that the challenged actions "risk imminent, ongoing damage" to its "reputation and institutional standing." PI Mot. 30. But a finding of reputational harm must be grounded in non-conclusory record evidence, *see Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013), and here, the record evidence consists of conclusory statements about risks that may occur at a future date. For example, Anthropic's Chief Commercial Officer, Paul Smith, avers that the Secretarial Determination and the social medial posts "endeavor to signal to customers and counterparties that [Anthropic] [is] a company to be avoided[,]" and "should it stand, . . . risks Anthropic's partnerships with all kinds of firms[.]" Smith Decl. ¶¶ 8, 10. Far from demonstrating that harm to Anthropic's reputation is imminent, that assertion merely indicates the possibility of a reputational injury. As Smith concedes, the "practical effect" of the Secretarial Determination on Anthropic's reputation will materialize only if the Determination is upheld, *see id.* ¶ 8. Further, Anthropic's reliance on *Stuhlbarg International Sales Company Inc. v. John D. Brush & Company* for the proposition that "threatened loss of prospective customers or goodwill" could support an irreparable harm, is misplaced. 240 F.3d 832, 841 (9th Cir.

2001).  The case was assessing whether there was a "possibility of irreparable harm," *id.* at 840-41—a standard that has been overruled by the Supreme Court in *Winter*, which now requires that the asserted harm be "likely," 555 U.S. at 22.

*Third*, Anthropic asserts the challenged actions "risk rupturing" its relationships with DoW "contractors with which Anthropic partners on government work and commercial partners embedded in the national-security sector," which may affect "the company's growth."  PI Mot. 31.  Anthropic cited purported confusion among its customers and its partners' concerns about continuing to work with the company. *Id.* at 31-32.  It also noted that others have "delayed or paused several national security contracts or business arrangements already in active development with Anthropic." *Id.* Most of these asserted injuries are speculative.  More importantly, as discussed above, no one is entitled to conduct business with the Federal Government, *see Perkins*, 310 U.S. at 127, and irrespective of the challenged actions, DoW and other federal agencies are free to terminate its contracts and agreements with Anthropic, as Anthropic readily admits.  *See* PI Mot. 9, 33.  The Government frequently terminates contractual relationships with vendors, but that does not mean that any collateral consequences flowing from such terminations constitute irreparable harm entitling a vendor to the extraordinary relief of an injunction.  This is so because if the termination were illegal, the asserted harm would be redressable "by a legal or equitable remedy following adjudication on the merits."  *Haaland*, 762 F. Supp. 3d at 897.  And given that Anthropic's partners and potential partners are only "assessing" their relationships with Anthropic, Ramasamy Decl. ¶ 33, "much of [Anthropic]'s asserted injury could be repaired if [Anthropic] were to prevail." *AFGE*, 2026 WL 534591, at *8.  Even "temporary economic loss alone generally is not a basis for injunctive relief[.]" *Id.* (citing *Arcamuzi v. Cont'l Air Lines, Inc.*, 819 F.2d 935, 938 (9th Cir. 1987)).

Finally, Anthropic argues that the resulting economic harm is irreparable because "sovereign immunity precludes Anthropic from obtaining compensatory relief from the government[.]"  PI Mot. 32.  Anthropic, however, has grounded its allegations of economic harm in the potential termination and modification of its contracts, which are governed by the terms of each contract.  Monetary relief for breach of contract is available in the Court of Federal Claims.  *See Thakur v. Trump*, 163 F.4th 1198, 1204 (9th Cir. 2025) (Tucker Act confers jurisdiction on the Court of Federal Claims for contract claims against the United States seeking more than $10,000); *United Aeronautical Corp.*, 80 F.4th at 1022-23.

## III.    THE BALANCE OF EQUITIES STRONGLY DISFAVORS A PRELIMINARY INJUNCTION

Even if Anthropic could show some modicum of irreparable harm, "any such injury is outweighed by the public interest" and the Government's "interest" in eliminating the risk that an AI model used in national security systems would be sabotaged by a hostile and untrustworthy corporate owner. *Winter*, 555 U.S. at 23. Anthropic's sweeping proposed preliminary injunction would prohibit every federal agency—including DoW and members of the Intelligence Community—from complying with the Presidential Directive to cease using the company's technology. *See* ECF No. 6-34, at 2 (asking the Court to, among other things, enjoin all Defendants "from implementing, applying, or enforcing in any manner" the directives to stop using Anthropic's technology and "from taking any other action to implement, effectuate, or further the purposes of" those directives). That relief would inflict substantial harm across the Executive Branch "by denying a duly elected branch[] the policies of [its] choice" about which AI models to use. *Immigrant Defs. L. Ctr.*, 145 F.4th at 994. The Government should not be required to use, and particularly within its most sensitive national security IT infrastructure, an AI technology that it neither wants nor is legally required to use, regardless of whether it obtained the technology directly or through subcontracts or vendor agreements. Because that is the sole purpose of the Presidential Directive, the public interest commands that it stand.

The harm would be especially acute at the Department of War. Anthropic's preliminary injunction would intrude on "'complex, subtle, and professional decisions as to the . . . equipping, and control of a military force,' which are 'essentially professional military judgments.'" *Winter*, 555 U.S. at 24 (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)). This Court must "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest" in identifying and mitigating supply chain risks posed by particular AI companies and their models. *Winter*, 555 U.S. at 24 (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)). As the record reflects, the Secretary determined there is a "substantial risk that Anthropic could attempt to disable its technology or preemptively and surreptitiously alter the behavior of the model in advance or in the middle of ongoing warfighting operations[.]" DoW-PI-007; *see also id.* (assessing risk to supply chain to include "potential for model poisoning, insider threat risk, data exfiltration, and denial of service"). The Under Secretary explains such action "could cause serious harm to national security and loss of human life." Michael Decl.

¶ 16. This substantial risk is amplified by Anthropic's demand during contract negotiations that "it ha[s] an approval role in the operational decision chain." DoW-PI-007. Acquiescing to such a demand would require "DoW to accept significant operational risk" at a time when its warfighters are actively operating abroad. *Id.*; *see also* Michael Decl. ¶ 27 ("preventing the removal of Anthropic's technology from DoW systems" would "result in an ongoing threat to national security remaining on DoW's systems . . . regardless of whether [the risk] flows directly to DoW systems or through a prime contractor").

On the other side of the ledger, Anthropic concedes the Government's right to not "deal with Anthropic" and to "transition" away from using its products. PI Mot. 33. Given this concession, particularly in light of Anthropic's speculative assertions of irreparable harm, the equities strongly favor permitting the Government to continue taking steps to cease its use of Anthropic's products and services. Amici, including Microsoft and a number of employees from Open AI and Google, contend that the Secretarial Determination harms the public interest by "introduc[ing] an unpredictability" in the AI industry that undermines "innovation and competitiveness." Brief of Amici Curiae Employees of Open AI and Google, ECF No. 24-1, at 8; *see also* Brief of Microsoft Corp., ECF No. 75, at 9-11; Brief of Former Service Secretaries Retired Senior Military Officers, ECF No. 58, at 12-14; Brief of ACT | The App Association, ECF No. 73, at 7-8. Innovation and competitiveness, however, do not outweigh the public interest in national security and the safety of the nation's warfighters, whether or not during a time of active operations.

Further, the Government "suffers a form of irreparable injury" when it is prevented "from effectuating statutes enacted by representatives of its people." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). That harm is especially pronounced here because the interest in ensuring the nation's security "is an urgent objective of the highest order." *Humanitarian L. Project,* 561 U.S. at 28; *see Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 581-82 (2017) (recognizing the central importance of national security). The requested preliminary injunction would inflict irreparable harm on the Secretary by interfering with the national-security determinations entrusted to him by Congress in 10 U.S.C. § 3252, thereby compromising DoW's "technical and warfighting infrastructure" and placing the national security at risk. In sum, the balance of equities and consideration of the overall public interest . . . tip strongly" against granting Anthropic's request for preliminary relief. *Winter*, 555 U.S. at 26.

## IV.   ANY PRELIMINARY RELIEF SHOULD BE NARROWLY TAILORED

Should the Court grant Anthropic's motion, it should not adopt Anthropic's proposed language. Anthropic's motion claims "[p]reliminary relief would not require the Department [of War] to deal with Anthropic," and the company disavows any interest in "require[ing] any other federal agency to deal with Anthropic on terms the agency does not prefer." PI Mot. 25. But Anthropic's proposed order, if adopted would require Defendants to continue the use of products and services that were or will be discontinued under the Presidential Directive and Secretarial Determination. *See* ECF No. 6-34, at 2 (enjoining all Defendants, and those working in concert with them, "from implementing, applying, or enforcing in any manner" the Presidential Directive and Secretarial Determination to stop using Anthropic's technology and "from taking any other action to implement, effectuate, or further the purposes of" those directives).

Even without Anthropic's concession, such a sweeping and extraordinary order would be inappropriate. The proposed order would turn this Court into a supervisor of AI use across the Federal Government. But "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff[]." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). A court order requiring the use of Anthropic's products and services would not redress the company's alleged irreparable harm because, as discussed above, Anthropic asserted harm generally centers on its potential loss of business (sometimes repackaged as reputational injuries). PI Mot. at 24.[6] A public ruling on the merits in the company's favor would address those concerns. But a court order compelling Defendants' use of Anthropic's products and services would not. When Defendants use AI models, that conduct generally takes place in private—out of view of the private firms with which Anthropic separately deals.

Nor should the President's or the Secretary's public criticisms of Anthropic form the basis for injunctive relief. The former is not even a defendant. Anthropic wisely does not sue the President, likely recognizing the Court cannot enjoin him. And in any event, "[a] government entity has the right to 'speak for itself.'" *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) (quoting *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000)). Because Anthropic acknowledges the right

---

[6] To the extent Anthropic complains about the loss of revenue from government business, the company's remedy, if any, is in the contract governing that business, and any judicial remedy, if available, would be in the Court of Federal Claims.

of every defendant agency and officer to not deal with Anthropic on terms they do not prefer and to transition to other AI models, any preliminary injunction must preserve the Executive Branch's discretion to do just that while this case is pending. Accordingly, even if the Court were to preliminary set aside the Secretarial Determination, Defendants, including DoW, should be permitted to continue to take steps to comply with the Presidential Directive.

**V.     ANY INJUNCTION SHOULD BE STAYED PENDING APPEAL AND BE ACCOMPANIED BY A BOND**

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for a period of seven days to allow Defendants to seek an emergency, expedited stay from the court of appeals if an appeal is authorized. The factors a court considers when evaluating a request for an administrative stay "substantial[ly] overlap" with the "factors governing preliminary injunctions." *Nken*, 556 U.S. at 434. Thus, for all the reasons the Government demonstrated above in opposing the motion for preliminary injunction, an administrative stay would be warranted.

Defendants also respectfully request that any injunctive relief accompany a bond under Fed. R. Civ. P. 65(c)—that is, "security in an amount that the court considers proper to pay the costs and damages" sustained by the Government. A bond is appropriate here given that any preliminary relief would potentially mandate that the Executive spend money on unneeded and unwanted uses of Anthropic's technology that may be lost forever once distributed. *California*, 604 U.S. at 651-52.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiff's Motion for a Preliminary Injunction.

Respectfully submitted,


BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

JEAN LIN
Special Litigation Counsel
Federal Programs Branch

*/s/ James W. Harlow*
JAMES W. HARLOW (Md. Bar; no number issued)
KRISTINA A. WOLFE (VA. Bar. 71570)
Senior Trial Counsel
CHRISTIAN DIBBLEE (D.C. Bar 90002557)
Trial Attorney
Federal Programs Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
(202) 514-6786
james.w.harlow@usdoj.gov