MICHAEL J. MONGAN (SBN 250374)
michael.mongan@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
Telephone: (628) 235-1000

EMILY BARNET (*pro hac vice*)
emily.barnet@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich St
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Plaintiff Anthropic PBC*

KELLY P. DUNBAR (*pro hac vice*)
kelly.dunbar@wilmerhale.com
JOSHUA A. GELTZER (*pro hac vice*)
joshua.geltzer@wilmerhale.com
KEVIN M. LAMB (*pro hac vice*)
kevin.lamb@wilmerhale.com
SUSAN HENNESSEY (*pro hac vice*)
susan.hennessey@wilmerhale.com
LAUREN MOXLEY BEATTY (SBN 308333)
lauren.beatty@wilmerhale.com
LAURA E. POWELL (*pro hac vice*)
laura.powell@wilmerhale.com
SONIKA R. DATA (*pro hac vice*)
sonika.data@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

ANTHROPIC PBC,

Plaintiff,

v.

U.S. DEPARTMENT OF WAR, et al.,

Defendants.

Case No. 26-cv-1996

**PLAINTIFF ANTHROPIC PBC'S REPLY BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Judge: Hon. Rita F. Lin

Hearing Date: March 24, 2026
Time: 1:30 PM (PST)
Courtroom: 12, 19th Floor

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................2

I.      Anthropic Is Likely To Prevail On The Merits................................................................2

    A.      Defendants' Unprecedented Campaign Of Retaliation Violated
        Anthropic's  First Amendment Rights.........................................................................2

    B.      The Secretary Of War Violated The Administrative Procedure Act ............................7

    C.      The Challenged Actions Violate Due Process ...............................................13

    D.      The Presidential Directive Violated The Separation Of Powers
        By Blacklisting Anthropic Without Statutory Or Constitutional
        Authority To Do So ..................................................................................15

II.     Preliminary Injunctive Relief Is Needed To Prevent Further Irreparable Harm .....................17

III.    The Balance Of The Equities And The Public Interest Weigh In Favor
    Of An Injunction.........................................................................................19

IV.     The Scope Of Requested Relief Is Appropriate And No Stay Or Bond Should Issue ............20

CONCLUSION....................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Al Haramain Islamic Found. v. U.S. Dep't of Treasury*,
  686 F.3d 965 (9th Cir. 2012) ...................................................................................14, 15

*American Federation of Government Employees v. Trump*,
  167 F.4th 1247 (9th Cir. 2026) ....................................................................................6, 9

*Am. Ass'n of Univ. Professors v. Trump*,
  2025 WL 3187762 (N.D. Cal. Nov. 14, 2025) ...............................................................17, 18

*Ariz. Dream Act Coal. v. Brewer*,
  757 F.3d 1053 (9th Cir. 2014) ...........................................................................................19

*Bennett v. Spear*,
  520 U.S. 154 (1997)....................................................................................................7, 8

*Burwell v. Hobby Lobby Stores*,
  573 U.S. 682 (2014).........................................................................................................4

*California v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
  718 F. Supp. 3d 1060 (N.D. Cal. 2024) ...........................................................................9

*California Motor Transp. Co. v. Trucking Unlimited*,
  404 U.S. 508 (1972).........................................................................................................4

*CarePartners, LLC v. Lashway*,
  545 F.3d 867 (9th Cir. 2008) .............................................................................................6

*Caribbean Marine Servs. Co. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) ............................................................................................18

*Chamber of Com. of U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996).........................................................................................16

*Conner v. City of Santa Ana*,
  897 F.2d 1487 (9th Cir. 1990) .........................................................................................14

*Deal v. United States*,
  508 U.S. 129 (1993)........................................................................................................11

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019).................................................................................................1, 9, 13

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020)........................................................................................................8, 13

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012).................................................................................................................13

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992).................................................................................................................16

*Garza v. Woods*,
    150 F.4th 1118 (9th Cir. 2025) ...............................................................................................15

*Imperial Sovereign Ct. of Montana v. Knudsen*,
    ___ F.4th ___ (9th Cir. Mar. 13, 2026)...................................................................................4

*Int'l Rehabilitative Scis. Inc. v. Sebelius*,
    688 F.3d 994 (9th Cir. 2012) ..................................................................................................12

*Janus v. Am. Fed'n of State, Cnty. & Mun. Emps.*,
    585 U.S. 878 (2018)...............................................................................................................4, 5

*Johnson v. Couturier*,
    572 F.3d 1067 (9th Cir. 2009) ................................................................................................20

*Kennedy v. Braidwood Mgmt., Inc.*,
    606 U.S. 748 (2025).................................................................................................................10

*Kharb v. DHS*,
    2026 WL 485765 (C.D. Cal. Feb. 17, 2026)...........................................................................20

*Leedom v. Kyne*,
    358 U.S. 184 (1958).................................................................................................................17

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ..................................................................................................17

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
    526 U.S. 172 (1999).................................................................................................................15

*Murphy Co. v. Biden*,
    65 F.4th 1122 (9th Cir. 2023) .................................................................................................16

*Nader v. Democratic Nat'l Comm.*,
    567 F.3d 692 (D.C. Cir. 2009)...................................................................................................5

*Nat'l Council of Resistance of Iran v. Dep't of State*,
    251 F.3d 192 (D.C. Cir. 2001)............................................................................................14, 15

*Nat'l Parks Conservation Ass'n v. EPA*,
    788 F.3d 1134 (9th Cir. 2015) ................................................................................................12

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024)...................................................................................................................2

*Nat'l Urb. League v. Ross*,
  508 F. Supp. 3d 663 (N.D. Cal. 2020) ........................................................................8

*Nebraska v. Su*,
  121 F.4th 1 (9th Cir. 2024) .......................................................................................17

*Newsom v. Trump*,
  141 F.4th 1032 (9th Cir. 2025) .................................................................................16

*Nuclear Regulatory Commission v. Texas*,
  605 U.S. 665 (2025) (*NRC*) .....................................................................................16

*O'Brien v. Welty*,
  818 F.3d 920 (9th Cir. 2016) .......................................................................................3

*Pacito v. Trump*,
  ___ F.4th ___ (9th Cir. Mar. 5, 2026)........................................................................18

*Paul v. Davis*,
  424 U.S. 693 (1976)...................................................................................................13

*Perkins Coie LLP v. U.S. Dep't of Justice*,
  783 F. Supp. 3d 105 (D.D.C. 2025) .............................................................................3

*Perry v. Sindermann*,
  408 U.S. 593 (1972).....................................................................................................6

*Ralls Corp. v. CFIUS*,
  758 F.3d 296 (D.C. Cir. 2014)...................................................................................14

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013) ...................................................................................19

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943)........................................................................................................9

*Snyder v. Phelps*,
  562 U.S. 443 (2011)......................................................................................................3

*Soranno's Gasco, Inc. v. Morgan*,
  874 F.2d 1310 (9th Cir. 1989) .....................................................................................6

*Thakur v. Trump*,
  787 F. Supp. 3d. 955 (N.D. Cal. 2025) ...........................................................13, 18, 20

*Trifax Corp. v. District of Columbia*,
  314 F.3d 641 (D.C. Cir. 2003)...................................................................................14

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  578 U.S. 590 (2016)......................................................................................................8

*United States ex rel. Accardi v. Shaughnessy*,
  347 U.S. 260 (1954)...................................................................................................................9

*Washington v. Trump*,
  145 F.4th 1013 (9th Cir. 2025) .................................................................................................19

*Wieman v. Updegraff*,
  344 U.S. 183 (1952)...................................................................................................................13

*Wisconsin v. Constantineau*,
  400 U.S. 433 (1971)...................................................................................................................13

**Federal Statutes**

5 U.S.C. § 706.................................................................................................................................9

10 U.S.C. § 3203...........................................................................................................................17

10 U.S.C. § 3204...........................................................................................................................17

10 U.S.C. § 3252.................................................................................................................... *passim*

28 U.S.C. § 1491...........................................................................................................................16

40 U.S.C. § 121.............................................................................................................................17

41 U.S.C. § 3303...........................................................................................................................17

41 U.S.C. § 3304...........................................................................................................................17

41 U.S.C. § 7103...........................................................................................................................16

41 U.S.C. § 7104...........................................................................................................................16

41 U.S.C. § 7107...........................................................................................................................16

**Rules and Regulations**

48 C.F.R. § 9.406-2 .......................................................................................................................17

48 C.F.R. § 9.407-2 .......................................................................................................................17

48 C.F.R. § 239.7304(a).................................................................................................................9

Fed. R. Civ. P. 65(c) .....................................................................................................................20

**INTRODUCTION**

Defendants insist that this is "a usual case," involving nothing more than a "routine exercise" of the President's authority to guide federal contracting. Dkt. 96 ("Opp.") at 3, 22. But courts "are not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

After Anthropic adhered to its long-expressed and strongly held views about the safe and responsible use of AI, and declined to abandon two narrow contract terms that restrict use of its frontier AI model for lethal autonomous warfare and mass surveillance of Americans, the Executive Branch launched an unprecedented campaign of retaliation. The President commanded his subordinates to immediately blacklist Anthropic government-wide in response to the company's supposed "Radical Left" and "WOKE" views. Dkt. 1-1. The Secretary of War responded to Anthropic's "rhetoric" and "ideology" by issuing a "final" decision designating the company as a supply-chain risk—the first time an American company has ever been so designated—and ordering all military contractors to immediately stop doing business with Anthropic. Dkt. 1-2. Other Defendants followed suit.

Put simply, the Executive Branch is leveraging its powers to punish a major American company for the sin of expressing its views on a matter of profound public significance. Left unchecked, the Challenged Actions will continue to harm Anthropic in irreparable ways. They will also harm the public and chill the speech of companies and individuals throughout our Nation—as numerous amici have now attested.

No amount of after-the-fact lawyering can cure the statutory and constitutional violations apparent on the face of the Challenged Actions. Defendants do not even attempt to defend the legality of the Secretary's February 27 Order, and now concede (Opp. 21) that the Secretary had no power to order all defense contractors to stop working with Anthropic. They are left instead to argue that an Order declaring itself "final" and "[e]ffective immediately," Dkt. 1-2, is somehow "not a final" action, Opp. 16. Defendants' attempt to rehabilitate the supply-chain-risk designation fares no better: the March 3 Determination by the Secretary unveiled along with the opposition brief is procedurally flawed, exceeds the substantive authority granted by Congress, and rests on arbitrary

and inconsistent rationales. As to the First Amendment, Defendants contend that Anthropic either engaged in no protected speech or that its speech was not the motivating factor for Defendants' actions. But they fail to grapple with the language in the Presidential Directive and the Secretarial Order expressly acknowledging that they punished Anthropic because of its rhetoric and ideological views. And Defendants' arguments regarding Anthropic's due process and separation of powers claims are similarly unpersuasive.

Anthropic is therefore entitled to a preliminary injunction that preserves the pre-February 27 status quo. That relief "would not require Defendants to use Anthropic's services or prevent them from transitioning to other AI providers." Dkt. 6 ("Mot.") at 2. Defendants could have lawfully begun such a transition (instead of retaliating against Anthropic) before the afternoon of February 27, *see* Dkt. 1 ¶ 87, and they may lawfully do so while a preliminary injunction is in place. Nor would a preliminary injunction prohibit the President from "guid[ing] his subordinates' lawful exercise of discretion regarding procurement policies," Opp. 23, consistent with federal procurement statutes and regulations. Instead, preliminary relief would enjoin only the Secretary's unprecedented and stigmatizing designation of Anthropic as a supply-chain risk under 10 U.S.C. § 3252, his secondary-boycott directive to defense contractors (which Defendants no longer defend), and implementation of the facially retaliatory Presidential Directive issued on February 27.

## ARGUMENT

### I.   Anthropic Is Likely To Prevail On The Merits

#### A.   Defendants' Unprecedented Campaign Of Retaliation Violated Anthropic's First Amendment Rights

Uncontroverted facts establish that the Executive Branch did exactly what the First Amendment forbids: it wielded the extraordinary "power of the State to punish or suppress disfavored expression," *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024), through an unprecedented supply-chain designation of an American technology company followed by a government-wide campaign of retaliation. The government retaliates in violation of the First Amendment where (1) a person has engaged in constitutionally protected activity, (2) the government takes an adverse action that would chill a person of ordinary firmness, and (3) the

constitutionally protected activity was a "substantial or motivating" factor in the government's action. *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016); *see* Mot. 12. Defendants do not dispute that the second element is satisfied here. Instead, they argue that Anthropic did not engage in protected speech and that Anthropic's speech was not the motivating factor for the challenged actions. *See* Opp. 11-15. Both arguments fail.

*Anthropic Engaged In Constitutionally Protected Activity.* From its inception, Anthropic and its founders have advocated for the safe and responsible use of AI. *See* Mot. 12-13. That public expression has encompassed legislative advocacy, interviews, articles, and blog posts, Dkt. 1 ¶¶ 140-142—including CEO Dario Amodei's public statement on February 26, explaining why Anthropic could not "in good conscience" abandon the two disputed use restrictions. Dkt. 6-18. That kind of speech on a subject of great public significance "is at the heart of the First Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) (internal quotation marks omitted).

And the Executive Branch has "openly acknowledge[d] that [Anthropic] engaged in speech." *Perkins Coie LLP v. U.S. Dep't of Justice*, 783 F. Supp. 3d 105, 151 (D.D.C. 2025). The President's February 27 directive emphasized Anthropic's supposed "Leftwing," "Radical Left," and "WOKE" views. Dkt. 1-1. The Secretary of War's Order on the same day called out Anthropic's "rhetoric" and its purported "Silicon Valley ideology." Dkt. 6-21. Even the documents belatedly introduced by Defendants in support of their opposition brief underscore the expressive nature of Anthropic's activities. Their purported explanations for why Anthropic is a supply-chain risk repeatedly point to expressive activity: "statements made [by Anthropic] during negotiations," Dkt. 96-2; its decision to engage in a "public[] spat" with the Department, *id.*; "the public statements of Anthropic's CEO and others associated with the company," *id.*; and Anthropic's purported discussions "with the press," Dkt. 96-3 ¶ 13. Those are all core speech activities, protected by the First Amendment.

Despite their own statements, Defendants contend that this "dispute stems from Anthropic's refusal to agree to the Government's 'all lawful use' contractual term," asserting that "[t]he refusal is conduct, not speech." Opp. 12. But even if this case could be artificially narrowed to a mere dispute about "contract negotiations," Opp. 13, Defendants' categorical position that negotiations with the government never implicate the First Amendment is untenable. Indeed, it is foreclosed by the

Supreme Court's decision in *Janus* (*see* Mot. 13)—a decision Defendants fail to address. In that case, the Court held that the "positions [a] union takes in collective bargaining" with the government are "private speech" protected by the First Amendment. *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps.*, 585 U.S. 878, 884-85 (2018); *see also id.* at 893-94. If Defendants were correct that all speech incidental or adjacent to government contract negotiations is unprotected conduct, *Janus* would have come out differently. Just like a union's collective bargaining with the government, Anthropic's negotiations with the Department are speech activities.

At a minimum, those negotiations qualify as protected expressive conduct. "The Supreme Court has . . . long recognized that the First Amendment extends protection to 'expressive conduct,' that is, a message 'delivered by conduct' that is not purely expressive activity but which is 'intended to be communicative.'" *Imperial Sovereign Ct. of Montana v. Knudsen*, ___ F.4th ___, 2026 WL 708218, at *13 (9th Cir. Mar. 13, 2026). That aptly describes the communications at issue here. Anthropic is a public benefit corporation whose charter, mission, and advocacy center on safe and responsible use of advanced AI. Dkts. 6-1 ¶¶ 8-11, 6-2 ¶ 6; *see generally Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 701, 712-13 (2014) (private entities, and particularly benefit corporations, may have "altruistic objectives" and "mission[s]" rooted in "ethical [and] moral . . . principles"). Its negotiating stance and refusal to accede to the government's proposed contract modification were intended to convey Anthropic's foundational principles regarding AI safety, as explained in Dr. Amodei's public statement on February 26. Dkt. 6-1 ¶¶ 33-36, 38-39; Dkt. 6-18. And Defendants underscored that they understood the expressive nature of those acts when they accused Anthropic of engaging in "brand-building" and "marketing" through the company's adherence to its views during negotiations. Dkt. 96-2. For those reasons, the government's cited cases establishing that not all conduct is subject to First Amendment protection, *see* Opp. 12-13, do not apply here.

The Petition Clause reinforces the application of the First Amendment here. The Petition Clause "extends to" advocacy directed to "all departments of the Government," even when parties are motivated solely by "economic interests." *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972). To be sure, it does not "require the Government 'to listen or respond' to petitions." Opp. 13. But it does "prohibit[] any" government "sanction" on petitioning activity,

*Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 696 (D.C. Cir. 2009), which is precisely what Defendants did here. Anthropic sought to "influence public officials" (Opp. 13) about the importance of its narrow limits on the use of AI. *See, e.g.*, Dkt. 96-3 ¶ 11.

*Anthropic's Protected Activity Was A "Substantial Or Motivating Factor" In The Challenged Actions.* Defendants offer no meaningful response to Anthropic's showing that its expressive activities motivated the Challenged Actions. Nor could they. Unlike cases where retaliatory motive must be inferred, the retaliatory motive here is evident on the face of the Presidential Directive and the Secretarial Order. The President and the Secretary of War punished Anthropic because of its "rhetoric" and its expression of "ideological" views that the current Administration perceives as aligning with a "Radical Left" and "WOKE" perspective. Dkts. 1-2, 1-1. Those statements are not comprehensible without reference to Anthropic's public expression and advocacy around AI safety, including Dr. Amodei's public statement on February 26. Defendants simply ignore the language quoted above—it does not appear anywhere in their 30-page opposition brief. But they identify no sound basis for this Court to disregard it.

Defendants attempt to reframe the cause of the supply-chain designation as Anthropic's refusal to agree to "the Government's standard contractual term." Opp. 14. Even under that framing, however, Anthropic's stance on AI use limitations was inseparable from protected expression, expressive conduct, and petitioning activity. *Supra* pp. 3-4. Anthropic's refusal "to sign a document expressing support" for this Administration's preferred position on "controversial public issues"— and its related public and private communications explaining and defending that stance—fall comfortably within the protections of the First Amendment. *Janus*, 585 U.S. at 892. And the Challenged Actions were a direct response to that activity. After all, Defendants first threatened a supply chain risk designation to make Anthropic "pay a price" for standing by its views on AI safety. Dkt. 1 ¶ 83.

Indeed, the scope of the retributive response confirms retaliatory purpose. If the Executive Branch were merely displeased with a vendor rejecting "the Government's standard contractual term," Opp. 14, it could have followed procurement procedures and declined to contract with Anthropic. Instead, it took a series of actions plainly designed to "maximize the harm inflicted upon"

Anthropic. *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1316 (9th Cir. 1989). It publicly branded Anthropic as a national security risk and purported to blacklist and impose a secondary boycott on the company. As Anthropic's declarants have explained and Defendants do not dispute, the Department has even pressured Anthropic's counterparties into carrying out the secondary boycott. Dkts. 6-3 ¶ 30, 6-4 ¶ 14. That response is wildly disproportional to any legitimate procurement dispute, underscoring Defendants' desire to punish Anthropic for its perceived ideology.

Those considerations distinguish this case from *American Federation of Government Employees v. Trump*, 167 F.4th 1247, 1256 (9th Cir. 2026). *See* Opp. 11, 15. The plaintiffs in that case challenged an executive order excluding various agencies from collective bargaining requirements, allegedly for retaliatory purposes. The Ninth Circuit held that "the President would have taken the same action even in the absence of protected conduct." *Id.* at 1256. It observed that the executive order "discloses no retaliatory animus on its face," *id.*, and that the lines drawn by the executive order had plausible, non-retaliatory justifications, *id.* at 1256-58. Neither observation applies here. Retaliatory animus is written into the text of the Challenged Actions, and the disproportionate scope of those Actions demonstrates why Defendants cannot carry their burden to show they "*would* have reached the same decision" absent retaliatory animus. *CarePartners, LLC v. Lashway*, 545 F.3d 867, 877 (9th Cir. 2008) ("[I]t is insufficient to show merely that it *could* have reached the same decision.").

Accepting Anthropic's arguments does not mean that the government violates the First Amendment "every time it rejects a vendor's proposed term," or that government contractors may wield the First Amendment as "a license to unilaterally impose contract terms on the Government." Opp. 13. The government has discretion in deciding upon "the terms and conditions" of its procurements, Opp. 1, and it remains free to walk away from a negotiation. What it may not do is wield a punitive supply-chain-risk designation and a secondary boycott to punish a company for its expressed viewpoints and advocacy. "[E]ven though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely"—including retaliation "because of constitutionally protected speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

**B.**     **The Secretary Of War Violated The Administrative Procedure Act**

Anthropic's APA claim challenges the Secretary's "final" decision, announced on February 27 and "[e]ffective immediately," to "designate Anthropic a Supply-Chain Risk to National Security" and prohibit any "contractor, supplier, or partner that does business with the United States military" from "conduct[ing] any commercial activity with Anthropic." Dkt. 1-2. The record before the Court now makes clear that the Department implemented that Secretarial Order through a subsequent Secretarial "Determination" (issued on March 3) and a letter to Anthropic (dated March 3, but sent on March 4) notifying Anthropic of the designation.[1]

Remarkably, the Opposition does not defend the legality of the February 27 Secretarial Order. To the contrary: After maligning Anthropic in public and purporting to immediately bar all military contractors from doing any business with the company, the Secretary and his co-defendants now explain in court that military contractors and other private enterprises "remain free to transact with Anthropic for any purpose unrelated to providing a service to the Government." Opp. 21. They further acknowledge that "the statutory process" Congress required *in advance* of a supply chain designation did not occur until "[a]fter the Secretary's" self-described final decision on February 27. *Id*. at 6; *see* 10 U.S.C. § 3252(b). Those concessions mean that Defendants have no prospect of success on the merits of Anthropic's APA claim regarding the Secretarial Order—and no reasonable basis for resisting a preliminary injunction or stay as to that Order. Defendants instead pivot to the argument that the Secretarial Order is "*not* a final agency action." Opp. 16. That argument fails; but even if it were correct, the Secretary's new Determination would not survive APA review.

**1.**     **The February 27 Secretarial Order is final agency action**

Defendants first characterize the Secretarial Order as "the beginning" of the Department's decisionmaking process rather than its "consummation." Opp. 16; *see Bennett v. Spear*, 520 U.S. 154, 178 (1997). That is beyond implausible. The Secretary stated, in no uncertain terms: "This

---

[1] For avoidance of doubt, Anthropic seeks preliminary relief with respect to the February 27 Secretarial Order, Dkt. 1-2; the Secretarial "Determination" (dated March 3) that formalizes the Section 3252 designation, Dkt. 96-2 at 2; and the Secretarial Letter (received by Anthropic on the evening of March 4), Dkt. 1-3. Until the filing of the opposition brief, Anthropic was unaware of any March 3 Determination. But because the Determination and Letter carry out the February 27 Secretarial Order, Anthropic is entitled to relief with respect to each of the documents.

decision is final." Dkt. 1-2. He further declared that the purported bar on military contractors, suppliers, and partners conducting commercial activity with Anthropic was "[e]ffective immediately." *Id.* That language (which does not appear anywhere in the Opposition) describes a "definitive decision," not a "tentative or interlocutory" one. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597-98 (2016) (internal quotation marks and citation omitted). Defendants point to the fact that the Secretary failed to follow Section 3252's requirements before acting. Opp. 16. That failure merely underscores the illegality of the Secretarial Order; it does not make it less final.

The Order also plainly imposes legal consequences. Defendants assert that the Secretarial Order is not "the source of any binding legal obligations," by which they seem to mean that the Secretarial Order did not *lawfully* impose any obligations "on Anthropic or any other contractor." Opp. 17. But finality is judged by whether an action imposes "legal consequences," *Bennett*, 520 U.S. at 178, not whether it does so permissibly. The Order here purports to "immediately" prohibit every military contractor from "conduct[ing] any commercial activity with Anthropic." Dkt. 1-2. Indeed, within hours, major law firms began alerting their government-contractor clients to "audit[] their Anthropic exposure now" and "prepare to deploy alternatives" to Anthropic. Dkts. 6-30, 6-31.

Alternatively, Defendants argue that even if the Secretarial Order is a "final agency action," the March 3 Secretarial Determination is "a new agency action, evaluated on its own record." Opp. 17 (citing *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020)). True, an agency may choose "to 'deal with [a] problem afresh' by taking *new* agency action." *Regents*, 591 U.S. at 21. But when an agency "decline[s] to disturb" its prior agency action, *id.*, judicial review focuses on the initial action and "is limited to 'the grounds that the agency invoked when it took th[at] action,'" *id.* at 20. Here, nothing in the March 3 Determination (or the March 4 Letter) disturbs or rescinds the February 27 Secretarial Order. *See* Dkts. 96-2 at 2, 1-3; *cf. Nat'l Urb. League v. Ross*, 508 F. Supp. 3d 663, 703 (N.D. Cal. 2020) ("A final agency action does not become non-final after it is implemented.").

And while an agency may sometimes "elaborate later on" the ground it originally invoked to justify a final agency action, the March 3 Determination contains no rationale for the designation

besides a rote recitation of the statutory text. Dkt. 96-2 at 2. That is not a "reasoned explanation." *Dep't of Com.,* 588 U.S. at 785; *see also SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

### 2. Regardless, the Secretary's subsequent Section 3252 determination fails APA review many times over

Even accepting Defendants' mistaken premise that the March 3 Determination is the relevant final agency action, that Determination would not survive APA review. Whatever deference properly attaches to that Determination, *see generally Am. Fed'n of Gov't Employees, AFL-CIO*, 167 F.4th at 1257, it cannot overcome the Secretary's repeated failure to comply with 5 U.S.C. § 706(2). The Determination failed to "observe" the "procedure required by law," *id.* § 706(2)(D), by relying on a risk assessment from the wrong subordinate and neglecting to make any genuine determination about less-intrusive measures. The designation of an American company as a supposed "supply chain risk" based on a dispute about contract terms far exceeds the authority Congress granted the Secretary in Section 3252. *See id.* § 706(2)(C). The confused, contradictory, and contrived rationales asserted in support of the Determination are arbitrary and capricious. *Id.* And the post hoc rationales advanced by the agency in this litigation cannot remedy those failures.

*The Secretary Failed To Observe Procedures Required By Law.* Under the Department's regulations, the Secretary may make a designation "only after [o]btaining a joint recommendation" from specified officials "on the basis of a risk assessment by the Under Secretary of Defense for Intelligence." 48 C.F.R. § 239.7304(a). The Under Secretary for Intelligence did not prepare any such risk assessment here; rather, it was prepared by Emil Michael, the Under Secretary for Research and Engineering. Dkts. 96-3 ¶ 1, 96-2 at 6-9. Under Secretary Michael attempts to justify that violation by explaining that the Department recently underwent a reorganization. Dkt. 96-3 ¶¶ 6-8; *see* Opp. 18. But that provides no basis for the agency to act "contrary to existing valid regulations." *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *see also California v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 718 F. Supp. 3d 1060, 1085 (N.D. Cal. 2024) (agency violates the APA when it "fails to comply with its own regulations").

Moreover, Section 3252(b)(2) requires the Secretary to determine that "less intrusive measures" could not "reduce" the identified supply chain risk before taking action. The Secretary

Case No. 3:26-cv-1996      - 9 -      REPLY BRIEF ISO MOTION FOR PRELIMINARY INJUNCTION

flouted that requirement. The March 3 Secretarial Determination pronounces that conclusion but does not explain it. *See* Dkt. 96-2 at 2. And none of the documents in the "recommendation packet" purportedly sent to the Secretary in advance of that Determination even discuss less-intrusive measures. *See id*. at 3-11. Defendants' only response to this lacuna is to point (Opp. 20) to a declaration submitted on March 17—along with their opposition—which cannot possibly stand in for the pre-decisional procedure Congress required.

*The Secretary Exceeded His Statutory Authority.* Section 3252 is not a broad grant of authority for the Secretary to punish counterparties whose principles differ from his own. It is a narrow statute, drafted with exacting precision, authorizing the Secretary to exclude a contractor or subcontractor from certain Department procurements only in circumstances creating a "risk that an adversary may sabotage, maliciously introduce unwanted function, or otherwise subvert" an information technology system used for national-security purposes. 10 U.S.C. § 3252(d)(4).

The Secretary's Determination rests on an untenable reading of that statute, under which he may classify an American company as an "adversary." Opp. 18. But that is contrary to the text and history of Section 3252. The text plainly targets "malicious foreign actors," Dkt. 54-1 at 6—not American companies with whom the Department has contractual or policy disagreements. Statutory history is in accord: Congress modeled Section 3252 on a prior statutory provision enacted in response to a catastrophic cyber incident perpetrated "by a foreign intelligence agency." *Id.* at 4. And "Executive Branch practice—which began contemporaneously with enactment of the statute"— resolves any doubt. *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 783 (2025). Shortly after Congress enacted Section 3252's substantively identical predecessor provision, the Department issued implementing instructions defining the relevant risk as "sabotage or subversion" by "foreign intelligence, terrorists or other hostile elements." Dep't of Def., Instruction 5200.44, Protection of Mission Critical Functions to Achieve Trusted Systems and Networks (TSN) (Nov. 5, 2012), perma.cc/TW3D-735M. Consistent with that understanding, no American entity has ever been designated as a supply chain risk, much less labeled an adversary itself.

Defendants ignore the Department's instruction, instead invoking dictionary definitions for the word "adversary" that "broadly encompass[] any 'opponent in a contest, conflict, or dispute.'"

Opp. 19. That contravenes the "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal v. United States*, 508 U.S. 129, 132 (1993). Defendants' broad reading of "adversary" proves far too much: it could sweep in all manner of domestic entities and individuals who "opposed" the Administration (or the Secretary) in negotiations, legislative conflicts, or even political disputes.

*The Rationales Underlying The Determination Are Arbitrary And Capricious.* Apart from the Secretary's unduly expansive construction of Section 3252, the explanations given for applying that provision to Anthropic fail APA review. The Secretary's March 3 Determination again provided no explanation beyond parroting the statutory text. Dkt. 96-2 at 2. The only purportedly contemporaneous rationales are found in a conspicuously undated memorandum from Under Secretary Michael. *See* Opp. 16. It is unclear whether the Secretary acted based on all, some, or any of those rationales. Regardless, none of the rationales is reasonable or reasonably explained.[2]

The memorandum asserts that "Anthropic [sought] to grant itself" a "veto" over Department operations. Dkt. 96-2 at 6. That assertion is unmoored from technical reality: "Anthropic does not have the access required to disable [its] technology or alter [its] model's behavior before or during ongoing operations." Second Ramasamy Decl. ¶ 14. Once deployed in classified environments, Anthropic has no access to (or control over) the model. *Id*. ¶¶ 13-20. It could not "veto" particular uses even if it wanted to. *Id*. And Anthropic did *not* want to, as Dr. Amodei explained to the Secretary and in a public statement. Second Heck Decl. ¶¶ 6-9; *cf.* Dkt. 96-2 at 6 (accusing Anthropic executive of "question[ing] the propriety of the potential use of [Claude] for a sensitive military operation"). In fact, the company proposed contract language expressly disavowing any such authority, precisely to allay any concern about operational control. Second Heck Decl. ¶ 9.

The memorandum next observes that AI technology is often "opaque" to its users and subject to some measure of control by its providers. Dkt. 96-2 at 7. But those concerns apply across the entire industry. Second Ramasamy Decl. ¶ 20; Dkt. 96-3 ¶ 9 (conceding that these are "common

---

[2] Defendants also submitted a document under seal produced by a third party, which the Court should disregard. The record does not indicate how (or even whether) the Department relied on it.

concern[s] with all LLMs"). If anything, Anthropic is more transparent than other companies and has a longstanding history of open and successful partnership with the Department. Second Ramasamy Decl. ¶ 20. Moreover, any concern about "operational risk" posed by Anthropic's ability to "unilaterally alter . . . model weights," Dkt. 96-2 at 7, reflects another technical misunderstanding: Anthropic has no unilateral ability to make changes to model weights once the Department has deployed the model. Second Ramasamy Decl. ¶¶ 13-20.[3]

The rationales advanced by Defendants are also "internally inconsistent." *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015). For example, Under Secretary Michael's memorandum posits that "Anthropic's risk level escalated" over its entire course of dealing with the Department to the point that the company's services posed "an unacceptable national security threat." Dkt. 96-2 at 8. Yet Defendants also contend that if Anthropic had "agreed to the Government's term" by the Secretary's February 27 deadline, "the challenged actions would not have occurred." Opp. 14. If Anthropic already posed an unacceptable national security threat by that point—and the Department genuinely feared that the company might interfere with military operations—the Department should have taken this action regardless of whether Anthropic accepted its contract term. This kind of "unexplained inconsistency" is a classic sign of "arbitrary" decisionmaking. *Int'l Rehabilitative Scis. Inc. v. Sebelius*, 688 F.3d 994, 1001 (9th Cir. 2012).

And the present circumstances suggest it is also a sign of pretext. On the morning of March 4, before the Department notified Anthropic of the Secretary's March 3 Determination, Under Secretary Michael emailed Dr. Amodei. In response to Anthropic's latest proposed contractual resolution, Under Secretary Michael wrote: "I think we are very close here," and "I hope this work[s]." Second Heck Decl. Ex. 1. It is inconceivable that Under Secretary Michael's memorandum—undated, but apparently completed in time to be an exhibit to the March 3 Determination—reflected genuine concerns that Anthropic would sabotage military operations, when he was actively negotiating with Anthropic through March 4 and expressing keen interest in Anthropic continuing to provide AI services to the Department. This case presents the Court with

---

[3] The memorandum also characterizes Anthropic as adopting a "negotiation posture meant principally to benefit its public perception." Dkt. 96-2 at 6. But concern about a company's public relations activities is not a reasonable explanation for designating that company a supply-chain risk.

"explanation[s] for agency action that [are] incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Com.*, 588 U.S. at 785. The only plausible conclusion is that the reasons set forth in the memorandum are "contrived." *Id.* at 784.

*New Rationales Unveiled In A Declaration On March 17 May Not Be Considered.* The declaration from Under Secretary Michael, submitted along with Defendants' opposition, adds brand new rationales to the mix. These "belated justifications" cannot change the analysis. *Regents*, 591 U.S. at 20; *see, e.g.*, *Thakur v. Trump*, 787 F. Supp. 3d 955, 982 (N.D. Cal. 2025) ("post-hoc materials must . . . contain no new rationalizations" for an earlier action). In any event, the post hoc rationales are no less arbitrary or capricious. The declaration references misgivings about Anthropic's employment of "foreign nationals," but concedes in the same paragraph that the "other major U.S. AI labs that provide LLM products to DoW may present similar risks." Dkt. 96-3 ¶ 10; *see also* Dkt. 6-1 ¶ 24 (describing Anthropic's commitment to defeating authoritarian adversaries). It observes that "adversarial nation states have a practice of stealing Anthropic's LLM technology," Dkt. 96-3 ¶ 11, which makes Anthropic a victim—not an adversary itself. And it alludes to an incident in which "safety filters" on Claude interfered with CDC work, *id.* ¶ 14, which arose from the use of a general commercial model for research and was promptly addressed, underscoring Anthropic's commitment to supporting special government uses. Second Ramasamy Decl. ¶ 21.

### C.    The Challenged Actions Violate Due Process

By purporting to designate Anthropic a supply-chain risk, blacklist it, and impose a secondary boycott on the company, Defendants also deprived Anthropic of constitutionally protected interests without due process of law. Mot. 20-21.

Defendants respond that "Anthropic's cursory invocation of reputational harm does not suffice." Opp. 21. Although harm to reputation "alone" does not implicate a liberty interest, *id.*, government labels of wrongdoing that affect a person's "reputation," combined with tangible harm or legal consequences, do implicate constitutional due process protections, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 255-56 (2012). For example, the loss of public employment based on charges of "disloyalty" may trigger due process protections. *Wieman v. Updegraff*, 344 U.S. 183, 191-92 (1952); *see also Paul v. Davis*, 424 U.S. 693, 708-09 (1976); *Wisconsin v. Constantineau*,

400 U.S. 433, 437 (1971). And there is nothing cursory about the concrete damage to Anthropic's reputation and tangible interests inflicted by the supply-chain risk designation and assertion that Anthropic is endangering American troops. Dkts. 1-2; 6-4 ¶¶ 5-20; 6-5 ¶¶ 4-10.

That alone is sufficient to trigger due process protections, but there is more. Anthropic has protected interests in contractual relationships with third parties, *Al Haramain Islamic Found. v. U.S. Dep't of Treasury*, 686 F.3d 965, 979-80 (9th Cir. 2012), and in not being de facto debarred from government contracting, *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643-44 (D.C. Cir. 2003). The government has no good answer. As to contracts with third parties, it asserts that it "played no role" in impairing those contractual relationships, Opp. 21, ignoring the Secretary's directive that "[e]ffective immediately, no contractor, supplier, or partner that does business with the United States military may conduct any commercial activity with Anthropic" as well as the fact that Defendants took steps to enforce that secondary boycott, Dkts. 1-2, 6-3 ¶ 30, 6-4 ¶ 14. As to government contracting, the government observes that a prospective contractor has no protectible interest in particular contracts. Opp. 21. But that is not the issue here. The President's command that "EVERY Federal Agency" must "IMMEDIATELY CEASE" dealings with Anthropic, and that no federal agency will "do business with [Anthropic] again," Dkt. 1-1, fits within established precedent recognizing that "debarring a corporation from government contract bidding … triggers the procedural guarantees of the Due Process Clause," *Trifax Corp.*, 314 F.3d at 643.

Defendants argue that Anthropic received constitutionally adequate post-deprivation process, either through reconsideration or judicial review, Opp. 22, but that argument fares no better. "The fundamental requirements of procedural due process are notice and an opportunity to be heard *before* the government may deprive a person of a protected liberty or property interest." *Conner v. City of Santa Ana*, 897 F.2d 1487, 1492 (9th Cir. 1990) (emphasis added). Purported national-security concerns do not allow the government to dispense with that basic component of due process. *See Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 207-08 (D.C. Cir. 2001); *see also Ralls Corp. v. CFIUS*, 758 F.3d 296, 319 (D.C. Cir. 2014). The D.C. Circuit has rejected the argument (reprised here by the government) that "the foreign-policy/national-security nature" of a designation of an entity as a foreign terrorist organization "support[ed] the constitutional adequacy

of a post-deprivation remedy." *Nat'l Council*, 251 F.3d at 207. The constitutional baseline is that "[p]re-deprivation notice typically is required absent 'a strong justification' from the government." *Garza v. Woods*, 150 F.4th 1118, 1130 (9th Cir. 2025).

Defendants do not attempt to articulate such a justification. They point to Section 3252(c), which allows the Department to "limit disclosure" of information regarding a supply-chain-risk designation. Opp. 22. But they do not explain why the Department needed to withhold the factual basis for the designation before the Secretary imposed it. Nor could they plausibly do so: the government publicly released the *same* information with its filing in this Court. If post-deprivation process is constitutionally inadequate for purported foreign terrorist organizations, *see Nat'l Council*, 251 F.3d at 207-08, it is surely inadequate for a leading American frontier AI company.

And Defendants' failure to afford pre-deprivation process was not harmless. For instance, Under Secretary Michael's memorandum is riddled with speculative assertions, factual errors, and misunderstandings that Anthropic could have rebutted had it been afforded the opportunity. Among other problems, the memorandum states that "Anthropic [sought] to grant itself" a "veto" over Department operations. Dkt. 96-2 at 6. Anthropic did nothing of the sort. *Supra* p. 11. The memorandum also asserts that Anthropic sought to "restrict[] the use of a system" to "diminish functionality" and limit "warfighting capabilities." Dkt. 96-2 at 6. Had Anthropic been able to respond, it could have demonstrated why that assertion is irreconcilable with technological reality. Second Ramasamy Decl. ¶¶ 13-20. Due process exists precisely to prevent these kinds of government actions premised on errors that "go uncorrected despite potentially easy, ready, and persuasive explanations." *Al Haramain*, 686 F.3d at 982.

**D.      The Presidential Directive Violated The Separation Of Powers By Blacklisting Anthropic Without Statutory Or Constitutional Authority To Do So**

Anthropic is also likely to establish that the Presidential Directive, and thus the federal agency actions implementing it, are unlawful. It is "black letter law" that the President's power to act "must stem either from an Act of Congress or from the Constitution." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188-89 (1999). Yet here, as Anthropic has explained, no statute or constitutional provision authorized the President unilaterally to blacklist a company and to

effectively debar it from any existing or future government contract. Mot. 21-22.

Invoking *Nuclear Regulatory Commission v. Texas,* 605 U.S. 665, 681 (2025) (*NRC*), Defendants argue (Opp. 22-24) that this claim fails because Anthropic has available remedies under "the APA and contract-specific statutory review schemes." That is incorrect. The APA does not apply to the President and offers no vehicle to challenge the legality of the Directive itself, as the government acknowledges. Opp. 16 n.5. And contract remedies operate only piecemeal—through bid protests or disputes tied to particular procurements—and cannot reach a government-wide directive that both immediately and prospectively excludes a company from all federal contracting. *See, e.g.*, 28 U.S.C. § 1491(b)(1); 41 U.S.C. §§ 7103(a)(1), 7104, 7107.

Defendants also invoke *NRC* for their argument that *ultra vires* review is available only when the Executive Branch acts "contrary to a specific prohibition in a statute." Opp. 23. That misunderstands both *NRC* and Anthropic's claim. *NRC* involved a "nonstatutory ultra vires review" claim challenging an agency action for which Congress had specifically limited the scope of judicial review. 605 U.S. at 680. In those circumstances, "[b]ecause ultra vires review could become an easy end-run around the limitations" of "judicial-review statutes," the doctrine is "strictly limited." *Id.* at 681. But Anthropic is seeking relief from an unlawful Presidential Directive and from implementing agency actions complying with that Directive. And "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring in part and concurring in the judgment); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996). Courts routinely consider *ultra vires* claims that a presidential action exceeded statutory authority without applying *NRC*'s "specific prohibition" standard. *E.g.*, *Newsom v. Trump*, 141 F.4th 1032, 1044 (9th Cir. 2025); *Murphy Co. v. Biden*, 65 F.4th 1122, 1128-29 (9th Cir. 2023).

In any event, the "specific prohibition" standard is satisfied here. By taking the extraordinary step of ordering the entire Executive Branch to cancel all contracts with Anthropic and debarring Anthropic from future government contracting, invoking no relevant legal authority, the Presidential Directive exceeds the President's authority. Congress enacted a detailed framework governing federal procurement and contractor exclusions, which specifies who may be excluded, under what

circumstances, and through what process. *See* 10 U.S.C. §§ 3203(a)(1), 3204(a); 40 U.S.C. § 121(a); 41 U.S.C. §§ 3303(a)(1), 3304(a); *see also* 48 C.F.R. §§ 9.406-2, 9.407-2. The Directive overrides that comprehensive statutory framework, meaning the President engaged in "an attempted exercise of power that had been specifically withheld." *Leedom v. Kyne*, 358 U.S. 184, 189 (1958).

Nor can the President's Article II authority justify the Directive. No doubt, "the President may guide his subordinates' *lawful* exercise of discretion regarding procurement policies." Opp. 23 (emphasis added). But the Constitution, including the Take Care Clause, does not empower the President to direct subordinates to act unlawfully, such as by violating procurement statutes enacted by Congress or binding procurement regulations. *See, e.g.*, *Nebraska v. Su*, 121 F.4th 1, 16 (9th Cir. 2024) (Procurement Act "does not give the President unrestrained authority to issue any procurement policy that he desires").

**II. Preliminary Injunctive Relief Is Needed To Prevent Further Irreparable Harm**

Anthropic is suffering ongoing violations of its constitutional rights, damage to its reputation and institutional standing, loss of important relationships with private defense-sector partners, and other substantial economic injuries. Mot. 22-24. Defendants do not contest Anthropic's factual showing and offer no contrary evidence.

As to the constitutional injuries, Defendants argue that "there is no evidence of a chilling effect on Anthropic's speech." Opp. 25. But irreparable injury unquestionably exists whenever the government violates the First Amendment or the Due Process Clause. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *see Am. Ass'n of Univ. Professors v. Trump*, 2025 WL 3187762, at *36 (N.D. Cal. Nov. 14, 2025). So the relevant question is not whether *Anthropic* has been chilled, but whether Defendants' retaliatory actions would chill the speech of a person of ordinary firmness. And Defendants do not dispute that Anthropic satisfies that objective standard. *See supra* p. 3.

As to the reputational harm that ineluctably followed from the Executive Branch labeling Anthropic an unpatriotic threat to national security, Defendants dismiss Anthropic's evidence as "conclusory statements about risks that may occur at a future date." Opp. 25. That ignores the record. Anthropic has suffered lost contracts, business uncertainty, and the stigma of being cast as (among other things) a threat to the lives of American soldiers. Dkt. 6-4 ¶¶ 5, 9, 12-15.

That reputational harm is comparable to other forms of reputational harm that have recently been found to warrant provisional relief. *See, e.g.*, *AAUP*, 2025 WL 3187762, at \*36. It accrued the day Anthropic was blacklisted by the President and became the first American company labeled a supply-chain risk—not at some speculative future date. Dkts. 6-5 ¶ 4, 6-4 ¶¶ 12-15, 18. Because these reputational injuries are "not easily measured or fully compensable in damages," they are irreparable as a matter of law. *AAUP*, 2025 WL 3187762, at \*36 (internal quotation marks omitted). Undisputed record evidence likewise refutes Defendants' claim that Anthropic's loss of key private defense-sector relationships is "speculative." Opp. 26. The Challenged Actions stalled six potential Anthropic national security contracts; prevented at least three significant deals valued at almost $200 million from closing; forced Anthropic partners to "immediately switch[] from Claude to a competing generative AI model"; and ended several partnerships altogether—all within days of Defendants' branding of Anthropic as a threat to the nation. Dkts. 6-3 ¶ 33, 6-4 ¶¶ 11-20. Anthropic's customers have canceled sales meetings, sought to shorten or renegotiate existing contracts, and replaced Claude with competitors' models. *Id*. Anthropic's partners are not merely "assessing" their relationships with the company—some are actively terminating them. *Id.* These already-inflicted losses are far from the "subjective apprehensions and unsupported predictions" that characterize speculative harm. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 675-76 (9th Cir. 1988).

Finally, Defendants miss the point when they attempt to recast Anthropic's economic injuries as arising from a simple breach of contract that could be litigated in the Court of Federal Claims. Anthropic is not challenging the termination of any particular government contract; it challenges Defendants' attempt to blacklist the company and brand it a national security threat. Those actions have cost Anthropic revenue and threaten to inflict still more harms. Dkts. 6-5 ¶ 6, 6-4 ¶¶ 16-20, 6-3 ¶¶ 32-33. Anthropic accordingly seeks injunctive and declaratory relief against the Challenged Actions—relief for which the Court of Federal Claims offers no recourse. *See Pacito v. Trump*, \_\_\_ F.4th \_\_\_, 2026 WL 620449, at \*18-21 (9th Cir. Mar. 5, 2026); *Thakur*, 787 F. Supp. 3d at 990-91.

**III.     The Balance Of The Equities And The Public Interest Weigh In Favor Of An Injunction**

Because Anthropic has established a likelihood of success on its constitutional and statutory claims, it has "also established that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). Nonetheless, as amici from across the Nation and across the political spectrum have now attested, a preliminary injunction would serve an array of specific and vital public interests. Twenty-two former high-ranking military leaders, who served under presidents of both parties, warn that the Challenged Actions will have "dire" consequences for the national defense and "will materially detract from military readiness and operational safety." Dkt. 58 at 14. Microsoft—an industry leader and prime government contractor uniquely positioned to understand the private sector's role in safeguarding national security—cautions that the Challenged Actions could deprive Americans of "access to state-of-the-art technological solutions" critical to national security in the digital age. Dkt. 75 at 11. Thirty-seven employees from OpenAI and Google explain that the Challenged Actions threaten to "chill open deliberation" and "professional debate" amongst the people best positioned to understand AI technology and its potential for "catastrophic misuse." Dkt. 24-1 at 6, 8, 9. Amici have articulated other compelling public interests: government contractors who would bear unnecessary, "substantial and wide-ranging costs"; ideologically diverse think tanks and the largest federal employee union, both concerned about unconstitutional government retaliation; and theologians underscoring the public interest in ethical guardrails on technical progress. Dkts. 67, 71, 75, 80.

Defendants respond that an injunction would prevent the Executive "from effectuating statutes enacted by representatives of its people." Opp. 28. But the Executive's actions here are *not* faithful to the statute Congress enacted. The government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). And "the rule of law is secured by a strong public interest that the laws enacted by [the people's] representatives are not imperiled by executive fiat." *Washington v. Trump*, 145 F.4th 1013, 1037 (9th Cir. 2025) (internal quotation marks omitted).

**IV.    The Scope Of Requested Relief Is Appropriate And No Stay Or Bond Should Issue**

Defendants conclude by asking the Court to narrowly tailor any preliminary relief, grant a stay pending appeal, and require a bond under Fed. R. Civ. P. 65(c). Opp. 29-30.

The preliminary relief proposed by Anthropic is already narrowly tailored. It only enjoins specific, unlawful executive actions and bars Defendants from "implementing, applying, or enforcing" those specific actions. *See* Dkt. 6-34. It would not "compel[] Defendants' use of Anthropic's products and services" going forward. Opp. 29. Anthropic recognizes that the relief sought here "would not require Defendants to use Anthropic's services or prevent them from transitioning to other AI providers," so long as that transition complies with applicable regulations, statutes, and constitutional provisions. Mot. 2. For the avoidance of any doubt, Anthropic would not object to the Court including similar language in its order.

Defendants acknowledge that the factors governing a request for a stay pending appeal are substantially the same as those governing a preliminary injunction. Opp. 30. For the reasons noted above, Defendants could not satisfy those standards here. But to allow for a more orderly appellate process, and without prejudice to its arguments that Defendants are not entitled to a stay, Anthropic would not object to Defendants' alternative proposal for an administrative stay "for a period of seven days to allow Defendants to seek an emergency, expedited stay from the court of appeals," *id.*, or whatever other brief, time-limited period this Court deems appropriate.

Finally, no Rule 65(c) bond is appropriate here. Rule 65(c) "invests the district court 'with discretion as to the amount of security required, if *any*.'" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (citations omitted). Defendants have not demonstrated that they "will incur any significant cost" here, and "a bond 'would have a negative impact on [Anthropic's] constitutional rights'" by taxing it for seeking relief against unconstitutional retaliation. *Kharb v. DHS*, 2026 WL 485765, at *5 (C.D. Cal. Feb. 17, 2026). At the least, "because this litigation is brought to protect the public interest and ensure compliance with federal law," only a "nominal bond" should be required. *Thakur*, 787 F. Supp. 3d at 1005 ("$100").

**CONCLUSION**

This Court should grant the emergency relief in Anthropic's proposed order.

Date: March 20, 2026　　　　　　　　　　　/s/ Michael J. Mongan

KELLY P. DUNBAR (*pro hac vice*)　　　　MICHAEL J. MONGAN (SBN 250374)
kelly.dunbar@wilmerhale.com　　　　　　michael.mongan@wilmerhale.com
JOSHUA A. GELTZER (*pro hac vice*)　　　WILMER CUTLER PICKERING
joshua.geltzer@wilmerhale.com　　　　　　　HALE AND DORR LLP
KEVIN M. LAMB (*pro hac vice*)　　　　　50 California Street, Suite 3600
kevin.lamb@wilmerhale.com　　　　　　　San Francisco, CA 94111
SUSAN HENNESSEY (*pro hac vice*)　　　　Telephone: (628) 235-1000
susan.hennessey@wilmerhale.com
LAUREN MOXLEY BEATTY (SBN 308333)　EMILY BARNET (*pro hac vice*)
lauren.beatty@wilmerhale.com　　　　　　emily.barnet@wilmerhale.com
LAURA E. POWELL (*pro hac vice*)　　　　WILMER CUTLER PICKERING
laura.powell@wilmerhale.com　　　　　　　HALE AND DORR LLP
SONIKA R. DATA (*pro hac vice*)　　　　　7 World Trade Center
sonika.data@wilmerhale.com　　　　　　　250 Greenwich St
WILMER CUTLER PICKERING　　　　　　New York, NY 10007
　HALE AND DORR LLP　　　　　　　　　Telephone: (212) 230-8800
2100 Pennsylvania Avenue NW
Washington, DC 20037　　　　　　　　　*Attorneys for Plaintiff Anthropic PBC*
Telephone: (202) 663-6000