UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHROPIC PBC,<br><br>                Plaintiff,<br><br>        v.<br><br>U.S. DEPARTMENT OF WAR, et al.,<br><br>                Defendants. | Case No.  26-cv-01996-RFL<br><br>**NOTICE OF QUESTIONS FOR HEARING**<br><br>Re: Dkt. No. 6 |

The Court requests that the parties be prepared to address the following questions at the hearing on Anthropic's Motion for a Preliminary Injunction, set for March 24, 2026, at 1:30 p.m., in Courtroom 12 at the San Francisco Courthouse.

1.    Secretary Hegseth "direct[ed]" the following action on February 27 via social media:  "Effective immediately, no contractor, supplier, or partner that does business with the United States military may conduct any commercial activity with Anthropic. . . .  This decision is final."  The quoted language (the "Hegseth Directive") is much broader than the later March 3 determination that Anthropic was a "supply chain risk" under 10 U.S.C. § 3252.  For example, under the Hegseth Directive, a law firm that gave advice to the Department of War would have to stop using Claude in unrelated matters for other clients.  That would not be required by the supply chain risk designation.

    a.    Defendants' opposition brief states that the Hegseth Directive was not the "'source of any binding legal obligations' on Anthropic or any other

1

contractor."  Is it Defendants' position that this directive had no legal effect?

    b.  Is the Hegseth Directive an accurate statement of the Department's immediate intended course of action?

    c.  Do Defendants agree that Secretary Hegseth lacked authority to enter a directive of this breadth under Section 3252 or any other statute?

    d.  If Defendants concede that the Hegseth Directive has no legal effect, how does Anthropic still face irreparable harm from it?  What, if any, legal authority supports that view?

2.  Section 3252(b)(3) provides that Secretary Hegseth may designate Anthropic as a supply chain risk only after providing notice to various congressional committees and requires the notice to contain "a discussion of less intrusive measures that were considered and why they were not reasonably available to reduce supply chain risk."  Do Defendants concede that Secretary Hegseth's letters to the congressional committees did not contain a discussion of those required topics?

3.  With respect to the "less intrusive measures" analysis, everyone agrees that the Department would be free to terminate any direct contract with Anthropic. However, Defendants contend that this would be insufficient to mitigate the risk, because the Department also needs to prohibit the use of Claude in its national security systems in situations where Anthropic is a subcontractor.  Does designating Anthropic as a supply chain risk sweep more broadly than that, though?  For example, if a contractor for the Department uses Claude Code as a tool to write software for the Department's national security systems, would that contractor face termination as a result?

4.  The term "supply chain risk" means "the risk that an adversary may sabotage, maliciously introduce unwanted function, or otherwise subvert" the operation of the Department's national security systems.  *See* 10 U.S.C. § 3252(d)(4).  Assume the Court determines that the plain text of the term "adversary" encompasses

domestic terrorists and other non-foreign hostile actors.

    a.  Do Defendants agree that usage restrictions that are publicly announced or directly communicated to the Department do not themselves constitute acts of "sabotag[ing], maliciously introduc[ing] unwanted function, or otherwise subvert[ing]" an IT system?

    b.  What evidence in the record shows that Anthropic had ongoing access to or control over Claude after delivering it to the government, such that Anthropic could engage in such acts of sabotage or subversion?

    c.  Presumably most IT vendors could, if they wanted to, update their systems or bury unwanted functions in their software without detection.  Is it Defendants' view that Section 3252 allows the Department to designate an IT vendor a supply chain risk on the sole basis that the vendor acted stubbornly or refused to agree to contracting terms, causing the Department to question its trustworthiness?

5.  Defendants submit an undated memorandum from Under Secretary Emil Michael containing a risk assessment about Anthropic.  (Dkt. 96-2 at 6–9.)  When was this memorandum completed and signed?

6.  As to the following agencies, what evidence in the record indicates that each of the agencies uses Anthropic's products, such that Anthropic has standing to seek emergency injunctive relief against that agency?

    a.  U.S. Office of Personnel Management

    b.  U.S. Nuclear Regulatory Commission

    c.  U.S. Social Security Administration

    d.  Securities and Exchange Commission

    e.  National Aeronautics and Space Administration

    f.  Federal Reserve Board of Governors

    g.  National Endowment for the Arts

      h. Executive Office of the President

At the hearing, each side will address each question in the sequence stated above, and then at the end, the parties will have additional time to present any additional argument that they wish the Court to hear.  The parties **shall not** file written responses to this Notice of Questions.

**IT IS SO ORDERED.**

Dated: March 23, 2026

RITA F. LIN
United States District Judge

4