UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANTHROPIC PBC,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF WAR, *et al.*,<br><br>Defendants. | Case No. 3:26-cv-01996-RFL<br><br>**SECOND DECLARATION OF EMIL MICHAEL** |

Pursuant to 28 U.S.C. § 1746, I, Emil Michael, declare as follows:

1.     I am the Under Secretary of War for Research and Engineering (USW(R&E)) and Chief Technology Officer for the Department of War (DoW). I have held this position since May 20, 2025.

2.     In my current position, I am responsible for spearheading the Department's efforts to ensure U.S. military technological superiority and keep DoW at the forefront of innovation. I provide strategic direction and oversight for DoW's entire research, development, and prototyping enterprise, which includes providing critical input on the acquisition, implementation, and use of cutting-edge technologies such as artificial intelligence (AI).

3.     This declaration is based on my personal knowledge as well as information made available to me through reasonable diligence in the course of my official duties.

**DoW's 2025-2026 Contract Negotiations with Anthropic**

4.     During the course of contract negotiations with DoW in late 2025 and early 2026, Anthropic became a supply chain risk following a progression of risk that reached a saturation point as a result of the behavior of its leadership, resulting in DoW's designation of Anthropic under 10 U.S.C. § 3252.

5.     Contrary to Anthropic's assertions, DoW did raise its concerns during contract negotiations with Anthropic about the Department's need to use Anthropic's technology for all lawful

uses. Beyond that, the Department is not required to preemptively share information relating to national security concerns with private companies. Moreover, the Department generally does not share national security concerns with private actors, particularly when the Department has concerns about the private actor itself.

6. Anthropic has attempted to characterize itself as a trusted partner to DoW. However, Anthropic's continued attempts, including now under oath, to dictate to DoW what the nature of the Department's relationship with Anthropic is or has been demonstrates Anthropic's desire to insert itself into DoW decision-making.

7. While Anthropic has tried to disclaim a desire to have an approval role in DoW's decision-making, Anthropic leadership repeatedly sought to insert themselves into such decision-making. First, in a contract negotiation meeting on December 4, 2025, Anthropic leadership expressed that DoW would have to call Anthropic in real time to seek authorization for a usage exception to one of their redlines, which are not prohibited by law. Alarmingly, that statement demonstrated not only that Anthropic demanded an operational veto of DoW's decision-making, but that Anthropic would seek to exercise that veto, possibly in situations where any delay or disruption to U.S. military operational decisions and execution could endanger American lives and national security. Second, in both meetings and a publicly disclosed message to Anthropic staff, Anthropic leadership stated that it has two redlines that it will not allow the Department to cross.[1] If accepted, this would fundamentally insert Anthropic into decision-making related to those issues, and it engenders concern about other redlines the company may have, now or in the future.

8. Indeed, despite Anthropic's claim that it never desired an approval role in military operations, Anthropic repeatedly insisted in negotiations and in public statements that it would not allow DoW to use its technology to cross its redlines. That is in fact an operational veto over DoW's use of Anthropic technology for all lawful uses and confirms that Anthropic did want to intervene in and assert control over DoW operations in at least those two areas.

9. Moreover, Anthropic's insistence during contract negotiations on its redlines inherently injects the company into DoW's decision-making because those redlines could be embedded

---

[1] https://www.anthropic.com/news/statement-department-of-war.

restrictions on its model's functionality. That is a per se operational veto and suggests, contrary to the company's assertions, that Anthropic leadership believed it could enforce such a veto, including during active military operations.

10. Despite Anthropic's claims that before contract negotiations broke down the parties were near agreement on language that would address Anthropic's concerns about its technology being used for lethal autonomous warfare, the fact remains that Anthropic would not agree to acquisition of its LLM products with the usage terms and technical and service delivery specifications DoW requires.

11. Regarding the contractual language Anthropic proposed on March 4 ("For the avoidance of doubt, [Anthropic] understands that this license does not grant or confer any right to control or veto lawful Department of War operational decision-making"), this language remained insufficient to mitigate DoW's concerns that Anthropic would exercise its own judgment—and embed that judgment into model guardrails and weights—about what constitutes "lawful" operational decision-making.

12. Contrary to Anthropic's suggestion, any ongoing discussions do not undermine any of the determinations made by DoW. Rather, DoW will consider any information provided by Anthropic that may warrant altering its supply chain risk designation in whole or in part.

### Anthropic's Access to and Control of Its AI Model on DoW Systems

13. As previously explained in my March 17 declaration, the baseline risk inherent in the relatively opaque nature of large language model (LLM) technology that DoW procures from Anthropic escalated due to the unusual degree of control that Anthropic retains over its model, as well as Anthropic's adversarial posture towards DoW's statutory mission and the manner in which it is conducted.

14. The Department was reliant on Anthropic to continuously provide updated versions of its model to keep pace with the most advanced technology and emerging threats. Unlike traditional software, which has reviewable code, language models are a black box. Anthropic has full control over the weights in, and thus the resulting behavior and outputs of, the model it delivers to the Department. This access and control could enable Anthropic to impact the model's availability or performance.

15. Again, these threats do not arise only from Anthropic's work as a prime contractor. The incorporation of Anthropic's systems into a product on DoW systems would cause the same risks regardless of whether it flows directly to DoW systems or through a prime contractor.

16. Because of these access and control risks, DoW took prompt action in conjunction with the supply chain risk designation to work with its prime contractors to remove Anthropic's access, via the prime contractors, to make updates or other changes to the model. DoW did this to ensure that Anthropic no longer has the ability to interfere with DoW systems. DoW is also conducting an audit for any malicious or unintended software intrusions to existing Anthropic technology on DoW systems that could interfere with ongoing or future operations.

17. Regarding, the U.S. Centers for Disease Control's (CDC) lawful use of Anthropic's LLM technology being limited by safety filters, Anthropic failed to inform the prime contractor and the agency upfront about updates it made to the filters or how the filters could limit the product's functionality in relation to the CDC's sensitive infectious disease research.

18. DoW learned about this incident in the context of its own negotiations with Anthropic and assessed that Anthropic's demonstrated lack of transparency about the limits it had embedded in its AI models, and its apparent unwillingness to work with the government's prime contractors to enable mission continuity, creates operational risk that Anthropic may make updates to its model that cause the model to no longer function as expected when used for sensitive, but lawful purposes such as the CDC's research or DoW's military operations.

**Supply Chain Risk Designation**

19. I understand that the Court has inquired about the date I completed and signed the memorandum bearing the Bates stamp DoW-PI-005. I completed and signed this memorandum on March 2, 2026.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED this 24th day of March, 2026.

_____
Emil Michael