**Pages 1 - 66**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Rita F. Lin, Judge

ANTHROPIC PBC,                    )
                                  )
          Plaintiff,              )
                                  )
   VS.                            )   **NO. 3:26-cv-01996-RFL**
                                  )
U.S. DEPARTMENT OF WAR, et        )
al.,                              )
                                  )
          Defendants.             )
_____     )

                          San Francisco, California
                          Tuesday, March 24, 2026

          **TRANSCRIPT OF PROCEEDINGS** (CORRECTED)

**APPEARANCES**:

For Plaintiff:
                    WILMER CUTLER PICKERING HALE
                      & DORR LLP
                    50 California Street
                    San Francisco, California 94111
               BY:  **MICHAEL J. MONGAN, ATTORNEY AT LAW**

                    WILMER, CUTLER, PICKERING, HALE
                      & DORR LLP
                    2100 Pennsylvania Avenue
                    Washington, D.C. 20007
               BY:  **SUSAN J. HENNESSEY, ATTORNEY AT LAW**
                    **SONIKA R. DATA, ATTORNEY AT LAW**
                    **JOSHUA A. GELTZER, ATTORNEY AT LAW**
                    **LAUREN MOXLEY BEATTY, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**



Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

**APPEARANCES**:   (CONTINUED)

For Defendants:

                    U.S. DEPARTMENT OF JUSTICE
                    CIVIL DIVISION
                    Federal Programs Branch
                    1100 L Street NW
                    Washington, D.C. 20005
             BY:   **CHRISTIAN DIBBLEE, TRIAL ATTORNEY**

                    U.S. DEPARTMENT OF JUSTICE
                    CIVIL DIVISION
                    950 Pennsylvania Avenue NW
                    Washington, D.C. 20530
             BY:   **ERIC J. HAMILTON, TRIAL ATTORNEY**


**Also Present:**       **Brian Israel, Anthropic**
                    **Jeff Bleich, Anthropic**
                    **Aparna Sridhar, Anthropic**

**Tuesday - March 24, 2026**                            **1:33 p.m.**

**P R O C E E D I N G S**

---o0o---

THE COURTROOM DEPUTY:  All rise.  Court is now in session.  The Honorable Rita F. Lin is presiding.

Please be seated.

These proceedings are being recorded by this Court.  Any other recording of this proceeding, either by video, audio, screenshots, or any other copying of the hearing is strictly prohibited.

Calling Civil Action 26-1996, Anthropic PBC vs. U.S. Department of War, et al.

Counsel, please approach the podium and state your appearances for the record, beginning with counsel for plaintiffs.

MR. MONGAN:  Good morning, Your Honor.  Michael Mongan from Wilmer Hale on behalf of plaintiff Anthropic Public Benefit Corporation.

I'm joined in Court this morning by my colleagues from Wilmer Hale, Joshua Geltzer, Susan Hennessey, Lauren Moxley Beatty, and Sonika Data.  I'm also joined by Brian Israel, chief legal officer at Anthropic; Jeff Bleich, general counsel; and Aparna Sridhar, deputy general counsel.

And I'll just add that I apologize for my physical appearance this morning.  I had a very poorly timed mishap on a

trail run on Sunday.

**THE COURT:**  Thank you for making it despite your mishap.

**MR. MONGAN:**  Thank you.

**THE COURT:**  I appreciate it.

**MR. HAMILTON:**  Good afternoon, Your Honor.  Eric Hamilton for defendants.  I'm joined by Christian Dibblee at counsel table.

**THE COURT:**  Okay.  Good afternoon to -- to both of you.

Yesterday I disclosed a list of questions that I asked counsel to be prepared to answer today.  Before we go down that list, I thought it might be helpful for the attorneys to hear kind of a general overview of my tentative thoughts on the case so far.  You're welcome to sit down for that if you'd like, but then I'll invite you back up to address the questions.

I will say that I do think this case touches on an important debate.  On the one hand, Anthropic is saying that its AI product Claude is not safe to use for autonomous lethal weapons and domestic mass surveillance.  Anthropic's position is that if the Government wants to use its technology, the Government has to agree not to use it for those purposes.

On the other hand, the Department of War is saying that military commanders have to decide what is safe for its AI to do, not a private company.

It's a fascinating public policy debate and it's not my role to decide who's right in that debate; that is Secretary Hegseth's call. The Department of War decides what AI product it wants to use and buy. And everyone, including Anthropic, agrees that the Department of War is free to stop using Claude and look for a more permissive AI vendor.

I don't see that as being what this case is about. I see the question in this case as being a very different one, which is whether the Government violated the law when it went beyond that.

After Anthropic went public with this contracting dispute, defendants seemed to have a pretty big reaction to that. They took three actions that are the subject of this lawsuit.

So first, the President announced that every federal agency, not just the Department of War, would immediately ban Anthropic from ever having another government contract, so that would include the National Endowment of the Arts using Claude to design its website. Not allowed.

Second, Secretary Hegseth announced that anyone who wants to do business with the U.S. military has to sever their commercial relationship with Anthropic. So if a company uses Claude to have a customer service chatbot, now they can't do any defense work.

Third, the Department of War designated Anthropic as a, quote, supply chain risk. That label applies to adversaries of

the U.S. government who may sabotage its technology systems. It's typically directed at foreign intelligence, terrorists, or other hostile architects.

What is troubling to me about these reactions is that they don't really seem to be tailored to the stated national security concern.

If the worry is about the integrity of the operational chain of command, DoW could just stop using Claude.  It looks like defendants went further than that because they were trying to punish Anthropic.

One of the amicus briefs used the term "attempted corporate murder."  I don't know if it's murder, but it looks like an attempt to cripple Anthropic.

And specifically my concern is whether Anthropic is being punished for criticizing the Government's contracting position in the press.  Defendants say they were doing this because Anthropic's, quote, sanctimonious rhetoric, unquote, was an attempt to, quote, strong-arm the Government.

DoW's records say that it designated Anthropic as a supply chain risk because it was, quote, hostile in the press.  So it looks like DoW is punishing Anthropic for trying to bring public scrutiny to this contracting dispute, which, of course, would be a violation of the First Amendment.

So I have a lot of concern about that and I would like to hear more from the Government about that.

I also have a lot of questions about, one, whether Congress gave defendants the authority to do this in the first place; and two, whether defendants violated Anthropic's due process rights by not giving them notice and an opportunity to respond.

The questions I put out yesterday really go more to those latter two topics so I want to start going through those questions, but I will just say that at the end of the questions, I'll give both parties an opportunity to address the Court.  You can give me your reaction to the tentative thoughts that I gave you.

And you could also just let me know anything else you think is important that I know about the case before I take it under submission.  So let me just invite counsel back up to the podiums and we'll just go through the questions.

I'll direct the question at one party, and then the other one will have an opportunity to respond to what the first party said.

So the first question is really directed at counsel for defendants.  And I'll just read it so we're all on the same page. [as read]:

"Secretary Hegseth directed the following action on February 27th, via social media.  Quote, effective immediately, no contractor, supplier, or partner that does business with the United States military may

conduct any commercial activity with Anthropic.

Then there's some more statements and then it concludes with [as read]:

"This decision is final."

I'm just going to refer to that quote as the "Hegseth Directive."

Defendants' opposition brief states that the Hegseth Directive was not the, quote, source of any binding legal obligations on Anthropic or any other contractor.

So the question I have for defendants is, is it your position that this directive has just no legal effect at all?

**MR. HAMILTON:**  Yeah.  I think that is basically correct.  Our position is that this is not an action by which rights or obligations are determined, or from which legal consequences flow.

As we explain in our PI opposition brief, no entity would face liability for noncompliance with the post.  This was a social media post announcing that DoW would be taking action.

The sentence before the sentence that Your Honor read from says "I am directing the Department of War to designate Anthropic," indicating that action is to come.

Now, it's possible that officials within DoW might rely on this post in taking agency actions, but that would not convert the post into final agency action under the APA.

**THE COURT:**  So the post itself, it says "Effective

immediately, no contractor that does business with the U.S. military may conduct any commercial activity with Anthropic and that the decision is final."

Your position is that has absolutely no legal effect at all?

**MR. HAMILTON:**  Correct.  That sentence needs to be read with the previous sentence, which talks about taking action to designate Anthropic as a supply chain risk.

**THE COURT:**  So that brings me to my next question, which is whether this directive is an accurate statement of the Department of War's immediate intended course of action.

**MR. HAMILTON:**  The answer is no.  If the "no contractor" sentence is read in isolation.  DoW's present concern is with DoW personnel and contracting partners using Anthropic for DoW work.

Again, the better reading of the "no contractor" sentence is to read that sentence with the one that precedes it indicating DoW is going to take action to designate Anthropic as a supply chain risk.

"Supply chain risk" is capitalized.  It's a term of art in DoW procurement parlance, and that's how the post was understood.

The plaintiff attached to its motion for a preliminary injunction a post by an entity called Fluet Law.  This is ECF 6-30.  And what Fluet Law said in interpreting the post is

the Government hasn't identified its legal authority yet, which matters.  The scope of the restrictions on contractors depends entirely on which authority is invoked and each carries very different implications for contractors.

Fluet Law then goes on to talk about 10 U.S.C. 3252, as well as 41 U.S.C. 4713, which are the authorities that Secretary Hegseth invoked in designating Anthropic as a supply chain risk.

And I'd add that DoW has now filed briefs in this Court as well as the U.S. Court of Appeals for the DC Circuit in a separate action that the plaintiff here brought in that court to challenge the 4713 designation, and those briefs explain the agency's position on what it -- its designations.

**THE COURT:**  So I have to say, I find that pretty surprising that -- I mean, obviously, the statement is front and center in this lawsuit and had a pretty big impact on the way the public and Anthropic's customers and a whole ecosystem of people reacted to what was about to happen.

So you're saying that that sentence, "Effective immediately no contractor with the U.S. military may conduct any commercial activity with Anthropic," it's just not true? This is a false statement?

**MR. HAMILTON:**  Well, I'm saying it needs to be read in the context of the sentence that preceded it, which is, again, pointing to action that is yet to come in designating Anthropic

as a supply chain risk.

And it's -- it's indicating that DoW will be taking action to do that, which is what it did in the Title 10 and the Title 41 supply chain risk designations.

**THE COURT:**  But those subsequent designations don't take any action on this "no contractor" statement; right?

**MR. HAMILTON:**  They don't go as far as that sentence goes.

**THE COURT:**  So that sentence doesn't -- even though it says it's effective immediately, it doesn't reflect the immediate intent of the Department of War?

**MR. HAMILTON:**  That's right.  Technically, it would have been effective when the designations took effect, and the designations, of course, would control the limits of the authority that was exercised.

**THE COURT:**  And how -- how is Anthropic supposed to be able to know that that will be true?

I mean, you're standing here saying "We said it but we didn't really mean it."  So how do they have any confidence that even though Secretary Hegseth is out there saying effective immediately, we're going to do this, how do they know that that's not going to happen?

**MR. HAMILTON:**  A few ways.  Secretary Hegseth sent a letter directly to Anthropic explaining the designations of supply chain risks.  That letter attached to it a -- a process

statement about due process available to Anthropic if it wished to utilize that procedure to challenge the supply chain risk designation.  And the parties, of course, had lines of communication open, they were, after all, negotiating an agreement for the Department of War to use Anthropic's services before the designation.

THE COURT:  So -- but before this moment, did DoW do anything to take back that statement?

MR. HAMILTON:  We've clarified the statement through our filings in this Court, as well as the DC circuit.  I think we've been clear in both Secretary Hegseth's designation memoranda, that the Department of War has now filed on the public docket, as well as our filings in this Court and the DC circuit exactly what DoW --

THE COURT:  So just in the interest of clarity, I want to be clear:  Is it accurate the DoW does not intend to terminate any contractors on the basis that they have a commercial relationship with Anthropic that's separate from their work for DoW?

MR. HAMILTON:  Separate from their work from DoW?
That is my understanding.
Again, I'd say what I said earlier in our discussion, which is DOW's present concern is with DoW personnel and contracting partners using Anthropic for DoW work, not for non-DoW work.

**THE COURT:** So let's say I'm a military contractor. I don't provide IT to the military; I provide toilet paper to the military. I'm not going to be terminated for using Anthropic.

Is that accurate?

**MR. HAMILTON:** For non-DoW work, that is my understanding.

**THE COURT:** Okay. And then if I'm a military contractor and I am providing IT services to DoW but it's not for national security systems, it's just for their regular systems, I won't be terminated because I use Anthropic.

Is that accurate?

**MR. HAMILTON:** It might be if you're using it for DoW work. DoW still has concerns about the reliability and trustworthiness of the Anthropic model, and that includes with how contractors are using the services which, of course, have weights and measures that are set by Anthropic for DoW work in and out of the -- the -- you know, the controlled systems platforms.

But, to reiterate, for non-DoW work, that is not the Department's concern at this point.

**THE COURT:** Okay. And let me just also ask you: Are defendants then conceding that Secretary Hegseth did not have statutory authority to enter a directive of this breadth under Section 3252 or any other statute?

**MR. HAMILTON:** We agree that Section 3252 does not go

as far as the "no contractor" sentence goes.  If that sentence is read in isolation, standing here today, I'm not aware of any authorities that would permit DoW to categorically bar contractors from using a company's products or services for non-DoW work.

But to reiterate, this post does not itself impose obligations on contractors or subcontractors, that instead flows through the supply chain risk designations.

**THE COURT:**  So why did Secretary Hegseth say this if it has no legal effect and he didn't intend to -- to cause it to happen?

**MR. HAMILTON:**  I don't know.  I know that this administration is committed to transparency, and it indicated in this post it would be taking action following the post to designate the company as a supply chain risk, which is what it did.

**THE COURT:**  But this "no contractor" statement, why did Secretary Hegseth say that part?  Why didn't he just say "We're going to designate Anthropic a supply chain risk"?

**MR. HAMILTON:**  Again, that sentence has to be read in the context of the sentence that immediately precedes it, and uses a term of art, which the submission by the plaintiff even recognizes that at least the contractor -- you know, DoW contracting experts.  I understood what Secretary Hegseth was saying, which is he was talking about using authorities for

supply chain risk designation.

THE COURT: All right. I have a question for plaintiffs, and then I'll allow you to respond to some of the other things that defendants had said.

So for Anthropic, if defendants are conceding that this "no contractor" sentence, that I'm calling the Hegseth Directive, has no legal effect, how does Anthropic still face irreparable harm from that? What, if any, legal authority supports the view that there's still irreparable harm even if they're now saying it has no legal effect at all?

MR. MONGAN: Right, Your Honor. We are continuing to be irreparably injured by this directive and if I might -- if I can back up and respond to a few of the points and then get to your question about legal authority.

THE COURT: You may.

MR. MONGAN: I'm not sure that I totally followed the parsing offered by my colleague this morning, but what I heard him to say -- this afternoon, rather. What I heard him to say is that the defendants cannot identify any legal authority for the secondary boycott, what the Court has styled the Hegseth Directive, part of the February 27 post that the Federal Government's position is that it has no legal effect and that they have no present intent to enforce that against any entity.

I appreciate those concessions.

Those concessions are coming on March 24th, 25 days after

this directive went out.

It went out in a very public way.  Last time I looked, it was read by over 13 million people.  And I think that the average person or employee at a military contractor or prospective consumer or customer or partner or investor who looks at the words of this nine-paragraph directive on the official social media account of the Secretary of War is going to read it to say exactly what it says.  It is a final decision.  It says that at the end as to both components.

And with respect to this secondary boycott, "Effective; immediately no contractor," et cetera, "that does business with the United States military may conduct any commercial activity with Anthropic," that caused Anthropic immediate and irreparable harm to its constitutional rights, as Your Honor's tentative indicates, to its reputation, and to its business interests in the national security sector and beyond.

Now, I heard my colleague this afternoon say, "Well, that's okay, because there was a letter that clarified this."

That letter wasn't received until March 4th.  It's attached to our complaint at Docket 1-3.

I don't think it provides any clarity.  There has been a period, now, of 25 days where there is profound uncertainty as to the scope of this directive and its impact on our partners. And I think that this is a problematic scenario where the executive, in a profoundly public way, asserts something that

is sweeping and categorical that does immediate harm to a business, and then, through its lawyers, three or four weeks later in court, backs away from it.

So what we would suggest in response to your question about the need for preliminary injunctive relief, because all of these people who have X accounts probably don't have PACER accounts and may not be watching this hearing, and because the Secretary has not withdrawn this directive, we do need preliminary injunctive relief. We need authoritative clarity that binds the Department that the Secretary's directive does not have legal effect on Anthropic and its customers and partners.

And I want to emphasize, we'd be very open to achieving that clarity through a stipulation or other agreed resolution with the Government, but absent that, we need a preliminary injunction and eventually a permanent injunction.

Now, as to the question of authority, Your Honor, we have looked at this since we received the Court's order. This is a highly unusual case and, not surprisingly, we haven't found a decision involving an identical situation.

There is Ninth Circuit authority for the rather common-sense proposition that a defendant can't defeat a showing of irreparable injury at the preliminary injunction stage by unilaterally terminating the challenged conduct if they could resume the conduct during the course of the

litigation.

And we have copies of this case.  The case I'm referring to is *Boardman against Pacific Seafood Group* at 822 F.3d 1011, and the relevant discussion is at 1023.

And I think, although that case is factually dissimilar in some respects, the reasoning there applies *a fortiori* here, where the Secretary hasn't even publicly agreed to withdraw the secondary -- pardon me -- secondary boycott directive in his February 27th order, and where it's continuing to have effects until we get that authoritative clarity.

**THE COURT:**  Let me ask defendants:  Would you be willing to stipulate to the entry of an injunction enjoining the "no contracting" language that I'm calling the Hegseth Directive?

**MR. HAMILTON:**  No, Your Honor; there's nothing to stipulate to.

We have already disabused the plaintiff of the interpretation that it gave to the Secretary's post.  We've explained in this court, in writing and today orally, how that post is supposed to be interpreted.  And plaintiff is asking the Court to give the post a different interpretation and enjoin it in a way that the Department of War does not even read the post to operate.

**THE COURT:**  What prevents the Department of War from changing its mind about how this sentence operates or it --

changing its understanding?

**MR. HAMILTON:**  Well, the Department of War, and under Secretary Michael's declaration filed this morning, indicates that it remains open to receiving information from Anthropic and is continuing to assess the situation.

So I mean, the Department of War can, of course -- you know, and will take action as needed, as appropriate to mitigate the risk from Anthropic if it, you know, receives different information about the company.

But we've explained today and in writing how the Department of War understands Secretary Hegseth's post, and that should end the matter.

**THE COURT:**  So am I understanding that the Department of War could change its mind depending on other information it receives about the impact of this "no contracting" statement?

**MR. HAMILTON:**  The impact of the "no contracting" statement?

**THE COURT:**  Are you saying -- today you're saying that the "no contracting" statement is not a -- a statement that has any legal effect and it doesn't reflect the Department of War's immediate intended course of action.  Then you also said the Department of War is looking at the situation, every day changes, and it might change its mind.

So what's to prevent the Department of War from changing its view and having a different approach to this "no

contracting" statement that was made by Secretary Hegseth on February 27th?

**MR. HAMILTON:**  Well, the Department of War isn't going to change its interpretation of the social media post.  What might change is the Department of War might have additional information or -- I mean, this isn't different than any other national security risk.  If the Department of War comes into additional or new information, it evaluates that information.

And I only meant to indicate that if the Department of War does receive different information that changes its assessment of Anthropic's risk, it would act accordingly; but it won't change its interpretation of the social media post.

**THE COURT:**  Okay.  Let me move to my next question, which is about the supply chain risk designation.

Section 3252(b)(3) provides that Secretary Hegseth may designate Anthropic as a supply chain risk only after providing notice to various congressional committees and requires that the notice contain, quote, a discussion of less intrusive measures that were considered and why they were not reasonably available to reduce supply chain risk.

Do defendants concede that Secretary Hegseth's letters to the congressional committees did not contain a discussion of those required topics?

**MR. HAMILTON:**  Yes, we agree that the letters do not have that discussion, but that doesn't change the preliminary

injunction analysis for a few reasons.

First, this is an argument that Anthropic forfeited.  We filed the letters with our opposition brief.  Anthropic could have raised any argument it wished to make about this in its reply brief; it decided not to do so.  And under the party presentation principle, this Court should rule on the question -- the issues that Anthropic has decided to raise in its motion and its reply brief.

Second, Anthropic has no right to enforce the congressional notification requirement.  Statute doesn't give Anthropic a right to congressional notification.  Cases like *TransUnion against Ramirez* recognize that when a plaintiff complains of a harm, that harm has to be personal to the plaintiff.  Whatever harm could have possibly ensued from the Department's congressional notification correspondence, that harm would be personal to Congress, not to Anthropic, and it doesn't have the ability to challenge the congressional notifications that the Department provided.

That doesn't mean --

**THE COURT:**  Isn't the point of congressional notification to make sure that the Department gets it right and hears from members of Congress or others who have a viewpoint about whether there are less restrictive measures that the Department should think about?  And if then the Department didn't get it right because they didn't get enough input, that

harm, it seems to me, would be a harm to Anthropic.

What am I missing there?

**MR. HAMILTON:** I don't know Congress's specific purpose in creating the congressional notification requirement, but it's, if anything, at most, an information right only for Congress, not for Anthropic.

And the executive congressional back-and-forth is something that those two work out together, not Anthropic.

DoW has an office of legislative affairs that receives questions and provides answers when members of Congress have questions about correspondence the Department has sent or things that Congress comes to learn about that the Department has done.

And Congress has enforcement mechanisms if it feels like the executive has not done what Congress expects of the executive. It can withhold appropriations. It has its own information-gathering tools. But none of that creates a right for Anthropic as a third party to that congressional executive relationship to seek an injunction based on the congressional notice element of the statute.

And I would add that even if the Court found this piece to be actionable, it should, at most, enter an order deferring ruling on the motion for a preliminary injunction for three days to allow DoW to cure any defect that the Court may identify in its order.

It would be disruptive to DoW and not helpful to Anthropic to enjoin the designation over something that can be remedied in relatively short order.  And I would also note that if DoW did provide additional information to Congress on this point, it would likely do that in a classified or otherwise restricted nonpublic setting.

**THE COURT:**  Okay.  Let me give Anthropic an opportunity to respond.

**MR. MONGAN:**  Thank you, Your Honor.

I appreciate the concession from my colleague that this did not follow the procedures that Congress imposed when it granted this authority.

On the forfeiture point, I disagree.  Our motion specifically called out the procedural defects in this designation, including the failure to properly notify Congress.  And our reply brief also pointed to, in particular, the procedural defects with respect to the less intrusive measures requirement.

As to the question about whether there's a right to enforce, the Administrative Procedure Act is pretty clear under 5 U.S.C. Section 706(2)(D) that agencies have to follow the procedures required by Congress.

And I heard my colleague say that he doesn't know why Congress would have asked for this information.  I think it's apparent from the statute why Congress asked for this

information, because the Congress expressly said that this designation cannot incur -- occur until after this notification that goes to Congress.

It's not just an FYI to Congress.  It's an opportunity for Congress to review, in particular, a summary of the basis for the determination, including a discussion of less intrusive measures that were considered, and why they were not reasonably available.  And I've looked at all the materials in Docket 96-2 that my colleague is pointing to and there's -- there's nothing like that in the letters.

And beyond that, Your Honor, there's nothing like that even in the agency materials that predate the letters.  I have looked through those materials and I have not seen any discussion of less intrusive measures, even though there are some obvious less intrusive measures that were plainly available to the Department here.

And I think it's telling that when the defendants addressed this in their opposition brief and spoke about the Department's purported consideration of less intrusive measures, they don't point anything into their -- their submission of the documents that predated the Secretary's determination.  They point to a declaration from March 17th.

I guess, my final point on the suggestion of deferring ruling, I would submit, respectfully, that there are many other irregularities and deficiencies here that would support a

preliminary injunction and would urge the Court not to delay for this purpose.

Happy to have the Department notify Congress belatedly of the information that it should have notified Congress of before March 3rd, and indeed before February 27th, in our view; but that would not be a reason for slowing down the work of this Court given the irreparable and mounting injuries that Anthropic is experiencing.

**THE COURT:** When you mentioned that you believe that there are obvious less restrictive measures that should have been considered, what are you talking about?

**MR. MONGAN:** Well, Your Honor -- and this may be getting to some of the other questions that you have for us this afternoon, but as Your Honor's tentative suggested, they have concerns about working with Anthropic.

One obvious less intrusive measure, which we have recognized is available to them, is to stop working with Anthropic and to transition away from Anthropic and towards another AI frontier model. And we've said quite publicly and in our papers that if that's what the Department prefers to do, we will facilitate an orderly transition.

There are also federal procurement statutes and regulations that deal with procurement issues and procedures that an agency can invoke, such as the debarment procedure or the suspension procedure, terminating a contract at the

convenience of the Federal Government.

I don't want to concede anything to as to how we would respond to those procedures, but those are certainly less intrusive measures that, at a minimum, Congress is directing the Department to consider and evaluate before it takes this extraordinary action of designating an American company as a supply chain risk for the first time, as far as we are aware.

**THE COURT:**  Okay.  Let's go to the next question.

With respect to the less intrusive measures analysis, everyone agrees the Department would be free to terminate any direct contract with Anthropic.

I understand the defendants as saying that this would be insufficient to mitigate the risk because the Department needs to prohibit the use of Claude in its national security systems in situations where Anthropic is a subcontractor.  But does designating Anthropic as a supply chain risk sweep more broadly than that?

An example that comes to mind, after reading the amicus briefs, is if a contractor for the Department uses Claude code as a tool to write software for the Department's national security systems, would the contractor face termination as a result?

That's a question for defendants.

**MR. HAMILTON:**  My understanding is that that specific fact pattern would not be covered by the Section 3252

designation, the main thrust of which is to prevent Anthropic from being utilized as a subcontractor in covered settings.

DoW could still, in managing its contractors, tell contractors that it does not want them using Claude code as a tool to write software for DoW national security systems, but that wouldn't flow directly from the exercise of 3252 authority.

**THE COURT:** So it wouldn't flow from the exercise of 3252 authority that occurred in this litigation.

Am I understanding correctly?

**MR. HAMILTON:** Yes.

**THE COURT:** Okay.

**MR. HAMILTON:** Could I also make a few points responding to something my friend said earlier?

**THE COURT:** You may.

**MR. HAMILTON:** One is this is not -- we were talking about the congressional notification statute. This is not a statute like IEEPA or the Congressional Review Act that has built into it some mechanism for congressional review and congressional action upon agency action.

So the notification requirement is, at most, just a mechanism for Congress to stay abreast of actions that the Department of War is taking, but it doesn't itself confer on the -- the Congress an authority, like as in IEEPA, to review what the Department has done.

And the second point is my friend argued that it would have been a less intrusive measure for the Department of War to just decide it didn't want to work with Anthropic anymore; but that, of course, is exactly what this authority allows the Department to do.  And if that were always something that could be a less intrusive measure, then the authority would never be available to use.

Instead, Congress recognized that when a supply chain risk exists, the Department of War, and other covered agencies, shouldn't have to go contract by contract and tell contractors: We've identified a risk and we need you to adjust how you perform whatever services the Department of War has contracted for.

No, it wanted to give the executive a tool with one designation to address a risk.

**THE COURT:**  But the requirement isn't that as soon as there's a less restrictive measure, the Department of War has to take it.  It's just that the Department of War has to say why that less restrictive measure doesn't cut it and is it going to address the national security concern.

So I'm wondering why it is that the Department of War can't just say:  We're not using Claude anymore so we're going to stop our contract with Anthropic, and anyone else who is using Claude in our systems, they need to stop using Claude in our systems or we're going to terminate their contracts too.

That seems like it would get to the operational security concern that you have, but it doesn't go all the way to the supply chain risk designation.  Help me understand why that's not -- that's not sufficient for the national security justification that's been put forward.

**MR. HAMILTON:**  Well, the -- as I was trying to explain, the supply chain risk designation, it's a tool for the Department of War with one designation to address a risk, in particular under (d)(2)(C), to tell its primes that a source should not be contracted with as a subcontractor because of the supply chain risk.

The alternative is more of a patchwork approach that is not a preferred option in the context of a national security risk.

**THE COURT:**  Okay.  So I just want to be clear.  So is it DoW's view that the supply chain risk designation that occurred here excludes Claude from being deployed inside DoW's covered systems, whether by contract or subcontract, and it does not go beyond that?  That's the full extent of the impact of the supply chain risk designation?

**MR. HAMILTON:**  I think that is generally correct. There are three subsections to the statute 3252 in (d)(2)(A), (B), and (C).

My understanding is that it's (d)(2)(C) that is doing most of the work in permitting the Department of War to tell

contractors that it cannot use the Anthropic platform as a source for subcontracts, but the designation does also invoke (2)(A) and (B) where they apply.

**THE COURT:** I suppose what's giving me pause on some level is that Section 3252(d)(2)(C) seems to say that the DoW can withhold consent for a contractor to subcontract with Anthropic, but it doesn't limit that to subcontracting with Anthropic to incorporate the Claude software into the DoW system.

I mean, it would seem to cover the -- and I think the reason the amicus wrote that they were so concerned was because it would seem to cover situations in which a subcontractor is subcontracting with Anthropic to test its code, to write its code, to conduct a bunch of different functions that Anthropic commonly does for software development companies.

So I suppose this is kind of similar to our conversation about the Hegseth Directive.

How can Anthropic have some confidence that you're not going to interpret the scope of the supply chain designation to go further than what you just said in court today?

**MR. HAMILTON:** Well, to be clear, I've tried to provide some additional clarity on this particular authority, but DoW, of course, still retains the authority to manage this risk through discussions with contractors and other means.

You know, I don't mean to suggest that 3252 and the

Title 41 designation that Anthropic is challenging in the DC Circuit are the sole ways in which DoW is going to mitigate the risk that Anthropic presents, and the Davies memorandum, the March 5th Davies memorandum that is attached to our documents, talks some about DoW's implementation of the measures to mitigate supply chain risk, and that talks about authorities that aren't just confined to 3252 and the Title 41 authority, although, I think the main thrust of that is implementing those authorities.

I hope that's helpful.

**THE COURT:**  Just to be clear, that memorandum that you referred to that is a March 5th memorandum, is that DoW's view of the full scope of the implementation of the Section 3252 finding here?

In other words, this is not Phase 1 of the implementation of that designation.  It's -- this memo is the full implementation of the designation.

Am I understanding that correctly?

**MR. HAMILTON:**  I don't know the exact answer to that question.  I can say it is at least what the CIO deemed appropriate the day after the designation was signed in implementing the designation.

**THE COURT:**  So maybe it's Phase 1 or maybe it's the complete plan; we don't know yet.

Am I understanding that right?

**MR. HAMILTON:**  No.  And the designation does go to the full limits of 3252(d)(2), each of those A, B, and C.  So those are fully designated.  I just don't know the kind of full, you know, nature of that memorandum.

**THE COURT:**  Okay.  Let me give Anthropic an opportunity to respond.

**MR. MONGAN:**  Sure, Your Honor.

I'll address the issues related to Question 3, and with the Court's permission, maybe very quickly respond to the remaining points on Question 2.

**THE COURT:**  You may.

**MR. MONGAN:**  I think I heard defendants say that the designation -- the 3252 designation only reaches formal subcontracting relationships --

**THE COURT:**  Let me just check if that's right before we go down a whole discussion.

Is that accurate?

**MR. HAMILTON:**  That is, I think, generally correct for (d)(2)(C) but not (d)(2)(A) and (B).

**THE COURT:**  So in the Department of War's view, under the designation that was made, it could apply beyond formal subcontracting relationships?

**MR. HAMILTON:**  Yes.  But I believe (d)(2)(A) and (B) are generally discussing prime relationships.

**THE COURT:**  So it's the practice not to go beyond

subcontracting relationships but the Department could, if it wanted to, include informal uses or not formal subcontracting of Anthropic?

**MR. HAMILTON:**  No, no.  I'm only trying to explain that (d)(2)(A) and (B) apply to certain situations involving primes, wherein, I mean, in the case of (d)(2)(A) where there's a failure to meet qualification standards established in accordance with requirements of Section 3243, that's not exclusive to a subcontractor situation.  And in (d)(2)(B) where there's a failure to achieve an acceptable rating with regard to an evaluation factor, by contrast, (d)(2)(C) is about subcontractors.

**THE COURT:**  So I guess what I'm asking is, let's say Anthropic is not the prime contractor in the contract.  They're also not a formal subcontractor to the prime contract in any way.

Is it the Department of War's position that this designation does not apply in that situation?

**MR. HAMILTON:**  That's my understanding.  But DoW may mitigate a risk that Anthropic presents, for example, if, you know, someone is using Claude code for DoW work, and DoW has a concern that the use of that software may affect the reliability or trustworthiness or quality of the product and create a risk, it would work with that contractor to mitigate that risk, but that's outside the scope of 3252.

**THE COURT:**  Okay.  Let me allow Mr. Mongan to continue.

**MR. MONGAN:**  Yeah.  So I think this may be one issue on which I believe we're in vigorous agreement.  If we're looking at the provisions in 3252(b) -- sorry, (d)(2)(A) through (C), (A) through (B) are generally dealing with prime contracts, (C) is dealing with subcontractors.

As my colleague walked through (A) and (B).  They require particular determinations regarding failures to meet qualification standards or failures to achieve an acceptable rating with regard to an evaluation factor.  We're not aware of those determinations being made here, so I think we're centrally focused on Subsection C.

And as to the hypothetical, the text of 3252 does not reach suppliers or vendors who have commercially available products that happen to be used by a contractor under a general license in the way that a contractor might use Excel or Word.

The -- Professor Rozenshtein's amicus brief is helpful on this point because it notes that there have been circumstances where Congress has wanted to accomplish a broader ban and it has done that through different statutory authority which indicates that 3252 is narrow.

If I might briefly return to a couple of points on Question 2.

**THE COURT:**  You may.

**MR. MONGAN:**  The general argument here is to sort of normalize the invocation of the supply chain risk designation. This is a fairly extraordinary authority.  So the suggestion from my colleague this afternoon is:  Well, you have a contract negotiation and if you can't work it out and you're frustrated that the other side is being stubborn, then instead of just following the normal lawful approach under the procurement laws and winding down the contract, or even doing something like pursuing debarment or suspension, you invoke the supply chain risk designation.

This is something that has never been done with respect to an American company.  It is a very narrow authority.  It doesn't apply here, and it's not a normal way to respond to the concerns that have been articulated by -- by the other side.

There was a point about the congressional statute here and it only requiring notice.  I think what's clear on the face of that statute is not only that Congress intended this to be a narrow authority, but that it was presuming an agency decision-maker with an open mind who would make a designation -- and this is in 3252(b), quote, only after doing the enumerated things.

And one of those things is consulting with procurement or other relevant officials of the covered agency.  The other is giving this fairly detailed summary to the appropriate congressional committees which presumes an ability for those

committees to respond and raise questions or concerns.

Now, the suggestion I seem to be hearing this morning is it wouldn't have made a difference because this cake was already fully baked; and as an observation about what happened here, I'm not sure I'm in a position to dispute that.  But that just underscores the irregularity and the problematic nature of this decision-making processes where it appears that the Secretary, on February 27th, had made this decision and then you have folks at the agency sort of, after the fact, scrambling around to try and backfill the procedural requirements and not even doing that successfully, Your Honor.

**THE COURT:**  Okay.  Let me move to the next question, then.

The term "supply chain risk" refers to, quote, the risk that an adversary may sabotage, maliciously introduce an unwanted function, or otherwise subvert the operation of the Department's national security systems.

Assume that the Court determines that the plain text of the term "adversary" could encompass domestic terrorists or other non-foreign hostile actors.  Do defendants then agree that usage restrictions that are publicly announced and directly communicated to the Department do not, standing by themselves, constitute acts of sabotaging, maliciously introducing an unwanted function, or otherwise subverting an IT system?

**MR. HAMILTON:** Yes. And we have never argued that Anthropic's insistence in contract negotiations on limiting DoW's lawful uses is itself sabotage or subversion of an IT system. Instead, based on Anthropic's position in negotiations, based on discussions that have incurred, DoW has come to worry that Anthropic may in the future take action to sabotage or subvert IT systems. That is why they have been designated a supply chain risk; it's because of the risk of future sabotage or subversion or like acts.

**THE COURT:** So that brings me to the next question, then, which is: What evidence in the administrative record shows that Anthropic had ongoing access to or control over Claude after delivering it to the Government such that Anthropic could engage in acts of sabotage or subversion after the product was delivered?

**MR. HAMILTON:** Well, everyone agrees that the Department of War, to maintain the freshest, up-to-date, and best artificial intelligence technology will require updates to that technology. And I'll point to a few places in the record where the record discusses the concern that sabotage and subversive functionality could be introduced through updates to the Anthropic platform.

Start with the joint recommendation, which is Bates-stamped 002, it says [as read]:

"Use of the covered entity's products or

services introduces significant risk to the DoW's covered systems as the vendor, by maintaining the ability and necessity to continuously update the product or service, enables the potential of the vendor to subvert the design and/or functionality of their product or service."

There's similar language in the separate memorandum completed by Undersecretary Michael at Bates stamp 8, talks about Anthropic maintaining the ability and necessity to continuously update and tune the product.

And earlier in the Michael memorandum, on the page having 6 as the Bates stamp, talks about how DoW cannot trust Anthropic to ensure the integrity of its models through these updates.

Again, the --

**THE COURT:**  Are you -- so I understand what you're saying about updates, but do you dispute that the updates have to be accepted by DoW?  It only updates if DoW agrees to update the software.  It's not like Anthropic can secretly update the software without DoW agreeing and accepting each update.

**MR. HAMILTON:**  I don't know that we've taken a position on whether or not Anthropic maintains the ability to update the platform without DoW's consent.

I'll note that Undersecretary Michael's declaration, filed this morning, notes that the agency is conducting an audit to

identify any malicious or unintended software intrusions to Anthropic's technology.

THE COURT:  So just to be clear, standing here now, DoW doesn't know one way or the other whether Anthropic is, in fact, able to update without DoW's consent.

Is that what you're saying?

MR. HAMILTON:  I'm not aware of DoW having knowledge of Anthropic maintaining that functionality.  But, like I said, there's an audit underway to better understand what may be in the Anthropic platform.

THE COURT:  And sitting here now, are you aware of whether Anthropic -- or is DoW aware of whether Anthropic can, in fact, access its existing model to make adjustments or tune it without DoW's knowledge or consent?

MR. HAMILTON:  I don't know.

THE COURT:  Okay.  So if we're just talking about updates or the original delivery of the software, that brings me to my other question, which is, you know, presumably most IT vendors could, if they wanted to, deliver updates that had to be accepted by the Government client and could bury unwanted functions in their software without detection.

I mean, I know theoretically the Department of War could review every line of code from every update, but I think the reality is that at some level, it's a trust relationship and so -- with every software vendor, it is really a trust

relationship on some level.  But is it defendant's view, then, that Section 3252 lets the Department designate an IT vendor as a supply chain risk just on the basis that "The vendor was really stubborn or refused to agree to contracting terms and so now we, the Department of War, don't really trust them anymore"?

That seems like a really low bar and potentially one that could apply basically in any case.

So is that your view?

**MR. HAMILTON:**  No, Your Honor.  Acting stubbornly and refusing to agree to contracting terms are not alone enough to satisfy Section 3252 standards.  But Anthropic is not just acting stubbornly; it's not just refusing to agree to contracting terms.  Instead, it's raising concerns to DoW about how DoW uses its technology in military missions that are even within the scope of the usage terms.

And I'd add, DoW has not been working with this vendor for a very long period of time.  There's not the same trusting relationship built over decades of time that DoW has with some other vendors, and so the trust is especially important.  And Anthropic's insistence on being able to dictate which lawful uses DoW can use its technology for, combined with the discussions that have taken place in recent months between the company and the Department of War, have destroyed that trust and made it unacceptable for the Department of War to treat

Anthropic as a reliable and trustworthy partner whose technology can be installed in classified settings and whose technology would be relied upon by our war fighters in sensitive missions and important operations.

**THE COURT:**  So what I'm hearing from you, though, is that it's enough if an IT vendor is stubborn and insists on certain contracting terms and it asks annoying questions, then it can be designated as a supply chain risk, because they might not be trustworthy.  That seems like a pretty low bar.

Am I misunderstanding your view?

**MR. HAMILTON:**  I don't think that's the best -- the best interpretation of the record here.

Again, there have been discussions between the company and the Department of War.  Those discussions have included the company questioning lawful uses even within the usage terms that Anthropic has presently with the subcontract with which DoW uses the technology.

And so the worry is if Anthropic is now pushing back against the Department of War's use of its technology in certain settings, what's going to happen in the future?  What happens if Anthropic, through an update, installs a kill switch or installs functionality that allows it to change how the software is functioning when our war fighters need it the most?

That is an unacceptable risk to DoW, especially with this very sensitive type of technology embedded in classified

settings and which our war fire -- war fighters rely on in performing missions and operations.

**THE COURT:**  I guess I'm just wondering why it is that someone questioning the way things work would lead to suspicion that they might build in a kill switch or backdoor or other sabotage mechanisms.

I'm not seeing the connection here.

**MR. HAMILTON:**  Well, the worry is that Anthropic will, instead of merely raising concerns and pushing back, it will decide "We have a problem with what DoW is doing and we are going to manipulate the software in a way so that we can control how DoW is using it, and we are going to adjust the weights so that it doesn't perform in the way DoW wants and expects it to because we aren't okay with what DoW is doing." And that isn't the sort of partner with which the Department of War can work.  In this setting -- I can't imagine another setting where total trust, total reliability is more important than this one.

And so the record here shows that the Federal Government isn't able to treat Anthropic as a reliable and trustworthy partner anymore because of the conduct that has taken place between the company and the Department in recent months.

**THE COURT:**  Okay.  Let me give Anthropic an opportunity to respond.

**MR. MONGAN:**  Where to start, Your Honor?

If I can begin at a high level and then respond to the particular points and questions raised.

At this point, I've now reviewed the Undersecretary Michael memorandum, two declarations, the opposition brief, and the arguments we've heard this afternoon.

The rationale seems to continue to shift and I'm not sure that I entirely understand what the current rationale is.

But what I have heard this afternoon, which seems to align with much of the original memorandum from Undersecretary Michael, is that there is a mature supply chain risk in the Department's view that has built up as a result of these contract negotiations and the public statements and pronouncements by Anthropic and its leadership to the point that it not only distrusts us and wants to discontinue the contract, but that they think we are an adversary for purposes of a supply chain risk designation.

It's very hard for me to square that with the suggestion in the opposition brief that if Anthropic agreed to the contract term that was preferred by the Secretary of War, none of this would have happened.

It's hard for me to square it with the undisputed recognition in the declarations that even after the designation, negotiations continued; and that was noted by Undersecretary Michael in his declaration today where he indicated that they would still be open to an arrangement.

I think that the reality is that this is a supply chain designation in search of a justification or a rationale, and that is a problem under the Administrative Procedure Act.

I'd like to go directly to the technical matter. We introduced a declaration on this point. It's at Docket 115. And it was not controverted in Undersecretary Michael's declaration which was submitted this morning. And that makes very clear that before any model is deployed, the Department has an extensive opportunity to test it and approve it.

That's at paragraph 18.

After it's deployed, Anthropic has no ability to cause the model to stop working, to alter its functionality, to shut off access, to surveil the Department's activities, or otherwise to influence operations. That's at paragraph 19 and the surrounding paragraphs. And I don't think that that's a question that's in dispute.

As to Your Honor's questions, I think -- it sounds like we're in agreement as to Subsection A, that simply arguing for usage restrictions on a service or product is not enough to make you an adversary who is trying to sabotage or maliciously introduce unwanted function.

And I think that the language in (d)(4) is relevant because what Congress is talking about there is a whole bunch of surreptitious things that an adversary or saboteur might do to try and torpedo a national security IT system. Everything

we stand accused of in this proceeding has been entirely aboveboard.  It's openly having transparent usage restrictions, which the Government previously agreed to, and then openly communicating to the Government and the public our continuing views about the profound importance of these two usage restrictions with respect to mass surveillance of Americans and lethal autonomous weaponry.

But if Congress is positing a saboteur, a saboteur is not going to get into a public spat or a contracting dispute. They're just going to accept the contractual term proposed by the Government and then go and do the nefarious things that Congress was contemplating.

As to -- I think I've already addressed the Question B.  I don't think that there is any evidence in the record or otherwise that Anthropic has the ability to alter or control the model once it has been deployed after approval by the Department of War.

And finally, the question about another IT vendor, I think it's a good question, Your Honor, because notwithstanding what we've heard this afternoon, it does seem that that is the logical implication of defendants' position here, that they can point to their frustrations in a contract negotiation, the stubbornness of the vendor, and say:  Aha.  Because you're working in an area that touches national security, we're now going to tell the world that we think you might come around in

the future and sabotage our systems.

That is clearly not what Congress was talking about in 3252. And it's especially inapplicable to a company like Anthropic, who, in contrast to most IT vendors, has this air gap where they're not in any position to alter or control the model once it's been deployed; where they've made very clear publicly, including to the Secretary of War, that there's no desire to interfere with ongoing operations. And so I don't see how that can be a tenable understanding of the statute.

**THE COURT:** Okay. Let me move to -- I'm going to skip Question 5 because it was answered by Michael's declaration this morning, and just move to Question 6, which is a question for Anthropic.

I listed a series of agencies in this question and my question is: Is there evidence in the record that indicates these agencies actually use Anthropic's products so that Anthropic has standing to seek emergency injunctive relief against those agencies?

**MR. MONGAN:** Yes.

Your Honor, this is in an emergency posture and we're moving quickly. If I can give a little bit of context and then respond specifically to each of the listed agencies.

Our complaint named agencies that we know have contracts with Anthropic, or use Anthropic's technology through a third-party provider, as well as agencies that indicated they

would be terminating contracts or terminating use of Claude shortly after the February 27th presidential directive.  And we also name the Executive Office of the President in part because of its likely role in carrying out the directive and in facilitating any government-wide relief.

The Court asked about evidence in the record and I want to be candid that we haven't yet introduced evidence as to every single one of the particular contracts or use through third parties or termination decisions.  We can do that in a declaration very quickly, unless the Court would prefer us to proceed in a different manner.

And to just quickly tic through this -- the other specific agencies that the Court asked about in its question, we are aware -- I understand that the Office of Personnel Management announced internally that it was terminating use of Anthropic's technology.  The Nuclear Regulatory Commission told Anthropic it is no longer using Claude, and cited the presidential directive.

And then, as the Social Security Administration, the SEC, NASA, the Federal Reserve, and the National Endowment for the Arts, these all have contracts or have subagencies with contracts with Anthropic or use our technology through a third-party provider.

**THE COURT:**  If I ordered you to submit that declaration by 6:00 p.m. today, is that something that you all

could do?

**MR. MONGAN:**  Yes.

**THE COURT:**  Okay.  And that if I would allow them to do that, would the -- does the Government dispute this point? Do you want an opportunity to put in evidence that you don't actually have contracts with these entities?

Or -- I don't want to waste your time, so if you don't have a dispute with that, I won't set a deadline.  But if you have a dispute and you want to put in evidence, I can set a deadline for you to provide --

**MR. HAMILTON:**  We do, Your Honor.  And we'd respectfully object to Anthropic providing late record evidence as a basis for a preliminary injunction.

I didn't hear my friend on the other side say anything that would entitle it to a preliminary injunction.  Anthropic decided when it would file its motion.  It could have waited to put forward the record evidence and given us an opportunity to respond to that in our opposition brief.  It decided against that.  This is a forfeited argument and we would respectfully submit that the Court should not consider any late evidence that Anthropic submits where it bears the burden on its motion and chose the timing of its motion.

**THE COURT:**  I understand that, but we're also in a preliminary injunction posture and I've been trying to let everyone put in evidence all the way up till this morning when

the Government put in evidence, which I thought was absolutely fair for you to do and I had invited you to do.  So I think it's important that we just get this right more than that we stand on ceremony necessarily.

So I don't have a problem with them putting in the evidence, but I want to make sure I give you all a chance to respond, so I'm thinking about setting the deadline for you all to respond at noon if you have some reason to think it's not true that you have contracts with these -- or these entities have contracts with Anthropic.

Otherwise, it seems the analysis is pretty much the same, unless there's something I'm missing.

MR. HAMILTON:  Could we get just a little more time than that?  You're saying noon after they file something at 6:00 p.m. today?  Could we get at least 24 hours for any response?

THE COURT:  I could -- yeah, I could set it at 6:00 p.m. tomorrow.  That's fine.

MR. HAMILTON:  Thank you, Your Honor.

THE COURT:  So the deadline for Anthropic is 6:00 p.m. today, and then any response by 6:00 p.m. tomorrow with counterevidence.

I promised I'd give you all -- I know we've been going for some time but I promised I'd give you all an opportunity to tell me anything else you wanted me to know before I took the

case under submission.  Let me give defendants the opportunity, and then I can hear from Anthropic, and then we'll probably conclude the hearing at that point.

**MR. HAMILTON:**  Thank you, Your Honor.

This Court should deny the motion for a preliminary injunction.  In January, Secretary Hegseth signed a policy memorandum directing that the Department of War would not use artificial intelligence services that came with limits on lawful uses -- there were any other way a tech company could gain leverage over the Department of War and influence DoW's decision-making on which missions it chooses to undertake. That is unacceptable and DoW will instead continue to direct its operations without tech company influence.

Anthropic does not want to contract with DoW on the terms that DoW requires for AI contracts.  It believes tech companies should be able to tell DoW what it can and cannot do with the products and services that DoW purchases.  And more than that, Anthropic revealed itself to be an untrustworthy and unreliable partner in recent negotiations.

Based on that, the President directed the Federal Government to end its relationships with Anthropic, and Secretary Hegseth designated Anthropic as a supply chain risk under two separate authorities.  As we've discussed earlier today, Anthropic is challenging one of those supply chain risk designations separately in the DC Circuit.

This case fails for multiple reasons.  I'll start with the First Amendment retaliation claim that Anthropic brings which fails for at least three reasons.

To start, Anthropic's refusal to deal with the Government on the terms that the Government requires for AI providers is conduct that is not protected by the First Amendment.

Cases like *Rumsfeld against FAIR* recognize that for conduct to be protected by the First Amendment, it has to be inherently expressive.  In *Rumsfeld*, a law school boycotted military recruiters over the law school's opposition to the "Don't Ask, Don't Tell" policy and the Supreme Court recognized that that conduct is not inherently expressive, the boycott, and so --

**THE COURT:**  Do you think going to the press and bringing public scrutiny to a contracting dispute is conduct rather than speech?

**MR. HAMILTON:**  That sounds more like speech, but the conduct in Anthropic refusing to deal with the Government is not speech.  That is commercial conduct and it isn't inherently expressive commercial conduct.

Anthropic's response is, "Well, we were trying to express something," but that's the argument that was rejected in *Rumsfeld against FAIR*.  It doesn't change the fundamentally noninherently expressive nature of this commercial conduct.

Anthropic also argues in its reply brief that *Janus* is a

key case for its argument.  That case received one passing mention in its opening brief, but it's a readily distinguishable case dealing with a compelled speech claim where a public employee was required to subsidize a union negotiator on that employee's behalf.  And the Supreme Court held that that was inconsistent with the First Amendment.

I'd also note one point of agreement between Anthropic and the Government, to the extent Anthropic has identified inherently expressive conduct or speech, that has to be examined through the *Pickering-Connick/Garcetti* framework for public employee and governmental contractor speech.

Under that framework, the company has to show that it spoke on a matter of public concern, has to show that its interest as the employee or contractor outweigh the interest of the Federal Government, and statements pursuant to official duties are not protected by the First Amendment.

That gauntlet is something that Anthropic can't possibly run through on the speech and conduct that it points to, especially given the Department of War's strong interest in protecting national security and the sensitive setting for this particular contract that is being negotiated.

**THE COURT:**  I didn't recall you applying the *Pickering* framework in your opposition brief, but will you give me the basis for applying that to a government contractor as opposed to a federal employee?

**MR. HAMILTON:**  Well, Anthropic cites the *Umbare* case which extends *Pickering-Connick* to the context of contractors.  So I believe *Umbare* is the case that takes *Pickering-Connick* to the context of a government contractor.  And to be clear, we don't think that that case reaches *Pickering-Connick/Garcetti*, and the reason is that the conduct of Anthropic refusing to deal with the Government on the terms the Government requires for AI providers isn't inherently expressive, so we don't even enter into the *Pickering-Connick/Garcetti* framework.  But if the Court disagrees with us on that, that is the framework on which its First Amendment arguments would be tested.

The second defect is one of causation.  Anthropic, to succeed on its claim, has to show that its speech or inherently expressive conduct was the motivating factor for the challenged actions.

But here, what the record shows is that the company's refusal to deal with the Government as well as the lost trust between the company and the Department of War was the motivating factor.

That's what the President's post on the Truth Social platform says.  It says Anthropic was trying to strong-arm the Department of War.

Secretary Hegseth's post repeats that.  And Undersecretary Michael's memorandum talks about Anthropic as an unreliable and untrustworthy contracting partner.

**THE COURT:**  I have a question about that "strong-arm" language.  It's a little odd to think about a private company negotiating with the U.S. Government saying, "We really want this term," and the U.S. Government saying, "No, no, we're not going to agree to that" and that being a strong-arming act.  So when I read "strong-arm" it seemed to -- and you tell me if I'm wrong about this -- it seemed to me likely a reference to the bringing of public pressure and public scrutiny to the contracting dispute.

Is there some reason I should interpret "strong-arm" in a different way?

**MR. HAMILTON:**  I think it's principally driving at Anthropic's insistence on dictating to the Federal Government what it can and cannot use its products and services for.

But as we've explained through Undersecretary Michael's declarations, as well as the record for the supply chain risk designation, there is a whole record of conduct here that underlies the judgment that this is not a trustworthy and it is not a reliable partner with which the United States Government could continue to work.

An additional point on the President's and the Secretary's judgments about Anthropic, and that is that those judgments are entitled to substantial deference, especially in the context of national security.  That's something the U.S. Supreme Court recognized in the *TikTok against Garland* case.

The third defect in the First Amendment retaliation claim is the fact that even if Anthropic succeeds in showing retaliatory animus was the motivating factor, the Government can show that it still would have acted the same way.

And the Government has made that showing here in explaining that it has acted because of Anthropic's insistence on dictating to the United States Government how it would control the use of products and services that the Government purchases from Anthropic.

And I want to highlight the Ninth Circuit's recent decision in the *AFGE* case. There the President signed an executive order designating certain employees as exempt from collective bargaining, and the plaintiff argued that there was a First Amendment problem because a fact sheet on the White House website said that unions had declared war on President Trump's agenda and asserted that one union had said it was fighting Trump.

The Ninth Circuit assumed that the plaintiff had succeeded in showing retaliatory animus underlied the President Trump's action, but it still held that the First Amendment retaliation claim failed because the focus was on the national security judgment that the President made, and the same is true for the actions that Anthropic has challenged here.

We've already discussed the 3252 designation, and so I'll make just a few brief additional points. One, that this is a

highly deferential standard in the context of arbitrary and capricious review; it's an extremely limited one.  And that deference is doubled in the national security context.  Our brief at page 18 marches through some of those authorities that explain that.

A point on the term "adversary."  The term does not apply exclusively to foreign actors or foreign states.  Congress instead just used the term "adversary," which Webster's defines as an opponent in a contest, conflict, or dispute.

And in addition, Anthropic's weight on the adversary term in this statute and its interpretation really leads to some absurd results.  It would suggest that Congress wanted the Department of War to have an authority to counter risks of sabotage and subversion of IT systems but only if the adversary is a foreign state overseas; and that policy, of course, makes no sense.

The better interpretation is that this is a statute giving the Department a tool to address subversion and -- and risks of sabotage by an adversary, and one that only needs to be a risk of an adversary at that.  Again, Secretary Hegseth only designated Anthropic as a supply chain risk; and under the statute, there only needs to be a risk that an adversary will take these acts that are covered by the statute.

We've already discussed the record supporting the Secretary's determination of a supply chain risk.

And I'll move, then, to procedural due process.

This claim also fails by Anthropic -- first, it hasn't been deprived of a life, liberty, or property interest.  Its reputational harms that are alleged are not sufficient to satisfy that element for procedural due process, nor or any interests that it has in a contracting relationship with the United States Government.

And in any event, it has process with the procedure outlined in Secretary Hegseth's memorandum attached to the correspondence that Anthropic received.  And in addition, the Court of Federal Claims is a forum in which Anthropic could litigate any concerns that it may have about contract terminations.

Our brief also explains why the irreparable harm showing is fail- -- why they failed to make an irreparable harm showing.

And I will just conclude the *Winter* factors by touching on the balance of the equities.  This factor in *Winter* often gets glossed over.  It's not usually a very important part of the analysis, but this is a case where this is a significant factor, and a -- a fatal one for the motion that Anthropic has filed.

The *Winter* case itself is directly on point.  *Winter* arose in the national security context.  The plaintiff was challenging the Navy's use of sonar equipment, and the Supreme

Court recognized the harm that would befall the Navy and the-then -- the Department of Defense for a limitation on the use of the sonar equipment.

The Court said, "We give great deference to the professional judgment of military authorities."  And that case is directly on point here because the plaintiff is seeking a preliminary injunction that would interfere and act against the judgments of the country's commander-in-chief, as well as the secretary of defense in whom the Congress has vested this authority to designate a supply chain risk.

In addition, on the balance of the equities, I would note that this is a highly unusual motion for a preliminary injunction in that, at the same time, the plaintiff is asking the Court to enter an order against enforcement and implementation of the challenged actions.  It is telling the Court to, in the motion, say that the defendants can continue to decide they don't want to work with Anthropic, and they aren't compelled to use the software and the products that Anthropic had -- provides to the defendants in this case.

I appreciate the concession, and it's a necessary concession, but the concession doesn't change the fact that this is a fatally flawed theory of a motion for a preliminary injunction that fails each of *Winter's* factors and very clearly fails the balance of the equities factor in the *Winter* test.

I'll conclude by just noting that if the Court does enter

any injunctive relief, it should stay any preliminary injunction or other relief pending appeal for all of the reasons that we have argued in our opposition to the motion for a preliminary injunction.

We would ask the Court to rule on our motion for a stay pending appeal in the same order that it issues -- that provides any sort of relief to Anthropic.  At a minimum, we'd ask the Court to administratively stay any injunctive relief for a seven-day period.  And I note that in its reply brief, anthropic states it would not oppose that seven-day administrative stay.

And finally, we agree that if the Court does enter a preliminary injunction, it should be clear in recognizing that the Government can continue to off-board Anthropic, and it is not required by the Court's order to continue to use the services that Anthropic provides to the United States Government.

**THE COURT:**  Okay.

Let me give Anthropic an opportunity to respond.

**MR. MONGAN:**  Thank you, Your Honor.

I was scribbling furiously earlier in the hearing when Your Honor walked through your tentative.  And, I think, from my notes, we generally agree with the points made in that tentative.

With great respect to my -- to my colleague, we generally

disagree with the legal arguments that we've heard in the last few minutes, including some of the characterizations of our position and arguments. I think you have most of our arguments in the reply brief in response to the opposition brief, and I want to proceed in a manner that would be helpful to the Court.

Suffice it to say on the merits, Anthropic's view is it is likely to succeed on a powerful First Amendment retaliation claim, on the APA claim, the due process claim, and the separation of powers claim.

And if the Court has particular questions on the merits issues, I'd be happy to respond to them.

THE COURT: I do have a question about the *Pickering* framework that counsel said that you conceded applies.

MR. MONGAN: Sure.

THE COURT: I don't recall seeing anyone walk through the *Pickering* factors in the briefing, but maybe -- there was a lot of briefings, so maybe I'm not recalling it.

What is your position as to the applicability of the *Pickering* factors and whether the Court needs to walk through that analysis?

MR. MONGAN: That's right, Your Honor.

I understand my colleague to be inferring that from a citation. That is not the framework that we have advanced. It's not the way that the defendants have analyzed this claim. We are proceeding on the standard three-factor retaliation

framework that is well familiar in this circuit.

THE COURT:  Do you contest that the *Pickering* factor app- -- *Pickering* framework applies to government contractors and their speech?

MR. MONGAN:  I want to be very candid, Your Honor. This is not an issue that's been briefed, and I'm a little bit reluctant to state a final position on behalf of Anthropic.

That's not the framework that we have advocated, and I think as recent decisions, including from this Court, applying the three-part *O'Brien* retaliation framework suggests, it's perfectly applicable, I think, in this -- in this context as well.

If that's something that is of interest to the Court, we would be happy to prepare a supplemental briefing to make sure that we can give you a forthright statement of our positions.

MR. HAMILTON:  Your Honor, if I could make a correction on this.  My colleague has handed me a note indicating that Anthropic did not cite *Umbare*, so I think I was incorrect in saying that.

But again, it is the defendants' view that if this claim gets off the ground and past the inherently expressive test, then it would go through that framework of *Pickering-Connick* and *Garcetti*.  But I don't believe the plaintiff did cite *Umbare* in their papers.

THE COURT:  Did you argue for the *Pickering* framework

in your papers?

**MR. HAMILTON:**  It's not something we raised because we don't think it even gets that far.

**THE COURT:**  Okay.  Thank you.

I didn't -- the other question I did have for plaintiffs is:  In your reply brief you suggested that the Court, for clarity, should -- or could enter a ruling saying that the Department of War would be free to stop using Claude.  I am assuming that's in a situation where Anthropic was the prime contractor, but do you agree also that it makes sense to allow the Department of War to stop using Claude in situations where Anthropic is a formal subcontractor of some kind?

**MR. MONGAN:**  Your Honor, what I -- I want to be a little bit careful about making concessions as to hypotheticals that have not come to pass yet because, as we've seen in this case, there's various different forms of executive actions and the details matter here.

The relief that we are requesting would be to put the parties back in the status quo that existed on the morning of February 27th.  And on that day, instead of taking these unlawful and retaliatory actions, the Department could have decided it no longer wanted to contract with Anthropic.  There are many detailed statutes and regulations that bear on how agencies can wind down statutes and make procurement decisions, and what our point is, is that nothing in this preliminary

injunction that we're seeking would prohibit the Government from taking any action that it would have been able to take on February 27 so long as it complies with applicable regulations and statutes and constitutional provisions.

THE COURT:  So the Department of War could, for example, decide to terminate contracts in which Anthropic is a subcontractor and go through the termination process with those contracts.

Is that accurate?

MR. MONGAN:  Yes.  And I don't want to be evasive, but we'd like to know what the exact action is.  But the Federal Government has broad authority under the FAR and under the procurement statutes, and our point is simply that it just needs to comply with the existing authority as --

THE COURT:  As long as the action's otherwise lawful.

MR. MONGAN:  As long as it's otherwise lawful and not for a, you know, unconstitutional, retaliatory purpose, Your Honor.

THE COURT:  Okay.

MR. MONGAN:  And if I might just say a few words about the equities, which we haven't spent much time on.

These are unprecedented executive actions.  We recognize in our papers that they are in the national security realm and that courts accord an appropriate measure of deference, but courts do sometimes, as appropriate, grant preliminary

injunctive relief when executive actors violate the Constitution or violate statutes.

These actions are unlawful for the reasons that we've discussed.  They have caused immediate, irreparable, and ongoing harm to Anthropic, to its constitutional rights, to its reputation in the eyes of partners, customers, and investors, and to its business interests not just in the national security sector, but beyond.

And I want to emphasize, my colleague talked about the public interest.  These harms don't just stop at Anthropic. We've been joined by dozens of amici who have underscored how these actions are harming the broader public interest; military leaders who explained how the actions harm our military readiness; employees of other competitor frontier AI labs who talk about how they are chilling debate on this really important subject of public significance about AI safety; Microsoft industry trade associations who explain how they hinder the development of important technologies.

And, Your Honor, as I mentioned a moment ago, what we're asking for, contrary to what my colleague just suggested, is not extraordinary at all.  We are simply asking to be returned to the status quo on the morning of February 27th.

At that time, there's a range of lawful actions that the defendants could have taken.  What they can't do is engage in unconstitutional retaliation for our protected speech.  They

can't impose a secondary boycott that they have now conceded has no valid legal basis.  They can't impose an immediate prospective effective debarment of Anthropic for all future government contracting that is not supported by any lawful executive authority.

So we would respectfully request that the Court enter a preliminary injunction.

**THE COURT:**  Thank you all for the argument and for the briefing on both sides, which was very helpful to the Court.  I also want to thank the amici for providing a lot of important background on a very short timeline.  Thank you all.

I anticipate issuing an order in the next few days, but I'm going to take the matter under submission and look into the different authorities that you all cited.

Be well.

**THE COURTROOM DEPUTY:**  Court is adjourned.

(Proceedings adjourned at 3:09 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Wednesday, March 25, 2026

_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court