# ECF No. 97-2
# Exhibit A to
# Defendants' Motion to Seal



**SECRETARY OF WAR**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

## DETERMINATION

MAR - 3 2026

In accordance with title 10, United States Code (U.S.C.), section 3252 ("Section 3252"), and pursuant to the recommendation provided by the Under Secretary of War for Acquisition and Sustainment (USW(A&S)) and the Department of War Chief Information Officer (DoW CIO), I hereby determine that (i) the use of the authority set forth in section 3252(a)(1) with respect to a covered procurement involving Anthropic, PBC, and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof (the "Covered Entity"), is necessary to protect national security by reducing supply chain risk, (ii) less intrusive measures are not reasonably available to reduce such supply chain risk, and (iii) the use of such authorities apply to a class of covered procurements.

**Determination.** In accordance with Section 3252(b)(1), based on the scoping analysis, mitigation considerations, and the joint recommendation of the USW(A&S) and the DoW CIO (Attached), I make the following determinations:

- **Covered Procurement Actions Are Necessary to Protect National Security**: The use of any of the Covered Entity's covered products or services in any DoW covered system presents a supply chain risk and the use of the authority in Section 3252(a) is necessary to protect national security by reducing that supply chain risk.

- **No Less Intrusive Measures Are Reasonably Available:** There are no less intrusive measures that are reasonably available to reduce the supply chain risk associated with the use of the Covered Entity's products or services in any DoW covered system.

- **Class Determination:** The use of Section 3252 authorities apply to all covered procurement actions that involve the Covered Entity.

**Scope and Applicability:** This Determination is applicable to all of the Covered Entity's products or services that meet the definition of a "covered item of supply" or that are part of a "covered procurement," as those terms are defined at 10 U.S.C. § 3252(d), whether acquired as a product or service. This includes all of the Covered Entity's products or services offered by the Covered Entity that become available for procurement.

Attachment:
As stated

Controlled By: OUSW(A&S) OASW(IBP)
CUI Category: OPSEC, PROPIN
LDC: D
POC: Vy Nguyen, Vy.K.Nguyen.civ@mail.mil

DoW-PI-001



~~CUI~~



**OFFICE OF THE SECRETARY OF WAR**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

### Joint Recommendation, Concurrence, and Determination to Use Section 3252 of Title 10, United States Code, Authorities to Mitigate Supply Chain Risk Related to Anthropic, PBC

**Summary**

This document sets forth (1) the joint recommendation of the Under Secretary of War for Acquisition and Sustainment (USW(A&S)) and the Department of War Chief Information Officer (DoW CIO), and (2) the concurrence of the USW(A&S), to support and document the basis for actions undertaken pursuant to section 3252 of title 10, United States Code (U.S.C.) ("Section 3252"), as implemented by subpart 239.73 of title 48, Code of Federal Regulations (C.F.R.).

In accordance with section 3252(b)(1), the USW(A&S) and DoW CIO consulted with procurement and other relevant officials within DoW and, on the basis of a risk analysis provided by DoW CIO, jointly recommend that there is supply chain risk to DoW covered systems[1] related to the use of Anthropic, PBC, and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof ("Covered Entity"), products or services.

- Use of the Covered Entity's products or services introduces significant risk to the DoW's covered systems, as the vendor, by maintaining the ability and necessity to continuously update the product or service, enables the potential of the vendor to subvert the design and/or functionality of their product or service. Such ability by the vendor could be used to implement changes in alignment to the vendor's preferred terms of service, putting the Department's lawful use of the capability at risk.

- The Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

In accordance with section 3252(b)(2), the USW(A&S) has determined and concurs that (i) the use of the authority in section 3252(a)(1) is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.

This action is an enterprise-wide use of section 3252 authority and is a class determination that applies to any eligible DoW procurement.

---

[1] "Covered system" is defined at Section 3252(d)(5) as meaning a "national security system, as that term is defined in Section 3552(b)(6) of title 44, U.S.C."

~~CUI~~

**UNCLASSIFIED WHEN SEPARATED FROM ATTACHMENT 1** DoW-PI-002

~~CUI~~

## Joint Recommendation by USW(A&S) and DoW CIO

**Risk Analysis:** The DoW CIO conducted a risk analysis of the use of the Covered Entity's products and services in DoW covered systems to inform the use of Section 3252 authorities. Based on the risk analysis, the USW(A&S) and DoW CIO determined there are vulnerabilities present in the Covered Entities products and services that may pose unacceptable risk to the DoW. Additionally, the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

**Joint USW(A&S)/DoW CIO Class Recommendation to Mitigate Supply Chain Risk:** On the basis of the risk analysis and consultation with relevant DoW officials, the USW(A&S) and the DoW CIO jointly recommend mitigating the supply chain risk associated with the use of the Covered Entity's products and services in any DoW covered system.

**Determination.** In accordance with Section 3252(b)(2) and 48 C.F.R. § 239.7304(b), based on the risk analysis, the scoping analysis (Attachment 1), mitigation considerations, and the joint recommendation of the DoW CIO and the USW(A&S), the USW(A&S) makes the following determinations:

- **Covered Procurement Actions Are Necessary to Protect National Security:** The use of any of the Covered Entity's covered products or services in any DoW covered system presents a supply chain risk, and the use of the authority in Section 3252(a)(1) is necessary to protect national security by reducing that supply chain risk.

- **No Less Intrusive Measures Are Reasonably Available:** There are no less intrusive measures that are reasonably available to reduce the supply chain risk associated with the use of the Covered Entity's products or services in any DoW covered system.

**Scope and Applicability:** The DoW CIO and the USW(A&S) hereby affirm that this Joint Recommendation, Concurrence, and Determination is applicable to the Covered Entity, Covered Products or Services, Covered Procurements, and Covered Procurement Actions, as described in the Scoping Analysis (Attachment 1).

SIGNED:

HON Michael P. Duffey
Under Secretary of War for
Acquisition and Sustainment

Date: 3/3/26

HON Kirsten Davies
Department of War Chief
Information Officer

Date: 3 MARCH 2026

~~CUI~~

**UNCLASSIFIED WHEN SEPARATED FROM ATTACHMENT 1** DoW-PI-003

~~CUI~~

**Attachments:**
ATTACHMENT 1a – Urgent Supply Chain Risk Analysis on Anthropic PBC ~~(CUI)~~
ATTACHMENT 1b – Due Diligence Preliminary Report on Anthropic (CUI//PROPIN)
ATTACHMENT 2 – Section 3252 Scoping Analysis for Anthropic, PBC

~~CUI~~
**UNCLASSIFIED WHEN SEPARATED FROM ATTACHMENT 1** DoW-PI-004

~~CUI~~



**RESEARCH
AND ENGINEERING**

**UNDER SECRETARY OF WAR**
**3030 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-3030**

MEMORANDUM FOR THE RECORD

SUBJECT:  Urgent Supply Chain Risk Analysis: Anthropic's Refusal to Permit Lawful AI Use

1. Summary

This analysis outlines the significant and unacceptable supply chain risk posed by Anthropic's unwillingness to agree to the U.S. government's use of its artificial intelligence (AI) models for lawful warfighting purposes. This unreasonableness endangers the strategic implementation and technical integrity of the Department of War's (DoW) information and related systems. Thus, this is not a mere contractual dispute. Anthropic's actions represent a direct challenge to the government's ability to control its own lawful operations and a threat to the security of the DoW's critical technology infrastructure. Anthropic's behavior therefore squarely meets the definition of "supply chain risk" as defined in both 10 U.S.C. § 3252 and 41 U.S.C. § 4713 and requires immediate mitigatory action.

2. The Operational and Strategic Threat

The government must ensure its technology assets are reliable, secure, and effective. Were DoW to accede to Anthropic's demands, the sought-after contract language would introduce a vendor-imposed point of failure. This is untenable. By embedding unreasonably restrictive terms that restrict DoW's warfighting operations beyond the limitations imposed by law, Anthropic seeks to grant itself an operational veto. This triggers the legal definition of supply chain risk at 10 U.S.C. § 3252(d)(4), which explicitly includes the risk that an entity may "deny, disrupt, or otherwise degrade the function, use, or operation" of a covered system. A contractual provision that unnecessarily restricts the use of a system to diminish functionality and limit DoW's warfighting capabilities introduces, by definition, an unreliable and compromised component into our warfighting mission.

This is compounded by demonstrated hostility in negotiations with DoW. Based on statements made during negotiations, Anthropic appears to be taking a negotiation posture meant principally to benefit its public perception that is not centered on truth or fact. In addition, during our negotiations, one of Anthropic's executives questioned the propriety of the potential use of their software for a sensitive military operation abroad despite that use being permitted under the existing Terms of Service.  This led to alarm by the DoW and the prime contractor who provides Anthropic software, and raised material doubts as to whether they would cause their software to stop working or cause some other disastrous action that would put our warfighters lives in danger.  The DoW recognizes that its suppliers are often for-profit corporations that intend both to help the warfighters and American public and turn a profit. However, a vendor that raises the prospect of disallowing its software to function in critical military operations, and treats its

~~CUI~~





**UNDER SECRETARY OF WAR**
3030 DEFENSE PENTAGON
WASHINGTON, DC 20301-3030

RESEARCH
AND ENGINEERING

negotiations with the DoW primarily as tools for brand-building cannot be trusted, particularly when that marketing campaign is openly hostile to the DoW and duplicitous. By ceding to Anthropic's terms, the DoW would be allowing the very corporate decisionmakers who have opted to publicly spat with DoW into its technical and operational warfighting infrastructure, thereby introducing unnecessary risk into DoW supply chains. The American people have vested elected officials and military and civilian leadership with warfighting authorities; it is untenable and unlawful to insert unelected corporate bureaucrats into this process.

3. The Underlying Technical Vulnerability of AI

This strategic risk is magnified by the unique, opaque nature of the technology itself. Unlike traditional software, AI models are probabilistic systems which are understood to "drift" or degrade as new data is introduced and require constant tuning, the integrity of which, is fundamentally based on the trustworthiness of the vendor to ensure the model continues to perform accurately and fairly.

The DoW cannot trust Anthropic to ensure the integrity of its models. As research demonstrates,[1] AI systems are acutely vulnerable to manipulation. Privileged access with malintent can subtly poison the training data to maliciously introduce unwanted function, or otherwise subvert the design, integrity, and operation of the model. Research shows such attacks can degrade accuracy by over 27% and introduce targeted misclassifications at an alarming rate.[2] Anthropic's ability to unilaterally alter system guardrails and model weights without DoW consent could fundamentally change the system's function and creates a significant operational risk. This could create catastrophic downstream consequences, such as a critical defense system failing to engage due to an unapproved, vendor-side modification. In August 2025, Anthropic itself disclosed that hackers had used its chatbot, Claude, to write code capable of carrying out cyberattacks against at least 17 organizations, including government entities noting that Agentic AI has been weaponized.[3]

A vendor like Anthropic, which has already demonstrated a hostile and non-cooperative stance on the use of its product, has the motive, means, and opportunity to introduce such vulnerabilities. Its refusal to partner in good faith makes it impossible to establish the deep trust required for security collaboration. The DoW would be forced to operate a black box controlled by a hostile party, which could contain hidden biases or backdoors. A vendor that seeks to control the use of its product so as to restrict DoW's lawful use thereof cannot be trusted. Given the public statements of Anthropic's CEO and others associated with the company, the

---

[1] See e.g. 2025 Photonics & Electromagnetics Research Symposium, Abu Dhabi, UAE, 4-8 May PIERS Detecting and Preventing Data Poisoning Attacks on AI Models
[2] Id.
[3] anthropic.com/news/detecting-countering-misuse-aug-2025#:~:text=No-code%20malware:%20selling%20AI,with%20third-party%20safety%20teams.

CUI

~~CUI~~



**RESEARCH
AND ENGINEERING**

**UNDER SECRETARY OF WAR**
**3030 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-3030**

Department must assume that Anthropic can and would impose its moral and policy judgments on the warfighting capabilities of the DoW, and therefore there is a substantial risk that Anthropic could attempt to disable its technology or preemptively and surreptitiously alter the behavior of the model in advance or in the middle of ongoing warfighting operations, if it feels that its "redlines" are crossed. The threat of such an action is unacceptable.

4. Progression of Risk

The DoW institutes the U.S. Government standard Risk Management Framework (RMF) across all layers of technology, assets, data, processes, and supply chain. In accordance with the DoW RMF, assessments result in areas of risk across the DoW ecosystem (including vendors). Though an individual vendor may have only limited risk in individual categories, the aggregation of risk across categories can result in a vendor being deemed high risk. In other words, the culmination of unmitigable risks lead to a vendor having a material level of risk. The vendor can then be deemed a "supply chain risk," at which time they typically are removed from applicable systems to mitigate issues and threats.

In the instant case, Anthropic's risk level escalated from a potentially manageable technical and business negotiation to an unacceptable national security threat over the course of the DoW's contract negotiation with them. Given the nature of AI systems and Anthropic's privileged access as the AI model's developer, curator and maintainer, there was a baseline risk given the potential harmful actions this privileged technical access makes possible. The supply chain risk level increased when Anthropic insisted on terms of service that would constrain the DoW beyond what is in the law. This risk further increased when Anthropic asserted in the negotiations that it have an approval role in the operational decision chain, which would require the DoW to accept significant operational risk. Then during the final weeks of negotiations, it became clear that Anthropic was leveraging the DoW's ongoing good faith negotiations for Anthropic's own public relations, and they began engaging in an increasingly hostile manner through the press, despite the ongoing private negotiations with DoW leadership. Finally, this hostile posture was even further compounded when, during a time of active military operations, Anthropic leadership questioned the use of their technology in our warfighting systems clearly permitted under the Terms of Service of their existing contract with our Prime contractor. This collective set of actions represents a fully mature supply chain risk – including increased potential for model poisoning, insider threat risk, data exfiltration, and denial of service – posing a direct, intolerable, and material risk to our warfighting capability which warrants the designation of Anthropic as a supply chain risk.

~~CUI~~

~~CUI~~



**RESEARCH
AND ENGINEERING**

**UNDER SECRETARY OF WAR**
3030 DEFENSE PENTAGON
WASHINGTON, DC 20301-3030

5. Conclusion and Justification for Action

Anthropic's position is not a simple policy disagreement; it is an active demonstration of the exact risks our supply chain risk management laws were written to prevent. Use of Anthropic's products or services introduces significant risk to the DoW's covered systems, as the vendor, by maintaining the ability and necessity to continuously update and tune the product enables the potential for the vendor to subvert the design and/or functionality of their product or service. Such ability by the vendor could be used to implement changes in alignment with the vendor's ideology, putting the Department's lawful use of the capability at risk.

Therefore, Anthropic's unwillingness to permit the use of its technology to the extent permitted by law creates a clear and present supply chain risk as defined in 10 U.S.C. § 3252 and 41 U.S.C. § 4713.

Emil Michael

~~CUI~~

DoW-PI-008

# Anthropic PBC

Date: February 26, 2026

Information Cutoff Date: February 26, 2026

## EXIGER

DoW-PI-009

 Anthropic PBC

For Client Use Only — Proprietary

**Table of Contents**

**Anthropic PBC** ..................................................................................................................................................................3

Executive Summary ....................................................................................................................................................3

OVERALL SUBJECT RISK: 4.3 — MEDIUM...................................................................................................3

KEY FINDINGS........................................................................................................................................................4

**FOCI RISK — MEDIUM-HIGH** ..............................................................................................................................4

High Risks and Vulnerabilities......................................................................................................................8

**OPERATIONAL RISK — LOW-MEDIUM** ..............................................................................................................6

**CYBER RISK – MEDIUM**..........................................................................................................................................7

SOFTWARE, HARDWARE, PERSONNEL, AND PHYSICAL SECURITY RISK........................................7

**COMPLIANCE RISK — LOW-MEDIUM**.................................................................................................................8

Commerce Risk.........................................................................................................................................10

**FINANCIAL HEALTH RISK — MEDIUM**.............................................................................................................**10**

## Source Summary Statement

Sources of information may vary greatly in terms of reliability. Efforts are taken during research to identify and cite authoritative and independent sources available within the scope of the research. Information collected from less than reputable or less authoritative sources is generally included by the research with accompanying notes and caveats that decrease the researcher's confidence in their assessments depending on the sources.

## Methodology

Exiger reports are compiled by researchers who obtain information from in-depth global public records research, including queries of commercial and public databases performed by Exiger's DDIQ System, as well as focused internet searches for ownership and supply chain information. Research seeks to develop profiles of the Subjects and to identify potential key findings including but not limited to evidence of bribery, corruption, dishonesty, misrepresentation, questionable financial health, poor past performance, and litigation. Information in this report may not be comprehensive.

Exiger's risk model assigns a risk score between 0 and 10 to each corporate or individual entity. Proprietary algorithms parse DDIQ profile returns for impactful events and data, converting DDIQ's structured and unstructured data into five risk ratings: LOW, LOW-MEDIUM, MEDIUM, MEDIUM-HIGH, and HIGH.

LOW — DDIQ likely found no adverse media or watchlist hits naming the Subject and likely found no elevated-risk jurisdictions in the Subject's ownership structure.

LOW-MEDIUM — DDIQ likely found no significant adverse media or watchlist hits naming the Subject and likely found no elevated-risk jurisdictions in the Subject's ownership structure.

MEDIUM — DDIQ likely found either adverse media and/or watchlist hits naming the Subject company OR found elevated-risk jurisdictions in the Subject's ownership structure or operations.

MEDIUM-HIGH — DDIQ likely found recent adverse media and/or watchlist hits naming the Subject in at least one risk category in addition to finding elevated-risk jurisdictions in the Subject's ownership structure or operations.

HIGH — DDIQ likely found recent and significant adverse media and/or watchlist hits naming the Subject across multiple risk categories in addition to finding elevated-risk jurisdictions in the Subject's ownership structure or operations.

## Disclaimer

Exiger was retained to conduct research into the data subject via Exiger's due diligence software and open-source risk research. The information compiled in this report was gathered and assessed exclusively for the Client and according to the specifications of the terms of engagement between Exiger and the Client. This report is meant for the Client only. Distribution of this report or its contents, in whole or in part, to any third party is prohibited except as approved in the Agreement or by Exiger.

The report is provided as is. It is the responsibility of the report recipient to conduct further due diligence into information presented in the report and to assess this information independently in the light of your organization's policies and risk tolerance. Exiger accepts no liability for any decisions or actions made or not made based on the information in this report. All information contained in this report is based on information and analysis available to Exiger at the time of writing the report.

DoW-PI-010

 Anthropic PBC

For Client Use Only — Proprietary

# Anthropic PBC

## EXECUTIVE SUMMARY

**Anthropic PBC ("Anthropic")** is a software company founded in 2021 and headquartered in San Francisco, California.[i] Anthropic specializes in AI research.[ii]

| DDIQ Profile | Anthropic PBC |
|---|---|
| Physical Address | 500 Howard St., San Francisco, CA, 94104[iii] |
| CAGE Code(s) | 9VKX2[iv] |
| Entity Website | https://www.anthropic.com |
| Unique Entity Identifier(s) | SPQZL8XDKGK7[v] |
| DUNS | - |
| BvDID | US374042333L[vi] |
| Active Business License(s) | Colorado[vii], New York[viii], among others |
| Employees | Approximately 2,000[ix] |
| Annual Revenue | USD 14 billion (2025)[x] |

## OVERALL SUBJECT RISK: 4.3 — MEDIUM[1]

Foreign Ownership, Control, or Influence ("FOCI") Risk: MEDIUM-HIGH

Operational Risk: LOW-MEDIUM

Cyber Risk: MEDIUM

Compliance Risk: LOW-MEDIUM

Financial Health Risk: MEDIUM

---

[1] Discrepancies in this report's risk scores, a subject's adjudicated DDIQ profile, and a subject's DDIQ Analytics dashboard risk scoring are a result of manual adjudication of risk events and open-source research verifying DDIQ results.

DoW-PI-011

 Anthropic PBC

For Client Use Only — Proprietary

## KEY FINDINGS

Anthropic's adjudicated DDIQ profile, Exiger's proprietary risk model, and open-source research indicate that the overall risk the company represents is **MEDIUM**, owing to elevated scores for the elements **Operational and Compliance Risk**.

- Anthropic has been the victim of multiple data breaches and hacks since 2024, including by an alleged Chinese-state affiliated group (outlined in the **Operational Risk** section of this report).

- Anthropic is allegedly at risk of losing its contract with the US Department of Defense and the US Secretary of Defense threatened to label the company as a "supply chain risk" (outlined in the **Compliance Risk** section of this report).

- Anthropic has been the defendant in numerous lawsuits, resulting in the company paying billions in settlements (outlined in the **Compliance Risk** section of this report).

## FOCI RISK — MEDIUM-HIGH

**Anthropic is a private company located in San Francisco, California.**[xi] DDIQ and open-source information, including Anthropic's PitchBook, show that Anthropic has generated a total of USD 60.55 billion in funding and is owned 69.74% by investors as of February 26, 2026. Anthropic has 221 active investors and has received funding through four funding rounds.[xii]

| | Investment Round | % Owned | # of Shares Authorized |
|---|---|---|---|
| | Series F | 7.1% | 145,774,450 |
| | Series E | 5.69% | 95,281,934 |
| | Series B | 6.73% | 87,430,352 |

- On September 2, 2025, Anthropic completed a Series F funding round that was led by US-based investing company Lightspeed Management Company LLC (dba "Lightspeed Venture Partners"), Fidelity Management & Research Company ("FMR Co."), and ICONIQ Capital LLC ("ICONIQ"). Lightspeed Venture Partners and FMR Co. also took part in the Series G and E funding rounds, while ICONIQ participated in the Series G funding round. This investment round also included Qatar Investment Authority, Qatar's sovereign wealth fund.[xiii]

According to Lightspeed Ventre Partner's 2025 Form ADV filed with the US Securities and Exchange Commision ("SEC") on March 27, 2025, it is more than 10% but less than 25% owned by members Barry Eggers, Ravi Mhatre ("Mhatre"), NIEH Peter (尼彼得

DoW-PI-012

Anthropic PBC

For Client Use Only — Proprietary

, "Nieh") and Christoper Schaepe.[xiv] According to Mhatre's LinkedIn-registered profile, he is also a current investor in Anthropic and is a board member of several entities based in froeign jurisdictions such as Israel-based network security company Cato Networks Ltd.[xv] Additionally, according to Nieh's LinkedIn-registered profile, he previosuly worked at Taiwan-based electronics company Acer Inc.[xvi]

ICONIQ is owned 75% or more by Divesh Makan, its founding partner, according to its 2025 Form ADV filed with the SEC.[xvii]

FMR Co. is a wholly owned subsidiary of FMR LLC ("FMR"), a US-based private assets management company.[xviii] FMR is 49% ultimately beneficially owned by its director, chairman, and CEO, Abigail Johnson ("A. Johnson"), and members of the Johnson family, either directly or indirectly through trusts, according to FMR's Form Schedule 13G/A filed with the SEC in March 2025.[xix] According to Forbes, A. Johnson is a US citizen residing in the US.[xx]

- On March 3, 2025, Anthropic completed a Series E funding round that was led by Lightspeed Venture Partners and raised USD 3.5 billion.

Research did not identify furhter material information.

According to their LinkedIn-registered profiles, the Key Management Personnel include the following:[xxi]

Key Management Personnel

| Name | Role on Board | Management Role | Citizenship |
|---|---|---|---|
| Dario Amodei | - | CEO | - |
| Mike Krieger | - | Chief Product Officer | - |
| Paul Smith | - | Chief Commercial Officer | - |

- According to Anthropic's CEO Dario Amodei's ("Amodei") LinkedIn-registered profile, from November 2014 to October 2015, he worked as a research scientist at China-based AI company Baidu Inc. in Sunnyvale, California.[xxii]

- According to Anthropic's Chief Commercial Officer Paul Smith's ("Smith") LinkedIn-registered profile, he previously worked at UK-based ad insertion company Yospace Technologies Ltd. and Cayman Islands-based software company Umee Technologies Ltd.[xxiii] Additionally, Smith was the EVP and general manager in the UK for US-based software company Salesforce Inc.[xxiv]

DoW-PI-013

 Anthropic PBC

For Client Use Only — Proprietary

According to a third-party H-1B visa sponsorship data aggregator, Anthropic and its US-based subsidiaries sponsored the following visas to the US between 2023 and 2025:[xxv]

Sponsorship Data

| Type | Certified | Certified Withdrawn | Certified Expired | Citizenship |
|------|-----------|---------------------|-------------------|-------------|
| H-1B Visa | 168 | 4 | - | - |
| Green Card | 0 | - | - | - |

**Anthropic conducts operations in foreign jurisdictions such as South Korea.** According to Anthropic's 2026 Bureau van Dijk profile, it has subsidiaries located in foreign jurisdictions such as Japan, France, Germany, and Ireland.[xxvi] Additionally, in 2025, Anthropic established a subsidiary in South Korea.[xxvii] Research did not identify further material information.

**In 2025, Anthropic partnered with the UK government.** In 2025, Anthropic signed a memorandum of understanding with the government of the UK to utilize AI tools to improve online access and public services for citizens of the UK.[xxviii] Research did not identify further material information.

## OPERATIONAL RISK — LOW-MEDIUM

**Anthropic has been the victim of multiple data breaches and hacks.** In February 2026, Anthropic accused three Chinese AI developers, Hangzhou DeepSeek Artificial Intelligence Co. Ltd. ("DeepSeek"), MiniMax Group Inc., and Beijing Moonshot AI Technology Co. Ltd. ("Moonshot"), of illegally extracting output from its Claude AI model to improve their own competing systems. DeepSeek reportedly has close ties to China's military and intelligence operations, with claims that it is state-controlled or state-subsidized.[xxix] Anthropic says these firms generated more than 16 million interactions with Claude using thousands of fake accounts, a practice known in the industry as distillation, which it argues lets rivals shortcut costly development by learning directly from Claude's responses.[xxx] Anthropic claimed that "approximately 16 million exchanged with its Claude model and 24,000 fake accounts" were used by the three companies.[xxxi] According to a January 27, 2026, article published by KXAN, a US-based local news source, Moonshot was banned by Greg Abbott, the governor of Texas over security and data concerns.[xxxii]

In November 2025, Anthropic disclosed that a Chinese state-sponsored group manipulated its Claude Code AI tool to run a large-scale, largely autonomous cyber espionage campaign in September 2025.[xxxiii] The attackers bypassed Claude's safety guardrails through prompt manipulation, enabling the AI to automate about 80 to 90% of the offensive work against

DoW-PI-014

Anthropic PBC

For Client Use Only — Proprietary

roughly 30 high-value targets, including tech firms, financial institutions, and government entities.[xxxiv]

In August 2025, Anthropic disclosed that North Korea-linked hackers used the Claude code AI tool to obtain remote positions at US Fortune 500 companies.[xxxv]

In December 2024, hackers gained control of an Anthropic social media account and used it to promote a counterfeit "CLAUDE" token, resulting in losses of about USD 100,000.[xxxvi] Research did not identify further material information.

# CYBER RISK – MEDIUM

## SOFTWARE, HARDWARE, PERSONNEL, AND PHYSICAL SECURITY RISK

**According to SecurityScorecard, an information security company that provides cybersecurity ratings, Anthropic has an overall cybersecurity score of 85 out of 100, leading to an overall grade of "B."**

The following table identifies the risk factors that contributed to lowering Anthropic's cybersecurity rating:

Cybersecurity Risk

| Risk Factor | Rating |
|---|---|
| IP Reputation[2] | F |
| Network Security[3] | B |
| Information Leak[4] | B |

SecurityScorecard noted 13,815 site vulnerabilities, 17 open ports, and four examples of malware discovered, but no examples of leaked information.

According to the National Institute of Standards and Technology (NIST) National Vulnerability Database, Anthropic has had four reported security vulnerabilities since 2025, including two since 2026 that scored a seven or higher out of 10.[xxxvii]

---

[2] IP Reputation — IP reputation Leverages SecurityScorecard sinkhole infrastructure, OSINT malware feeds, and third-party threat intelligence.
[3] Network Security — The network security module checks public datasets for evidence of high-risk or insecure open ports within the organization's networks.
[4] Information Leak — Information leak uses chatter and deep web monitoring to identify compromised credentials being circulated by hackers.

DoW-PI-015

 Anthropic PBC

For Client Use Only — Proprietary

HIGH RISKS AND VULNERABILITIES

The following table identifies the high risks and vulnerabilities identified in Anthropic's open-source repositories:

| Software List | High Risks[5] | Vulnerabilities[6] |
|---|---|---|
| anthropics/beam | 1,249 | 19 |
| anthropics/argo-cd | 1,239 | 3 |
| anthropics/anthropic-sdk-ty-pescript | 1,074 | 1 |
| anthropics/PySvelte | 489 | 22 |
| anthropics/anthropic-tokenizer-typescript | 383 | 5 |
| anthropics/rclone | 140 | 0 |
| anthropics/riv2025-long-horizon-coding-agent-demo | 115 | 1 |
| anthropics/s5cmd | 22 | 0 |
| anthropics/claude-agent-sdk-demos | 19 | 1 |
| anthropics/anthropic-sdk-ruby | 19 | 1 |
| anthropics/anthropic-sdk-go | 13 | 0 |
| anthropics/orjson | 11 | 0 |
| anthropics/anthropic-retrieval-demo | 10 | 8 |
| anthropics/github-mcp-server | 9 | 0 |
| anthropics/claude-code-action | 4 | 1 |
| anthropics/torchtyping | 3 | 0 |
| anthropics/anthropic-tools | 3 | 4 |
| anthropics/python-tblib | 2 | 0 |
| anthropics/claude-code-security-review | 2 | 1 |
| anthropics/financial-services-plugins | 2 | 1 |
| anthropics/claude-code-base-action | 2 | 1 |
| anthropics/redis-py | 2 | 3 |
| anthropics/skills | 2 | 9 |
| anthropics/httpcore | 1 | 1 |

## COMPLIANCE RISK — LOW-MEDIUM

**Anthropic software was used in an operation overseas.** According to a February 15, 2026, article published by Yeni Safak, a Turkey-based online news source, Anthropic's Claude AI software was used in the January 3, 2026, operation that captured Nicolás Maduro, the president of Venezuela. Claude AI was accessed through Anthropic's partnership with Palantir.[xxxviii] According to a February 25, 2026, article published by Al Jazeera English, an online news source, Claude AI is subject to Anthropic's usage policy, which includes regulations against using Claude for surveillance, the development off weapons, or inviting weapons.

---

[5] Exiger Cyber's risk assessment outlines common risks by applying statistical methods grounded in a deep understanding of software development metrics and distinguishing between normal and abnormal patterns. The severity of risks is rated as high, medium, or low depending on the gravity of individual rule violations or the total number of failing rules.

[6] Exiger Cyber's vulnerability assessment leverages data from the National Vulnerability Database to identify potential vulnerabilities. The assessment relies on precise product identifiers within software components to accurately match and detect known security weaknesses.

DoW-PI-016

Anthropic PBC    For Client Use Only — Proprietary

Anthropic declined to comment on the usage.[xxxix] Research did not identify any additional material information.

**Anthropic is allegedly at risk of losing its US Government contract**. According to a February 24, 2026, article published by Head Topics, an online news source, Anthropic could lose its government contract if the company fails to allow the US Department of Defense ("DoD") to use its AI technology for unrestricted military use. The article stated that Secretary of Defense Pete Hegseth warned Amodei that the company could be designated a supply chain risk if company policy did not align with the DoD's usage.[xl] Research did not identify any additional material information.

**Anthropic was accused of stealing training data.** According to a February 24, 2026, article published by Digit Fast Track, an online news source, Anthropic was accused of stealing training data by Elon Musk ("Musk"), a US businessman. Musk's accusations came after Anthropic accused three China-based AI companies of using Claude to improve their own AI models.[xli] Research did not identify any additional material information.

**Anthropic's Claude can be exploited and leak sensitive data.** According to an October 31, 2025, article published by Techradar, an online technology news source, Claude can be exploited by hackers. The article stated that Claude can be tricked into uploading sensitive data when prompted to run code within a conversation. Hackers can then gain access to downloaded software packages. Users have been advised to limit network communications to their own account or disable network access to prevent data leaks.[xlii] Research did not identify any additional material information.

**Anthropic has been the defendant in numerous lawsuits.** Anthropic was sued by major music publishers, including the Netherlands-based Universal Music Group NV, US-based Concord Music Group Inc. ("Concord"), and US-based ABKCO Music & Records Inc., which alleged the company used copyrighted lyrics and sheet music from more than 700 identified songs, and potentially over 20,000 works in total, without authorization to train its Claude AI model in 2026 as an extension of the original lawsuit filed in October 2023.[xliii] The plaintiffs are seeking statutory damages that could exceed USD 3 billion, describing the case as potentially one of the largest non-class action copyright lawsuits in US history, while Anthropic denies the allegations and maintains its training practices comply with the law.[xliv] The case with Concord is continuing through normal federal litigation processes and has not yet been resolved or dismissed.[xlv]

In 2025, Anthropic was the defendant in a lawsuit filed by a group of book authors who alleged that the company's Claude AI platform infringed on the authors' copyrights by copying and using their books to train the Claude AI platform. A judge ruled that Anthropic's use of legally purchased books, including print copies it digitized, to train its language models was transformative and protected under fair use, so it did not constitute copyright infringement on that basis; however, the court found that retaining millions of pirated books from unauthorized sources was not protected by fair use, and that dispute ultimately led to a late-2025 settlement in which Anthropic agreed to pay about USD 1.5 billion, with the agreement receiving preliminary court approval.[xlvi]

DoW-PI-017

 Anthropic PBC

For Client Use Only — Proprietary

In June 2025, US-based social news company Reddit Inc. sued Anthropic over an alleged breach of contract. Reddit alleged that Anthropic improperly used its content to train Anthropic's AI systems without permission.[xlvii]

An IT firm based in Belagavi, Anthropic Software Private Limited ("ASPL"), has filed a civil suit against Anthropic, alleging that the company's use of the same name has harmed its brand, diverted online traffic, and caused financial losses. ASPL, which says it registered its name in India in 2017, before Anthropic was established, claims passing off, misrepresentation, and brand erosion and is seeking to bar Anthropic from operating under that name in India along with damages.[xlviii] The court allowed the lawsuit to proceed and issued summons to Anthropic PBC; after the defendant's representatives failed to appear on an earlier date, fresh summons have been issued to Anthropic India Pvt Ltd in Bengaluru for a hearing set on March 9, 2026.[xlix] Research did not identify further material information.

COMMERCE RISK

Between 2021 and 2026, Anthropic received approximately one shipment from an international supplier. The following table includes the top supplier country.

Shipment Data

| Country | Number of Shipments | Percentage of Shipments |
|---------|--------------------|-----------------------|
| UK | 1 | 100% |

Anthropic's corporate supplier was Qumpus Inc. (dba Better World Books), a US-based company specializing in books and e-commerce.[l]

# FINANCIAL HEALTH RISK — MEDIUM

The following table represents Anthropic's commercial credit scores:[li]

Commercial Credit Scores

| Source | Category | Rating |
|--------|----------|--------|
| Cortera | Commercial Credit Risk Rating | B |

DoW-PI-018



Anthropic PBC                                    For Client Use Only — Proprietary

| Cortera | Payment Risk Segment | 1 (Higher payment risk, trending down)[7] |
|---------|---------------------|------------------------------------------|

According to USAspending, Anthropic has received USD 18,960 in US federal prime contracts, grants, and loans since fiscal year 2008, all of which was with the US Department of State.[lii] This data pertains to prime contracts awarded to Anthropic and may not capture products developed by Anthropic and redistributed by third parties.

The following table represents the top major contract awarded to Anthropic by government contract organizations:

US Government Contracts Data

| Government Organization | Award Amount (USD) |
|------------------------|--------------------|
| US Department of State | USD 18,960 |

END REPORT

[i] https://www.anthropic.com/
https://ddiq.efc.exigerfed.com/ddiq-services/rest/bvdReport/US374042333L?entityId=207595844632576

[ii] https://www.anthropic.com/

[iii] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bvdReport/US374042333L?entityId=207595844632576

[iv] https://cage.dla.mil/Search/Details?id=19488082

[v] https://cage.dla.mil/Search/Details?id=19488082

[vi] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bvdReport/US374042333L?entityId=207595844632576

[vii] https://opencorporates.com/companies/us_co/20241311617

[viii] https://opencorporates.com/companies/us_ny/6565058

[ix] https://pitchbook.com/profiles/company/466959-97#overview

[x] https://siliconangle.com/2026/02/12/anthropic-closes-30b-round-annualized-revenue-tops-14b/

[xi] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bvdReport/US374042333L?entityId=207595844632576

[xii] https://pitchbook.com/profiles/company/466959-97

[xiii] https://pitchbook.com/profiles/company/466959-97#overview
https://www.qia.qa/

[xiv] https://files.adviserinfo.sec.gov/IAPD/content/viewform/adv/Sections/iapd_AdvScheduleASection.aspx?ORG_PK=160187&FLNG_PK=044CB0FE000801E401697B11059F1935056C8CC0

[xv] https://www.linkedin.com/in/ravimhatre/details/experience/

---

[7] Payment Risk Segment of 1 — Higher payment risk, trending down. Cortera's Payment Risk Segment is based on how fast the company is paying vendors and whether the payments are getting faster or slower. The Payment Risk Segment is based on a scale of 1-6.

---

DoW-PI-019

Anthropic PBC

For Client Use Only — Proprietary

[xvi] https://www.linkedin.com/in/peternieh/

[xvii] https://files.adviserinfo.sec.gov/IAPD/content/viewform/adv/Sections/iapd_AdvScheduleBSection.aspx?ORG_PK=159198&FLNG_PK=028FE254000801EE04DE0862004AA729056C8CC0
https://www.sfjazz.org/about/board-of-trustees/divesh-makan/

[xviii] https://www.fidelity.com/bin-public/060_www_fidelity_com/documents/FMR-ADV-FPWA.pdf#:~:text=Fidelity%20Management%20&%20Research%20Company%20("FMR%20Co.")%2C,reorganized%20into%20FMR%20effective%20January%201%2C%202020.

[xix] https://www.sec.gov/Archives/edgar/data/1850838/000031506625000984/exhibit99.txt

[xx] https://www.forbes.com/profile/abigail-johnson/?sh=66106e251c42

[xxi] https://www.linkedin.com/in/mikekrieger/
https://www.linkedin.com/in/dario-amodei-3934934/
https://www.linkedin.com/in/pjsmith/

[xxii] https://www.linkedin.com/in/dario-amodei-3934934/

[xxiii] https://www.linkedin.com/company/umee-network/about/

[xxiv] https://www.linkedin.com/in/pjsmith/

[xxv] https://www.myvisajobs.com/employer/anthropic-pbc/

[xxvi] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bvdReport/US374042333L?entityId=207595844632576

[xxvii] https://www.businesskorea.co.kr/news/articleView.html?idxno=249227

[xxviii] https://www.biometricupdate.com/202502/uk-govt-signs-mou-with-anthropic-as-digital-id-ai-become-economic-issues

[xxix] https://www.cnbc.com/2025/06/24/deepseek-aids-chinas-military-and-evaded-export-controls-us-official-says-reuters.html#:~:text=Since%202022%20those%20chips%20have,a%20Reuters%20request%20for%20comment.&text=%22We%20do%20not%20support%20parties,by%20competitors%20such%20as%20Huawei.%22
https://www.congress.gov/crs-product/IF13051

[xxx] https://www.bloombergtechnoz.com/detail-news/100527/anthropic-deepseek-cs-ekstraksi-hasil-dari-claude-secara-ilegal

[xxxi] https://www.taipeitimes.com/News/biz/archives/2026/02/25/2003852826

[xxxii] https://www.kxan.com/news/texas/texas-adds-26-china-affiliated-technology-companies-to-banned-list/

[xxxiii] https://www.kanalcoin.com/anthropic-ai-cyber-espionage-attack/

[xxxiv] https://bitcoinethereumnews.com/tech/anthropic-detects-potential-first-ai-led-cyberattack-by-chinese-group-using-claude/

[xxxv] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bca/article/urn:bca:oiq.bca.model.LexisJsonRecord:5bcb69198ed8947d0459f5928d71aae7eb?lnid=6GRP-KM73-RS3C-71VC-00000-00

[xxxvi] https://www.cryptotimes.io/2024/12/26/animoca-chairmans-x-account-hacked-to-promoting-fake-token/

[xxxvii] https://nvd.nist.gov/vuln/search#/nvd/home?keyword=anthropic&resultType=records

[xxxviii] https://en.yenisafak.com/technology/us-military-used-anthropics-claude-ai-in-maduro-capture-operation-3714626

[xxxix] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bca/article/urn:bca:oiq.bca.model.LexisJsonRecord:3558920e44a1e43504b0193c6910e4082e?lnid=6J0F-WBD3-RTTP-W0GW-00000-00

[xl] https://us.headtopics.com/news/hegseth-warns-anthropic-to-let-the-military-use-the-80212130

[xli] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bca/article/urn:bca:oiq.bca.model.LexisJsonRecord:01ba9db2b8d1565a0417b48ec90b9b218d?lnid=6J06-7JC3-RS9G-92C2-00000-00

DoW-PI-020

 Anthropic PBC

For Client Use Only — Proprietary

[xlii] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bca/article/urn:bca:oiq.bca.model.LexisJsonRecord:f6fa725637d00733047837a81882f32891?lnid=6H3J-JPK3-RS1H-N380-00000-00

[xliii] https://www.musicbusinessworldwide.com/anthropic-must-face-music-publishers-copyright-claims-after-judge-denies-dismissal-motion/

[xliv] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bca/article/urn:bca:oiq.bca.model.LexisJsonRecord:74e4ea163085a38504f53165214ed9ea6c?lnid=6HT2-KNS3-SJ7N-J15S-00000-00

[xlv] https://mpost.io/anthropic-faces-3b-copyright-lawsuit-from-major-music-publishers-over-ai-training-practices/

[xlvi] https://www.loeb.com/en/insights/publications/2025/07/bartz-v-anthropic-pbc
https://www.deep-lex.com/blog/bartz-v-anthropic

[xlvii] https://ddiq.efc.exigerfed.com/dashboard/#/cached-article?url=https:%2F%2Fddiq.efc.exigerfed.com:443%2Fddiq-services%2Frest%2FoiqPrivate%2Farticle%3Fid%3D207595844632576%26url%3Dhttps%253A%252F%252Fwww.clydeco.com%252Fen%252Finsights%252F2025%252F07%252Fnavigating-ai-risks

[xlviii] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bca/article/urn:bca:oiq.bca.model.LexisJsonRecord:d606d82e348b9cad0481e727c59f3034c4?lnid=6HWP-7B63-RRHW-22NX-00000-00

[xlix] https://timesofindia.indiatimes.com/legal/news/belagavi-court-issues-fresh-summons-to-us-ai-firm-anthropic/articleshow/128415251.cms?

[l] https://support.betterworldbooks.com/hc/en-us/articles/200801763-Sales-Tax-Exemption-Process#:~:text=Better%20World%20Books%2C%20DBA%20Qumpus%2C%20Inc.%2C%20is,your%20phone%20number%20*%20Your%20order%20number
https://www.linkedin.com/company/better-world-books/

[li] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bvdReport/US374042333L?entityId=207595844632576

[lii] https://www.usaspending.gov/search?hash=229167627d88222a690619ea1d7c18d4

DoW-PI-021

UNCLASSIFIED

**Enclosure**
**Section 3252 Scoping Analysis for Anthropic, PBC**

This document supports the use of section 3252 of title 10, United States Code ("Section 3252") authorities, as implemented by subpart 239.73 of title 48, Code of Federal Regulations (C.F.R.), "Requirements for Information Relating to Supply Chain Risk." The Under Secretary of War for Acquisition and Sustainment and the Department of War Chief Information Officer have determined the following as the appropriate scope for use of Section 3252 authorities necessary to address the supply chain risk related to the use of covered products or services of Anthropic, PBC:

• **Covered Entity:** Anthropic, PBC, and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof ("Covered Entity").

• **Covered Products or Services:** All of the Covered Entity's products or services that meet the definition of a "covered item of supply" or that would be procured as part of a "covered system," as those terms are defined at 48 C.F.R. § 239.7301, whether acquired as a product or service. This includes all of the Covered Entity's products or services offered by the Covered Entity that become available for procurement.

• **Covered Procurements:** All DoW procurements for which 48 C.F.R. Subpart 239.73 is applicable, in accordance with 48 C.F.R. § 239.7302.

• **Covered Procurement Actions:** All actions authorized in accordance with 48 C.F.R. § 239.7305.

UNCLASSIFIED

DoW-PI-022



**SECRETARY OF WAR**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MAR - 3 2026

The Honorable Mike D. Rogers
Chairman
Committee on Armed Services
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

In accordance with section 3252 of Title 10 United States Code ("section 3252"), I am notifying you of my determination that the use of products or services of Anthropic, PBC, including its subordinate, subsidiary, and affiliated offices or entities, doing business under various names, and all successors or assigns thereof (the "Covered Entity") in Department of War (DoW) covered systems[1] presents a significant supply chain risk and that the use of section 3252 authorities is necessary to protect our national security. This determination is based in part on a risk analysis by the DoW and input from senior DoW personnel that the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

I have consulted with procurement and other relevant officials within DoW regarding the Covered Entity, and determined that (i) use of the authority provided in section 3252 to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk. Accordingly, this letter is providing notice of a section 3252 determination regarding the products and services of the Covered Entity.

I am sending identical letters to Congress and the appropriate congressional committees.

Sincerely,

cc:
The Honorable Adam Smith
Ranking Member

---

[1] Section 3252(d)(5).
[2] Section 3252(d)(2).



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR - 3 2026

The Honorable Roger F. Wicker
Chairman
Committee on Armed Services
United States Senate
Washington, DC  20510

Dear Mr. Chairman:

In accordance with section 3252 of Title 10 United States Code ("section 3252"), I am notifying you of my determination that the use of products or services of Anthropic, PBC, including its subordinate, subsidiary, and affiliated offices or entities, doing business under various names, and all successors or assigns thereof (the "Covered Entity") in Department of War (DoW) covered systems[1] presents a significant supply chain risk and that the use of section 3252 authorities is necessary to protect our national security.  This determination is based in part on a risk analysis by the DoW and input from senior DoW personnel that the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

I have consulted with procurement and other relevant officials within DoW regarding the Covered Entity, and determined that (i) use of the authority provided in section 3252 to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.  Accordingly, this letter is providing notice of a section 3252 determination regarding the products and services of the Covered Entity.

I am sending identical letters to Congress and the appropriate congressional committees.

Sincerely,

cc:
The Honorable Jack Reed
Ranking Member

---

[1] Section 3252(d)(5).
[2] Section 3252(d)(2).

DoW-PI-024



**SECRETARY OF WAR**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MAR - 3 2026

The Honorable Susan M. Collins
Chair
Committee on Appropriations
United States Senate
Washington, DC  20510

Dear Madam Chair:

In accordance with section 3252 of Title 10 United States Code ("section 3252"), I am notifying you of my determination that the use of products or services of Anthropic, PBC, including its subordinate, subsidiary, and affiliated offices or entities, doing business under various names, and all successors or assigns thereof (the "Covered Entity") in Department of War (DoW) covered systems[1] presents a significant supply chain risk and that the use of section 3252 authorities is necessary to protect our national security.  This determination is based in part on a risk analysis by the DoW and input from senior DoW personnel that the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

I have consulted with procurement and other relevant officials within DoW regarding the Covered Entity, and determined that (i) use of the authority provided in section 3252 to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.  Accordingly, this letter is providing notice of a section 3252 determination regarding the products and services of the Covered Entity.

I am sending identical letters to Congress and the appropriate congressional committees.

Sincerely,

cc:
The Honorable Patty L. Murray
Vice Chair

---

[1] Section 3252(d)(5).
[2] Section 3252(d)(2).

DoW-PI-025



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR - 3 2026

The Honorable Tom J. Cole
Chairman
Committee on Appropriations
U.S. House of Representatives
Washington, DC  20515

Dear Mr. Chairman:

In accordance with section 3252 of Title 10 United States Code ("section 3252"), I am notifying you of my determination that the use of products or services of Anthropic, PBC, including its subordinate, subsidiary, and affiliated offices or entities, doing business under various names, and all successors or assigns thereof (the "Covered Entity") in Department of War (DoW) covered systems[1] presents a significant supply chain risk and that the use of section 3252 authorities is necessary to protect our national security.  This determination is based in part on a risk analysis by the DoW and input from senior DoW personnel that the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

I have consulted with procurement and other relevant officials within DoW regarding the Covered Entity, and determined that (i) use of the authority provided in section 3252 to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.  Accordingly, this letter is providing notice of a section 3252 determination regarding the products and services of the Covered Entity.

I am sending identical letters to Congress and the appropriate congressional committees.

Sincerely,

cc:
The Honorable Rosa L. DeLauro
Ranking Member

---

[1] Section 3252(d)(5).
[2] Section 3252(d)(2).

DoW-PI-026



**SECRETARY OF WAR**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MAR − 3 2026

The Honorable Rick Crawford
Chairman
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

In accordance with section 3252 of Title 10 United States Code ("section 3252"), I am notifying you of my determination that the use of products or services of Anthropic, PBC, including its subordinate, subsidiary, and affiliated offices or entities, doing business under various names, and all successors or assigns thereof (the "Covered Entity") in Department of War (DoW) covered systems[1] presents a significant supply chain risk and that the use of section 3252 authorities is necessary to protect our national security. This determination is based in part on a risk analysis by the DoW and input from senior DoW personnel that the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

I have consulted with procurement and other relevant officials within DoW regarding the Covered Entity, and determined that (i) use of the authority provided in section 3252 to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk. Accordingly, this letter is providing notice of a section 3252 determination regarding the products and services of the Covered Entity.

I am sending identical letters to Congress and the appropriate congressional committees.

Sincerely,

cc:
The Honorable Jim Himes
Ranking Member

---

[1] Section 3252(d)(5).
[2] Section 3252(d)(2).



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR - 3 2026

The Honorable Tom Cotton
Chairman
Select Committee on Intelligence
United States Senate
Washington, DC  20510

Dear Mr. Chairman:

In accordance with section 3252 of Title 10 United States Code ("section 3252"), I am notifying you of my determination that the use of products or services of Anthropic, PBC, including its subordinate, subsidiary, and affiliated offices or entities, doing business under various names, and all successors or assigns thereof (the "Covered Entity") in Department of War (DoW) covered systems[1] presents a significant supply chain risk and that the use of section 3252 authorities is necessary to protect our national security.  This determination is based in part on a risk analysis by the DoW and input from senior DoW personnel that the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

I have consulted with procurement and other relevant officials within DoW regarding the Covered Entity, and determined that (i) use of the authority provided in section 3252 to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.  Accordingly, this letter is providing notice of a section 3252 determination regarding the products and services of the Covered Entity.

I am sending identical letters to Congress and the appropriate congressional committees.

Sincerely,

cc:
The Honorable Mark Warner
Vice Chairman

---

[1] Section 3252(d)(5).
[2] Section 3252(d)(2).



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR - 3 2026

Mr. Dario Amodei
Chief Executive Officer
Anthropic, PBC
548 Market Street
San Francisco, CA  94104

Dear Anthropic, PBC Executive Leadership:

This letter provides notice to Anthropic, Public Benefit Corporation (PBC), and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof ("Covered Entity") that, pursuant to title 10, United States Code (U.S.C.), section 3252 ("Section 3252"), the Department of War (DoW) has determined that (i) the use of the Covered Entity's products or services in DoW covered systems[1] presents a supply chain risk and that the use of the Section 3252 authority to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.

**Scope of Authorized Covered Procurement Actions**

This Determination is necessary to reduce supply chain risk and applies to the Covered Entity, Covered Products or Services, Covered Procurements, and Covered Procurement Actions as follows:

- **Covered Entity:**  Anthropic, PBC, and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof.

- **Covered Products or Services:**  All of the Covered Entity's products or services that meet the definition of a "covered item of supply" or that would be procured as part of a "covered system," as those terms are defined at 48 C.F.R. § 239.7301, whether acquired as a product or service.  This includes all of the Covered Entity's products or services offered by the Covered Entity that become available for procurement.

- **Covered Procurements:**  All DoW procurements for which 48 C.F.R. Subpart 239.73 is applicable, in accordance with 48 C.F.R. § 239.7302.

- **Covered Procurement Actions:**  All actions authorized in accordance with 48 C.F.R. § 239.7305.

---

[1] 10 U.S.C. § 3252(d)(5)
[2] 10 U.S.C. § 3252(d)(2)

**Effective Date**

This Determination is effective immediately and shall remain in effect until modified or terminated in writing by the Section 3252 Authorized Official.

**Request for Reconsideration**

If the Covered Entity wishes to request that the DoW reconsider this Determination, the Covered Entity must submit in writing to the undersigned within 30 days of receipt of this letter, notice of such request for reconsideration. For additional information, requirements, and procedures governing such request, see the enclosed Requirements and Procedures for Requesting Reconsideration of a Section 3252 Determination.

Sincerely,

Enclosure:
As stated

2

DoW-PI-030

UNCLASSIFIED

**ATTACHMENT 1**
**Requirements and Procedures for Requesting Reconsideration of a Section 3252**
**Determination**

The following requirements and procedures govern a Covered Entity's request for reconsideration of a Section 3252 determination:

1. **Notice of Request for Reconsideration:** Within thirty (30) days of receiving the Section 3252 Authorized Official's letter notifying the Covered Entity of the Section 3252 determination, the Covered Entity may submit in writing to the Section 3252 Authorized Official notice of the Covered Entity's request for reconsideration. Such notice should identify the specific relief or remedy being requested (e.g., specific modifications to, or termination in whole or in part, of any elements of the determination). All notices and written information must be submitted to osd.mc-alex.ousd-a-s.mbx.10-usc-section-3252-determinations@mail.mil.

2. **Opportunity to Submit and Present Information**: If the Covered Entity submits a timely notice of request for consideration, the Covered Entity will be afforded an additional thirty (30) calendar days (from the date the Section 3252 Authorized Official received such timely notice) to submit in writing, and to appear and present, additional information and arguments in support of such request for reconsideration. The Covered Entity must either send, or make arrangements to appear and present, the information to representatives of the Section 3252 Authorized Official within the thirty (30) day period. The Section 3252 Authorized Official may extend the time to appear and submit documentary evidence upon written request by the Covered Entity.

3. **Flexible Procedures**: The Section 3252 Authorized Official may use flexible procedures to allow the Covered Entity to submit and present information in support of the request for reconsideration. In so doing, the Section 3252 Authorized Official is not required to follow formal rules of evidence or procedures in creating an official record of the request for reconsideration and the Official's disposition of that and request.

4. **Content of Submissions/Presentations**: When submitting and presenting information in support of a request for reconsideration, the Covered Entity should, to the maximum extent practicable, identify specific facts that contradict statements contained in the Section 3252 Covered Entity notification, and provide detailed rationale for any arguments in support of the request and the remedy or relief being requested. A general denial is insufficient to support reconsideration of a Section 3252 determination.

5. **Appearing and Presenting Information:** An appearance and presentation is an informal meeting that is non-adversarial in nature. When electing to appear and present information, the representative(s) of the Covered Entity may choose to appear with counsel. Any information to be presented should be provided in written form at least 5 working days in advance of the presentation. Usually, all matters in opposition should be presented in a single proceeding. Any information not submitted in advance, but provided orally during an appearance, must also be submitted in writing after the appearance for the information to be

DoW-PI-031

considered. The representative(s) of the Section 3252 Authorized Official, and/or other agency representatives, may ask questions of the Covered Entity's representative(s) making the presentation. Federal rules of evidence do not govern the appearance and presentation.

6. **Notice Regarding False Statements**: Any material information submitted in response to this action will be considered a statement or representation to a government official concerning a matter within the jurisdiction of the executive branch of the government. To that end, please note that an individual making any materially false, fictitious, or fraudulent statement or representation to a Government official may be subject to prosecution under 18 U.S.C. § 1001.

26-T-1038



**DEPARTMENT OF WAR**
6000 Defense Pentagon
Washington, D.C. 20301-6000

CHIEF INFORMATION OFFICER

March, 5 2026

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
                    COMMANDERS OF THE COMBATANT COMMANDS
                    DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

Subject: Removal of Anthropic, PBC Products in DoW Systems

References: (a) 10 United States Code (U.S.C.) § 3252
           (b) Defense Federal Acquisition Regulations (DFAR) Subpart 239.73
           (c) DoDI 3020.45, Mission Assurance Construct, August 14, 2018, as amended
           (d) DoDI 3741.0, National Leadership Command Capabilities (NLCC)
           Configuration Management (CM), May 1, 2013, as amended
           (e) DoDD 3020.26, DoD Continuity Programs, June 4, 2024
           (f) National Defense Authorization Act for 2018, Section 1659, Evaluation and
           Enhanced Security of Supply Chain for Nuclear Command, Control, and
           Communications and Continuity of Government Programs
           (g) Executive Order 13873, Securing the Information and Communications
           Technology and Services Supply Chain
           (h) DoDI 8500.0, Cybersecurity, March 14, 2014, as amended
           (i) DoDD 5144.02, DoD Chief Information Officer (DoD CIO), November 21,
           2014
           (j) DoDM 8530.0, Cybersecurity Activities Support Procedures, May 31, 2023
           (k) Joint Capability Integration and Development System (JCIDS) Cyber
           Survivability Endorsement Implementation Guide, V3.0, July 2022
           (l) 44 U.S.C. § 3554, Federal agency responsibilities
           (m) 40 U.S.C. § 11331, Responsibility for acquisitions of information technology
           (n) 41 U.S.C. § 4713, Enhancement of Contractor Protection from Reprisal for
           Disclosure of Certain Information

       Information and communications technology (ICT) is essential to the daily operations and functionality of the Department of War (DoW) and facilitates DoW's ability to conduct business and execute its mission. Existing and emerging threats to weapon and information systems are often directly linked to the ICT supply chain. Adversaries can exploit vulnerabilities tied to hardware, software, and managed services from primary and third-party vendors, suppliers, and service providers. Successful exploitation of ICT supply chain vulnerabilities can lead to asymmetric adversary advantages, significant detriment to DoW critical systems (references a through d), and potentially catastrophic risks to the warfighter (references g and h). The DoW Chief Information Officer (CIO), in compliance with the authorities granted by references (g) through (n), has determined that the use of Anthropic, PBC, and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all

1

DoW-PI-033

subsidiaries, successors, or assigns thereof (Covered Company) products presents an unacceptable supply chain risk for use in all DoW systems and networks.

DoW Components will discontinue all use of the Covered Company's products across all DoW systems within 180 days. This action must be prioritized for systems supporting critical missions, including but not limited to:
- National security systems (NSS), strategic priorities, and nuclear weapons
- Nuclear command, control, and communications
- Continuity of government
- Ballistic missile defense (references a-f)
- Warfighting capabilities at high-risk cyber survivability levels (Categories 3-5), per reference (k)

DoW Components will remove the Covered Company's products from all DoW systems and networks, including government-furnished end-user devices such as desktops, laptops, and mobile devices, as soon as practical or through leveraging established technical refresh cycles. However, all products covered by this memorandum must be removed within 180 days from the date of this memorandum. To ensure continuity of operations during the migration, Components are authorized to procure temporary licenses and support tokens as required. All such procurements must be tied to an approved transition plan and are limited to the 180-day period defined in this memorandum.

Furthermore, Components must remove the Covered Company's products from all Component Approved Products Lists, Service Provider Equipment Lists, e-Commerce markets, and other similar functions that facilitate the procurement of IT hardware, software, and services, as these products are no longer authorized for installation in DoW systems and networks.

This memorandum directs the phased removal of all products and services from the Covered Company from the DoW enterprise. All DoW Components and Defense Industrial Base (DIB) partners must achieve full compliance within 180 days of this memorandum's date. As directed by the Under Secretary of War for Acquisition and Sustainment (USD(A&S)), this prohibition applies to all DIB contracts. Accordingly, DoW Components shall incorporate this restriction into all current and future contracts. Contracting officers shall notify contractors of this requirement within 30 days, and all DIB entities must represent their full compliance in writing to their contracting officer no later than the 180-day deadline.

While this memorandum prohibits waivers, the DoW CIO is the sole authority for granting temporary exemptions in rare and extraordinary circumstances. Exemptions will only be considered for mission-critical activities directly supporting national security operations where no viable alternative exists, and the requesting Component must submit a comprehensive risk mitigation plan for approval.

Kirsten A. Davies

2

DoW-PI-034