MICHAEL J. MONGAN (SBN 250374)
michael.mongan@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
Telephone: (628) 235-1000

EMILY BARNET (*pro hac vice*)
emily.barnet@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Plaintiff Anthropic PBC*

KELLY P. DUNBAR (*pro hac vice*)
kelly.dunbar@wilmerhale.com
JOSHUA A. GELTZER (*pro hac vice*)
joshua.geltzer@wilmerhale.com
KEVIN M. LAMB (*pro hac vice*)
kevin.lamb@wilmerhale.com
SUSAN HENNESSEY (*pro hac vice*)
susan.hennessey@wilmerhale.com
LAUREN MOXLEY BEATTY (SBN 308333)
lauren.beatty@wilmerhale.com
MATTHEW E. MORRIS (*pro hac vice*)
matt.morris@wilmerhale.com
BARDIA VASEGHI (*pro hac vice*)
bardia.vaseghi@wilmerhale.com
DAKOTA C. FOSTER (*pro hac vice*)
dakota.foster@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHROPIC PBC,<br><br>     Plaintiff,<br><br> v.<br><br>U.S. DEPARTMENT OF WAR, et al.,<br><br>     Defendants. | Case No. 3:26-cv-01996-RFL<br><br>**ANTHROPIC PBC'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: Hon. Rita F. Lin<br>Hearing Date: July 30, 2026<br>Time: 10:00 a.m. PT |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

      A.    Anthropic And Its Mission To Responsibly Develop AI Tools ....................... 2

      B.    Anthropic's Partnership With The Federal Government .................................. 2

      C.    The Present Dispute ....................................................................................... 3

ARGUMENT ........................................................................................................................ 6

   I.    Anthropic Is Entitled To Summary Judgment On Its First Amendment Claim Because Defendants Retaliated Against Anthropic For Its Protected Expression ............................................................................................ 6

      A.    The Undisputed Facts Establish A Prima Facie Case Of Retaliation .............. 7

      B.    Defendants Cannot Rebut The Prima Facie Case ........................................... 10

   II.   Secretary Hegseth's Actions Violate The APA Because They Are Arbitrary, Capricious, And Contrary To § 3252's Procedural And Substantive Requirements ..................................................................................... 12

      A.    Secretary Hegseth's February 27 Directive Is Final And Unlawful Agency Action ................................................................................................. 12

      B.    The March Determination Is Independently Unlawful ................................... 13

      C.    Additional Materials Properly Considered Here Reinforce The APA Violations ........................................................................................................ 20

   III.   Defendants Violated The Due Process Clause By Blacklisting Anthropic Without Notice Or An Opportunity To Be Heard ......................................... 21

   IV.   The Presidential Directive Violates The Separation Of Powers ............................... 24

   V.   Implementation Of The Presidential Directive Violated 5 U.S.C. § 558 ................... 24

CONCLUSION .................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Al Haramain Islamic Found. v. Dep't of Treasury*,
686 F.3d 965 (9th Cir. 2012) ...............................................................................21, 23, 24

*Alpha Energy Savers, Inc. v. Hansen*,
381 F.3d 917 (9th Cir. 2004) ...........................................................................................7, 9

*Am. Bus Ass'n v. Slater*,
231 F.3d 1 (D.C. Cir. 2000) ................................................................................................24

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999) ...............................................................................................................21

*Am. Textile Mfrs. Inst., Inc. v. Donovan*,
452 U.S. 490 (1981) .............................................................................................................19

*Am. Fed'n of Gov't Employees, AFL-CIO v. Trump*,
167 F.4th 1247 (9th Cir. 2026) .....................................................................................11, 12

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).............................................................................................................6

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
824 F.3d 858 (9th Cir. 2016) ...........................................................................................6

*Bennett v. Spear*,
520 U.S. 154 (1997)..............................................................................................................12

*Burlington Truck Lines Inc. v. United States*,
371 U.S. 156 (1962)..............................................................................................................18

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014)...............................................................................................................7

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
404 U.S. 508 (1972)...............................................................................................................8

*CarePartners, LLC v. Lashway*,
545 F.3d 867 (9th Cir. 2008) ...........................................................................................10

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985)..............................................................................................................23

*Compassion Over Killing v. FDA*,
849 F.3d 849 (9th Cir. 2017) ...........................................................................................6

*Conner v. City of Santa Ana*,
897 F.2d 1487 (9th Cir. 1990) ....................................................................................21, 22

*Coszalter v. City of Salem*,
320 F.3d 968 (9th Cir. 2003) ...............................................................................9

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)...............................................................................19, 20

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)...............................................................................13, 19

*Fikre v. FBI*,
35 F.4th 762 (9th Cir. 2022) ...............................................................................21

*Fuentes v. Shevin*,
407 U.S. 67 (1972)...............................................................................23

*Garza v. Woods*,
150 F.4th 1118 (9th Cir. 2025) ...............................................................................23

*Greene v. McElroy*,
360 U.S. 474 (1959)...............................................................................21

*Hartman v. Moore*,
547 U.S. 250 (2006)...............................................................................6

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*,
585 U.S. 878 (2018)...............................................................................7, 8

*Kartseva v. Dep't of State*,
37 F.3d 1524 (D.C. Cir. 1994) ...............................................................................21

*Kennedy v. Braidwood Mgmt., Inc.*,
606 U.S. 748 (2025)...............................................................................16, 17

*Lands Council v. Powell*,
395 F.3d 1019 (9th Cir. 2005) ...............................................................................20

*Mathews v. Eldridge*,
424 U.S. 319 (1976)...............................................................................22, 24

*Mills v. Alabama*,
384 U.S. 214 (1966)...............................................................................9

*Nat. Res. Def. Council, Inc. v. Pritzker*,
828 F.3d 1125 (9th Cir. 2016) ...............................................................................14

*Nat'l Ass'n of Home Builders v. Norton*,
340 F.3d 835 (9th Cir. 2003) ...............................................................................14

*Nat'l Council of Resistance of Iran v. Dep't of State*,
51 F.3d 192 (D.C. Cir. 2001)...............................................................................23

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)...............................................................................8

*People's Mojahedin Org. of Iran v. Dep't of State*,
613 F.3d 220 (D.C. Cir. 2010) ...................................................................................23

*Ralls Corp. v. CFIUS*,
758 F.3d 296 (D.C. Cir. 2014) ...................................................................................21

*Riley's Am. Heritage Farms v. Elsasser*,
32 F.4th 707 (9th Cir. 2022) .....................................................................................11

*Scott v. Harris*,
550 U.S. 372 (2007) ..................................................................................................10

*Snyder v. Phelps*,
562 U.S. 443 (2011).................................................................................................7, 8

*State v. Su*,
121 F.4th 1 (9th Cir. 2024) ........................................................................................24

*Thomas v. County of Riverside*,
763 F.3d 1167 (9th Cir. 2014) ...................................................................................10

*Thompson v. U.S. Dep't of Lab.*,
885 F.2d 551 (9th Cir. 1989) .....................................................................................20

*Trifax Corp. v. Dist. of Columbia*,
314 F.3d 641 (D.C. Cir. 2003) ...................................................................................21

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016)...................................................................................................12

*Ulrich v. City & Cty. of San Francisco*,
308 F.3d 968 (9th Cir. 2002) .....................................................................................21

*United States ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954)...................................................................................................14

*White v. Lee*,
227 F.3d 1214 (9th Cir. 2000) ...................................................................................10

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)...................................................................................................24

**STATUTES, RULES, AND REGULATIONS**

5 U.S.C. § 558 ........................................................................................................24, 25

5 U.S.C. § 706 ............................................................................................................ *passim*

10 U.S.C. § 3203 ..............................................................................................................24

10 U.S.C. § 3204 ..............................................................................................................24

10 U.S.C. § 3252 ........................................................................................................ *passim*

41 U.S.C. § 1327 ................................................................................................................5

41 U.S.C. § 3303 .................................................................................................................24

41 U.S.C. § 3304 .................................................................................................................24

41 U.S.C. § 4713 ...................................................................................................................5

48 C.F.R. § 9.402 ...............................................................................................................24

48 C.F.R. § 9.406-2 ...........................................................................................................24

48 C.F.R. § 9.407-2 ...........................................................................................................24

48 C.F.R. § 49.101 .............................................................................................................11

48 C.F.R. § 49.402-3 .........................................................................................................11

48 C.F.R. § 52.212-4 .........................................................................................................11

48 C.F.R. § 52.243-4 .........................................................................................................11

48 C.F.R. § 52.249-1 .........................................................................................................11

48 C.F.R. § 52.249-2 .........................................................................................................11

48 C.F.R. § 52.249-3 .........................................................................................................11

48 C.F.R. § 52.249-4 .........................................................................................................11

48 C.F.R. § 52.249-5 .........................................................................................................11

48 C.F.R. § 52.249-6 .........................................................................................................11

48 C.F.R. § 239.7304 .........................................................................................................14

**OTHER AUTHORITIES**

S. Rep. No. 111-201 (2010) ...............................................................................................16

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on July 30, 2026 at 10:00 a.m. PT, Plaintiff Anthropic PBC will and hereby does move the Court for an order granting Anthropic's Motion for Summary Judgment. Anthropic's motion is based on this Notice of Motion, the supporting Memorandum, and the Declarations filed herewith. Anthropic requests that the Court grant Anthropic summary judgment on each of its claims.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

The undisputed facts establish that Defendants' campaign of retaliation against Anthropic violated the Constitution and the Administrative Procedure Act.

Defendants have been remarkably transparent about what happened here. They view Anthropic as providing the best frontier AI model and engaged the company to help the Department of War and other agencies protect America's national security. They acknowledge that Anthropic has always made its models available subject to certain use restrictions, consistent with its longstanding advocacy for safe and responsible use of AI. In February 2026, Defendants insisted that Anthropic abandon two contractual restrictions that prohibited them from using the model for lethal autonomous warfare or mass surveillance of Americans. When Anthropic respectfully declined to abandon those restrictions, and publicly emphasized their importance, Defendants abruptly decided to punish the company. They barred every federal agency and every military contractor from doing business with Anthropic and designated the company a threat to national security.

Everyone agrees that the Executive Branch can lawfully decide to stop contracting with a vendor that declines to accept its preferred contract terms. But the Executive Branch remains subject to the requirements of the Constitution and federal law. It may not retaliate against an American company in violation of the First Amendment; it may not disregard procedural and substantive requirements imposed by Congress; it may not exercise its statutory national-security authorities in a manner that is arbitrary and capricious; and it may not punish a company without providing notice and an opportunity to respond.

As the undisputed record shows, Defendants did each of those things here. Their campaign of retaliation commenced with statements from the President and the Secretary of War that acknowledged—on their face—that the Executive was taking action against Anthropic for its "rhetoric" and its "ideology." The Secretary designated Anthropic a "supply chain risk" under 10 U.S.C. § 3252 without taking the procedural steps required by Congress and based on rationales that exceed the statutory definition of a supply chain risk—and that the record shows to be arbitrary, false, and pretextual. Each of the unprecedented sanctions imposed by Defendants occurred without any pre-deprivation process, in violation of the Due Process Clause. On this record, Anthropic is entitled to judgment as a matter of law.

## BACKGROUND

### A.    Anthropic And Its Mission To Responsibly Develop AI Tools

Anthropic is a frontier AI company founded in 2021. It offers an industry-leading large language model (LLM), known as Claude, which is capable of interpreting and responding to a wide range of user inputs in an intelligent, human-like manner. Kaplan Decl. ¶ 16.[1] LLMs are algorithmic systems that acquire predictive capabilities, allowing them to perform complex tasks in a fraction of the time it would take humans. *Id.* ¶ 15.

Anthropic was founded on the animating principle that the most capable AI systems should also be the safest. *Id.* ¶¶ 8-11. That principle is embedded in Anthropic's corporate charter and governance. *Id.* ¶ 8. As a public benefit corporation, Anthropic balances stockholder interests with its public benefit purpose of responsibly developing and maintaining advanced AI tools for the long-term benefit of humanity. *See id.* ¶¶ 8-9.

### B.    Anthropic's Partnership With The Federal Government

Anthropic began commercial deployment of Claude in 2023, *id.* ¶ 12, and started working with the federal government the following year, Ramasamy Decl. ¶ 7. In November 2024, Anthropic began working with a defense technology partner to provide AI-enabled capabilities to U.S. intelligence and defense agencies. *Id.* ¶ 8. On its own initiative and at its own expense,

---

[1] All declarations cited in this motion are attached and have been filed concurrently.

Anthropic built a new version of Claude (known as "Claude Gov") that was tailored to national-security needs and classified environments. *Id*. ¶¶ 31-32.

Every Anthropic model is subject to a Usage Policy that prohibits certain uses of Claude. *Id*. ¶ 25. Claude Gov is subject to a government-specific addendum to the Usage Policy that removes certain restrictions for national security customers that would otherwise apply to civilian users. Kaplan Decl. ¶¶ 27-28. From the outset of the Department's partnership with Anthropic, the Department has operated subject to the Usage Policy and a government-specific addendum. *Id*. ¶¶ 28-29; Ramasamy Decl. ¶ 26.

Since March 2025, the Department has accessed Claude Gov through classified cloud environments; entrusted Anthropic to handle classified national security data; and awarded the company a Top Secret facility clearance. Ramasamy Decl. ¶¶ 33, 58. In the summer of 2025, the Department awarded Anthropic a two-year contract worth up to $200 million. *Id*. ¶¶ 9, 69. Until the events that gave rise to this litigation, Claude had reportedly become the Department's most widely deployed frontier AI model. Kaplan Decl. ¶ 26. According to the Department, Claude was "far and away [its] best model." Heck Decl. ¶ 9.

Other agencies have also made extensive use of Claude and praised it. In 2025, the General Services Administration (GSA) announced a first-of-its-kind agreement with Anthropic to deliver Claude across all three branches of government for just $1 per agency. Ramasamy Decl. ¶ 71. And the General Counsel of the Department of Veterans Affairs, for example, called Claude and related tools "incredible" and pledged to "make full use of" them. AR 537.

## C.    The Present Dispute

In fall 2025, the Department and Anthropic began discussing a new deployment of Claude on the Department's "GenAI.mil" platform. Kaplan Decl. ¶ 32. For the first time, the Department demanded that Anthropic discard its Usage Policy and agree to a new contractual provision allowing the Department to use Claude "for all lawful uses." *Id*. Anthropic agreed to accommodate the Department by significantly revising its usage restrictions. *Id*. ¶ 33; AR 7. But it respectfully declined to discard two narrow restrictions grounded in its founding commitments: it would not authorize use of Claude for lethal autonomous warfare or mass surveillance of

Americans. Kaplan Decl. ¶ 33; AR 1-2. Anthropic's CEO told the Under Secretary of War for Research and Engineering that the company would assist in offboarding Claude from the Department's systems if it concluded Anthropic was not the right vendor for its needs. AR 2, 29.

On February 24, Anthropic's leadership met with Secretary Hegseth and his team at the Pentagon. Heck Decl. ¶ 13. The Secretary did not say anything about Anthropic's AI models being unsafe, insecure, or subject to compromise. *Id*. ¶ 18. To the contrary, he praised Claude's "exquisite capabilities" and told Anthropic that the Department "would love to work with" the company. *Id*. ¶¶ 13, 16. But he insisted on Anthropic removing its two remaining restrictions. *Id*. ¶¶ 13, 17. And he issued an ultimatum: Unless Anthropic agreed to the "all lawful uses" contract term by 5 p.m. ET on February 27, he would either designate the company as a "supply chain risk" *or* invoke the Defense Production Act to compel Anthropic to comply with his demand. *Id*. ¶ 17. On the eve of that deadline, Anthropic's CEO publicly explained why Anthropic could not "in good conscience" abandon its commitments to AI safety. *See* Mongan Decl. Ex. 1 at 1-2.

The next day, before the Secretary's 5 p.m. deadline, President Trump issued a statement on social media (the "Presidential Directive"). He branded Anthropic a "Radical Left AI company" that threatened "AMERICAN LIVES" and "direct[ed] EVERY Federal Agency in the United States Government to IMMEDIATELY CEASE all use of Anthropic's technology." AR 255A. Federal agencies moved quickly to carry out the Presidential Directive. That same day, GSA removed Anthropic from the government's primary procurement marketplace, AR 394-95, and the Department of Health and Human Services disabled access to Claude, AR 335. Within days, the Departments of State, Treasury, Veterans Affairs, and other agencies announced that they would terminate or suspend use of Anthropic's products. Each cited only the Presidential Directive. *See* AR 321 (State); AR 256 (Treasury); AR 527 (VA); AR 317 (FHFA).

Less than two hours after the Presidential Directive, Secretary Hegseth issued a "final" decision (the "Hegseth Directive") via social media. AR 255B. He accused Anthropic of "betrayal"; declared its conduct "fundamentally incompatible with American principles"; "direct[ed] the Department of War to designate Anthropic a Supply-Chain Risk to National Security"; ordered that, "[e]ffective immediately, no contractor, supplier, or partner that does

business with the United States military may conduct any commercial activity with Anthropic" (the "secondary boycott" order); and instructed that Anthropic would continue to provide its technology to the Department for up to six months. AR 255B.

Later, the Secretary signed a determination dated March 3 (the "March Determination") that formalized his designation of Anthropic as a supply chain risk under 10 U.S.C. § 3252. AR 209. But the Department did not reveal that determination to Anthropic on March 3. Instead, it continued negotiations with Anthropic about the disputed contract terms. Heck Decl. ¶¶ 20-22. Those negotiations extended through the morning of March 4, when Under Secretary Michael sent Anthropic a revised counteroffer and wrote: "I think we are very close here." *Id.* Ex. 1; *see also* Dkt. 164 ¶ 104 (admitting that negotiations extended through the evening of March 4). That evening, however, Anthropic received a letter (dated March 3) notifying it of the March Determination. AR 237-38; Heck Decl. ¶ 21. The Department did not disclose the text of that Determination—or any materials purporting to justify it—until March 17. *See* Dkt. 96-2.[2]

On March 26, this Court preliminarily enjoined Defendants' implementation of the Presidential Directive, the Hegseth Directive, and the March Determination (together, the "Challenged Actions"). Dkt. 134 ("Op."). The Court restored the pre-February 27 status quo, while also expressly allowing Defendants to take any lawful step to halt their work with Anthropic and its AI tools. Dkt. 135 at 3. In the months since the Challenged Actions, the Department and other federal agencies have continued using those tools. Ramasamy Decl. ¶¶ 78-81. A senior official also publicly acknowledged that the Department has used Claude in active military operations in Iran. Mongan Decl. Ex. 5 at 28. And before making a new and powerful model named Mythos more broadly available, Anthropic briefed senior officials across government agencies on its capabilities and made it available to government partners. Ramasamy Decl. ¶¶ 80-81; Mongan Decl. Ex. 3.

---

[2] The Department sent Anthropic another letter on March 4 notifying it of a separate determination by the Secretary under 41 U.S.C. § 4713. Anthropic is currently challenging that action in a separate proceeding in the D.C. Circuit, as required by 41 U.S.C. § 1327(b)(3).

**ARGUMENT**

This Court should grant summary judgment in favor of Anthropic on its constitutional claims because "there is no genuine issue as to any material fact," and Anthropic "is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). As to Anthropic's APA claims, this Court reviews the challenged final agency action pursuant to 5 U.S.C. § 706. *Compassion Over Killing v. FDA*, 849 F.3d 849, 854 (9th Cir. 2017). Anthropic should prevail on its APA claims whether they are viewed in light of the proffered administrative record, *see* Dkt. 156-1, or with the benefit of additional documents that the Court may consider under these circumstances, *see infra* pp. 20-21. Either way, the actions are invalid.

## I.    Anthropic Is Entitled To Summary Judgment On Its First Amendment Claim Because Defendants Retaliated Against Anthropic For Its Protected Expression

To prevail on its First Amendment claim, Anthropic must establish "that (1) it engaged in constitutionally protected activity; (2) the defendant's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). Once Anthropic has made that showing, "the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of." *Hartman v. Moore*, 547 U.S. 250, 260 (2006).

The undisputed facts here establish a "classic" case of "illegal First Amendment retaliation." Op. 2. This Court has already concluded that Anthropic "engaged in protected activity." *Id.* at 20. Anthropic has been "a loud and influential voice regarding the capabilities, risks, and safe uses of AI technology." *Id.*; *see also* Kaplan Decl. ¶¶ 8-10, 13; Heck Decl. ¶¶ 5-6; Mongan Decl. Exs. 1, 4. Defendants have introduced no contrary evidence, and they have never disputed that the Challenged Actions would chill a person of ordinary firmness from engaging in that protected activity. Op. 21. And the very words used by President Trump, Secretary Hegseth, and Under Secretary Michael in announcing and justifying those actions leave no question that Anthropic's protected activity substantially motivated them. In light of those words—and other

undisputed evidence—Anthropic has carried its burden on its retaliation claim, and Defendants cannot show they would have taken the Challenged Actions absent the retaliatory impetus.

### A.   The Undisputed Facts Establish A Prima Facie Case Of Retaliation

#### 1.   Anthropic Engaged In Constitutionally Protected Activity

The evidence shows that Anthropic engaged in activity protected by the First Amendment. Since its founding, Anthropic has been a leading voice in the ongoing public debate about AI safety. It has worked to advance AI research, safety, and policy, *see* Kaplan Decl. ¶¶ 9-10, 13, including by publishing essays and public statements about the risks of deploying AI without proper restrictions and safeguards, *see id*. ¶¶ 10, 13; Mongan Decl. Exs. 1, 4. Its CEO has been a particularly prominent advocate for AI safety, including through a January 2026 public essay calling for "guardrails" on the development of powerful AI to address its risks to public safety and security. Mongan Decl. Ex. 4 at 21, 22, 30-32, 44. That speech on matters of profound "'public concern'" lies at the core of what the First Amendment protects. *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011).

The undisputed facts demonstrate that Anthropic's interactions with the Department are also protected First Amendment activity. When summoned to Washington on February 24 and pressed by the Secretary to abandon Anthropic's longstanding restrictions against the use of Claude for mass surveillance of Americans or lethal autonomous warfare, Anthropic's leadership explained to the government the importance of those restrictions and respectfully declined to abandon them. Heck Decl. ¶¶ 13-20. Anthropic was addressing "governmental conduct" regarding the safe use of AI—a subject in which the public has a "deep and abiding interest" because it "affects the societal interest as a whole." *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 926-27 (9th Cir. 2004). The communications "touche[d] on fundamental questions" of "policy." *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 585 U.S. 878, 913 (2018). And they implicated the "'ethical [and] moral'" principles that define Anthropic's public-benefit mission. *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 701 (2014). The speech was no less protected just because Anthropic expressed itself directly to the government: The Free Speech Clause protects speech on "matters of substantial public concern" during contractual bargaining with the

government. *See Janus*, 585 U.S. at 885-86. And the Petition Clause independently protects efforts to advocate before "all departments of the Government." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

The First Amendment likewise protects Anthropic's public communications about the dispute. On February 26, Anthropic's CEO issued a statement explaining that Anthropic could not "in good conscience" abandon its two restrictions because certain uses of AI fall "outside the bounds of what today's technology can safely and reliably do." Mongan Decl. Ex. 1 at 1-2. That public statement on a question of pressing national importance—delivered when both sides had "publicly staked out their positions and engaged in a public debate," Op. 20—is precisely the kind of contribution to "uninhibited, robust, and wide-open" debate that the First Amendment protects, *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Indeed, it "'occupies the highest rung of the hierarchy of First Amendment values.'" *Snyder*, 562 U.S. at 452.

### 2.    Defendants' Actions Would Chill A Person Of Ordinary Firmness

The Challenged Actions "easily qualify as ones which would chill a person of ordinary firmness from continuing to engage in further protected speech." Op. 21. Defendants have never contested that issue. *Id.* Nor could they. The Presidential Directive categorically bars Anthropic from working with all federal agencies, AR 255A; the secondary boycott order prohibits any "contractor, supplier, or partner that does business with the United States military" from engaging in any "commercial activity" with Anthropic, AR 255B; and the supply chain risk designation labels Anthropic a national-security threat and prevents it from competing for certain Department contracts, including as a subcontractor, AR 209. Together, the Challenged Actions "chill public debate" (Op. 21) by sending an unmistakable warning to companies in the industry: speak out and you too may be blacklisted, boycotted, and branded a national-security risk.

### 3.    Anthropic's Speech Substantially Motivated The Challenged Actions

The record does not allow for any genuine dispute that Anthropic's protected expression was a substantial motivating factor for the Challenged Actions. Defendants' own words establish that they acted to punish Anthropic for its public stance on whether its models could safely be used in the two contexts at issue: Secretary Hegseth tied the supply chain risk designation and the

secondary boycott to Anthropic's "sanctimonious rhetoric" and its purported attempt to "strong-arm the United States military" to accept its "Silicon Valley ideology." AR 255B. President Trump similarly explained his Directive by describing Anthropic as a "RADICAL LEFT, WOKE COMPANY" staffed by "Leftwing nut jobs" who made a "DISASTROUS MISTAKE trying to STRONG-ARM the Department of War." AR 255A. And Under Secretary Michael doubled down in his "Risk Analysis." AR 213. He asserted that Anthropic's "risk level" supposedly "escalated" when the company "began engaging in an increasingly hostile manner through the press." AR 215. He dismissed Anthropic's position as "brand-building" and "marketing," characterized the dispute as a "public[] spat," and accused Anthropic of "leveraging" the parties' "negotiations for Anthropic's own public relations." AR 214-15.

These statements expressly take issue with Anthropic's decision to participate in "free discussion of governmental affairs"—precisely what the First Amendment was designed to protect by "practically universal agreement." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). When direct "evidence that the defendants expressed opposition to" Anthropic's speech appears in the same statements that announced and justified the Challenged Actions, that is powerful proof that "retaliation was a substantial or motivating factor." *Alpha Energy Savers,* 381 F.3d at 929.

Other factors that the Ninth Circuit considers point decisively in the same direction. The "proximity in time between [the] expressive conduct and the allegedly retaliatory action," *id.*, confirms that the conduct motivated the actions. President Trump and Secretary Hegseth issued their Directives fewer than 24 hours after Anthropic's CEO publicly defended its usage restrictions and declined to abandon them. Mongan Decl. Exs. 1, 7-8. If "three to eight months is easily within a time range that can support an inference of retaliation," *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003), a single day certainly is.

And the undisputed facts also show that Defendants' "proffered explanations for their adverse actions were false or pretextual." *Alpha Energy Savers,* 381 F.3d at 929. To the extent the February 27 Directives offer any rationale beyond invective and criticism of First Amendment activity, they suggest a concern that Anthropic will "veto" the "operational decisions of the United States military." AR 255B; AR 255A. The Michael memorandum likewise asserts that Anthropic

possesses an "operational veto" over Claude after it is deployed in the Department's classified systems. AR 213. But none of those documents explains why Defendants "believed Anthropic has 'privileged access,' 'backdoors,' or can otherwise 'control' Claude after its delivery to DoW." Op. 14; *see also* Ramasamy Decl. ¶¶ 48-58.

The record directly contradicts the government's after-the-fact rationales. Once deployed in secure Department environments, Anthropic has no access to its models, no visibility into their use, and no technical ability to alter or disable them. Ramasamy Decl. ¶¶ 48-58. It cannot push changes, introduce vulnerabilities, or interfere with operations. *Id*. It cannot veto Department uses—and it has expressly disavowed any desire to interfere with military operations, including by offering a contract term expressly disavowing any authority to interfere with ongoing operations. Heck Decl. ¶ 25; *see* Ramasamy Decl. ¶¶ 48-58. Bare assertions of theoretical risk made "without evidence in the record" cannot defeat summary judgment. *White v. Lee*, 227 F.3d 1214, 1241 (9th Cir. 2000). That is especially true where (as here) those assertions are "blatantly contradicted by the record," such that "no reasonable jury could believe" them. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Far from creating a triable issue, the inaccurate and pretextual nature of Defendants' chosen explanations confirms what is already apparent: their actions were substantially motivated by a desire to punish Anthropic for its protected constitutional activities.

### B.    Defendants Cannot Rebut The Prima Facie Case

Defendants can "'escape liability only'" by proving that they "'would have reached the same decision . . . even in the absence of'" that speech. *Thomas v. County of Riverside*, 763 F.3d 1167, 1169 (9th Cir. 2014). It is not enough for Defendants to show that they "could have" taken the Challenged Actions in response to the contracting impasse. *CarePartners, LLC v. Lashway*, 545 F.3d 867, 877 (9th Cir. 2008). The question is whether, without Anthropic's protected speech, Defendants *would have* taken these same sweeping actions anyway. Op. 23. The undisputed facts show they would not have.

The Presidential and Hegseth Directives identify the reason for the Challenged Actions on their face. Both link the government's response to Anthropic's public position, which the Directives characterize as an ideologically objectionable effort to "strong-arm" the government.

*See* AR 255A, 255B; *supra* p. 9. Where the government's own documents "admit[] that they took the action directly in response to" protected speech, "[t]here is no genuine issue of disputed fact" that the same action would not have occurred without that speech. *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 728 (9th Cir. 2022). That alone should end the inquiry.

And nothing in the record supports the "determination that the contracting impasse alone would have triggered such an extreme response" absent Anthropic's protected speech. Op. 24; *see* Dkt. 96 at 23; AR 213-16. If Defendants' actual concern had been Anthropic's refusal to accept the Department's preferred contract terms, they had methods to address that concern directly. Defendants could have stopped using Claude; selected another vendor for the GenAI.mil contract; or used ordinary procurement authorities to terminate, narrow, or wind down particular Anthropic contracts, *see, e.g.*, 48 C.F.R. §§ 49.101(b), 49.402-3, 52.212-4(l), 52.212-4(m), 52.243-4(a), 52.249-1-52.249-6. Even absent the Directives, which lay bare Defendants' retaliatory purpose, a dispute over contract terms would not explain a government-wide blacklist, a sweeping secondary boycott, or a first-of-its-kind supply chain risk designation.

Recent events underscore that Defendants took the Challenged Actions in response to Anthropic's protected speech, not genuine national-security concerns. Even after the supply chain risk designation, a Department official testified that the agency used Claude to support military efforts in Iran. Mongan Decl. Ex. 5 at 28. Anthropic has continued to work closely with the federal government, including by proactively extending access to its new Mythos model and meeting with senior White House officials in April to discuss its responsible use—discussions the White House described as "productive and constructive." Heck Decl. ¶ 27; Mongan Decl. Ex. 7 at 1. These are not the actions of parties genuinely concerned that Anthropic poses a national-security risk.

Finally, *American Federation of Government Employees, AFL-CIO v. Trump*, 167 F.4th 1247 (9th Cir. 2026) (*AFGE*), does not help Defendants. *See* Op. 23 n.12. The government would have issued the challenged executive order in that case even absent the asserted retaliatory motive because the order itself contained no retaliatory language, it had "'legitimate grounding in national security concerns,'" and the record showed it would have issued one way or the other. *AFGE*, 167

F.4th at 1256-57. This case is the opposite: The Presidential and Hegseth Directives tied the Challenged Actions to Anthropic's speech activities. And there is no record-supported national-security rationale that would independently explain the Challenged Actions. *See infra* pp. 17-21.

## II. Secretary Hegseth's Actions Violate The APA Because They Are Arbitrary, Capricious, And Contrary To § 3252's Procedural And Substantive Requirements

On February 27, Secretary Hegseth issued a "final" decision, "[e]ffective immediately." AR 255B. That Directive contained two unprecedented orders: The Secretary ordered a secondary boycott, prohibiting all military contractors from conducting business with Anthropic; and he "direct[ed] the Department of War to designate Anthropic a Supply-Chain Risk to National Security." AR 255B. Both orders violate the APA. Defendants have "concede[d]" that the secondary boycott order "was in excess of and contrary to [the Secretary's] statutory authority." Op. 35. And the supply chain risk designation is procedurally and substantively flawed. That is true regardless of whether the Court views the relevant agency action as the Secretary's February 27 decision or his subsequent March Determination formalizing the designation, and regardless of whether the Court reviews the action exclusively in light of the administrative record proffered by Defendants or with the benefit of additional materials it may properly consider. *See infra* pp. 20-21.

### A. Secretary Hegseth's February 27 Directive Is Final And Unlawful Agency Action

To date, Defendants have offered no defense of the actions announced in Secretary Hegseth's February 27 Directive. They instead contend that the Directive is unreviewable because it "is *not* a final agency action subject to APA review." Dkt. 96 at 25. As this Court previously concluded, that is wrong. Op. 35. The Directive reflects the "'consummation' of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). It states unequivocally that "[t]his decision is final" and "[e]ffective immediately." AR 255B. That language conveys a "definitive decision," not a "tentative or interlocutory" one. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597-98 (2016). For the same reason, the Directive imposes "legal consequences" and determines "rights" and "obligations." *Bennett*, 520 U.S. at 178; *see* Op. 35. It

therefore satisfies the APA's finality requirement.

Neither action announced in the February 27 Directive can survive APA review. At the preliminary injunction hearing, "Defendants conceded . . . that there is no statutory basis for" the secondary boycott order. Op. 34. As to Secretary Hegseth's order that the Department designate Anthropic a supply chain risk, Defendants have submitted no evidence that the Secretary complied with the statutory prerequisites of § 3252 before issuing it. *See id.* The Directive itself contains scarcely any reasoning—apart from criticizing Anthropic's "rhetoric" and "ideology," AR 255B—and lacks any genuine support from contemporaneous record evidence. The administrative record materials proffered by Defendants almost entirely post-date the Directive. The lone exception is a due-diligence report from a third-party vendor dated February 26, 2026. AR 217-29. It assigns Anthropic an overall risk of "medium," based in substantial part on private copyright litigation against the company and the fact that "the US Secretary of Defense threatened to label the company as a 'supply chain risk.'" AR 219-20. That circular reasoning "does not corroborate the risks that purportedly resulted in the supply chain risk designation." Op. 36 n.18.

The Secretary's March Determination merely formalized and carried out his earlier, "final" decision "directing the Department of War to designate Anthropic a Supply-Chain Risk to National Security." AR 255B. The Secretary did not "'deal with the problem afresh'" on March 3, as would be required for "*new* agency action." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020). Nor did he "withdraw[] or rescind[]" the earlier Directive. Op. 35. As a result, the prior Directive is the operative agency action—and the supply chain risk designation must be evaluated based on the scant reasoning in that Directive and the record before the Secretary when he issued it on February 27. *See Regents*, 591 U.S. at 20. Because the original Directive cannot be sustained, the March Determination cannot stand.

### B.    The March Determination Is Independently Unlawful

Even crediting Defendants' position that the March Determination is the relevant final agency action, it cannot survive APA review. The action violates clear-cut procedural requirements in 10 U.S.C. § 3252; stretches the substantive authority granted in § 3252 beyond the breaking point; and rests on arbitrary, incorrect, and contrived rationales.

### 1.     The § 3252 Designation Violates Procedures Required By Law

To start, Secretary Hegseth failed to comply with mandatory procedural safeguards. *See* 5 U.S.C. § 706(2)(D). Before making a supply chain risk designation, the Secretary must determine in writing that "less intrusive measures" could not "reduce" the identified risk, 10 U.S.C. § 3252(b)(2)(B), and then provide Congress "a discussion of less intrusive measures that were considered and why they were not reasonably available," *id.* § 3252(b)(3)(B). He also must determine in writing that the designation is "necessary to protect national security by reducing supply chain risk," *id.* § 3252(b)(2)(A), and provide Congress "a summary of the basis for the determination," *id.* § 3252(b)(3)(B). Under the Department's regulations, that latter determination must be based on "a risk assessment [prepared] by the Under Secretary of Defense for Intelligence." 48 C.F.R. § 239.7304(a). Collectively, these procedural requirements help to ensure that the Secretary appropriately exercises the weighty authority granted him in § 3252.

The proffered administrative record shows that the Secretary violated each of those requirements here. He failed to make any reasoned determination that less intrusive measures could not reduce any risk Anthropic posed. Although the March Determination pronounces that conclusion, it does not explain it. AR 209. Nor does any other contemporaneous document in the record. And "mere lip service or verbal commendation of [the] standard" cannot satisfy the statutory requirement. *Nat. Res. Def. Council, Inc. v. Pritzker*, 828 F.3d 1125, 1135 (9th Cir. 2016); *see* Op. 33-34. The Secretary also failed to provide Congress the required analysis of less intrusive measures, "as Defendants conceded at oral argument." Op. 33; *see* P.I. Hr'g Tr. 20:15-21:1, 23:10-12. The six congressional notification letters in the record incant § 3252's text, but do not contain the mandated "discussion." 10 U.S.C. § 3252(b)(3)(B). Further still, the underlying risk assessment was prepared by Under Secretary for Research and Engineering Emil Michael—not the Under Secretary for Intelligence, as the Department's regulation requires. AR 213-16, 243. Defendants seek to justify reassigning the risk assessment by pointing to a recent Department reorganization, *see* AR 244-45, but an internal reorganization is no basis to act "contrary to existing valid regulations." *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *see Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003).

### 2.    The § 3252 Designation Is Contrary To Law

As a substantive matter, the supply chain risk designation is incompatible with the text of § 3252. *See* 5 U.S.C. § 706(2)(A), (C). Congress defined "supply chain risk" as "the risk that an adversary may sabotage, maliciously introduce unwanted function, or otherwise subvert . . . a covered system." 10 U.S.C. § 3252(d)(4). That text requires an "adversary" and "is directed at covert acts or hacks"—"not overt positions taken during contract negotiations." Op. 30.

Although the March Determination does not explain how Anthropic presents the kind of risk Congress described, AR 209, the underlying risk analysis asserts that "Anthropic's risk level escalated from a potentially manageable technical and business negotiation to an unacceptable national security threat over the course of the DoW's contract negotiation[s] with them," AR 215. Those negotiations, and Anthropic's private and public statements about them, purportedly led the Department to conclude that there was a "significant risk" that Anthropic itself was an adversary that would "subvert the design and/or functionality of their product or service." AR 210; *see also* AR 215. But Defendants ultimately assert that if Anthropic had "agreed to the Government's term, the challenged actions would not have occurred"—meaning that Anthropic's refusal to agree was the dispositive factor in the Secretary's § 3252 designation. Dkt. 96 at 23. Defendants thus "appear to be taking the position that any vendor who 'push[es] back' on" the Department in a contract negotiation becomes an "'adversary'" who presents a supply chain risk. Op. 30.

As this Court has recognized, "[t]hat position is deeply troubling and inconsistent with the statutory text." Op. 31. Under § 3252's plain terms, the stance Anthropic took in negotiations with the Department provides no basis for a supply chain risk designation. The text reflects Congress's choice to target the risk of malicious entities engaged in "covert acts or hacks," *id.*, not vendors openly expressing views with which the Department disagrees. A supply chain risk must come from an "adversary"—that is, an "enemy," "foe," "opponent," or "rival." *Adversary*, Black's Law Dictionary (12th ed. 2024). Those words naturally describe hostile foreign countries, terrorist groups, and similar actors. They do not describe a company like Anthropic, whatever one thinks of its stance on AI safety. A contractor does not give rise to a national-security risk because it disagrees with the Department about how a technology can be used safely. That is particularly so

where the contractor has consistently supported American national security agencies; has been entrusted with access to Top Secret facilities and classified information; and continues to provide the Department with technological tools that help to protect the Nation. *See supra* pp. 5-6.

Other statutory terms reinforce that conclusion. Section 3252 does not address all risks from an "adversary" but only the risks of "sabotage," "subver[sion]," and the "malicious[] introduc[tion of] unwanted function." 10 U.S.C. § 3252(d)(4). Each of those actions is typically taken or planned covertly. *See, e.g.*, *Sabotage*, Oxford English Dictionary (2d ed. 1989) ("[T]o ruin, destroy, or disable deliberately and maliciously (frequently by indirect means)."); *Subvert*, Oxford English Dictionary (2d ed. 1989) ("[T]o attempt to achieve, esp. by covert action, the weakening or removal of (a government, political regime, etc.)."). The statute further limits the relevant covert actions to those taken "so as to surveil, deny, disrupt, or otherwise degrade" covered national security systems. 10 U.S.C. § 3252(d)(4). That language connotes purposeful misconduct. *See So As*, Oxford English Dictionary (2d ed. 1989) ("Expressing result, consequence, or purpose: in such a way that; so that, in order that."). But Defendants designated Anthropic over its *public* disagreement about contract language. Dkt. 96 at 23. A company that openly announces its position in negotiations and publicly defends that position is not "sabotag[ing]," "subvert[ing]," or "maliciously introduc[ing]" anything. Those words describe the opposite of the transparent and public position taken by Anthropic here. *See* Op. 30.

"The legislative history confirms that Section 3252's purpose is to address covert acts." Op. 31. Congress enacted § 3252's predecessor provision in response to a cyber incident perpetrated by a foreign intelligence agency. That episode sparked concerns about how "the globalization of the information technology industry" could increase the risk that "systems and networks critical to DOD could be exploited through the introduction of counterfeit or malicious code and other defects introduced by suppliers of systems or components." S. Rep. No. 111-201, at 162 (2010). Those concerns bear no relation to the Department's dispute with Anthropic—an American company that actively supports the Department's mission and that the Department has never accused of an "attack," *id.*, or anything of the sort.

"[C]onsidered and consistent Executive Branch practice" resolves any doubt. *Kennedy v.*

*Braidwood Mgmt., Inc.*, 606 U.S. 748, 783 (2025). Shortly after Congress enacted the provision that became § 3252, the Department issued instructions defining the relevant risk as "sabotage or subversion" by "foreign intelligence, terrorists, or other hostile elements." Dep't of Def., Instruction No. 5200.44 (Nov. 5, 2012), perma.cc/TW3D-735M. In keeping with that understanding, the Department has never before designated an entity a supply chain risk due to a contract dispute.

### 3.    Defendants' Rationales Are Arbitrary And Capricious

Secretary Hegseth's proffered explanations are also arbitrary and capricious, providing another basis for this Court to hold unlawful and set aside the § 3252 Designation. 5 U.S.C. § 706(2)(A). The March Determination itself is wholly conclusory. AR 209. The only contemporaneous rationales appear in the memorandum from Under Secretary Michael. AR 213-16. But its justifications provide nothing close to the reasoned explanation the APA requires.

The overarching theme of the memorandum is that Anthropic presents a supply chain risk because its "unwillingness to agree" to the Department's preferred contract term amounted to an attempt "to grant itself" a "veto" over Department operations. AR 213. The memorandum asserts that Anthropic's preferred terms create a risk that it will "'deny, disrupt, or otherwise degrade'" covered Department systems by "diminish[ing] functionality and limit[ing] DoW's warfighting capabilities." *Id.* A post-decision Michael declaration reiterates the point, stating that Anthropic's two usage restrictions amount to "an operational veto" that "confirms that Anthropic did want to intervene in and assert control over DoW operations." AR 252; *see* P.I. Hr'g Tr. 41:18-23.

Those assertions are unfounded. Contract terms the Department was free to reject are not intrusions into the "operational decision chain." AR 215. And there is nothing reasoned or reasonable about the contention that, by refusing to abandon two narrow use restrictions, Anthropic demonstrated a propensity to interfere with Department operations. A company's forthright insistence on usage restrictions in contract negotiations (conducted to establish ground rules *before* models are deployed) does not provide evidence that the company would sabotage the Department *after* its models are deployed. A saboteur would not care about the particulars of contract terms. And the notion that the two use restrictions maintained by Anthropic signal a risk

of sabotage is especially irrational because the Department insists that it has no intention of using Anthropic's models for those uses. *See* Dkt. 96 at 14. Whatever deference is due to the Department's national-security judgments cannot provide cover for treating good-faith contractual disagreements as evidence of threatened sabotage or subversion.

In the related D.C. Circuit litigation, Secretary Hegseth emphasized a somewhat different rationale in Michael's memorandum: that Anthropic is a supply chain risk because AI technology is "opaque" and "vulnerable to manipulation," and the Department "cannot trust Anthropic to ensure the integrity of its models." AR 214; *see, e.g.*, Br. for Respondents 26-27, *Anthropic v. Dep't of War*, No. 26-1049 (D.C. Cir. May 6, 2026). But that rationale is no better than the first. The opacity of AI technology is "a common concern with all" large language models, AR 245, and the possibility of vendor manipulation is a risk with "technology more broadly," Op. 32.

That leaves only the "trust" rationale, which similarly fails. Michael rested his assertion that Anthropic "cannot be trusted" on Anthropic's purported conduct during negotiations. AR 214. He viewed Anthropic's negotiating posture as designed "to benefit [Anthropic's] public perception," and objected to Anthropic's engagement with "the press" and to a single question from an Anthropic employee about the Department's use of Claude. AR 213-15. In his view, that conduct created "material doubts as to whether [Anthropic] would cause [its] software to stop working or cause some other disastrous action." AR 213.

Even crediting that characterization of Anthropic's conduct, there is no "rational connection" between the conduct and Michael's conclusion. *Burlington Truck Lines Inc. v. United States*, 371 U.S. 156, 168 (1962). Every company wants to burnish its public image; that does not make it a threat of sabotage or covert attack. *See* AR 214. Nor is it reasonable to infer that Anthropic might undermine future military operations because the company raised a question about a prior operation or criticized the Department in the press. Engaging in public disagreements and frank conversations with the Department is a most unlikely strategy for any entity intent on "sabotag[ing]" or "subvert[ing]" it. 10 U.S.C. § 3252(d)(4). While Defendants might have lost "trust" in Anthropic as a contracting partner, that hardly establishes that Anthropic would secretly and maliciously interfere with the Department's information systems.

Indeed, the proffered administrative record reveals that the Department's explanations for its actions are pretextual. Almost all of the records produced in support of the designation were created *after* Secretary Hegseth ordered the Department to designate Anthropic a supply chain risk on February 27. *See* Op. 36; *supra* p. 13. That timeline "raises an inference" that the record "was generated after the fact to justify" a "foreordained conclusion." Op. 36.

The Department's own contradictory statements further demonstrate that this is a designation in search of a justification. According to the Michael memorandum, "Anthropic's risk level escalated" during its dealings with the Department to the point when, "during the final weeks of negotiations," the company became a "fully mature supply chain risk." AR 215. Yet Defendants also insist that if Anthropic had just accepted the Department's contract term on February 27, "the challenged actions would not have occurred." Dkt. 96 at 23. It is inconceivable that Defendants would allow a company that supposedly presented a "fully mature" threat of "model poisoning, insider threat risk, data exfiltration, and denial of service" (AR 215) to continue providing services merely because it agreed to a contract term. *See also* AR 255B (February 27 Hegseth Directive allowing continued use of Anthropic's services for up to six months). "Altogether, the evidence tells a story that does not match the explanation the Secretary gave for his decision." *Dep't of Com. v. New York*, 588 U.S. 752, 784 (2019).

The "belated justifications" offered by Under Secretary Michael in his declarations filed in this litigation on March 17 and March 24 do not salvage the Secretary's action. *Regents*, 591 U.S. at 23. Agency action cannot be upheld based on "*post hoc* rationalizations." *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981). In any event, the post hoc rationalizations here would not change the analysis. The concern about Anthropic's employment of "foreign nationals" applies to "other major U.S. AI labs," as Michael concedes. AR 245. The fact that "adversarial nation states" have stolen Anthropic's technology (AR 246) makes Anthropic a victim, not an adversary. And when the CDC used a commercial version of Claude to conduct public health research and encountered difficulties as a result of the commercial Usage Policy, it is undisputed that Anthropic promptly assisted the CDC as soon as it learned of the situation. AR 246. Far from suggesting sabotage or adversarial intent, that shows a company responding to government needs

and working collaboratively with federal partners.

### C.   Additional Materials Properly Considered Here Reinforce The APA Violations

As addressed in a concurrently filed motion, in evaluating the APA claim, this Court should consider two additional documents beyond the materials proffered by Defendants. The first—an email from Under Secretary Michael to Anthropic—is part of the "whole record." 5 U.S.C. § 706; *see Thompson v. U.S. Dep't of Lab.*, 885 F.2d 551, 555 (9th Cir. 1989). The second—the June 10 Declaration of Thiyagu Ramasamy ("the Ramasamy Declaration")—may be considered "to identify and plug holes in the administrative record." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). That additional evidence confirms the APA violations.

Under Secretary Michael's correspondence with Anthropic confirms that the asserted concerns about Anthropic presenting a supply chain risk are "contrived." *Dep't of Com.*, 588 U.S. at 784. On March 4—two days after Under Secretary Michael prepared the risk assessment and one day after the Secretary's Determination—Michael sent Anthropic a revised counteroffer. Dkt. 114-1 at 2. He wrote: "I think we are very close here," and "I hope this work[s]." *Id.* If the Department genuinely believed that Anthropic was likely to maliciously disrupt military operations, such continued and enthusiastic negotiations would have been unthinkable.

The additional materials also fatally undermine the Department's contentions that Anthropic demanded an "operational veto," AR 213, and that the company might "alter the behavior" of its models "in the middle of ongoing warfighting operations." AR 215. As the Ramasamy Declaration explains, Anthropic lacks the technical capability to take any such actions. It "has no ability to access, alter, or shut down" a model that has been "deployed in DoW environments." Ramasamy Decl. ¶ 48. It maintains no "back door or remote kill switch" in Claude. *Id.* And "Anthropic personnel cannot log into a Department system to modify or disable the models during an operation." *Id.* Before a new or updated model is deployed, moreover, "Department security reviewers inspect and approve it to ensure it is safe and appropriate." *Id.* ¶ 53. This evidence—all of which Anthropic would have submitted to the Department before the § 3252 designation, if given the opportunity to do so—shows that Anthropic could not exercise an "operational veto" even if it wanted to. AR 213.

III.    **Defendants Violated The Due Process Clause By Blacklisting Anthropic Without Notice Or An Opportunity To Be Heard**

The undisputed facts also establish a violation of Anthropic's due process rights. To begin with, they show that Anthropic has "been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). Defendants previously argued (Dkt. 96 at 30) that the due process claim "fails at this first step." That argument can be rejected here because it relies on no disputed facts, only a mistaken understanding of the law.

The Challenged Actions deprived Anthropic of three protected interests. *First*, the Presidential Directive abridged Anthropic's liberty interest in "follow[ing] [its] chosen profession free from unreasonable governmental interference," *Greene v. McElroy*, 360 U.S. 474, 492 (1959), by "debarring" it "from government contract[ing]." *Trifax Corp. v. Dist. of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003); *see* Op. 25-26. The Presidential Directive ordered federal agencies to "IMMEDIATELY CEASE all use of Anthropic's technology" and "not do business with [it] again." AR 255A. And Defendants' implementation of that ban "automatically exclude[s]" Anthropic from a "category of future [agency] contracts," likewise triggering due process protections. *Kartseva v. Dep't of State*, 37 F.3d 1524, 1528 (D.C. Cir. 1994). *Second*, the Challenged Actions deprived Anthropic of "a cognizable liberty interest," *Fikre v. FBI*, 35 F.4th 762, 776 (9th Cir. 2022), by stigmatizing Anthropic as "a Supply-Chain Risk to National Security," AR 255B, and a company that put "AMERICAN LIVES at risk," AR 255A, while stripping it of federal contracts and any opportunity to compete for contracts in the future. *See Ulrich v. City & Cty. of San Francisco*, 308 F.3d 968, 983 (9th Cir. 2002); Op. 26-27. *Third*, the secondary boycott order prohibited Anthropic from "conduct[ing] any commercial activity" with military contractors, AR 255B, implicating "significant" property interests, *Al Haramain Islamic Found. v. Dep't of Treasury*, 686 F.3d 965, 979-80 (9th Cir. 2012); *see also Ralls Corp. v. CFIUS*, 758 F.3d 296, 315-16 (D.C. Cir. 2014).

And the meager post-deprivation procedures that Defendants offered Anthropic here do not "comport with due process." *Sullivan*, 526 U.S. at 59. "The fundamental requirements of procedural due process are notice and an opportunity to be heard *before* the government may

deprive a person of a protected liberty or property interest." *Conner v. City of Santa Ana*, 897 F.2d 1487, 1492 (9th Cir. 1990) (emphasis added) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). The record here establishes a "complete lack of prior notice or process" as to each of the Challenged Actions. Op. 27; *see also* Heck Decl. ¶¶ 22, 24.

The government told Anthropic that it wanted to alter the parties' contract terms, *see* Heck Decl. ¶ 11, but gave Anthropic no notice or opportunity to object before publicly barring the company from all federal government work and blacklisting it with all military contractors, *see* AR 255A, 255B. The Department also did not provide Anthropic with the factual basis for the supply-chain-risk designation before imposing it. The document containing the purported rationales was not disclosed to Anthropic until after this litigation began, *see* AR 213-16, and that analysis relied on accusations that Anthropic had no prior opportunity to contest, AR 214-15. Nor did Secretary Hegseth's statements during negotiations provide the requisite notice. At the same time he suggested that Anthropic could be designated a supply chain risk, he also suggested that the Department could invoke the Defense Production Act to force Anthropic to provide its technology on the Department's preferred terms. Heck Decl. ¶ 17. Those conflicting positions did not give Anthropic meaningful notice of the basis for the later designation, much less a meaningful opportunity to respond before Defendants acted. *See* Op. 27 (opining that "[t]his contradiction underscores the complete lack of prior notice or process.").

Anthropic also did not receive pre-deprivation notice or process from the agencies that carried out the Presidential Directive. Within hours of that Directive, GSA directed Anthropic's reseller to submit a deletion modification, AR 403, and removed Anthropic from USAi.gov and the Multiple Award Schedule, AR 394-95, 408. HHS disabled enterprise access to Claude that evening. AR 335, 336. The State Department initiated removal of the Anthropic model from its internal generative AI tool by the close of business. AR 321. None of these actions was preceded by notice to Anthropic, an opportunity to respond, or any agency-specific risk finding.

Defendants contend that they provided constitutionally sufficient post-deprivation process. *See* Dkt. 96 at 31. But they did not offer *any* post-deprivation process for the Presidential Directive or Secretary Hegseth's secondary boycott order. And the 30-day reconsideration process

the Department offered on March 4 with respect to the § 3252 designation (*see* AR 238) is constitutionally inadequate. The constitutional baseline is that "[p]re-deprivation notice typically is required absent 'a strong justification' from the government." *Garza v. Woods*, 150 F.4th 1118, 1130 (9th Cir. 2025); *see generally Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). The record here establishes no such justification. *See* Op. 28-29; AR 209-16.

In Defendants' telling, the "national security" setting warranted only post-deprivation process. Dkt. 96 at 31. But "the foreign-policy/national-security nature" of an action does not automatically "support[] the constitutional adequacy of a post-deprivation remedy." *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 207 (D.C. Cir. 2001) (*NCRI*). Indeed, the D.C. Circuit has repeatedly held that due process typically requires advance notice as to the government's intent to designate an entity a foreign terrorist organization. *See id.* at 207-08; *People's Mojahedin Org. of Iran v. Dep't of State*, 613 F.3d 220, 227-28 (D.C. Cir. 2010) (per curiam). Even in the national-security context, therefore, Defendants must "make a showing of particularized need" to dispense with pre-deprivation process. *NCRI*, 251 F.3d at 208. Situations presenting such a need are "'extraordinary'" and "truly unusual." *Fuentes v. Shevin*, 407 U.S. 67, 90 (1972); *see, e.g.*, *Al Haramain*, 686 F.3d at 985 (substantial risk of "asset flight").

Here, Defendants have "present[ed] no evidence of exigency whatsoever," Op. 28, let alone a "particularized need" sufficient to justify depriving Anthropic of process before the Challenged Actions, *NCRI,* 251 F.3d at 208. To be sure, they have vaguely suggested a need for "quick action." Dkt. 96 at 31. But "nothing in the record indicates a heightened supply chain risk to national security systems on February 27 or March 3." Op. 28. To the contrary, the Department had been using Claude subject to the restrictions to which it now objects. Ramasamy Decl. ¶¶ 8, 25-27, 65; Kaplan Decl. ¶ 29. The Department's own conduct refutes any urgency: it allowed Anthropic six months to wind down, AR 242, and it continues to rely on Anthropic's tools for national-security functions to this day, Heck Decl. ¶ 27; Ramasamy Decl. ¶¶ 80-81; *see* Mongan Decl. Exs. 2-3, 6.

The record also "show[s] that meaningful pre-deprivation notice of DoW's concerns and an opportunity to respond to those concerns were necessary to avoid the risk of erroneous

deprivation." Op. 27-28; *see Mathews*, 424 U.S. at 335. The central rationale underlying the § 3252 designation is the assertion that Anthropic would alter or shut down its models to compromise Department operations. Op. 28; *see* AR 213, 215. But the unrebutted evidence now "shows that Anthropic is not technologically capable of taking such unilateral actions." Op. 28; *see supra* pp. 10, 21; Ramasamy Decl. ¶¶ 48-58. Given the opportunity, Anthropic would have corrected the Department's misunderstanding before the Department took action. Instead, the Department's "factual errors [went] uncorrected" because its failure to afford constitutionally required process deprived the Secretary of "easy, ready, and persuasive explanations." *Al Haramain*, 686 F.3d at 982.

## IV.    The Presidential Directive Violates The Separation Of Powers

The Presidential Directive is an immediate, permanent, government-wide debarment of Anthropic, issued by executive fiat. Presidential power must "stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *see also State v. Su*, 121 F.4th 1, 7-13 (9th Cir. 2024). The Directive does not. It invokes no statutory authority and has no constitutional basis. Congress—not the President—sets the rules for exclusion from federal contracting, including which contractors may be excluded, under what circumstances, and through what process. *See, e.g.*, 10 U.S.C. §§ 3203(a)(1), 3204(a); 41 U.S.C. §§ 3303(a)(1), 3304(a); *see also* 48 C.F.R. §§ 9.406-2, 9.407-2. And even the Executive has recognized that exclusion of a contractor is not a tool "for purposes of punishment." 48 C.F.R. § 9.402(b). By defying Congress's chosen scheme for exclusion from federal contracting, the President acted at the "lowest ebb" of presidential authority, and the Directive may stand only if it is supported by an independent constitutional power. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). It is not.

## V.    Implementation Of The Presidential Directive Violated 5 U.S.C. § 558

Finally, the actions taken by defendant agencies to implement the Presidential Directive violated the APA. Agencies may not impose sanctions or issue orders "except within jurisdiction delegated to the agency and as authorized by law." 5 U.S.C. § 558(b); *see Am. Bus Ass'n v. Slater*, 231 F.3d 1, 7 (D.C. Cir. 2000). No statute authorizes federal agencies to abruptly impose blanket

orders and sanctions that terminate all Executive Branch use of Anthropic tools. *See, e.g.*, AR 259-66; AR 319-32; AR 403-10. Those actions violate § 558(b) and must be set aside.

## CONCLUSION

Anthropic's motion for summary judgment should be granted.

Respectfully submitted,

Date: June 10, 2026

*/s/ Michael J. Mongan*

KELLY P. DUNBAR (*pro hac vice*)
kelly.dunbar@wilmerhale.com
JOSHUA A. GELTZER (*pro hac vice*)
joshua.geltzer@wilmerhale.com
KEVIN M. LAMB (*pro hac vice*)
kevin.lamb@wilmerhale.com
SUSAN HENNESSEY (*pro hac vice*)
susan.hennessey@wilmerhale.com
LAUREN MOXLEY BEATTY (SBN 308333)
lauren.beatty@wilmerhale.com
MATTHEW E. MORRIS (*pro hac vice*)
matt.morris@wilmerhale.com
BARDIA VASEGHI (*pro hac vice*)
bardia.vaseghi@wilmerhale.com
DAKOTA C. FOSTER (*pro hac vice*)
dakota.foster@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAEL J. MONGAN (SBN 250374)
michael.mongan@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
Telephone: (628) 235-1000

EMILY BARNET (*pro hac vice*)
emily.barnet@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich St
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Plaintiff Anthropic PBC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of June, 2026, I electronically filed the foregoing document using the CM/ECF System, that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

By:    /s/ *Michael J. Mongan*
Michael J. Mongan