MICHAEL J. MONGAN (SBN 250374)
michael.mongan@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
Telephone: (628) 235-1000

EMILY BARNET (*pro hac vice*)
emily.barnet@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Plaintiff Anthropic PBC*

KELLY P. DUNBAR (*pro hac vice*)
kelly.dunbar@wilmerhale.com
JOSHUA A. GELTZER (*pro hac vice*)
joshua.geltzer@wilmerhale.com
KEVIN M. LAMB (*pro hac vice*)
kevin.lamb@wilmerhale.com
SUSAN HENNESSEY (*pro hac vice*)
susan.hennessey@wilmerhale.com
LAUREN MOXLEY BEATTY (SBN 308333)
lauren.beatty@wilmerhale.com
MATTHEW E. MORRIS (*pro hac vice*)
matt.morris@wilmerhale.com
BARDIA VASEGHI (*pro hac vice*)
bardia.vaseghi@wilmerhale.com
DAKOTA C. FOSTER (*pro hac vice*)
dakota.foster@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHROPIC PBC, <br><br> Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF WAR, et al., <br><br> Defendants. | Case No. 3:26-cv-01996-RFL <br><br> **DECLARATION OF THIYAGU RAMASAMY** |

DECLARATION OF
                                                                      THIYAGU RAMASAMY

I, Thiyagu Ramasamy, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am the Head of Public Sector at Anthropic PBC. I have held that position since January 2025. Before joining Anthropic, I worked for Amazon Web Services ("AWS"), where I was a Principal Lead for Data, Analytics, and Artificial Intelligence/Machine Learning. In that role, I was responsible for, among other things, implementing Anthropic's AI models, Claude, for AWS's public sector customers, including AWS's deployment of Claude in classified government networks. Together, my prior experience and current role give me a detailed understanding of Anthropic's relationship with the U.S. government, the technical capabilities of Anthropic's AI models, how third-party cloud providers deploy Claude to government customers, and how those customers access and integrate Claude in their workflows.

2. I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Anthropic personnel, and could testify thereto.

### Purpose of Declaration

3. I submit this declaration in support of Anthropic's Motion for Summary Judgment. I have previously submitted multiple declarations in this matter and in related proceedings before the United States Court of Appeals for the District of Columbia Circuit. This declaration consolidates and supplements the information set forth in those prior declarations to provide the Court with a consolidated account of the relevant facts.

4. I am aware that the government has asserted that Anthropic poses a supply chain risk to national security, and that government declarants have offered various rationales in support of that designation. While those explanations have evolved over the course of these proceedings, the government's assertions continue to reflect a fundamental misunderstanding of how Anthropic's tools are deployed in classified systems and made available to the government, and they contain multiple factual misstatements.

5. I submit this declaration to explain 1) how Anthropic builds, trains, and deploys Claude and the extent of the company's ability to influence the behavior of models before and after deployment; 2) the Department of War's adoption and use of Claude in classified networks,

including through defense contractor platforms; 3) Anthropic's collaborative working relationship with the Department and U.S. national security agencies; and 4) relevant developments following the Department's supply chain risk designation.

**Anthropic's Positive Relationship with the U.S. Government**

6.      Anthropic is a public benefit corporation whose mission is to ensure that the transition to powerful AI benefits humanity. We view partnering with the U.S. government as an important way to achieve that mission. During my time at Anthropic, we have aggressively pursued opportunities to empower the U.S. government to use our signature large language model (LLM), called Claude. Our government customers include the Department of War and agencies in the Intelligence Community.

7.      Anthropic began working with the U.S. government as early as 2024. In April 2024, Anthropic became the first frontier AI lab to collaborate with the Department of Energy National Laboratories and the National Nuclear Security Administration to evaluate one of Anthropic's models in a Top Secret classified environment to determine how large language models may contribute to or help to address national security risks in the nuclear domain. Anthropic later expanded its partnership with the Department of Energy National Laboratories by deploying Claude to 10,000 scientists at Lawrence Livermore National Laboratory to help bolster research across nuclear deterrence, energy, materials science, and energy security.

8.      In November 2024, Anthropic expanded its relationship with the U.S. government via a partnership with the software company Palantir Technologies. Anthropic and Palantir partnered to provide intelligence and defense capabilities to U.S. intelligence and defense agencies. That partnership has allowed Claude to be used to support government operations, including rapidly processing large datasets; autonomously completing complex software engineering projects related to offensive and defensive cyber operations and vulnerability detection; supporting military operations; performing intelligence analysis and threat assessments; and handling national security workflows and other mission-critical tasks integral to national security.

9. We have only deepened our relationship with the Department and the Intelligence Community since then. In June 2025, we announced a custom set of models built for U.S. national security customers, described further below. In July 2025, alongside other frontier AI labs including Google, OpenAI, and xAI, Anthropic was awarded a two-year, up to $200 million agreement by the Department's Chief Digital and Artificial Intelligence Office ("CDAO"), the primary office within the Department responsible for integrating and optimizing AI capabilities across the Department. As part of that agreement, we expanded our commitment to work with the Department to explore and prototype frontier AI capabilities that advance U.S. national security. In announcing the award of these contracts to Anthropic and the other frontier AI labs, the CDAO emphasized that it was "leveraging commercially available solutions" to "accelerate the use of advanced AI" in service of the Department's mission. Anthropic worked diligently under that agreement, scoping out potential ways that the Department could best be served by Claude and related Anthropic professional services. During this period, the Department conveyed to Anthropic that Claude was the best solution for some of the proposals.

10. We have also partnered with the General Services Administration ("GSA"), the civilian agency responsible for centralized procurement and shared services across the federal government. In August 2025, Anthropic and GSA announced a first-of-its-kind OneGov agreement to deliver Claude Gov to all three branches of the government—civilian executive, legislative, and judiciary—for a nominal fee of $1 per agency. As GSA announced at the time, "This trailblazing partnership directly supports the White House's America's AI Action Plan and positions the United States as the global leader in government AI adoption, ensuring that the federal workforce can tap into the transformative power of AI to modernize operations, improve decision-making, and deliver better results for taxpayers."

11. Throughout, we have maintained our commitment to supporting the national security of the United States and its allies. I have a team of over 30 individuals who manage relationships with our federal government customers, including national security customers. This team includes individuals with security clearances who drew on their past experience training AI models for the Department and Intelligence Community to help lead the development of

Anthropic's Claude Gov models. My team partners closely with dozens of other Anthropic employees across other parts of the company, including Product, Applied AI, Legal, and Policy. And recently, to help the company identify and develop high-impact applications that strengthen U.S. and close allies' capabilities in areas like cybersecurity and intelligence analysis, on August 27, 2025, we introduced the Anthropic National Security and Public Sector Advisory Council, a group of leading bipartisan national security and public policy experts.

12.    As one would expect, our many partnerships with the U.S. government have involved intense security reviews and thorough vetting. Last year, the Department's Defense Counterintelligence and Security Agency granted Anthropic a Top Secret facility security clearance, after an 18-month vetting process, along with several personnel clearances for Anthropic employees and management, to enable continued support for classified national security projects.

13.    In June 2025, GSA and the Department granted Claude authorization through the Federal Risk and Authorization Management Program ("FedRAMP") for use with FedRAMP High and DoD Impact Level 4 and 5 workloads, representing the highest levels of cloud security certification for unclassified and controlled unclassified information.

14.    To my knowledge, at no point in any of those processes did the Department identify any potential supply chain risk posed by Anthropic, its employees, or its products and services.

15.    In fact, to my knowledge, we have only ever received positive feedback about Claude's performance from our governmental customers. For example, a technology leader at a large civilian agency informed us that their agency had used Claude to resolve legacy system issues that had been stuck for years (with one five-year-old bug fixed within days), build internal tools within days rather than waiting through year-long procurement processes, and modernize applications that have not been updated since the 2000s to current technology stacks within hours. The leader of another organization shared that they named Claude their "top model" and planned to grow usage as quickly as possible: "We want to move as fast as possible with you guys." Similarly, senior leaders within a part of the Intelligence Community reported that they were "hammering away" at Claude once they obtained access to their networks.

**Background On Claude**

16.    Like other LLMs, Claude can interpret and respond to diverse user prompts, including analyzing large volumes of text, generating written content, generating and debugging code, and reasoning through complex, multi-step problems. It can also be configured to act "agentically" by taking actions on a user's behalf—from simple tasks like sending emails to complex workflows executed with limited ongoing user direction.

17.    LLMs like Claude are dual-use technology: the same capabilities that drive medical breakthroughs, accelerate scientific research, and enhance human creativity can also be misused by malicious actors, making it difficult to restrict harmful applications without undermining beneficial ones. LLMs can also produce outputs that diverge from their users' intentions or reflect errors embedded in training data.

18.    To address these risks, Anthropic has implemented a multilayered safety framework operating at three levels: the model layer, the safeguards layer, and the policy layer (with the last effectuated partly through contract terms). The sections below explain how each layer functions in commercial deployments and how each is adapted for national security deployments, where many commercial-use safety mechanisms may not be appropriate. Understanding this framework is essential to understanding when and how Anthropic can influence how the model operates.

**Model Layer**

19.    At the model layer, Anthropic embeds safety directly through training. Training an LLM requires processing large amounts of data to develop a mathematical representation of language. The product of that training process is a set of model weights, which are the numerical parameters that shape how the model responds to inputs by determining how strongly different inputs influence a model's outputs. In other words, the model weights encode Claude's learned behaviors and capabilities and govern how Claude responds to any given input.

20.    One key training technique is what we call "Constitutional AI," which trains the model to evaluate and revise its outputs against a set of normative principles, such as balancing being helpful against avoiding harm. We publish "Claude's Constitution" to be transparent about those principles and how Claude has been trained to behave. We also use techniques like

reinforcement learning from human feedback, in which human reviewers rank model outputs to train the model toward responses that better align with human judgment. Through these techniques, Anthropic also embeds guardrails into the model weights, which are specific behavioral constraints that Claude is trained to follow regardless of how it is subsequently deployed or configured. For example, Claude is trained to refuse to generate child exploitation material under any circumstances.

21.    Anthropic has adapted its model-layer training to account for the specific needs of national security users. As described in detail below, Anthropic engaged directly with government stakeholders to understand operational needs and develop a version of Claude specifically tailored for national security use. That model, Claude Gov, retains the same baseline alignment and safety testing as commercial models, but is trained to specifically perform in classified environments where users can be trusted with prompting the model in ways that, ordinarily, the model would refuse to be responsive to.

22.    Model training is the primary mechanism through which Anthropic can influence the behavior of models used by the Department because it is the only technical safety layer that operates before deployment. Once a model is delivered to a third-party cloud provider and deployed inside a government-secure enclave, Anthropic has no ability to access it, alter it, or shut it down. Any subsequent change to the model's behavior requires preparing and delivering an entirely new version of the model, a process that requires the Department's approval and is described in detail below. Anthropic does not engage in ongoing administration of models operationally deployed by the Department.

### Safeguards Layer

23.    For commercial deployments, Anthropic applies a safeguards layer on top of the model at runtime. This consists of technical controls, including classifiers and probes that detect harmful activity in real time, targeted interventions to reduce harmful outputs, and monitoring systems to identify misuse at scale. Generally speaking, classifiers engage in monitoring functions or intervening functions. A monitoring classifier looks at prompts to assign and record a risk score but does not impact system behavior. An intervening classifier operates like an automated filter

that reads Claude's output before it reaches the user—if the output appears to provide instructions for synthesizing a dangerous substance, for example, the classifier triggers an intervention that blocks or rewrites the unsafe response before it is delivered.

24.     While the safeguards layer is very important in Anthropic's commercial deployments, it is far less relevant when it comes to the Department. From a technical standpoint, because Anthropic does not have any ongoing access to models deployed in the Department's classified environments, it cannot operate or access any classifiers, probes, or other runtime monitoring systems. The Department's cloud provider does deploy a monitoring classifier that records risk scores for prompts (though not the text of the prompt itself), but it does not impact the behavior of the model. Anthropic does not control the monitoring classifier in such operational deployments and cannot access any risk score information. Furthermore, there are no intervening classifiers in use in Department deployments.

**Policy Layer**

25.     The policy layer consists of Anthropic's Usage Policy, which governs how Claude may be used. Claude is available to any user only under Terms of Service that incorporate the Usage Policy. The policy defines the scope of permissible use and steers users away from applications for which Claude has not been developed or is not ready. By establishing reasonable limitations on the appropriate uses for our products and services, the Usage Policy effectively defines Anthropic's commercial offerings. For commercial users, the Usage Policy generally prohibits uses that pose unacceptable risks, including using Claude to conduct surveillance, to compromise computer systems, or to design weapons or other systems intended to cause harm or loss of human life. The Usage Policy is critical because technical safeguards alone cannot prevent all dangerous uses of such a powerful, novel technology.

26.     The contractual usage restrictions at the policy layer are both substantively and technically different for Department deployments. Substantively, Anthropic has adapted its Usage Policy over time, in consultation with government partners, specifically to support national security uses. When Claude was first deployed for national security use in early 2024, the applicable Usage Policy was identical to the commercial policy. In June 2024, Anthropic issued its

first government-specific addendum to allow analysis of foreign intelligence; a subsequent January 2026 addendum further expanded permissible government uses to include offensive cyber operations and certain intelligence collection. Technologically, Anthropic does not have the ability to enforce the Usage Policy in Department operational deployments or direct visibility into how the model is being used. However, these usage restrictions are nevertheless critical to articulate the boundaries of safe usage.

27. In summary, as a practical matter, Anthropic can influence the operation of its models with respect to the Department's uses only through model training prior to operational deployment. And it can negotiate contract-based but technically unenforceable limitations on use. In both contexts, Anthropic has sought to be exceptionally transparent. It has presented its usage limitations directly to the Department and has worked collaboratively with the government in adjusting model-layer safeguards for national security purposes. Below I describe model training for national security purposes and the Department's rigorous testing, evaluation, and approval process to assess the security, capability, and behavior of models prior to operational deployment.

**The Government's Adoption of Anthropic's Models in Classified Environments**

28. To understand the ways in which Anthropic has used model training to shape the operation of its models in Department deployments, it is useful to step back to explain the evolution of the Department's operational deployments of Anthropic tools.

29. Anthropic began working with the federal government as early as 2024. Beginning in early 2024, Anthropic worked with a third-party cloud provider to support deployment of Anthropic's commercial AI models in classified cloud environments. By May 2024, Claude Sonnet was available on a third-party provider's Top Secret cloud and was being used by Intelligence Community ("IC") and Department customers. As government users adopted the commercial version of Claude in classified settings, Anthropic received feedback that its commercial models, appropriately trained to decline discussion of classified materials with the general public, sometimes applied those same protections to IC and Department users in secure environments. In response, in order to better assist the national security components of the U.S. government in using Claude to fulfill their mission, Anthropic engaged directly with government

stakeholders, including through classified discussions led by Anthropic engineers holding security clearances, to understand operational needs and identify appropriate technical solutions.

30. In December 2024, the updated commercial version of Claude (Sonnet 3.5) was launched in classified cloud environments. To be clear, in these arrangements, once Anthropic gives its models to the third-party cloud provider, Anthropic has no access to, or control over, the model as deployed or used by government customers.

31. In early 2025, Anthropic—on its own initiative and at its own expense—assigned cleared personnel to develop Claude Gov, a version of Claude specifically tailored for national security use and designed to operate in a high-trust classified environment. As discussed above, Claude Gov retains the same baseline alignment and safety testing as commercial models but is trained to understand what entity is making use of it and what legal framework governs that work. Specifically, Claude Gov is instructed to assume that it is working with a cleared U.S. military or intelligence officer acting under lawful authority. Claude Gov was developed based on extensive collaboration with government partners regarding applicable policies and operational use cases. It is trained to perform tasks appropriate to the national security context while remaining within the rules governing intelligence and military activities.

32. Claude Gov is a distinct version of the Claude model, specifically trained to operate appropriately in a national security context. Claude Gov does not include any additional "wrapper" layer that could provide Anthropic with access to, or control over, the model's operation or that inserts any additional safeguards or restrictions.

33. Claude Gov was made available to IC and Department customers through classified cloud environments in March 2025. Government users reported that it performed significantly better for classified uses than the commercial version, including now completing tasks that were appropriate to the national security mission—such as reviewing classified documents or supporting military planning—which it had previously refused. Adoption of Claude Gov increased rapidly across the Department and the IC. Government customers expressed strong appreciation for Anthropic's proactive approach to national-security partnerships.

34. In June 2025 and again in November 2025, Anthropic deployed new, improved versions of the Claude Gov models. Before each deployment, Department customers conducted extensive testing to confirm that the new model performed as expected before the prior version was retired and replaced, as described further below. Anthropic closely collaborated with its government and third-party partners to ensure a seamless transition throughout this process.

35. Within weeks of the November 2025 release, nearly all IC and Department customers had adopted the updated version of Claude Gov. Government users praised this model as a major technical advance, citing significant improvements in reasoning, agentic tool use, and coding. These improvements enabled customers to fully leverage air-gapped deployment of Claude Code, Anthropic's agentic coding tool, which is now widely used across the IC and Department.

## The Department Tests and Approves All Models Prior to Deployment

36. Anthropic's role in deploying models on Department systems is limited to providing the model. The Department and its cloud provider conduct a rigorous, multilayered evaluation and approval process, entirely within their own systems and under their own control.

37. Before any model can be deployed in a classified environment, the third-party cloud provider that operates the relevant government region must submit a Significant Change Request ("SCR") to the relevant government region sponsor. The SCR process is a formal approval mechanism by which the cloud provider certifies that a proposed system change—including the introduction of a new model version—meets applicable security and operational requirements.

38. SCRs are classified according to complexity levels. A low-complexity SCR involves straightforward, well-understood changes with minimal risk and typically requires the fewest approvals and shortest review period. A medium-complexity SCR involves changes with a moderate degree of technical risk or interdependency and requires additional review. A high-complexity SCR involves significant system changes with broad potential impact and requires the most comprehensive review and approval process.

39. The transition of a new model from the unclassified environment (the "low side") to the classified environment (the "high side") is controlled entirely by the cloud provider.

Anthropic's involvement ends at the low side. Anthropic provides the model to the cloud provider; thereafter, the cloud provider takes responsibility for validating, transferring, and deploying the model in the government's secure environment. Anthropic personnel are not present during or after that transition and have no access to or visibility into the high-side system.

40.    Once a new model version is available in the high-side environment, the cloud provider conducts its own security testing before the model may be made available to the Department. That security testing is separate from and in addition to Anthropic's own internal evaluations conducted prior to releasing the model to the cloud provider.

41.    The Department also conducts its own independent evaluation of each model at the program level before approving it for operational use. That evaluation is conducted by Department personnel and is not performed or supervised by Anthropic. The Department's evaluation includes formal testing to assess model performance for the specific operational requirements of the relevant program. Such evaluation includes refusal testing—assessing whether the model correctly responds to tasks appropriate to the program's operational mission—and human-to-model comparisons, in which analysts evaluate model outputs against outputs produced by human analysts for the same prompts, providing a direct measure of model performance relative to established baselines.

42.    This evaluation process equips the Department to identify and address any concern it may have about potential limitations in a model's performance. The Department has the ability to directly test any aspect of the model's behavior. For example, if the Department were concerned that the model was trained in a way that caused it to refuse tasks the Department deemed appropriate to its lawful mission, or to override the Department's judgment that an activity is permissible, the Department could directly test the model on those specific tasks. Anthropic actively recommends that the Department conduct evaluations and testing before deploying systems in operational environments—particularly for highly consequential use cases—and makes its cleared engineers available to support that testing as needed.

43.    If a model failed to perform as intended, the Department could assess whether the issue could be resolved—for instance, by refining the prompts provided to the model to enable it

to correctly recognize a request as authorized. If the concern could not be resolved, the Department could decline to approve the model, either for the particular activity in question or for Department-wide use. It could also provide feedback to Anthropic and request that Anthropic address the issue in training future models—which Anthropic has done on multiple occasions.

44.     The evaluation process has matured over the course of successive model deployments. Through its experience with earlier models, the Department has developed a baseline understanding of how each model performs particular tasks and maintains records of example prompts alongside the corresponding outputs produced by both human analysts and the model. Using this baseline, the Department evaluates outputs from new models, identifies instances where the model falls short of expected performance, and determines whether corrections are required. Where corrections are necessary, the Department implements them through prompt refinement—adjusting the instructions provided to the model—and related controls. Once the Department determines that a model is safe, effective, and performs as expected for the specific operational requirements of an individual program, the model is approved for use and the prior model may be retired.

45.     Each Department component conducts its own testing and is not required to retire the prior version until it is satisfied that the new version meets or exceeds the prior version's performance for its specific mission requirements. For example, some components continued to use Claude Gov Sonnet 3.5 after Claude Gov Sonnet 3.7 was released because they preferred its functionality for their particular needs. By contrast, Claude Gov Sonnet 4.5 (released in November 2025) represented a significant enough advance that nearly every Department component adopted it within weeks of release.

46.     Models are evaluated by testing their behavior in response to inputs. That is how the Department evaluates Anthropic's models, how the industry evaluates models generally, and how Anthropic evaluates Claude. The numerosity of model weights is irrelevant to evaluation and I am not aware of any form of AI model evaluation by the Department or commercial industry that tests a model by examining individual model weights. Doing so would be analogous to testing software

by examining every individual character of source code—of which there are also many millions. Instead, models are evaluated for their performance and behavior under a range of conditions.

47. The Department undertakes comprehensive testing of model behavior before authorizing deployments. While no testing regime could test every possible input or validate every possible execution path, this is not a limitation specific to Anthropic's models and is inherent to any AI model the Department might deploy, regardless of provider. The same is true of conventional software more broadly—including mission-critical software.

## Anthropic Cannot Access or Alter Deployed Models

48. As explained above, once a model is deployed in DoW environments, Anthropic has no ability to access, alter, or shut down the deployed model. Anthropic maintains no back door or remote kill switch, and Anthropic personnel cannot log into a Department system to modify or disable the models during an operation. Anthropic does not have ongoing connectivity to, or control over, model instances running in the Department's secure networks. Only the government and its authorized cloud provider have access to the deployed system. If the government requires the assistance of any Anthropic employee with respect to the deployed model, it would need to request and facilitate that individual's access to the Department's systems directly.

49. A deployed model is static. The model weights and guardrails remain fixed unless and until a newer version is deployed to replace it. A model does not degrade or change on its own, and model weights are not automatically modified or updated based on the Department's usage. The concern that AI models may "drift" or degrade over time—leaving the Department reliant on Anthropic to ensure continued accuracy and fairness—reflects a fundamental misunderstanding of how AI models operate. Once a model is trained and deployed, its parameters remain fixed. Anthropic cannot push undisclosed or unsanctioned changes to a model after the Department has deployed it.

50. The undated "Memorandum for the Record" documenting Under Secretary Michael's analysis of the purported "Urgent Supply Chain Risk" and the March 17, 2026 declaration of Under Secretary of War Emil Michael cite the "relatively opaque nature of large language model technology" as a baseline risk requiring heightened trust in Anthropic. It is true

that large language models ("LLMs") are probabilistic, not deterministic, as Anthropic's Chief Science Officer has explained, and there is some legitimacy to DoW's concern about the opacity of these systems generally. But that characteristic applies to all LLMs. Compared to other AI labs, Anthropic is uniquely transparent. We maintain a publicly available set of normative principles—"Claude's Constitution" —a human-readable document that explains the values and rules our AI is trained to follow. Anthropic is also at the forefront of interpretability research aimed at making the behavior of models like Claude easier to understand. If anything, Anthropic presents a lower baseline risk than other AI labs, not a higher one.

51.    Because Anthropic has no access to Department systems, Anthropic also cannot exfiltrate Department data or conduct surveillance of Department activities. Anthropic does not have access to the Department's Claude prompts; because Anthropic lacks any access to this customer data, there is nothing that could be exfiltrated or inspected. Any suggestion that Anthropic could engage in "data exfiltration" of Department information is unfounded.

52.    The government has suggested that Anthropic could alter its models after deployment, without the Department's knowledge or consent, by modifying model guardrails or model weights—and that Anthropic is capable of making "ongoing operational alterations" to an existing model that could turn "refusals or guardrails on or off." That is incorrect. Once a model is running inside a government-secure enclave, Anthropic has no ability to unilaterally alter the guardrails or the model weights. Any such change would require Anthropic to produce an entirely new version of the model, which the Department must approve and take affirmative steps to install. The Department retains complete discretion to decline to install any new model, for any reason or for no reason at all.

53.    For this reason, the term "update" is a misnomer in this context. Unlike conventional software, a model cannot be updated in place through patches or other changes pushed to a running system. The only way to alter a deployed model's behavior is to replace it with an entirely new model version. This process is analogous to ordering a cake at a restaurant: once the cake is served, the diner cannot adjust the recipe at the table, and the chef cannot reach into the dining room—secretly or otherwise—to change it either. Even if the cake is missing only a teaspoon of

baking soda, it must be made again from scratch with the correct ingredients baked in. Anthropic is the chef. If changes to model behavior are desired, whether small or large, Anthropic can prepare a new version of the model with those changes built in. But that new version is not automatically substituted. Before deployment, the third-party cloud provider and Department security reviewers inspect and approve it to ensure it is safe and appropriate. Only after that approval, and only after the customer confirms the new version performs as expected, can it retire the prior model.

54. In some instances when a model produces unwanted refusals, the Department can resolve the issue through prompt engineering—that is, by adjusting how a request is phrased so that the model responds more effectively. This is akin to trying a different phrase in a search engine when the initial phrase fails to yield the desired results. It is something all AI users do when a model does not respond to a prompt as desired, and it does not constitute altering the model itself or turning off refusals or guardrails. When basic prompt adjustments are insufficient to resolve an issue, the only option is to train and deploy an entirely new model—which is not a simple "tweak."

55. Every model version is therefore, in fact, a brand-new deployment subject to the same testing and approval processes described above. A new model version cannot be deployed without the approval of the third-party cloud provider and Department security reviewers, and the prior version is not retired until the customer confirms the new version performs as expected. Department components are free to continue using the prior version indefinitely. Neither the Department nor any Department program is compelled to adopt a new model if it is not fully satisfied with the evaluation and testing process, and the existing model will continue to perform without degradation.

56. I understand that the government has alleged that AWS provided approximately twelve cleared Anthropic engineers with administrative access to Department systems, allowing them to affect the functioning of the model by pushing updates or changing its functionality, including the ability to remove the model from the system or shut it down altogether. These

statements are incorrect. AWS has not provided Anthropic or any of its employees with administrative access to the model or with any access to the Department's operational systems.

57.    Anthropic does employ certain personnel who hold security clearances. Those clearances exist solely to allow these individuals to participate in classified discussions with the Department and others regarding model functionality, to receive feedback, and to provide training to assist the Department in using the model effectively. These individuals do not have access to operational systems. Cleared Anthropic personnel would have access to the Department's operational systems only if the Department itself specifically requested and facilitated such access, and only for the limited purpose of performing functions at the Department's direction.

58.    In connection with its work supporting government customers, Anthropic has undergone rigorous security vetting and compliance processes. Anthropic holds a DCSA Top Secret facility security clearance, the result of a comprehensive vetting process that took approximately eighteen months to complete. As noted above, in June 2025, Anthropic received FedRAMP High authorization and was certified at DoD Impact Level 4 and Impact Level 5—the highest classification tiers for commercial cloud services used by the Department of Defense. At no point in any of these review and certification processes did any government entity identify Anthropic as a potential supply chain risk or raise any concern about Anthropic's security posture.

**The Use of Claude by Government Contractors**

59.    The processes and technical limitations described above apply equally when defense contractors use Claude Gov in performing Department contracts. Once Claude Gov is deployed in a classified cloud environment, it can be accessed via an application programming interface ("API"), which allows the model to be used for various purposes by cleared defense contractors. Defense contractors may use Claude Gov directly as a chatbot, use it to process their own dataflows, or integrate it into systems and platforms they develop for the military and intelligence community.

60.    For example, a major defense contractor might embed Claude Gov in an intelligence fusion system used by the military that ingests satellite images and signals intercepts from a large number of sources and integrates them into a unified operational picture. Claude Gov would serve

as the analytical layer within such a system. Rather than manually reviewing reports and cross-referencing sources, a military user would be able to query Claude Gov in plain English to request summaries, ask targeted questions, or identify threats. Claude Gov could synthesize incoming data, generate written assessments, and deliver structured, actionable intelligence within seconds.

61.    Claude Gov is still hosted by third-party cloud providers in these kinds of deployments, and Anthropic would not have ongoing access to the model. Anthropic could not alter the model, change its behavior, or monitor its use. All models—whether accessed directly by Department users or embedded in contractor systems—are subject to the same rigorous testing and evaluation process described above and must be confirmed to perform as expected before being authorized for use.

62.    Defense contractors might also use Claude Gov to perform work on Department contracts in classified environments without embedding or integrating Claude Gov into any operational system. For example, a defense contractor might use Claude Gov to write a line of computer code for military software or edit a report being drafted as part of a Department contract. In such cases, the outputs generated by Claude Gov are entirely separate from the model itself and exist as ordinary, static data. Once Claude Gov produces an output—such as a line of code or a document—that output has no connection to the model weights, no link back to Anthropic's systems, and no mechanism by which the model or Anthropic could later access or modify the data.

### The Government's Other Alleged Concerns Are Misplaced

63.    I understand that the government has referenced Anthropic deployment issues at the Center for Disease Control and Prevention ("CDC") as supporting its designation. As I stated in previous declarations, to the extent this incident relates to CDC work of which I am aware, that characterization reflects a misunderstanding. My understanding is that the issue arose from the CDC's use of a general commercial model whose standard safeguards—appropriately designed for public users—limited certain interactions related to biomedical research to mitigate public safety risks. Once Anthropic became aware of the issue, we worked promptly with our third-party partners and the government to enable use of the model in a manner appropriate to the CDC's

mission and expertise. As noted above, safeguards suitable for commercial deployments may not be appropriate for government uses, and some government deployments require customization or parameter adjustments. That collaborative, iterative process—balancing safety in commercial settings with valid government uses—is a core tenet of Anthropic's AI safety approach. That is precisely how we addressed the CDC issue once identified, supporting important CDC research while preventing individual users from engineering dangerous biological weapons.

64.    The government's declarations also suggest that Anthropic's employment of foreign nationals increases "adversarial risk." Anthropic, like many cutting-edge AI companies, employs a globally diverse team of highly skilled researchers and engineers. Anthropic has undergone extensive U.S. Government security vetting in connection with its classified work and takes seriously its obligation to comply with all security and technical requirements for safeguarding sensitive government information. As stated above, to my knowledge, Anthropic is the only AI company where cleared personnel have led the development of AI models tailored to be deployed in classified environments.

## The Department's Supply Chain Risk Designation

65.    The government's supply chain risk designation arose in the context of a broader dispute over usage terms. Beginning in September 2025, as Anthropic was negotiating its deployment on the Department's genAI.mil platform, the Department began demanding that Anthropic modify its usage policy as a condition of participation. As I have described above, Anthropic's usage policies do not give Anthropic operational control over government users— they reflect Anthropic's own principles regarding appropriate use and cannot be enforced against the Department once the model is deployed on Department systems. And of course, if Anthropic's Usage Policy restrictions do not meet the Department's needs, the Department is able to use any other AI system that better meets its requirements. Nonetheless, Anthropic indicated it was prepared to modify its usage policy to accommodate the Department's concerns, and was willing to remove essentially all usage restrictions for Department purposes. Anthropic retained only two narrow carve-outs: restrictions on the use of Claude to develop lethal autonomous weapons systems and to enable the mass domestic surveillance of United States persons. The Department

rejected Anthropic's proposed modifications and insisted on language permitting "all lawful uses." I understand that the Department has been or is exerting similar pressure on other leading AI labs to agree to similar demands, as reflected in a memorandum Secretary Hegseth issued on January 9, 2026. I further understand that many of these labs have agreed to the Department's preferred usage terms.

66.    Prior to the supply chain risk designation, neither the Department nor any other government customer had ever identified Anthropic as a supply chain risk, raised supply chain concerns in any security review or procurement process, or expressed any concern about Anthropic's security posture. To the contrary, Anthropic's government customers—including those in the Intelligence Community—had consistently expressed strong appreciation for Claude Gov's capabilities, praised Anthropic as a trusted national security partner, and enthusiastically adopted new model versions. The supply chain risk designation was issued only after the usage term negotiations reached an impasse, and the record does not reflect any identified supply chain concern that preceded or independently motivated the designation.

67.    In addition, neither I nor anyone else at Anthropic had seen Under Secretary Michael's memorandum or declaration until the Department of Justice publicly filed them in this matter. Those materials reflect a fundamental misunderstanding of how Anthropic's tools are deployed in classified systems and otherwise made available to the government, and they contain multiple factual misstatements. Had the DoW disclosed its rationales before designating Anthropic a supply chain risk, I and other Anthropic subject-matter experts could have corrected these errors.

68.    On February 27, 2026, the government took a series of formal actions that effectively severed Anthropic's relationship with the Department. A post attributed to President Trump on Truth Social directed all government agencies to cease use of Anthropic's products. That same day, Secretary Hegseth issued a formal supply chain risk designation identifying Anthropic as a supply chain risk to national security. The accompanying directive stated that, effective immediately, no contractor, subcontractor, or other commercial entity performing work for or on behalf of the Department may conduct any commercial activity with Anthropic, subject to a six-month period for winding down existing contractual obligations.

**The Department's Designation Has Affected Anthropic's**

**Contracts, Reputation, And Mission**

69.     The Department's Chief Digital and Artificial Intelligence Office ("CDAO") awarded Anthropic in July 2025, alongside Google, OpenAI, and xAI, a two-year, up to $200 million agreement. The award expressly emphasized the Department's interest in leveraging commercially available solutions, and Anthropic worked diligently over the following months to assess and identify ways its services could best support the Department's mission. The Department communicated that it was interested in moving forward with Anthropic's recommendations, and conveyed that Claude was the best available option for certain of its proposed use cases. The arrangement was cancelled after only a few months as a result of the usage term negotiations. Absent those negotiations and the resulting supply chain risk designation, it is almost certain that Anthropic would have continued to develop its relationship with CDAO and received a substantial portion of the full award.

70.     As a result of the usage term negotiations and supply chain designation, Anthropic also lost the opportunity to be deployed on genAI.mil, the Department's secure, official generative AI platform to provide its personnel with access to cutting-edge AI models. Anthropic began negotiations with the Department for this deployment in September 2025. As a result of the usage term negotiations and subsequent supply chain risk designation, Anthropic was no longer in consideration to be deployed on the Department's genAI.mil platform. Two other AI vendors have instead deployed their AI models on the Department's platform—one in December 2025 and another in February 2026.

71.     In August 2025, Anthropic entered into a first-of-its-kind, government-wide contract with the General Services Administration under the GSA's OneGov program. That contract made Claude available to agencies across all three branches of the federal government for a nominal fee of $1 per agency, as part of the White House's America's AI Action Plan initiative to expand access to commercial AI capabilities across the government. Anthropic expected the OneGov contract to generate approximately $100 million in annual recurring revenue in 2026. Following the February 27 government actions, Anthropic was removed from the government's USAi.gov

portal and from the Multiple Award Schedule through which the OneGov contract was offered. This decision cut off sales opportunities for many federal agencies, including the U.S. Departments of Veterans Affairs, Health and Human Services ("HHS"), State, Labor, and Interior, in addition to the federal judiciary and many state and local governments that procure through the Multiple Award Schedules. The expected revenue from the OneGov agreement is now entirely at risk.

72.    Other agencies also took action in response to the February 27 government actions. On Monday, March 2, 2026, the U.S. Department of the Treasury and the Federal Housing Finance Agency (which oversees Fannie Mae and Freddie Mac) announced they were terminating all use of Claude. A technology leader at a federal civilian agency has also informed me that the DoW advised his agency, and is advising all other civilian agencies, to stop using Claude. We also understand that other agencies, including the Department of State and HHS, have issued internal statements saying they will follow the President's directive. The AI leadership of one portion of the Intelligence Community informed us that they were preparing for "complete detachment" from Claude based on the "directive" they had received. The Lawrence Livermore National Laboratory, a nuclear weapons research and development center funded by the Department of Energy, also informed Anthropic that it was shutting down Claude. Many of these customers—and others, particularly in the Intelligence Community—have continued to express how much they value their partnership with Anthropic and how harmful losing access to our models will be (setting back their work months or even years). They have also expressed, however, feeling like they have little choice in the matter.

73.    As of March 24, 2026, the following agencies, or sub-agencies thereof, had contracts with Anthropic or used Anthropic's technology through a third-party provider, but indicated they would be terminating the contracts or terminating uses of Anthropic's technology after February 27, 2026:

      a)  U.S. Department of War

      b)  U.S. Department of State

      c)  U.S. Department of Health & Human Services

      d)  U.S. Office of Personnel Management[1]

      e)  U.S. Nuclear Regulatory Commission[2]

      f)  U.S. Department of Treasury

74.  As of March 2026, the following agencies, or sub-agencies thereof, had contracts to use Anthropic's technology or used Anthropic's technology through a third-party provider:

      a)  U.S. Department of Commerce[3]

      b)  U.S. Social Security Administration

      c)  U.S. Department of Homeland Security

      d)  Securities and Exchange Commission

      e)  National Aeronautics and Space Administration

      f)  U.S. Department of Energy

      g)  Federal Reserve Board of Governors

      h)  National Endowment for the Arts

      i)  Federal Housing Finance Agency

      j)  U.S. Department of Veterans Affairs

75.  The supply chain risk designation has also frustrated Anthropic's contracts with prime contractors that perform services for the Department. For example, Anthropic has maintained a multi-year relationship with a defense technology provider that permits Anthropic to offer Claude to the Department for classified purposes. Anthropic also works closely with a cloud service provider that offers Claude to government agencies, including the Department. Both partners have indicated that, pursuant to Department leadership directives, they need to discontinue using Anthropic as a subcontractor on Department contracts and have begun doing so.

---

[1] I understand that the Office of Personnel Management sent a message requesting its personnel not to use Claude following the President's social media post.

[2] Anthropic was informed that the Nuclear Regulatory Commission was no longer deploying Claude, citing the President's social media post.

[3] Within the U.S. Department of Commerce, the International Trade Administration has indicated that it was terminating use of Anthropic's technology, whereas the U.S. Patent and Trademark Office and National Telecommunications and Information Administration had contracts with Anthropic or used Anthropic's technology as of March 2026 but have not announced termination actions.

Anthropic has invested significant time and resources in building relationships with these national security stakeholders and the supply chain risk designation demands that those relationships be severed.

76. The supply chain risk designation has caused both significant financial harm and concrete, ongoing damage to Anthropic's reputation and customer relationships that will be difficult to undo. In terms of financial impact, Anthropic had experienced approximately a fourfold increase in annual recurring revenue ("ARR") from December 2025 to January 2026, and had projected several hundred million dollars in public sector ARR for 2026—a projection that had been revised upward before the designation. The Department's designation and related government actions place an estimated $150 million or more in immediate Department ARR at risk, including approximately $50 million attributable to the CDAO contract alone, and expose Anthropic to over $500 million in total 2026 ARR losses when accounting for the GSA OneGov contract, state and local government customers, and other government-adjacent relationships that have been disrupted. Beyond the direct financial consequences, Anthropic depends on an interconnected network of relationships—with government agencies, prime contractors, commercial partners, cloud providers, and investors—and its reputation underpins each of them. The Department of War's public designation of Anthropic as a supply chain risk signals to enterprise customers and counterparties that Anthropic is a company to be avoided, a harm that becomes increasingly difficult to unwind the longer the designation remains in effect.

77. Anthropic is a company that has invested deeply in its relationship with the federal government, and with the IC and the Department in particular. Supporting the national security of the United States and allied democracies has been a deliberate choice—one we have made because it is central to our mission of developing AI for the benefit of humanity. While we are proud of our commitment to our founding values under these difficult circumstances, and are gratified by indications of some public support, we certainly do not welcome this dispute, which we long sought to avoid, including through good-faith negotiations with the Department. While we respect that decisions about the use of AI in military applications belong to the Department, we are harmed by the lost opportunity to continue to support the national security mission directly, and

we believe the country and its national security are harmed as well. Notably, we developed these tools specifically for use by the national security components of the federal government at our own initiative and at significant expense. Being branded a threat to the national security of our own country therefore inflicts more than financial harm.

**Anthropic's Ongoing Government Engagement**

78.    Despite the supply chain risk designation, Anthropic has continued to work collaboratively with the U.S. government to promote national security interests, including by supporting the Department's use of Claude during the six-month transition period.

79.    On March 26, 2026, the Northern District of California issued a preliminary injunction preventing the government from implementing elements of its supply chain risk designation, but did not require the government to continue using any Anthropic products. Following the injunction, although the designation continues to create uncertainty and hesitancy to build long-term partnerships, we have worked with government customers seeking to resume use of Claude to support their restore access as requested.

80.    We have also worked closely with the U.S. government in connection with the release of Anthropic's new Mythos model. On April 7, 2026, Anthropic publicly announced Project Glasswing, an initiative to deploy Mythos for defensive cybersecurity work in partnership with over fifty major technology companies and critical infrastructure operators. The initiative is designed to apply Mythos's capabilities to defensive purposes before similar capabilities can be adopted by adversaries. Before making Mythos externally available, Anthropic briefed senior officials across multiple government agencies on the model's capabilities, including its ability to identify and help remediate critical vulnerabilities in widely used software systems. Through Project Glasswing, Anthropic extended access to Mythos to select government partners and committed substantial resources, at no cost to national security customers, to efforts to secure critical software infrastructure.

81.    On April 17, Anthropic CEO Dario Amodei met with senior White House officials, including the Chief of Staff and the Treasury Secretary, to discuss the responsible use of Mythos. I understand that the White House described those discussions as "productive and constructive" and

stated that the parties "discussed opportunities for collaboration, as well as shared approaches and protocols to address the challenges associated with scaling this technology." Since then, Anthropic has remained in frequent communication with representatives of multiple agencies and departments regarding how best to use Mythos to advance U.S. objectives. My team has, over the past several months, worked diligently to support government national security requests and to make clear that we stand ready to assist the government in advancing U.S. national security, as we have always done.

82.    These engagements reflect Anthropic's continued commitment to partnering with the U.S. government to strengthen the nation's cyber defenses and support national security objectives—even as the supply chain risk designation remains in place.

*      *      *

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

Executed on June 10, 2026.

/s/ Thiyagu Ramasamy
Thiyagu Ramasamy
Head of Public Sector, Anthropic

**<u>ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)</u>**

Pursuant to Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from the other signatories.

By:    */s/ Michael J. Mongan*
Michael J. Mongan