MICHAEL J. MONGAN (SBN 250374)
michael.mongan@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
Telephone: (628) 235-1000

EMILY BARNET (*pro hac vice*)
emily.barnet@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Plaintiff Anthropic PBC*

KELLY P. DUNBAR (*pro hac vice*)
kelly.dunbar@wilmerhale.com
JOSHUA A. GELTZER (*pro hac vice*)
joshua.geltzer@wilmerhale.com
KEVIN M. LAMB (*pro hac vice*)
kevin.lamb@wilmerhale.com
SUSAN HENNESSEY (*pro hac vice*)
susan.hennessey@wilmerhale.com
LAUREN MOXLEY BEATTY (SBN 308333)
lauren.beatty@wilmerhale.com
MATTHEW E. MORRIS (*pro hac vice*)
matt.morris@wilmerhale.com
BARDIA VASEGHI (*pro hac vice*)
bardia.vaseghi@wilmerhale.com
DAKOTA C. FOSTER (*pro hac vice*)
dakota.foster@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHROPIC PBC,<br><br>                      Plaintiff,<br><br>    v.<br><br>U.S. DEPARTMENT OF WAR, et al.,<br><br>                     Defendants. | Case No. 3:26-cv-01996-RFL<br><br>**DECLARATION OF SARAH HECK** |

I, Sarah Heck, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am the Head of Policy at Anthropic PBC ("Anthropic"), where I have worked since June 2024. Before joining Anthropic, I held senior roles at Stripe, the White House's National Security Council, and the U.S. Department of State.

2.      In my role as Head of Policy, I lead Anthropic's public policy engagement, government relationships, strategic partnerships, and government communications, including engagements and initiatives that address the intersection of artificial intelligence ("AI"), national security, and economic policy. This includes being involved in communications between Anthropic and the government.

3.      As the Head of Policy, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Anthropic personnel, and could testify thereto.

4.      I have previously submitted two declarations in this matter: a declaration dated March 9, 2026, filed in support of Anthropic's Motion for a Preliminary Injunction, and a supplemental declaration filed in support of Anthropic's Reply Brief in Support of Plaintiff's Motion for a Preliminary Injunction. I submit this consolidated declaration, which sets forth in a single, comprehensive account all of the facts from those two prior declarations, in order to assist the Court.

**Anthropic Has Maintained A Strong Relationship With The Federal Government**

5.      Partnerships with private and public sector entities are central to Anthropic's mission, business model, public policy goals, and overall success. Our partners range from Fortune 500 companies and U.S. government agencies to small businesses and local municipalities. These partnerships are core to Anthropic and essential to advancing its policy objectives of promoting the responsible deployment of AI, supporting democratic institutions, and ensuring that powerful AI systems are developed and used safely and in ways that benefit society.

6.      One of Anthropic's most important partnerships is with the federal government. Anthropic has consistently supported the U.S. government's goal of maintaining global AI dominance and its efforts to ensure that American AI systems are widely adopted across the

federal government and throughout the private sector at home and abroad. Anthropic publicly supported the Trump administration's efforts to promote AI adoption throughout the federal government as part of its AI Action Plan for America. Anthropic has also partnered with the National Institute of Standards and Technology's Center for AI Standards and Innovation (CAISI) to undertake collaborative research evaluating and mitigating safety risks. It has advocated in support of the bipartisan Future of AI Innovation Act, which supports CAISI's initiatives and promotes strong partnerships between private and public stakeholders to advance AI research and innovation.

7. Importantly, in developing its relationship with the government, Anthropic has strived to build a reputation as a nonpartisan advocate dedicated to building a safer AI ecosystem. In addition to supporting the bipartisan Future of AI Innovation Act, Anthropic recently donated over $20 million to Public First Action, a bipartisan nonprofit co-founded and co-led by Republican and Democratic former lawmakers, which supports public education about AI, promotes safeguards, and works to ensure America leads in the AI race. Anthropic has also actively engaged with bipartisan legislative efforts on Capitol Hill, including advocacy in support of the CREATE AI Act of 2025 and the GAIN Act of 2025—both bipartisan safety bills that align with the company's policy priorities. And the company deliberately maintains a bipartisan lobbying effort, with an in-house team that includes former senior staffers from both sides of the aisle and a roster of Republican-aligned and Democratic-aligned outside lobbying firms. Anthropic invests in and undertakes this public policy work because it is committed to AI safety and the policies that underpin it. Based on my experience, collaboration across the political spectrum is critical to policy progress.

8. Anthropic has also been committed to developing its AI systems to advance U.S. national security interests and has partnered with national security components of the government, including the Department of War (the "Department") and intelligence agencies, to do so. To that end, Anthropic also formed a National Security and Public Sector Advisory Council composed of former U.S. government senior defense and intelligence officials, in part to strengthen the company's understanding of government needs and become a more effective partner.

9.   Throughout my engagements with the federal government in my capacity as Anthropic's Head of Policy, various officials and government staff have repeatedly conveyed that the government values its partnership with Anthropic and acknowledged that competitors' AI models lag behind Anthropic's capabilities. A wide range of senior intelligence community officials have emphasized to us that Claude's capabilities are unique, and that Claude is "widely recognized as the leading model for coding and autonomous tool use." Department of War staff themselves have described Claude as "far and away the best model" in briefings attended by the Policy team and warned that losing this capability would set the Department back several years. These characterizations are consistent with the ones set forth in the declarations of Thiyagu Ramasamy.

10.   Anthropic appreciates this recognition and has, in turn, repeatedly and publicly expressed its willingness to continue providing Claude for the full range of lawful national security applications, subject to two narrow usage restrictions that reflect the company's expert, considered judgment on the nature of the AI model and its safe and reliable use: namely, restrictions on the use of Claude for mass surveillance of Americans and for lethal autonomous warfare.

**Secretary Of War Pete Hegseth Issued An Ultimatum Threatening Consequences If Anthropic Adhered To Its Fundamental Commitments**

11.   Over the months that preceded the initiation of this litigation, Anthropic and the Department had been discussing an agreement to continue their partnership. I understand that the crux of the discussions focused on two specific limitations that would restrict the Department's ability to use Claude for purposes of mass surveillance of Americans and lethal autonomous warfare. During that time, I engaged with the Department on behalf of Anthropic and was included in discussions between Anthropic CEO Dario Amodei and Emil Michael, Under Secretary of War for Research and Engineering and Chief Technology Officer. The conversations throughout this process remained respectful, and the parties remained committed to finding a path forward to harness Anthropic's technology to fulfill the Department's important national security goals.

12.     Both parties agreed that neither wanted to enter into a begrudging partnership. At one point, Dr. Amodei stressed to Under Secretary Michael that if Anthropic's position on these two guardrails meant that Anthropic was not the right vendor for the Department's needs, then he would respect that decision. Dr. Amodei further emphasized that, if Anthropic and the Department failed to come to an agreement, Anthropic stood ready to assist in an orderly offboarding from the Department's systems.

13.     On February 24, 2026, I attended a meeting held between Secretary of War Pete Hegseth and Dr. Amodei, among others. At that meeting, Secretary Hegseth said that Claude had "exquisite capabilities." He then objected to Anthropic's unwillingness to remove the two usage restrictions noted above.

14.     During the meeting, Dr. Amodei reiterated that Anthropic maintains a strong partnership with national security agencies, including the Department and intelligence community. He stated that Anthropic has had no intention of dictating national security operations. Dr. Amodei emphasized that the company's commitment to the safe use of its AI models, as reflected in the agreement, has permitted—and would continue to permit—the Department to use Anthropic's products for all lawful uses, save for those two important exceptions. Dr. Amodei noted that these two exceptions have never obstructed the Department's operations to his knowledge, and Combatant Commanders he has spoken to have been pleased with Anthropic's partnership and models.

15.     As to autonomous uses, Dr. Amodei clarified that, while Anthropic has been open to certain autonomous applications of its technologies, at this stage, AI systems cannot yet capably or reliably perform lethal autonomous warfare without appropriate oversight.

16.     Secretary Hegseth stated that Dr. Amodei's concerns were "understandable" and further stated that "they don't do mass domestic surveillance." While Secretary Hegseth expressed that the Department "would love to work with [Amodei]," he stated that the Department had many other vendors to choose from that have never raised these types of concerns and would never hold any veto power over the Department.

17.     At the end of the meeting, Secretary Hegseth presented Anthropic with what appeared to be an ultimatum: if Anthropic did not agree to "all lawful uses" of its system by 5 p.m. on Friday, February 27, 2026, the Department would issue a statement at 5:01 p.m. that they would designate Anthropic a supply-chain risk—preventing Anthropic from partnering with the Department, anyone affiliated with the Department, or any other agency—or invoke the Defense Production Act to compel Anthropic to comply with the Secretary's demands.

18.     During this meeting, Secretary Hegseth never stated that Anthropic's AI models were unsafe, much less subject to compromise by a foreign adversary. I am unaware of anyone at the Department ever suggesting Anthropic's models are somehow insecure or have been compromised. Moreover, I understand that these two restrictions have never previously been a barrier to the Department's adoption and use of our models to date. Nor has anyone else articulated such a barrier to me.

19.     Additionally, it is my understanding that the Department had previously expressed concerns that Anthropic had objected—after the fact—about how Anthropic's models were being used in Department operations, concerns now reprised in the government's materials. But this concern was and is misplaced, as Anthropic has made very clear. Indeed, when Secretary Hegseth raised this topic at the February 24 in-person meeting, Dr. Amodei clarified that the company had not objected to the use of its tools as reported. Dr. Amodei further explained that Anthropic has no interest in interfering with the Department's operations more generally. Dr. Amodei publicly reiterated that stance in a February 26 blog post, explaining that Anthropic "understands that the Department of War, not private companies, makes military decisions" and underscoring that Anthropic has "never raised objections to particular military operations nor attempted to limit use of our technology in an ad hoc manner."

20.     Conversations continued even after Dr. Amodei's meeting with Secretary Hegseth. They remained cordial and amicable. Dr. Amodei continued to seek a resolution prior to Secretary Hegseth's deadline during the afternoon of Friday, February 27, 2026, during which he provided Under Secretary Michael his redline edits on the Department's latest offer, alongside a detailed explanation of the same, still attempting to engage in earnest while ensuring that Anthropic's two

guardrails core to its principles would be retained. Under Secretary Michael did not respond in kind with written edits. At that same time, President Trump directed all agencies, by posting on Truth Social, to cease use of Anthropic's AI system immediately. Shortly thereafter, Secretary Hegseth posted on X.com designating Anthropic a supply chain risk. Throughout these discussions, Dr. Amodei remained firm in expressing Anthropic's unmovable guardrails as essential to the Company's mission to offer safe, reliable AI tools.

**Secretary Hegseth Notified Anthropic Of His "Supply Chain Risk" Designation**

21.    The following week, as agencies across the federal government moved to implement the Presidential Directive, Dr. Amodei continued negotiating in good faith with senior Department officials. Those discussions were still ongoing when, at 8:48 p.m. ET on March 4, Dr. Amodei received a letter from Secretary Hegseth, expanding on the Secretarial Order's "supply chain risk designation." That letter (the "Secretarial Letter"), dated March 3, asserted that the Department of War had "determined" that Anthropic's technology "presents a supply chain risk" and that exercising the authority granted by 10 U.S.C. § 3252 against Anthropic is "necessary to protect national security." The letter pronounced that this determination covers all Anthropic "products" and "services," including any that "become available for procurement." And it asserted that "less intrusive measures are not reasonably available" to mitigate the risks that Anthropic's products and services supposedly pose to national security.

22.    In the days that followed, the parties continued to work towards an agreement even while the Department was, unbeknownst to Anthropic, drafting materials claiming the company poses a risk of sabotage, data exfiltration, and other serious harms. At no point in these conversations did Under Secretary Michael or anyone at the Department share with Anthropic its apparently grave concerns or suggest that they were an impediment to a deal. In fact, the Department and Anthropic were still engaged in negotiations on March 4, 2026—the day after the Department completed its formalization of the supply-chain risk designation (but before Anthropic received that formal notice).[1]

---

[1] Attached hereto as **Exhibit 1** is a true and correct copy of a March 4, 2026 email from Emil Michael to Dario Amodei.

**The Government's Filings Mischaracterize Anthropic's Positions**

23.     In reviewing the materials the government has filed in this case, I was struck by its repeated claim that Anthropic insisted during negotiations that the company have some sort of approval role in the Department's operational decision chain. That is false. At no time during Anthropic's negotiations with the Department did I or any other Anthropic employee state that the company wanted that kind of role. We do not want it now, either.

24.     Likewise, at no point during the negotiations did any party raise any concerns about Anthropic taking technical steps to disrupt the U.S. military. This is a new purported concern that was raised, for the first time, in the government's filings in this case. Had this concern been raised in a manner allowing Anthropic to respond, we would have explained, among other things, the technical impossibility of such disruption. As I understand from Thiyagu Ramasamy's declaration, Anthropic is unable to alter an AI model after deployment without the Department's knowledge or consent.

25.     All of this was avoidable. In an effort to be responsive to the Department's apparent concerns about operational interference, Anthropic was willing to make contractual commitments. In a draft agreement transmitted to the Department on March 4, 2026, Anthropic included language stating: "For the avoidance of doubt, [Anthropic] understands that this license does not grant or confer any right to control or veto lawful Department of War operational decision-making." Anthropic included this language to clarify that it did not seek to be, and would not be, part of any operational decision chain.[2]

26.     I was also surprised to read in the government's materials that Anthropic's beliefs that Claude should not be used for autonomous lethal warfare or mass surveillance of Americans are part of what makes the company a danger to national security. I find this rationale puzzling for two reasons: (1) when negotiations broke down, the parties were very near agreement on language that would address Anthropic's concerns regarding autonomous lethal warfare and (2) Secretary Hegseth himself referred to Anthropic's concerns regarding autonomous lethal warfare and mass

---

[2] Attached hereto as **Exhibit 2** is a true and correct copy of a March 4, 2026 email from Anthony Fuscellaro to Dario Amodei Re: Official Correspondence from the Department of War to Anthropic.

surveillance of Americans as "understandable." That was echoed mere days later by the Commander of U.S. Central Command, who told a media outlet, "Humans will always make final decisions on what to shoot and what not to shoot." And a recent threat assessment from the Office of the Director of National Intelligence, reflecting the collective views of the U.S. Intelligence Community, further confirms that at least some portions of the Administration believe "it is essential to make sure that humans maintain control of the [AI models] and how AI is used."[3] Indeed, on March 4, 2026—after the Secretarial Letters were drafted—Under Secretary Michael emailed Dr. Amodei to say "I think we are very close here" regarding these two issues.

27.    In recent weeks, Anthropic has worked closely with the U.S. government in connection with the release of its new Mythos model. On April 7, 2026, Anthropic publicly announced Project Glasswing, an initiative to deploy Mythos for defensive cybersecurity work in partnership with over fifty major technology companies and critical infrastructure operators. The initiative is an effort to put Mythos's capabilities to work for defensive purposes before similar capabilities can be adopted by adversaries. Prior to making Mythos available externally, Anthropic briefed senior officials across multiple government agencies on the model's capabilities, including its ability to identify and help remediate critical software vulnerabilities in widely used systems. Through Project Glasswing, Anthropic extended access to Mythos to select government partners and committed substantial resources to support efforts to secure critical software infrastructure. On April 17, Dr. Amodei met with senior White House officials, including the Chief of Staff and the Treasury Secretary, to discuss the responsible use of Mythos. I understand that the White House described those discussions as "productive and constructive" and stated that the parties "discussed opportunities for collaboration, as well as shared approaches and protocols to address the challenges associated with scaling this technology."[4] Since then, we have been in frequent communication with representatives of various agencies and departments about the best way to

[3] Off. of the Dir. of Nat'l Intelligence, *Annual Threat Assessment of the U.S. Intelligence Community* 12 (Mar. 2026), https://www.dni.gov/files/ODNI/documents/assessments/ATA-2026-Unclassified-Report.pdf.

[4] Brendan Bordelon et al., *White House Meets with Anthropic CEO amid Hopes for a Truce,* Politico (Apr. 17, 2026, 2:59 PM EDT), https://www.politico.com/news/2026/04/17/white-house-to-meet-with-anthropic-ceo-as-mythos-anxiety-spreads-00878960.

use Mythos to serve the objectives of the United States. These engagements reflect Anthropic's continued commitment to partnering with the U.S. government to strengthen the nation's cyber defenses and support national security objectives—even as the supply chain risk designation remains in place.

*      *      *

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

Executed on June 10, 2026.                          /s/ Sarah Heck
                                                     Sarah Heck
                                                     Head of Policy, Anthropic

**<u>ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)</u>**

Pursuant to Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from the other signatories.

By:    */s/ Michael J. Mongan*
　　　　Michael J. Mongan