Fred Norton (SBN 224725)
fnorton@nortonlaw.com
Jo Levy (SBN 136327)
jlevy@nortonlaw.com
Josephine K. Petrick (SBN 280233)
jpetrick@nortonlaw.com
Celine G. Purcell (SBN 305158)
cpurcell@nortonlaw.com
Heather Bates (SBN 337703)
hbates@nortonlaw.com
Hayley Landman (SBN 337852)
hlandman@nortonlaw.com
Saja Spearman-Weaver (SBN 355275)
sspearmanweaver@nortonlaw.com
THE NORTON LAW FIRM PC
300 Frank H. Ogawa Plaza, Suite 450
Oakland, CA 94612
Telephone: (510) 906-4900

Counsel for *Amici Curiae*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANTHROPIC PBC, | Case No. 3:26-cv-01996-RFL |
| *Plaintiff*, | **PROPOSED BRIEF OF *AMICI CURIAE* FREEDOM ECONOMY BUSINESS ASSOCIATION AND OTHER VALUES-LED INVESTORS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| U.S. DEPARTMENT OF WAR, *et al.*, | Hon. Rita F. Lin |
| *Defendants*. | Date:        July 30, 2026<br>Time:        10:00 AM<br>Dept.:        15 |
| | Complaint Filed: March 9, 2026 |

**TABLE OF CONTENTS**

I.      STATEMENT OF INTEREST OF AMICI CURIAE ...................................................... 1

II.     INTRODUCTION ................................................................................................................2

III.    ARGUMENT ......................................................................................................................3

        A.      The Administration's Unlawful Actions Damage Anthropic, Investors, and the Critical
                Market Values of Stability, Predictability, and Rule of Law.............................................3

        B.      The Government's Viewpoint-Based Discrimination Violates the First Amendment
                Rights of Both Anthropic and its Investors ......................................................................6

IV.     CONCLUSION ....................................................................................................................9

APPENDIX A ................................................................................................................................ 10

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Asia Pac. Airlines v. United States*,
   68 Fed. Cl. 8 (2005) ..................................................................................................... 5

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963) ....................................................................................................... 7

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014) .................................................................................................. 5, 8

*Corey Airport Servs., Inc. v. Clear Channel Outdoor, Inc.*,
   682 F.3d 1293 (11th Cir. 2012) .................................................................................. 7

*Frederick Douglass Found., Inc. v. D.C.*,
   82 F.4th 1122 (D.C. Cir. 2023) ................................................................................... 7

*Friedler v. Gen. Servs. Admin.*,
   271 F. Supp. 3d 40 (D.D.C. 2017) .............................................................................. 3

*Gonzalez v. Freeman*,
   334 F.2d 570 (D.C. Cir. 1964) .................................................................................... 3

*Learning Res., Inc. v. Trump*,
   146 S. Ct. 628 (2026) ................................................................................................... 3

*Nat'l Rifle Ass'n of Am. v. City of L.A.*,
   441 F. Supp. 3d 915 (C.D. Cal. 2019) ........................................................................ 7

*Nat'l Rifle Ass'n of Am. v. Vullo*,
   602 U.S. 175 (2024) ..................................................................................................... 7

*Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*,
   631 F.2d 953 (D.C. Cir. 1980) .................................................................................... 3

*Perkins Coie LLP v. U.S. Dep't of Just.*,
   783 F. Supp. 3d 105 (D.D.C. 2025) ............................................................................ 7

*Sorrell v. IMS Health, Inc.*,
   564 U.S. 552 (2011) ..................................................................................................... 7

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994) ..................................................................................................... 8

*United States v. Borjesson*,
   92 F.3d 954 (9th Cir. 1996) ........................................................................................ 7

ii

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ............................................................................................................ 3

**Statutes**

10 U.S.C. § 3252 .............................................................................................................. 3, 4

41 U.S.C. § 3301(a)(1) .......................................................................................................... 5

**Regulations**

48 C.F.R. § 9.402(b) ............................................................................................................. 7

DFARS § 239.7301(1)(v) ..................................................................................................... 4

FAR 9.406-3 ......................................................................................................................... 4

## I.    STATEMENT OF INTEREST OF AMICI CURIAE[1]

The Freedom Economy Business Association ("FEBA") is a national membership community of more than 150 institutional investors, asset managers, asset owners, allocators, and service providers committed to advancing sustainable investment practices.  Based on currently reported member data, FEBA members collectively represent more than $25 billion in assets under management and influence. *Amici* also include ten other entities and three individuals (listed on Appendix A attached hereto) who are values-led investors that rely upon the existence of rules-based market conditions and a stable legal environment to make their investment decisions.

FEBA's membership and the other investor *amici* have a direct and substantial interest in the outcome of this litigation.  The responsible development and deployment of AI technology represent one of the most consequential areas of investment activity in the current economic landscape.  FEBA members and the other *amici* have invested significantly in companies across the AI ecosystem—companies whose valuations, revenue stability, and long-term viability depend on a predictable, rules-based regulatory environment and the protection of private enterprise from arbitrary government action.

The Administration's unlawful actions directing federal agencies to boycott Anthropic, directing federal military contractors to cease all commercial activity with Anthropic, and designating Anthropic as a "supply chain risk" all in retaliation for Anthropic's expression of views protected by the First Amendment, pose a profound threat not only to Anthropic but to the broader investment ecosystem that supports innovation in this sector.  FEBA and the other *amici* thus have a strong interest in the subject-matter of this litigation and submit this *amicus* brief in the hope of assisting the Court in its deliberation.

For these reasons, *amici* respectfully urge this Court to grant Anthropic's motion for summary judgment, vacate the unlawful "supply chain risk" designation, and reaffirm that the federal government may not weaponize procurement and contracting authority to coerce American companies into abandoning lawful, ethical commitments.

---

[1] No party's counsel authored this brief in whole or part, contributed money that was intended to fund preparing or submitting this brief, and no person other than Amicus Curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief. *Cf.* Fed. R. App. P. 29(a)(4)(E).

1

## II.    INTRODUCTION

"It is the Department of War's prerogative to decide what AI product it uses. Everyone, including Anthropic, agrees that the Department of War may permissibly stop using Claude and look for a new AI vendor who will allow 'all lawful uses' of its technology.  That is not what this case is about." Dkt. No. 134 at 1 (Order Granting Motion for PI).

The February 2026 Presidential Directive and Department of War pronouncements targeting Anthropic (the "Challenged Actions") disrupt not just Anthropic's business but American capitalism itself.  The government of course must be free to choose who it does business with, and on what lawful terms.  What it cannot do is what the Administration has done here: wholesale blacklist a company that declines to offer its products or services on terms the Administration prefers, because the company has expressed a competing policy view about how those products or services should be used by a responsible administration.  The Challenged Actions are *ultra vires*, arbitrary and capricious, undertaken without due process, and violate Anthropic's First Amendment right to free expression, as well as the First Amendment rights and associational rights of Anthropic's investors.  But the Challenged Actions not only hurt Anthropic and its investors; they limit any market participant that relies upon process, information transparency, and the rule of law to make informed decisions about where to invest.  And they particularly limit values-led investors who align their capital with companies' core values.

Reasonable investors like FEBA's members and the *amici* cannot operate in this environment. All investments, especially with government contractors, are now clouded by the threat that the Administration can, at any time and for any reason, designate an American company as an adversary and seek to destroy it.  Dean Ball, President Trump's former Senior Policy Advisor for AI and Emerging Tech, reacted to the Challenged Actions bluntly and aptly: "Nvidia, Amazon, Google will have to divest from Anthropic if Hegseth gets his way.  This is simply attempted corporate murder.  I could not possibly recommend investing in American AI to any investor; I could not possibly recommend starting an AI company in the United States."[2]

---

[2] Dean Ball (@deanwball), X (Feb. 27, 2026, at 2:46 PM), https://x.com/deanwball/status/2027515599358730315

2

## III.    ARGUMENT

### A.    The Administration's Unlawful Actions Damage Anthropic, Investors, and the Critical Market Values of Stability, Predictability, and Rule of Law

President Trump issued a directive to all federal agencies to stop working with Anthropic (the "Presidential Directive").  Secretary of War Hegseth issued a blanket directive to all federal military contractors to cease "any commercial activity" with Anthropic (the "Secretarial Order"), and then labeled Anthropic a "supply chain risk" under 10 U.S.C. § 3252 (the "Secretarial Letter").  Dkt. 6 at 16-17.  All three of these actions violate the law.

As for President Trump's social media directive to all federal agencies to stop working with Anthropic, the President has no such authority.  It is axiomatic that Executive power must stem from Congress or the Constitution itself.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 586-87 (1952); *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 639 (2026).  Yet Congress has conferred no general authority on the President to debar a company from the entire federal government, much less without notice or process.

In *Gonzalez v. Freeman*, 334 F.2d 570 (D.C. Cir. 1964), Chief Justice Burger, then on the D.C. Circuit, considered a claim by individuals—who had pled guilty to a misdemeanor for misusing government certificates—that the Department of Agriculture had debarred them from a single agency without direct authority from Congress or compliance with any procedure.  The court squarely held the government could do no such thing:

> [W]e conclude that although the Act vests Commodity Credit with power to impose debarment for misuse of official inspection certificates, we cannot agree that Congress intended to authorize such consequences without regulations establishing standards and procedures and without notice of changes, hearings, and findings pursuant thereto.  Absent such procedural regulations and absent notice, hearing and findings in this case, the debarment is invalid; to reach any other conclusion would give rise to serious constitutional issues.

*Gonzalez*, 334 F.2d at 579 (citations omitted); *see also Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953, 955-56 (D.C. Cir. 1980) (holding "that when the Government effectively bars a contractor from virtually all Government work due to charges that the contractor lacks honesty or integrity, due process requires that the contractor be given notice of those charges [...] and some opportunity to respond to the charges before adverse action is taken."); *Friedler v. Gen. Servs. Admin.*, 271 F. Supp. 3d

40, 61 (D.D.C. 2017) (Jackson, D.J.) (finding where an agency "ignores its own regulations and imposes a debarment that does not adhere to the procedural due process mandates of FAR 9.406-3, it has acted arbitrarily and capriciously").

As for the Secretarial Order prohibiting all other military contractors from conducting "any commercial activity" with Anthropic, that too has no authority in any statute or regulation.  To the contrary, Congress gave the Secretary circumscribed authority in 10 U.S.C. § 3252 to designate a "supply chain risk."  But "[t]hat designation has **never** been applied to a domestic company and is directed principally at foreign intelligence agencies, terrorists, and other hostile actors." Dkt. No. 134 at 2 (Order Granting Motion for PI) (emphasis added).  And the power to take that drastic action is subject to both clear limits and detailed procedural safeguards, as reasonable market participants would expect.  If the Secretary had first satisfied all the prerequisites to the supply chain risk designation (including a determination that less intrusive measures are not reasonably available, *see id.* § 3252(b)(2)(B)), he would have had the authority to limit Anthropic's participation in that portion of the Department of War's supply chain which relates to a specific "covered system" or "covered item of supply."  *Id.* § 3252(d)(3), (5), (6); *see also* DFARS § 239.7301(1)(v).  That authority in no way permits the Secretary to direct all military contractors to treat Anthropic as a pariah in all business dealings of any kind.

As for the Secretarial Letter, that at least invokes § 3252.  Yet even here, the Challenged Action violates federal law substantively.  For example, § 3252(d)(4) defines a "supply chain risk" as "the risk that an **adversary** may sabotage, maliciously introduce unwanted function, or otherwise subvert the design, integrity, manufacturing, production, distribution, installation, operation, or maintenance of a covered system so as to surveil, deny, disrupt, or otherwise degrade the function, use, or operation of such system." (Emphasis added.)  But nothing in the Presidential Directive, the Secretarial Order, or the Secretarial Letter supports a conclusion that **Anthropic** is an "adversary."  Nor do the Challenged Actions support the conclusion that Anthropic's principled refusal to make its generative AI technology available for tasks that technology cannot perform safely would enable an actual foreign "adversary" to engage in the kind of sabotage or disruption that would create "supply chain risk."

Lawless and arbitrary government action is anathema to investment and an economy based on free enterprise.  The comprehensive statutory and regulatory framework for federal procurement exists

for a reason. It provides clear standards, fairness, and stability through a policy of "full and open competition." 41 U.S.C. § 3301(a)(1). When the Administration bypasses that framework entirely, directing every agency and all military contractors to blacklist a company via the fiat of a social media post, it harms investors and markets. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 707 (2014) ("Protecting corporations from government seizure of their property without just compensation protects all those who have a stake in the corporations' financial well-being."); *Asia Pac. Airlines v. United States*, 68 Fed. Cl. 8, 27 (2005) ("[I]t is well-established that the public interest is well-served by ensuring that the government procurement process is fair."). Investors like FEBA's members and the other *amici* invest billions of dollars in capital in reliance on the expectation that government will follow the law, respect property rights, and provide meaningful process before taking adverse action.

The risk that a successful, industry-leading American company can be summarily and arbitrarily excluded, overnight, from all business with the U.S. government and its contractors is a risk that is intolerable to investment and free enterprise. And given the scale of federal government contracting— over $755 billion in fiscal year 2024 alone[3]—the Challenged Actions' disruptive and perverse chilling effect on investment is all the greater.

The Administration's violations of law and their market harms are exacerbated further by the fact that the Administration's attack on Anthropic springs from Anthropic's refusal to offer its generative AI technology for (1) mass surveillance of U.S. citizens or (2) lethal autonomous warfare, each of which would violate Anthropic's stated principles as a public benefit corporation. The Administration's demands are incompatible with Anthropic's mission statement; if Anthropic were to comply, that compliance would weaken its role as a responsible and deliberate leader in the emerging field of AI. Compl. ¶¶ 63-66 (Anthropic's Foundational Commitment to AI Safety). "Nothing in the governing statute supports the Orwellian notion that an American company may be branded a potential adversary and saboteur of the U.S. for expressing disagreement with the government." Dkt. No. 134 at 2 (Order Granting Motion for PI).

FEBA's members and the other *amici* are values-led investors. They deploy their capital to

---

[3] *See* U.S. Government Accountability Office, *A Snapshot: Government-Wide Contracting, available at* https://files.gao.gov/multimedia/Federal_Government_Contracting-FY2024/index.html.

companies that not only provide valuable goods and services for a profit, but do so in accordance with other principles that those companies and their investors believe benefit society as a whole.  Values-led investing does not belong to a single party or political ideology—in 2024, investors of all political stripes invested over $1.5 trillion in capital in companies and funds whose social missions they support.[4] If the ability to contract with the federal government at all is limited to companies that align with a given Administration's policy views, such investment makes no sense.  Worse still, the shifts in policy from administration to administration every four years or so threatens to subject over three quarters of a trillion dollars in government contracting, and still billions more in contracts with government contractors, to a crude form of patronage, in which the Administration's perceived allies are allowed to participate and its perceived "adversaries" are shut out.  Unlike countries that suffer from that kind of corruption,[5] the United States has long attracted investment capital from all over the globe because its economy is based on merit and ingenuity—not currying favor with the powers that be.

The Challenged Actions clearly violate the law and harm Anthropic, but the harm to investors and investment markets goes much further and is pervasive.  The public interest in stable, predictable markets and the rule of law weighs in favor of granting the motion for summary judgment that Anthropic seeks.

**B.      The Government's Viewpoint-Based Discrimination Violates the First Amendment Rights of Both Anthropic and its Investors**

Even assuming the Administration had some authority to undertake the Challenged Actions in whole or in part (it did not), those actions are still unlawful because the Administration expressly took those actions to punish Anthropic for expressing views the Administration disfavors.

> The government may not enforce the laws in a manner that picks winners and losers in public debates.  It would undermine the First Amendment's protections for free speech if the government could enact a content-neutral law and then discriminate against disfavored viewpoints under the cover of prosecutorial discretion.  Neutral regulations may reasonably limit the time, place, and manner of speech, but such regulations cannot be enforced based

---

[4] Hand, D., Ulanow, M., Pan, H., Xiao, K. (2024), *Sizing the Impact Investing Market 2024, The Global Impact Investing Network (GIIN)*, New York, *available at* https://s3.amazonaws.com/giin-web-assets/giin/assets/publication/giin-sizingtheimpactinvestingmarket-2024.pdf.

[5] *See* Jorge Farinha & Oscar López-de-Foronda, *The impact of corruption on investment and financing in the European Union: new insights*, 30 European J. of Finance 339 (2024), *available at* https://www.tandfonline.com/doi/full/10.1080/1351847X.2023.2240846#d1e167.

AMICUS CURIAE BRIEF OF AMICI CURIAE FREEDOM ECONOMY
CASE NO. 3:26:CV-01996-RFL

on the content or viewpoint of speech. *Frederick Douglass Found., Inc. v. D.C.*, 82 F.4th 1122, 1142 (D.C. Cir. 2023).

The First Amendment bars the government from "us[ing] the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024) (*Vullo*). The government violates the First Amendment when it uses regulatory leverage to coerce third parties into suppressing speech, even if the government never directly censors the speech. *Id.* at 197; *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (informal censorship and coercion—even absent a formal ban—can constitute a First Amendment violation). "[T]he First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or (as alleged here) through private intermediaries." *Vullo*, 602 U.S. at 197; *Nat'l Rifle Ass'n of Am. v. City of L.A.*, 441 F. Supp. 3d 915, 942 (C.D. Cal. 2019) (granting plaintiff injunction against an ordinance adopted "in direct response" to the plaintiff's political speech and expression); *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 170 (D.D.C. 2025) (holding Administration could not "indirectly" interfere with attorney-client relationships by pressuring clients). Moreover, courts have held that federal debarment is not to be employed as a punitive measure, but only to protect the federal government. *See United States v. Borjesson*, 92 F.3d 954, 955 (9th Cir. 1996) (citing cases); *see also* 48 C.F.R. § 9.402(b).

The Challenged Actions violate this principle. The Administration is not simply choosing a different vendor. It is actively punishing Anthropic, designating it a "supply chain risk" and directing a boycott of it by federal agencies and contractors, specifically and expressly because Anthropic expressed a contrary view on a matter of profound legal, social, and political importance: the extent to which novel and largely untested generative AI technology may be used for mass surveillance of U.S. citizens and for lethal autonomous warfare. While the Administration can certainly choose which private companies win a government contract, *see, e.g.*, *Corey Airport Servs., Inc. v. Clear Channel Outdoor, Inc.*, 682 F.3d 1293 (11th Cir. 2012), it cannot pick winners and losers based on viewpoint, *see Frederick Douglass Found., Inc.*, 82 F.4th at 1142; Dkt. No. 134 at 19 (Order Granting Motion for PI) ("'But a State's failure to persuade' its prospective contracting partner to come around to its views 'does not allow it to hamstring' disagreeing parties." (*quoting Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 578 (2011)). That is exactly what the Administration seeks to do here, and the First Amendment forbids it.

7

And the Administration's unlawful action by no means harms only Anthropic. "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). The Supreme Court has recognized that both individuals and companies have protected beliefs and guiding principles that are insulated from the preferences of a given Administration. *See, e.g.*, *Burwell*, 573 U.S. at 690. Protected rights in those beliefs extend to those "associated with a corporation in one way or another," including investors. *Id.* at 706-07. Values-led investors choose where to invest their dollars as a form of expression, showing solidarity and support for the principles and values of the companies in which they invest. But the Challenged Actions target and punish expression with which the Administration disapproves, in violation of investors' own rights of free expression and association.

Worse still, the Administration's abuse harms not only values-led investors—it hampers *all* investors' abilities to make informed decisions about whether and how to allocate their resources to a safety-oriented AI company, or any company that has expressed a commitment to policy or points of view that an administration may dislike. Accordingly, the chilling effect on speech as well as investment extends far beyond Anthropic. The Presidential Directive, Secretarial Order, and Secretarial Letter send a clear message to every company that does business with the government: disagreement risks debarment. The market of course amplifies that message, as pragmatic, risk-averse corporate partners and investors flee companies they fear may be targeted (or, in Mr. Ball's trenchant phrasing, "murdered").

If allowed to stand, the Challenged Actions will chill or even silence speech on important legal, social, and political issues by some of the largest and most influential actors in the American economy. Government contractors will learn to say nothing, commit to nothing, and stand for nothing, because any stated principle becomes a liability the moment it conflicts with the political preferences of the party in power. Values-led investors like FEBA's members and the other *amici* will be left to choose between companies that have no principles, those that are too fearful to announce their principles, and those whose stated principles conveniently align with the prevailing wind of the then-current administration's views. This barren landscape of corporate speech and expression is the opposite of what a free-market

8

economy or a free market of ideas should produce.

No such result is necessary, no such result would be lawful, and no such result can be reconciled with the values of the First Amendment or the principles on which our market economy relies. The Challenged Actions must be enjoined.

## IV.    CONCLUSION

FEBA and the other *amici* respectfully request that the Court grant Anthropic's motion for summary judgment.

Dated: June 10, 2026

Respectfully submitted,
THE NORTON LAW FIRM PC

*/s/ Josephine K. Petrick*
Josephine K. Petrick

Attorneys for *Amici Curiae*
Freedom Economy Business Association
Candide Group
Howard Fischer (an individual)
Thomas Haslett (an individual)
Investor Advocates for Social Justice
Mission Driven Finance
The Nathan Cummings Foundation, Inc.
Omidyar Network LLC
Pluralize Capital
Interfaith Center on Corporate Responsibility
Humanize Wealth
John O'Farrell (an individual)
American Federation of Teachers
Adasina Social Capital

# APPENDIX A

Freedom Economy Business Association

Candide Group

Howard Fischer (an individual)

Thomas Haslett (an individual)

Investor Advocates for Social Justice

Mission Driven Finance

The Nathan Cummings Foundation, Inc.

Omidyar Network LLC

Pluralize Capital

Interfaith Center on Corporate Responsibility

Humanize Wealth

John O'Farrell (an individual)

American Federation of Teachers

Adasina Social Capital

AMICUS CURIAE BRIEF OF AMICI CURIAE FREEDOM ECONOMY
CASE NO. 3:26:CV-01996-RFL