David R. Friedman (CA Bar No. 300737)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
dfriedman@wilkinsonstekloff.com

*Counsel for Amicus Curiae*
*Faith Family Technology Network*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHROPIC PBC, | Case No. 3:26-cv-01996-RFL |
| Plaintiff, | **[PROPOSED] BRIEF FOR FAITH FAMILY TECHNOLOGY NETWORK AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF'S SUMMARY JUDGMENT MOTION** |
| v. | |
| U.S. DEPARTMENT OF WAR, et al. | |
| Defendants. | Judge:     Hon. Rita F. Lin |

**TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE ........................................................................................ 1

SUMMARY OF ARGUMENT ............................................................................................... 1

ARGUMENT ........................................................................................................................... 3

I.       The Constituion Places Matteres Of Conscience Beyond The Reach Of Government Coercions ................................................................................................ 3

      A.      The Government's Actions Threaten Freedom of Conscience— The Foundation of American Religious Liberty. ............................................ 3

      B.      The Government's Proposed "All Lawful Uses" Constraint Does Not Adequately Protect Freedom of Conscience. ............................................ 5

II.     Anthropic's Viewpoint That The Value of Human Life Requires Human Accountability When Lethal Force Is Used Is A Matter Of Conscience Consistent With Religious Teachings And Protected By The First Amendment ........................................................................................................... 6

III.    Anthropic's Viewpoint That Mass Domestic Surveillance Violates Basic Human Dignity Is A Matter Of Conscience Consistent With Religious Teachings And Protected By The First Amendment. ...................................... 9

CONCLUSION ...................................................................................................................... 12

-i-

[PROPOSED] BRIEF FOR FAITH FAMILY
TECHNOLOGY NETWORK AS *AMICUS CURIAE*

# TABLE OF AUTHORITIES

**Cases**                                                                                            **Page(s)**

*303 Creative LLC v. Elenis*,
 600 U.S. 570 (2023) ................................................................................................................ 3

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
 570 U.S. 205 (2013) ................................................................................................................ 6

*Anthropic PBC v. U.S. Dep't of War*,
 2026 WL 836842 (N.D. Cal. Mar. 26, 2026) ................................................................ 1, 4, 8, 11

*Cantwell v. Connecticut*,
 310 U.S. 296 (1940) ................................................................................................................ 3

*Girouard v. United States,*
 328 U.S. 61 (1946) .................................................................................................................. 3

*Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31*,
 585 U.S. 878 (2018) ................................................................................................................ 4

*Kennedy v. Bremerton Sch. Dist.*,
 597 U.S. 507 (2022) ................................................................................................................ 3

*Masterpiece Cakeshop v. Colorado C.R. Comm'n*,
 584 U.S. 617 (2018) ................................................................................................................ 2

*W. Va. State Bd. of Educ. v. Barnette*,
 319 U.S. 624 (1943) ................................................................................................................ 2

*Wooley v. Maynard*,
 430 U.S. 705 (1977) ................................................................................................................ 3

**Statutes**

5 U.S.C. § 706 ...................................................................................................................... 1, 12

42 U.S.C. §§ 2000bb–2000bb-4 ........................................................................................... 2, 4

**Other Authorities**

S. Rep. No. 94-755 ................................................................................................................. 10

-ii-

[PROPOSED] BRIEF FOR FAITH FAMILY
TECHNOLOGY NETWORK AS *AMICUS CURIAE*

**INTEREST OF AMICUS CURIAE**

FFTN is a non-partisan, interfaith organization with a vested[1] interest in preserving the right of religious organizations and people of faith to take moral stances without fear of retribution from the Government. This brief provides this Court with the perspective of a coalition of those of Jewish, Christian, and Muslim faith who regularly engage with questions at the intersection of faith, family, and technology. To the undersigned's knowledge, no other amicus has filed, or plans to file, a brief expressing similar views or based on similar experiences of interfaith communities.

**SUMMARY OF ARGUMENT**

What is at stake in this case is whether the Government can seek to destroy a company for setting moral limits on the use of its products. It is undisputed that Anthropic has broken no law. It has instead refused to allow the Government to use its product in ways that conflict with its deeply held moral principles. In response, the Government has taken sweeping actions that would, in the Court's words, "cripple Anthropic." *Anthropic PBC v. U.S. Dep't of War*, No. 3:26-CV-01996-RFL, 2026 WL 836842, at *1 (N.D. Cal. Mar. 26, 2026) (granting Anthropic's motion for a preliminary injunction).

Allowing the Government's actions to stand will set a dangerous precedent. It will discourage other companies from acting consistent with morality and conscience. And it will chill religious organizations and religiously affiliated entities from freely expressing their beliefs—publicly or privately—when interacting with the Government. As an organization composed of people of faith, FFTN believes America is at its best when individuals and institutions remain free to speak according to conscience, especially when their beliefs diverge from the Government's desires. The Constitution and federal law require nothing less.

Consistent with these principles, the Court should grant Anthropic's motion for summary judgment and set aside the Government's supply-chain risk designation and related actions as unlawful under 5 U.S.C. § 706 for three separate reasons.

---

[1] This brief represents the views of FFTN and its alliance members, and does not entail endorsement by its host institution, the Institute for Family Studies.

-1-

**First**, the law prohibits the Government from penalizing an organization for refusing to take actions that contradict its moral or religious convictions. The First Amendment of the United States Constitution, the Religious Freedom Restoration Act of 1993, and centuries of religious liberty jurisprudence all stand for the same proposition: when the state demands that a private actor participate in activities raising profound questions of human dignity, the right to refuse is constitutionally protected. *See Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617 (2018); 42 U.S.C. §§ 2000bb–2000bb-4; *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943).

**Second**, the value of human life demands that fully autonomous weapons be operated by individuals who can be held accountable for their actions. Our faith traditions all recognize that human life is sacred. They also counsel that no human life should be taken by a technology that cannot show mercy and compassion and cannot face meaningful consequences for wrongfully taking life. The Government's efforts to demand that Anthropic allow otherwise should not be allowed to stand.

And **third**, our faith traditions recognize that mass surveillance and authentic religious life are incompatible. In fact, authentic religious exercise depends on freedom from pervasive government monitoring. Again, the Government's demand that Anthropic allow its products to be used for these purposes is untenable.

An organization that declines, on grounds of conscience, to create tools for automated destruction of human life or mass surveillance is not obstructing government policy—it is exercising rights this Nation has protected since its founding. The law does not permit the Government to demand moral conformity or to punish adherence to conscience. This Court should accordingly grant summary judgment for Anthropic and set aside the Government's designation of Anthropic as a supply-chain risk.

-2-

## ARGUMENT

**I.    THE CONSTITUTION PLACES MATTERS OF CONSCIENCE BEYOND THE REACH OF GOVERNMENT COERCION.**

**A.    The Government's Actions Threaten Freedom of Conscience—The Foundation of American Religious Liberty.**

From our Nation's earliest days, freedom of conscience has been recognized as a fundamental limit on state power. The Founders articulated that principle even before the Constitution was drafted and ratified. James Madison described conscience as "unalienable" in his Memorial and Remonstrance of 1785, emphasizing that a person's convictions "cannot follow the dictates of other men."[2] And Thomas Jefferson echoed the same point in the Virginia Statute for Religious Freedom (1786), condemning government efforts to force conduct against belief as "sinful and tyrannical."[3] These statements reflect Founding-Era consensus that conscience stands beyond the state's reach.

These principles animate the First Amendment. As the Supreme Court explained in *Cantwell v. Connecticut*, the First Amendment "embraces two concepts—freedom to believe and freedom to act." 310 U.S. 296, 303–04 (1940) (describing the "freedom to believe" as "absolute"). The Free Exercise Clause protects the right to live out one's convictions while the Free Speech Clause protects the right not to speak or act in ways that violate conscience. Together, they guarantee that the Government may not enforce ideological conformity. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 514, 524 (2022).

The Court has extended that same protection to refusals to act. In *Girouard v. United States*, for instance, the Court held the Government cannot deny citizenship to an applicant based on his refusal, on religious conscience grounds, to promise to bear arms as part of the naturalization oath. 328 U.S. 61, 70 (1946). In *Wooley v. Maynard*, the Court held that citizens cannot be forced to

---

[2] James Madison, *A Memorial and Remonstrance Against Religious Assessments* (1785), ENCYCLOPEDIA VIRGINIA [https://perma.cc/QT2C-TBEC].

[3] *An Act for Establishing Religious Freedom* (1786), ENCYCLOPEDIA VIRGINIA [https://perma.cc/5GZP-CT6K].

display messages they reject, recognizing that compelled conduct may violate conscience just as surely as compelled words would. 430 U.S. 705, 715 (1977) ("The First Amendment protects the right of individuals to . . . refuse to foster . . . an idea they find morally objectionable."). And more recently, in *303 Creative LLC v. Elenis*, the Court reaffirmed that the state may not "compel an individual to create speech she does not believe," underscoring that First Amendment protection applies equally to expressive and religiously grounded refusals. 600 U.S. 570, 579 (2023); *see also Janus v. Am. Fed'n of State, Cnty., and Mun. Emps.*, Council 31, 585 U.S. 878, 892 (2018).

Congress has similarly granted conscience full protection. The Religious Freedom Restoration Act of 1993 ("RFRA") provides that the Government may not "substantially burden" religious exercise unless it can show that its decision to burden a person's religious exercise furthers a compelling governmental interest and is "the least restrictive means" possible of doing so. 42 U.S.C. §§ 2000bb–2000bb-4. RFRA's basic promise reflects the principle that the Government cannot conscript action that contravenes moral or religious beliefs.

Applying these settled principles here, the Constitution and RFRA protect those who refuse to affirmatively take actions that would take human life or offend human dignity.[4] These principles carry special weight when the Government seeks to impose draconian punishments against those who resist participating in activities that implicate human dignity, moral agency, or religious conviction. As the Court has already observed, the challenged measures "appear designed to punish Anthropic," rather than to advance any lawful governmental objective. *Anthropic PBC*, 2026 WL 836842, at *1.

The fuller record now before the Court confirms that conclusion and leaves no genuine dispute as to the Government's impermissible motive or lack of lawful basis. On the undisputed

---

[4] That is not to say that companies should be empowered to weaponize a purported freedom of conscience to resist common-sense regulation of technology aimed at *protecting* human life and dignity. Preserving Anthropic's conscience-based objection to enabling autonomous destruction of life or mass surveillance of Americans should not be extended to resisting, for instance, laws or regulations aimed at limiting distribution of abusive materials against minors, preventing trafficking, and the like. *See, e.g.*, Natasha Singer, *Silicon Valley Battles States Over New Online Safety Laws for Children*, NYT, Jan. 31, 2024 [https://perma.cc/YB3S-4LRS].

-4-

record, the Government cannot justify those measures under the First Amendment or RFRA. Because there is no genuine dispute of material fact and the Government's actions fail as a matter of law, summary judgment should be entered for Anthropic.

### B.    The Government's Proposed "All Lawful Uses" Constraint Does Not Adequately Protect Freedom of Conscience.

The Government's insistence that Anthropic must support the use of its AI for "all lawful uses" ignores Anthropic's conscience-based objection. The law is a floor, not a ceiling, for ethical responsibility. In areas touching human life and dignity, positive law does not draw the outer limits of moral principles. And as just explained, *see supra* at I.A, our constitutional tradition recognizes the right of individuals and institutions to decline participation in activities they deem immoral.

This legal point also accords with common sense and ordinary practice. Across safety-critical professions, ethical obligations routinely exceed legal minima. Physicians may decline to participate in lawful executions because professional ethics require them to "do no harm."[5] Lawyers may withdraw when a client insists on conduct the attorney finds "repugnant," even if the conduct is legal.[6] Engineers are bound to "[h]old paramount the safety, health, and welfare of the public," a standard that depends on independent moral judgment, not mere regulatory compliance.[7] These professions share a common insight: when human life and dignity are at stake, the question is not simply "Is this lawful?" but "Is this right?"

Religious and moral traditions reinforce the point.[8] No serious faith tradition treats legality

---

[5] *See* AMA CODE OF MEDICAL ETHICS, Op. 9.7.3 (2016).

[6] *See* MODEL RULES OF PRO. CONDUCT r. 1.16(b)(4) (AM. BAR ASS'N 2020).

[7] *See* NSPE CODE OF ETHICS FOR ENGINEERS, § I.1 (2019).

[8] In the Christian tradition, the Apostle Paul cautioned that "all things are lawful, but not all things are beneficial." 1 Corinthians 10:23. Jewish law (halakha) recognizes a duty to act lifnim mishurat hadin—beyond the strict letter of the law — precisely because legal permission does not confer moral license. *See, e.g.*, Bavli Bava Metzia 30b; Ramban on Deuteronomy 6:18 (mandating conduct "right and good" beyond strict legal entitlement); Shulchan Aruch, Choshen Mishpat 12:2 & Rema (encouraging compromise and lifnim mishurat hadin). The hadith of Nu'man Ibn Basheer in Islamic jurisprudence notes that "[t]he lawful is clear and the unlawful is clear, and between them are equivocal matters . . . whoever guards against them protects his faith and his dignity." Sahīh al-Bukhārī 52, Sahīh Muslim 1599; *see generally* WAHBAH

-5-

[PROPOSED] BRIEF FOR FAITH FAMILY TECHNOLOGY NETWORK AS *AMICUS CURIAE*

as the measure of morality; each recognizes that ethical responsibility often demands more. The Government's contrary view—that companies must support any lawful use of their technology—would collapse the protected space between legality and morality that the First Amendment safeguards. It would convert every conscientious refusal into insubordination and treat respect for ethical boundaries as unlawful defiance. The Constitution does not permit the Government to force institutions to abandon their moral commitments simply because the Government has not banned the conduct the institutions believe is immoral. *See, e.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 220–21 (2013).

## II.     ANTHROPIC'S VIEWPOINT THAT THE VALUE OF HUMAN LIFE REQUIRES HUMAN ACCOUNTABILITY WHEN LETHAL FORCE IS USED IS A MATTER OF CONSCIENCE CONSISTENT WITH RELIGIOUS TEACHINGS AND PROTECTED BY THE FIRST AMENDMENT.

Anthropic's first proposed limit on the Government's use of its technology—a prohibition against using Claude for fully autonomous warfare that can take human life—falls well within the conscience protections of our constitutional tradition and constitutes protected speech and conduct that, on the developed administrative record, cannot lawfully serve as the basis for the Government's actions.

First, the faith traditions of FFTN's members teach that human life is sacred, and that the taking of any human life is a grievous act.[9] Killing is accordingly one of the most morally significant actions an individual or a government can take. And no human life should be taken absent the deliberate exercise of a fully formed moral conscience. Rather, the taking of life requires a conscience capable of mercy, compassion, and remorse—and it must be effectuated, if at all, by a person who can stand accountable before their deity and their community for their actions.

---

AL-ZUHAYLI, USŪL AL-FIQH AL-ISLĀMĪ (1986) (distinguishing mubāh from mustahabb and wājib); MOHAMMAD HASHIM KAMALI, PRINCIPLES OF ISLAMIC JURISPRUDENCE (3rd ed. 2005).

[9] *See* Genesis 1:27 ("So God created mankind in his own image[.]"); Luke 12:6-7 ("Are not five sparrows sold for two pennies? Yet not one of them is forgotten by God . . . Don't be afraid; you are worth more than many sparrows."); The Qur'an 5:32 ("[W]hoever kills a soul . . . it is as if he had slain mankind entirely. And whoever saves one – it is as if he had saved mankind entirely.").

As the employees of OpenAI and Google have explained in their *amicus* brief, AI is incapable of exercising contextual moral judgment.[10] And a crucial element of ethical—and moral—decision-making in wartime is the ability of the decision-maker to recognize that the target of their decisions is a human being, with a life that has value.[11] Human life is far too valuable to entrust AI, which lacks the ability to feel the weight of its actions and is incapable of deciding to show compassion or mercy, with the power to snuff it out.

Moreover, AI's lack of mercy, compassion, and remorse is matched by the absence of legal or interpersonal accountability. AI cannot worry about social, interpersonal consequences for wrong actions, like human beings do. And more critically, AI cannot face criminal liability for any war crimes it commits. Traditional criminal law relies on the concept of mens rea—the mental state of the person who has committed a crime. Whether that concept could possibly apply to a generative AI model, which is not human, is at best dubious.[12]

This is not to say that all use of lethal military force is inherently immoral. FFTN's members' faith traditions all teach that the need to protect human life can sometimes justify lethal force.[13] But the decision to use lethal force must be made by a human being—one who can choose

---

[10] *Amicus Curiae* Brief of Employees of OpenAI and Google in Their Personal Capacities at 13, *Anthropic PBC v. U.S. Dep't of War et al.*, No. 24-1 (N.D. Cal. Mar. 26, 2026) ("[Current AI models] are incapable of making the subtle contextual tradeoffs between achieving an objective and accounting for collateral effects that a human can."); *see also* United Nations, *International Covenant on Civil and Political Rights*, General comment No. 36, para. 65 (2019) [https://perma.cc/4EMS-XVXJ]; *see also* Brian Stauffer, *A Hazard to Human Rights: Autonomous Weapons Systems and Digital Decision-Making*, HUMAN RIGHTS WATCH, Apr. 28, 2025 [https://perma.cc/SWY9-E6Y8].

[11] Robert Sparrow, *Robots and Respect: Assessing the Case Against Autonomous Weapon Systems*, 30 ETHICS & INT'L AFFAIRS 93, 107, 112 (2016); Alex Leveringhaus, *Autonomous weapons mini-series: Distance, weapons technology and humanity in armed conflict*, HUMANITARIAN L. & POL'Y, Oct. 6, 2017 [https://perma.cc/25NS-WFCK].

[12] *See* Daniel Gall, *AI Decision-Making: Legal and Ethical Boundaries and the Mens Rea Dilemma*, ABA: GPSOLO MAGAZINE, Dec. 3, 2024 [https://perma.cc/8YXT-U8GY]; *see also* Roee Sarel, *Restraining ChatGPT*, 75 U.C. L.J. 115, 135 (2023).

[13] Michael J. Davidson, *War and the Doubtful Soldier*, 19 NOTRE DAME L.J. ETHICS & PUB. POL'Y 91, 103–04 (2005); *The Qur'an* 22:39–40; *Leviticus* 19:16.

-7-

mercy, and one who can face consequences for their actions. Notably, Department of Defense Directive 3000.09 shows that the Department itself at one time respected these principles, explaining that "[a]utonomous and semi-autonomous weapon systems will be designed to allow commanders and operators to exercise appropriate levels of human judgment over the use of force."[14] That commitment accords with a foundational precept: the lawful use of force requires a human mind capable of moral judgment, accountability, and restraint.

In sum, human life is too precious to allow AI to decide whether someone lives or dies. Using AI to deploy autonomous weapons is therefore not efficient warfare; it is the eradication of the moral friction that our traditions regard as essential to the just exercise of force. A company that takes a principled stance that it is unwise, premature, or immoral to use AI to deploy fully autonomous weapons is not a national security risk. Neither is it using "sanctimonious rhetoric" to tell the Government how to fight its wars.[15] Nor is it giving a "master class in arrogance."[16] On the record now before the Court, it is instead expressing a protected viewpoint on a matter of profound public concern—one the Government cannot punish consistent with the First Amendment or RFRA. Rather, it is adhering to principles of conscience shared by people of faith the world over, who believe that human life is uniquely valuable and should not be taken by an amoral, unfeeling, and unaccountable machine.

Because the Government's asserted justification for its actions rests on disagreement with that protected position, and not on any lawful or factually supported basis, it cannot carry its burden at summary judgment. Judgment should therefore be entered for Anthropic as a matter of law.

---

[14] Dep't of Defense Directive 3000.09, *Autonomy in Weapon Systems*, Sec. 1.2(a) (Effective Jan. 25, 2023).

[15] *Anthropic PBC*, 2026 WL 836842, at *5.

[16] *Id.*

### III. ANTHROPIC'S VIEWPOINT THAT MASS DOMESTIC SURVEILLANCE VIOLATES BASIC HUMAN DIGNITY IS A MATTER OF CONSCIENCE CONSISTENT WITH RELIGIOUS TEACHINGS AND PROTECTED BY THE FIRST AMENDMENT.

Anthropic's second proposed limit to the Government's use of its products—as a tool for mass domestic surveillance—is equally grounded in moral and religious tradition. The prospect of a government surveilling its own citizens violates deeply rooted values in our faith traditions regardless of how it is conducted, but the massive scale enabled by AI technologies vastly exacerbates these dangers. As with Anthropic's limitations on autonomous weapons, this position reflects a protected moral and policy judgment that, on the administrative record, cannot lawfully justify adverse government action.

The Catholic Church's recent instruction on AI, *Antiqua et Nova,* explains that certain types of personal and relational data "touch upon the individual's interiority, perhaps even their conscience."[17] Privacy from surveillance of this data "plays an essential role in protecting the boundaries of a person's inner life, preserving their freedom to relate to others, express themselves, and make decisions without undue control."[18] This principle is inherent across religious traditions as the precondition for moral freedom and the space in which humans wrestle with their conscience and discern their moral values. The Catholic sacrament of confession depends on the absolute confidentiality of the penitent's disclosure; study of the Torah is premised on moral understanding through communal debate, and requires freedom from external coercion;[19] and Islam places a high premium on privacy and protection of the believer from unwarranted intrusion into personal affairs.[20] By contrast, misused surveillance can "exert control over the lives of believers and how

---

[17] *Antiqua et Nova* ¶ 90.

[18] *Id.*

[19] The Talmud also tells the story of Balaam, who praised the tents of Israel because their openings did not face one another (*Numbers* 24:5), as community architecture should shield its people from the unwanted gaze of their neighbor. (*Bava Batra* 60(a)).

[20] The Qur'an expressly teaches: "O you who believe! Avoid much suspicions, indeed some suspicions are sins. And spy not, neither backbite one another." *The Qur'an* 49:12.

-9-

they express their faith."[21]

History teaches that government surveillance programs, once established, often devolve into unwarranted intrusions of civil and religious life even without the aid of AI technologies. The FBI's Counterintelligence Program (commonly known as "COINTELPRO") surveilled and attempted to disrupt civil rights leaders, religious organizations, and political dissidents for fifteen years.[22] Its targets were not foreign adversaries, but instead Americans exercising their constitutional rights of speech, religion, assembly, and petitioning. Among them was Dr. Martin Luther King, Jr., whose home and office were subjected to break-ins, phone taps, and planted listening devices in an effort to neutralize his leadership of the civil rights movement.[23]

In the years following the September 11, 2001, attacks on the World Trade Center, the New York City Police Department systematically surveilled and infiltrated Muslim communities—mapping entire neighborhoods, photographing mosques, and planting informants to report on sermons and attendees—based on the assumption that Muslim identity itself constituted a security threat.[24] Muslim communities across the United States experienced "a climate of insecurity, fear, and suspicion" that fundamentally altered how members practiced and expressed their faith.[25]

AI exponentially compounds these dangers. Where domestic surveillance was once limited by the resource constraints inherent in use of human agents, AI eliminates those limitations entirely.[26] AI systems can already deanonymize individuals from writing patterns alone.[27] They

---

[21] *Antiqua et Nova* ¶ 90.

[22] S. Rep. No. 94-755, Book III (1976).

[23] *See* Danielle Cadet, *How the FBI Invaded Martin Luther King Jr.'s Privacy—and Tried to Blackmail Him into Suicide*, HUFFPOST, Jan. 20, 2014 [https://perma.cc/3A8Z-UMXE].

[24] *The NYPD's Discriminatory Surveillance of Muslim Communities*, ACLU [https://perma.cc/3KVF-AGDQ].

[25] Tahseen Shams, *Visibility as Resistance by Muslim Americans in a Surveillance and Security Atmosphere*, 33 SOCIOLOGICAL FORUM 73, 74 (2018).

[26] *See, e.g.*, *Amicus Curiae* Brief of Employees of OpenAI and Google in Their Personal Capacities at 10–11, A*nthropic v. U.S. Dep't of War et al.*, No. 24-1 (N.D. Cal. Mar. 26, 2026)

[27] Simon Lermen et al., *Large-Scale Online Deanonymization with LLMs* at 13, CORNELL

can capture and evaluate communications at scale, identify both the speaker and their religious community with startling precision, and recommend targets for further monitoring. The resulting chilling effect, as evident from post-9/11 surveillance of Muslim communities, risks stifling religious communities' ability to thrive and even exist. Refusing to facilitate such uses is therefore not only a moral judgment, but the expression of a protected viewpoint on a matter of profound public concern.

*    *    *

The Court has already recognized that the Government's actions constitute "classic First Amendment retaliation," driven not by legitimate national security concerns but by "a desire to make an example of Anthropic for its public stance[.]" *Anthropic PBC*, 2026 WL 836842, at *11–12. The moral traditions and history described above illuminate precisely why that conclusion is correct—and why it compels judgment for Anthropic on the record now before the Court.

If this Court permits the Government to punish a company for adhering to ethical safeguards on the use of its products, it will chill other companies from acting consistent with conscience. The chilling effect will extend far beyond Anthropic, potentially silencing the engineers, researchers, and executives best positioned to prevent AI's catastrophic misuse. A company's adherence to such guardrails is not a supply-chain risk—it is an act of civic responsibility that honors the constitutional order.

The faith traditions represented by amicus have survived empires, inquisitions, and revolutions. And they have done so not by accommodating every demand of the state, but by insisting that some obligations are higher than any human authority. The right of conscience, the sanctity of human life, and the importance of privacy to religious faith—these are not mere policy preferences subject to negotiation as part of procurement. They are the moral foundations on which free societies are built. Because the Government's actions target that protected position and are unsupported by any lawful justification in the administrative record, there is no genuine dispute of

UNIVERSITY: ARXIV (Feb. 25, 2026) [https://perma.cc/Q49M-HC8E].

Case No. 3:26-cv-01996-RFL

[PROPOSED] BRIEF FOR FAITH FAMILY TECHNOLOGY NETWORK AS *AMICUS CURIAE*

material fact and Anthropic is therefore entitled to judgment as a matter of law.

## CONCLUSION

The Court should grant Anthropic's motion for summary judgment and set aside the challenged designation and related procurement actions as unlawful under 5 U.S.C. § 706.


Dated:    June 10, 2026                    Respectfully Submitted,


By:  /s/ David R. Friedman
       David R. Friedman (CA Bar No. 300737)
       **WILKINSON STEKLOFF LLP**
       2001 M Street NW, 10th Floor
       Washington, DC 20036
       Telephone: (202) 847-4000
       Facsimile: (202) 847-4005
       dfriedman@wilkinsonstekloff.com


       *Counsel for Amicus Curiae*
       *Faith Family Technology Network*