CROWELL & MORING LLP
Warrington S. Parker III (SBN 148003)
  WParker@crowell.com
3 Embarcadero Center
26th Floor
San Francisco, CA 94111
Telephone:  415.986.2800
Facsimile:   415.986.2827

CROWELL & MORING LLP
Sharmistha Das (*pro hac vice*)
  SDas@crowell.com
Matthew F. Ferraro (SBN 296622)
  MFerraro@crowell.com
Alexandra Barbee-Garrett (*pro hac vice*)
  ABarbee-Garrett@crowell.com
Stephanie Crawford (*pro hac vice*)
  SCrawford@crowell.com

600 Fifth Street, N.W.
Washington, DC 20001
Telephone:  202.624.2500
Facsimile:   202.628.5116

Attorneys for *Amici Curiae*
Industry Trade Associations

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ANTHROPIC PBC, | Case No. 3:26-cv-01996-RFL |
| Plaintiff, | **BRIEF OF *AMICI CURIAE* INDUSTRY TRADE ASSOCIATIONS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| U.S. DEPARTMENT OF WAR, et al., | Date:      July 30, 2026 |
| Defendants. | Time:      10:00 AM |
| | Ctrm.:     Courtroom 15 - 18th Floor |
| | Judge:     Hon. Rita F. Lin |
| | Date Action Filed: March 9, 2026 |

## TABLE OF CONTENTS

**Page**

IDENTITY AND INTEREST OF *AMICI CURIAE*................................................................. 1

INTRODUCTION ............................................................................................................... 2

SUMMARY OF ARGUMENT ........................................................................................... 3

BACKGROUND ................................................................................................................ 4

ARGUMENT ...................................................................................................................... 5

I.     The Section 3252 Determination threatens technology companies' ability to provide products and services to the government. ................................................. 5

    A.     The use of pretextual national security determinations in disagreements over commercial contract terms is contrary to law. ................................. 6

    B.     DoW's national security justifications are unsupported, compounding its adverse effect on commercial contracting.................................................. 8

II.    The Department of War's failure to use established processes destabilizes government contracting and the technology industry. ........................................ 10

    A.     The Department of War failed to follow the requisite process under Section 3252................................................................................................ 10

    B.     The Department of War failed to provide the requisite process to effectively debar a company.......................................................................... 12

III.   The ambiguity and internal contradictions of the Administration's actions harm the broader technology sector. ................................................................... 13

    A.     The Section 3252 Determination imposes significant compliance burdens. ......... 14

    B.     The harm to industry has no justified connection to DoW's underlying dispute with Anthropic. ............................................................................... 16

IV.    The Administration's actions threaten *amici*'s members' First Amendment rights. .......... 16

CONCLUSION ................................................................................................................. 17

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-i-

BRIEF OF AMICI CURIAE
INDUSTRY TRADE ASSOCIATIONS
CASE NO. 3:26-CV-01996-RFL

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anthropic PBC v. U.S. Dep't of War*,
  No. 26-CV-01996-RFL, 2026 WL 836842 (N.D. Cal. Mar. 26, 2026) ................................... 9

*Miami Herald Publ'g Co. v. Tornillo*,
  418 U.S. 241 (1974) ................................................................................................ 17

*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024) ................................................................................................ 17

*Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*,
  631 F.2d 953 (D.C. Cir. 1980) ................................................................................ 13

**Statutes**

10 U.S.C. § 3252 ........................................................................... 2, 4, 5, 8, 11, 12, 15

10 U.S.C. § 3452 .................................................................................................... 7

10 U.S.C. § 3453 ................................................................................................. 5, 7

41 U.S.C. § 107 .................................................................................................... 17

41 U.S.C. § 1906 .................................................................................................... 7

41 U.S.C. § 3306 .................................................................................................. 17

41 U.S.C. § 3307 ................................................................................................. 5, 7

41 U.S.C. § 4713 .................................................................................................... 2

44 U.S.C. § 3552 .................................................................................................... 4

Federal Acquisition Streamlining Act of 1994, Pub. L. No. 103-355, § 8104, 108
  Stat. 3243 (1994) ................................................................................................ 5

National Defense Authorization Act for Fiscal Year 2026 § 1801, Pub. L. No. 119-
  60, 139 Stat. 718 (2025) ...................................................................................... 6

National Defense Authorization Act for Fiscal Year 2026 §§ 1821-28, Pub. L. No.
  119-60, 139 Stat. 718 (2025) ............................................................................... 6

**Regulations and Legislative Materials**

48 C.F.R. § 9.402(b) ............................................................................................. 12

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-ii-

48 C.F.R. § 52.212-4 ............................................................................................................ 7

48 C.F.R. § 239-7306 ........................................................................................................... 5

48 C.F.R. § 252.239-7017 .............................................................................................. 5, 15

48 C.F.R. § 252.239-7018 .............................................................................................. 5, 15

S. Rep. No. 103-258 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2561 ............................................ 5

**Other Authorities**

Ashley Capoot, *Trump says Anthropic is shaping up and a deal is 'possible' for Department of Defense use*, CNBC (Apr. 21, 2026), https://www.cnbc.com/2026/04/21/trump-anthropic-department-defense-deal.html ........................................................................................................................ 9

Maria Curi, Sam Sabin, *Scoop: NSA using Anthropic's Mythos despite blacklist*, Axios (Apr. 19, 2026), https://www.axios.com/2026/04/19/nsa-anthropic-mythos-pentagon ............................................................................................................... 9

Mem. from Dep't of War Chief Info. Off. to Senior Pentagon Leadership et al., *Removal of Anthropic, PBC Products in DoW Systems*, Dep't of War 2 (Mar. 6, 2026), https://www.cbsnews.com/news/pentagon-ai-anthropic-memo-remove-from-key-systems/ ............................................................................................................... 14

President Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 27, 2026, 3:47 PM), https://truthsocial.com/@realDonaldTrump/posts/116144552969293195 .............................. 2

Secretary Pete Hegseth (@SecWar), X (Feb. 27, 2026, 5:14 PM), https://x.com/SecWar/status/2027507717469049070 ............................................................. 2

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-iii-

BRIEF OF AMICI CURIAE
INDUSTRY TRADE ASSOCIATIONS
CASE NO. 3:26-CV-01996-RFL

**IDENTITY AND INTEREST OF *AMICI CURIAE*[1]**

TechNet is a national, bipartisan network of technology CEOs and senior executives that promotes the growth of the innovation economy by advocating for a federal and state policy agenda across the country.

The Software & Information Industry Association ("SIIA") is the principal trade association for those in the business of information, including developers of artificial intelligence ("AI") models and applications.

The Computer & Communications Industry Association ("CCIA") is an international, not-for-profit association that represents a broad cross-section of communications, technology, and Internet industry firms.

The Information Technology Industry Council ("ITI") is the premier global advocate for technology, representing the world's most innovative companies, including those that are driving American leadership in AI.

*Amici* industry trade associations submit this brief because the government actions that Anthropic PBC ("Anthropic") challenges in this lawsuit carry immediate and concrete consequences for *amici*'s members and for the legal framework on which the entire government contracting community depends. Many of *amici*'s members contract with the U.S. Government, including the Department of War ("DoW"),[2] to provide mission-critical products and services, including AI technology. The designation of a major domestic AI firm as a supply-chain risk, without the thorough risk assessment required by statute, engenders uncertainty throughout the broader industry. Treating an American technology company as a foreign adversary, rather than an asset, will chill U.S. innovation and further embolden China's efforts to export its own government-backed AI technology. *Amici* respectfully request that this Court grant Anthropic's motion for summary judgment.

---

[1] No party or counsel for a party authored this brief in whole or in part, and no one other than *amici*, their members, or their counsel funded the preparation or submission of this brief.

[2] The U.S. Department of War is the secondary name for the U.S. Department of Defense.

**INTRODUCTION**

*Amici*'s concern is plain: if, as the result of a contractual disagreement, the federal government can instantly blacklist a U.S. company from government work on the pretext that the company poses a security risk, then the procurement framework that Congress built over decades becomes contingent on political favor rather than the rule of law. A system in which agencies may bypass governing statutes and regulations at presidential or secretarial command is not the system Congress designed, nor the one this Court should endorse.

On February 27, 2026, all federal agencies were directed "to IMMEDIATELY CEASE all use of Anthropic's technology" because, the directive posited, Anthropic was "forc[ing]" DoW "to obey [Anthropic's] Terms of Service instead of our Constitution."[3] Roughly 90 minutes later, Secretary of War Hegseth announced on social media that he was directing DoW "to designate Anthropic a Supply-Chain Risk to National Security," and that "[e]ffective immediately, no contractor, supplier, or partner that does business with the United States military may conduct any commercial activity with Anthropic."[4] Six days after the social media activity, DoW delivered two formal determinations to Anthropic, declaring the company a supply-chain risk under both 10 U.S.C. § 3252 ("Section 3252") and 41 U.S.C. § 4713 ("Section 4713"), enacted as part of the Federal Acquisition Supply Chain Security Act ("FASCSA") (collectively, the "Determinations"). In this proceeding, Anthropic challenges the Determination under Section 3252 (the "Section 3252 Determination").

Section 3252 provides substantive and procedural considerations for supply-chain risk determinations. The Administration issued the Presidential Directive, the Secretarial Order, and the Determinations on a basis substantively at odds with Section 3252, and without completing the statutory procedural requirements. The consequences have been swift: contracts terminated, partnerships frozen, workflows thrown into disarray, and *amici* member companies facing a compliance crisis with no clear guidance on applicable requirements in situations where

---

[3] President Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 27, 2026, 3:47 PM) ("Presidential Directive"), https://truthsocial.com/@realDonaldTrump/posts/116144552969293195.
[4] Secretary Pete Hegseth (@SecWar), X (Feb. 27, 2026, 5:14 PM) ("Secretarial Order"), https://x.com/SecWar/status/2027507717469049070.

Anthropic-assisted work product is embedded into their offerings. The uncertainty coursing throughout the broader technology industry risks undermining the credibility of the U.S. AI sector and the Administration's own national and economic security objectives.

As industry trade associations with members that are government contractors and technology companies, many of which use Anthropic's signature offering, the AI model Claude, as part of or to help create products and services sold to the government, *amici* write separately to highlight the Section 3252 Determination's practical impacts on American industry. These impacts range from the challenges in continuing to provide cutting-edge commercial products and services to the government to the need for *amici*'s member companies to reengineer their government offerings to maintain their DoW contracts. These harms affect the entire technology industry, not just Anthropic.

### SUMMARY OF ARGUMENT

*Amici* request that the Court grant plaintiff's motion for summary judgment and set aside the Section 3252 Determination for four principal reasons. *First*, the Section 3252 Determination elevates a contract dispute about commercial contracting terms to a supply-chain risk determination that affects the entire industry, imperiling the commercial contracting practices on which the government and industry have relied for decades to deliver timely and modern solutions to the government.

*Second*, the Presidential Directive, the Secretarial Order, and the Section 3252 Determination threaten the entire enterprise of federal procurement for the technology industry by disregarding the carefully constructed legal structure that *amici*'s members rely upon to make reasoned business decisions. If an executive branch agency may convert a contract dispute into a government-wide supply-chain risk determination, disregarding procedural safeguards Congress prescribed, then the procurement framework Congress built protects no one. Members of the domestic technology sector will rationally recalculate whether providing products and services to the government is worth the business risk.

*Third*, to this day, the reach and effect of the government's actions are so unclear that they are causing immediate and substantial harm to the technology industry. For months, DoW contractors, including *amici*'s members, have devoted time and resources to parsing the meaning of social media posts, inconsistent and shifting Administration statements, and vague directions on whether their offerings must be reengineered to comply with the Section 3252 Determination.

*Fourth*, the conduct in question raises serious concerns that DoW has violated Anthropic's First Amendment rights, including by compelling the company to alter its expressive product and retaliating against the company for its perceived viewpoint. *Amici*'s member companies also have an interest in preserving their rights to constitutionally protected speech.

## BACKGROUND

Section 3252 was designed to help DoW reduce supply chain risk, defined, as relevant here, as "the risk that an adversary may sabotage, maliciously introduce unwanted function, or otherwise subvert the design, integrity, . . . operation, or maintenance of a covered system so as to surveil, deny, disrupt, or otherwise degrade the function, use, or operation of such system." 10 U.S.C. § 3252(d)(4). The statute permits DoW to use "covered procurement actions" to exclude sources that fail to meet supply-chain security requirements from "covered procurements" for a "covered system"[5] or "covered item of supply"[6] or any other contract that contains a supply chain security clause. 10 U.S.C. § 3252(a), (d)(2)-(3). To invoke Section 3252, DoW must make a written determination that the invocation is "necessary to protect national security by reducing supply chain risk" and that "less intrusive measures are not reasonably available to reduce such supply chain risk[,]" and notify Congress. *Id.* § 3252(b).

Both the categories of covered procurements and the covered procurement actions are narrow. Section 3252 is limited to "covered procurement actions"—*i.e.*, (A) exclusion of a source that fails qualification requirements to reduce supply-chain risk; (B) exclusion of a source that

---

[5] A "covered system" is a "national security system," as defined in 44 U.S.C. § 3552(b)(6), *i.e.*, information systems used by agencies or contractors, the function of which is for intelligence activities, cryptologic activities related to national security, command and control of military forces, or weapon systems, or is critical to fulfillment of military missions. 10 U.S.C. § 3252(d)(5).

[6] A "covered item of supply" is "an item of information technology . . . purchased for inclusion in a covered system, and the loss of integrity of which could result in a supply chain risk for a covered system." 10 U.S.C. § 3252(d)(6).

fails to achieve an acceptable supply-chain risk evaluation rating; or (C) exclusion or withholding approval of a source as a subcontractor. *Id.* § 3252(d)(2). And the requirement that covered procurements involve covered systems or covered items of supply, or involve a supply-chain risk clause, reflects the statute's goal of applying to sensitive military information systems. *Id.* § 3252(d)(3).

Section 3252 is implemented by the Defense Federal Acquisition Regulation Supplement in mandatory clauses applicable to DoW solicitations, 48 C.F.R. § 252.239-7017, or contracts, 48 C.F.R. § 252.239-7018, for contracts for an information technology product or service "that is a covered system, is a part of a covered system, or is in support of a covered system[.]" *See* 48 C.F.R. § 239-7306.

DoW issued a nearly identical determination under Section 4713, which Anthropic has challenged on similar grounds under that statute's limited review under FASCSA in the U.S. Court of Appeals for the District of Columbia Circuit.

**ARGUMENT**

**I.     The Section 3252 Determination threatens technology companies' ability to provide products and services to the government.**

For over thirty years, Congress has required federal agencies, to the maximum extent practicable, to procure commercially available technology to meet their needs. *See* Federal Acquisition Streamlining Act of 1994, Pub. L. No. 103-355, § 8104, 108 Stat. 3243 (1994) (codified as amended at 10 U.S.C. § 3453 and 41 U.S.C. § 3307). Congress mandated this focus on commercial contracting to "eliminate the need for research and development, minimize acquisition leadtime, and reduce the need for detailed design specifications or expensive product testing." S. Rep. No. 103-258, at *5 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2561, 2566. Just last year, Congress directed DoW to further leverage commercially available technology. *See* National Defense Authorization Act for Fiscal Year 2026 §§ 1801, 1821-28, Pub. L. No. 119-60, 139 Stat. 718, 1221-25, 1245-52 (2025). Accordingly, *amici*'s member companies sell products and services to the government using commercial terms and conditions, much as Anthropic has.

DoW's unsupported designation of Anthropic as a supply-chain risk because of a disagreement with Anthropic's commercial terms imperils the industry's ability to continue using commercial contracting to deliver innovative products and services to the government. First, converting a dispute over commercial terms and conditions to a supply-chain risk determination is contrary to law. Second, the national security justifications proffered to support the Section 3252 Determination are plainly pretextual. Allowing the Section 3252 Determination to stand would risk the commercial contracting practices upon which the government and industry have relied for decades.

### A. The use of pretextual national security determinations in disagreements over commercial contract terms is contrary to law.

The Section 3252 Determination, like the Presidential and Secretarial Directives that it implements, is the result of a contract dispute between DoW and Anthropic over Anthropic's commercial terms and conditions, which DoW claims were overly restrictive. The Secretarial Directive specifically cited "The Terms of Service of Anthropic's defective altruism" as "unacceptable" before "directing the Department of War to designate Anthropic a Supply-Chain risk to National Security."[7] DoW's own record evidence before the Court establishes that its officials settled on the supply-chain risk determination only as contract negotiations deteriorated between the parties. *See* DoW, "Urgent Supply Chain Risk Analysis: Anthropic's Refusal to Permit Lawful AI Use" Memorandum (undated) ("Risk Memo"), Dkt. 96-2 at DoW-PI-005-08; DoW, Joint Recommendation, Concurrence, and Determination to Use Section 3252 of Title 10, United States Code, Authorities to Mitigate Supply Chain Risk Related to Anthropic, PBC (undated) ("Joint Recommendation"), *id.* at DoW-PI-002-03; Index of the Administrative Record, Dkt. 155-1 at 1-2 (showing that, before issuing the Section 3252 Determination, DoW considered the Joint Recommendation and its attachments, the Risk Memo, a February 26, 2026 "Due Diligence Preliminary Report," and a "Section 3252 Scoping Analysis for Anthropic").[8]

---

[7] Secretarial Order, *supra* n.4.
[8] *Amici* cite to the publicly filed documents at Dkt. 96-2, which correspond to the documents listed in the Index to the Administrative Record at Dkt. 155-1, as the Administrative Record itself was not publicly filed.

Federal law unquestionably underscores the importance of commercial contracting so that the government has access to the best products and services available on the market. *See, e.g.*, 10 U.S.C. § 3453 (DoW preference for commercial products and commercial services); *id.* § 3452 (incorporating 41 U.S.C. § 1906); 41 U.S.C. § 3307 (preference for commercial products and commercial services); *id.* § 1906 (list of laws inapplicable to procurements of commercial products and commercial services). Commercial contracting relies on the use of commercial terms and conditions, supplemented only with "those contract clauses that are required to implement provisions of law or executive orders applicable to acquisitions of commercial products, commercial components, or commercial services; or determined to be consistent with standard commercial practice." 41 U.S.C. § 3307(e)(2); *see also* 10 U.S.C. § 3452 (parallel authority for DoW-specific procurements); 48 C.F.R. § 52.212-4 (setting out the minimal commercial terms). Nothing in Section 3252 or any other federal procurement law permits DoW to designate a supply-chain risk based on a dispute over commercial contract terms. And with good reason. The use of commercial contracting terms allows companies to meet the government's procurement needs quickly and cost-effectively.

Consistent with the commercial contracting preferences enshrined in law, many of *amici*'s members are DoW contractors that proudly sell their commercial offerings to DoW under commercial terms and conditions. *Amici*'s members would be harmed if their ability to sell commercial offerings to DoW were interrupted, if commercial terms and conditions were subject to protracted negotiation, or if those commercial terms and conditions were subjected to post-award modifications that converted *amici*'s members' commercial offerings into customized—*i.e.*, non-commercial—offerings simply to comply with a direction to exclude a term or condition that Defendants disfavor. This uncertainty regarding their ability to rely on their commercial terms and conditions could chill *amici*'s members' ability to offer their innovative solutions to the government. Furthermore, if DoW, or any agency, can use the specter of a supply-chain risk determination—made without the legally required findings or process—to dispute commercial

terms and conditions, it may adversely affect a company's ability to engage in commercial contracting with the government.

### B.    DoW's national security justifications are unsupported, compounding its adverse effect on commercial contracting.

The Section 3252 Determination's lack of justification compounds its deleterious impact on the continued ability of industry and the government to benefit from commercial contracting. The Section 3252 Determination resulted from a contract dispute between DoW and Anthropic, *see* Risk Memo at DoW-PI-005-08, but DoW cites no evidence that Anthropic is an "adversary," or has otherwise taken any action to justify that Determination, which is designed to apply to the "risk that an adversary may sabotage, maliciously introduce unwanted function, or otherwise subvert . . . a covered system so as to surveil, deny, disrupt, or otherwise degrade the function, use, or operation of such system." 10 U.S.C. § 3252(d)(4). Instead, DoW declared in March that it was still "working with its counterintelligence and law enforcement partners to assess the *potential* risk that Anthropic's LLM products *may contain* technical exploits, including ones that *could have been* embedded by foreign nationals[.]" Michael Decl. ¶ 28, Dkt. 96-3 (emphases added). DoW has not provided any update since then. Dkt. 155-1 at 2. To the extent that there exists a *bona fide* national security concern, DoW still has not found it, let alone clearly identified it.

The lack of logic in DoW's position also supports the conclusion that the Section 3252 Determination is a pretext. On the one hand, DoW asserts that Anthropic is an "urgent" national security risk, Risk Memo at DoW-PI-005, and directs that, "immediately," "no contractor, supplier, or partner that does business with the United States military may conduct any commercial activity with [it]."[9] On the other, DoW orders Anthropic to continue to provide this supposedly risky service to DoW for six months,[10] and it has reportedly expanded its use of

---

[9] Secretarial Order, *supra* n.4.
[10] *Id.*

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-8-

BRIEF OF AMICI CURIAE
INDUSTRY TRADE ASSOCIATIONS
CASE NO. 3:26-CV-01996-RFL

Anthropic's latest model, Mythos, amid this litigation and in apparent tension with the Determination.[11]

Nothing in the Certified Administrative Record contradicts the Court's earlier conclusion that DoW's proffered rationales for the national security determination "appear pretextual." *Anthropic PBC v. U.S. Dep't of War*, No. 26-CV-01996-RFL, 2026 WL 836842, at \*21 (N.D. Cal. Mar. 26, 2026). The timing of the administrative record gave rise to the Court's inference that it was created "to justify the foreordained conclusion ordered in Secretary Hegseth's mandate to 'designate Anthropic a Supply-Chain Risk to National Security' on February 27." *Id.* (citation omitted).

The Court was correct to draw pretext from "inconsistencies" in the DoW record, where on one day, DoW proffered evidence purporting to show officials preparing various documents to support the Section 3252 Determination, but a day after the Determination was finalized and before DoW transmitted it to Anthropic, a DoW official "cordially exchanged drafts of Anthropic's usage terms" with Anthropic, writing, "'After reviewing with our attorneys and seeing your last draft (thanks for being fast), I think we are very close here.'" *Id.* (citation omitted). Nothing in the Record has disproven the Court's finding that "the contradictory positions, the procedural defects, and the rushed process following a public declaration of the foreordained conclusion all indicate that the actions were arbitrary and capricious." *Id.*

The evidence shows the Section 3252 Determination is an outcome in search of a justification. Allowing such a determination premised on unsubstantiated national security concerns to eclipse the traditional commercial contracting model favored by law and policy harms not only *amici*'s members, but also the government customers that commercial contracting is intended to serve.

---

[11] Maria Curi, Sam Sabin, *Scoop: NSA using Anthropic's Mythos despite blacklist*, Axios (Apr. 19, 2026), https://www.axios.com/2026/04/19/nsa-anthropic-mythos-pentagon; Ashley Capoot, *Trump says Anthropic is shaping up and a deal is 'possible' for Department of Defense use*, CNBC (Apr. 21, 2026), https://www.cnbc.com/2026/04/21/trump-anthropic-department-defense-deal.html.

**II.    The Department of War's failure to use established processes destabilizes government contracting and the technology industry.**

Many of *amici*'s members, like other government contractors, participate in government contracting because executive agencies and contractors are mutually bound in a procurement system with stable rules, predictable terms, and legal channels for dispute resolution. But the Section 3252 Determination short-circuits that carefully crafted process by effectively excluding the company from DoW contracting. Doing so is a *de facto* debarment or, at a minimum, a *de facto* exclusion order designed to functionally ban Anthropic from the government contracting ecosystem. Because it has this authority, DoW must follow the processes established by law and DoW's decision to take those actions outside the statutory process for debarment cannot be shielded from judicial review.

Both Section 3252 and the law governing debarment require substantive and procedural safeguards that provide pre-deprivation rights to contractors and prevent the government from taking punitive action. In this instance, DoW did not provide the requisite process under either Section 3252 or the debarment authorities. DoW's failure here is especially concerning to *amici*'s members because it upends the process and norms on which their government business depends. As a consequence of a disagreement over a contract's terms and without following the process that Congress set out, DoW has introduced a new and unbounded risk into every company's calculus about whether to do business with the federal government. In doing so, Defendants risk chilling domestic innovation and ceding ground to China's state-directed AI enterprises at the precise moment American leadership matters most.

**A.    The Department of War failed to follow the requisite process under Section 3252.**

Defendants claim that they provided Anthropic with sufficient post-deprivation process under Section 3252. Defendants claim that because Section 3252 addresses "sensitive national security matters," due process is "satisfied post-determination"—meaning, post-deprivation—because Anthropic has the options "to seek reconsideration before DoW within 30 days of receipt of the Determination, and to pursue judicial review under the [Administrative Procedure Act

("APA").]" Opp. to Plaintiff's Motion for Preliminary Injunction ("Opp."), Dkt. 96, at 22. According to Defendants, post-deprivation process constitutes due process here because Section 3252 provides for limited disclosure of the supply chain risk. *Id.* (citing 10 U.S.C. § 3252(c)). The record confirms this Court's finding on preliminary injunction that none of Defendants' arguments have merit.

Section 3252 requires—before taking any covered procurement action—DoW to consult with procurement officials, prepare a written determination justifying that the restriction is the least restrictive means to accomplish reducing supply-chain risk, and notify Congress. 10 U.S.C. §3252(b). If DoW intends to limit disclosure of the Section 3252 Determination, as it appeared to do here, Section 3252 further requires DoW "notify appropriate parties of a covered procurement action and the basis for such action only to the extent necessary to effectuate the covered procurement action[.]" *Id.* § 3252(c)(2)(A). But Defendants substantively and procedurally violated Section 3252(b), (c), and (d) by failing to:

- make a written determination *before* undertaking the Section 3252 Determination, *id.* § 3252(b)(1);
- consider "less intrusive measures" and determine that they are "not reasonably available to reduce such supply chain risk," *id.* § 3252(b)(2)(B);
- document how the risk to national security due to the disclosure of the supply chain risk determination outweighs the risk due to not disclosing such information, *id.* § 3252(b)(2)(C);
- "notify appropriate parties" of the covered procurement action and its basis and "ensure the confidentiality of any such notifications[,]" *id.* § 3252(c)(2)(A), (C); and
- apply the Section 3252 Determination only to covered procurement actions, *id.* § 3252(d)(2).

Instead, the Section 3252 Determination was issued after the Presidential Directive and Secretarial Order, justified only by the "risks" in Anthropic's commercial terms (*see* § I, *supra*), applicable to all Anthropic products and services and all DoW procurements, Joint

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-11-

BRIEF OF AMICI CURIAE
INDUSTRY TRADE ASSOCIATIONS
CASE NO. 3:26-CV-01996-RFL

Recommendation at DoW-PI-002-03. Far from limiting disclosure of the basis for the Section 3252 Determination, Defendants released it publicly via the Presidential Directive and Secretarial Order before even drafting the Joint Recommendation, Risk Memo, or the Section 3252 Determination itself. By issuing the overbroad Section 3252 Determination without following the required process, DoW introduced a new and unbounded risk into every company's calculus about whether to do business with the federal government.

**B.     The Department of War failed to provide the requisite process to effectively debar a company.**

DoW's actions were akin to debarment. Yet, contrary to law, DoW failed to provide the requisite process for a debarment. Before the government may exclude a company from federal contracting, the law requires the government to satisfy a set list of procedural safeguards: a notice of the factual basis for the action, an opportunity to respond, and a written determination grounded in law and fact. *See, e.g.*, 48 C.F.R. § 9.402(b) (debarment may "*not*" be used "for purposes of punishment") (emphasis added).

Defendants claim that "section 3252 does not mandate pre-deprivation process[,]" suggest that post-designation process is sufficient, and argue that broader due-process principles do not apply because the government did not debar Anthropic or broadly preclude it from a "chosen trade." Opp. at 21-22 (internal quotation marks and citation omitted). Not so. The Section 3252 Determination functionally bars Anthropic from DoW work (at least, once the six-month transition period expires) and, far from impacting Anthropic alone, the Section 3252 Determination prohibits contractors, including *amici*'s members, from incorporating or using Anthropic offerings in their own products and services provided to DoW. To that end, DoW is now effectuating the Section 3252 Determination through "covered procurement actions" under recent solicitations and their active contracts. Together, these actions mean that Anthropic will have virtually no way to access the DoW market at the end of the transition period.

Moreover, contractors, including *amici*'s members that use Anthropic's products to support their offerings to DoW, rely upon due-process protections themselves when contracting

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-12-

BRIEF OF AMICI CURIAE
INDUSTRY TRADE ASSOCIATIONS
CASE NO. 3:26-CV-01996-RFL

with the government. *See Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953, 961-67 (D.C. Cir. 1980) (holding that contractor's due process right was violated when it was not provided notice and an opportunity to respond to a "stigmatizing governmental defamation having an immediate and tangible effect on its ability to do business"). The Section 3252 Determination extends far beyond DoW contracts, Opp. at 21, to impact the entire DoW supply chain. Further, DoW has appeared to interpret the effect of Section 3252 impermissibly broadly, to bar Anthropic from all present and future DoW contracting work.

III.    **The ambiguity and internal contradictions of the Administration's actions harm the broader technology sector.**

The Section 3252 Determination cannot be treated as a simple vendor swap; Anthropic's offerings have a pervasive, foundational role in cutting-edge technologies. Thus, the Section 3252 Determination's practical consequences for *amici*'s members have been sweeping and immediate. Understanding why the Section 3252 Determination imposes such extraordinary burdens on *amici*'s members requires understanding how Claude functions within the technology ecosystem. Claude is not a plug-in application that a company can uninstall and easily replace. It is incorporated into the technology stack—the collection of infrastructure, operations, and data through which companies build, test, and deliver their products and services. In addition to productivity tools and process automation, companies use Claude to write code incorporated into other applications at every level of the stack. Once that code is embedded, it cannot be cleanly extracted, and, in many instances, a contractor cannot readily determine whether a given line of code or software component originated with Claude's assistance. Other companies use Claude to test the security and performance of their existing offerings, including testing for compliance with the government security certifications that many of *amici*'s members are required to hold. And, more recently, certain *amici* member companies are also using Claude to discover and remediate potential software vulnerabilities. Claude's pervasive, foundational role is also why the Section 3252 Determination's costs and disruptions are so severe.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-13-

BRIEF OF AMICI CURIAE
INDUSTRY TRADE ASSOCIATIONS
CASE NO. 3:26-CV-01996-RFL

**A.      The Section 3252 Determination imposes significant compliance burdens.**

The known requirements stemming from the Section 3252 Determination are already causing *amici*'s members to expend significant resources on compliance and contingencies. The Section 3252 Determination is not limited to what a government contractor delivers to DoW, but it also covers how that contractor "builds" its offerings and performs its work. For government contractors, like many *amici* members that use Claude in the development of their products or other workflows, the compliance question is not simply "did we sell Claude to DoW?" but "is Claude touching, in any way, anything we do to perform this contract?" *See* Michael Decl. ¶ 24.

The DoW Memorandum signed by DoW Chief Information Officer Kirsten Davies on March 6, 2026 ("DoW Memo")[12] imposed nearly immediate implementation deadlines, directing senior leadership to incorporate the restriction into "all current and future contracts" and instructs contracting officers to notify contractors within 30 days of the new requirement. The DoW Memo further mandates that all DoW Components and Defense Industrial Base ("DIB") partners represent their full compliance in writing to their contracting officer within 180 days.[13] At the same time, the DoW Memo explicitly "prohibits waivers," making the DoW CIO the sole authority for granting a temporary exemption in "rare and extraordinary circumstances"—and only where the requesting Component submits a comprehensive risk mitigation plan demonstrating that no viable alternative exists.

While the DoW Memo suggested a 180-day compliance deadline, the experience of *amici*'s members is that DoW is requiring government contractors to begin the complex process of coming into compliance far sooner—within days or weeks—in order to make the representations that contracting officers may now demand under every individual contract. *See* 48 C.F.R. § 252.239-7018(b), (c). As a result, while DoW itself has 180 days from March 6 to comply, contractors must accomplish an arguably more complex task in a fraction of that time:

---

[12] Mem. from Dep't of War Chief Info. Off. to Senior Pentagon Leadership et al., *Removal of Anthropic, PBC Products in DoW Systems*, Dep't of War 2 (Mar. 6, 2026), https://www.cbsnews.com/news/pentagon-ai-anthropic-memo-remove-from-key-systems/.

[13] *Id.*

identifying every point of contact between Claude and their DoW work, designing a path to replace it, and certifying under each applicable contract that such work is done.

The compliance process itself is resource-intensive. *Amici*'s members must assess the contractual and technical impact of excluding or removing Anthropic products and services from their offerings across their portfolios of DoW contracts. Contractors are required to review new DoW solicitations to redesign their DoW offerings to exclude supplies and services from being provided to DoW or used to perform the resulting DoW contract under a covered procurement. *See* 48 C.F.R. §§ 252.239-7017(b), 252.239-7018(b), (c). And where DoW has applied the Section 3252 Determination to a specific contract, the contractor must then identify its risk-mitigation actions, await potential contract modification by DoW, and then potentially modify their offerings or contracts to remove Anthropic products and services delivered to DoW or used in contract performance. *See* 48 C.F.R. § 252.239-7018(c); 10 U.S.C. § 3252(d)(2).

The downstream commercial consequences are severe. *Amici*'s member companies that have collaborated with Anthropic to build cutting-edge commercial offerings may be unable to provide those products, as built, to DoW. Given the pervasive, foundational role of Claude in many of *amici*'s members' offerings, many have found no viable substitute for some Claude workflows, leaving them with alternatives that, at a minimum, will require extensive re-development and training, and, even then, may still not be fit-for-purpose. As a result, these *amici* members may be forced to rebuild mature and long-tested offerings, under compressed timelines and substantial cost. Indeed, contractors, including *amici*'s members, have already begun to incur some of those costs, including the costs of re-engineering and re-procurement and the associated legal and administrative burdens. Rather than innovate or improve, *amici*'s members are forced to invest time, personnel hours, and money into modifying and rebuilding offerings that incorporate Anthropic's products and services, and confirming their updated offerings meet the contractual requirements. For those *amici* member companies that use Anthropic, replacing its models would require, in some instances, at least six months of development (including lost productivity) and model training to achieve the same level of security that the current model offers.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-15-

BRIEF OF AMICI CURIAE
INDUSTRY TRADE ASSOCIATIONS
CASE NO. 3:26-CV-01996-RFL

**B.     The harm to industry has no justified connection to DoW's underlying dispute with Anthropic.**

*Amici*'s members are bearing real costs to address DoW's purported perception of risk posed by Anthropic, even though DoW's concerns with Anthropic relate entirely to its commercial terms and conditions. *Amici*'s members are actively receiving outreach from DoW seeking compliance with the exclusion and removal requirements, and contractors are being pushed to modify contracts and restructure their offerings even as the legal validity of the Section 3252 Determination is subject to litigation.

The issue is compounded by the unresolved scope of the Secretarial Order, which raises questions that the Section 3252 Determination alone does not address. As a result, *amici*'s members must take consequential business decisions today without any authoritative guidance. Contractors are grappling with many unanswered questions: Is the ban on "commercial activity" still incoming, separate from and broader than the Section 3252 Determination's implementation? If so, will it reach Claude-generated code already incorporated into a product currently shipping to commercial customers? Does a cloud platform that hosts Claude alongside dozens of other AI models qualify as a "partner that does business with the United States military," and if so, is it prohibited from hosting Claude for customers with no government connection? These questions have no clear answers. They describe the actual uncertainty in which *amici*'s members are making immediate, material, irreversible business decisions.

**IV.     The Administration's actions threaten *amici*'s members' First Amendment rights.**

*Amici*'s members engage in speech through their incorporation of Anthropic, an expressive product, into their own offerings; through competition for government and commercial business; and through government contracting. DoW's designation of Anthropic as a supply-chain risk compels member company speech with regard to the message of their expressive offerings, and in their associations with business partners. *Amici*'s members engage in a wide range of speech: through expressive products and services, algorithmic speech, competition for commercial and government business, government contracting, and terms of use.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-16-

BRIEF OF AMICI CURIAE
INDUSTRY TRADE ASSOCIATIONS
CASE NO. 3:26-CV-01996-RFL

First, if the government's actions amount to compelling a contractor to alter the message embodied in an expressive product, like Claude, those actions raise serious compelled-speech concerns. *See Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974). DoW's designation also creates an unjustified, restrictive barrier to competition, 41 U.S.C. §§ 107, 3306(a)(2)(B), based on a government contractor's willingness to participate in the government's compelled speech by excluding Anthropic.

Second, the Section 3252 Determination is pretextual. If the government retaliated against Anthropic based on the perceived viewpoint of the company and its leadership, that retaliation is constitutionally impermissible regardless of whether the government characterizes its actions as procurement decisions. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180-81 (2024); *id.* at 203-04 (Jackson, J., concurring). *Amici*'s members also have First Amendment rights that they wish to exercise, and have an absolute right to exercise, without the threat of unlawful governmental interference.

## CONCLUSION

*Amici* respectfully urge the Court to grant Plaintiff's motion for summary judgment. The government has ample, well-established tools to resolve procurement disputes and to contract with providers on whatever terms it prefers. What it may not do is misuse extraordinary national security authorities designed for foreign adversary sabotage to punish a cleared American contractor for a negotiation disagreement, dispense with procedural protections Congress enacted, and upend the legal framework on which the entire technology contracting community depends. The Court should conclude that there is no genuine dispute as to any material fact and that Plaintiff is entitled to judgment as a matter of law.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-17-

BRIEF OF AMICI CURIAE
INDUSTRY TRADE ASSOCIATIONS
CASE NO. 3:26-CV-01996-RFL

Dated:  June 16, 2026

CROWELL & MORING LLP

By: _____
Warrington S. Parker III
  WParker@crowell.com
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Telephone:  415.986.2800
Facsimile:   415.986.2827

CROWELL & MORING LLP
Sharmistha Das (*pro hac vice*)
  SDas@crowell.com
Matthew F. Ferraro
  MFerraro@crowell.com
Alexandra Barbee-Garrett (*pro hac vice*)
  ABarbee-Garrett@crowell.com
Stephanie Crawford (*pro hac vice*)
  SCrawford@crowell.com
600 Fifth St., N.W.
Washington, DC 20001
Telephone:  202.624.2500
Facsimile:   202.628.5116

Attorneys for *Amici Curiae*
Industry Trade Associations

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-18-

BRIEF OF AMICI CURIAE
INDUSTRY TRADE ASSOCIATIONS
CASE NO. 3:26-CV-01996-RFL