BRYAN CAVE LEIGHTON PAISNER LLP
David B. Schwartz (*pro hac vice*)
1155 F Street NW
Washington, DC 20004
david.schwartz@bclplaw.com
Tel. (202) 508-6086

Barbara Smith Tyson (*pro hac vice* motion forthcoming)
One Metropolitan Square
211 N. Broadway #3600
St. Louis, Missouri 63102
barbara.smith@bclplaw.com
Tel. (314) 259-2367

(Ashley) Hyun-Jeong Kim, SBN: 350856
120 Broadway, Suite 300
Santa Monica, CA 90401
ashley.kim@bclplaw.com
Tel. (310) 576-2113

Jessica Limbaugh (*pro hac vice* motion forthcoming)
211 Bolivar Street #101
Jefferson City, MO 65101
jessica.limbaugh@bclplaw.com
Tel. (573) 556-6633

*Counsel for Amicus Curiae Taxpayers Protection Alliance Foundation*

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ANTHROPIC PBC, | Case No. 3:26-cv-01996-RFL |
| Plaintiffs, | **BRIEF OF *AMICUS CURIAE* TAXPAYERS PROTECTION ALLIANCE FOUNDATION IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| U.S. DEPARTMENT OF WAR, et al., | |
| Defendants. | Judge:   Hon. Rita F. Lin<br>Crtrm:   15, 18th floor<br>Date:    July 30, 2026<br>Time:    10:00 a.m. |

# TABLE OF CONTENTS

**Page**

IDENTITY AND INTEREST OF AMICUS CURIAE ................................................................. 1

SUMMARY OF ARGUMENT ................................................................................................... 2

BACKGROUND ......................................................................................................................... 3

ARGUMENT ............................................................................................................................... 4

I.      Defendants' Actions Violate the First Amendment and Threaten the Free Market ........... 4

        A.      Defendants' Actions Impose Unconstitutional Conditions Outside Relevant
                Contracting ...................................................................................................................... 4

        B.      Defendants' First Amendment Violations Will Destabilize Markets .................... 7

II.     The "Supply Chain Risk" Designation of Anthropic Ignores the Plain Meaning of 10
        U.S.C. § 3252 and Lacks an Intelligible Principle .............................................................. 8

CONCLUSION ......................................................................................................................... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ............................................................................................... 6

*All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*,
651 F.3d 218 (2d Cir. 2011), aff'd, 570 U.S. 205 (2013) ........................................ 6

*Ashwander v. Tenn. Valley Auth.*,
297 U.S. 288 ......................................................................................................... 10

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) ................................................................................................ 9

*Citizens United v. FEC*,
558 U.S. 310 (2010) ................................................................................................ 5

*Connick v. Myers*,
461 U.S. 138 (1983) ................................................................................................ 5

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
472 U.S. 749 (1985) ................................................................................................ 5

*FCC v. League of Women Voters of Cal.*,
468 U.S. 364 (1984) ................................................................................................ 6

*Fed. Commc'ns Comm'n v. Consumers' Rsch.*,
606 U.S. 656 (2025) .............................................................................................. 11

*First Nat'l Bank of Boston v. Bellotti*,
435 U.S. 765 (1978) ................................................................................................ 5

*Gundy v. United States*,
588 U.S. 128 (2019) .............................................................................................. 11

*In re Google Play Store Antitrust Litig.*,
147 F.4th 917 (9th Cir. 2025)................................................................................. 8

*J. W. Hampton, Jr., & Co. v. United States*,
276 U.S. 394 (1928) .............................................................................................. 11

*Nat'l Collegiate Athletic Ass'n v. Alston*,
594 U.S. 69 (2021) ................................................................................................. 8

*NetChoice, LLC v. Fitch*,
  145 S. Ct. 2658 (2025) ............................................................................................... 1

*Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*,
  475 U.S. 1 (1986) ....................................................................................................... 5

*Rust v. Sullivan*,
  500 U.S. 173 (1991) ................................................................................................. 5, 6

*Snyder v. Phelps,*
  562 U.S. 443 (2011) ..................................................................................................... 5

*United States v. Nat'l Lib. Ass'n,*
  539 U.S. 194 (2003) ..................................................................................................... 5

*United States Postal Serv. v. Konan*,
  146 S. Ct. 736 (2026) ................................................................................................... 1

*United States v. Metcalf*,
  156 F.4th 871  (9th Cir. 2025) ................................................................................... 10

*United States v. Mingo*,
  964 F.3d 134 (2d Cir. 2020) ....................................................................................... 11

*Whitman v. American Trucking Assns., Inc.*,
  531 U.S. 457 (2001) ................................................................................................... 11

**Statutes**

10 U.S.C. § 3252 ................................................................................. 4, 9, 10, 11, 12

41 U.S.C. § 4713 ............................................................................................................ 9

**Other Authorities**

Exec. Order No. 14365, 90 Fed. Reg. 58499, (Dec. 11, 2025) ....................................... 8

*Adversary*, Black's Law Dictionary (10th ed. 2014) ....................................................  9

*Adversary*, Merriam-Webster, https://www.merriam webster.com/dictionary/adversary ............. 9

*Adversary*, Britannica, https://www.britannica.com/dictionary/ adversary  ................................ 10

*Maliciously*, Black's Law Dictionary (10th ed. 2014) ................................................... 10

*Sabotage*, Black's Law Dictionary (10th ed. 2014) ..................................................... 10

BRIEF OF AMICI CURIAE TAXPAYER PROTECTION ALLIANCE FOUNDATION

**Internet Sources**

*Claude's Constitution*, Anthropic, https://www.anthropic.com/constitution.................................. 6

Congressional Budget Office, *Artificial Intelligence and Its Potential Effects on the Economy and the Federal Budget* (Dec. 2024), https://www.cbo.gov/publication/61147 . ............................................................................... 3

Njenga Kariuki, *Artificial Intelligence Index Report 2025*, Stanford Institute for Human-Centered Artificial Intelligence, Chapter 4: Economy, https://hai.stanford.edu/assets/files/hai_ai-index-report 2025_chapter4_final.pdf .................. 3

President Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 27, 2026, 3:47 PM), https://truthsocial.com/@realDonaldTrump/posts/ 116144552 969293195 ................................................................................................ 2, 4, 7, 11

Sarah Kreps, *The Global AI Race: Will US Innovation Lead or Lag?*, Brookings Institution (Dec. 6, 2024), https://www.brookings. edu/articles/the-global-ai-race-will-us-innovation-lead-or-lag/. .................................................. 3, 4

Secretary of War Pete Hegseth (@SecWar), X (Feb. 27, 2026, 5:14 PM), https://x.com/SecWar/status/2027507717469049070?s=20 .............................................. 2, 4

*Statement from Dario Amodei on our discussions with the Department of War*, Anthropic (Feb. 26, 2026), https://www.anthropic.com/news /statement-department-of-war. ....................................................................................................... 5

*Statement on the comments from Secretary of War Pete Hegseth,* Anthropic (Feb. 26, 2026), https://www.anthropic.com/news /statement-department-of-war........................... 7

BRIEF OF AMICI CURIAE TAXPAYER PROTECTION ALLIANCE FOUNDATION

**IDENTITY AND INTEREST OF AMICUS CURIAE**

The Taxpayers Protection Alliance Foundation ("TPAF") is a nonpartisan non-profit 501(c)(3) organization dedicated to protecting free markets and educating the public on the impact of government overreach on the economy.[1] In its role as a watchdog, TPAF holds federal, state, and local bureaucracies accountable through articles, analyses, and congressional testimony. TPAF and its affiliated 501(c)(4) organization, the Taxpayers Protection Alliance ("TPA"), also regularly file *amicus* briefs in cases that directly implicate free market and limited government principles. For example, TPA has participated in cases with the aim of increasing U.S. Postal Service accountability, *see United States Postal Serv. v. Konan*, 146 S. Ct. 736 (2026), and defending the First Amendment right to participate in anonymous online speech and association without age verification, *see NetChoice, LLC v. Fitch*, 145 S. Ct. 2658 (2025). When government overreach directly encroaches on the lives, livelihoods, and freedoms of citizens, TPAF and TPA stand ready to fight.

TPAF has a strong interest in this matter because it believes that Defendants' decision to brand Anthropic a "supply chain risk" is unlawful, and this unlawful action threatens America's vibrant market-based order. When Defendants overstepped the statutory powers and limitations set by Congress, they acted as judge, jury, and executioner, and wholly disregarded the First Amendment in the process. Defendants unlawfully blacklisted Anthropic as a "supply chain risk," preventing it from ever doing business with the government. Aside from doing damage to the separation of powers outlined in the Constitution, those actions jeopardize future American economic prosperity by singling out for punishment a thriving, innovative leader in the AI industry.  Defendants' unlawful actions will likely cripple Anthropic's ability to do business, create new and better technologies, and provide services to American businesses and consumers. Critically, Defendants' unlawful actions also harm taxpayers by arbitrarily limiting which AI products government agencies can use to deliver services to citizens. Defendants have sidestepped

---

[1] No counsel for a party authored this brief in whole or in part, and no one other than *amicus curiae*, its members, or its counsel made a monetary contribution intended to fund this brief's preparation or submission. The views expressed in this brief are those of TPAF and do not reflect the opinions of any specific individual counselor affiliated with TPAF.

legal processes in order to punish Anthropic, a pioneer in an essential and emerging industry that will define the next chapter of modern life.

**SUMMARY OF ARGUMENT**

Defendants have begun a retaliatory vendetta against Anthropic, which will have dire consequences for innovation, the free market, and American taxpayers. When Defendants "direct[ed] EVERY Federal Agency in the United States Government to IMMEDIATELY CEASE all use of Anthropic's technology,"[2] in "conjunction" with the Secretary of War's "supply chain risk" designation (to use his own wording),[3] it had the effect of not just denying a strong AI competitor access to necessary scale but also chilling Anthropic's freedom of expression. Then, when Defendants declared that "[e]ffective immediately, no contractor, supplier, or partner that does business with the United States military may conduct any commercial activity with Anthropic," they cemented Anthropic's status as a pariah in the eyes of its other commercial partners.[4]

What occurred here was not a careful and measured review of a federal contract to assess its utility. The government did not merely terminate Anthropic's contract with the Department of War ("DOW"); Defendants blacklisted and boycotted the company across the government. Due to the severe and public nature of Defendants' actions, the viewpoint-discriminatory retaliation against Anthropic is likely to inflict reputational damage and thereby harm the company's ability to continue to provide cutting-edge technology to benefit American taxpayers and consumers.

Defendants' actions threaten the constitutional order and jeopardize the free-market economic system that has been the engine of tremendous American growth and innovation. Defendants' post-hoc justifications should be rejected. They cannot excuse Defendants' flagrant violations of the First Amendment or their flawed interpretation of the relevant statute. For these reasons, *amicus* urges this Court to grant Anthropic's motion for summary judgment.

---

[2]    President Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 27, 2026, 3:47 PM), https://truthsocial.com/@realDonald Trump/posts/116144552969293195 (emphasis in original).
[3]    Secretary of War Pete Hegseth (@SecWar), X (Feb. 27, 2026, 5:14 P.M.), https://x.com/SecWar/status/2027507717469049070?s=20.
[4]    *Id*.

2

**BACKGROUND**

America's free market, which rewards innovation and growth and promotes shared prosperity, and its robust republican form of government, which protects private actors from government overreach, are essential ingredients to the nation's 250-year success as a self-governing democracy. The economic and political freedoms Americans enjoy have produced world-changing technology like air travel, the electric light bulb, and the internet. Often, these private sector innovations help defend the systems that enabled their creation: they directly support American defense efforts by serving as the foundations of groundbreaking military technology.

Americans' next great innovative leap is AI. "AI could transform society in the same way that technological advances like the steam engine and electrification did in the distant past and as computing and the internet have done over the past few decades."[5] Studies suggest "that if AI's use became more widespread, it would boost economic growth," as well as "impact … federal spending through [AI's] use in the development of certain products."[6]

On a geopolitical scale, there is a race to develop the most advanced AI tools and deploy those tools to increase efficiencies and innovation.[7] American innovators are taking the lead. In 2024, the United States invested $109.1 billion in AI, nearly 12 times more than China and 24 times more than the United Kingdom.[8] Critically, the United States "has historically relied on the strength of its private sector to drive technological innovation, with breakthroughs in fields like aerospace, semiconductors, and computing often originating in commercial industries before being adapted for national security purposes," and it is continuing to do so in AI development.[9] But

---

[5]    Congressional Budget Office, *Artificial Intelligence and Its Potential Effects on the Economy and the Federal Budget* (Dec. 2024), https://www.cbo.gov/publication/61147.

[6]    *Id.*

[7]    Sarah Kreps, *The Global AI Race: Will US Innovation Lead or Lag?*, Brookings Institution (Dec. 6, 2024) https://www.brookings. edu/articles/the-global-ai-race-will-us-innovation-lead-or-lag/.

[8]    Njenga Kariuki, *Artificial Intelligence Index Report 2025*, Stanford Institute for Human-Centered Artificial Intelligence, Chapter 4: Economy, https://hai.stanford.edu/assets/files/hai_ai-index-report 2025_chapter4_final.pdf.

[9]    Sarah Kreps, *supra* n. 7.

BRIEF OF AMICI CURIAE TAXPAYER PROTECTION ALLIANCE FOUNDATION

China is gaining ground, demonstrating some of the most significant year-over-year growth.[10] It is not doing so with a free market but with "massive state-led investments" and a "strategy of military-civil fusion [through which] China is rapidly integrating advancements from its commercial sector into military operations."[11]

Anthropic and its competitors offer an American answer to this top-down centralized approach. For years, Anthropic has competed to offer groundbreaking technology in service of America's national defense.[12] Such was the case until February 27 when, in the midst of a contract dispute, both the President and the Secretary of War retaliated against Anthropic.[13] By blacklisting Anthropic as a "supply chain risk," Defendants have shut out a pioneer of innovation at a critically important juncture. By barring the company from federal contracts and inflicting reputational damage, Defendants have violated Anthropic's freedom of speech and run afoul of 10 U.S.C. § 3252, which is one statutory authority providing governing "supply chain risk" designations. These actions undermine the rule of law and threaten America's place as the global leader in AI investment and development. chapter of modern life.

## ARGUMENT

**I.      Defendants' Actions Violate the First Amendment and Threaten the Free Market.**

**A.      Defendants' Actions Impose Unconstitutional Conditions Outside Relevant Contracting.**

Defendants punished Anthropic for expressing public opinions on the thorny ethical and practical question of how much human oversight AI-fueled defense technology requires. As stated by Anthropic co-founder and CEO Dario Amodei, AI technology has "[s]ome uses"—such as mass domestic surveillance and autonomous weaponization—that lie "outside the bounds of what

---

[10]     *Id.*
[11]     *Id.*
[12]     Declaration of Thiyagu Ramasamy, Dkt. 6-3, ¶¶ 4-6. .
[13]     *Supra* nn. 2, 3.

4

BRIEF OF AMICI CURIAE TAXPAYER PROTECTION ALLIANCE FOUNDATION

today's technology can safely and reliably do."[14]  This understandable point of view on the current limits of what AI ought to be used for is core First Amendment-protected expression. Thus, a private actor's public expression on the appropriate exercise of a highly-consequential technology is at "'the heart of the First Amendment's protection'" and "'occupies the highest rung of the hierarchy of First Amendment values.'" *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–759 (1985) (opinion of Powell, J.)); *Connick v. Myers*, 461 U.S. 138, 145 (1983).

The Supreme Court has made clear that "political speech does not lose First Amendment protection 'simply because its source is a corporation.'" *Citizens United v. FEC*, 558 U.S. 310, 342 (2010) (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784 (1978)). That is because "[c]orporations..., like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (plurality opinion) (quoting *Bellotti*, 435 U.S. at 783); see *Citizens United*, 558 U.S. at 342-43. Unless said speech implicates fraud or other punishable conduct by companies, corporations' political speech should be protected just as the speech of American "natural persons" are protected. Id. at 343 (quoting *Bellotti*, 435 U.S. at 776).

To be sure, the government does not violate the First Amendment by merely choosing not to contract with companies that cannot fulfill the terms of its contracts. In general, the state has no obligation to bankroll any particular business model or any particular exercise of constitutional rights, including all conceivable views. *E.g., United States v. Nat'l Lib. Ass'n*, 539 U.S. 194, 212 (2003) ("A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity." (quoting *Rust v. Sullivan*, 500 U.S. 173, 193 (1991))). "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an

___

[14]    *Statement from Dario Amodei on our discussions with the Department of War*, Anthropic (Feb. 26, 2026) ("Statement from Dario Amodei"), https://www.anthropic.com/news/statement-department-of-war.

alternate program which seeks to deal with the problem in another way." *Rust*, 500 U.S. at 193.  In other words, if the government wants to contract with a vendor for a product, it can, and indeed necessarily must, consider the ethical boundaries that a particular vendor might place on the uses of its product. Because Anthropic's stated values, including "[i]ndividual privacy and freedom from undue surveillance,"[15] are part of its constitution and an integral part of its decisions to take on surveillance-related work, some of Anthropic's viewpoints will inevitably play a role in contract determination. Defendants thus could have severed DOW's contract with Anthropic without exceeding DOW's statutory authority and engaging in a government-wide contracting crusade against the company.

The state cannot retaliate against a company's point of view by cutting it off from all conceivable contracts, including contracts or programmatic funding that has nothing whatsoever to do with its point of view. See *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 217 (2013) (government does not "run afoul of the First Amendment" where it does not "prohibit the recipient from engaging in the protected conduct outside the scope of the federally funded program." (citation modified) (quoting *Rust*, 500 U.S. at 197)). A condition of contracting or funding unconstitutionally jeopardizes First Amendment rights when it "seek[s] to leverage funding to regulate speech outside the contours of the program itself." *Id*. at 206; see also *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 399-401 (1984) (finding that the state cannot substantially abridge a broadcaster's speech based on a limited policy interest).

Defendants' retaliation here effectively places an unconstitutional condition on Anthropic's exercise of its First Amendment freedoms. The unconstitutional conditions doctrine covers these "outside the contours" cases, providing that the government may not withhold a benefit—including taxpayer-funded contracts—"on a basis that infringes his constitutionally protected interests." *All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 231 (2d Cir. 2011) (quotation marks omitted), *aff'd*, 570 U.S. 205 (2013). Here, Defendants are violating Anthropic's First Amendment right to express concerns about the limits of AI by

---

[15]    *Claude's Constitution*, Anthropic, https://www.anthropic.com/constitution.

BRIEF OF AMICI CURIAE TAXPAYER PROTECTION ALLIANCE FOUNDATION

withholding the immense benefit of accessing its contracts. Anthropic's decision to place technical limitations on its tools—which, for example, prevent certain surveillance use cases—is part and parcel of its current philosophy on acceptable AI use. That philosophy includes the following statement: "we believe that mass domestic surveillance of Americans constitutes a violation of fundamental rights."[16]   This is not about Anthropic's ability to carry out any specific contract implicated by that point of view, but rather government-wide retaliation against protected (alleged) "RADICAL LEFT, WOKE"[17]  speech and an attempt to chill similar speech going forward.

### B.    Defendants' First Amendment Violations Will Destabilize Markets.

Defendants' unconstitutional actions will have profound economy-wide consequences, hamstringing the markets now fueling the explosive development of groundbreaking AI technology that benefit taxpayers and consumers.

Anthropic's relationships with public and private sector actors have already been impacted outside the defense sector. Following Defendants' actions, the Department of Treasury, Department of State, Department of Health and Human Services, and Department of Energy all announced they would discontinue use of Anthropic's products.[18]  Financial services institutions, a national grocery chain, a pharmaceutical company, and a financial technology company have also expressed reluctance to continue or commence working with Anthropic.[19]   The list is long and growing, and demonstrates that the government's unconstitutional viewpoint discrimination against Anthropic is having unwelcome ripple effects across the U.S. economy, wholly outside the contours of the programs and contracts on which Anthropic and the federal government differ.

Defendants' actions will thus cripple the ability of Anthropic to continue to grow, achieving the necessary scale to benefit taxpayers and consumers. The Trump administration has consistently acknowledged the importance of AI development to American global power and

---

[16]    *Statement on the comments from Secretary of War Pete Hegseth*, Anthropic (Feb. 27, 2026), https://www.anthropic.com/news /statement-comments-secretary-war.
[17]    President Donald J. Trump, *supra* n.1 (emphasis in original).
[18]    Declaration of Paul Smith, Dkt. 6-4, ¶ 13.
[19]    *Id.* at ¶¶ 16-17.

BRIEF OF AMICI CURIAE TAXPAYER PROTECTION ALLIANCE FOUNDATION

underscored the need to ensure that developers of the technology continue to compete inside and outside of government—free from bureaucratic interference. For example, the White House has declared that AI development "will promote United States national and economic security dominance across many domains."[20]

Despite these public pronouncements about the need for competitive AI, the government's actions punishing Anthropic for exercising its free speech threaten to reduce competition and harm innovation. The Ninth Circuit has recognized that modern technology offerings benefit from scale, i.e., the "yin and yang of th[e] symbiotic relationship" between users and developers of a platform. *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 950 (9th Cir. 2025). When appropriately used, increased scale allows digital platforms to grow quickly, creating substantial wealth, benefits, and improved quality of life for taxpayers and consumers alike. Blacklisting Anthropic at this pivotal moment in time, when the AI space is so highly competitive, threatens to deprive Anthropic of the access to markets it needs to succeed.

Defendants' actions here directly harm taxpayers, because their denial of scale to Anthropic undercuts innovation across the government. Anthropic—at the moment a leader in AI—now cannot compete for government contracts—defense or otherwise—with other AI innovators on the merits of the product it offers even if it offers the most efficient and innovative option. When AI providers are not free to compete based on the merit of their offerings, America loses the benefit of unfettered competition yielding the best allocation of the Nation's resources to produce the most innovative tools and services. See *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 73 (2021). The results will be predictable: higher prices, lower quality products, reduced innovation, and a breakdown in rule of law, all in a sector critical for continued American prosperity.

## II.   The "Supply Chain Risk" Designation of Anthropic Ignores the Plain Meaning of 10 U.S.C. § 3252 and Lacks an Intelligible Principle.

Beyond Defendants' grievous First Amendment violations and likely economy-wide

---

[20]   Exec. Order No. 14365, 90 Fed. Reg. 58499 (Dec. 11, 2025).

BRIEF OF AMICI CURIAE TAXPAYER PROTECTION ALLIANCE FOUNDATION

harms, Defendants' actions cannot be reconciled with the plain meaning of 10 U.S.C. § 3252 . Because the Department of War relies on that provision here as the legal basis for its "supply chain risk" designation, it is necessary to examine the ordinary public meaning of key terms found in the statute.[21] *Cf. Bostock v. Clayton Cnty.*, 590 U.S. 644, 654-55 (2020) ("[O]nly the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives.").

Here, ordinary principles of statutory construction support one conclusion: a domestic company engaged in a contract dispute is not a "supply chain risk." The law defines "supply chain risk" as "the risk that an adversary may sabotage, maliciously introduce unwanted function, or otherwise subvert the design, integrity, manufacturing, production, distribution, installation, operation, or maintenance of a covered system so as to surveil, deny, disrupt, or otherwise degrade the function, use, or operation of such system." 10 U.S.C. § 3252(d)(4). However, it is entirely unclear how Anthropic's concerns about the use of AI in mass surveillance and automated weapons render it an "adversary" to the government or U.S. taxpayer.

Dictionaries contemporary with the current statutory formulation—which dates to 2018 — uniformly define "adversary" as a "hostile opponent," often in the context of conflict, rivalry, or a contest between opposing sides—frequently nations, armed groups, or aligned entities acting on behalf of such powers. See, e.g., *Adversary*, Black's Law Dictionary (10th ed. 2014) (defined as "[a]n opponent; esp., opposing counsel."); *Adversary*, Merriam-Webster, https://www.merriam webster.com/dictionary/adversary (defining as "one that contends with, opposes, or resists"); *Adversary*, Britannica, https://www.britannica.com/dictionary/ adversary (defining as "an enemy or opponent"). In the national security context, that ordinary meaning is sharpened further: an "adversary" is not merely any disfavored actor, but one aligned with or acting in service of a

---

[21]     Defendants also rely on 41 U.S.C. § 4713 for their "supply chain risk" designation, which Plaintiff challenges separately. *See Anthropic v. U.S. Department of War et al.*, No. 26-1049 (D.C. Cir.).

BRIEF OF AMICI CURIAE TAXPAYER PROTECTION ALLIANCE FOUNDATION

foreign threat to the United States.

Other language Congress used in the definition of supply chain risk in section 3252 underscores this conclusion. Section 3252's use of terms like "sabotage" and "maliciously" indicate that Congress intended supply chain risks to be intentional acts by an adversary during a time of war. See *Sabotage*, Black's Law Dictionary (10th ed. 2014) ("Deliberate damage done to equipment, vehicles, etc. in order to prevent an enemy or adversary from using them; specif., the destruction, damage, or knowingly defective production of materials, premises, or utilities used for national defense or for war."); *Maliciously*, Black's Law Dictionary (10th ed. 2014) ("In a spirit of ill will."). Congress's choice of words in section 3252 emphasizes that there must be an alignment or action taken in service of a foreign threat, not a mere disagreement over the terms of a contract.

Read otherwise to include any party on the opposite side of contract negotiations would not only fly in the face of the "ordinary public meaning" of "adversary," but would also strip the DOW's "supply chain risk" designation powers of any intelligible or fathomable principle.[22] This Court should avoid any such statutory construction that enters these troubled Constitutional waters. *See United States v. Metcalf*, 156 F.4th 871, 881-82 (9th Cir. 2025) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." (quoting *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 348 (1936))).

A lack of intelligible principle would render 10 U.S.C. § 3252 an unconstitutional delegation of power from the legislative to executive branch. In determining whether the latter has been impermissibly delegated powers from the former, the Court has asked whether Congress has made clear an "intelligible principle" to guide what it has given the agency to do. *Gundy v. United States*, 588 U.S. 128, 135 (2019) (quoting *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S.

---

[22] Anthropic discusses the nature of the negotiations at length in its Motion for Summary Judgment. *See* Dkt. 166 at 17-20. Construing these negotiations as "adversarial" for purposes of Section 3252 further risks creating a chilling effect on contractor participation in government contracting.

BRIEF OF AMICI CURIAE TAXPAYER PROTECTION ALLIANCE FOUNDATION

394, 409 (1928)). "The 'guidance' needed is greater . . . when an agency action will 'affect the entire national economy' than when it addresses a narrow, technical issue[.]" *Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025) (quoting *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 475 (2001)). "[I]n examining a statute for the requisite intelligible principle, [courts] have generally assessed whether Congress has made clear both the general policy that the agency must pursue and the boundaries of its delegated authority." *Id*. (citation modified).

Non-delegation principles apply equally to the Department of War as to any coordinate branch. See *United States v. Mingo*, 964 F.3d 134, 137 (2d Cir. 2020) (examining whether a provision allowing the Secretary of War to designate which military offenses constitute sex offenses violates the non-delegation doctrine). If Section 3252, the statute governing supply chain risks in this case, can be invoked whenever there is an adversarial contracting relationship between the government and a private party, there is effectively no limit on the language's grant of powers to the executive branch—setting up DOW and its Secretary as judge, jury, and executioner and allowing it to ignore the vast body of government contract law and move against a company it disagrees with.

Even if this expansive reading of Section 3252 could survive constitutional scrutiny, the law nowhere allows the federal government authority to ban *other* government agencies from partnering with a contractor (properly designated) a supply chain risk—despite the White House appearing to institute a government-wide ban in direct connection with DOW's "supply chain risk" designation.[23]

Finding for Defendants would give the executive branch unconstitutional leeway in ignoring the plain meaning of Section 3252. Congress cannot, and did not, grant Defendants the power to weaponize a supply chain risk designation to prevent any other government agency from doing business with the named company.

---

[23]    President Donald J. Trump, *supra* n.1. *See also* Anthropic PBC's Motion for Summary Judgment, Dkt. 166 at 4-5.

BRIEF OF AMICI CURIAE TAXPAYER PROTECTION ALLIANCE FOUNDATION

**CONCLUSION**

Defendants' actions violate the First Amendment, harm the U.S. economy, ignore the meaning of 10 U.S.C. § 3252 and significantly undermine the rule of law. All these acts will injure taxpayers and consumers and undermine the wider economic order, jeopardizing current and future AI progress. *Amicus* therefore respectfully urges the Court to grant Anthropic's motion for summary judgment.

Dated:  June 16, 2026                    Respectfully Submitted,

  /s/ *David B. Schwartz*

David. B. Schwartz (*pro hac vice*)
BRYAN CAVE LEIGHTON PAISNER LLP
1155 F Street NW
Washington, DC 20004
david.schwartz@bclplaw.com
Tel. (202) 508-6086