BENJAMIN S. KINGSLEY (CSB No. 314192)
bkingsley@fenwick.com
FENWICK & WEST LLP
One Front Street, 33rd Floor
San Francisco, CA  94111
Telephone:     415.875.2300
Facsimile:     415.281.1350

JONATHAN T. MCMICHAEL (CSB No. 304737)
jmcmichael@fenwick.com
DEENA J.G. FEIT (admitted *pro hac vice*)
dfeit@fenwick.com
FENWICK & WEST LLP
401 Union Street, 5th Floor
Seattle, WA  98101
Telephone:     206.389.4510
Facsimile:     206.389.4511

Attorneys for *Amicus Curiae*
PROFESSOR SIMONA GROSSI

*Additional counsel listed on signature page*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

FENWICK & WEST LLP
ATTORNEYS AT LAW

| | |
|---|---|
| ANTHROPIC PBC,<br><br>    Plaintiff,<br><br>    v.<br><br>U.S. DEPARTMENT OF WAR, et al.,<br><br>    Defendant. | Case No.: 3:26-cv-01996-RFL<br><br>**BRIEF OF AMICUS CURIAE PROFESSOR SIMONA GROSSI IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:      Hon. Rita F. Lin<br>Date:       July 30, 2026<br>Time:       10:00 a.m. PT |

**TABLE OF CONTENTS**

**Page**

I.    INTEREST OF THE AMICUS CURIAE ................................................................. 1

II.   INTRODUCTION ................................................................................................. 1

III.  ARGUMENT ....................................................................................................... 3

    A.    The Executive's actions constitute unlawful First Amendment retaliation and viewpoint discrimination. ................................................................................ 3

    B.    The government's "expressive governance" here creates systemic harm. ............. 6

        1.    The adverse action here is of extreme severity and beyond the government's discretionary authority. ......................................................... 6

        2.    The government's "expressive governance" here tracks that against other entities. ................................................................................................ 7

        3.    The government's "expressive governance" creates a systemic injury. ...................................................................................................... 9

    C.    Amicus's proposed analytical framework provides a clear mechanism for lower courts to assess executive expressive governance. ..................................... 11

IV.   CONCLUSION .................................................................................................. 14

FENWICK & WEST LLP
ATTORNEYS AT LAW

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*American Ass'n of University Professors v. Trump,*
815 F. Supp. 3d 907 (N.D. Cal. 2025)*, appeal dismissed* (9th Cir. Feb. 11, 2026) ...............5, 6

*American Federation of Government Employees v. Trump,*
167 F.4th 1247 (9th Cir. 2026) .................................................................................13

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents,*
824 F.3d 858 (9th Cir. 2016) ...............................................................................4, 5

*Backpage.com, LLC v. Dart,*
807 F.3d 229 (7th Cir. 2015) ...............................................................................6, 7

*Boquist v. Courtney,*
32 F.4th 764 (9th Cir. 2022) ...................................................................................6

*Elrod v. Burns,*
427 U.S. 347 (1976) ...............................................................................................12

*Gregory v. Ashcroft,*
501 U.S. 452 (1991) ...............................................................................................11

*Jenner & Block LLP v. U.S. Dep't of Just.,*
784 F. Supp. 3d 76 (D.D.C. 2025) ......................................................................5, 8

*Legal Servs. Corp. v. Velazquez,*
531 U.S. 533 (2001) .................................................................................................7

*Lozman v. City of Riviera Beach,*
585 U.S. 87 (2018) ...................................................................................................4

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*
429 U.S. 274 (1977) .................................................................................................7

*Nat'l Rifle Ass'n of Am. v. Vullo,*
602 U.S. 175 (2024) ........................................................................................2, 3, 7

*Perkins Coie LLP v. DOJ, et al.,*
No. 25-05241 (D.C. Cir. July 2, 2025) ...................................................................5

*Perkins Coie LLP v. U.S. Dep't of Just.,*
783 F. Supp. 3d 105 (D.D.C. 2025)
*appeal docketed*, No. 25-05241 (D.C. Cir. July 2, 2025) ................................. *passim*

*Perry v. Sindermann,*
408 U.S. 593 (1972) ...............................................................................................12

*Snyder v. Phelps,*
562 U.S. 443 (2011) .................................................................................................4

FENWICK & WEST LLP
ATTORNEYS AT LAW

*Souders v. Dep't of Homeland Sec.*,
  Case No. 1:25-cv-03924...................................................................................................9

*Spence v. Washington*,
  418 U.S. 405 (1974)........................................................................................................4

*Susman Godfrey LLP v. Exec. Off. of President*,
  789 F. Supp. 3d 15 (D.D.C. 2025)...............................................................................4, 8

*Texas v. Johnson*,
  491 U.S. 397 (1989)........................................................................................................4

*West Virginia v. EPA*,
  597 U.S. 697 (2022)......................................................................................................11

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*,
  784 F. Supp. 3d 127 (D.D.C. 2025), *amended,* No. CV 25-917 (RJL),
  2025 WL 2105262 (D.D.C. June 26, 2025)..................................................................5, 8

**STATUTES**

10 U.S.C. § 3252(b)(2)(B) ..............................................................................................12

**OTHER AUTHORITIES**

Bianca Quilantan & Madi Alexander, *'None of these goals are illegal': Universities
  struggle to respond to funding threats*, Politico (Apr. 16, 2025),
  https://www.politico.com/news/2025/04/16/trumps-dei-backlash-ripples-across-the-
  nations-flagship-universities-00288742 .......................................................................10

Claire Brown, *Billions in Climate Grants, Frozen for a Year, Are Back in Court*, N.Y.
  Times (Feb. 24, 2026) .....................................................................................................9

Congress of the United States Comm. on Oversight and Gov't Reform, *Letter to Harvard
  re Title VI Compliance*, https://oversight.house.gov/wp-
  content/uploads/2025/04/Letter-to-Harvard-re-Title-VI-Compliance-04172025.pdf ...............8

Emma Whitford, *2 Years Later, Professors Still Face Consequences for Pro-Palestinian
  Speech*, Inside Higher Ed (Apr. 23, 2026),
  https://www.insidehighered.com/news/faculty/academic-
  freedom/2026/04/23/professors-still-facing-discipline-pro-palestine-speech.........................10

EPA Employees Challenge Firings for Signing Dissent Letter, Public Employees for
  Environmental Responsibility (Dec. 3, 2025), https://peer.org/epa-employees-
  challenge-firings-for-signing-dissent-letter/; ..................................................................9

Karen Freifeld, *Big Tech Group Tells Pentagon's Hegseth They Are 'Concerned' About
  Declaring Anthropic a Supply-Chain Risk*, Reuters (Mar. 4, 2026) .........................................10

Letter to Donald J. Trump (Mar. 4, 2026), https://www.siia.net/wp-
  content/uploads/2026/03/Letter-to-White-House.pdf.............................................................10

FENWICK & WEST LLP
ATTORNEYS AT LAW

Luke Barnes, *The Cost of Conscience: What the Anthropic-Pentagon Feud Means for AI Governance*, NYU Stern Center for Business & Human Rights (Feb. 19, 2026), https://bhr.stern.nyu.edu/quick-take/the-cost-of-conscience-what-the-anthropic-pentagon-feud-means-for-ai-governance/ ................................................................................10

Molly Redden, *Trump's War on Big Law Means It's Harder to Challenge the Administration*, ProPublica (Aug. 6, 2025), https://www.propublica.org/article/trump-law-firms-accountability-environment-police-lgbtq ................................................................10

Simona Grossi, *First Amendment and the Executive Power*, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6190198, *forthcoming* 78 U.C. L.J. ........................................................................................................1

U.S. Dep't of Educ. Off. of Civil Rights, *Dear Colleague Letter*, https://www.ed.gov/media/document/dear-colleague-letter-sffa-v-harvard-109506.pdf ...........8

FENWICK & WEST LLP
ATTORNEYS AT LAW

## I.    INTEREST OF THE AMICUS CURIAE

Simona Grossi is a Professor of Law and Theodore A. Bruinsma Fellow at Loyola Law School Los Angeles, where she has taught since 2010.  Professor Grossi's teaching encompasses Constitutional Law, Civil Procedure, Federal Courts, Civil Rights Litigation, and Class Actions.  Her books include, among others, *Constitutional Law: National Power and Federalism* (with Allan Ides & Christopher N. May) (Aspen, 10th ed. 2025); *Constitutional Law: Individual Rights* (with Allan Ides & Christopher N. May) (Aspen, 10th ed. 2025); *Civil Rights Litigation and Government Accountability: Cases and Problems* (West Academic Press, forthcoming March 2027); and *First Amendment and Executive Power* (Cambridge University Press, forthcoming June 2027).  Professor Grossi has served as a visiting professor at multiple law schools and has been an elected member of the American Law Institute.  In addition, Professor Grossi serves as an Academic Fellow at the National Civil Justice Institute where she has served as an instructor in the Institute's programs on constitutional law.  Professor Grossi's curriculum vitae is included in Appendix A.

Of direct relevance to this case, Professor Grossi's forthcoming article *First Amendment and the Executive Power*[1] argues that significant contemporary threats to the First Amendment arise not from statutes or criminal prohibitions, but from the routine exercise of Executive power—through personnel authority, funding decisions, institutional restructuring, and informal pressure.  The article terms this phenomenon "expressive governance": the Executive's use of administrative tools to shape incentives and penalize disfavored viewpoints while preserving the appearance of ordinary governance.  This case is a paradigmatic example of the phenomenon that Professor Grossi describes.  Professor Grossi files this brief to assist the Court by providing a doctrinal framework under which to evaluate the challenged actions and to illustrate the systemic stakes of this litigation.

## II.    INTRODUCTION

This case presents the latest, and among the most troubling examples, of what amicus curiae's scholarship has described as "expressive governance": the use of the Executive Branch's

---

[1]    Simona    Grossi,    *First    Amendment    and    the    Executive    Power*, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6190198, *forthcoming* 78 U.C. L.J.

FENWICK & WEST LLP
ATTORNEYS AT LAW

vast discretionary administrative power to punish disfavored speech and coerce conformity from private citizens and businesses.

Anthropic PBC, one of the nation's leading artificial intelligence companies, publicly articulated a position on a subject of public significance: that its AI models could not safely, responsibly, or reliably be used for autonomous lethal weapons or mass surveillance of American citizens. The government disagreed. When Anthropic refused to abandon that position, the Department of War retaliated and designated Anthropic a "supply-chain risk to national security"—a label historically reserved for foreign adversaries—and directed that no contractor, supplier, or partner doing business with the United States military could conduct commercial activity with the company. The President then ordered all federal agencies to cease using Anthropic's technology.

This is not a routine procurement dispute. It is an act of expressive governance, the use of the Executive's authority in procurement, to which it is typically afforded deference, to penalize a disfavored viewpoint and enforce ideological conformity within the private sector. While the Executive could have disagreed with Anthropic's position, rejected Anthropic's contract terms, and transitioned to another provider, it could not use its authority to punish Anthropic because it disagreed with Anthropic's views. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024) (the government "cannot ... use the power of the State to punish or suppress disfavored expression"); *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105 (D.D.C. 2025) (granting summary judgment against executive order that targeted law firm for its protected advocacy) *appeal docketed*, No. 25-05241 (D.C. Cir. July 2, 2025).

The Executive's actions against Anthropic follow the same template used against multiple law firms, universities, media organizations, and federal employees and contractors who expressed dissenting viewpoints on matters of public policy. In each instance, the Executive used administrative mechanisms where it is typically afforded deference (security clearance revocations, funding terminations, regulatory designations, contracting exclusions) to inflict consequences on speakers who refused to conform to the government's preferred viewpoint.

The significance of this case goes beyond Anthropic. Because this pattern of expressive governance has appeared in areas of Executive discretion, it can evade the First Amendment's

BRIEF OF AMICUS CURIAE PROF. GROSSI

2

Case No.: 3:26-cv-01996-RFL

doctrinal safeguards and pose unique challenges for judicial review. Courts have, with good reason, historically deferred to the Executive's administrative judgment in these kinds of decisions. But the Executive Branch now routinely exploits that deference to punish speech, creating an impact that extends beyond any individual case. Every entity that depends, directly or indirectly, on discretionary federal contracts, grants, or regulatory approvals now operates under the shadow of potential retaliation for expressing disfavored views. The resulting chill threatens to reshape public discourse on matters of national importance.

This brief makes three arguments in support of Anthropic's Motion for Summary Judgment ("Anthropic's Motion") (Dkt. 166). *First*, as Anthropic's Motion makes clear, the evidence in this case shows that the Executive's actions constitute unlawful First Amendment retaliation under settled doctrine. *Second*, those actions are not isolated but are part of a systemic pattern of unconstitutional Executive expressive governance that courts should view as threats to protected speech. *Third*, in granting Anthropic's Motion, this Court should apply a principled analytical framework—built on clear statutory authority, burden-shifting, and heightened scrutiny for actions targeting expressive intermediaries—that would provide guidance to courts to evaluate the increasingly common instances of Executive viewpoint discrimination cloaked in discretionary administrative action, while leaving room for the legitimate exercise of Executive authority.

## III.   ARGUMENT

### A.   The Executive's actions constitute unlawful First Amendment retaliation and viewpoint discrimination.

The Challenged Actions[2] here constitute both classic First Amendment retaliation and viewpoint discrimination. It is well settled that, under the First Amendment, the government cannot use threats of "'legal sanctions and other means of coercion ... to achieve the suppression' of disfavored speech." *Vullo*, 602 U.S. at 189 (alteration in original) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). Accordingly, the government may not engage in viewpoint discrimination, which is to "use the power of the State to punish or suppress disfavored expression."

---

[2] Amicus uses the term "Challenged Actions" as defined in the Court's preliminary injunction order: the Presidential Directive, the Hegseth Directive, and the Supply Chain Designation. *See* Dkt. 134 ("Order") at 10 n.7; *see also* Order at 8–10 (explaining each designation).

FENWICK & WEST LLP
ATTORNEYS AT LAW

*Id.* at 187–88 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995)). Further, "the First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018). Where, as here, a party brings a First Amendment retaliation claim, the party must show that "(1) it engaged in constitutionally protected activity; (2) the defendant's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). For the reasons discussed in Anthropic's Motion and below, each element is satisfied here. *See* Mot. (Dkt. 166) at 6–12.

***Anthropic engaged in constitutionally protected conduct.*** As described in Anthropic's Motion, its speech on the ethical boundaries of AI in warfare and domestic surveillance involves matters of public concern and is therefore "at the heart of the First Amendment's protection." *See Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985)). The Supreme Court has long recognized that conduct can constitute protected expression when it is "sufficiently imbued with elements of communication." *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974)). Under *Spence*, the inquiry is whether there was "[a]n intent to convey a particularized message" and whether "the likelihood was great that the message would be understood by those who viewed it." 418 U.S. at 410–11.

Anthropic's speech and actions parallel those of the law firms Perkins Coie, Jenner & Block, WilmerHale, and Susman Godfrey that courts consistently found constitute protected speech in response to similar Executive action targeting those private businesses. For example, in *Perkins Coie*, the court found that the challenged executive order openly acknowledged that the law firm was being targeted for its representation of certain clients and statements about diversity, which are all protected activities under the First Amendment. *See* 783 F. Supp. 3d at 152–55; *see also Susman Godfrey LLP v. Exec. Off. of President*, 789 F. Supp. 3d 15, 42 (D.D.C. 2025) (Susman Godfrey's activities related to client representation, funding, and diversity were tied to protected First

FENWICK & WEST LLP
ATTORNEYS AT LAW

Amendment activity); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 155 (D.D.C. 2025) (order suppressing speech of "WilmerHale's representation of certain causes" constitutes viewpoint discrimination and is "'an egregious' violation of the First Amendment" (citation modified)), *amended,* No. CV 25-917 (RJL), 2025 WL 2105262 (D.D.C. June 26, 2025); *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 94 (D.D.C. 2025) (representation of certain clients and employment of certain individuals enjoy "robust First Amendment protection").[3]  Similarly here, Anthropic's express statements about AI safety and its refusal to accept the government's proposed contract terms both constitute protected speech.

*The Executive's actions indisputably created a chilling effect*.  Conduct that "would lead ordinary [persons] in the plaintiffs' position to refrain from protected speech" includes "threatening or causing pecuniary harm."  *Ariz. Students' Ass'n*, 824 F.3d at 868 (citation modified).  For example, in *American Ass'n of University Professors v. Trump*, this Court explained that the government's actions would have a chilling effect when the government threatened to take away billions of dollars of funding from the University of California if the university refused the government's proposed settlement, and the university would have to pay more than a billion dollars and impose restrictive measures if it accepted the settlement.  *See* 815 F. Supp. 3d 907, 948 (N.D. Cal. 2025), *appeal dismissed* (9th Cir. Feb. 11, 2026).  As Anthropic's Motion explains, the Executive's actions here meet this prong.  In the preliminary injunction briefing, the government did not dispute that this prong was met, and the Court cited evidence not only from Anthropic but also from multiple amicus briefs.  Order at 21.  Given the Executive's actions' extremity and severe impact, *see infra* Section III.B.1, the Court should again find that the second prong has been met.

*Anthropic's activities were a "substantial motivating factor" for the Challenged Actions.*  The Executive's retaliatory motive is self-evident from the sequence of events, as detailed in Anthropic's Motion.  *See* Mot. at 2–5, 8–10.  And the circumstances here again parallel those in *Perkins Coie*.  There, the court found that the executive order, "the accompanying fact sheet, and the context surrounding the Order's issuance each express President Trump's disapproval of

---

[3] An appeal was docketed for the law firm actions as part of the same appeal as *Perkins Coie* in *Perkins Coie LLP v. DOJ, et al.*, No. 25-05241 (D.C. Cir. July 2, 2025).

BRIEF OF AMICUS CURIAE PROF. GROSSI                5                Case No.: 3:26-cv-01996-RFL

FENWICK & WEST LLP
ATTORNEYS AT LAW

plaintiff's First Amendment activity and demonstrate that EO 14230 targeted plaintiff because the Firm expressed support for employment policies the President does not like, represented clients the President does not like, represented clients seeking litigation results the President does not like, and represented clients challenging some of the President's actions, which he also does not like." 783 F. Supp. 3d at 165 ("That is unconstitutional retaliation and viewpoint discrimination, plain and simple."). Moreover, the Executive's motive is evidenced by the disproportionality of its response. Rather than simply declining to renew Anthropic's contract, the Executive sought to destroy Anthropic's ability to do business within the extremely broad ecosystem of federal defense contractors and with all federal agencies. In the words of the *Perkins Coie* court, "[t]he retaliatory nature of [the government's actions] is clear from its stunning overbreadth." 783 F. Supp. 3d at 161. The same reasoning applies here.

***No legitimate non-retaliatory ground justifies the Challenged Actions.*** Finally, the government has not carried its burden to show that a non-retaliatory ground justified the Challenged Actions. When a plaintiff makes a prima facie showing of retaliation, "the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of." *Boquist v. Courtney*, 32 F.4th 764, 778 (9th Cir. 2022) (quoting *Hartman v. Moore*, 547 U.S. 250, 260 (2006)). As detailed in Anthropic's Motion, the record here shows that the government cannot meet its burden, and no legitimate, non-retaliatory ground sufficient to provoke these extraordinary consequences exists.

**B.      The government's "expressive governance" here creates systemic harm.**

**1.      The adverse action here is of extreme severity and beyond the government's discretionary authority.**

The government's response to Anthropic's protected speech constitutes severe adverse action that extends beyond the government's discretionary authority. While the First Amendment allows government expression, it forbids government intimidation. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015). That is, "a State's failure to persuade does not allow it to hamstring the opposition." *Am. Ass'n of Univ. Professors*, 815 F. Supp. 3d at 947 (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 578–79 (2011)). Courts have accordingly distinguished between

FENWICK & WEST LLP
ATTORNEYS AT LAW

"attempts to convince and attempts to coerce." *Backpage.com*, 807 F.3d at 230 (quoting *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) (per curiam)). As applied to retaliation, the government can decide not to accept a certain contract or terms, but it cannot do so *because* an individual or entity exercised their First Amendment rights. *See, e.g.*, *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548–49 (2001) (government may decline to fund a particular program, but it may not condition funding on excluding certain ideas); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–87 (1977) (government can decline to renew a contract but not *because* the employee exercised First Amendment rights).

Here, the supply-chain risk designation—a label historically reserved for foreign adversaries engaged in sabotage or other subversive tactics—is itself a penalty that carries devastating reputational and economic consequences. And the government's procurement discretion does not encompass the authority to *punish* a vendor for its protected speech through mechanisms that extend beyond the procurement relationship. This pattern of conduct mirrors the actions condemned in *Vullo*. There, the Supreme Court held that a state regulator plausibly violated the First Amendment by pressuring insurance companies and banks to sever ties with the NRA. *See Vullo*, 602 U.S. at 188–94. The Court explained that just as a government official cannot "use the power of the State to punish or suppress disfavored expression … a government official cannot do indirectly what she is barred from doing directly: A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Id.* at 188, 190.

The same reasoning applies. As in *Vullo*, rather than imposing a formal prohibition on speech, the government leveraged its regulatory and contracting authority to punish the company through third-party and economic pressure. But, like in *Vullo*, the government cannot use indirect mechanisms to accomplish what it "is barred from doing directly"—punishing disfavored speech.

> **2.    The government's "expressive governance" here tracks that against other entities.**

This case is not an isolated dispute. It is part of a pattern of "expressive governance" in which the government deploys administrative tools to penalize disfavored viewpoints and coerce

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

ideological conformity.  Expressive governance operates not through direct censorship, but through incentives and consequences to shape expression.

The parallels between this case and the law firm cases illustrate this pattern.  In all these cases, the government targeted entities by name for the expression of disfavored viewpoints.  *See Perkins Coie*, 783 F. Supp. 3d at 152–53; *Jenner & Block*, 784 F. Supp. 3d at 99; *Wilmer*, 784 F. Supp. 3d at 153; *Susman Godfrey*, 789 F. Supp. 3d at 28.  Throughout the cases, the government deployed administrative instruments—an executive order against the law firms, a supply-chain risk designation against Anthropic—to inflict economic harm and stigmatization without any process that even remotely resembled adjudicative fairness.  *See Perkins Coie*, 783 F. Supp. 3d at 120; *Jenner & Block*, 784 F. Supp. 3d at 88, 113–14; *Wilmer*, 784 F. Supp. 3d at 138, 172; *Susman Godfrey*, 789 F. Supp. 3d at 50.  And throughout the cases, the government directed agencies and third parties to sever their relationships with the targeted entity, amplifying the punitive effect of the Executive's actions.  *See Perkins Coie*, 783 F. Supp. 3d at 128–30; *Jenner & Block*, 784 F. Supp. 3d at 89–90; *Wilmer*, 784 F. Supp. 3d at 151; *Susman Godfrey*, 789 F. Supp. 3d at 30–31.  In all the cases, the government provided after-the-fact invocation of policy justifications: alleged civil rights violations for the law firms, alleged supply-chain risk here.  *See Perkins Coie*, 783 F. Supp. 3d at 176; *Jenner & Block*, 784 F. Supp. 3d at 89; *Wilmer*, 784 F. Supp. 3d at 138; *Susman Godfrey*, 789 F. Supp. 3d at 29–30.  But those justifications were belied by the government's own public statements, which reveal viewpoint animus as the driving force.  *See Perkins Coie*, 783 F. Supp. 3d at 162–63, 176; *Jenner & Block*, 784 F. Supp. 3d at 106–07, 117; *Wilmer*, 784 F. Supp. 3d at 136–37, 157; *Susman Godfrey*, 789 F. Supp. 3d at 46–47.

Similar actions have been taken against other entities.  The government has threatened regulatory investigation of and termination of federal funding to educational institutions that maintain diversity, equity, and inclusion programs or refuse to enter into settlement agreements proposed by federal officials;[4] subjected media organizations whose editorial coverage the

---

[4]  *See, e.g.,* U.S. Dep't of Educ. Off. of Civil Rights, *Dear Colleague Letter*, https://www.ed.gov/media/document/dear-colleague-letter-sffa-v-harvard-109506.pdf (last visited Jun. 8, 2026); Congress of the United States Comm. on Oversight and Gov't Reform, *Letter to Harvard re Title VI Compliance*, https://oversight.house.gov/wp-content/uploads/2025/04/Letter-

President criticized to retaliatory actions, including threatened revocation of broadcast licenses;[5] terminated federal employees and contractors who expressed dissenting views on matters ranging from climate science to public interest;[6] and frozen or terminated federal funding to, without substantive justification, nonprofit organizations and research institutions whose grant-funded work touched on subjects the government disfavored, such as environmental regulation.[7]  In each case, the mechanism is the same: the deployment of facially neutral administrative authority to impose severe consequences on speakers who disagreed with the government's viewpoint.

These actions constitute "expressive governance," where the government uses administrative tools to shape private discourse without express censorship.  Courts considering any individual case in this pattern should assess it within the broader context because the chilling effect of each retaliatory action is amplified by the existence of all the others.

**3.**    **The government's "expressive governance" creates a systemic injury.**

The constitutional injury from expressive governance is systemic, as the Executive's actions impact not only the individual target but also the broader community of similarly situated speakers.  As applied here, American technology companies and researchers now know that if they publicly articulate ethical positions that conflict with the government's preferred policy—on AI or on any other subject—they risk the government branding them a threat to national security or using regulatory tools against them.  And companies doing business with the government know that maintaining a commercial relationship with a company the government disfavors could jeopardize their own government business.

---

to-Harvard-re-Title-VI-Compliance-04172025.pdf (last visited Jun. 8, 2026).

[5] *See* Brendan Carr (@BrendanCarrFCC), X (Mar. 14, 2026, at 12:24 PM) https://x.com/BrendanCarrFCC/status/2032855414233047172.

[6] *See, e.g.*, EPA Employees Challenge Firings for Signing Dissent Letter, Public Employees for Environmental Responsibility (Dec. 3, 2025), https://peer.org/epa-employees-challenge-firings-for-signing-dissent-letter/; *Souders v. Dep't of Homeland Sec.*, Case No. 1:25-cv-03924 (former federal contract worker sued government for alleged firing based on comments made on social media).

[7] *See* Claire Brown, *Billions in Climate Grants, Frozen for a Year, Are Back in Court*, N.Y. Times (Feb. 24, 2026), https://www.nytimes.com/2026/02/24/climate/billions-in-climate-grants-frozen-for-a-year-are-back-in-court.html.

BRIEF OF AMICUS CURIAE PROF. GROSSI

9

Case No.: 3:26-cv-01996-RFL

FENWICK & WEST LLP
ATTORNEYS AT LAW

The evidence of the chilling effect has already become manifest. The Information Technology Industry Council and a group of associations representing leading American technology companies wrote letters to the government warning that the supply-chain risk designation creates uncertainty in the industry that could threaten the government's access to best-in-class products and services and stifle the growth of American technology companies.[8] Neither letter named Anthropic, a reticence that itself illustrates the chilling dynamic. As a researcher from the NYU Stern Center for Business & Human Rights concluded, "if the United States government responds to principled limits by threatening to cut off the company that imposes them, it sends a clear message to the entire industry: responsibility is a liability."[9]

The pattern extends beyond the technology sector. Law firms have reconsidered their willingness to represent clients or causes that might draw executive displeasure.[10] Meanwhile, universities have curtailed programs and disciplined faculty whose scholarship the government criticized.[11] These decisions result in a contraction of the space for public debate on matters of national importance—precisely the kind of structural injury that the First Amendment exists to prevent. Judicial intervention is required not only to vindicate Anthropic's rights, but also to preserve protected discourse.

---

[8] *See* Karen Freifeld, *Big Tech Group Tells Pentagon's Hegseth They Are 'Concerned' About Declaring Anthropic a Supply-Chain Risk*, Reuters (Mar. 4, 2026), https://eu.detroitnews.com/story/tech/2026/03/04/big-tech-is-concerned-about-anthropics-supply-chain-risk-label/88986564007/; Letter to Donald J. Trump (Mar. 4, 2026), https://www.siia.net/wp-content/uploads/2026/03/Letter-to-White-House.pdf.

[9] Luke Barnes, *The Cost of Conscience: What the Anthropic-Pentagon Feud Means for AI Governance*, NYU Stern Center for Business & Human Rights (Feb. 19, 2026), https://bhr.stern.nyu.edu/quick-take/the-cost-of-conscience-what-the-anthropic-pentagon-feud-means-for-ai-governance/.

[10] Molly Redden, *Trump's War on Big Law Means It's Harder to Challenge the Administration*, ProPublica (Aug. 6, 2025), https://www.propublica.org/article/trump-law-firms-accountability-environment-police-lgbtq.

[11] Bianca Quilantan & Madi Alexander, *'None of these goals are illegal': Universities struggle to respond to funding threats*, Politico (Apr. 16, 2025), https://www.politico.com/news/2025/04/16/trumps-dei-backlash-ripples-across-the-nations-flagship-universities-00288742; Emma Whitford, *2 Years Later, Professors Still Face Consequences for Pro-Palestinian Speech*, Inside Higher Ed (Apr. 23, 2026), https://www.insidehighered.com/news/faculty/academic-freedom/2026/04/23/professors-still-facing-discipline-pro-palestine-speech.

BRIEF OF AMICUS CURIAE PROF. GROSSI                    10                    Case No.: 3:26-cv-01996-RFL

FENWICK & WEST LLP
ATTORNEYS AT LAW

### C.    Amicus's proposed analytical framework provides a clear mechanism for lower courts to assess executive expressive governance.

Amicus proposes a principled analytical framework for evaluating claims of executive expressive governance that would assist the Court in resolving Anthropic's claims, along with other instances of purported Executive discretion used to stifle speech.  The framework is built on three interlocking tools: (1) clear statutory authority; (2) burden-shifting; and (3) heightened scrutiny through an evidentiary presumption of systemic distortion where the Executive targets expressive intermediaries.  This framework draws from existing First Amendment doctrine but recalibrates for the distinctive mechanisms through which modern Executive power operates.

***First, clear statutory authority.***  Where Executive actions affect expressive infrastructure, courts should require clear congressional authorization for the discretionary category of action before permitting Executive suppression of speech.  "Expressive infrastructure" refers to the institutional and technological systems through which speech is produced, organized, and disseminated.  This infrastructure includes press entities, publishing and distribution channels, digital platforms, professional networks, and intermediaries like companies that shape how information is generated and communicated.  Absent a clear and specific statutory directive authorizing Executive action, courts should construe ambiguous delegations *not* to authorize viewpoint-based action or retaliation, even through indirect mechanisms.  That is, courts should require Congress to speak clearly if it intends to authorize such speech-affecting discretion.  Clear-statement principles already play a role in separation-of-powers and federalism contexts. *See, e.g.*, *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (discussing separation of powers and explaining that an agency "must point to clear congressional authorization for the power it claims" (citation modified)); *Gregory v. Ashcroft*, 501 U.S. 452, 467 (1991) ("We will not read the ADEA to cover state judges unless Congress has made it clear that judges are *included.*").  Applied here, a clear-statement principle would require the government to identify specific statutory authority for the use of the supply-chain risk designation, built for foreign adversaries, against an American company.  No such authority exists.

***Second, burden-shifting.*** Once a plaintiff demonstrates (1) a plausible viewpoint-linked pattern, such as timing, targeting, public statements, disparate treatment, or predictable chilling effects; and (2) a dependency relationship, such as employment, contracting, access, funding, or regulatory leverage, the burden should shift to the government to prove with record evidence that it would have taken the same action for viewpoint-neutral reasons and that no materially less speech-restrictive alternative was reasonably available. This approach parallels the less-intrusive-measures determination that Congress requires under 10 U.S.C. § 3252(b)(2)(B). Once the burden shifts, the government's action should be subject to a presumption of systemic distortion for expressive intermediaries, as discussed below. This approach aligns with the Supreme Court's political-patronage cases, which make clear that the government may not deny a benefit on a basis that infringes constitutionally protected speech or association, even where no one has a "right" to the benefit. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons … the government may … not deny a benefit to a person on a basis that infringes his constitutionally protected interests …."); *see also Elrod v. Burns*, 427 U.S. 347, 362–63 (1976) (requiring a standard of "exacting scrutiny"). Both triggers apply here. For the first trigger, the supply-chain risk designation followed immediately upon Anthropic's refusal to accept the government's terms. For the second trigger, Anthropic had a contracting relationship that the government ended, then tried to upend Anthropic's other contracting relationships through the far-reaching supply-chain risk designation. The burden should shift to the Executive.

***Third, heightened scrutiny through an evidentiary presumption of systemic distortion where the Executive targets expressive intermediaries.*** When the Executive acts against an entity expressing protected speech or a viewpoint, courts should require the Executive to justify the action with specific, viewpoint-neutral criteria and evidence establishing that the Executive action was actually motivated by these criteria. This presumption has the strongest application where the government targets "expressive intermediaries": entities that aggregate, filter, or generate speech, which impacts how others receive and understand information. In such cases, the government must

BRIEF OF AMICUS CURIAE PROF.
GROSSI                                              12                              Case No.: 3:26-cv-01996-RFL

FENWICK & WEST LLP
ATTORNEYS AT LAW

provide: (1) viewpoint-neutral criteria stated *ex ante*; (2) individualized reasons supported by record evidence; (3) procedural safeguards against pretext, including notice, opportunity to respond, and meaningful review; and (4) a showing that the government's objectives cannot be achieved through narrower means. Where a benefit, access, status, or professional opportunity is withdrawn because of viewpoint, the discretionary character of the benefit heightens, rather than relaxes, the need to scrutinize motive and pretext. Absent concrete evidence, the government may not prevail by invoking generalized assertions of "national security," "supply-chain risk," or "mission alignment."

This framework neither creates a new tier of scrutiny nor slots expressive governance into the rational-basis, intermediate, or strict scrutiny hierarchy. Instead, the heightened scrutiny it calls for is the product of burden-shifting and is a standard evidentiary presumption requiring that the government justify itself with record evidence rather than mere rhetorical labels. Rarely is the government's asserted interest (such as national security) too weak in the abstract in these cases. But, when, as here, the asserted and actual interests diverge, the discretionary, low-visibility character of the administrative tools deployed makes that difference systematically difficult to detect. A burden-allocation mechanism addresses that problem directly.

The Ninth Circuit's recent decision in *American Federation of Government Employees v. Trump*, 167 F.4th 1247 (9th Cir. 2026) ("*AFGE*"), aligns with this framework. There, the challenged executive order survived because the Executive carried the burden this framework would assign: the order did not contain retaliatory language on its face, the Executive based the order on national security concerns, and the record showed that the Executive would have issued the order regardless of the asserted retaliatory motive. *Id.* at 1256–57. Evidence in the record, such as the executive order itself, its attached fact sheet, and guidance from the Office of Personnel Management on the executive order, demonstrated the Executive's focus on national security. *Id.* at 1257–58. That the Executive prevailed in *AFGE* underscores the efficacy of a test for distinguishing legitimate, discretionary administration from unconstitutional viewpoint retaliation.

Anthropic, and any other LLM provider, should be considered an expressive intermediary. LLMs play a transformative role in how information is processed, analyzed, and communicated

FENWICK & WEST LLP
ATTORNEYS AT LAW

across government agencies and private enterprises.  An LLM provider's publicly articulated safety principles constitute speech on a matter of public significance.  Where, as here, the Executive deployed regulatory tools to punish that speech, the presumption of unlawful suppression is triggered.  The government has offered no viewpoint-neutral criteria, no individualized evidence, no procedural safeguards, and no showing that narrower alternatives—such as simply transitioning to another AI provider, which Anthropic had offered—were inadequate.  Under amicus's proposed framework, the Executive's actions could not be justified.

## IV.    CONCLUSION

This case presents a textbook example of First Amendment retaliation and viewpoint discrimination.  The government designated Anthropic a "supply-chain risk to national security" not because Anthropic's product posed any genuine risk, but because Anthropic publicly refused to conform its viewpoint to the government's preferred position on the deployment of artificial intelligence in autonomous lethal warfare and mass surveillance.  The government was free to disagree.  It was free to contract with a different provider.  It was not free to weaponize the machinery of national security to try to destroy a company's business and reputation for expressing a view on a matter of public importance.

The Court should declare the Challenged Actions unlawful and grant Anthropic's Motion.

Dated:   June 17, 2026                    FENWICK & WEST LLP

By:   */s/ Benjamin S. Kingsley*
Benjamin S. Kingsley (CSB No. 314192)
bkingsley@fenwick.com
One Front Street, 33rd Floor
San Francisco, CA  94111
Telephone:      415.875.2300
Facsimile:      415.281.1350

Jonathan T. McMichael (CSB No. 304737)
jmcmichael@fenwick.com
Deena J.G. Feit (admitted *pro hac vice*)
dfeit@fenwick.com

FENWICK & WEST LLP
ATTORNEYS AT LAW

401 Union Street, 5th Floor
Seattle, WA  98101
Telephone:      206.389.4510
Facsimile:      206.389.4511

Jonathan Lenzner
(*pro hac vice* admission pending)
jlenzner@fenwick.com
1155 F St NW, 12th Floor
Washington, DC 20004
Telephone:      202.970.3000
Facsimile:      650.938.5200

Tessa M. Placa (admitted *pro hac vice*)
tplaca@fenwick.com
902 Broadway, 18th Floor
New York, NY 10010
Telephone:      212.430.2600
Facsimile:      650.938.5200

Attorneys for *Amicus Curiae*
PROFESSOR SIMONA GROSSI

FENWICK & WEST LLP
ATTORNEYS AT LAW