**PERKINS COIE LLP**
Addison W. Bennett (SBN 333567)
ABennett@perkinscoie.com
2525 East Camelback Road, Suite 500
Phoenix, AZ 85016
Telephone: 602.351.8000
Facsimile: 602.648.7000

Todd M. Hinnen*
Sarah Grant*
THinnen@perkinscoie.com
SarahGrant@perkinscoie.com
1301 Second Avenue, Suite 4200
Seattle, WA 98101
Telephone: 206.359.8000
Facsimile: 206.259.9000

*Counsel for* Amici Curiae *The Foundation for
Individual Rights and Expression, The Electronic
Frontier Foundation, The Cato Institute, Chamber of
Progress, and The First Amendment Lawyers
Association*

*Admitted pro hac vice*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| ANTHROPIC PBC, | Case No. 3:26-cv-01996 |
| Plaintiff, | **BRIEF OF *AMICI CURIAE* THE FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, THE ELECTRONIC FRONTIER FOUNDATION, THE CATO INSTITUTE, CHAMBER OF PROGRESS, AND THE FIRST AMENDMENT LAWYERS ASSOCIATION IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| UNITED STATES DEPARTMENT OF WAR, et al., | |
| Defendants. | |
| | The Honorable Rita F. Lin |
| | Date:   July 30, 2026 |
| | Time:   10:00 am PT |
| | Courtroom: 15, 18th Floor |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................................................. 1

INTRODUCTION ..................................................................................................................... 3

ARGUMENT .............................................................................................................................. 5

    I.   The Pentagon's treatment of Anthropic violates the First Amendment........................ 5

        A. The First Amendment protects Anthropic's design choices, including the
safeguards for Claude, and Anthropic's speech about those choices...................... 5

        B. The government's actions are transparently retaliatory and coercive..................... 9

    II.  Vindicating Anthropic's First Amendment rights will protect all Americans............. 12

CONCLUSION ........................................................................................................................ 15

    BRIEF OF *AMICI CURIAE* FIRE et al.
CASE NO. 3:26-cv-01996

# TABLE OF AUTHORITIES

**CASES**

*Anthropic PBC v. U.S. Dep't of War*, No. 26-CV-01996-RFL, 2026 WL 836842
(N.D. Cal. Mar. 26, 2026) ...................................................................................... 12

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) ............................................................................... 11

*Backpage.com, LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015).................................................................................. 12

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) .................................................................................................... 9

*Bd. of Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*,
518 U.S. 668 (1996) ................................................................................................ 12

*CAIR Found. v. Desantis*,
No. 25-cv-516, 2026 WL 613468 (N.D. Fla. Mar. 4, 2026)............................. 11, 12

FISC Memorandum Opinion and Order (FISA Ct. Apr. 21, 2022) ............................... 14

*Hartman v. Moore*,
547 U.S. 250 (2006)................................................................................................. 12

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010)....................................................................................................... 9

*Houston Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022) ............................................................................................. 9, 10

*Jenner & Block LLP v. U.S. Dep't of Just.*,
784 F. Supp. 3d 76 (D.D.C. 2025) ............................................................................ 9

*Lee v. Garland*,
120 F.4th 880 (D.C. Cir. 2024) .............................................................................. 12

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)........................................................................................ 5, 7, 10

*NAACP v. Button*,
371 U.S. 415 (1963)................................................................................................... 9

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024)............................................................................................. 9, 12

*NetChoice, LLC v. Bonta*,
152 F.4th 1002 (9th Cir. 2025)................................................................................. 7

*Okwedy v. Molinari*,
    333 F.3d 339 (2d Cir. 2003) ........................................................................ 12

*Kassandra Rosado & Kreisau Grp. LLC v. Bondi*,
    No. 26-cv-1532, 2026 WL 1047786 (N.D. Ill. Apr. 17, 2026) .............................. 11

*Riley v. California*, 573 U.S. 373 (2014) ........................................................ 14

*Susman Godfrey LLP v. Exec. Off. of President*,
    789 F. Supp. 3d 15 (D.D.C. 2025) .................................................................. 11

*Texas v. Johnson*,
    491 U.S. 397 (1989) ...................................................................................... 13

*W. Virginia State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ........................................................................... 8, 11, 13

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*,
    784 F. Supp. 3d 127 (D.D.C. 2025) ............................................................. 9, 10

*X Corp. v. Bonta*,
    116 F.4th 888 (9th Cir. 2024) ...................................................................... 8, 9

*X.AI LLC v. Bonta*,
    No. 25-cv-12295, 2026 WL 626926 (C.D. Cal. Mar. 4, 2026) .............................. 7

**STATUTES**

10 U.S.C. § 3252 ................................................................................................ 5

**OTHER AUTHORITIES**

Annie Bang & Ryan Gallagher, *Pentagon Feud with Anthropic Shines Light on
    AI's Role in Mass Surveillance*, Bloomberg (Mar. 5, 2026) ............................. 14

Aaron Mackey, *New Surveillance Court Orders Show That Even Judges Have
    Difficulty Understanding and Limiting Government Spying*, EFF (Sept. 11,
    2018) ........................................................................................................... 14

*Autonomous Weapons Systems and International Humanitarian Law: Selected
    Issues*, International Committee of the Red Cross (Dec. 2025) ........................... 13

Bennett Cyphers, *How the Federal Government Buys Our Cell Phone Location
    Data*, EFF (June 13, 2022) ............................................................................ 14

Brandi Vincent, *Pentagon CTO urges Anthropic to 'cross the Rubicon' on military
    AI use cases amid ethics dispute*, DefenseScoop (Feb. 19, 2026) ......................... 3

*Claude's new constitution*, Anthropic (Jan. 22, 2026) ...................................... 3, 6

Cora Currier, Justin Elliott, and Theodoric Meyer, *Mass Surveillance in America: A Timeline of Loosening Laws and Practices*, ProPublica (June 7, 2013) ............................ 14

Dave Lawler, et al., *Exclusive: Pentagon Threatens Anthropic Punishment*, Axios (Feb. 16, 2026) ........................................................................................................ 3

Gilad Abiri, *Public Constitutional AI*, 59 GA. L. REV. 601, 660 (2025)........................................ 7

Greg Lukianoff, *The Pentagon's Anthropic ultimatum and the case for the 'separation of power and truth*,' The Eternally Radical Idea (Mar. 3, 2026)........................... 4

*Introducing Claude*, Anthropic (Mar. 14, 2023)................................................................. 3

Jennifer Valentino-Devries and Siobhan Gorman, *What You Need to Know on New Details of NSA Spying*, Wall Street Journal (Aug. 20, 2013)..................................... 13

*Letter from Kristi Noem, Sec'y of Homeland Security, to Maureen Martin, Harvard Univ.* (May 22, 2025) .................................................................................. 11

Letter from national security, business, civil society, and technology leaders to Senate and House Armed Services Committee leadership (Mar. 5, 2026)............................ 13

President Donald J. Trump, Truth Social (Feb. 26, 2026) ........................................................ 11, 13

S. Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, *Book II: Intelligence Activities and the Rights of Americans*, S. Rep. No. 94-755 (1976)..................................................................................................... 13

Secretary of War Pete Hegseth, X (Feb. 27, 2026)..................................................... 3, 5, 8, 10, 11

Seymour Hersh, *Huge C.I.A. Operation Reported in U.S. Against Antiwar Forces, Other Dissidents in Nixon Years*, N.Y. Times (Dec. 21, 1974) ............................................. 13

Simon Lerman, et al., *Large-Scale Online Deanonymization with LLMs* (Feb. 18, 2026) ................................................................................................................... 15

Statement from Dario Amodei on our discussions with the Department of War, Anthropic (Feb. 26, 2026)................................................................... 3, 4, 8, 9, 13

*Tracing the thoughts of a large language model*, Anthropic (Mar. 27, 2025)............................ 5

Under Secretary of War Emil Michael, X (Feb. 26, 2026)........................................................... 10

Under Secretary of War for Research and Engineering, Memorandum for the Record, *Urgent Supply Chain Risk Analysis on Anthropic PBC*, ANT_AR-0213-0216 .................................................................................................................. 5, 11

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici* form an ideologically diverse set of advocates, thought leaders, and practitioners who offer a valuable perspective about the grave threats to freedom of speech at stake in this action.

The **Foundation for Individual Rights and Expression (FIRE)** is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended these rights nationwide in cases implicating these freedoms, without regard to speakers' political views. Through litigation and advocacy, FIRE works to protect expressive rights in the digital realm. It frequently participates as an *amicus curiae* in litigation presenting First Amendment concerns.

The **Electronic Frontier Foundation (EFF)** is a non-profit public interest organization that works to ensure new technology enhances, rather than erodes, civil liberties. With tens of thousands of dues-paying members, EFF has advocated for thirty-five years in favor of user rights and protections. EFF has participated, either directly or as amicus, in litigation to ensure our nation's surveillance programs operate in accordance with federal law and the Constitution.

The **Cato Institute** is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to help restore the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, and produces the annual Cato Supreme Court Review.

**Chamber of Progress** is a tech-industry coalition devoted to a progressive society, economy, workforce, and consumer climate. It seeks to protect internet freedom and free speech, promote innovation and economic growth, and empower technology customers and users. As an advocate for preserving free online speech, Chamber of Progress opposes governmental attempts to force or restrict access to speech.[1]

---

[1] A list of Chamber of Progress partners is available at Partners (2026), https://progresschamber.org/partners/.

The **First Amendment Lawyers Association (FALA)** is a nonprofit organization comprised of attorneys across the United States with a shared commitment to preserving and advancing the rights guaranteed by the First Amendment. Since its founding in the 1960s, FALA has actively participated in cases concerning free expression, freedom of the press, and restrictions on speech in public spaces. FALA members are often on the front lines of First Amendment litigation, and the organization frequently appears as *amicus* to protect against government encroachment on constitutional expression.

## INTRODUCTION

The Pentagon designated Anthropic PBC ("Anthropic") a supply chain risk because of Anthropic's "hostile" positions, "sanctimonious rhetoric," and expression of values that the Pentagon deems "fundamentally incompatible with American principles."[2] Specifically, Anthropic refused to yield to the Pentagon's attempts to strong-arm Anthropic into removing safety constraints on use of its artificial intelligence tools to permit the Pentagon develop fully autonomous weapons or conduct mass domestic surveillance, and Anthropic spoke publicly about its concerns. Anthropic believes "deeply in the existential importance of using AI to defend the United States and other democracies," but it also believes there are "[s]ome uses" that are "simply outside the bounds of what today's technology can safely and reliably do."[3] Consistent with that viewpoint, Anthropic designed Claude, its "next-generation AI assistant,"[4] to embrace a broad set of values and safeguards—in Anthropic's words, "Claude's Constitution."[5] Anthropic also created and adopted a Usage Policy and a government-specific addendum to it. That policy, which applied to Anthropic's dealings with the Pentagon from the outset of their contract, does not permit the use of Claude to support fully autonomous weapons or mass domestic surveillance.[6]

But the Pentagon changed its mind. It demanded that Anthropic allow it to use Anthropic's technology for any purpose the Pentagon deems "lawful," including potentially to support fully autonomous weapons and mass domestic surveillance. When Anthropic held firm, the Pentagon went public with the dispute and threatened to penalize Anthropic.[7] Anthropic Chief Executive

---

[2] Secretary of War Pete Hegseth, X (Feb. 27, 2026) ("Secretary of War Pete Hegseth, X"), https://x.com/SecWar/status/2027507717469049070.

[3] *Statement from Dario Amodei on our discussions with the Department of War*, Anthropic (Feb. 26, 2026) ("Statement from Dario Amodei"), https://www.anthropic.com/news/statement-department-of-war.

[4] *Introducing Claude*, Anthropic (Mar. 14, 2023), https://www.anthropic.com/news/introducing-claude.

[5] *See Claude's new constitution*, Anthropic (Jan. 22, 2026), https://www.anthropic.com/news/claude-new-constitution.

[6] Statement from Dario Amodei.

[7] *See* Dave Lawler, et al., *Exclusive: Pentagon Threatens Anthropic Punishment*, Axios (Feb. 16, 2026), https://www.axios.com/2026/02/16/anthropic-defense-department-relationship-hegseth; Brandi Vincent, *Pentagon CTO urges Anthropic to 'cross the Rubicon' on military AI*

Officer Dario Amodei responded with a public post explaining Anthropic's position and pledging that, "should the Department choose to offboard Anthropic," Anthropic would "work to enable a smooth transition to another provider, avoiding disruption to ongoing military planning, operations, or other critical missions."[8]

Rather than resolve the matter amicably, the Pentagon then took the unprecedented step of designating an American company as posing a "supply chain risk," i.e., branding them an "adversary" that may "sabotage, maliciously introduce unwanted function, or otherwise subvert" the Department's information systems, without any apparent evidence to support that designation and despite significant evidence to the contrary. 10 U.S.C. § 3252. This potentially ruinous sanction threatens not only Anthropic's business but also that of its partners and customers. If left in place, that sanction will send a strong signal to the business community and the public at large that the U.S. government will use any means at its disposal, lawful or otherwise, to punish those who dare to disagree with it.

The Pentagon's temper tantrum is a textbook violation of Anthropic's First Amendment rights. Humans at Anthropic created Claude, shaped its expression, and crafted the Usage Policy and government-specific addendum to reinforce Anthropic's values and judgments about product safety. Claude is a "system that talks, explains, summarizes, argues, and refuses—a system that sits in the middle of human inquiry."[9] The Pentagon's demand that Anthropic remove constraints on that system—to alter what Claude can be made to say, analyze, and refuse—asked Anthropic to sacrifice its freedom of expression. In sum, Anthropic had to change its point of view, as embodied in its technical choices and its public statements, to avoid the supply chain risk designation that threatens its business.

---

*use cases amid ethics dispute*, DefenseScoop (Feb. 19, 2026), https://defensescoop.com/2026/02/19/pentagon-anthropic-dispute-military-ai-hegseth-emil-michael/.

[8] Statement from Dario Amodei.

[9] *See* Greg Lukianoff, *The Pentagon's Anthropic ultimatum and the case for the 'separation of power and truth,'* The Eternally Radical Idea (Mar. 3, 2026), https://eternallyradicalidea.com/p/the-pentagons-anthropic-ultimatum.

The Pentagon admits that its sanction is retaliation for Anthropic's speech, an independent violation of the First Amendment. Government officials have bragged that the purpose of sanctioning Anthropic is to punish Anthropic for its "ideolog[y]"[10] and its public statements regarding the dispute, which Under Secretary of Defense Emil Michael characterized as "openly hostile," "duplicitous," and about "brand-building."[11] "On the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Moody v. NetChoice, LLC*, 603 U.S. 707, 741–42 (2024).

This Court should grant summary judgment to Plaintiff and hold unlawful the Department of War's designation of Anthropic as a supply chain risk to national security under 10 U.S.C. § 3252.

## ARGUMENT

### I.    The Pentagon's treatment of Anthropic violates the First Amendment.

The Pentagon's designation of Anthropic as a supply chain risk violates the First Amendment in two independent ways. *First*, Anthropic's choices about Claude's output are expressive and receive First Amendment protection. The Pentagon has no justification—beyond mere policy disagreement—for effectively demanding that Anthropic *change* its layered safety mitigations to enable Claude to process data in a particular way or provide certain analyses or output. *Second*, the Pentagon's designation of Anthropic as a supply chain risk is open retaliation for Anthropic's protected speech.

#### A.    The First Amendment protects Anthropic's design choices, including the safeguards for Claude, and Anthropic's speech about those choices.

Claude is fundamentally expressive. It is a "large language model" that takes in tremendous amounts of data and engages in a pattern of "reasoning" to respond to user prompts.[12] It can deliver

---

[10] Secretary of War Pete Hegseth, X.

[11] Under Secretary of War for Research and Engineering, Memorandum for the Record, *Urgent Supply Chain Risk Analysis on Anthropic PBC* ("Michael Memorandum"), ANT_AR-0214.

[12] *See Tracing the thoughts of a large language model*, Anthropic (Mar. 27, 2025), https://www.anthropic.com/research/tracing-thoughts-language-model.

a range of outputs, including providing written responses to questions and generating structured databases.

Humans—developers at Anthropic—designed and identified data to train Claude. [13] Anthropic is *especially* careful about how it trains Claude, using a technique the company refers to as "Constitutional AI," which involves "train[ing models to evaluate and revise their own outputs against a set of normative principles, like balancing helpfulness against harm avoidance, and respecting values such as individual privacy and political freedom." Decl. of Jared Kaplan ("Kaplan Decl.") ¶ 19, Dkt. 166-1.[14] Claude's Constitution directly shapes the model's behavior.[15] *See* Decl. of Thiyagu Ramasamy ("Ramasamy Decl.") ¶ 20, Dkt. 166-4. For example, Claude will "refuse" to generate certain harmful material, such as child exploitation materials, "under any circumstances," due to "specific behavioral constraints that Claude is trained to follow." *Id.* The morals and values that Anthropic programmers instill in Claude through extensive training—and that company leaders speak about publicly—reflect Anthropic's officers' and employees' expressive choices.

To reinforce these design choices, Anthropic developed a Usage Policy that "reflects [Anthropic's] judgment based on technical expertise, [its] experience at the frontier of AI development, and [its] values as a company—on how to strike an optimal balance between enabling beneficial uses of AI while mitigating potential harms," and "generally prohibits uses that pose unacceptable risks, including surveillance, compromising computer systems or networks, and designing weapons or other systems to cause harm or loss of human life." Kaplan Decl. ¶ 22.

For U.S. national security customers, Anthropic created a bespoke product: "Claude Gov," a variation of Claude that is subject to the Usage Policy and a government-specific addendum. *See id.* ¶ 27. While Anthropic designed Claude Gov "to fulfill the missions of [Anthropic's] national security customers" and thus "the government-specific addendum does not impose the same restrictions on national security use as it does on civilian customers," *id.* ¶ 28, the government-

---

[13] *Id.*

[14] *See also Claude's new constitution.*

[15] *See id.*

BRIEF OF *AMICI CURIAE* FIRE et al.
CASE NO. 3:26-cv-01996

specific addendum did "impose[] broad restrictions"—to which Defendants originally assented by using Claude Gov—"that would have prohibited mass surveillance of Americans and lethal autonomous warfare," *id.* ¶ 29. Anthropic imposed these restrictions based on a determination that permitting Claude's use for mass surveillance "would risk Claude being misused in ways that seriously infringe Americans' rights," *id.* ¶ 34, and that use for lethal autonomous warfare "would place America's warfighters and innocent civilians at unacceptable risk," *id.* ¶ 35. In sum, Claude Gov also draws on and reflects Anthropic's fundamental values with some tweaks and accommodations to support governmental uses.

Anthropic's decisions about Claude's and Claude Gov's safeguards, and its public commentary about these decisions, are expressive choices that qualify for First Amendment protection. This conclusion is nothing new; it is well-established that the speech and expressive choices of businesses, including those operating online "platforms," plainly "receive the First Amendment's protection." *Moody*, 603 U.S. at 728–29. The Supreme Court has been clear that "whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles of the First Amendment do not vary." *Id.* at 733 (citing *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011)). The government may not "forc[e]" a person or business—no matter the means of its expression—to "present views it wished to spurn," control its "expressive choices," or require it to associate with speakers and "messages it would prefer to exclude." *Id.* at 731–33. The government therefore can no more force AI models to operate absent technical safeguards than it could force newspapers to print or censor articles on specified topics. *Id.* at 743.

That Claude's users interact with what appears to be an autonomous AI model does not change the analysis. Claude works only because Anthropic instills it with a set of "human editorial directions," which are inherently expressive and receive First Amendment protection—indeed, its algorithmic responses are "not unlike traditional media curated by human editors." *See NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1014 (9th Cir. 2025); *see also X.AI LLC v. Bonta*, No. 25-cv-12295, 2026 WL 626926, at *5–6 (C.D. Cal. Mar. 4, 2026) (applying First Amendment scrutiny to the claims of an AI company); Gilad Abiri, *Public Constitutional AI*, 59 GA. L. REV. 601, 660 (2025) ("[R]equiring AI companies to train their models on a specific set of constitutional principles and

precedents could be viewed as a form of compelled speech."). If those editorial directions change, so too do Claude's outputs.

When the Pentagon demands that Claude embrace "patriotic" values, what it really means is that Anthropic must jettison at least some of Claude's guiding principles to produce outcomes of the Pentagon's choosing.[16] For example, if the Pentagon wanted Claude to autonomously plan and carry out missile strikes in military operations, absent technical safeguards and contractual constraints on use in fully autonomous weapons,[17] the Pentagon hypothetically could task Claude to ingest relevant intelligence collected by the U.S. national security apparatus, identify targets that will advance the Pentagon's military aims—whatever those may be—determine which weapons system(s) will be most effective to strike the targets, and remotely initiate such strikes, all without human intervention in the process. Anthropic has made it clear that in its view "today's AI systems—including Claude—are not capable of reliably carrying out lethal autonomous warfare" and that "errors could have grave consequences" for both the U.S. military and innocent civilians. Kaplan Decl. ¶ 35.

Despite the obvious risks, the severity of the consequences, and Anthropic's ethical concerns, the government believes it is entitled to bully Anthropic into both contravening its "expert technical judgment" as well as "the very principles on which Anthropic was founded," *id.* ¶ 39, and keeping quiet about doing so. The First Amendment cannot countenance such a demand. Requiring Claude to express ideas that Anthropic does not wish to express is classic compelled speech, which lies in the heartland of First Amendment's prohibitions. *See W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943) (the government may not "compel" a person "to utter what is not in his mind"); *see also X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024) (The "First Amendment's guarantee of freedom of speech" generally prohibits government-mandated "compelled speech."). Nor could the First Amendment permit a demand by the Pentagon that Anthropic silence itself—for instance, by eliminating a technical safeguard that might prevent

---

[16] Secretary of War Pete Hegseth, X (Feb. 27, 2026).

[17] Statement from Dario Amodei.

requests to monitor domestic social media posts for comments critical of the government and use other available data to unmask commenters who post anonymously. *See X Corp.*, 116 F.4th at 900 (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796–97 (1988) (First Amendment also prohibits "compelled silence").

The Pentagon's speech-silencing, speech-altering, and speech-compelling demands simply cannot pass constitutional muster. National security does not justify an exception to strict scrutiny, which applies here. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) (refusing to apply lesser scrutiny to content-based speech-restrictive laws merely because their goal was to advance national security). "The First Amendment forbids that sort of speech manipulation by the government, even in an arguably national security-related setting." *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 103 (D.D.C. 2025); *see also Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 148 (D.D.C. 2025).

**B.    The government's actions are transparently retaliatory and coercive.**

Moreover, by designating Anthropic as a supply chain risk and imposing the consequences that designation carries, the government is punishing Anthropic for its beliefs and public speech—for instance, its stated viewpoint that "AI can undermine, rather than defend, democratic values" if not used responsibly.[18] The Pentagon evidently does not agree with that sentiment, but the Constitution protects Anthropic's expression of these principles through both Claude and its employees' public statements just the same. *See NAACP v. Button*, 371 U.S. 415, 444–45 (1963).

It is textbook First Amendment law that: *first*, "government officials" may not "subject[] individuals to 'retaliatory actions' … for having engaged in protected speech," *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)); and *second*, the government may not use a "threat of invoking legal sanctions and other means of coercion ... to achieve the suppression" of future disfavored speech, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 70 (1963); *see also Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 185 (2024). The Pentagon did both here.

---

[18] Statement from Dario Amodei.

A "plaintiff pursuing a First Amendment retaliation claim must show … that the government took an 'adverse action' in response to his speech [or protected conduct] that 'would not have been taken absent the retaliatory motive.'" *Wilson*, 595 U.S. at 477 (quoting *Nieves*, 587 U.S. at 399). As discussed above, *see* pp. 6–9, Anthropic's choices about Claude's permitted responses, including the outputs it creates (or does not create) in response to user input, and Anthropic's speech about these choices, are "unquestionably protected conduct under the First Amendment." *Wilmer*, 784 F. Supp. 3d at 150; *see Moody*, 603 U.S. at 728–29. And the Pentagon's decision to punish Anthropic for its refusal to deploy Claude to match the Pentagon's policy preferences and for Anthropic's public discussion of the Pentagon's demands constitutes retaliation "on its face." *Wilmer*, 784 F. Supp. 3d at 151.

This Court need not guess at the government's retaliatory motives because the Pentagon announced them publicly. In Secretary Hegseth's announcement of his "final" decision designating Anthropic as a supply chain risk, he chided Anthropic for purportedly failing to create an AI model that is sufficiently "patriotic."[19] He criticized Anthropic's "ideological whims," its policy of "effective altruism," its supposed "virtue signaling," and ultimately its "stance" on Claude's design as "fundamentally incompatible with American principles."[20] And he made clear that these criticisms were all based on Anthropic's Usage Policy for Claude. In response, he announced the Department's intent to "transition to a … more patriotic service."[21] Under Secretary of Defense Emil Michael supported the decision by claiming that Anthropic's CEO "is a liar and has a God-complex"[22] and scolded Anthropic in his formal justification memorandum for "opt[ing] to publicly

---

[19] Secretary of War Pete Hegseth, X.

[20] *Id.*

[21] *Id.*

[22] Under Secretary of War Emil Michael, X (Feb. 26, 2026), https://x.com/USWREMichael/status/2027211708201058578.

spat with DoW."[23] President Trump endorsed Secretary Hegseth's decision and labeled Anthropic "RADICAL," "WOKE," and "Leftwing nut jobs."[24]

Until recently, it was rare for government leaders so openly and proudly to boast about retaliating against someone for their protected speech. Now it is commonplace for the government to "virtually shun[] … as persona non grata" anyone perceived to be "woke," on the "left," or otherwise unwilling to toe the party line.[25] *Susman Godfrey LLP v. Exec. Off. of President*, 789 F. Supp. 3d 15, 50 (D.D.C. 2025); *cf. CAIR Found. v. Desantis*, No. 25-cv-516, 2026 WL 613468, at *1 (N.D. Fla. Mar. 4, 2026) (observing "the troubling trend of using an executive office to make a political statement at the expense of others' constitutional rights"). By the Administration's own admission, it is using its tremendous coercive power to promote what it views as "patriotic" and punish what it views as "incompatible with American principles"[26] to force Anthropic to alter its expressive position and its speech. But "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty" has that power. *Barnette*, 319 U.S. at 642.

Relatedly, the Pentagon's retaliation against Anthropic will chill future speech from those who fear their speech will elicit similar punishment. *See Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (government's "retaliatory action" violates First Amendment where it is "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again"). Anyone who

---

[23] Michael Memorandum, ANT_AR-0214.

[24] President Donald J. Trump, Truth Social (Feb. 26, 2026), https://truthsocial.com/@realDonaldTrump/posts/116144552969293195.

[25] As one example, the government has engaged openly in a campaign of retaliation against the creators of an application that reports public sightings of Immigration and Customs Enforcement officers *and* the news organizations that merely cover the application. *See Kassandra Rosado & Kreisau Grp. LLC v. Bondi*, No. 26 C 1532, 2026 WL 1047786 (N.D. Ill. Apr. 17, 2026) (granting preliminary injunction and finding plaintiffs are likely to succeed on claim that officials in the Department of Justice and Department of Homeland Security violated their First Amendment rights by using coercive means to deplatform plaintiffs). The Administration has also engaged in a similar retaliatory campaign against Harvard University, imposing on it as many sanctions as possible with the *stated goal* of "warning [] all universities"—public and private—that they must change their policies in order to remain in the Administration's good graces. *See Letter from Kristi Noem, Sec'y of Homeland Security, to Maureen Martin, Harvard Univ.* (May 22, 2025), available at Secretary Kristi Noem (@Sec_Noem), X (May 22, 2025, 2:01 PM), https://x.com/Sec_Noem/status/1925612991703052733.

[26] Secretary of War Pete Hegseth, X (Feb. 27, 2026).

BRIEF OF *AMICI CURIAE* FIRE et al.
CASE NO. 3:26-cv-01996

interacts with this Administration reasonably would believe that not complying with the government's demands will lead to "punishment" for "fail[ing] to accede to [an] official's request." *Okwedy v. Molinari*, 333 F.3d 339, 342 (2d Cir. 2003). At a minimum, the government's actions send the unmistakable message to the entire business community, if not the nation, that it "would be wise to dissociate from" Anthropic. *CAIR Found.*, 2026 WL 613468, at *4 (cleaned up).

The Pentagon's claimed national security rationale cannot save it here. In the "nature and posture in th[is] specific case," the Court can easily conclude, without undermining national security, that Secretary Hegseth's supply chain risk determination is a sham aimed at punishing a private company for a policy disagreement about responsible and ethical uses of AI. *Lee v. Garland*, 120 F.4th 880, 891 (D.C. Cir. 2024).[27] As this Court observed in issuing the preliminary injunction, Defendants' "actions go far beyond what would be necessary to address DoW's ostensible concern about having complete operational control when using AI," *Anthropic PBC v. U.S. Dep't of War*, No. 26-CV-01996-RFL, 2026 WL 836842, at *11 (N.D. Cal. Mar. 26, 2026), and appear instead driven "by a desire to make an example of Anthropic for its public stance on the weighty issues at stake in the contracting dispute," *id.* at *11. Labeling Anthropic a supply chain risk to put it out of business is akin to "killing a person by cutting off his oxygen supply rather than shooting him," and the "only remedy is an injunction against the [government's] violating [the company's] First Amendment rights." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231, 238–39 (7th Cir. 2015).

II.    **Vindicating Anthropic's First Amendment rights will protect all Americans.**

Dissent and good-faith debate about matters of critical societal importance are as American as apple pie. The First Amendment guarantees that "concepts virtually sacred to our Nation as a

---

[27] Although the Pentagon generally has leeway to determine whether to contract with a business, *see* Anthropic PBC's Motion for Summary Judgment at 1, Dkt. 166, even that decision is highly suspect here because of its obvious retaliatory motive. In the retaliation context, "[s]ome official actions adverse to ... a speaker might well be unexceptionable if taken on other grounds" but become unlawful when "retaliation is … the but-for cause of the official action." *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *see Vullo*, 602 U.S. at 203 (Jackson, J., concurring) ("Vullo's alleged conduct, if not done for retaliatory reasons, might otherwise be legitimate[.]"). And this contract termination also raises serious concerns under the unconstitutional conditions doctrine, as "the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech' even if he has no entitlement to that benefit." *Bd. of Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 674 (1996) (citation omitted).

whole" do not "go unquestioned in the marketplace of ideas." *Texas v. Johnson*, 491 U.S. 397, 418 (1989). Our society thrives because of the "joust of principles protected by the First Amendment." *Id.*; *see also Barnette*, 319 U.S. at 637 ("To enforce those rights today is not to choose weak government over strong government. It is only to adhere as a means of strength to individual freedom of mind in preference to officially disciplined uniformity for which history indicates a disappointing and disastrous end.").

Robust debate is especially important when government policy will have profound societal consequences. And this case implicates at least two areas of extraordinary consequence: *first*, the rapid evolution and transformational impact of AI; and *second*, the immense powers of our government's national security apparatus. The lines Anthropic sought to draw in its arrangement with the Pentagon and the ideas that Anthropic aims to contribute to the marketplace more broadly are hardly "radical" or "selfish."[28]

Rather, Anthropic's concerns about Claude being used to cause harm are well-founded.[29] Based on decades of organizational experience, *amici* agree with Anthropic that "AI-driven mass surveillance presents serious, novel risks to our fundamental liberties" and that law has not "caught up with the rapidly growing capabilities of AI."[30] The privacy and civil liberties risks associated with evolving government surveillance capabilities—especially those used with questionable legal authority—are not a new concern. [31] Government monitoring of American citizens'

---

[28] President Donald J. Trump, Truth Social (Feb. 26, 2026).

[29] *See, e.g.*, Letter from national security, business, civil society, and technology leaders to Senate and House Armed Services Committee leadership (Mar. 5, 2026), https://perma.cc/6M33-M2Y9; *Autonomous Weapons Systems and International Humanitarian Law: Selected Issues*, International Committee of the Red Cross (Dec. 2025), https://perma.cc/X3T3-TTL5.

[30] Statement from Dario Amodei.

[31] *See, e.g.*, Seymour Hersh, *Huge C.I.A. Operation Reported in U.S. Against Antiwar Forces, Other Dissidents in Nixon Years* at 1, N.Y. Times (Dec. 21, 1974), https://www.nytimes.com/1974/12/22/archives/huge-cia-operation-reported-in-u-s-against-antiwar-forces-other.html; S. Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, *Book II: Intelligence Activities and the Rights of Americans*, S. Rep. No. 94-755, at 12 (1976) (concluding that "surveillance … was also often conducted by illegal or improper means"), https://perma.cc/54FE-26TQ; Jennifer Valentino-Devries and Siobhan Gorman, *What You Need to Know on New Details of NSA Spying*, Wall Street Journal (Aug. 20, 2013), https://www.wsj.com/articles/SB10001424127887324108204579025222244858490;

---

BRIEF OF *AMICI CURIAE* FIRE et al.
                                        CASE NO. 3:26-cv-01996

communications with inadequate oversight is a recurring theme in this country's history.[32] Even a judge on the Foreign Intelligence Surveillance Court, which provides oversight of certain national security surveillance programs, conceded in publicly released redacted opinions that he had difficulty getting full accounts of surveillance programs and verifying government compliance.[33]

The Pentagon's deployment of artificial intelligence, unconstrained by adequate legal safeguards, exacerbates the risks that surveillance capabilities will be improperly weaponized. The Department of Defense acquires vast troves of personal information from commercial entities, including individuals' physical location, social media, and web browsing data.[34] Equipped with a powerful large language model (LLM), the Department could quickly analyze these massive datasets and draw inferences from a constellation of scattered datapoints to construct a comprehensive picture of an individual's private life, including their political affiliations, religious beliefs, personal communications, medical conditions, and sexual activities. *Cf. Riley v. California*, 573 U.S. 373, 395–6 (2014) (prior to the development of AI technologies like Claude, discussing how the "sum of an individual's private life can be reconstructed" from cell phone data). The Department could likewise use an LLM to deanonymize online speech, drawing on public

---

Bennett Cyphers, *How the Federal Government Buys Our Cell Phone Location Data*, EFF (June 13, 2022), https://perma.cc/2GMA-MBPG.

[32] *See generally* Cora Currier, Justin Elliott, and Theodoric Meyer, *Mass Surveillance in America: A Timeline of Loosening Laws and Practices*, ProPublica (June 7, 2013), https://projects.propublica.org/graphics/surveillance-timeline.

[33] *See* Aaron Mackey, *New Surveillance Court Orders Show That Even Judges Have Difficulty Understanding and Limiting Government Spying*, EFF (Sept. 11, 2018), https://www.eff.org/deeplinks/2018/09/new-surveillance-court-orders-show-even-judges-have-difficulty-understanding-and. The Foreign Intelligence Surveillance Court also has recognized repeated, widespread violations over a period of years by the Federal Bureau of Investigation of procedures for searching internet communications involving Americans, including especially sensitive people and groups, such as political donors. *See* FISC Memorandum Opinion and Order (FISA Ct. Apr. 21, 2022), *available at* https://www.intelligence.gov/assets/documents/702-documents/declassified/21/2021_FISC_Certification_Opinion.pdf.

[34] *See, e.g.*, Annie Bang & Ryan Gallagher, *Pentagon Feud with Anthropic Shines Light on AI's Role in Mass Surveillance*, Bloomberg (Mar. 5, 2026), https://www.bloomberg.com/news/articles/2026-03-05/pentagon-feud-with-anthropic-shines-light-on-mass-surveillance.

BRIEF OF *AMICI CURIAE* FIRE et al.
CASE NO. 3:26-cv-01996

information to infer the real identities of people speaking through anonymous accounts.[35] And the Department could do this at mass scale, well beyond what was imaginable even a few years ago.

Against this background and absent meaningful changes to the governing national security laws and judicial oversight structure, it is entirely reasonable for Anthropic—or any other company—to insist on its own guardrails regarding how the government uses its tools to surveil Americans. And it is essential for the public to be able to understand and debate, without fear of punishment, the use of new technologies to facilitate that surveillance.

## CONCLUSION

It is the government's actions here, not Anthropic's, that are radical. This Court should grant summary judgment to Anthropic.

---

[35] Simon Lerman, et al., *Large-Scale Online Deanonymization with LLMs* (Feb. 18, 2026), https://arxiv.org/html/2602.16800v1.

DATED:  June 17, 2026

Respectfully submitted,

*/s/ Addison W. Bennett*

PERKINS COIE LLP
Addison W. Bennett (SBN 333567)
2525 East Camelback Road, Suite 500
Phoenix, AZ 85016
Telephone: 602.351.8000
ABennett@perkinscoie.com

Todd M. Hinnen (Washington Bar No. 27176)*
Sarah Grant* (Washington Bar No. 63879)
1301 Second Avenue, Suite 4200
Seattle, WA 98101
Telephone: 206.359.8000
THinnen@perkinscoie.com
SarahGrant@perkinscoie.com

*Counsel for* Amici Curiae *The Foundation for Individual Rights and Expression, The Electronic Frontier Foundation, The Cato Institute, Chamber of Progress, and The First Amendment Lawyers Association*

*Admitted *pro hac vice*

BRIEF OF *AMICI CURIAE* FIRE et al.
CASE NO. 3:26-cv-01996