BRETT A. SHUMATE
Assistant Attorney General
Civil Division
ERIC J. HAMILTON (CA Bar No. 296283)
Deputy Assistant Attorney General
JEAN LIN (NY Bar No. 4074530)
Special Litigation Counsel
KRISTINA A. WOLFE (VA Bar. No. 71570)
Assistant Director
JAMES W. HARLOW (Md. Bar, no number issued)
Senior Trial Counsel
CHRISTIAN DIBBLEE (DC Bar No. 90002557)
Trial Attorney
Federal Programs Branch
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
(202) 514-6786
james.w.harlow@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ANTHROPIC PBC, | Case No. 3:26-cv-01996-RFL |
| Plaintiff, | **DEFENDANTS' COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| U.S. DEPARTMENT OF WAR, *et al.,* | Hearing Date: July 30, 2026 |
| Defendants. | Time: 10:00 a.m. PT |
| | Judge: Hon. Rita F. Lin |
| | Place: San Francisco Courthouse |
| | Courtroom 15 |

Case No. 3:26-cv-1996-RFL                                    Defs.' Cross-Motion for Summary Judgment

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

STATUTORY BACKGROUND ........................................................................................... 2

FACTUAL BACKGROUND ................................................................................................ 3

I.    Anthropic Rejects the Department of War's Standard "Any Lawful Use" Policy ........... 3

II.   The President Directs Agencies to Cease Use of Anthropic's Technology ..................... 4

III.  Secretary Hegseth Finds Anthropic's Untrustworthiness Poses a Supply-Chain Risk ..... 5

IV.   Anthropic Files Suit ...................................................................................................... 7

Legal Standard ..................................................................................................................... 8

Argument .............................................................................................................................. 8

I.    Anthropic's First Amendment Claim Fails as a Matter of Law ...................................... 8

      A.    Anthropic Fails To Make a *Prima Facie* Case of Retaliation .............................. 9

            1.    Refusal to accept the Government's contractual term is not speech ............. 9

            2.    Contract negotiations are not speech on a matter of public concern ............ 10

            3.    Anthropic's speech was not the motivating factor for the challenged actions ..... 11

      B.    Even Assuming a *Prima Facie* Case, There Is No First Amendment Violation ..... 12

            1.    National security outweighs Anthropic's purported speech interests ........... 12

            2.    The government would have taken the same actions ................................... 13

II.   Anthropic Was Not Deprived of a Protected Interest, Much Less Denied Requisite Process ..... 14

III.  Anthropic's APA Claims Fail ...................................................................................... 16

      A.    DoW did not violate the APA ............................................................................ 16

            1.    Secretary Hegseth's social media post is not a reviewable, final action ...... 16

            2.    The integrity of Anthropic's on sensitive DoW systems is untrustworthy ..... 17

      B.    No agency defendant violated 5 U.S.C. § 558(b) ................................................ 22

IV.   The President acted well within his authority ............................................................... 23

V.    Any Relief to Anthropic Should Be As Narrowly Tailored As Possible ........................ 24

CONCLUSION .................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*,
  686 F.3d 965 (9th Cir. 2012) .................................................................................... 8, 15, 17

*Am. Bankers Ins. Co. of Fla. v. Nat'l Fire Ins. Co. of Hartford*,
  517 F. Supp. 3d 1025 (N.D. Cal. 2021) ............................................................................. 22

*Am. Fed'n of Gov't Emps. v. Trump*,
  167 F.4th 1247 (9th Cir. 2026),
  *amended and superseded,* 2026 WL 1742911 (9th Cir. June 17, 2026) ........................................ 12, 13

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
  526 U.S. 40 (1999) ....................................................................................................... 14

*Am. Oversight v. Biden*,
  No. CV 20-00716 (RJL), 2021 WL 4355576 (D.D.C. Sept. 24, 2021) ........................................ 22

*Anthropic PBC v. U.S. Dep't of War*,
  2026 WL 1042493 (D.C. Cir. Apr. 8, 2026) ...................................................................... 14

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
  462 U.S. 87 (1983) ........................................................................................................ 19

*Barry v. Barchi*,
  443 U.S. 55 (1979) ....................................................................................................... 15

*Bd. of Cnty. Comm'rs v. Umbehr*,
  518 U.S. 668 (1996) ................................................................................................... 9, 13

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................................................... 16, 23

*Biden v. Texas*,
  597 U.S. 785 (2022) ...................................................................................................... 21

*Burch v. City of Chubbuck*,
  146 F.4th 822 (9th Cir. 2025) ......................................................................................... 11

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ...................................................................................................... 25

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................................... 8, 22

*China Telecom (Ams.) Corp. v. FCC*,
  57 F.4th 256 (D.C. Cir. 2022) ......................................................................................... 19

*China Unicom (Ams.) Operations Ltd. v. FCC,*
  124 F.4th 1128 (9th Cir. 2024) ............................................................................................ 17

*Collins v. Yellen,*
  594 U.S. 220 (2021) .............................................................................................................. 24

*Conn v. Gabbert,*
  526 U.S. 286 (1999) .............................................................................................................. 14

*Connick v. Myers,*
  461 U.S. 138 (1983) ...................................................................................................... 9, 10, 11

*Ctr. for Biological Diversity v. Haaland,*
  58 F.4th 412 (9th Cir. 2023) ................................................................................................. 16

*Ctr. for Cmty. Action & Env't Just. v. FAA,*
  18 F.4th 592 (9th Cir. 2021) ................................................................................................... 8

*Damiano v. Grants Pass Sch. Dist. No. 7,*
  140 F.4th 1117 (9th Cir. 2025) ............................................................................................... 9

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020) .................................................................................................................... 5

*Dep't of Navy v. Egan,*
  484 U.S. 518 (1988) .............................................................................................................. 24

*Dittman v. California,*
  191 F.3d 1020 (9th Cir. 1999) .............................................................................................. 14

*Dixon v. Love,*
  431 U.S. 105 (1977) .............................................................................................................. 15

*eBay Inc. v. MercExchange, LLC,*
  547 U.S. 388 (2006) .............................................................................................................. 24

*Edgar v. Haines,*
  2 F.4th 298 (4th Cir. 2021) ................................................................................................... 12

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021) ...................................................................................................... 17, 19, 20

*FDA v. Wages & White Lion Invs., LLC,*
  604 U.S. 542 (2025) .............................................................................................................. 22

*First Nat'l Bank & Tr. v. Dep't of Treasury,*
  63 F.3d 894 (9th Cir. 1995) .................................................................................................. 15

*Fla. Power & Light Co. v. Lorion,*
  470 U.S. 729 (1985) .............................................................................................................. 24

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*,
313 F.3d 852 (4th Cir. 2002) ........................................................................................... 17

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ........................................................................................................ 25

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) .......................................................................................................... 9

*Gilbert v. Homar*,
520 U.S. 924 (1997) ........................................................................................................ 15

*Gill v. Dep't of Just.*,
246 F. Supp. 3d 1264 (N.D. Cal. 2017) ............................................................................ 8

*Gilligan v. Morgan*,
413 U.S. 1 (1973) ............................................................................................................ 25

*Goldman v. Weinberger*,
475 U.S. 503 (1986) ........................................................................................................ 25

*Haig v. Agee*,
453 U.S. 280 (1981) ........................................................................................................ 12

*Hartman v. Moore*,
547 U.S. 250 (2006) .......................................................................................................... 8

*Havekost v. U.S. Dep't of Navy*,
925 F.2d 316 (9th Cir. 1991) .......................................................................................... 10

*Hearst Radio, Inc. v. FCC*,
167 F.2d 225 (D.C. Cir. 1948) ........................................................................................ 23

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) ........................................................................................................ 8, 18

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) ..................................................................................... 22, 24

*In re Vestavia Hills, Ltd.*,
630 B.R. 816 (S.D. Cal. 2021) .......................................................................................... 5

*Indiana v. Biden*,
652 F. Supp. 3d 995 (S.D. Ind. 2023) ............................................................................. 22

*Indus. Safety Equip. Ass'n v. EPA*,
837 F.2d 1115 (D.C. Cir. 1988) ...................................................................................... 17

*Klamath Forest All. v. U.S. Forest Serv.*,
746 F. Supp. 3d 761 (N.D. Cal. 2024) .............................................................................. 8

*Lackey v. Stinnie,*
    604 U.S. 192 (2025)............................................................................................................ 18

*Lujan v. G&G Fire Sprinklers, Inc.,*
    532 U.S. 189 (2001)............................................................................................................ 15

*Mary Ferrell Found., Inc. v. Biden,*
    No. 22-CV-06176-RS, 2023 WL 4551066 (N.D. Cal. July 14, 2023).................................. 25

*Murphy Co. v. Biden,*
    65 F.4th 1122 (9th Cir. 2023)............................................................................................. 23

*N. Cheyenne Tribe v. Norton,*
    503 F.3d 836 (9th Cir. 2007).............................................................................................. 24

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010) .......................................................................................... 25

*Nicopure Labs, LLC v. FDA,*
    944 F.3d 267 (D.C. Cir. 2019) ........................................................................................... 10

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004)........................................................................................................22-23

*Nuclear Regul. Comm'n v. Texas,*
    605 U.S. 665 (2025)............................................................................................................ 23

*O'Brien v. Welty,*
    818 F.3d 920 (9th Cir. 2016)............................................................................................... 11

*Parsons v. U.S. Dep't of Just.,*
    878 F.3d 162 (6th Cir. 2017)............................................................................................... 17

*Peck v. Thomas,*
    697 F.3d 767 (9th Cir. 2012)............................................................................................... 17

*Pension Benefit Guaranty Corporation v. LTV Corp.,*
    496 U.S. 633 (1990).............................................................................................................. 5

*People's Mojahedin Org. of Iran v. Dep't of State,*
    613 F.3d 220 (D.C. Cir. 2010) ........................................................................................... 15

*Perkins v. Lukens Steel Co.,*
    310 U.S. 113 (1940)...................................................................................................... 10, 24

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205,*
    391 U.S. 563 (1968).............................................................................................................. 9

*Pollinator Stewardship Council v. EPA,*
    806 F.3d 520 (9th Cir. 2015)............................................................................................... 24

*Pub. Serv. Comm'n of Utah v. Wycoff Co.*,
  344 U.S. 237 (1952) ............................................................................................................... 25

*Reliable Automatic Sprinkler Co. v. CPSC*,
  324 F.3d 726 (D.C. Cir. 2003) .............................................................................................. 16

*Riley's Am. Heritage Farms v. Elsasser*,
  32 F.4th 707 (9th Cir. 2022) ............................................................................................. 9, 13

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
  547 U.S. 47 (2006) ................................................................................................................. 10

*San Bernardino Physicians' Servs. Med. Grp., Inc. v. San Bernardino Cnty.*,
  825 F.2d 1404 (9th Cir. 1987) .......................................................................................... 14-15

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ................................................................................................. 18

*Savantage Fin. Servs., Inc. v. United States*,
  595 F.3d 1282 (Fed. Cir. 2010) .......................................................................................... 8, 17

*Seila Law LLC v. CFPB*,
  591 U.S. 197 (2020) ............................................................................................................... 23

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
  605 U.S. 168 (2025) ............................................................................................................... 19

*Snepp v. United States*,
  444 U.S. 507 (1980) ............................................................................................................... 12

*TikTok Inc. v. Garland*,
  604 U.S. 56 (2025) ................................................................................................................. 19

*Town of Castle Rock v. Gonzales*,
  545 U.S. 748 (2005) ............................................................................................................... 14

*Twitter, Inc. v. Garland*,
  61 F.4th 686 (9th Cir. 2023) ................................................................................................. 12

*Ukiah Valley Med. Ctr. v. FTC*,
  911 F.2d 261 (9th Cir. 1990) ................................................................................................. 16

*United Mine Workers of Am. v. Pennington*,
  381 U.S. 657 (1965) ............................................................................................................... 10

*United States v. Espy*,
  145 F.3d 1369 (D.C. Cir. 1998) ............................................................................................ 22

*United States v. O'Brien*,
  391 U.S. 367 (1968) ............................................................................................................... 10

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ............................................................................................. 24, 25

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...................................................................................................... 25

*Zinermon v. Burch*,
    494 U.S. 113 (1990) .................................................................................................. 15

**Statutes**

5 U.S.C. § 551 ...................................................................................................................... 23

5 U.S.C. § 558 ...................................................................................................................... 22

5 U.S.C. § 704 ...................................................................................................................... 23

5 U.S.C. § 706 .................................................................................................................. 8, 22

10 U.S.C. § 3252 ............................................................................................................. *passim*

12 U.S.C. § 4617 .................................................................................................................. 25

15 U.S.C. § 9901 .................................................................................................................. 18

40 U.S.C. § 11101 .................................................................................................................. 3

44 U.S.C. § 3552 .................................................................................................................... 3

**Rules**

Fed. R. Civ. P. 56 ............................................................................................................... 1, 8

**Regulations**

48 C.F.R. Subpart 239.73 ....................................................................................................... 7

48 C.F.R. § 239.7304 ......................................................................................................... 3, 22

48 C.F.R. § 239.7305 ................................................................................................... 7, 18, 20

**Other Authorities**

*Adversary*, New Oxford American Dictionary (3d ed. 2010) ............................................... 18

Amanda Silberling, *Anthropic CEO Dario Amodei calls OpenAI's messaging around military deal 'straight up lies,' report says*, TechCrunch (Mar. 4, 2026),
    https://perma.cc/N94P-H92D................................................................................... 14, 24

American Heritage Dictionary of the English Language (5th ed. 2011) ............................... 18

Claire Duffy et al., *Anthropic files to go public in a potentially trillion-dollar debut*, CNN Business, https://perma.cc/4MSF-E9NR (updated June 1, 2026).........................................................................24

Julie Bort, *Anthropic's latest feud with the Trump admin may actually help it, sales data suggests*, TechCrunch (June 16, 2026), https://perma.cc/XYK3-QXA2 ................................................................................................................14

S. Rep. No. 111-201 (2010) ....................................................................................................................2

Sec'y of War, *Artificial Intelligence Strategy for the Department of War* (Jan. 9, 2026), https://perma.cc/52KE-X7VQ?type=image............................................................................. 3, 4, 17, 20

Webster's New World College Dictionary (4th ed. 2008) ......................................................................18

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on July 30, 2026, at 10:00 a.m. PT, in the United States Courthouse at 450 Golden Gate Avenue, Courtroom 15, San Francisco, California, before the Honorable Rita F. Lin, Defendants will move for summary judgment on all claims alleged against them based on this motion, the ensuing supporting Memorandum, and the administrative record.  Fed. R. Civ. P. 56.

## INTRODUCTION

This case is about the Government's loss of trust in a contractor, Anthropic PBC, and the grave national security risks posed by the continued use of its technology.  In 2024, the Department of War (DoW) integrated Anthropic's artificial-intelligence models into its most sensitive systems and used the models in active military operations.  But the company's behavior in late 2025 and early 2026 eviscerated the trust required for Anthropic's products to remain on DoW's national security systems.  Accordingly, the President and Secretary Hegseth took action.

On February 27, 2026, the President explained on Truth Social that Anthropic was "trying to STRONG-ARM the Department of War," thereby "putting AMERICAN LIVES at risk, our Troops in danger, and our National Security in JEOPARDY."  He thus directed federal agencies to stop using "Anthropic's technology" within six months (the Presidential Directive), consistent with any applicable contractual terms.  The same day, Secretary Hegseth posted to social media a direction that his subordinates begin the process "to designate Anthropic a Supply-Chain Risk to National Security" under 10 U.S.C. § 3252.  On March 3, 2026, after receiving recommendations from the relevant senior DoW officials, the Secretary determined that it was necessary to designate Anthropic as a supply chain risk under § 3252(a) and exclude Anthropic's products from national security systems.

Anthropic's challenge to the President's and the Secretary's considered national security judgments fails.  The government did not retaliate against Anthropic for any protected speech.  Instead, DoW assessed a substantial risk that Anthropic might manipulate its AI model to enforce subjective redlines on DoW's use of the model, in ways that could cause serious harm to national security.  Anthropic's public airing of its objections to DoW's contractual terms does not transform this into a matter of public concern protected by the First Amendment.  Nor was Anthropic's speech about the use of its products the impetus for Defendants' actions; it was the assessed risk to national security.  Even if Defendants' actions were

motivated by Anthropic's speech (which they were not), under the test that governs the regulation of government contractors' speech, Defendants' compelling interest in protecting national security clearly outweighs any First Amendment interests Anthropic might have. Anthropic's due process claim also fails. There is no due process violation because the company has not been deprived of any protected liberty or property interest. Even if it had, Anthropic received all the process it was due.

Anthropic's Administrative Procedure Act (APA) claims are likewise without merit. Secretary Hegseth's decision to exclude Anthropic's products and services from DoW's systems is amply supported by the record. Anthropic does not dispute its capability to build limitations into an AI model that could restrict DoW's lawful use of that model. Nor does Anthropic dispute that, if such limitations were to surface for the first time during ongoing military operations, the national security consequences could be catastrophic. While Anthropic disagrees with the Secretary's assessment of the substantial risk that Anthropic would engage in such conduct, judicial deference to the Secretary's predictive national security judgments is at its apex, particularly since the Secretary's assessment is well-grounded in concrete concerns based on Anthropic's pattern of recent behavior.

Finally, Anthropic's conclusory assertion that non-DoW agency defendants have issued an "order" or a "sanction" against Anthropic is unsupported. These agencies merely engaged in internal IT housekeeping, choosing amongst optional AI models. Nor is there a violation of separation of powers. The President clearly has Article II authority to direct the Executive Branch to avoid dealing with an untrustworthy contractor in accordance with law.

### STATUTORY BACKGROUND

As early as 2011, Congress recognized the "increasing risk that [information technology] systems and networks critical to [DoW] could be exploited through the introduction of counterfeit or malicious code and other defects introduced by suppliers of systems or components." S. Rep. No. 111-201, at 162 (2010). It "conclude[d] that the Secretary should have the authority needed to address this risk," including the ability to "exclude a particular source from consideration where necessary to avoid an unacceptable supply chain risk." *Id.* The resulting legislation, as amended, is 10 U.S.C. § 3252.

The statute empowers the Secretary of War "to protect national security by reducing supply chain risk." 10 U.S.C. § 3252(b)(2)(A). "The term 'supply chain risk' means the risk that an adversary may

sabotage, maliciously introduce unwanted function, or otherwise subvert the design, integrity, manufacturing, production, distribution, installation, operation, or maintenance of a covered system so as to surveil, deny, disrupt, or otherwise degrade the function, use, or operation of such system." *Id.* § 3252(d)(4). The Secretary (along with the heads of the military departments) may designate a "supply chain risk" and take "covered procurement action[s]" for qualifying procurements of "a national security system" or "an item of information technology . . . purchased for inclusion in a" national security system. *Id.* § 3252(a)(1), (d)(1)(A), (d)(3), (d)(5), (d)(6); *see also* 44 U.S.C. § 3552(b)(6) (defining "national security system"); 40 U.S.C. § 11101(6) (defining "item of information technology"). Covered procurement actions include "[t]he decision to withhold consent for a contractor to subcontract with a particular source or to direct a contractor . . . to exclude a particular source from consideration for a subcontract." 10 U.S.C. § 3252(d)(2)(C). Before carrying out a covered procurement action, the Secretary must "consult[] with procurement or other relevant [DoW] officials" and "mak[e] a determination in writing" that, among other things, the use of § 3252 authority is necessary to protect national security and that less intrusive measures are not reasonably available. *Id.* § 3252(b). The Secretary must also notify appropriate congressional committees of the determination. *Id.* § 3252(b)(3); *see* 48 C.F.R. § 239.7304.

**FACTUAL BACKGROUND**

### I.    Anthropic Rejects the Department of War's Standard "Any Lawful Use" Policy

Anthropic is an artificial-intelligence company that has developed an AI model called Claude. Since 2024, various federal agencies have used Claude, either through a direct contract with Anthropic or indirectly via a third-party vendor (such as Amazon Web Services). For example, DoW previously deployed Claude for highly sensitive uses, including for classified work and to support ongoing military operations. *See* Answer (ECF No. 164) ¶ 2; *see also* AR247. Claude was primarily integrated into the DoW's systems via subcontracts with prime vendors, which "limited direct engagement between Anthropic and" DoW. *See* AR254. In 2025, however, Anthropic and DoW began negotiations about a direct contractual relationship. *See* AR251.

As discussions between Anthropic and DoW were ongoing, Secretary Hegseth in January 2026 "direct[ed] the Department of War to accelerate America's Military AI Dominance by becoming an 'AI-first' warfighting force across all components." Sec'y of War, *Artificial Intelligence Strategy for the*

Case No. 3:26-cv-1996-RFL                3                Defs.' Cross-Motion for Summary Judgment

*Department of War* (Jan. 9, 2026) at 1, https://perma.cc/52KE-X7VQ?type=image. Specifically, the Secretary directed DoW to acquire AI "models free from usage policy constraints that may limit lawful military applications" and incorporate "'any lawful use' language" into every "DoW contract through which AI services are procured." *Id.* 5.

To that end, DoW informed Anthropic that DoW "need[s] to be able to use Anthropic's products for all lawful use cases." AR6; *see, e.g.*, AR8. Anthropic refused. *See* AR7 (insisting upon "exceptions" to "a policy of 'any lawful use'"); *see also* AR29, AR2-3. As negotiations continued, Anthropic's troubling behavior escalated. Beyond seeking to limit all lawful uses, Anthropic exhibited unease about the possibility that DoW had used Claude in a particular military operation. *See* AR215; AR213; AR247. And a memo from Anthropic's CEO to company employees expressed hostility towards DoW. *See* AR206-AR207 ("DoW's messaging" was "completely false"); AR207 (DoW's position was "very suspicious"); *id.* (prospect of "Pete Hegseth" changing DoW policy "is exactly what we are worried about"); *id.* ("DoW messaging just straight up lies"). Given Anthropic's conduct towards DoW, significant concerns arose that Anthropic might manipulate Claude to enforce its own policy judgments regardless of DoW's contractual rights or legal authority.

## II.    The President Directs Agencies to Cease Use of Anthropic's Technology

On February 27, 2026, the increasing national security risks posed by Anthropic's behavior became intolerable. By "trying to STRONG-ARM" DoW "and force [it] to obey [Anthropic's] Terms of Service instead of our Constitution," the President explained on Truth Social, Anthropic was "putting AMERICAN LIVES at risk, our Troops in danger, and our National Security in JEOPARDY." AR255A. The President thus directed federal agencies to cease use of Anthropic's technology within six months. *Id.* In response, GSA "suspend[ed] availability of all Anthropic models" in USAi.gov, a "centralized platform for federal agencies to test . . . AI models" (AR398, AR410), modified the third-party provider contract to remove Claude's availability on the Multiple Award Schedule (AR397, AR400), and told internal users "to cease all use of Anthropic technology by August 27, 2026" (AR419). Agencies that used Claude only as an optional feature through a third-party vendor asked that another model be substituted for Claude. *See, e.g.*, AR262-266; AR327-331. Other agencies "temporarily disabled" access to Claude as they awaited further guidance, AR338; *see also* AR342; AR391; AR521-522; AR527; or "blocked access to Claude,"

AR361; AR387; AR1576-1577; or took no immediate action, *see* ECF Nos. 155-2, 155-3, 155-4.

**III.    Secretary Hegseth Finds Anthropic's Untrustworthiness Poses a Supply-Chain Risk**

Echoing the President's post of February 27, 2026, Secretary Hegseth posted on social media the same day that "the Commander- in-Chief and the American people alone will determine the destiny of our armed forces, not unelected tech executives." AR255B. Thus, he directed DoW to begin the process of "designat[ing] Anthropic a Supply-Chain Risk to National Security," *id.*, which DoW subsequently did.

On March 2, 2026, the Under Secretary of War for Research and Engineering, with the assistance of the Chief Digital and Artificial Intelligence Office (CDAO),[1] analyzed the risk posed by Anthropic in a memorandum entitled "Urgent Supply Chain Risk Analysis: Anthropic's Refusal to Permit Lawful AI Use." *See* AR213-216; AR244-245.[2] "Unlike traditional software," the Under Secretary explained, "AI models are probabilistic systems which are understood to 'drift' or degrade as new data is introduced and require constant tuning, the integrity of which[] is fundamentally based on the trustworthiness of the vendor"—*i.e.*, Anthropic—"to ensure the model continues to perform accurately and fairly." AR214. Thus, "AI systems are acutely vulnerable to manipulation" by those with "[p]rivileged access"—such as the model's builder—who can "introduce unwanted function, or otherwise subvert the design, integrity, and operation of the model." *Id.* And the "technical opacity" of an AI model "makes it difficult for DoW to assess technological features that may be encoded into the [AI] product and that may cause it to subvert the appropriate execution of mission applications, also known as 'model poisoning,' or to fail to perform altogether." AR245. Put simply, "Anthropic's ability to unilaterally alter system guardrails and model weights without DoW consent could fundamentally change the system's function and creates a significant operational risk" with potentially "catastrophic downstream consequences, such as a critical defense

---

[1] CDAO was realigned from the Office of the Under Secretary of War for Intelligence to the Office of the Under Secretary of War for Research and Engineering in 2025. AR244. "Because of its institutional and subject matter expertise, CDAO inherited responsibility for section 3252 supply chain risk assessments relating to AI issues." AR244-245.

[2] Anthropic wrongly dismisses Under Secretary Michael's March 17 and March 24 declarations as "post hoc rationalizations." Anthropic's Mot. for Summ. J. (ECF No. 166) at 19 ("MSJ"). The declarations are properly before the Court because they "offer 'a fuller explanation of the agency's reasoning at the time of the agency action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (quoting *Pension Benefit Guaranty Corporation v. LTV Corp.*, 496 U.S. 633, 654 (1990)) (emphasis omitted); *see, e.g.*, *In re Vestavia Hills, Ltd.*, 630 B.R. 816, 844-45 (S.D. Cal. 2021).

system failing to engage." AR214.

"While this is, at least in part, a common concern with all" AI models, "the technical and security assurances of the other [AI] labs' leadership, along with their consistently responsible and trustworthy behavior during their engagement with DoW, mitigate these risks." AR245. By contrast, "Anthropic's risk level escalated from a potentially manageable technical and business negotiation to an unacceptable national security threat over the course of the DoW's contract negotiation with them." AR215. Anthropic's desire to limit the lawful uses for which DoW may employ its model reflects an "untenable" position that would improperly "restrict DoW's warfighting operations beyond the limitations imposed by law" and effectively grant the company "an operational veto" over DoW's most sensitive operations. AR213. And Anthropic's efforts to impose its own judgments about the government's appropriate use of its model through contractual limits indicated that it might develop additional "redlines" and "preemptively and surreptitiously alter the behavior of the model in advance." AR215.

Those concerns were grounded in recent experience. An Anthropic executive contacted DoW's prime contractor "during a time of active military operations" and "questioned the use of their technology in our warfighting systems" though "clearly permitted under the Terms of Service of their existing contract." AR215; AR213. This "led to alarm by" DoW and the prime contractor, raising "doubts" about whether Anthropic would place corporate policy preferences above DoW's lawful uses. AR213. DoW also learned that filters built into Claude caused it "to stop functioning normally" for "sensitive" "infectious disease prevention research" that the U.S. Centers for Disease Control and Prevention (CDC) was conducting. AR246; *see* AR9. Yet Anthropic had "failed to inform the prime contractor and the agency upfront about updates it made to the filters or how the filters could limit the product's functionality." AR254. Furthermore, Anthropic treated "negotiations with the DoW primarily as tools for brand-building"—including in ways "openly hostile" to the government— elevating the risk that Anthropic would poison a model. AR213-214.

Based on all these factors, the Under Secretary determined that DoW could not "establish the deep trust required for security collaboration" with Anthropic and "cannot trust Anthropic to ensure the integrity of its models." AR214. Because of "a substantial risk that Anthropic could attempt to . . . preemptively and surreptitiously alter the behavior of the model in advance or in the middle of ongoing warfighting

operations" to enforce its policy "redlines," AR215, the Under Secretary assessed that Anthropic constituted "a clear and present supply chain risk as defined in 10 U.S.C. § 3252." AR216. The Under Secretary of War for Acquisition and Sustainment and DoW's Chief Information Officer concurred and jointly recommended to Secretary Hegseth "that there is supply chain risk to DoW covered systems related to the use of Anthropic . . . products or services." AR210-AR211; *see* 10 U.S.C. § 3252(d)(5).

On March 3, 2026, Secretary Hegseth accepted the joint recommendation and determined that "[t]he use of" Anthropic's "products or services in any DoW covered system presents a supply chain risk and the use of the authority in section 3252(a) is necessary to protect national security by reducing that supply chain risk." AR209. He directed that "[a]ll actions authorized in accordance with 48 C.F.R. § 239.7305" should be implemented for "[a]ll DoW procurements for which 48 C.F.R. Subpart 239.73 is applicable." AR230 (Scoping Analysis); AR209 (adopting Scoping Analysis). This excludes Anthropic from supplying products or services, as a contractor or a subcontractor, for procurements involving national security systems. *See* 10 U.S.C. § 3252(d)(2)-(3), (d)(5)-(6); 48 C.F.R. § 239.7305.

Through letters dated March 3, the Secretary notified Congress, *see* AR231-236; 10 U.S.C. § 3252(b)(3), and Anthropic of his Determination, *see* AR237-240. Secretary Hegseth also informed Anthropic that it had 30 days to submit notice of a request for reconsideration (and for additional time to submit relevant information or arguments). AR239-240.

## IV.    Anthropic Files Suit

On March 9, 2026, Anthropic filed this suit against 17 federal agencies (and their heads), as well as the Executive Office of the President. Anthropic alleges five counts: (1) an APA claim challenging the Secretarial Determination and the Secretary's social media post; (2) a First Amendment claim based on the Presidential Directive and the Secretary's actions; (3) an *ultra vires* claim against the Presidential Directive; (4) a Fifth Amendment due process claim; and (5) and an omnibus APA claim against all agency defendants. Compl. (ECF No. 1) ¶¶ 113-87.

On March 26, 2026, the Court issued a preliminary injunction. *See* ECF Nos. 134 (Op.), 135. Defendants have since answered the complaint, ECF No. 164, and produced the certified administrative record, *see* ECF Nos. 155-1, 156-1. On June 10, 2026, Anthropic moved for summary judgment. *See* ECF No. 166. Defendants now oppose that motion and cross-move for summary judgment.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Summary judgment also "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Gill v. Dep't of Just.*, 246 F. Supp. 3d 1264, 1268 (N.D. Cal. 2017) (quotation omitted). "Under the APA's deferential standard of review, an agency action may be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Klamath Forest All. v. U.S. Forest Serv.*, 746 F. Supp. 3d 761, 767–68 (N.D. Cal. 2024) (quoting 5 U.S.C. § 706(2)(A)). "The party challenging the agency's action carries the burden of persuasion." *Id.* at 768 (citing *Ctr. for Cmty. Action & Env't Just. v. FAA*, 18 F.4th 592, 599 (9th Cir. 2021)).

**ARGUMENT**

To overturn the assessments of the President and the Secretary of War about the risks to federal systems posed by Anthropic's products, Anthropic must overcome the "unique deference" owed to the Executive Branch in national security matters, *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012), and the "significant weight" afforded such judgments, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 36 (2010). Further, agencies "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process," and "determining an agency's minimum needs" for AI models falls squarely within that broad discretion and is not "for [the] court to second guess." *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (alteration in original) (citations omitted). Against this headwind of deference, Anthropic's suit fails.

**I.    Anthropic's First Amendment Claim Fails as a Matter of Law**

The First Amendment generally prohibits the government from retaliating against individuals for engaging in protected speech. *See Hartman v. Moore*, 547 U.S. 250, 256 (2006). In the context of government employees or contractors, however, the government has "interests as an employer in regulating the speech of its employees [or contractors] that differ significantly from those it possesses in

connection with regulation of the speech of the citizenry in general." *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968); *see also Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 677 (1996) (applying *Pickering* to government contractors). This is because "the government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Umbehr*, 518 U.S. at 676 (alteration in original) (citation omitted). The Supreme Court thus requires a "fact-sensitive and deferential weighing of the government's legitimate interests" against the First Amendment rights of government employees and contractors. *Id.* at 677; *see also Connick v. Myers*, 461 U.S. 138 (1983); *Garcetti v. Ceballos*, 547 U.S. 410 (2006).

Under the "*Pickering* balancing test," "a plaintiff must establish a prima facie case of retaliation." *Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1137 (9th Cir. 2025) (quoting *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 720–21 (9th Cir. 2022)). Anthropic must show it engaged in expressive conduct about a matter of public concern; government officials took adverse action against it; and its expressive conduct was a substantial or motivating factor for the adverse action. *Id.* Only if Anthropic establishes its prima facie case does the burden shift to the government to show that its legitimate interests outweigh the Anthropic's. *Id.* Alternatively, "the government can show that it would have taken the same actions in the absence of [Anthropic's] expressive conduct." *Id.* (citation omitted).

### A.    Anthropic Fails To Make a *Prima Facie* Case of Retaliation

#### 1.    Refusal to accept the Government's contractual term is not speech

Anthropic's First Amendment retaliation claim fails at the threshold because no speech or expressive conduct is at issue. The parties' dispute stems from Anthropic's "declin[ing] to abandon" certain restrictions on its model despite the Government's offer of a different contractual term. MSJ 13.[3] That refusal is conduct, not speech. Anthropic says DoW's contractual term would "undercut Anthropic's core identity and competitive advantage," "erode internal and external trust, weaken the company's culture, and threaten its ability to attract and retain" talent—in short, hurt its business. Kaplan Decl. (ECF No. 166-1) ¶ 38. A refusal to deal for commercial reasons is not speech or expressive conduct. *Cf.*

---

[3] Pincites to the MSJ are to the ECF pagination.

*Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 291 (D.C. Cir. 2019) (ban on free distribution of manufacturer's products does not "restrict the manufacturer's ability to communicate" and thus does not implicate any "communication of information" protected by the First Amendment). To conclude otherwise "would extend First Amendment protection to every commercial transaction on the ground that it communicates to the customer information about a product or service." *Id.*

Indeed, the Supreme Court has long rejected the "view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). "If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 65–68 (2006). Further, because the government can "determine those with whom it will deal," *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940), it does not risk a First Amendment violation every time it rejects a vendor's contractual terms.

Anthropic also briefly mentions the Petitions Clause, *see* MSJ 14, but that Clause protects "concerted efforts to influence public officials" about policy, *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965), not a vendor's business negotiations with the Government. Anthropic remains free to advocate to or petition the Government and offers no evidence to the contrary.

### 2. Contract negotiations are not speech on a matter of public concern

Anthropic similarly cannot make the threshold showing of speech on a matter of public concern. The alleged expressive conduct concerned DoW's refusal to accept certain of Anthropic's terms, which reflects at most that "a single [contractor] is upset with the status quo." *Connick*, 461 U.S. at 148. Such individual grievance is not a matter of public concern. Nor did this dispute about the potential use of a private, propriety product transform into a matter of public concern simply because Anthropic adopted the negotiating tactic of publicly critiquing the government. At bottom, Anthropic's statements about the contractual negotiations were designed to "further some purely private interest," *Havekost v. U.S. Dep't of Navy*, 925 F.2d 316, 318 (9th Cir. 1991)—namely its corporate objectives, *see* Kaplan Decl. ¶ 38 (noting acceptance of the government's terms would "undercut Anthropic's core identity and competitive advantage")—not to "bring to light actual or potential wrongdoing or breach of public trust," *Connick*,

461 U.S. at 148.  For this Court to hold otherwise "would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case." *Id.*

### 3.    Anthropic's speech was not the motivating factor for the challenged actions

Anthropic sees no "genuine dispute" that its protected expression motivated the government's actions, MSJ 14, but the record is clear that those actions were rooted in DoW's risk assessment that Anthropic could manipulate or modify its model to restrict the model's usage.  DoW concluded, for example, that "there is a substantial risk" that Anthropic "could attempt to disable its technology or preemptively and surreptitiously alter the behavior of the model in advance" of "warfighting operations" to enforce its own judgments about the technology's appropriate use.  AR215; *see also* AR214 (Anthropic could "subvert the design, integrity, and operation of the model" or "unilaterally alter" the design of the model without DoW's knowledge or consent).  Anthropic's expressive activity thus was not "a substantial or motivating factor" for the Presidential Directive or the Secretary's designation.  *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016) (citation omitted).

The timeline supports the Government's position.  *See Burch v. City of Chubbuck*, 146 F.4th 822, 838 (9th Cir. 2025) (examining "timeline of events").  Anthropic's views about the proper use of AI were well known to DoW when it first engaged with Anthropic in 2024.  *See* Op. 5.  The dispute arose only when Anthropic's conduct during the 2025-2026 contract negotiations led DoW to assess that Anthropic "can and would impose its moral and policy judgments on the warfighting capabilities" of DoW by manipulating or restricting DoW's use of the model.  AR215.

This concern about Anthropic's conduct is evident from the face of the challenged actions.  The President expressly rebuffed what he viewed as Anthropic's efforts "TO DICTATE HOW OUR GREAT MILITARY FIGHTS AND WINS WARS"—namely its attempt to "STRONG-ARM the Department of War, and force them to obey [Anthropic's] Terms of Service," which would put "AMERICAN LIVES at risk, our Troops in danger, and our National Security in JEOPARDY."  AR255A.  The Secretary echoed those sentiments, emphasizing the dangers of allowing a private vendor to "seize veto power over the operational decisions of the United States military."  AR255B.  The recommendation underlying the Secretary's § 3252 determination identified a supply chain risk based on Anthropic's "restrictions on the use of [its] products and services."  AR210.  Specifically, because of the need "to continuously update and

tune" Claude, Anthropic could "subvert the design and/or functionality" of any new version without DoW's knowledge or consent. AR216.

Anthropic wrongly claims these concerns are post hoc explanations. MSJ 16. Under Secretary Michael specifically mentioned the risk that Anthropic would use updates to "subvert" its products. AR216. Anthropic also challenges these reasons as "pretextual" because, according to a new declaration (ECF No. 166-4), Anthropic "has no access" or "visibility" into its models once deployed on DoW systems. MSJ 16. This self-serving declaration is not part of the administrative record (and thus is not properly before the Court), nor can it be used to rebut DoW's reasonable assessment that the potential risk of manipulation is intolerable for national security interests. Anthropic further fails to acknowledge that CDC could not use Claude as desired due to a hidden limitation CDC only learned of when the model failed to perform as expected. *See* AR254. DoW "learned about this incident in the context of its own negotiations with Anthropic." *Id.* Thus, DoW's concern about Anthropic using updates to compromise warfighting was based in evidence, and was not pretextual. And although the President's and the Secretary's posts mention Anthropic's supposed ideology, the Court should not read those statements out-of-context "in the[ir] worst possible light," particularly given the legitimate national security risks discussed in Under Secretary Michael's analysis. *Am. Fed'n of Gov't Emps. v. Trump*, 167 F.4th 1247, 1257 (9th Cir. 2026) ("*AFGE*"), *amended and superseded,* 2026 WL 1742911 (9th Cir. June 17, 2026).

Accordingly, Anthropic has failed to establish a *prima facie* case of First Amendment retaliation.

**B.      Even Assuming a *Prima Facie* Case, There Is No First Amendment Violation**

**1.      National security outweighs Anthropic's purported speech interests**

Even assuming Anthropic could establish a *prima facie* case, its First Amendment interest is outweighed by the Government's "compelling interest" in protecting national security. *Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980). "It is obvious and inarguable that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (citation omitted). Courts give "high priority" to the government's national security interests when balancing the First Amendment against the Government's interests. *Edgar v. Haines*, 2 F.4th 298, 318 (4th Cir. 2021); *see also Twitter, Inc. v. Garland*, 61 F.4th 686, 698 (9th Cir. 2023) (same).

That "legitimate countervailing government interest[]" is "sufficiently strong" to justify the supply

chain risk designation. *Umbehr*, 518 U.S. at 675. "The [G]overnment must ensure its technology assets are reliable, secure, and effective" for warfighting purposes. AR213. DoW does not have that assurance when a contractor acts to "unnecessarily restrict[] the use of a system to diminish functionality and limit DoW's warfighting capabilities," as Anthropic did. *Id.* Anthropic's hostile public statements regarding DoW and the apparent sincerity of its beliefs escalated the risk that Anthropic "would impose its moral and policy judgments on [DoW's] warfighting capabilities," a risk that would disrupt efforts to protect national security. AR215. DoW's prediction was reasonable, not "rank speculation or bald allegation." *Riley's*, 32 F.4th at 725 (citation omitted). Anthropic questioned the use of its technology during an active military operation. *See* AR215; AR247. It also inserted limitations into its product to restrict CDC's usage of Claude without telling CDC first. *See* AR246. These facts, coupled with Anthropic's "hostile and non-cooperative stance" during negotiations with DoW, threatened to undermine the Government's compelling interest in protecting national security. AR214. Therefore, under the *Pickering* framework, there is no First Amendment violation.

### 2.    The government would have taken the same actions

Alternatively, even if Anthropic could prove "some retaliatory animus in the official's mind" (and it has not), the First Amendment claim still fails because the government "would have taken the same actions in the absence of" retaliatory intent. *AFGE*, 167 F.4th at 1256–57 (citation omitted). DoW's administrative record is replete with national security concerns, making clear that its decision has "a legitimate grounding in national security concerns, quite apart from any retaliatory animus." *Id.* at 1257 (citation omitted). The record contains multiple references to a national security risk that animated DoW's designation. *See, e.g.*, AR213 (concern about introducing "an unreliable and compromised component into our warfighting mission"); AR214 (Anthropic's ability to "fundamentally change the system's function" "create[s] a significant operational risk"). And the social-media posts by the President and Secretary Hegseth about Anthropic should be "taken as a whole," just like the fact sheets at issue in *AFGE*, which the Ninth Circuit found "demonstrate[d] the President's focus on national security," *AFGE*, 167 F.4th at 1257, even though they also included statements that unions had "declared war on President Trump's agenda" and were "fighting back against Trump," *id.* at 1253 (citation omitted). Nor does DoW's use of Claude after the designation to support military operations undermine the national security rationale

for that designation; the six-month phaseout of Anthropic's technology serves national security by ensuring continuity of capabilities during active military operations. *See* AR255A, AR255B.[4]

## II.    Anthropic Was Not Deprived of a Protected Interest, Much Less Denied Requisite Process

The threshold "inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest" in liberty or property. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). Anthropic asserts a liberty interest in pursuing government contracts and in its reputation. *See* MSJ 27. However, the Presidential Directive did not "debar[] [Anthropic] from government contracting." *Id.* (citation omitted). Multiple agencies took no action against Anthropic after the Directive, ECF Nos. 155-2, 155-3, 155-4, and others temporarily paused the use of Claude, *see* AR338, AR342, AR391, AR521–522, AR527. Thus, the Directive effected at most a "brief interruption," *Conn v. Gabbert*, 526 U.S. 286, 292 (1999), not "a complete prohibition of the right to engage in [the] calling" of government contracting, *Dittman v. California*, 191 F.3d 1020, 1029 (9th Cir. 1999) (citation omitted).

Anthropic also has not shown the challenged actions actually "stigmatiz[ed]" it or impaired its reputation at all. MSJ 27. Anthropic's CEO says "the general public" and "the media" "see us as the heroes." Amanda Silberling, *Anthropic CEO Dario Amodei calls OpenAI's messaging around military deal 'straight up lies,' report says*, TechCrunch (Mar. 4, 2026), https://perma.cc/N94P-H92D. Indeed, "Anthropic's best month on record, as far as business adoption, was the month that [DoW] labeled them a supply-chain risk." Julie Bort, *Anthropic's latest feud with the Trump admin may actually help it, sales data suggests*, TechCrunch (June 16, 2026), https://perma.cc/XYK3-QXA2; *cf. Anthropic PBC v. U.S. Dep't of War*, 2026 WL 1042493, at *3 (D.C. Cir. Apr. 8, 2026) ("some record evidence suggests that Anthropic has financially benefited from its refusal to accede to the Department's request").

Nor has Anthropic been deprived of a property interest. "To have a property interest in a benefit, a person clearly must . . . have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (citation omitted). And Anthropic is not entitled to "commercial activity with military contractors" or to government contracts. *Compare* MSJ 27-28*, with San Bernardino Physicians'*

---

[4] Even if the *Pickering* framework does not apply, Anthropic's First Amendment retaliation claim fails for many of the same reasons—namely, Anthropic's refusal to agree to DoW's "any lawful use" term was not speech or expressive conduct and, regardless, that purported speech or expressive conduct was not the motivating factor behind the government's actions.

*Servs. Med. Grp., Inc. v. San Bernardino Cnty.*, 825 F.2d 1404, 1410 (9th Cir. 1987) ("contract to supply medical services to the state does not confer any constitutionally protectible interest on" the plaintiff). Also, unlike the plaintiff in the primary case Anthropic relies on (MSJ 27), it has not been broadly prohibited from "conduct[ing] any business whatsoever." *Al Haramain*, 686 F.3d at 980.

Even if a deprivation had occurred (it had not), Anthropic received sufficient process. "Due process . . . is a flexible concept that varies with the particular situation." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). Deferring process "until after the initial deprivation" is permissible when "[a]n important government interest" demands "prompt action" and there is "a substantial assurance that the deprivation is not baseless or unwarranted." *Gilbert v. Homar*, 520 U.S. 924, 930-31 (1997) (citation omitted). Sufficiently important government interests have included "preserving the integrity of" horse racing, *Barry v. Barchi*, 443 U.S. 55, 63–65 (1979), and "safety on the roads and highways," *Dixon v. Love*, 431 U.S. 105, 112–15 (1977). Further, "advance notification" of adverse action is not required when such "notification would impinge upon the security and other foreign policy goals of the United States." *People's Mojahedin Org. of Iran v. Dep't of State*, 613 F.3d 220, 227 n.4 (D.C. Cir. 2010) (per curiam) (citation omitted). The national security interests at stake here rank far above the integrity of horse racing or even road safety and therefore justify post-deprivation process.

As for the Secretary's designation, Congress expressly authorized him "to limit disclosure of information" about any determination, 10 U.S.C. § 3252(c), thereby recognizing that pre-deprivation process is not required. Due process was satisfied by providing Anthropic the opportunity to seek reconsideration within 30 days of receipt of the designation (which it did not do), *see* AR238, and to pursue judicial review under the APA, *see First Nat'l Bank & Tr. v. Dep't of Treasury*, 63 F.3d 894, 899 (9th Cir. 1995) (holding that APA review in district court adequately safeguards "due process rights"). Anthropic complains that it could have "corrected [DoW's] misunderstanding," MSJ 30, but nowhere explains why pre-deprivation—rather than post-deprivation—process was necessary to present evidence and arguments to DoW. And to the extent that Anthropic's contracts with particular agencies create a protected interest, "an ordinary breach-of-contract suit" provides sufficient due process. *Lujan v. G&G Fire Sprinklers, Inc.*, 532 U.S. 189, 196–97 (2001).

**III.     Anthropic's APA Claims Fail**

Anthropic brings APA claims against Secretary Hegseth's February 27 social media post and his subsequent determination under 10 U.S.C. § 3252, *see* MSJ 18-26, as well as "the actions taken by [non-DoW] agencies to implement the Presidential Directive," *id.* 30.  Neither challenge has merit.

**A.     DoW did not violate the APA**

**1.     Secretary Hegseth's social media post is not a reviewable, final action**

Defendants maintain that Secretary Hegseth's "social media post on February 27 is *not* a final agency action subject to APA review" because it was not the consummation of DoW's decisionmaking process and did not determine any rights or obligations.  *See* PI Opp'n (ECF No. 96) 25-26; *see also Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (a final agency action "must mark the consummation of the agency's decisionmaking process" and "must be one by which rights or obligations have been determined, or from which legal consequences will flow" (citations omitted)).  Although the Court previously disagreed and treated the "plain language" of the post as essentially dispositive, *see* Op. 35; MSJ 12, that language must be read in context, which shows that DoW "plainly has not treated the [social media post] as the last step," *Ctr. for Biological Diversity v. Haaland*, 58 F.4th 412, 417 (9th Cir. 2023), because it subsequently undertook § 3252's formal designation process, and only then did legal consequences flow.  DoW had no reason to do that if the social media post already had legal effect.

The legal framework of 10 U.S.C. § 3252 corroborates Defendants' position.  Section 3252 and the implementing "regulations clearly prescribe a scheme whereby" DoW undertakes specific steps "before it can make any determination" about a supply chain risk "that is legally binding." *Reliable Automatic Sprinkler Co. v. CPSC*, 324 F.3d 726, 732 (D.C. Cir. 2003).  At the time of Secretary Hegseth's post, DoW indisputably had "not yet taken the steps required under the statutory and regulatory scheme for its actions to have any legal consequences." *Id.*; *see* MSJ 19 (admitting "[t]he administrative record materials . . . almost entirely post-date the" post).  Put simply, the Secretary's post did not have "the status of law or comparable legal force." *Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264 (9th Cir. 1990).

That is further borne out by Anthropic's inability to identify any legal consequences of the post.  Law firms advising clients to "review their use of Anthropic technology," Op. 35 (citation omitted), is hardly evidence that the post "alter[ed] the legal regime to which" Anthropic "is subject," *Bennett*, 520

U.S. at 178.  Nor do "indirect" effects arising "from the reactions and choices of industry customers" and legal observers suffice for finality.  *Indus. Safety Equip. Ass'n v. EPA*, 837 F.2d 1115, 1121 (D.C. Cir. 1988); *see also Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 860 (4th Cir. 2002); *Parsons v. U.S. Dep't of Just.*, 878 F.3d 162, 168 (6th Cir. 2017).  Accordingly, Anthropic has not proved that Secretary Hegseth's February 27 post is a final agency action subject to APA review.

### 2.    The integrity of Anthropic's on sensitive DoW systems is untrustworthy

Secretary Hegseth's § 3252 determination readily clears APA review.  The Secretary's "action is presumed to be valid and must be upheld if a reasonable basis exists for the agency decision." *Peck v. Thomas*, 697 F.3d 767, 772 (9th Cir. 2012).  "A court may not substitute its own policy judgment for that of the agency"; rather, it "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423-24 (2021).  Moreover, the Secretary is entitled to "unique deference," *Al Haramain*, 686 F.3d at 980, given "the broad discretion of agency officials" in the areas of national security and procurement, *Savantage*, 595 F.3d at 1286 (citation omitted); *see China Unicom (Ams.) Operations Ltd. v. FCC*, 124 F.4th 1128, 1153-54 (9th Cir. 2024).

"In the national security domain, AI-enabled warfare and AI-enabled capability development will re-define the character of military affairs over the next decade."  Sec'y of War, *Artificial Intelligence Strategy* 1.  For DoW to have cutting-edge, state-of-the-art technical capabilities, an AI vendor must "continuously provide updated versions of its model."  AR253.  Each iteration of this constantly evolving technology provides a fresh opportunity for a vendor to introduce changes that "subvert the [model's] design and/or functionality" in ways that could jeopardize DoW's "lawful use of the [model's] capability." AR216; *see* AR210.  And because AI models are largely a "black box," "deep trust [is] required" between DoW and the vendor "for security collaboration."  AR214.

For all the reasons set forth in the record and summarized above, DoW "cannot trust Anthropic to ensure the integrity of its [AI] models."  AR214.  Rather, "there is a substantial risk that Anthropic could attempt to . . . preemptively and surreptitiously alter the behavior of the model in advance" and "impose its [own] moral and policy judgments on the warfighting capabilities of the DoW"—a "threat" that "is unacceptable."  AR215.  The Secretary therefore reasonably determined that "[t]he use of any of"

Case No. 3:26-cv-1996-RFL                    17                    Defs.' Cross-Motion for Summary Judgment

Anthropic's "products or services in any DoW covered system presents a supply chain risk and the use of the authority in Section 3252(a) is necessary to protect national security by reducing that supply chain risk." AR209; *see also* 10 U.S.C. § 3252(d)(2)-(3), (d)(5)-(6); 48 C.F.R. § 239.7305. Under the APA's "highly deferential" review, *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014), this Court may not override the Secretary's calculated judgment that including Anthropic's products and services in national security systems is intolerable, *see Holder*, 561 U.S. at 33-35.

Anthropic's counterarguments are unavailing. *First*, designation of Anthropic as a supply-chain risk is not "incompatible with the text of § 3252," MSJ 21, which requires the risk stem from an "adversary," 10 U.S.C. § 3252(d)(4). The term broadly encompasses any "opponent in a contest, conflict, or dispute," *Adversary*, New Oxford American Dictionary (3d ed. 2010); *see* American Heritage Dictionary of the English Language 25 (5th ed. 2011) (adversary includes "an opponent"); Webster's New World College Dictionary 20 (4th ed. 2008) (same). Anthropic's cramped reading of "adversary" as "hostile foreign countries" and "terrorist groups," MSJ 21, has no foothold in the statutory text or the word's plain meaning. And "[a]textual judicial supplementation" with Anthropic's foreign-nation qualifier "is particularly inappropriate" because "Congress has shown that it knows how to adopt the omitted language." *Lackey v. Stinnie*, 604 U.S. 192, 205 (2025) (citation omitted); *see, e.g.*, 15 U.S.C. § 9901(c)(2), (c)(4) (defining "foreign adversary" and "foreign adversary country").

*Second*, Anthropic says § 3252 targets "entities engaged in 'covert acts or hacks,' not vendors openly expressing views with which [DoW] disagrees." MSJ 21 (quoting Op. 30). But the statutory text is broader than Anthropic suggests; § 3252 covers risks that a vendor may "subvert the design, integrity," or "operation" of a covered system to "disrupt, or otherwise degrade the function, use, or operation of such system." 10 U.S.C. § 3252(d)(4). That language plainly covers the risk DoW assessed that Anthropic could limit or manipulate the capabilities of its model to restrict DoW's use. But even if the text is as limited as Anthropic argues, DoW is concerned expressly about the "substantial risk that Anthropic could . . . preemptively and surreptitiously"—that is, covertly—"alter the behavior of the model in advance" to reflect "its moral and policy judgments." AR215. And that "threat" of "model poisoning," *id.*, goes well beyond a perfunctory "disagreement about contract language," MSJ 22.

DoW's concern about unapproved limitations built into the model by Anthropic could manifest at

ill-timed moments. This concern is not hypothetical. DoW knew that, on at least one occasion, Claude had declined to perform activities required by CDC based on limits embedded by Anthropic and that were unknown to CDC. *See* AR246. Anthropic's professed intent to prevent specific uses by DoW was not only alarming for its own sake; it also signaled that Anthropic may develop additional "redlines" in the future and build those into a model without telling DoW. The risk that DoW seeks to mitigate— surreptitious model poisoning based on Anthropic's current or future moral judgments—is precisely the type of intolerable risk that § 3252 is designed to prevent.

*Third*, both Anthropic and the Court believe § "3252 obviously does not permit DoW to designate IT vendors as 'supply chain risks' whenever they ask probing questions or stubbornly insist on particular contracting terms, even if their doing so causes DoW to doubt their trustworthiness." Op. 32; *see* MSJ 24. But that limitation is not grounded in the text of § 3252. The question of whether a supply chain risk exists "involves primarily issues of fact," and DoW "is better equipped to assess what facts are relevant to the agency's own decision than a court is." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180–81 (2025) (citation omitted). At bottom, "DoW cannot trust Anthropic to ensure the integrity of its models." AR214. The Secretary thus reasonably found it "necessary to protect national security" by excluding Anthropic's "products or services in any DoW covered system." AR209.

Because DoW "is making predictions" about supply chain risk "within its area of special expertise," this Court's review must be "most deferential." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). It is axiomatic that agencies can act without "wait[ing] for a risk to materialize." *China Telecom (Ams.) Corp. v. FCC*, 57 F.4th 256, 266 (D.C. Cir. 2022); *see TikTok Inc. v. Garland*, 604 U.S. 56, 75 (2025) (per curiam). That principle is particularly apt here, where the Secretary sought to mitigate risks that threaten to disrupt DoW's critical military operations. Section 3252, after all, speaks of supply-chain "risks," not certainties. This Court therefore may not "substitute its own policy judgment for that of" DoW. *Prometheus Radio Project*, 592 U.S. at 423.

*Fourth*, there is no mismatch between the threat assessed by DoW and the measures authorized by § 3252. *See* MSJ 20, 24; Op. 36. DoW determined there is a "substantial risk that," regardless of DoW's contractual rights or legal authorities, Anthropic "could . . . preemptively and surreptitiously alter the behavior of the model in advance" to reflect "its moral and policy judgments" thereby undermining

national security. AR215. "This risk is not limited only to Anthropic['s] . . . standalone presence in DoW systems." AR247. "As a subcontractor, Anthropic poses the same threats as it would as a prime contractor" by "incorporation of Anthropic's systems into a product on DoW systems." AR249. And "[w]hen Anthropic's model is layered into other applications, there is a substantial risk that any company-imposed restrictions or alterations to the model would be transferred and impact mission applications, including in weapons systems development and other products or services that ultimately perform DoW activities." AR247. Given this widespread and diffuse risk, the Secretary acted well "within a zone of reasonableness," *Prometheus Radio Project*, 592 U.S. at 423, by excluding Anthropic from supplying products or services, as a contractor or a subcontractor, for covered procurements. *See* AR209; 10 U.S.C. § 3252(d)(2)-(3), (d)(5)-(6); 48 C.F.R. § 239.7305.[5]

In imposing this bright line disqualification, the Secretary was not obligated to tolerate these risks or to credit blindly Anthropic's asserted support of "American national security agencies,"  MSJ 22, particularly given Anthropic's conflicting views as to how DoW and the Commander-in-Chief should conduct warfighting, *see* AR246 (noting "internal company memorandum" that discussed how "the company sought to impose multiple restrictions over the Government's lawful use of Claude, including safety mechanisms that may be outside the control of DoW"). Anthropic also blinks reality in asserting (*see* MSJ 26; ECF No. 166-4) that DoW could simply use an old version of Claude or uncover any unwanted limitations through rigorous testing. National security requires that DoW have access to "rapid model updates" and deploy "the latest models" within "30 days of public release." Sec'y of War, *Artificial Intelligence Strategy* 4. Each updated model is "a brand-new deployment subject to" a new "testing and approval process[]." Ramasamy Decl. ¶ 55. Given the vast and opaque nature of the technology, *see* AR214, AR253, DoW cannot perform time-intensive testing on successive model iterations across all possible uses in the hope of discovering a debilitating limitation before it manifests "in the middle of ongoing warfighting operations." AR215. The Secretary reasonably determined that the "deep trust"

---

[5] Tellingly, Anthropic does not identify any "less intrusive measures" that would address the "risk Anthropic posed." MSJ 20. If anything, it concedes "the Executive Branch can lawfully decide to stop contracting with a vendor," *id.* 7, which basically replicates the covered procurement actions taken here.

required in "security collaboration" for AI models deployed in DoW systems is lacking with Anthropic, so its products must be excluded. AR214.

*Fifth*, DoW's reasoning was not "pretextual." MSJ 25. Anthropic complains that "[a]lmost all the records produced in support of the designation were created *after* Secretary Hegseth['s]" February 27 post. *Id.* That is hardly surprising because the post merely set the administrative wheels in motion. Nor may the Secretary's "*ex ante* preference for" a particular result "be held against" DoW. *Biden v. Texas*, 597 U.S. 785, 812 (2022); *contra* Op. 36. The Supreme Court has made clear that "[i]t is hardly improper for an agency head to" have "policy preferences and ideas" and then "work with" his subordinates "to substantiate the legal basis for a preferred policy." *Texas*, 597 U.S. at 812 (quotation omitted).

It is irrelevant that DoW previously used Claude with certain limitations and continued contract negotiations after issuing the designation. *See* Op. 36-37. The parties' long contractual negotiation was probative primarily because it exposed the substantial risk that Anthropic would build restrictions into its AI models reflecting its normative views about the use of those models. *See* AR215 (explaining that "[petitioner's] risk level escalated . . . to an unacceptable national security threat over the course of the . . . contract negotiation"). The prospect that Anthropic might eventually compromise in no way undermined the Secretary's conclusion that Anthropic's unyielding stance to-date about the proper use of its products created a present danger that necessitated the § 3252 designation. The invocation of § 3252 also is not inconsistent (MSJ 25) with the six-month transition period from Anthropic's products. Exercising his national security expertise, the Secretary determined that removing Claude from DoW's systems immediately—in the middle of active military operations and before procuring suitable replacements— posed a greater threat to national security than did providing for an orderly transition period. *See* AR248.

*Finally*, Anthropic claims that the Secretary committed two procedural errors: (1) the congressional notification letters did not discuss why less intrusive measures were unsuitable; and (2) a risk assessment was prepared by the Under Secretary for Research and Engineering instead of the Under Secretary for Intelligence. *See* MSJ 20. But the notification provision is for Congress's benefit; it does not protect any interest of Anthropic. *Contra* Op. 33. If the "appropriate congressional committees" (10 U.S.C. § 3252(d)(7)) believed further explanation was warranted, they were and are perfectly capable of saying so. Thus, overturning the Secretary's designation on this ground "would be pointless" formalism.

*FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 590 (2025); *see* 5 U.S.C. § 706 (incorporating "the rule of prejudicial error"); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995).

As for the risk assessment prepared by the Under Secretary for Research and Engineering, as opposed to the Under Secretary for Intelligence, *see* 48 C.F.R. § 239.7304(a), DoW explained that the Under Secretary for Research and Engineering has the "institutional and subject matter expertise" to prepare "Section 3252 supply chain risk assessments relating to AI issues," AR244-AR245. Anthropic does not dispute this; nor does it even hint that "the substance of" the Secretary's decision would be different if the Under Secretary for Intelligence chimed in. *See Wages & White Lion*, 604 U.S. at 590 (citation omitted). On the contrary, because the Secretary already consulted with those senior subordinates whose portfolios cover AI acquisition and deployment, Anthropic again advocates for a "pointless" remand because this is at most a harmless error. *Id.*; 5 U.S.C. § 706.

## B.    No agency defendant violated 5 U.S.C. § 558(b)

Beyond DoW, Anthropic argues "the actions taken by" the other "defendant agencies to implement the Presidential Directive violated" 5 U.S.C. § 558(b)'s prohibition against imposing a "sanction[]" or issuing an "order[] 'except within jurisdiction delegated to the agency and as authorized by law.'" MSJ 30 (quoting 5 U.S.C. § 558(b)). But the Executive Office of the President is not "an agency under the APA." *Am. Oversight v. Biden*, No. CV 20-00716 (RJL), 2021 WL 4355576, at *6 (D.D.C. Sept. 24, 2021) (citing *United States v. Espy*, 145 F.3d 1369, 1373 (D.C. Cir. 1998)); *cf. Indiana v. Biden*, 652 F. Supp. 3d 995, 1009 (S.D. Ind. 2023). The claims against Does 1 to 10 are entirely "factually unsupported." *Celotex*, 477 U.S. at 323. And the National Endowment of the Arts, Social Security Administration, and Federal Reserve Board "had not issued any order or directive, or otherwise taken any agency action, regarding the use of Anthropic PBC's AI models." ECF Nos. 155-2 ¶ 4, 155-3 ¶ 4, 155-4 ¶ 4; *see* Answer ¶¶ 168, 183-84. So Anthropic's APA claims against all these Defendants fail off the bat. *See Am. Bankers Ins. Co. of Fla. v. Nat'l Fire Ins. Co. of Hartford*, 517 F. Supp. 3d 1025, 1029 (N.D. Cal. 2021).

Anthropic's motion cites evidence about only the Treasury Department (AR259-AR266), State Department (AR319-AR332), and General Services Administration (AR403-AR410). *See* MSJ 31. Yet Anthropic does not show that the challenged conduct both fits within a defined "categor[y] [of] circumscribed, discrete agency action[]" and constitutes "*final* agency action." *Norton v. S. Utah*

*Wilderness All.*, 542 U.S. 55, 62 (2004) (quoting 5 U.S.C. § 704).  After all, the APA does not authorize "judicial review [over] everything done by an administrative agency."  *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948).  The record excerpts cited by Anthropic belie its claim that the agencies issued final "orders and sanctions that terminate all Executive Branch use of Anthropic tools."  MSJ 31.

The Treasury Department merely instructed its third-party vendor to "turn[] off Anthropic" models "within Treasury's FedRAMP environment."  AR264.  Likewise, and also through a third-party vendor, the State Department "change[d] away from Anthropic" in "StateChat, the Department's internal generative AI resource."  AR319, AR327.  Such internal IT housekeeping, while having practical effect on the agency's use of AI technology, does not amount to a final agency action reviewable under the APA because it did not determine Anthropic's own legal "rights or obligations."  *Bennett*, 520 U.S. at 178 (citation omitted).  Nor do these steps constitute "the whole or a part of a final disposition . . . of an agency in a matter other than rule making," 5 U.S.C. § 551(6), or any "compulsory or restrictive action" upon Anthropic, *id.* § 551(10)(G).  As for GSA, it "suspend[ed] availability of all Anthropic models" in USAi.gov, a "centralized platform for federal agencies to test . . . AI models" (AR398, AR410), and instructed a third party "to remove Anthropic items from [its] [Multiple Award Schedule] contract" (AR397, AR400, AR403), which the third party did without any objection (AR404).  Again, Anthropic does not explain how either instruction met the APA's definition of an "order" or "sanction."  Thus, the APA claims against all of the non-DoW agencies fail.

**IV.    The President acted well within his authority**

As a last gasp, Anthropic asserts that the Presidential Directive violates the separation of powers and is *ultra vires*.  MSJ 30.  An *ultra vires* claim "is essentially a Hail Mary pass" that "rarely succeeds." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681-82 (2025) (citation omitted).  The Ninth Circuit permits *ultra vires* review of presidential action only for whether it clearly exceeded a delegated, statutory authority.  *See Murphy Co. v. Biden*, 65 F.4th 1122, 1129-31 (9th Cir. 2023).  Yet the Presidential Directive did not rely on any statutory authority delegated to the President; it issued under Article II's vesting of "[t]he entire 'executive Power'" in the President.  *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020).

Article II permits "the President [to] maintain a degree of control over [his] subordinates" and "ensure that these subordinates serve the people effectively and in accordance with the [President's]

policies." *Collins v. Yellen*, 594 U.S. 220, 252 (2021). It is within the President's authority to determine that the Executive Branch does not "need" or "want" to use Anthropic's products and services, when, in the President's judgment, their continued use jeopardizes national security. AR255A. The President fairly required his subordinates to "CEASE all use of Anthropic's technology" in accordance with applicable law. *Id.* Such an order falls squarely within the Executive's "power . . . to determine those with whom it will deal," *Perkins*, 310 U.S. at 127, and "the authority of the Executive in military and national security affairs," *Dep't of Navy v. Egan,* 484 U.S. 518, 530 (1988). Anthropic's *ultra vires* claim fails.

**V.      Any Relief to Anthropic Should Be As Narrowly Tailored As Possible**

Even if the Court grants summary judgment to Anthropic (in part or in whole), only modest relief is warranted. For example, if the Court finds that DoW's actions were inadequately explained or procedurally deficient, *see* Op. 33-36, "the proper course" under the APA "is to remand to the agency for additional investigation or explanation," *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). Such remand should be without vacatur because DoW likely could "offer better reasoning or" correct any "procedural" deficiencies and still reach the same decision. *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015). Indeed, given the sensitive national security interests, "equity demands" the § 3252 procurement actions remain in place in the interim. *Babbitt*, 58 F.3d at 1405.

A permanent injunction also would be inappropriate. "[T]here is no rule requiring automatic issuance of a blanket injunction when a violation is found." *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843 (9th Cir. 2007); *see Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). A permanent injunction remains "an act of equitable discretion by the district court." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). But to even be eligible, Anthropic "must satisfy a four-factor test": "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* None of these factors support Anthropic.

Anthropic is not suffering any irreparable injury. It continues to speak freely about AI, *see* Silberling, *supra*, and reached a nearly trillion dollar valuation, Claire Duffy et al., *Anthropic files to go public in a potentially trillion-dollar debut*, CNN Business, https://perma.cc/4MSF-E9NR (updated June

1, 2026). Anthropic also offers no evidence that an agency defendant unlawfully termination a single contract. Accordingly, the agency defendants have not taken action that the Court must enjoin. *Cf. Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.").[6]

The Court must pay "particular regard for the public consequences" of a permanent injunction as well. *Romero-Barcelo*, 456 U.S. at 312. Any injury to Anthropic "is outweighed by the public interest" in eliminating risks of AI model poisoning from national security systems. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008). This involves "'complex, subtle, and professional decisions as to the . . . equipping, and control of a military force,' which are 'essentially professional military judgments.'" *Id.* at 24 (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)). The Court must "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest," including predictive judgments about supply chain risks posed by particular AI companies and their models. *Id.* (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)).

Anthropic has no "absolute right" to a declaratory judgment; that relief too is a matter of "discretion" based on "the circumstances of this case." *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241 (1952). And "[a] court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions." *Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010); *see Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring) (a court "cannot issue a declaratory judgment against the President"); *Mary Ferrell Found., Inc. v. Biden*, No. 22-CV-06176-RS, 2023 WL 4551066, at *5 (N.D. Cal. July 14, 2023). The Court thus should not enter any relief impinging upon the President's Article II power to direct the actions of his subordinates.

Finally, Defendants request that any relief be administratively stayed for a period of seven days to allow defendants to determine whether any appeal would be authorized by the Solicitor General.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiff's Motion for Summary Judgment and grant Defendants' Cross-Motion for Summary Judgment.

---

[6] The Court also lacks jurisdiction to enjoin the director of the Federal Housing Finance Agency in his capacity as conservator for Fannie Mae and Freddie Mac. *See* 12 U.S.C. § 4617(f).

Respectfully submitted,


BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

JEAN LIN
Special Litigation Counsel
Federal Programs Branch

KRISTINA A. WOLFE (VA. Bar. 71570)
Assistant Director


*/s/ James W. Harlow*
JAMES W. HARLOW (Md. Bar; no number issued)
Senior Trial Counsel
CHRISTIAN DIBBLEE (D.C. Bar 90002557)
Trial Attorney
Federal Programs Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
(202) 514-6786 (Harlow)
james.w.harlow@usdoj.gov