Meetali Jain
SBN 214237
Tech Justice Law Project
611 Pennsylvania Ave., Southeast #337
Washington, DC 20003
(510) 570-4116
meetali@techjusticelaw.org

Sadaf M. Doost
SBN 346104
Bassel H. El-Rewini, admitted *pro hac vice*
Abolitionist Law Center
8583 Irvine Center Dr. #481
Irvine, CA 92618
(412) 654-9070
sadaf@alcenter.org
bassel@alcenter.org

Katherine Gallagher, admitted *pro hac vice*
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
kgallagher@ccrjustice.org

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHROPIC PBC, | ) Case No.: 3:26-cv-01996-RFL |
| | ) |
| *Plaintiff*, | ) BRIEF OF *AMICI CURIAE* HUMAN |
| | ) RIGHTS AND TECHNOLOGY JUSTICE |
| | ) ORGANIZATIONS IN SUPPORT OF |
| v. | ) NEITHER PARTY |
| | ) |
| U.S. DEPARTMENT OF WAR, *et al.*, | ) The Honorable Rita F. Lin |
| | ) Date:    July 30, 2026 |
| *Defendants*. | ) Time:    10:00am PST |
| | ) Crtrm:   15, 18th Floor |

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES……………………………………………………………iii

INTEREST OF *AMICI CURIAE*……………………………………………………1

PRELIMINARY STATEMENT…………………………………………………………1

ARGUMENT…………………………………………………………………………….2

    I.     Militarized AI Poses Catastrophic Humanitarian and Legal Risks,

           Even Without Full Autonomy………………………………...………………..2

    II.    The Department of War Has Used Tech Provided by Anthropic

           to Commit Violations of International Law…..…………………………..7

    III.   Attacks against Civilians and Civilian Infrastructure Enabled by

           the Current Practice of AI-Accelerated "Kill Chains" Constitute

           War Crimes under U.S. and International Law……………...……………10

CONCLUSION…………………………………………………………………..13

APPENDIX……………………………………………...………………………….16

## TABLE OF AUTHORITIES

**FEDERAL CASES**

*Defense for Children International-Palestine v. Biden*,
   714 F. Supp. 3d 1160 (N.D. Cal. 2024) ................................................................. 6

*Siderman de Blake v. Republic of Argentina*,
   965 F.2d 699 (9th Cir. 1992) ................................................................................ 1

**STATUTES**

18 U.S.C. § 2441 ................................................................................................... 8, 9

**INTERNATIONAL CASES, MATERIALS AND TREATIES**

Ashwini K.P. (Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination, Xenophobia and Related Intolerance), *Contemporary Forms of Racism, Racial Discrimination, Xenophobia, and Related Intolerance*, U.N. Doc A/HRC/56/68 (June 3, 2024) ................................................................................................................ 4

Convention Relative to the Protection of Civilian Persons in Time of War,
   done at Geneva, August 12, 1949 (6 UST 3516) ............................................. 1, 11

G.A. Res. 79/239, Artificial Intelligence in the Military Domain and its Implications for Peace and Security (Dec. 24, 2024) ................................................................... 10

Hague Convention (IV) Respecting the Law and Customs of War on Land and Its Annex: Regulations Concerning the Law and Customs of War on Land, (Oct. 18, 1907) ............. 11

Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion, 1996 I.C.J. 226 (July 8)11

International Committee of the Red Cross,
   *Submission to the United Nations Secretary-General on Artificial Intelligence in the Military Domain* (2025) ............................................................................. 4, 5, 12

International Committee of the Red Cross,
   *What Is International Humanitarian Law?*  (2022)    ........................................... 2

Independent International Commission of Inquiry on the occupied Palestinian territory, including East Jerusalem, and Israel, *Legal analysis of the conduct of Israel in Gaza pursuant to the Convention on the Prevention and Punishment of the Crime of Genocide*, U.N. Doc. A/HRC/60/CRP.3 (2025) ............................................................................. 6, 12

Organisation for Economic Co-operation and Development,
   *OECD Recommendation of the Council on Artificial Intelligence*, OECD/LEGAL/0449 (2025) ................................................................................................................ 14

Office of the United Nations High Commissioner for Human Rights,
Guiding Principles on Business and Human Rights: Implementing the United Nations
"Protect, Respect, and Remedy" Framework, HR/PUB/11/4 (2011) ........................... 13, 14

Press Release, Office of the United Nations High Commissioner for Human Rights, U.N. Experts
Denounce Aggression on Iran and Lebanon, Warn of Devastating Regional Escalation, U.N.
Press Release (Mar. 12, 2026) ............................................................................... 9

Press Release, U.N. Secretary-General, Humanity's Fate Cannot Be Left to Algorithm,' Warns
Secretary-General in Security Council Debate on Artificial Intelligence, U.N. Press Release
SG/SM/22830 (Sep. 24, 2025)....................................................................... 2, 3

U.N. Secretary-General,
Artificial Intelligence in the Military Domain and Its Implications for International Peace
and Security, ¶ 16-17, U.N. Doc A/80/78* (June 5, 2025)...................................... 2

## OTHER AUTHORITIES

Amnesty International, Iran: President Trump's apocalyptic threats of large-scale civilian
devastation demand urgent global action to prevent atrocity crimes (Apr. 7, 2026)........... 8

Anthropic, Claude's Constitution (Jan. 21, 2026), .................................................... 11

Anurag Rao & Mariano Zafra, Strikes create toxic clouds over Tehran, Reuters (Mar. 10, 2026)
....................................................................................................................... 8

Caroline Orr Bueno, The Pentagon-Anthropic Feud is Quietly Obscuring the Real Fight over
Military AI, Fast Company (Mar. 5, 2026) ............................................................ 5

Chris Stokel-Walker, AIs can't stop recommending nuclear strikes in war game simulations,
New Scientist (Feb. 25, 2026)........................................................................... 4

David Brennan et al., US conducts 'self defense' strikes in Iran, ABC News (May 31, 2026) .. 8

Donald J. Trump, Truth Social (Mar. 7, 2026) ................................................... 7, 8

Duarte Dias et al., U.S. and Iran trade attacks again after Trump pledges Tehran will "pay the
price" for not accepting deal, CBS News (Jun. 11, 2026) ....................................... 8

Elizabeth Dwoskin, Israel Built an 'AI factory' for War. It Unleashed it In Gaza, Washington
Post (Dec. 29, 2024)................................................................................... 6, 13

Ellen Mitchell, US faulted in Iran school strike in initial Pentagon review: Report, The Hill
(Mar. 11, 2026) ........................................................................................... 4

Helene Cooper, After U.S. Strike on Iranian School, Months Pass Without Answers, N.Y. Times
(Jun. 16, 2026), ........................................................................................... 7

Hugo Bachega, *Israeli 'double-tap' strike kills three rescue workers in Lebanon*, BBC News (Apr. 29, 2026).................................................................................................................9

Israel Wullman, *Shaping the new battlefield: how the IDF uses AI to sync hundreds of strikes in Iran and Lebanon*, YNetNews (Mar. 31, 2026)...........................................................

James C. Reynolds, *US-Iran war in numbers: Thousands killed and billions spent as fragile ceasefire takes effect*, Independent (Apr. 9, 2026)....................................................7

Middle East Eye, *More than 24,000 civilian units damaged in Iran, Red Crescent Says* (Mar. 13, 2026) ...............................................................................................................8

N. Ostrovsky and B. Perrigo, *How Do You Teach an AI to Be Good?  Anthropic Just Published Its Answer*, TIME (Jan. 21, 2026)....................................................................13

Nayera Abdallah & Menna Alaaeldin, *How many people have been killed in the Iran war?*, Reuters (updated Apr. 10, 2026)...............................................................................9, 10

Nils Melzer, *Interpretive Guidance on the Notion of Direct Participation in Hostilities*, ICRC (2009)..........................................................................................................................11

Noa Mor et al., *Claude's new Constitution: two evaluative continua*, Institute for Ethics in AI (Mar. 13, 2026) .................................................................................................13

Peter Asaro, *On Banning Autonomous Weapon Systems: Human Rights, Automation, and the Dehumanization of Lethal Decision-making*, 94 Int'l Rev. Red Cross 687 (2012)..............3

Reuters, *Trump says 'a whole civilization will die tonight' if Iran does not make a deal* (Apr. 7, 2026) ...........................................................................................................8, 13

Robert Booth & Dan Milmo, *Iran War Heralds Era of AI-Powered Bombing Quicker Than "Speed of Thought,"* The Guardian (Mar. 3, 2026).....................................................3, 5, 6

Scott Shane et al., *Trove of Stolen Data Is Said to Include Top Secret U.S. Hacking Tools*, N.Y. Times (Oct. 19, 2016) .................................................................................................5

Tara Copp, Elizabeth Dwoskin & Ian Duncan, *Anthropic's AI tool Claude central to U.S. campaign in Iran, amid a bitter feud*, Washington Post (Mar. 4, 2026)..............................9

U.S. Dep't of War, *Artificial Intelligence Strategy for the Department of War* (2026) .............5

U.S. Dep't of War, *Secretary of War Pete Hegseth and Chairman of the Joint Chiefs Air Force Gen. Dan Caine Hold a Press Briefing* (Mar. 13, 2026) ..............................................8, 10

Yuval Abraham, *'Lavender': The AI Machine Directing Israel's Bombing Spree in Gaza*, +972 Magazine (Apr. 3, 2024)...............................................................................6, 7, 13

**INTEREST OF AMICI CURIAE**

*Amici Curiae* are non-profit organizations who offer their insights on advancing and protecting the rights guaranteed in both U.S. and international law, particularly in the context of armed conflict and the use of technology. *Amici* are: Abolitionist Law Center, Access Now, Center for Constitutional Rights, the Centre for Research on Multinational Corporations ("SOMO"), and Tech Justice Law. See Appendix for detailed descriptions of *Amici*.

**PRELIMINARY STATEMENT**

This Court is being asked to determine the scope of the Parties' rights following actions by the U.S. government, including by and through the Department of War ("DOW"), against Anthropic for its public position on the purported responsible use of AI. To answer this question, the Court must consider the deeper (un)lawfulness of the Parties' use of artificial intelligence ("AI"), not only for any potential fully autonomous AI weaponry, but also for the semi-autonomous AI already deployed at scale to displace human deliberation in armed conflict.

As this Court has acknowledged, this litigation is not about determining the "public policy question" of AI's role in war. *See* ECF 134, Order Granting Mot. Prelim. Inj. ("Order") 1. But the bounds of public debate are set by U.S. and international law. Just as the "Executive Branch remains subject to the requirements of the Constitution and federal law" in how it responds to a contracting dispute, *see* ECF 166, Pls.' Mot. Summ. J. 1, *both* Parties are bound by the law in their use of AI.

Emerging technologies do not excuse States from complying with international humanitarian law, including laws prohibiting and punishing war crimes; nor does it permit non-State actors to violate *jus cogens* norms intended to protect civilians in armed conflict. *See* Convention Relative to the Protection of Civilian Persons in Time of War, done at Geneva August 12, 1949, arts. 3 and 147 (6 UST 3516) ("Fourth Geneva Convention"). *See also Siderman de Blake v. Republic of Argentina,* 965 F. 2d 699, 716 (9th Cir. 1992) (explaining the "the supremacy of *jus cogens*"). Yet, Anthropic and the DOW, which dispute whether Claude should be deployed *fully autonomously*, never address the tool's existing human cost or legality. In so doing, they have failed to recognize this overarching prohibition. Defining the Parties'

rights in this case requires explaining their limits—and corresponding legal responsibilities. The "Department of War's prerogative to decide what AI product it uses" cannot extend to deploying *semi-autonomous* (as well as *fully* autonomous) AI to harm, destroy, or kill without allowing humans adequate time to evaluate the lawfulness of the targets the AI selects.[1] Order 1. *Amici* respectfully urge this Court to explicitly remind both parties of the legal limits of AI use, which is essential to countering the threat to the rule of law – and human life – posed by the conduct at issue in this litigation.

This Court's decision on Anthropic's Motion for Summary Judgment should clarify that the Parties are not constrained simply by their own opinions on militarized AI; they are bound, and their actions constrained, by the laws of war.[2]

**ARGUMENT**

*"Humanity's fate cannot be left to an algorithm."*

*-United Nations Secretary-General António Guterres*[3]

**I. Militarized AI Poses Catastrophic Humanitarian and Legal Risks, Even Without Full Autonomy.**

Anthropic is clear that its AI model Claude cannot safely be used for fully autonomous warfare. Compl. ¶¶1, 3, 76. Yet even without full autonomy, militarized AI gravely and unlawfully endangers civilian life on a mass scale, especially and including during armed conflict.

---

[1] While this brief addresses AI-enabled international law violations in armed conflict, *Amici* also have significant concerns about how Defendants deploy AI-enabled products domestically, including for surveillance, and the legality of such uses for both U.S.- and non-U.S. persons; addressing such concerns falls beyond the scope of this brief.

[2] *Amici* use the terms "laws of war" and "international humanitarian law" or "IHL" interchangeably to describe the body of law applicable in the context of armed conflict. *See* International Committee of the Red Cross ("ICRC"), *What Is International Humanitarian Law?* 1 (2022), https://www.icrc.org/sites/default/files/document/file_list/what_is_ihl.pdf.

[3] Press Release, U.N. Secretary-General, 'Humanity's Fate Cannot Be Left to Algorithm,' Warns Secretary-General in Security Council Debate on Artificial Intelligence, U.N. Press Release SG/SM/22830 (Sep. 24, 2025), https://press.un.org/en/2025/sgsm22830.doc.htm, ("SG's Statement on AI").

AI technologies such as Maven Smart System ("Maven")—the U.S. military's targeting system which relied on Claude at the time of the challenged actions—exponentially increase the speed and scale of warfare beyond the capacity for any meaningful human review. They do so by dramatically accelerating the "kill chain," a military term referencing the process of identifying a potential target as a combatant, and thus a permissible target under international humanitarian law, to tracking and eventually killing them.[4] This process once took days or weeks; now, with the use of AI, it takes mere seconds for the "kill chain" to culminate in death.[5] This fatal process can be executed simultaneously on a massive scale, no longer constrained by the number of human analysts or soldiers.[6]

This acceleration occurs because, as Anthropic acknowledges, AI tools "enable collection and analysis of information at speeds and scales not previously contemplated[.]" Compl. ¶77. The result is that AI-based systems can "ingest[] satellite images and signals intercepts from a large number of sources and integrate[] them into a unified operational picture," with Claude Gov purportedly capable of analyzing this data to "identify threats" and "deliver structured, actionable intelligence within seconds." ECF 166-4, Ramasamy Decl. ¶60. AI tools use such analysis to recommend kills—all still operating at a speed faster than human thought.[7]

This unprecedented acceleration of the "kill chain" has resulted in kills happening too fast for critical pre-attack assessments that are required under the laws of war.[8] *See* Sec. III. It

---

[4] *See* Peter Asaro, *On Banning Autonomous Weapon Systems: Human Rights, Automation, and the Dehumanization of Lethal Decision-making*, 94 Int'l Rev. Red Cross 687, 694 (2012), https://international-review.icrc.org/sites/default/files/irrc-886-asaro.pdf; *see also* U.N. Secretary-General, *Artificial Intelligence in the Military Domain and Its Implications for International Peace and Security*, ¶ 16-17, U.N. Doc A/80/78* (June 5, 2025), https://docs.un.org/en/A/80/78 (describing concerns about military use of AI). On the issue of permissible targets under international humanitarian law, see *infra*, Sec. III.

[5] *See* Robert Booth & Dan Milmo, *Iran War Heralds Era of AI-Powered Bombing Quicker Than "Speed of Thought"*, The Guardian (Mar. 3, 2026), https://www.theguardian.com/technology/2026/mar/03/iran-war-heralds-era-of-ai-powered-bombing-quicker-than-speed-of-thought.

[6] *Id.*

[7] *Id.*

[8] *See* SG's Statement on AI, *supra* n. 3.

also introduces lethal AI errors, which human input fails to mitigate. The result demonstrates why contemporary AI is wholly inappropriate for target selection: much of the time saved due to the speed of multimodal data ingestion, processing, and transformation into actionable decisions would likely be erased by the time required to adequately comply with mandated assessments. In practice, and considering the state of AI technologies at least in the current time and foreseeable future, this dynamic means that the speed gained by using AI is only possible if the overall decision is, by default, to not comply with international humanitarian law.

As Anthropic acknowledges, AI models such as Claude "are not perfect. Despite developers' best efforts, models can … confidently provid[e] incorrect information … As a result, the outputs may or may not be factually accurate[.]" Compl. ¶62. Alternatively, models may accurately summarize outdated or faulty data, without identifying the data as unreliable. For example, the U.S.'s deadly bombing of a girls' school in Iran was reportedly due to outdated targeting data.[9] *See* ECF 166, Pls.' Mot. Summ. J. 11 (noting that a senior U.S. official acknowledged that DOW has used Anthropic's Claude in active military operations in Iran).

In studies, these errors have reflected a bias toward violence and other harm. AI models have been shown to err on the side of escalation during combat: one recent study demonstrated that leading models, including Anthropic's Claude Sonnet 4, opted to deploy nuclear strikes in 95% of simulated war game scenarios.[10] AI models have also been found to disproportionately make mistakes that harm racial minorities and other marginalized groups.[11]

---

[9] Ellen Mitchell, *US faulted in Iran school strike in initial Pentagon review: Report*, The Hill (Mar. 11, 2026), https://thehill.com/policy/defense/5779199-iran-school-strike-investigation/.
[10] Chris Stokel-Walker, *AIs can't stop recommending nuclear strikes in war game simulations*, New Scientist (Feb. 25, 2026) https://www.newscientist.com/article/2516885-ais-cant-stop-recommending-nuclear-strikes-in-war-game-simulations/.
[11] Ashwini K.P. (Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination, Xenophobia and Related Intolerance), *Contemporary Forms of Racism, Racial Discrimination, Xenophobia, and Related Intolerance*, ¶¶ 13-18, U.N. Doc. A/HRC/56/68 (June 3, 2024), https://docs.un.org/en/A/HRC/56/68; *see also* G.A. Res. 79/239 at 2 (Dec. 24, 2024),https://docs.un.org/en/a/res/79/239 (expressing concern about algorithmic bias in military AI).

Human supervisors do not meaningfully mitigate AI errors when these technologies are deployed in armed conflict. First, studies have repeatedly demonstrated human susceptibility to "automation bias": people supervising AI systems are prone to accept AI-generated recommendations, even when these recommendations are wrong.[12] More fundamentally, slowing down to verify AI-recommended targets runs contrary to the militaries' purported purpose in employing these automated systems in the first place.

The militarization of AI furthers a goal of ever-faster action, which the DOW succinctly stated in its AI strategy: "speed wins."[13] AI systems synthesize *terabytes* of data across multiple streams to instantaneously recommend an attack.[14] Humans generally cannot immediately verify whether the resulting recommendation is a lawful military target, let alone whether it minimizes civilian harm in accordance with the laws of war. But if human operators stop to review the underlying data themselves to check for errors, they lose what the DOW itself has explained as the "benefit" of militarized AI: to maximize the speed of the "kill chain." Nor are they capable of meaningfully reviewing the underlying data within the time frames that apply in active combat situations, given the terabytes of information that drive AI recommendations. Perhaps recognizing this, the U.S.'s AI targeting system reportedly generates its own explanation of the legal grounds for each recommended airstrike,[15] a feature that invites the U.S. military to attack

---

[12] ICRC, *Submission to the United Nations Secretary-General on Artificial Intelligence in the Military Domain* 5 (2025), https://www.icrc.org/sites/default/files/2025-04/ICRC_Report_Submission_to_UNSG_on_AI_in_Military_domain.pdf ("ICRC AI Submission"). In one study, researchers found that 39 of 40 participants followed faulty automated recommendations, even when they had the ability to independently verify their accuracy. Caroline Orr Bueno, *The Pentagon-Anthropic Feud is Quietly Obscuring the Real Fight over Military AI*, Fast Company (Mar. 5, 2026), https://www.fastcompany.com/91502340/the-pentagon-anthropic-feud-is-quietly-obscuring-the-real-fight-over-military-ai.

[13] Dep't of War, *Artificial Intelligence Strategy for the Department of War* (2026), https://media.defense.gov/2026/Jan/12/2003855671/-1/-1/0/ARTIFICIAL-INTELLIGENCE-STRATEGY-FOR-THE-DEPARTMENT-OF-WAR.PDF.

[14] 1 Terabyte of data can hold "the contents of about one million books." Scott Shane et al., *Trove of Stolen Data Is Said to Include Top Secret U.S. Hacking Tools*, N.Y. Times (Oct. 19, 2016), https://www.nytimes.com/2016/10/20/us/harold-martin-nsa.html.

[15] *See* Booth & Milmo, *supra* n. 5.

---

without independent human consideration of a strike's impact on civilians or its legitimacy under IHL.[16]

The speed and scale of AI-enabled warfare indicates that militaries are *de facto* deferring to AI's directions rather than slowing down the "kill chain." In the U.S.-Israeli war on Iran, discussed below, strikes have reportedly been proceeding ***"quicker than 'the speed of thought*,'"*** creating "*fears **human decision-makers could be sidelined**.*"[17] One expert explained that human decision makers now have "*a much narrower time band … to evaluate the [AI's] recommendation*" than they did to make an assessment themselves.[18] Similarly, in Israel's AI-facilitated military assault on Gaza, human soldiers were technically responsible for evaluating AI-selected targets, but they spent just seconds on the task—sometimes, the only review of the AI output was confirming a target was male.[19]

Human oversight therefore does not solve the danger of probability-driven AI models like Claude providing wrong answers with lethal—and unlawful—consequences. It is not enough to say that Claude, via its Maven targeting system deployment, might "only" incorrectly recommend the targeting of civilians in a small percentage of cases. First, every rubber-stamped recommendation is a violation of international humanitarian law. *See* Sec III. Second, because the scale of AI-enabled military assaults are so immense, these lethal errors add up. And because of the sheer number of recommendations Claude makes within Maven, Anthropic is potentially facilitating mass war crimes or crimes against humanity.

Moreover, as AI increases governments' capacity for warfare, it increases their capacity for war crimes and other atrocities. In Gaza, for example, Israel used AI to generate massive "target lists," enabling a military campaign on Palestinians that international bodies, a U.S.

---

[16] *See* ICRC AI Submission, *supra* n. 12 (noting that individuals remain accountable for determining the lawfulness of attacks.

[17] *See* Booth & Milmo, *supra* n. 5.

[18] *Id.*

[19] Elizabeth Dwoskin, *Israel Built an 'AI factory' for War. It Unleashed it In Gaza*, Washington Post (Dec. 29, 2024), https://www.washingtonpost.com/technology/2024/12/29/ai-israel-war-gaza-idf/; Yuval Abraham, *'Lavender': The AI Machine Directing Israel's Bombing Spree in Gaza*, +972 Magazine (Apr. 3, 2024), https://www.972mag.com/lavender-ai-israeli-army-gaza/.

federal court, and human rights watchdogs have concluded is or plausibly may constitute genocide.[20] Militaries using AI in this way can seek to circumvent accountability by disguising international criminal law violations as apparently neutral outputs of a technical system. In the same Israeli campaign, the country's military illustrated this risk when it reportedly lowered the threshold for designating someone a "militant" so that their AI programs would identify more people to bomb, leading to target lists containing Palestinians who would previously have been treated as civilians.[21]

Even without full autonomy, therefore, militarized AI poses a grave threat. As the following sections make clear, this threat exceeds the bounds of a legitimate policy dispute, amounting to violations of U.S. and international humanitarian law.

**II. The Department of War Has Used Tech Provided by Anthropic to Commit Violations of International Law.**

The consequences of militarized AI, and with it, the escalation of mass death and destruction, are not theoretical: Anthropic's technology has been enabling the Department of War's apparent war crimes since the commencement of this action. On February 28, 2026, the United States and Israel unleashed "Operation Epic Fury" on Iran, aided by highly sophisticated artificial intelligence tools. Within the first 24 hours of the war, U.S. and Israeli forces struck more than 1,750 targets,[22] reportedly including the Shajarah Tayyebeh elementary school—an

---

[20] *See, e.g.,* Independent International Commission of Inquiry on the occupied Palestinian territory, including East Jerusalem, and Israel, *Legal analysis of the conduct of Israel in Gaza pursuant to the Convention on the Prevention and Punishment of the Crime of Genocide*, U.N. Doc. A/HRC/60/CRP.3 (2025); *Defense for Children International-Palestine v. Biden*, 714 F. Supp. 3d 1160, 1163 (N.D. Cal. 2024). On Israel's use of AI, *see* Dwoskin, *supra* n. 19.

[21] One military source revealed to a journalist that "[a]t its peak, the system managed to generate 37,000 people as potential human targets." "But the numbers changed all the time… There were times when a Hamas operative was defined more broadly, and then the machine started bringing us all kinds of civil defense personnel, police officers …" *See* Abraham, *supra* n. 19.

[22] James C. Reynolds, *US-Iran war in numbers: Thousands killed and billions spent as fragile ceasefire takes effect*, Independent (Apr. 9, 2026), https://www.independent.co.uk/news/world/middle-east/iran-israel-us-war-death-toll-b2953551.html.

all-girls primary school in southern Iran—which a U.S. preliminary investigation showed the United States struck with a Tomahawk missile.[23] The strike killed 175 people, nearly all of them children aged between seven and 12.[24] In recent months, President Trump has threatened collective punishment against Iran and Iranians on numerous occasions, including announcing "serious consideration for complete destruction and certain death . . . areas and groups of people that were [previously] not considered for targeting" (March 7)[25]; warning that Iran could be "taken out in one night" and promising to obliterate every power plant and bridge in the country, such that it would be "burning, exploding, and never to be used again" (April 5)[26]; and warning that "a whole civilization will die tonight, never to be brought back again" (April 7)[27].

Over the course of hostilities, U.S. and Israeli forces have continued to indiscriminately escalate violence towards, and attacks on, civilians and civilian infrastructure en masse across Iran. Within the first two weeks of the war, on March 13, the U.S. announced that jointly, alongside Israel, the two states had struck over 15,000 "enemy targets."[28] During that same period, 24,000 civilian units were targeted or damaged, including health facilities, schools, and residential and business units.[29] The bombing of oil refineries has subjected entire cities to acidic

---

[23] Helene Cooper, *After U.S. Strike on Iranian School, Months Pass Without Answers*, N.Y. Times (Jun. 16, 2026), https://www.nytimes.com/2026/06/16/us/politics/us-strike-iranian-school.html.

[24] *Id.*

[25] Donald J. Trump, Truth Social (Mar. 7, 2026), https://truthsocial.com/@realDonaldTrump/posts/116187586876366061.

[26] Amnesty Internationl, *Iran: President Trump's apocalyptic threats of large-scale civilian devastation demand urgent global action to prevent atrocity crimes* (Apr. 7, 2026), https://www.amnesty.org/en/latest/news/2026/04/iran-president-trumps-apocalyptic-threats-of-large-scale-civilian-devastation-demand-urgent-global-action-to-prevent-atrocity-crimes/.

[27] Reuters, *Trump says 'a whole civilization will die tonight' if Iran does not make a deal* (Apr. 7, 2026), https://www.reuters.com/world/middle-east/trump-says-a-whole-civilization-will-die-tonight-if-iran-does-not-make-deal-2026-04-07/.

[28] U.S. Dep't of War, *Secretary of War Pete Hegseth and Chairman of the Joint Chiefs Air Force Gen. Dan Caine Hold a Press Briefing* (Mar. 13, 2026), https://www.war.gov/News/Transcripts/Transcript/Article/4434484/secretary-of-war-pete-hegseth-and-chairman-of-the-joint-chiefs-air-force-gen-da/.

[29] Middle East Eye, *More than 24,000 civilian units damaged in Iran, Red Crescent Says* (Mar. 13, 2026), https://www.middleeasteye.net/live-blog/live-blog-update/more-24000-civilian-units-damaged-iran-red-crescent-says.

---

rainfall, which has exposed their populations to the risk of chemical burns and serious lung damage.[30] In April and May, the U.S. continued to strike Iran despite a nominal ceasefire and President Trump threatened attacks on civilians.[31] In June, the U.S. struck multiple shipping vessels, including a cargo vessel reportedly carrying essential goods.[32] While uncertainty on the ground has limited accurate and real-time reporting of the death toll, estimates from early April reveal that over 3,600 people have been killed, including more than 1,700 of whom were civilians.[33] These acts may constitute war crimes, including grave breaches of the Fourth Geneva Convention, as defined in U.S. federal law under 18 U.S.C. § 2441. *See* Section III.

Anthropic's Claude is so deeply embedded in the U.S. military's Maven system that Defendants DOW and Secretary Peter Hegseth demanded Anthropic provide up to six months of services to DOW *even after* Anthropic was banned by Defendants and deemed a "supply chain risk." Compl. ¶125. When the U.S. and Israel began bombing Iran, Claude was still being used

---

[30] Anurag Rao & Mariano Zafra, *Strikes create toxic clouds over Tehran*, Reuters (Mar. 10, 2026) https://www.reuters.com/graphics/IRAN-CRISIS/MAPS/znpnmelervl/2026-03-10/strikes-create-toxic-clouds-over-tehran/.

[31] David Brennan et al., *US conducts 'self-defense' strikes in Iran*, ABC News (May 31, 2026), https://abcnews.com/International/live-updates/iran-live-updates-peace-deal-work-progress-rubio; *see supra* notes 25-27.

[32] Duarte Dias et al., *U.S. and Iran trade attacks again after Trump pledges Tehran will "pay the price" for not accepting deal*, CBS News (Jun. 11, 2026), https://www.cbsnews.com/live-updates/iran-war-trump-us-strikes-apache/.

[33] Nayera Abdallah & Menna Alaaeldin, *How many people have been killed in the Iran war?*, Reuters (updated Apr. 10, 2026), https://www.reuters.com/world/middle-east/how-many-people-have-been-killed-us-israel-war-iran-2026-04-07/. And while U.S. and Israeli forces continued attacks in Iran with the assistance of Claude, Israeli forces expanded their assault to Lebanon with the use of other AI-enabled products, another example showcasing the critical role of technology in accelerating the speed and scale of destruction. *See* Israel Wullman, *Shaping the new battlefield: how the IDF uses AI to sync hundreds of strikes in Iran and Lebanon*, YNetNews (Mar. 31, 2026), https://www.ynetnews.com/tech-and-digital/article/bk3000ltobe#google_vignette (reporting "[i]ntegrated into command-and-control systems from the General Staff down, AI is helping the Air Force plan and coordinate strikes in Iran and Lebanon and assist with navigation). As of late April, since March 2, 2026, over 2,500 people have been killed in Lebanon. Hugo Bachega, *Israeli 'double-tap' strike kills three rescue workers in Lebanon*, BBC News (Apr. 29, 2026) https://www.bbc.com/news/articles/cvgz5rgv4n3o.

---

within Maven, including to identify, suggest, and prioritize hundreds of targets and provide location coordinates to carry out attacks on those targets.[34]

Claude's use by DOW in Iran exemplifies the grave threat to human life, and breaches of human rights and international humanitarian law posed by militarized AI, even without full autonomy. The intensity of U.S.-Israeli attacks on Iran, which UN experts have condemned as "flagrant violations of international law,"[35] was enabled by AI's extreme acceleration of the "kill chain." The high rate of estimated civilian death may reflect the "errors" to which Claude is admittedly prone when processing vast amounts of surveillance data.[36] Compl. ¶77; *see also* ECF 166-4, Ramasamy Decl. ¶17 (explaining the LLMs "can produce outputs that … reflect errors embedded in training data"). And the ability for U.S. officers to make the final call on strikes has not mitigated Claude's dangers, because Defendant Hegseth has prioritized maximizing attack speeds via AI rather than giving humans enough time to abide by, in his words, "stupid" rules of engagement.[37] Even with Anthropic's proposed AI protections still in place, Claude's deployment under these conditions would still enable, and even promote, egregious human rights and humanitarian law violations.

### III.    Attacks against Civilians and Civilian Infrastructure Enabled by the Current Practice of AI-Accelerated "Kill Chains" Constitute War Crimes under U.S. and International Law.

Significantly, neither party acknowledges that deploying Claude semi-autonomously in armed conflict is not only unsafe and unreliable, *see* Sec. I & II, but can also be illegal.

---

[34] Tara Copp, Elizabeth Dwoskin & Ian Duncan, *Anthropic's AI tool Claude central to U.S. campaign in Iran, amid a bitter feud*, Washington Post (Mar. 4, 2026) https://www.washingtonpost.com/technology/2026/03/04/anthropic-ai-iran-campaign/. *See also* ECF 166, Pls.' Mot. Summ. J. 11.

[35] *UN experts denounce aggression on Iran and Lebanon, warn of devastating regional escalation*, UN Office of the High Commissioner for Human Rights (Mar. 12, 2026) https://www.ohchr.org/en/press-releases/2026/03/un-experts-denounce-aggression-iran-and-lebanon-warn-devastating-regional.

[36] *See* Abdallah & Alaaeldin, *supra* note 33.

[37] U.S. Dep't of War, *supra* note 28.

Both U.S. and international law governing armed conflict prohibit the targeting of civilians or civilian infrastructure, attacks that cause incidental loss of life or injury to civilians clearly excessive in relation to the overall military advantage, and attacks that lead to extensive destruction not justified by military necessity, among other prohibitions. Violations of these prohibitions are war crimes. If committed as part of a widespread or systematic attack on civilians, they may amount to crimes against humanity. These fundamental prohibitions apply to "all stages of the life cycle of artificial intelligence, including systems enabled by artificial intelligence, in the military domain," as the UN General Assembly overwhelmingly affirmed in 2024.[38]

The U.S. War Crimes Act of 1996, 18 U.S.C. § 2441, as amended (2023), criminalizes under domestic law the commission of war crimes, defined in part as grave breaches of the four Geneva Conventions of 1949, to which the United States is a party.[39] The list of crimes include wilful killing, wilfully causing serious injury to body and health, and extensive destruction of civilian property not justified by military necessity.[40] The provisions of the Hague Regulations also incorporated into the War Crimes Act, *see* 18 U.S.C. § 2441(c)(2), are intended to codify cardinal principles of IHL restricting the means and methods of warfare. These include (1) the *principle of distinction*, which requires that combatants distinguish between military and civilian targets and minimize harm to noncombatants; (2) the *principle of proportionality*, which requires that harm to civilians and their property be proportionate to the military advantage achieved; and (3) the *principle of necessity*, which requires that attacks are actually necessary to accomplish a legitimate military purpose.[41] The prohibited conduct punishable under this provision of the War

[38] G.A. Res. 79/239 at 2 (Dec. 24, 2024), https://docs.un.org/en/a/res/79/239.
[39]  A "war crime" is "any conduct – (1) defined as a grave breach in any of the international conventions signed at Geneva 12 August 1949 […]; (2) prohibited by Articles 23, 25, 27 or 28 of the Annex to the Hague; Convention IV, Respecting the Laws and Customs of War on Land […]." 18 U.S.C. § 2441(c) (1),(2). *See also* Convention Relative to the Protection of Civilian Persons in Time of War, done at Geneva August 12, 1949 (6 UST 3516) ("Fourth Geneva Convention").
[40] *See* Fourth Geneva Convention, art. 147 (grave breaches).
[41]  *See* Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion, 1996 I.C.J. 226, ¶78 (July 8); *see also* Nils Melzer, *Interpretive Guidance on the Notion of Direct Participation*

Crimes Act includes the use of weapons calculated to cause unnecessary suffering, the destruction of property not necessitated by war, the attack of undefended towns or buildings, and the siege or bombardment of buildings dedicated to religion, art, historic monuments, schools, and hospitals provided they are not being used for military purposes.[42]

DOW's deployment of Claude to compress "kill chains" beyond the speed of human thought makes it impossible for DOW to comply with these essential obligations under U.S. criminal law and IHL. Humans are ultimately responsible for determining who or what is the intended target of an attack, and whether the attack complies with the principles of distinction, proportionality, and necessity.[43] Anthropic recognizes that "Claude is simply not capable of performing [lethal military] tasks responsibly without human oversight." Compl. ¶76; *see also* ECF 166-1, Kaplan Decl. ¶35. As DOW is deploying Claude in practice, however, the AI model's human operators have mere seconds to evaluate targets, precluding them from performing the case-by-case assessments of the targets and consequences of the use of lethal force which are required under these cardinal principles of international humanitarian law, codified in the War Crimes Act and the Geneva Conventions. Thus, each time DOW uses Claude to condense the "kill chain" to seconds, faster than humans can verify the legal legitimacy of the attack's target, it is acting against U.S. and international law. That it may comply with Anthropic's proposed "red lines" is of no moment about its legality, and indeed, permissive use policies could be evidence of Anthropic's complicity in war crimes.[44]

---

*in Hostilities*, ICRC (2009); International Committee of the Red Cross, *Military Necessity*, How Does Law Protect in War?, https://casebook.icrc.org/a_to_z/glossary/military-necessity.

[42] Hague Convention (IV) Respecting the Law and Customs of War on Land and Its Annex: Regulations Concerning the Law and Customs of War on Land, (Oct. 18, 1907), arts. 23(e) and (g), 25 and 27.

[43] *See* ICRC AI Submission, *supra* n. 12.

[44] Indeed, Anthropic's woefully inadequate response to its international and domestic legal obligations has been to develop a foundational safety framework for its LLM, or what it calls "Claude's Constitution." *See* Anthropic, Claude's Constitution (Jan. 21, 2026), https://www-cdn.anthropic.com/d0636f72a9493d279ed36b33987da3430bcb5911/claudes-constitution_webPDF_26-02.02a.pdf.  The constitution prioritizes that Claude should be "broadly safe" and subject to "human oversight" but explicitly does not apply to military use. *Id*. at 2. As of January 2026, Anthropic confirmed that it does not have an alternate constitution

The deliberate mass killing of civilians is also fundamentally—and obviously—incompatible with these principles of U.S. and international law. President Trump's April 7 declaration that "*a whole civilization will die tonight, never to be brought back again*," raises serious concerns that the DOW may not only be failing to minimize civilian death but may also be intentionally targeting civilians or willing to do so in the future.[45] This, too, would constitute a war crime. Anthropic's knowing provision of AI to the DOW under those circumstances, with safeguards removed and models "instructed to assume" DOW operators are "acting under lawful authority," see ECF 166-4, Ramasamy Decl. ¶31, would enable and escalate those crimes in violation of the law.[46]

Notably, many international law violations, including grave breaches of the Geneva Conventions, provide for "universal jurisdiction." This means that any State—and, in certain circumstances, also the International Criminal Court—has jurisdiction to prosecute U.S. persons, including members of the U.S. military, corporate officers and, in many jurisdictions, corporate or juridical entities that commit or are complicit in such war crimes. The soldiers who commit these crimes, the officers who issue their orders, the civilian officials who authorize the actions, and the corporations who enable the crimes all may be vulnerable to arrest and prosecution abroad.[47]

---

for the US government "at this time." *See* N. Ostrovsky and B. Perrigo, *How Do You Teach an AI to Be Good?  Anthropic Just Published Its Answer*, TIME (Jan. 21, 2026),https://time.com/7354738/claude-constitution-ai-alignment/. *See also* Noa Mor et al., *Claude's new Constitution: two evaluative continua*, Institute for Ethics in AI (Mar. 13, 2026), https://afp.oxford-aiethics.ox.ac.uk/article/professor-yuval-shany-discusses-claudes-new-constitution-latest-article-0.

[45] Reuters, *supra* n. 27.

[46] *See supra* nn. 20-21(discussing AI's power to increase governments' capacity for war crimes). *See generally*, Office of the United Nations High Commissioner for Human Rights, Guiding Principles on Business and Human Rights: Implementing the United Nations "Protect, Respect, and Remedy" Framework ("UNGPs"), #12 (commentary), #14, U.N. Doc. HR/PUB/11/04 (2011), https://www.ohchr.org/sites/default/files/documents/publications/guidingprinciplesbusinesshr_en.pdf.

[47] While this brief focuses on violations of IHL, human rights law also constrains the conduct of both state and non-state actors. Of particular relevance is the UNGPs, which is an authoritative global standard of 31 guidelines for states and companies to prevent, address, and remedy

---

**CONCLUSION**

The arguments raised by the parties fail to acknowledge the broader legal frameworks applicable in the context of armed conflict that bind them both. Under U.S. and international humanitarian law, both parties are prohibited from using AI—whether fully autonomous or not—to facilitate or commit war crimes and other serious violations of international law. Any decision on the Parties' dispute must make clear that their collaboration is constrained by these fundamental principles of law.

---

human rights abuses committed in business operations. S*ee, e.g.,* UNGP 7 (requiring that States take greater steps to constrain companies' activities in conflict-affected areas, where the risk of gross abuses is seen as especially high); UNGP 17 (companies have an ongoing obligation to act with due diligence to avoid infringing on the rights of others, and identify and assess risks to rights-holders so that potential adverse impacts can be prevented or mitigated). Importantly, Anthropic's obligation to comply with international human rights law is independent of the assessment of legality or willingness to comply by others, including States.

Additionally, there has been a sharp increase in the promulgation of formal and informal human rights standards for the development and use of AI systems in recent years. *See, e.g.*, Organisation for Economic Co-operation and Development, *OECD Recommendation of the Council on Artificial Intelligence*, OECD/LEGAL/0449 (2025), https://legalinstruments.oecd.org/en/instruments/oecd-legal-0449.

Respectfully submitted,

Dated: June 24, 2026

/s/ Meetali Jain

Meetali Jain
SBN 214237
Tech Justice Law Project
611 Pennsylvania Ave., Southeast # 337
Washington, DC 20003
(510) 570-4116
meetali@techjusticelaw.org

Katherine Gallagher, admitted *pro hac vice*
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
kgallagher@ccrjustice.org

Sadaf M. Doost
SBN 346104
Bassel H. El-Rewini, admitted *pro hac vice*
Abolitionist Law Center
8583 Irvine Center Dr. #481
Irvine, CA 92618
(412) 654-9070
sadaf@alcenter.org
bassel@alcenter.org

**APPENDIX**

Abolitionist Law Center ("ALC") is a nonprofit legal organization and community organizing project fighting to dismantle state and corporate violence through legal action, research, public education, and advocacy on the local, state, national, and international levels. Since 2023, ALC has investigated and reported on the emerging role of artificial intelligence in state sponsored violence and oppression.

Access Now is an international non-profit organization and US-registered 501(c)3 tax-exempt organization working to strengthen the digital rights of people and communities at risk. Access Now routinely engages courts in the United States and abroad, advocating for privacy, freedom of expression, and civic space in the digital age.

Center for Constitutional Rights ("CCR") is a national not-for-profit legal, educational, and advocacy organization dedicated to advancing and protecting the rights guaranteed by the United States Constitution and international law. CCR has been responsible for some of the most significant advancements in the recognition of international law in federal courts over the last four decades, and has sought to hold state and nonstate actors liable for torture, extrajudicial killings, war crimes, and crimes against humanity. CCR has an interest in the proper interpretation of international law as it applies to the use of evolving technologies in the context of armed conflict.

Centre for Research on Multinational Corporations ("SOMO") is a non-for-profit organisation registered in the Netherlands. SOMO investigates the impacts and enablers of unjustified corporate power, with a clear goal – a fair and sustainable world in which public interests outweigh corporate interests. Headquartered in Amsterdam, SOMO works with hundreds of organisations worldwide, acting as a knowledge, research and communications hub.

<u>Tech Justice Law</u> ("TJL") is a nonpartisan nonprofit organization that works to ensure artificial intelligence systems are safe by design, subject to human oversight, and transparent. TJL frequently participates directly and as amicus curiae in litigation presenting AI safety concerns. Through litigation and advocacy, TJL advances human rights principles in global tech accountability efforts, recognizing that AI systems and digital platforms often facilitate surveillance, repression, and state violence worldwide.