**Gibson, Dunn & Crutcher LLP**
Gregg J. Costa (*pro hac vice* granted)
811 Main Street, Suite 3000
Houston, TX 77002-6117
(346) 718-6600
gcosta@gibsondunn.com

Lauren Goldman (*pro hac vice* pending)
200 Park Ave.
New York, NY 10166-0193
(212) 351-4000
lgoldman@gibsondunn.com

Martie Kutscher (SBN 302650)
310 University Ave.
Palo Alto, CA 94301-1744
(650) 849-5300
mkutscherclark@gibsondunn.com

*Counsel for Democracy Defenders Fund*


Attorneys for *Amici Curiae*
DEMOCRACY DEFENDERS FUND AND 149
FORMER JUDGES

**Democracy Defenders Fund**
Norman L. Eisen (*pro hac vice* pending)
600 Pennsylvania Ave. SE #15180
Washington, DC 20003
(202) 514-9948
norman@democracydefenders.org

*Counsel for Democracy Defenders Fund*

Stephen A. Jonas
600 Pennsylvania Ave. SE #15180
Washington, DC 20003
(202) 514-9948
steve@democracydefenders.org

*Counsel for Former Judges*


# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ANTHROPIC PBC,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>U.S. DEPARTMENT OF WAR, et al.<br><br>　　　　　Defendants. | Case No. 3:26-cv-01996-RFL<br><br>**BRIEF OF *AMICI CURIAE* DEMOCRACY DEFENDERS FUND AND 149 FORMER JUDGES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:　　July 30, 2026<br>Time:　　10:00 a.m.<br>Ctrm:　　Courtroom 04 – 17th Floor<br>Judge:　　Hon. Rita F. Lin |

GIBSON, DUNN &
CRUTCHER LLP

**TABLE OF CONTENTS**

**Page**

IDENTITY AND INTEREST OF *AMICI CURIAE* ...................................................................... 1

INTRODUCTION .................................................................................................................... 2

ARGUMENT ........................................................................................................................... 3

I.     THE EXECUTIVE BRANCH'S INVOCATION OF NATIONAL
       SECURITY AUTHORITIES DOES NOT DISPLACE THE ORDINARY
       FUNCTIONS OF JUDICIAL REVIEW ................................................................ 3

II.    ANTHROPIC IS ENTITLED TO HAVE THE DEPARTMENT'S
       SECTION 3252 DESIGNATION SET ASIDE BECAUSE THE
       EXECUTIVE'S ACTIONS WERE SUBSTANTIVELY AND
       PROCEDURALLY UNLAWFUL. ........................................................................ 8

       A.     This Court Should Apply Ordinary Tools of Interpretation to Section
              3252, which Shows the Executive's Designation of Anthropic as a
              "Supply Chain Risk" Was Substantively Unlawful. ................................... 8

       B.     The Executive Branch Failed to Adhere to Core, Judicially
              Enforceable, Procedural Requirements in Designating Anthropic a
              "Supply Chain Risk." ............................................................................... 12

III.   SETTING ASIDE THE DEPARTMENT'S SECTION 3252
       DESIGNATION WOULD NOT ENCROACH ON THE EXECUTIVE
       BRANCH'S NATIONAL SECURITY PREROGATIVES. ................................. 14

GIBSON, DUNN &
CRUTCHER LLP

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A.R.P. v. Trump,*
605 U.S. 91 (2025).................................................................................................................8

*Al Haramain Islamic Foundation v. Dept. of Treasury,*
686 F.3d 965 (9th Cir. 2012)..............................................................................5, 7, 13, 14

*Baker v. Carr,*
369 U.S. 186 (1962).................................................................................................................4

*Biden v. Nebraska,*
600 U.S. 477 (2023).................................................................................................................9

*Clement v. City of Glendale,*
518 F.3d 1090 (9th Cir. 2008)........................................................................................13, 14

*Colorado River Water Conservation Dist. v. United States,*
424 U.S. 800 (1976).................................................................................................................4

*Davis v. Bandemer,*
478 U.S. 109 (1986).................................................................................................................6

*Defense for Children International-Palestine v. Biden,*
107 F.4th 926 (9th Cir. 2024).................................................................................................6

*Erlenbaugh v. United States,*
409 U.S. 239 (1972)...............................................................................................................10

*FBI v. Fikre,*
601 U.S. 234 (2024).................................................................................................................4

*Fischer v. United States,*
603 U.S. 480 (2024)...............................................................................................................11

*Hamdan v. Rumsfeld,*
548 U.S. 557 (2006).................................................................................................................9

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010)..................................................................................................................6, 7

*Kashem v. Barr,*
941 F.3d 358 (9th Cir. 2019)................................................................................................13

*Korematsu v. United States,*
323 U.S. 214 (1944), *overruled by Trump v. Hawaii*, 585 U.S. 667 (2018)............................4

*Learning Resources v. Trump,*
607 U.S. 229 (2026)................................................................................................5, 9, 10, 11

GIBSON, DUNN &
CRUTCHER LLP

ii

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)......................................................................................................4

*Maracich v. Spears*,
570 U.S. 48 (2013)......................................................................................................11

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803)........................................................................................3

*Mathews v. Eldridge*,
424 U.S. 319 (1976)....................................................................................................12

*Ex parte Milligan*,
71 U.S. (4 Wall.) 2 (1866).............................................................................................4

*Nat'l Council of Resistance of Iran v. Dep't of State*,
251 F.3d 192 (D.C. Cir. 2001) .....................................................................................13

*New York Times Co. v. United States*,
403 U.S. 713 (1971)......................................................................................................5

*Noem v. Abrego Garcia*,
145 S. Ct. 1017 (2025)...............................................................................................7, 8

*Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*,
758 F.3d 296 (D.C. Cir. 2014) ..................................................................................4, 13

*Republic of Marshall Islands v. United States*,
865 F.3d 1187 (9th Cir. 2017)........................................................................................6

*TikTok, Inc. v. Garland*,
604 U.S. 56 (2025)........................................................................................................6

*Trump v. Illinois*,
146 S. Ct. 432 (2025) ...................................................................................................8

*Washington v. Trump*,
847 F.3d 1151 (9th Cir. 2017).......................................................................................13

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)......................................................................................................5

*Zivotofsky v. Clinton*,
566 U.S. 189 (2012)......................................................................................................6

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
576 U.S. 1 (2015)..........................................................................................................8

**Statutes**

5 U.S.C. § 706..................................................................................................................6

5 U.S.C. § 706(2) ...........................................................................................................14

5 U.S.C. § 706(2)(B)......................................................................................................12

GIBSON, DUNN &
CRUTCHER LLP

10 U.S.C. § 3252(a)(2) ........................................................................................................6

10 U.S.C. § 3252(c)(1) ........................................................................................................6

10 U.S.C. § 3252(d)(4) .....................................................................................................9, 11

10 U.S.C. § 4811(a)(3) .......................................................................................................10

10 U.S.C. § 4811(a)(8) .......................................................................................................10

50 U.S.C. § 1701(a) .............................................................................................................9

**Other Authorities**

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ...................10, 11

Robert M. Chesney, *National Security Fact Deference*, 95 Va. L. Rev. 1361
    (2009) .........................................................................................................................6

Suzanne Spaulding et al., *The National Security Case for Judicial Review*, Lawfare
    (Feb. 20, 2026, 8:00 AM), https://www.lawfaremedia.org/article/the-national-
    security-case-for-judicial-review, https://perma.cc/N4GU-WSQF ....................................4, 12

**Regulations**

Exec. Order No. 14193, 90 Fed. Reg. 9113 (Feb. 7, 2025) ................................................9

Exec. Order No. 14257, 90 Fed. Reg. 15041 (Apr. 7, 2025) .............................................9

**Constitutional Provisions**

U.S. Const. amend. V.........................................................................................................12

GIBSON, DUNN &
CRUTCHER LLP

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

The *amici* judges are 149 former federal and state judges, including judges appointed by presidents and governors of both major political parties.[2]  Collectively, *amici* served for centuries in state and federal courts.  *See* Exhibit A.  *Amici* have a deep and abiding interest in preserving the independent role of the federal judiciary and ensuring that its functions are not displaced by either political branch, including in cases involving matters related to national defense and foreign policy.  They have a firsthand understanding of the ability of judges to apply standard tools of statutory interpretation in such contexts while affording appropriate deference to the policy and national security judgments of other branches of government.

*Amicus* Democracy Defenders Fund is a non-profit organization whose mission is to confront anti-democratic actions and defend American civic institutions.

In opposing Anthropic's motion for summary judgment, the government claims that it is entitled to "unique" and "great" deference in this lawsuit because it implicates national security.  ECF No. 214 at 8, 25; *see also*, *e.g.*, ECF No. 96 at 11 (asking for "unique" and "double" deference).  Together, *amici* believe that this assertion of deference misunderstands the judiciary's role in cases implicating national security affairs.  Instead, *amici* believe that ordinary tools of statutory interpretation and principles of due process readily resolve this case.  The plain text of the statute relied on by the government and the ordinary application of settled due process precedents support setting aside the Department's Section 3252 designation.  Doing so will not entangle the judiciary in the national security functions of the Executive Branch.

---

[1] No counsel for a party authored this brief in whole or in part.  No person other than *amici curiae* or their counsel contributed money that was intended to fund preparing or submitting the brief.
[2] *Amici* also include one judge who served on an international tribunal.  *See* Exhibit A.

Gibson, Dunn & Crutcher LLP

- 1 -

**INTRODUCTION**

The Constitution vests the federal judiciary with ensuring that the Executive Branch does not exceed the powers Congress delegates to it. That duty does not go away when the Executive Branch purports to act under statutes that protect our nation's security.

This case is a straightforward challenge to unlawful agency action. The Secretary of War, before running any agency process, directed the Department of War "to designate Anthropic a Supply-Chain Risk to National Security." ECF No. 134 at 9 ("PI Op.") He further ordered that, "[e]ffective immediately, no contractor, supplier, or partner that does business with the United States military may conduct any commercial activity with Anthropic" and indicated that "[t]his decision is final." *Id.* Days later, purporting to apply 10 U.S.C. § 3252, the Department formally designated Anthropic a "supply chain risk." *Id.* at 9–10.

In taking these actions, the Secretary and the Department misinterpreted the statute and ignored the necessary procedures. This Court therefore appropriately entered a preliminary injunction, concluding that the Secretary's directive and the designation were likely unlawful under the Administrative Procedure Act. PI Op. at 30. In doing so, the Court correctly rejected the Department's arguments that it is entitled to "unique" and "double" deference in this lawsuit because it implicates national security. *See*, *e.g.*, ECF No. 96 at 11, 20.

As at the preliminary injunction stage, in resolving Anthropic's summary judgment motion, this Court should not depart from the ordinary judicial task of declaring what the law is. To be sure, courts must sometimes conduct themselves differently due to national security concerns. Some claims are not justiciable because resolving them would require the court to make the types of substantive national security judgments that judges are ill-equipped to render. In other instances, the government may be entitled to some deference in factual determinations. And in still other cases, courts must consider the impact on national security when crafting an injunctive remedy to avoid judicial entanglement in the conduct of foreign affairs or national defense. But this is not such a case.

Applying ordinary principles of judicial review, the Department's Section 3252 designation was unlawful. This Court should therefore grant summary judgment in Anthropic's favor and set

aside the Department's Section 3252 designation as unlawful under the Administrative Procedure Act, 5 U.S.C. § 706(2).  Anthropic is entitled to this relief for at least two reasons.  First, the government's actions against Anthropic were substantively unlawful.  The government has conceded that the Secretary's directive purporting to bar all defense contractors from conducting any commercial activity with Anthropic had no basis in law.  PI Op. at 16, 34–35.  And standard tools of interpretation demonstrate that a private company's contractual dispute with a government agency cannot render that company a "supply chain risk" within the meaning of 10 U.S.C. § 3252.  That conclusion, based on the statute's plain text, does not require judicial second-guessing of the Executive Branch's national security judgments.  Second, as this Court found previously, the government ignored basic principles of due process by failing to give Anthropic notice and a meaningful opportunity to challenge the relevant agency actions.  Both issues are independently dispositive.

Setting aside the Department's Section 3252 designation will not require the Department of War—or any other agency—to work with Anthropic.  "Everyone, including Anthropic, agrees that the Department of War may permissibly stop using Claude and look for a new AI vendor . . . .  That is not what this case is about."  PI Op. at 1.  Anthropic instead seeks ongoing protection from further retaliatory domestic sanction for opting *not* to provide certain services to the Department.  *Amici* urge the Court to grant that relief.

## ARGUMENT

I.    **THE EXECUTIVE BRANCH'S INVOCATION OF NATIONAL SECURITY AUTHORITIES DOES NOT DISPLACE THE ORDINARY FUNCTIONS OF JUDICIAL REVIEW**

The government claims that it is entitled to "unique" deference in this lawsuit because it implicates national security.  ECF No. 214 at 8.  But this is a dramatic overstatement of the deference that courts owe to the Executive Branch.

There is no "national security exception" to ordinary principles of judicial review.  Rather, "[i]t is emphatically the province and duty of the judicial department to say what the law is."  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).  That is why "[a] court with jurisdiction

has a 'virtually unflagging obligation' to hear and resolve questions properly before it." *FBI v. Fikre*, 601 U.S. 234, 240 (2024) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).  Of course, while "exercising independent judgment," courts may also pay "due respect" to the views of the Executive Branch.  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024).  "'Respect,' though, [is] just that." *Id.* at 386.  "The views of the Executive Branch [can] inform the judgment of the Judiciary, but . . . not supersede it." *Id.* Ultimately, it remains the Judiciary's task to form an independent view of the law in every justiciable case.

The same rules apply when a justiciable case could implicate national security.  "[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, 758 F.3d 296, 313 (D.C. Cir. 2014) (quoting *Baker v. Carr*, 369 U.S. 186, 211 (1962)).  And the judiciary cannot "distort the Constitution" or other applicable law to accommodate the Executive Branch's claims of necessity or expediency.  *Korematsu v. United States*, 323 U.S. 214, 244 (Jackson, J., dissenting) (1944), *overruled by Trump v. Hawaii*, 585 U.S. 667, 710 (2018).  As more than a dozen former national security officials who served in administrations of both political parties have argued, robust judicial review in national security matters strengthens American national security interests by "promot[ing] discipline in process and discernment within the executive branch, leading to more informed decisions, better resource allocation, and sustained public support."  Suzanne Spaulding et al., *The National Security Case for Judicial Review*, Lawfare (Feb. 20, 2026, 8:00 AM), https://www.lawfaremedia.org/article/the-national-security-case-for-judicial-review, https://perma.cc/N4GU-WSQF.

That is why—again and again—courts have been willing to decide cases properly before them even when they implicate questions that affect the nation's security.  Consider *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866), in which the Supreme Court held that a United States citizen could not be tried by a military tribunal while ordinary Article III courts were available.  *Id.* at 127. Notwithstanding the government's invocation of military necessity, the Court held firm to its duty to apply the law.  "The Constitution of the United States," the Court held, "is a law for rulers and

people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances." *Id.* at 120–21. "No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government." *Id.* at 121.

That tradition of judicial independence has continued through the 20th century and to the present day. Perhaps most famously, the Supreme Court prevented President Truman from nationalizing the steel industry in the midst of the Korean War—notwithstanding the President's finding that the government's actions were "necessary to avert a national catastrophe." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952). So too in the Pentagon Papers case, in which the Court held that the government's concerns about disclosure of classified information did not overcome the First Amendment right against prior restraints. *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam). And mere months ago, the Supreme Court held that the President lacked authority to impose tariffs pursuant to a statute that provides broad emergency powers, notwithstanding the President's findings that the tariffs were necessary to address public health and economic emergencies. *Learning Resources v. Trump*, 607 U.S. 229, 237, 255 (2026).

The government nonetheless claims that it is entitled to "unique deference" in this case because its decisions implicate national security. ECF No. 214 at 8 (quoting *Al Haramain Islamic Foundation v. Dept. of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012)). But the deference courts have afforded in the cases cited by the government is "unique" precisely because it does *not* apply anytime the government raises national security concerns.

Instead, courts have identified discrete doctrines—including limits on justiciability, deference to specific factual conclusions of the government, and limits on courts' authority to fashion equitable remedies—to accommodate national security concerns in specific circumstances, while emphasizing that these doctrines do *not* support judicial abdication or putting a thumb on the government's side whenever it invokes national security. None of these three doctrines applies here.

**First, the parties agree that this case is justiciable**. The government, rightly, does not assert that the questions presented are so entangled in foreign policy or military judgments as to

GIBSON, DUNN & CRUTCHER LLP

trigger the political question doctrine. *Cf.*, *e.g.*, *Defense for Children International-Palestine v. Biden*, 107 F.4th 926, 929–31 (9th Cir. 2024) (per curiam) (legality of U.S. support for Israeli military action in Gaza presented nonjusticiable political question); *Republic of Marshall Islands v. United States*, 865 F.3d 1187, 1200–01 (9th Cir. 2017) (United States compliance with treaty obligation to pursue nuclear disarmament presented nonjusticiable political question). Although the government has claimed that the Secretary's directive was not final agency action for purposes of the APA, it has—correctly—never claimed that the directive is not justiciable for constitutional purposes.[3] That is for good reason, given the Supreme Court's admonitions that the political question doctrine cannot be used as an "ad hoc litmus test of" a court's "reactions to the desirability of" adjudicating a case. *Davis v. Bandemer*, 478 U.S. 109, 126 (1986); *see also Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012) ("*Zivotofsky I*").

Because all parties agree that the Department's designation of Anthropic as a "supply chain risk" is subject to review under the APA, *see* 5 U.S.C. § 706, this Court needs only to perform the "familiar judicial exercise" of determining whether the Executive Branch's actions are consistent with the operative statute and requisite procedures, *Zivotofsky I*, 566 U.S. at 196.

**Second, the Court need not defer to factfinding.** It is true that, in certain circumstances, the Executive Branch's "evaluation of the *facts*" concerning national security matters may be "entitled to deference." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33 (2010) (emphasis added); *see also, e.g.*, *TikTok, Inc. v. Garland*, 604 U.S. 56, 75 (2025) (deferring to Congress's predictive judgments about China's likelihood of seeking to acquire user data for intelligence purposes). But, even in such unique cases, "concerns of national security and foreign relations do not warrant abdication of the judicial role," and courts must not "defer to the Government's reading" of the law itself. *Holder*, 561 U.S. at 34. Put differently, "[f]act deference, even when warranted, does not require a judge to abandon independent judgment in the evaluation of the legal consequences of those facts." Robert M. Chesney, *National Security Fact Deference*, 95 Va. L.

---

[3] Congress created a narrow carveout to the ordinary principle of judicial review of final agency action for certain highly confidential Section 3252 designations. *See* 10 U.S.C. § 3252(c)(1). But the government does not contend that this carveout applies here—nor could it, given that the Department disclosed these actions against Anthropic to the general public. *See id.* § 3252(c)(1), (a)(2).

GIBSON, DUNN &
CRUTCHER LLP

- 6 -

Rev. 1361, 1382 (2009).

Not surprisingly, then, the government's request for "unique deference," ECF No. 214 at 8, relies on cases bearing little resemblance to this one. In *Al Haramain*, for example, the court stated that it owed "unique deference to the executive branch's determination" that the terrorist acts of September 11, 2001 "constitute an unusual and extraordinary threat" to U.S. national security for purposes of triggering the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 *et seq.* *See* 686 F.3d at 980, 972. And in *Holder*, the Court deferred to findings by both Congress and the Executive Branch that material support provided to terrorist organizations, even when intended to promote peaceable conduct, would nonetheless further those organizations' violent aims because terrorist organizations do not segregate funds intended for humanitarian purposes. *Holder*, 561 U.S. at 29–34.

This case is nothing like these examples. The Executive Branch does not, for example, claim to rely on classified reporting about specific national security threats, nor does it claim to rely on predictive judgments about the plans of hostile foreign actors or the impacts of decisions on U.S. foreign policy interests, or even on unique technological expertise. Instead, it seeks "unique" and "great" deference, ECF No. 214 at 8, 25, for its astonishing conclusion that an American company's public expression of disagreement with the government renders it so untrustworthy as to become a would-be saboteur. *See id.* at 19.[4] To defer to that conclusion would amount to the very "abdication of the judicial role" that the Supreme Court has warned against. *Holder*, 561 U.S. at 34.

**Third and finally, the party-specific relief Anthropic requests would not interfere with the Executive Branch's ability to conduct foreign affairs.** While courts sometimes exercise caution in crafting remedies in light of "the deference owed to the Executive Branch in the conduct of foreign affairs," Anthropic seeks relief only for itself; it does not seek to regulate the Executive Branch's conduct with respect to any foreign nation. *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025). The remedy requested by Anthropic—that this Court "set aside" the Department's

---

[4] This conclusion is particularly startling given this country's proud history and tradition of free and open debate over the government's foreign policy and national security decisions. *See, e.g.*, Letter of James Madison to Thomas Jefferson (April 2, 1798) (denouncing the "violent passions & heretical politics" of President Adams's policies toward France).

GIBSON, DUNN & CRUTCHER LLP

Section 3252 designation as unlawful—is straightforward and requires no judicial entanglement in the Executive Branch's national security affairs. *See infra* at 14–15.

\* \* \*

These doctrines relating to justiciability, deference for factual judgments, and caution in crafting remedies are important, but none requires the Court to set aside its role in this case, as the Department urges. Indeed, this is not the first case in which the government has recently claimed that judicial relief would undermine its national security interests. In 2025 alone, the Supreme Court on at least three occasions ruled against the government in emergency applications where the government claimed that judicial relief jeopardized national security.[5] The Supreme Court does not reflexively defer to the government merely because it invokes national security, but instead considers each invocation on its own terms. This Court should adopt the same approach.

II.     **ANTHROPIC IS ENTITLED TO HAVE THE DEPARTMENT'S SECTION 3252 DESIGNATION SET ASIDE BECAUSE THE EXECUTIVE'S ACTIONS WERE SUBSTANTIVELY AND PROCEDURALLY UNLAWFUL.**

      A.     **This Court Should Apply Ordinary Tools of Interpretation to Section 3252, which Shows the Executive's Designation of Anthropic as a "Supply Chain Risk" Was Substantively Unlawful.**

Perhaps no area of law is *less* susceptible to national security exceptionalism than statutory interpretation. When the Executive Branch acts pursuant to statute, it is "not free from the ordinary controls and checks of Congress merely because foreign affairs" or national security concerns are invoked. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015) ("*Zivotofsky II*"). Accordingly, when the Executive acts under a law whose function is to protect national security interests, the Supreme Court has repeatedly applied ordinary tools of statutory interpretation to

---

[5] *See* Application for Stay at 35, *Trump v. Illinois*, 146 S. Ct. 432 (2025) (arguing that injunction against deployment of the National Guard "undermine[d] national security"); *Illinois*, 146 S. Ct. at 434 (denying government's request for a stay); Supplemental Brief for Respondents at 3, *A.A.R.P. v. Trump*, 605 U.S. 91 (2025) (arguing that injunction created the "alarming" consequence of prolonged domestic detention of those deemed "a threat to national security"); *A.A.R.P.*, 605 U.S. at 99 (per curiam) (enjoining government from removing Petitioners from the United States under the Alien Enemies Act); Application to Vacate Injunction at 3, *Noem v. Abrego Garcia*, 145 S. Ct. 1017 (2025) (arguing that district court's injunction "seize[d] control of foreign relations"); *Abrego Garcia*, 145 S. Ct. at 1018 (holding that district court "properly require[d] the Government to 'facilitate' Abrego Garcia's release from custody in El Salvador").

GIBSON, DUNN & CRUTCHER LLP

determine whether those acts fit within the bounds of the law. *See, e.g.*, *Learning Resources*, 607 U.S. at 247–48; *Biden v. Nebraska*, 600 U.S. 477, 494–95 (2023); *Hamdan v. Rumsfeld*, 548 U.S. 557, 577–78 (2006).

*Learning Resources* reaffirms that there is no national-security carveout from the Judiciary's obligation to discern statutory meaning. In that case, the President attempted to justify the tariffs he imposed under IEEPA as necessary to deal with an "'unusual and extraordinary threat' to American national security, foreign policy, or the economy, originating primarily 'outside the United States.'" *Learning Resources*, 607 U.S. at 237 (quoting 50 U.S.C. § 1701(a)). The President had declared national emergencies and determined that there were "unusual and extraordinary" threats to the United States, concluding that the flow of illegal drugs "'created a public health crisis'" and that trade deficits "had 'led to the hollowing out' of the American manufacturing base and 'undermined critical supply chains.'" *Id.* (quoting Exec. Order No. 14193, 90 Fed. Reg. 9113 (Feb. 7, 2025); Exec. Order No. 14257, 90 Fed. Reg. 15041 (Apr. 7, 2025)). Notwithstanding the President's invocation of these emergency authorities, the Court performed its duty to interpret the statute relied upon and held that "the terms of IEEPA do not authorize tariffs." *Learning Resources*, 607 U.S. at 255.

So too here. Several basic principles of statutory interpretation resolve this case.

***First***, **the government has conceded that no statute provides authority for the Secretary to bar all defense contractors from conducting business with Anthropic.**[6] *See* PI Op. at 16 (counsel for the government conceded he was aware of no statutory authority authorizing this directive and agreed that it had "absolutely no legal effect at all").

***Second***, **when considering the Department's supply chain risk designation under Section 3252, this Court should construe relevant terms according to their plain meaning and based on the context in which they appear.** The relevant statute defines a "supply chain risk" as the risk that an "*adversary*" may take certain actions. 10 U.S.C. § 3252(d)(4) (emphasis added). Because Congress "generally uses a particular word with a consistent meaning in a given context,"

---

[6] The government has also never suggested that the Secretary has such power under Article II of the Constitution.

GIBSON, DUNN & CRUTCHER LLP

*Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972), the word "adversary" should be interpreted in a way that gives it a consistent meaning in other parts of the U.S. Code. *See Learning Resources*, 607 U.S. at 249 (rejecting the government's argument that the power to "regulate" includes the power to tax because "[t]he U.S. Code is replete with statutes granting the Executive the authority to 'regulate' someone or something," but "the Government cannot identify any statute in which the power to regulate includes the power to tax"); A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 252 (2012) (statutory terms are "part of an entire *corpus juris*" and should generally be given a consistent meaning).

Other uses of the word "adversary" throughout the U.S. Code—particularly in Title 10, governing the military's authorities—show that this term refers to governments or other armed groups that pose strategic threats to U.S. national security, not American businesses with which the U.S. government has policy and contractual disagreements. For example, 10 U.S.C. § 113(i)(1) lists among the Secretary's core duties a requirement to transmit an annual report to Congress containing a comprehensive assessment "of the defense capabilities and programs of the armed forces of the United States and its allies as compared with those of their potential adversaries." An "adversary" in that context is plainly a foreign government or foreign entity with a military or other type of fighting capability. Another defense-related statute calls for the Secretary to develop a strategy for, among other things, "[m]aintaining advanced research and development activities to provide the armed forces with systems capable of ensuring technological superiority over potential adversaries" and for "[m]aintaining critical design skills to ensure that the armed forces are provided with systems capable of ensuring technological superiority over potential adversaries." 10 U.S.C. §§ 4811(a)(3), (8). Again, the use of "adversary" presupposes a sophisticated, hostile threat actor that could engage the American military in a conflict.

The government's contrary interpretation—that "any vendor who 'pushes back' on or 'questions' [the Department] becomes its 'adversary,'" PI Op. at 30—is incompatible with the use of "adversary" throughout Title 10. It would make no sense, for example, to require the Secretary to prepare an annual report about the military's defense capabilities as compared to those of domestic technology companies, nor would it make any sense to require the Secretary to develop a

GIBSON, DUNN & CRUTCHER LLP

strategy for maintaining technological superiority over domestic technology companies.

**Third, even beyond the word "adversary," other principles of statutory interpretation make clear that domestic critics of the United States are not "supply chain risks."** Words and phrases that are capable of multiple meanings should be "construed in light of their accompanying words in order to avoid giving" the statutory term "unintended breadth." *Maracich v. Spears*, 570 U.S. 48, 62–63 (2013) (quotation marks omitted); *see also* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012) (when several words "are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar"). The *Learning Resources* Court applied this "*noscitur a sociis*" canon to IEEPA's word "regulate," explaining that each surrounding word "authorizes a distinct action a President might take in sanctioning foreign actors or controlling domestic actors engaged in foreign commerce." 607 U.S. at 250. So it was telling that "[n]one of IEEPA's authorities includes the distinct and extraordinary power to raise revenue." *Id*.

So too here. When construing the meaning of the term "supply chain risk," the Court should examine the various risks that the statute contemplates and construe them together. *See* 10 U.S.C. § 3252(d)(4) (defining "supply chain risk" as the "risk that an adversary may *sabotage*, *maliciously introduce unwanted function*, *or otherwise subvert the design, integrity, manufacturing, production, distribution, installation, operation, or maintenance*" of covered technologies or services in a way that results in certain deleterious effects (emphases added)). And the Court should construe the term "otherwise subvert" to reflect the same risks such as "sabotage" or "malicious[] introduc[tion of] unwanted function"—*i.e.*, the types of actions that a hostile, clandestine adversary might take to damage or obtain information from a government system. *Cf. Fischer v. United States*, 603 U.S. 480, 491 (2024) ("'Otherwise' can link a set of examples to a general phrase and give it more definite meaning.") (emphasis omitted). Given this list, a "supply chain risk" must involve a risk of insidious interference with the functioning of a technology—not merely disagreement about how a technology should be used.

The concerns that the government raises about Anthropic are not the types of concerns that Section 3252 authorizes the government to address. This alone is a sufficient basis for this Court

to grant summary judgment to Anthropic. National-security exceptionalism does not support a different conclusion.

**B.      The Executive Branch Failed to Adhere to Core, Judicially Enforceable, Procedural Requirements in Designating Anthropic a "Supply Chain Risk."**

Because the Secretary and the Department failed to give Anthropic adequate notice and opportunity to respond, this Court should further set aside their actions as "contrary to constitutional right." 5 U.S.C. § 706(2)(B). Just as the Judiciary must apply ordinary principles of statutory interpretation, it must also enforce fundamental due process protections when reviewing the legality of executive actions. Those due process protections provide an additional basis to set aside the Department's Section 3252 designation.

Although the Executive Branch may be afforded deference for substantive national security judgments, the Judiciary plays an essential role in ensuring that the process underlying those judgments is fair and adequate when the "life, liberty, or property" of Americans or American businesses is at stake. U.S. Const. amend. V. Ensuring that private parties have been afforded the procedural protections required by the Due Process Clause is—like interpreting a statute—a quintessential judicial exercise. Even when the Executive Branch invokes weighty interests like neutralizing terrorist organizations, it cannot act rashly, and it cannot disregard the fundamental requirements of adequate notice and an opportunity to respond. Lack of process is also, itself, a warning sign that the substance of the Executive's actions may be suspect. "[O]paque, cursory, or pretextual processes justify skepticism. Process failures often signal that considerations other than facts and law drove the decision—considerations less deserving of deference." Spaulding et al., *supra* at 4.

Courts consider three factors to determine whether administrative procedures adequately protect private actors' due process rights: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424

GIBSON, DUNN &
CRUTCHER LLP

U.S. 319, 335 (1976).

The *Mathews* factors apply even in contexts that implicate national security.  As the Ninth Circuit has explained:  "Even when national security interests are at stake, . . . the government must 'take reasonable measures to ensure basic fairness to the private party and follow procedures reasonably designed to protect against erroneous deprivation of the private party's interests.'" *Kashem v. Barr*, 941 F.3d 358, 364–65 (9th Cir. 2019) (quoting *Al Haramain*, 686 F.3d at 980). To that end, the Ninth Circuit has applied *Mathews* when assessing policies for placing individuals on the No-Fly list, *Kashem*, 941 F.3d at 377–90, and for the designation of a U.S.-based organization as a specially designated global terrorist, *Al Haramain*, 686 F.3d at 979–90.  Other circuits have taken the same approach.  *See, e.g.*, *Ralls Corp.*, 758 F.3d at 317–19.

This Court already correctly applied the *Mathews* factors to determine that the Secretary's and the Department's actions likely violated Anthropic's due process rights.  Indeed, the Secretary's directive was preceded by no process whatsoever.  And while the government has since argued that the directive has no legal effect, this Court appropriately concluded that it nonetheless has significantly harmed—and continues to harm—Anthropic by creating substantial confusion and uncertainty among its business partners and investors.  PI Op. at 25–27, 35.

The Department of War also failed to afford Anthropic necessary process before designating it a supply chain risk.  *See* PI Op. at 24–29.  Pre-deprivation notice is presumptively required when significant liberty and property interests are at stake.  *See Clement v. City of Glendale*, 518 F.3d 1090, 1094 (9th Cir. 2008) ("[T]he default rule is advance notice, and the state must present a strong justification for departing from the norm.").  This continues to be the default rule even when national security interests are implicated.  *See, e.g.*, *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017) (government failed to show that due process did not require "notice and a hearing *prior* to restricting an individual's ability to travel," even in the context of an Executive Order designed to fight terrorism (emphasis added)); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 207–08 (D.C. Cir. 2001) (government violated the Due Process Clause where it offered no pre-deprivation notice in designation of a foreign terrorist organization and was unable to show how affording pre-deprivation notice "would interfere with the Secretary [of State's] duty

to carry out foreign policy").[7] Anthropic did not receive these bedrock requirements of due process. It had no meaningful opportunity to contest its classification as a supply chain risk, even though it could have offered evidence demonstrating the government's fundamental misunderstandings of its technology. PI Op. at 27–28.

As this Court observed in granting the preliminary injunction, "in many instances" the government will have sufficient exigent circumstances that it can constitutionally classify an entity as a supply chain risk without any process. *Id.* at 29. But, in this case, the government demonstrated no such exigency. *Id.* To the contrary, the Department indicated it intended to continue using Anthropic's products for an additional six months, ECF No. 6 at 9, 25. This Court's holding that the Executive deprived Anthropic of its due process rights provides, by itself, sufficient reason to set aside the Department's Section 3252 designation.

## III. SETTING ASIDE THE DEPARTMENT'S SECTION 3252 DESIGNATION WOULD NOT ENCROACH ON THE EXECUTIVE BRANCH'S NATIONAL SECURITY PREROGATIVES.

Anthropic asks this Court to apply familiar standards to grant a familiar remedy. This Court has a duty to "set aside" any agency action that was arbitrary and capricious or otherwise contrary to law—the most familiar standard in all of administrative law. *See* 5 U.S.C. § 706(2). Entering this kind of discrete, congressionally commanded remedy raises none of the concerns that might arise were a court seeking to issue an injunction superintending the Executive's foreign policy or national defense functions. Indeed, given that the political question doctrine and other justiciability constraints are inapplicable here, this Court should be skeptical of any government rhetoric about judicial intrusion into sensitive questions of national security.

Moreover, setting aside the Department's Section 3252 designation—while necessary to protect Anthropic—will not affect the government's ability to make national security decisions. Just as with this Court's preliminary injunction, setting aside the Department's Section 3252

---

[7] Although advance notice is the "default rule," the government "need not give notice in an emergency, nor if notice would defeat the entire point of the [government action], nor when the interest at stake is small relative to the burden that giving notice would impose." *Clement*, 518 F.3d at 1093–94; *see also, e.g.*, *Al Haramain*, 686 F.3d at 985 (advance notice not required before terrorist designation and asset freeze due to risk of asset flight).

GIBSON, DUNN & CRUTCHER LLP

designation will not force the Department to contract with Anthropic. "It is the Department of War's prerogative to decide what AI product it uses." PI Op. at 1. And Anthropic and the Department have already agreed that the Department is *not* currently interested in Anthropic's services in the form that Anthropic is willing to provide them. *Id.* at 5–8. Instead, setting aside the Section 3252 designation will merely ensure that the government may not continue to punish Anthropic on its way out the door via a sweeping directive by the Secretary and a supply chain risk designation whose effects may extend beyond direct engagements between the Department and Anthropic.

The Department is welcome to continue to decide who it does and does not want to contract with. But it cannot punish Anthropic in its dealings with the rest of the world. In its efforts to do so, the government violated applicable law and violated Anthropic's due process rights. Anthropic is therefore entitled to summary judgment in its favor and an order setting aside the Department's Section 3252 designation.

Dated: June 26, 2026                                GIBSON, DUNN & CRUTCHER LLP


                                                    By /s/Gregg J. Costa
                                                        Gregg J. Costa

**Democracy Defenders Fund**
Norman L. Eisen (*pro hac vice* pending)
600 Pennsylvania Ave. SE #15180
Washington, DC 20003
(202) 514-9948
norman@democracydefenders.org

*Counsel for Democracy Defenders Fund*

Stephen A. Jonas
600 Pennsylvania Ave. SE #15180
Washington, DC 20003
(202) 514-9948
steve@democracydefenders.org

*Counsel for Former Judges*

**Gibson, Dunn & Crutcher LLP**
Gregg J. Costa (*pro hac vice* granted)
811 Main Street, Suite 3000
Houston, TX 77002-6117
(346) 718-6600
gcosta@gibsondunn.com

Lauren Goldman (*pro hac vice* pending)
200 Park Ave.
New York, NY 10166-0193
(212) 351-4000
lgoldman@gibsondunn.com

Martie Kutscher (SBN 302650)
310 University Ave.
Palo Alto, CA 94301-1744
(650) 849-5300
mkutscherclark@gibsondunn.com

*Counsel for Democracy Defenders Fund*

GIBSON, DUNN &
CRUTCHER LLP