Todd C. Toral (SBN CA 197706)
JENNER & BLOCK LLP
2029 Century Park East, Suite 1450
Los Angeles, CA 90067-2901
Telephone:     +1 213 239 6900
TToral@jenner.com

Matthew Klapper (SBN DC 90035346)*
JENNER & BLOCK LLP
1099 New York Avenue, NW Suite 900
Washington, DC 20001-4412
Telephone:     +1 202 639 6000
MKlapper@jenner.com

*Counsel for Amici Curiae Leon Panetta and the Institute for Security and Technology*

*Pro hac vice forthcoming.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHROPIC PBC,<br><br>                    Plaintiff,<br><br>          v.<br><br>UNITED STATES DEPARTMENT OF WAR, et al.,<br><br>                    Defendants. | Case No. 3:26-cv-01996<br><br>**BRIEF OF AMICI CURIAE FORMER SECRETARY OF DEFENSE LEON PANETTA AND THE INSTITUTE FOR SECURITY AND TECHNOLOGY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:   Hon. Rita F. Lin<br>Ctrm:    15, 18th Floor<br>Date:    July 30, 2026<br>Time:    10:00 A.M. |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................... i

IDENTITIES AND INTERESTS OF *AMICI CURIAE* .................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................ 2

ARGUMENT............................................................................................................................. 3

I. THE DEPARTMENT'S SUPPLY CHAIN RISK DESIGNATION WAS UNJUSTIFIED AND UNDERMINES ITS CREDIBILITY. .......................................................... 3

    A.    THE DEPARTMENT'S DESIGNATION OF ANTHROPIC WAS PRETEXTUAL, AND FAR EXCEEDED WHAT WAS NECESSARY TO ADDRESS THE SUPPOSED THREAT. ................................................... 4

    B.    PRETEXTUAL USE OF THIS SIGNIFICANT AUTHORITY UNDERMINES THE CREDIBILITY OF THE DEPARTMENT WITH INDUSTRY AND THE PUBLIC. ................................................................. 8

II. IMPROPER DESIGNATION OF ANTHROPIC AS A SUPPLY CHAIN RISK THREATENS THE U.S.'S MILITARY AND ECONOMIC ADVANTAGE AT A PIVOTAL MOMENT IN U.S.–CHINA TECHNOLOGICAL COMPETITION................... 12

CONCLUSION........................................................................................................................ 14

BRIEF OF AMICI CURIAE FORMER SECRETARY OF DEFENSE LEON PANETTA AND THE INSTITUTE FOR SECURITY AND TECHNOLOGY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT CASE NO. 3:26-CV-01996

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Georgia v. President of the U.S.*,
46 F.4th 1283 (11th Cir. 2022)......................................................................................7

*Greer v. Spock*,
424 U.S. 828 (1976)........................................................................................................8

*Perkins v. Lukens Steel Co.*,
310 U.S. 113 (1940).......................................................................................................7

**Statutes**

10 U.S.C § 3252...........................................................................................................2, 3

10 U.S.C. § 3252(b)(2)(B)..........................................................................................6, 8

10 U.S.C. § 3252(d)(4)....................................................................................................3

**Legislative Materials**

S. Rep. No. 111-201 (2010)............................................................................................5

**Other Authorities**

48 C.F.R. § 9.103.............................................................................................................6

48 C.F.R. § 9.104-1(d)....................................................................................................6

48 C.F.R. § 9.104-4.........................................................................................................6

48 C.F.R. § 9.402(b)........................................................................................................6

48 C.F.R. § 42.1303........................................................................................................6

48 C.F.R. § 49.101(b)......................................................................................................6

48 C.F.R. § 49.402-3........................................................................................................6

48 C.F.R. § 52.212-4(m)..................................................................................................6

48 C.F.R. § 52.242-15......................................................................................................6

48 C.F.R. § 52.243-4........................................................................................................6

48 C.F.R. § 52.249-1-52.249-6........................................................................................6

*2025 Reagan National Defense Survey*, Ronald Reagan Inst. (Nov. 2025),
https://www.reaganfoundation.org/reagan-institute/centers/peace-through-
strength/survey/2025-reagan-national-defense-survey.........................................................9

*Assessing Claude Mythos Preview's Cybersecurity Capabilities*, Anthropic Red Team
(Apr. 7, 2026), https://red.anthropic.com/2026/mythos-preview/;.......................................11

Anisha Sircar, *Anthropic Disabled Fable 5 and Mythos 5 After a U.S. Export-Control
order. Here's What Happened*, Forbes (June 16, 2026)
https://www.forbes.com/sites/anishasircar/2026/06/16/anthropic-disabled-fable-5-
and-mythos-5-after-a-us-export-control-order-heres-what-happened/;.................................5

Cristina Criddle & Demetri Sevastopulo, *US National Security Agency Using
Anthropic's Mythos for Cyber Attacks*, Fin. Times (June 4, 2026),
https://www.ft.com/content/d02d91b3-2636-454e-9442-dc7e69f51815?syn-
25a6b1a6=1....................................................................................................................4

David Montgomery, *Many Americans Think AI Companies Should Be Able to Limit
How the U.S. Military Uses Their Tools*, YouGov (Mar. 10,
2026),https://yougov.com/en-us/articles/54285-many-americans-think-ai-
companies-should-be-able-to-limit-how-us-military-uses-tools-march-6-9-2026-
economist-yougov-poll......................................................................................................9

Dean Ball, *Clawed*, Hyperdimensional (Mar. 2, 2026),
https://www.hyperdimensional.co/p/clawed...................................................................14

Dep't of Def., Instr. 5200.44, Protection of Mission Critical Functions to Achieve
Trusted Sys. and Networks (TSN) (Nov. 5, 2012).............................................................6

Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 27, 2026),
https://truthsocial.com/@realDonaldTrump/posts/116144552969293195............................6

Fatima Faisal Khan, *The Missing Middle*, Inst. for Sec. + Tech. (Oct. 2025)...........................13

Jake Bleiberg & Margi Murphy, *White House Works to Give US Agencies Anthropic
Mythos Access*, Bloomberg (Apr. 16, 2026)......................................................................8

Karen Freifeld, *Big Tech Group Tells Pentagon's Hegseth They Are 'Concerned'
About Anthropic Supply-Chain Risk Designation*, Reuters (Mar. 4, 2026).........................10

Kate Conger & David E. Sanger, *Pentagon Cancels a Disputed $10 Billion Technology
Contract*, N.Y. Times (July 6, 2021) ................................................................................7

Kyle Chan et al., *Full Stack: China's Evolving Industrial Policy for AI*, RAND (June
26, 2025)........................................................................................................................12

*Leon Panetta*, Panetta Inst., https://www.panettainstitute.org/about-us/institute-
people/leon-panetta/.........................................................................................................1

BRIEF OF AMICI CURIAE FORMER SECRETARY OF DEFENSE LEON PANETTA AND THE INSTITUTE FOR
SECURITY AND TECHNOLOGY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:26-CV-01996

Luke Emberson, *Chinese AI Models Have Lagged the US Frontier by 7 Months On Average Since 2023*, Epoch AI (Jan. 2, 2026) ...................................................................12

Mike Stone et al., *Hegseth Wants Pentagon to Dump Anthropic's Claude, But Military Users Say It's Not So Easy*, Reuters (Mar. 19, 2026) ..................................................10

Mike Stone, *Pentagon Deploys Anthropic's Mythos to Patch Cyber Gaps While Planning to Ditch Firm*, Reuters (May 12, 2026) ....................................................4

*Nation State Threats*, CISA, https://www.cisa.gov/topics/cyber-threats-and-advisories/nation-state-cyber-actors..........................................................................9, 10

Nick Wakeman, *Pentagon Hits Accenture, Booz Allen and Deloitte with Contract Cancellations*, Wash. Tech. (Apr. 11, 2025), https://. .com//2025/04/hits-accenture-booz-allen-and-deloitte-contract-cancellations/404500/.......................................7

*Our Evaluation of Claude Mythos Preview's Cyber Capabilities*, UK AI Sec. Inst.: Blog (Apr. 13, 2026), https://www.aisi.gov.uk/blog/our-evaluation-of-claude-mythos-previews-cyber-capabilities .................................................................11, 12

Pablo Chavez, *The Sovereignty Gap in U.S. AI Statecraft*, Lawfare (Feb. 16, 2026), https://www.lawfaremedia.org/article/the-sovereignty-gap-in-u.s.-ai-statecraft ............. 13-14

Pete Hegseth (@SecWar), X (Feb. 27, 2026), https://x.com/SecWar/status/2027507717 469049070 ..............................................................................................................6

*Project Glasswing: An Initial Update*, Anthropic (May 22, 2026), https://www.anthropic.com/research/glasswing-initial-update ...........................................11

Robert Brodsky, *GAO: Major Defense Contracts Cheaper to Cancel Than Continue*, Gov't Exec. (Mar. 19, 2008), https://www.govexec.com/defense/2008/03/gao-major-defense-contracts-cheaper-to-cancel-than-continue/26527........................................7

*Statement on the US Government Directive to Suspend Access to Fable 5 and Mythos*, Anthropic (Jun. 12, 2026) .......................................................................................5

Scott Singer & Matt Sheehan, *China's AI Policy at the Crossroads: Balancing Development and Control in the DeepSeek Era*, Carnegie Endowment for Int'l Peace (July 17, 2025)..........................................................................................13

*To Support and Defend: Principles of Civilian Control and Best Practices of Civil-Military Relations*, War on the Rocks (Sept. 6, 2022)...........................................8

BRIEF OF AMICI CURIAE FORMER SECRETARY OF DEFENSE LEON PANETTA AND THE INSTITUTE FOR SECURITY AND TECHNOLOGY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:26-CV-01996

### **IDENTITIES AND INTERESTS OF *AMICI CURIAE*[1]**

*Amici* have a strong interest in this case, which lies at the intersection of significant civilian military authorities and technological advancements, national security, and global stability. They submit this brief to provide the Court with the views and expertise of a former leader of the Department of War ("Department"), and researchers who work to unite policymakers, technology experts, and industry leaders behind the development of trustworthy, non-exploitative, and non-negligent technologies.

*Amicus* former Secretary of Defense Leon Panetta[2] has directed the Nation's military through numerous armed conflicts and has managed countless relationships between the government and the private sector that have materially enhanced American military capabilities. Secretary Panetta helped shepherd emerging technologies into appropriate use and deployment by the Armed Forces and appreciates how essential it is to maintain the trust and cooperation of private sector partners on whom the Department depends. He understands, through direct experience, the gravity and responsibility of deploying the Department's most severe sanctions, including those designed to address threats to national security, and he is uniquely positioned to speak to the need to do so in a manner that protects the credibility of the Department in the eyes of industry and the American public.

*Amicus* the Institute for Security and Technology ("IST") is a critical action think tank dedicated to the development of trustworthy technologies that advance national security and global stability, and the study of policy that fosters such technological development and builds trust between industry, civic leaders, technology experts, and government. IST has been especially focused on the impact of the American developers of artificial intelligence ("AI") on global stability, and the interaction between those developers and government actors. Through its research, IST has developed a special expertise in AI security and the need to maintain American leadership in AI over China.

---

[1] No counsel for any party authored this brief in whole or in part. No person other than *amici* or their counsel contributed money intended to fund this brief's preparation or submission.

[2] A brief biography of Secretary Panetta can be found at *Leon Panetta*, Panetta Inst., https://www.panettainstitute.org/about-us/institute-people/leon-panetta/.

BRIEF OF AMICI CURIAE FORMER SECRETARY OF DEFENSE LEON PANETTA AND THE INSTITUTE FOR SECURITY AND TECHNOLOGY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:26-CV-01996

*Amici* understand that the government protects national security while private industry drives technological innovation—innovation that, in turn, drives American economic and national security. They are profoundly committed to the appropriate deployment of the authorities of the Department in a manner that serves U.S. national security, as well as the need to ensure that advancements in technology—particularly in AI—also advance national security and global stability. *Amici* submit this brief to provide the Court with the perspective of a Department leader charged with safeguarding both national security and the institutional integrity and long-term credibility of the United States military, and of a group dedicated to seizing the opportunities created by and mitigating the potential harms of technology, and to understanding its impact on national security, global stability, and trust between industry, the government, and the public.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Department's decision to designate American artificial intelligence company Anthropic PBC a supply chain risk under 10 U.S.C § 3252 is a clear misuse of an authority designed to protect government systems from genuine threats to national security. It is a reactive gesture that threatens to upend the stability of the government's relationship with its private sector partners—a stability on which American military and economic power depend. The consequences for the strength and credibility of the government are far-reaching, as the designation risks driving away the companies who provide technological capabilities critical to the functioning of a modern military and, through its punitive reach, undermining the American advantage in the race to develop the world's best AI models.

Section 3252 is a substantial authority that should be used sparingly, and only to protect the country against real and serious risks to the integrity of government systems. It has never been used against an American company—and certainly never so publicly, and with such an expansive and detrimental impact on a vital national industry and on the American economy writ large. The government has never designated a company a supply chain risk—such that working with it would purportedly render an agency vulnerable to penetration by foreign and hostile entities—and nevertheless continued to explore working with and potentially even using its top-of-the-line technology. But here, the government, including the Department, continues to work with Anthropic to expand its use of

Anthropic's most important new model, Claude Mythos Preview ("Mythos"). The government seeks to benefit from Anthropic's active collaboration by using Mythos, while simultaneously trying to leverage Anthropic into betraying its commercial interests and values through the section 3252 designation. But section 3252 cannot bear the weight of that dissonance.

The designation will let China pull ahead in the AI race and make the military seem less trustworthy to its contracting partners—both of which will make the country less safe. Because that is not what Congress intended, and not how former Secretaries have conceived of the Department's exceptional statutory authorities, the Court should grant Anthropic's Petition for Review and enjoin the government's section 3252 designation.

## ARGUMENT

When the Department designated Anthropic a supply chain risk, its justification was pretextual. There is and was no evidence that the company poses any legitimate national security risk to government systems, and the government's own statements suggest that the decision was motivated by a desire to punish the company for staking out a contractual position at odds with the Department's own preferences. The government's true assessment of Anthropic's technology is laid bare by the government and the Department's own ongoing use of Anthropic's latest and most cutting-edge model, Mythos. Far from protecting U.S. national security, this pretextual designation threatens it in at least three ways: first, by eroding the credibility of the Department when trust in the institution could not be more critical; second, by denying the Department access to cutting-edge technology and thereby rendering it less effective in its mission; and third, by undercutting the country's AI ecosystem and ceding technological leadership to China at a defining moment in geopolitical competition.

## I. THE DEPARTMENT'S SUPPLY CHAIN RISK DESIGNATION WAS UNJUSTIFIED AND UNDERMINES ITS CREDIBILITY.

10 U.S.C. § 3252 grants the Secretary of War the power to take certain procurement actions to designate a source a "supply chain risk" if it may "sabotage, maliciously introduce unwanted function, or otherwise subvert" a national security system. 10 U.S.C. § 3252(d)(4). Anthropic posed no such risk, yet the Department invoked this harsh sanction to cripple the company, seemingly out of ideological animus. Such a pretextual designation, particularly where the government's continuing use

- 3 -

of Mythos is in tension with its stated views, has far-reaching effects for the Department's integrity, undermining public trust and making it harder for the nation's Armed Forces to do their job.

### A. THE DEPARTMENT'S DESIGNATION OF ANTHROPIC WAS PRETEXTUAL, AND FAR EXCEEDED WHAT WAS NECESSARY TO ADDRESS THE SUPPOSED THREAT.

The Department's decision to target Anthropic was not motivated by concern about a legitimate supply chain risk. Until negotiations broke down between the Department and Anthropic, the Department appeared to be highly satisfied with both the company and its AI model, Claude. The government consistently granted Anthropic top-level security clearances and authorizations to support sensitive national security projects, as this Court has already recognized. *See* Order Granting Motion for Preliminary Injunction, ECF No. 134 at 5 (concluding that "The unrebutted record shows that, until this dispute, Anthropic 'only ever received positive feedback about Claude's performance from [its] governmental customers.'") (internal cited authorities omitted) (alteration in original). Even in the wake of the supply chain risk designation, public reporting suggests the government continues to expand, rather than wind down, its use of Anthropic's AI models. *See, e.g.*, Mike Stone et al., *Hegseth Wants Pentagon to Dump Anthropic's Claude, But Military Users Say It's Not So Easy*, Reuters (Mar. 19, 2026), https://www.reuters.com/business/hegseth-wants-pentagon-dump-anthropics-claude-military-users-say-its-not-so-easy-2026-03-19/. The Pentagon is apparently deploying a powerful new version of Claude, called Mythos, to find and patch cybersecurity vulnerabilities across the federal government. *See* Mike Stone, *Pentagon Deploys Anthropic's Mythos to Patch Cyber Gaps While Planning to Ditch Firm*, Reuters (May 12, 2026), https://www.reuters.com/technology/pentagon-deploys-anthropics-mythos-patch-cyber-gaps-while-planning-ditch-firm-2026-05-12/. Similarly, the NSA is apparently embedding Anthropic's engineers in the agency to assist in guiding its use of Mythos. *See* Cristina Criddle & Demetri Sevastopulo, *US National Security Agency Using Anthropic's Mythos for Cyber Attacks*, Fin. Times (June 4, 2026), https://www.ft.com/content/d02d91b3-2636-454e-9442-dc7e69f51815?syn-25a6b1a6=1. This is not the behavior expected of a government facing a national

security threat so grave it felt compelled to ban all departments and agencies from working with the company.[3]

The novel designation also contravenes the statute. In a report discussing the threat of supply chain risks to the Department of Defense as part of the National Defense Authorization Act for Fiscal Year 2011, which laid the groundwork for the provision now codified at 10 U.S.C. § 3252, Congress noted that "the globalization of the information technology industry has increased the vulnerability of the Department of Defense (DOD) to attacks on its systems and networks." S. Rep. No. 111-201, at 162 (2010). Congress was particularly worried about the "increasing risk that systems and networks critical to DOD could be exploited through the introduction of counterfeit or malicious code and other defects introduced by suppliers of systems or components," and concluded that the Secretary of Defense "should have the authority needed to address this risk." *Id.* Indeed, the Department's own instructions acknowledge that the focus of the provision is "sabotage" or "subversion" by "foreign intelligence, terrorists, or other hostile elements." Dep't of Def., Instr. 5200.44, Protection of Mission Critical Functions to Achieve Trusted Sys. and Networks (TSN), § 1(a) (Nov. 5, 2012). Here, there is no indication of *any* risk that Anthropic has enabled or could enable "foreign intelligence, terrorists, or other hostile elements" to gain access to and "sabotage" or "subver[t]" Department systems and networks, through "malicious code" or otherwise. *Id.* The government has neither asserted that Anthropic is controlled by a foreign adversary or hostile element, nor has it publicly disclosed any evidence that the company's products are otherwise compromised by foreign control or espionage activities. Further, there is no indication that Anthropic's products – including its AI models – are

---

[3] Indeed, Anthropic's new models are apparently so powerful that the Department of Commerce very recently ordered that Anthropic suspend access to Mythos and another of its AI models still in development, Fable 5, by any foreign national. *See Statement on the US Government Directive to Suspend Access to Fable 5 and Mythos 5*, Anthropic (June 12, 2026), https://www.anthropic.com/news/fable-mythos-access. According to the White House's AI advisor, their concerns about Mythos had nothing to do with the Department of War's supply chain risk designation. *See* Anisha Sircar, *Anthropic Disabled Fable 5 and Mythos 5 After a U.S. Export-Control Order. Here's What Happened*, Forbes (June 16, 2026), https://www.forbes.com/sites/anishasircar/2026/06/16/anthropic-disabled-fable-5-and-mythos-5-after-a-us-export-control-order-heres-what-happened/.

BRIEF OF AMICI CURIAE FORMER SECRETARY OF DEFENSE LEON PANETTA AND THE INSTITUTE FOR SECURITY AND TECHNOLOGY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:26-CV-01996

somehow uniquely vulnerable to espionage activities. If the Pentagon truly believed they were, it would not be deploying one of the company's most advanced AI models to patch its own cyber vulnerabilities.

The unprecedented public statements accompanying the designation reveal its true motivation: animus toward Anthropic, and a desire to retaliate against the company for disagreeing with the government about the operational use of its technology. *See*, *e.g.*, Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 27, 2026), https://truthsocial.com/@realDonaldTrump/posts/116144552969293195 (excoriating Anthropic as a "RADICAL LEFT, WOKE COMPANY" filled with "Leftwing nut jobs"); Pete Hegseth (@SecWar), X (Feb. 27, 2026), https://x.com/SecWar/status/2027507717469049070 (accusing Anthropic of "attempt[ing] to strong-arm the United States military into submission—a cowardly act of virtue-signaling that places Silicon Valley ideology above American lives"). For this alleged "betrayal," *see* Pete Hegseth (@SecWar), X Post, the Department escalated a straightforward contract dispute into a dangerous accusation that the contracting party posed a threat to national security.

The Department's reaction was not only unjustified but also wildly disproportionate. The Department bypassed without considering—as required by statutory directive and by general prudence—the many ordinary tools the government has at its disposal to terminate or cabin its relationships with contractors. For instance, the government can terminate a contract for convenience when it is in its interest. *See* 48 C.F.R. §§ 49.101(b), 52.249-1–52.249-6. It can terminate a contract for cause in case of breach. *See id*. §§ 49.402-3, 52.212-4(m). It can direct changes "at any time" to the general scope of a contract, including the manner, method, or performance of the work, *id*. § 52.243-4, or suspend work on a contract, including to realign with its programs, *id*. §§ 42.1303, 52.242-15. It can also decline to award a contract based on a determination that a contractor or subcontractor is not responsible, *id*. §§ 9.103, 9.104-1(d), 9.104-4, and in more extreme cases can debar or suspend a contractor if in the public interest and with appropriate procedural safeguards, *id*. § 9.402(b). These are just a few of the many more proportionate authorities the Department can and routinely does leverage to bring an end to a current or potential future relationship with a contractor it deems untrustworthy or otherwise problematic—all of which stop far short of the extraordinary remedy deployed here.

The Department regularly utilizes the tools available to it to shape or limit its relationships with contractors, including when it deems a restriction on a contracted good or service to be at odds with its mission. Across every service branch, and for reasons as varied as cost overruns, shifting strategic priorities, technological overambition, or other performance failures, the Department has terminated contracts, or declined to exercise options under them, or deemed a contractor no longer responsible enough to work with the government. For example, in 2025, Secretary Hegseth announced over $5 billion in cancelled contracts, including nearly $2 billion in cuts at the Defense Health Agency to contracts held by consulting firms, as part of a DOGE-driven effort to reduce overall spending at the Department.[4] Sometimes, when priorities shift, it costs the Department less to terminate a major weapons systems contract than to complete it, even when a settlement must then be paid to a contractor.[5] On occasion, the Department will cancel high-dollar-value technology contracts if they "no longer [meet] the requirements to fill the D.O.D.'s capability gaps"—another way of framing the Department's stated objections to Anthropic.[6]

Moreover, the government's power over procurement has long been recognized by the Supreme Court. *See Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940) ("Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases."); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1292 n.5 (11th Cir. 2022) (observing that *Perkins*' "propositions. . . hold true"). If the government is unhappy with a contractor, it can cease buying goods or services from them—and, as noted, it has a number of less-extreme statutory levers it can pull to achieve its aims. Here, the Department could simply have decided not to contract further

---

[4] Nick Wakeman, *Pentagon Hits Accenture, Booz Allen and Deloitte with Contract Cancellations*, Wash. Tech. (Apr. 11, 2025), https://www. washingtontechnology.com/contracts/2025/04/pentagon-hits-accenture-booz-allen-and-deloitte-contract-cancellations/404500/. A separate $1.4 billion reselling contract for Air Force enterprise cloud IT services was terminated around this time.

[5] Robert Brodsky, *GAO: Major Defense Contracts Cheaper to Cancel Than Continue*, Gov't Exec. (Mar. 19, 2008), https://www.govexec.com/defense/2008/03/gao-major-defense-contracts-cheaper-to-cancel-than-continue/26527.

[6] Kate Conger & David E. Sanger, *Pentagon Cancels a Disputed $10 Billion Technology Contract*, N.Y. Times (July 6, 2021), https://www.nytimes.com/2021/07/06/technology/JEDI-contract-cancelled.html.

BRIEF OF AMICI CURIAE FORMER SECRETARY OF DEFENSE LEON PANETTA AND THE INSTITUTE FOR SECURITY AND TECHNOLOGY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:26-CV-01996

with Anthropic, deeming the restrictions it imposed on its AI model no longer in the interests of the U.S. military. That is how the break-up of this kind of contractual relationship generally unfolds; the Department can't make a company change its product or its values, but it can decide, with few restrictions, that company or its product isn't right for the military.

Yet not a single less drastic measure appears to have been considered and deemed insufficient in this case, notwithstanding the unambiguous statutory mandate to determine whether "less intrusive measures" are "reasonably available," 10 U.S.C. § 3252(b)(2)(B). That statutory language imposes a procedural and substantive safeguard against improper use of this weighty authority. As a procedural matter, the government must indicate, in some fashion, that it has considered less restrictive means—and no such indication exists here. As a substantive matter, that language unmistakably directs the Department to designate supply chain risks under this authority sparingly, judiciously, and only when absolutely necessary for reasons of national security—not for punitive reasons or to achieve, more dramatically, what it could already have achieved through the exercise of its standard procurement authorities.

The use of this designation under these circumstances, without considering any lesser alternatives, was extreme. In an ironic twist, however, the Pentagon's reported use of Mythos suggests Anthropic's technology may be too useful for the government to stay away for long. *See* Jake Bleiberg & Margi Murphy, *White House Moves to Give US Agencies Anthropic Mythos Access*, Bloomberg (Apr. 16, 2026), https://www.bloomberg.com/news/articles/2026-04-16/white-house-moves-to-give-us-agencies-anthropic-mythos-access. The government's continued interest in and use of Claude is all the more evidence that the supply-chain designation of Anthropic was pretextual. That it was not driven by any legitimate statutory considerations is obvious.

## B. PRETEXTUAL USE OF THIS SIGNIFICANT AUTHORITY UNDERMINES THE CREDIBILITY OF THE DEPARTMENT WITH INDUSTRY AND THE PUBLIC.

The credibility of the Department and our Armed Forces depends on political neutrality and commitment to the rule of law. *See Greer v. Spock*, 424 U.S. 828, 839 (1976) (discussing the "American constitutional tradition of a politically neutral military establishment under civilian control"); *To*

*Support and Defend: Principles of Civilian Control and Best Practices of Civil-Military Relations*, War on the Rocks, para. 15 (Sept. 6, 2022) (open letter signed by Secretary Panetta) ("Military and civilian leaders must be diligent about keeping the military separate from partisan political activity."). If the Department takes significant action that falls outside the bounds of the authority conferred by Congress—particularly where, as here, its decisions appear motivated by political retribution or animus—it risks upending public trust in the military and the decisions of its civilian leaders.

By undermining that critical trust, this supply chain risk designation could undermine America's military supremacy and damage its ability to do its job. First, retaliatory and vindictive actions by Department leaders that appear to be motivated by partisan political disagreements undermine the public's trust and confidence in the Pentagon's civilian leaders and in the military as an institution. Public trust in the military is the foundation upon which any military action derives legitimacy. The fallout from the Anthropic designation will make the public less likely to trust the Department and the military overall, which will have ripple effects for recruitment and for Department morale.[7] This is particularly concerning at present, since public confidence in the institution is already fragile; less than 50% of Americans currently report a great deal of confidence in the military, down 21 points from 2018. *See* 2025 Reagan National Defense Survey, Ronald Reagan Inst. at 5 (Nov. 2025), https://www.reaganfoundation.org/reagan-institute/centers/peace-through-strength/survey/2025-reagan-national-defense-survey.

Second, a pretextual supply chain risk designation undermines the public's confidence in all future supply chain risk designations. This, in turn, undermines the very national security interests that section 3252 was designed to protect. If the government's supply chain designations are viewed as suspect, private citizens and businesses may not follow the government's lead in severing their personal and commercial connections to the companies and technologies that pose legitimate supply chain risks,

---

[7] *Cf.* David Montgomery, *Many Americans Think AI Companies Should Be Able to Limit How The U.S. Military Uses Their Tools*, YouGov (Mar. 10, 2026), https://yougov.com/en-us/articles/54285-many-americans-think-ai-companies-should-be-able-to-limit-how-us-military-uses-tools-march-6-9-2026-economist-yougov-poll (reporting on poll results finding that "Americans are more likely to say that AI companies should be able to restrict how their AI tools are used by the military than that the military should be able to use AI tools any way it wants (44% vs. 25%)").

BRIEF OF AMICI CURIAE FORMER SECRETARY OF DEFENSE LEON PANETTA AND THE INSTITUTE FOR SECURITY AND TECHNOLOGY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:26-CV-01996

exposing industry and the public to threats from malicious actors and hostile foreign powers. For example, the Cybersecurity & Infrastructure Security Agency ("CISA"), which has warned about cyber and physical threats from hostile nation-states and nation-state sponsored entities, relies on partnerships with "critical infrastructure owners and operators nationwide." *Nation State Threats*, CISA, https://www.cisa.gov/topics/cyber-threats-and-advisories/nation-state-cyber-actors. CISA has explained that "it is critical to the nation's safety and security that critical infrastructure owners and operators prepare for and adapt to changing conditions." *Id.* But if private operators do not trust the government's national security recommendations, they may not follow those recommendations in the future, leaving critical infrastructure vulnerable to hostile foreign actors.

Third, public companies that work with the military must have confidence that the government will be a reliable and trustworthy partner that adheres to the governing legal and regulatory frameworks when they enter into contracts with federal agencies. Unpredictability is bad for business. This is especially true for companies that develop emerging technologies, who may now hesitate before partnering with the federal government—and the military in particular—given the possibility that unforeseen disputes about technology use could drive the Department to impose crippling sanctions. The supply chain risk designation could, as a result, hinder the government's ability to work with a range of different companies across different sectors, many of whom are key partners of agencies in helping them achieve their missions.

Fourth, and relatedly, the government could lose access to critical technologies. In early March, the Information Technology Industry Council, a technology industry group whose members include Nvidia, Amazon, and Apple, expressed exactly these concerns to Secretary Hegseth, lamenting that misuse of supply-chain designation authorities could "undermine the government's access to the best-in-class products and services from American companies that serve all agencies and components of the federal government."[8] The Department could find itself cut off from the most capable AI systems precisely as such systems become most consequential to military operations. It is no surprise, then, that

---

[8] *See* Karen Freifeld, *Big Tech Group Tells Pentagon's Hegseth They Are 'Concerned' About Anthropic Supply-Chain Risk Designation*, Reuters (Mar. 4, 2026), https://www.reuters.com/business/retail-consumer/big-tech-group-tells-pentagons-hegseth-they-are-concerned-about-declaring-2026-03-04.

BRIEF OF AMICI CURIAE FORMER SECRETARY OF DEFENSE LEON PANETTA AND THE INSTITUTE FOR SECURITY AND TECHNOLOGY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:26-CV-01996

public reporting confirms that "Pentagon staffers, former officials and IT contractors who work closely with the U.S. military say they are reluctant to give up Anthropic's AI tools, which they view as superior to alternatives." Mike Stone et al., *Hegseth Wants Pentagon to Dump Anthropic's Claude, But Military Users Say It's Not So Easy*, Reuters (Mar. 19, 2026), https://www.reuters.com/business/hegseth-wants-pentagon-dump-anthropics-claude-military-users-say-its-not-so-easy-2026-03-19/.

The military maintains its technological supremacy through partnerships with America's businesses that enable it to leverage American ingenuity and technological innovation. Undermining this trust and the partnerships that rely on it jeopardizes America's national security by cutting off military personnel from critical technologies and the companies supplying and developing those technologies.

This is all the more damaging as powerful new AI systems emerge with significant national security applications. Anthropic's new model, Mythos, is reportedly able to identify and exploit and also patch zero-day cybersecurity vulnerabilities in major operating systems and web browsers, making it a uniquely valuable tool for national defense. *See* Nicholas Carlini et al., *Assessing Claude Mythos Preview's Cybersecurity Capabilities*, Anthropic Red Team (Apr. 7, 2026), https://red.anthropic.com/2026/mythos-preview/; *see also Our Evaluation of Claude Mythos Preview's Cyber Capabilities*, UK AI Sec. Inst.: Blog (Apr. 13, 2026), https://www.aisi.gov.uk/blog/our-evaluation-of-claude-mythos-previews-cyber-capabilities. As of late May 2026, Anthropic and roughly 50 partners have used Mythos to "find more than ten thousand high- or critical-severity vulnerabilities across the most systemically important software in the world." *Project Glasswing: An Initial Update*, Anthropic (May 22, 2026), https://www.anthropic.com/research/glasswing-initial-update. The supply chain designation of Anthropic threatens to make it difficult for the government to take full advantage of this new model to address its vulnerabilities at a sensitive moment for national defense. What's more, critical infrastructure providers who also contract with the government are highly likely to be reluctant to engage with Anthropic to test Mythos's capabilities, over fears that association with the company will damage their competitiveness for future contracts with the federal government. The Department's actions are therefore actively preventing critical infrastructure owners and operators, including in the

- 11 -

military, from strengthening their cyber defenses through the development and deployment of Mythos—thereby undermining the credibility and safety of government systems at a time when the United States is actively engaged in hostilities with a foreign nation and other non-state actors.

## II. IMPROPER DESIGNATION OF ANTHROPIC AS A SUPPLY CHAIN RISK THREATENS THE U.S.'S MILITARY AND ECONOMIC ADVANTAGE AT A PIVOTAL MOMENT IN U.S.–CHINA TECHNOLOGICAL COMPETITION.

The United States is engaged in a high-stakes AI competition with China, the outcome of which will have profound consequences for American military and economic strength. The nation that leads in AI will also gain substantial advantages on the battlefield, as "frontier AI" systems—the most cutting-edge AI models—are increasingly capable of accelerating intelligence collection and analysis, supporting weapons development, and conducting offensive and defensive cyber operations. Mythos provides a case in point: The UK AI Security Institute, a leading British government institution dedicated to evaluating the safety and security of advanced AI models, performed an independent evaluation of Mythos's cyber capabilities and found that it was able to "execute multi-stage attacks on vulnerable networks and discover and exploit vulnerabilities autonomously." *Our Evaluation of Claude Mythos Preview's Cyber Capabilities*, UK AI Sec. Inst.: Blog (Apr. 13, 2026), https://www.aisi.gov.uk/blog/our-evaluation-of-claude-mythos-previews-cyber-capabilities. The U.S. military has already reportedly used earlier Claude models to plan and execute sensitive military operations. In the hands of U.S. adversaries, such capabilities present a frightening proposition. Beyond military advantages, the winner of the AI race may also benefit from significant gains in economic productivity and related GDP growth.

China understands the stakes and has invested accordingly. *See* Kyle Chan et al., *Full Stack: China's Evolving Industrial Policy for AI*, RAND (June 26, 2025) (noting that "China wants to become the global leader in artificial intelligence (AI) by 2030" and is "deploying industrial policy tools across the full AI technology stack, from chips to applications," to achieve that goal). Although the United States remains ahead in technical capabilities, Beijing is catching up. For the past few years, Chinese AI models have been just half a year behind the top U.S. models on average. *See* Luke Emberson, *Chinese AI Models Have Lagged the US Frontier by 7 Months on Average Since 2023*, Epoch AI (Jan.

- 12 -

2, 2026).  A Chinese lead in frontier AI would give Beijing a decisive advantage in military planning, cyber operations, and intelligence analysis at precisely the moment those capabilities are becoming most consequential.

The United States cannot outcompete China by playing by Beijing's rules.  Washington's advantage comes not from out-spending or out-planning Beijing, but from maintaining a flourishing private sector, governed by stable and predictable rules, that drive technological innovation at scale.  *See* Fatima Faisal Khan, *The Missing Middle*, Inst. for Sec. + Tech. at 32-33 (Oct. 2025) (the United States maintains "clear leadership in artificial intelligence" because "[t]ransparent governance attracts the global capital that China's opacity repels").  China has enduring strengths in AI talent and energy infrastructure, and is pouring resources into its AI ecosystem. What China cannot replicate, however, is the stability of the relationship in the United States between the public and private sectors, which allows companies to innovate, commercialize, and grow without fear of interference or reprisal.  *See* Scott Singer & Matt Sheehan, *China's AI Policy at the Crossroads: Balancing Development and Control in the DeepSeek Era*, Carnegie Endowment for Int'l Peace (July 17, 2025) (noting that China has exercised strict control over its AI sector by "systematically reassert[ing] its power over China's leading technology companies through antitrust investigations, stricter regulations, record-breaking fines, and, in some cases, the acquisition of board seats by state entities").  This stability and predictability is why the world's leading frontier AI models—including Anthropic's Claude—are American.  It is also why American AI systems are the technology of choice for allied governments and global companies.  The relationship between the Department and the private sector is not only vital to ensuring that American AI development outpaces Chinese AI development; it is also key to translating private-sector innovations into economic and battlefield advantages.

Moreover, when the Department deploys its substantial authorities to punish a leading technology company, it signals that doing business in the United States is risky, and that frontier AI labs should take their business elsewhere.  And, at the same time, the designation could accelerate efforts by foreign countries to diversify away from American AI, weakening the country's AI ecosystem on which its modern-day military and economic dominance depend.  If it appears that Silicon Valley is at the

BRIEF OF AMICI CURIAE FORMER SECRETARY OF DEFENSE LEON PANETTA AND THE INSTITUTE FOR SECURITY AND TECHNOLOGY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:26-CV-01996

mercy of the U.S. government, it may create an environment in which foreign countries are more likely to adopt Chinese AI or build their own sovereign capabilities—an outcome that would run directly counter to U.S. national security interests. *See*, *e.g.*, Pablo Chavez, *The Sovereignty Gap in U.S. AI Statecraft*, Lawfare (Feb. 16, 2026), https://www.lawfaremedia.org/article/the-sovereignty-gap-in-u.s.-ai-statecraft; Dean Ball, *Clawed*, Hyperdimensional (Mar. 2, 2026), https://www.hyperdimensional.co/p/clawed. The Department's supply chain risk designation of Anthropic is a live demonstration of what foreign AI purchasers fear: that reliance on American AI exposes them to the shifting and mercurial impulses of the U.S. Executive Branch.

Much damage has already been done. If Anthropic's designation as a supply chain risk is not reversed, it is likely that Washington will come to regret its self-harm in the most important geopolitical competition of our age.

## CONCLUSION

For the foregoing reasons, the Court should grant Anthropic's Motion for Summary Judgement.

DATED:  June 26, 2026

**s/Todd C. Toral**

TODD C. TORAL
MATTHEW KLAPPER*
JENNER & BLOCK LLP
*Counsel for Amici Curiae Leon Panetta and the Institute for Security and Technology*

*Pro hac vice forthcoming.*
E-mail:   TToral@jenner.com
MKlapper@jenner.com

*Counsel for Amici Curiae Leon Panetta and the Institute for Security and Technology*

- 14 -