MICHAEL J. MONGAN (SBN 250374)
michael.mongan@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
Telephone: (628) 235-1000

EMILY BARNET (*pro hac vice*)
emily.barnet@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Plaintiff Anthropic PBC*

KELLY P. DUNBAR (*pro hac vice*)
kelly.dunbar@wilmerhale.com
JOSHUA A. GELTZER (*pro hac vice*)
joshua.geltzer@wilmerhale.com
KEVIN M. LAMB (*pro hac vice*)
kevin.lamb@wilmerhale.com
SUSAN HENNESSEY (*pro hac vice*)
susan.hennessey@wilmerhale.com
LAUREN MOXLEY BEATTY (SBN 308333)
lauren.beatty@wilmerhale.com
MATTHEW E. MORRIS (*pro hac vice*)
matt.morris@wilmerhale.com
BARDIA VASEGHI (*pro hac vice*)
bardia.vaseghi@wilmerhale.com
DAKOTA C. FOSTER (*pro hac vice*)
dakota.foster@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ANTHROPIC PBC,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF WAR, et al.,<br><br>Defendants. | Case No. 3:26-cv-01996-RFL<br><br>**ANTHROPIC PBC'S OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: Hon. Rita F. Lin<br><br>Hearing Date: July 30, 2026<br>Time: 10:00 a.m. PT |

Case No. 26-cv-01996-RFL

PLAINTIFF'S OPPOSITION TO DEFENDANTS' CROSS-MOTION
FOR SUMMARY JUDGMENT AND REPLY
ISO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

ARGUMENT..................................................................................................................................1

    I.     Anthropic Is Entitled To Summary Judgment On Its First
        Amendment Claim ....................................................................................................1

        A.    The Undisputed Facts Establish A Prima Facie Case Of Retaliation...........2

        B.    Defendants Cannot Rebut Anthropic's Prima Facie Showing
              Of Retaliation................................................................................................6

        C.    *Pickering* Does Not Apply And Anthropic Is Entitled
              To Summary Judgment Even If It Does........................................................7

    II.    Secretary Hegseth's Actions Violate The APA .........................................................9

        A.    The Secretary's February 27 Directive Is Final And
              Unlawful Agency Action................................................................................9

        B.    The March Determination Is Independently Unlawful ..............................11

    III.    The Challenged Actions Violate Due Process ..........................................................18

        A.    Defendants Deprived Anthropic Of Protected
              Liberty And Property Interests....................................................................18

        B.    Anthropic Did Not Receive Sufficient Process...........................................20

    IV.    The Presidential Directive Violates The Separation Of Powers ............................22

    V.    Defendants Violated 5 U.S.C. § 558(b) ..................................................................22

    VI.    The Court Should Vacate The Challenged Actions And Enjoin
        Their Enforcement ..................................................................................................23

CONCLUSION.............................................................................................................................25

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Al Haramain Islamic Foundation v. Department of Treasury*,
    686 F.3d 965 (9th Cir. 2012) ......................................................................................19, 20

*Alpha Energy Savers, Inc. v. Hansen*,
    381 F.3d 917 (9th Cir. 2004) ..........................................................................................4, 8, 9

*American Federation of Government Employees v. Trump*,
    167 F.4th 1247 (9th Cir. 2026) ...........................................................................................6

*Arizona Dream Act Coalition v. Brewer*,
    855 F.3d 957 (9th Cir. 2017) ..............................................................................................24

*Barry v. Barchi*,
    443 U.S. 55 (1979)...............................................................................................................21

*Board of County Commissioners v. Umbehr*,
    518 U.S. 668 (1996)............................................................................................................7, 8

*Burlington Truck Lines Inc. v. United States*,
    371 U.S. 156 (1962)............................................................................................................16

*California ex rel. Becerra v. U.S. Dep't of Interior*,
    381 F. Supp. 3d 1153 (N.D. Cal. 2019) ............................................................................24

*California Communities Against Toxics v. EPA*,
    688 F.3d 989 (9th Cir. 2012) .............................................................................................23

*California Wilderness Coalition v. U.S. Dep't of Energy*,
    631 F.3d 1072 (9th Cir. 2011) ...........................................................................................12, 13

*CarePartners, LLC v. Lashway*,
    545 F.3d 867 (9th Cir. 2008) .............................................................................................6, 8

*Center for Biological Diversity v. Haaland*,
    58 F.4th 412 (9th Cir. 2023) ..............................................................................................10

*City & County of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ...........................................................................................22

*Cleveland Board of Education v. Loudermill*,
    470 U.S. 532 (1985).............................................................................................................21

*Conner v. City of Santa Ana*,
    897 F.2d 1487 (9th Cir. 1990) ...........................................................................................20

*Coszalter v. City of Salem*,
  320 F.3d 968 (9th Cir. 2003) ...................................................................................5

*Damiano v. Grants Pass School District No. 7*,
  140 F.4th 1117 (9th Cir. 2025) ...............................................................................8

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019)................................................................................................17

*California v. DHS*,
  612 F. Supp. 3d 875 (N.D. Cal. 2020) ....................................................................5

*Dixon v. Love*,
  431 U.S. 105 (1977)................................................................................................21

*Engquist v. Oregon Dep't of Agriculture*,
  553 U.S. 591 (2008)................................................................................................8

*Fikre v. FBI*,
  35 F.4th 762 (9th Cir. 2022) ...................................................................................19

*Flue-Cured Tobacco Cooperative Stabilization Corp. v. EPA*,
  313 F.3d 852 (4th Cir. 2002) ..................................................................................10

*Garza v. Woods*,
  150 F.4th 1118 (9th Cir. 2025) ...............................................................................20

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service*,
  378 F.3d 1059 (9th Cir. 2004) ................................................................................12

*Gilbert v. Homar*,
  520 U.S. 924 (1997)................................................................................................21

*Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*,
  736 F.3d 1239 (9th Cir. 2013) ................................................................................24

*Hernandez v. City of Phoenix*,
  43 F.4th 966 (9th Cir. 2022) ...................................................................................8

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) ..................................................................................24

*Industrial Customers of N.W. Utilities v. Bonneville Power Administration*,
  408 F.3d 638 (9th Cir. 2005) ..................................................................................10

*Industrial Safety Equipment Ass'n, Inc. v. EPA*,
  837 F.2d 1115 (D.C. Cir. 1988)..............................................................................10

*Janus v. American Fed'n of State, County, & Municipal Employees, Council 31*,
  585 U.S. 878 (2018)................................................................................................3

*Johnson v. Multnomah County, Oregon*,
    48 F.3d 420 (9th Cir. 1995) ......................................................................................................9

*King v. Burwell*,
    576 U.S. 473 (2015)..................................................................................................................14

*Klamath-Siskiyou Wildlands Ctr. v. National Oceanic & Atmospheric Admin.*,
    109 F. Supp. 3d 1238 (N.D. Cal. 2015) ...............................................................................23, 24

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..................................................................................................................13

*Lynch v. United States*,
    292 U.S. 571 (1934)..................................................................................................................19

*Mendocino Environmental Center v. Mendocino County*,
    192 F.3d 1283 (9th Cir. 1999) .................................................................................................24

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.*,
    463 U.S. 29 (1983)....................................................................................................................12

*National Council of Resistance of Iran v. Dep't of State*,
    251 F.3d 192 (D.C. Cir. 2001) .................................................................................................20

*Nicopure Labs, LLC v. FDA*,
    944 F.3d 267 (D.C. Cir. 2019) ...................................................................................................3

*Parsons v. U.S. Department of Justice*,
    878 F.3d 162 (6th Cir. 2017) ...................................................................................................10

*Payne v. Norwest Corp.*,
    113 F.3d 1079 (9th Cir. 1997) .................................................................................................16

*Perkins v. Lukens Steel Co.*,
    310 U.S. 113 (1940)...............................................................................................................3, 22

*Pickering v. Board of Education*,
    391 U.S. 563 (1968)....................................................................................................................7

*Pollinator Stewardship Council v. EPA*,
    806 F.3d 520 (9th Cir. 2015) ...................................................................................................24

*Ralls Corp. v. CFIUS*,
    758 F.3d 296 (D.C. Cir. 2014)..............................................................................................19, 20

*Reliable Automatic Sprinkler Co. v. CPSC*,
    324 F.3d 726 (D.C. Cir. 2003).................................................................................................10

*Riley's American Heritage Farms v. Elsasser*,
    32 F.4th 707 (9th Cir. 2022) ..........................................................................................7, 8, 9, 24

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
    547 U.S. 47 (2006)............................................................................................................3

*San Francisco Herring Ass'n v. Dep't of Interior*,
    946 F.3d 564 (9th Cir. 2019) ...........................................................................................9

*Estate of Shapiro v. United States*,
    634 F.3d 1055 (9th Cir. 2011) ...............................................................................2, 11, 22

*Sierra Club v. Trump*,
    929 F.3d 670 (9th Cir. 2019) ........................................................................................5, 22

*Snyder v. Phelps*,
    562 U.S. 443 (2011).........................................................................................................2

*Nebraska v. Su*,
    121 F.4th 1 (9th Cir. 2024) .............................................................................................22

*Trifax Corp. v. District of Columbia*,
    314 F.3d 641 (D.C. Cir. 2003).....................................................................................18, 19

*Ukiah Valley Medical Center v. FTC*,
    911 F.2d 261 (9th Cir. 1990) ..........................................................................................10

*United Mine Workers of America v. Pennington*,
    381 U.S. 657 (1965).........................................................................................................4

*United States v. O'Brien*,
    391 U.S. 367 (1968).........................................................................................................3

*Wisconsin v. Constantineau*,
    400 U.S. 433 (1971)........................................................................................................19

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)........................................................................................................22

**STATUTES, RULES AND REGULATIONS**

5 U.S.C. § 551.......................................................................................................................23

5 U.S.C. § 558.................................................................................................................22, 23

10 U.S.C. § 3252................................................................................................... *passim*

48 C.F.R. § 239.7304.......................................................................................................11, 13

**OTHER AUTHORITIES**

S. Rep. No. 111-201 (2010)..................................................................................................14

**INTRODUCTION**

Everyone agrees that the government may decide it no longer wishes to use Anthropic's AI models—whether because Anthropic declines to accept a contract term that the government proposes, or the government sours on the relationship after spirited contract negotiations. The Department of War and other agencies may lawfully use procurement authorities to wind down contracts and decline to procure services from Anthropic in the future. *See* Dkt. 134 ("Op.") at 1. But the government's asserted "loss of trust in a contractor," Dkt. 214 ("U.S. Br.") at 1, is not a license for it to violate the First Amendment, the Due Process Clause, or the Administrative Procedure Act.

Defendants oppose Anthropic's motion for summary judgment and cross-move for summary judgment in their favor. But they largely ignore the reasoning of this Court when it held that Anthropic was likely to succeed on the merits just a few months ago. And while the pending motions are subject to a different legal standard from the prior motion for a preliminary injunction, Defendants do not seriously attempt to establish that there are genuine disputes as to material facts. Instead, Defendants contend that Anthropic's claims fail as a matter of law. They are wrong.

The undisputed facts show that Defendants mounted a campaign of retaliation against Anthropic for its protected expression, in violation of the First Amendment. As part of that campaign, the Secretary of War imposed an unprecedented supply chain risk designation on Anthropic under 10 U.S.C. § 3252—without observing the statute's procedural requirements, without conforming to the substantive limits on his authority, and without providing any explanation that survives the APA's requirement for reasoned decisionmaking. And none of Defendants' punitive actions was preceded by notice and an opportunity to be heard, as required by the Due Process Clause. The Court should enter summary judgment in favor of Anthropic.

**ARGUMENT**

**I.    Anthropic Is Entitled To Summary Judgment On Its First Amendment Claim**

After reviewing the President's and Secretary Hegseth's February 27 Directives, as well as the Secretary's later determination dated March 3 (the "March Determination"), this Court correctly observed that Defendants were "[p]unishing Anthropic for bringing public scrutiny to the government's contracting position" and described this as a "classic" case of "illegal First

Amendment retaliation." Op. 2. The material facts surrounding those Challenged Actions are unchanged and undisputed. Defendants instead argue that the claim fails as a matter of law. U.S. Br. 8. But their legal arguments under the standard First Amendment retaliation framework are unpersuasive. And their belated attempt to invoke the *Pickering* framework fails as well.

### A. The Undisputed Facts Establish A Prima Facie Case Of Retaliation

Defendants have never disputed that the Challenged Actions would chill a person of ordinary firmness, *see* U.S. Br. 8-12; Op. 21, and therefore concede the point, *see Estate of Shapiro v. United States*, 634 F.3d 1055, 1060 (9th Cir. 2011). They instead contend that (1) Anthropic did not engage in constitutionally protected activity and (2) Anthropic's protected activity was not a substantial or motivating factor in the Challenged Actions. U.S. Br. 9-12. But they fail to raise any genuine dispute of material fact as to either issue.

### 1. Anthropic Engaged In Protected Expression

Defendants assert that the relevant activity here "is conduct, not speech." U.S. Br. 9. *But see* Op. 22-23. The undisputed facts in the record—including Defendants' own words explaining why they punished Anthropic—show otherwise.

As this Court observed, "the record shows that Anthropic and its CEO, Dario Amodei, are a loud and influential voice regarding the capabilities, risks, and safe uses of AI technology." Op. 20; *see* Dkt. 166 ("Ant. Br.") at 7 (collecting record citations). Anthropic continued to speak publicly on its concerns about AI safety in the context of the Department's demand that Anthropic abandon two narrow usage restrictions. *See* Mongan Decl. Ex. 1 at 1-2; Op. 20. Indeed, Defendants described Anthropic as engaging in core speech activities during those negotiations: they lambasted Anthropic for its "rhetoric," AR 255B; for its "ideology," *id.*, which they characterized as "Leftwing," AR 255A; and for "engaging . . . through the press," supposedly for the "public relations" purpose of "trying to STRONG-ARM the Department of War," AR 215, 255A. That public expression lies at "'the heart of the First Amendment's protection.'" *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011).

Defendants nonetheless take a blinkered view of the record, arguing that the relevant activity is merely a "[r]efusal to accept the Government's contractual term." U.S. Br. 9. That argument improperly ignores the expressive activities that this Court already identified: Anthropic's stated

2

position, conveyed to senior government officials and the public, that Claude should not be used for lethal autonomous warfare or the mass surveillance of Americans, together with its advocacy explaining why those limits matter to the safe and responsible use of its model. Mongan Decl. Ex. 1 at 1-2; Kaplan Decl. ¶¶ 33, 38. Defendants' conduct argument therefore fails at the threshold because it does not address the protected expression squarely implicated here.

The cases Defendants invoke are not remotely comparable to this one. Each involved a neutral rule regulating conduct for its practical and noncommunicative effects—not sanctions that openly punish a speaker for its "rhetoric" on an important public issue. In *United States v. O'Brien*, 391 U.S. 367, 377, 382 (1968), the Supreme Court upheld a ban on destroying draft cards because the government's interest was "unrelated to the suppression of free expression"; it reached only the "noncommunicative impact" of burning a draft card "and nothing else." The equal-access rule in *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 60 (2006), "neither limit[ed] what law schools may say nor require[d] them to say anything." And the ban on free distribution of products in *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 291-92 (D.C. Cir. 2019), did "not seek to restrict the manufacturer's ability to communicate."[1] Here, Defendants punished Anthropic not for declining a contract term but for its stated position and public advocacy about AI safety restrictions—speech that the February 27 Directives and Under Secretary Michael's risk analysis repeatedly treated as the problem. AR 213-15, 255A-B.

Even if Defendants were correct to focus myopically on the negotiations over Anthropic's "contractual terms," U.S. Br. 10, a private party's positions in government bargaining can qualify as protected speech when they address "matters of substantial public concern." *Janus v. Am. Fed'n of State, Cty. & Mun. Emps., Council 31*, 585 U.S. 878, 885-86, 913 (2018). Anthropic's negotiations with the Department concerning autonomous weaponry and mass surveillance undoubtedly "touche[d] on fundamental questions" of concern. *Id.* at 913. That Anthropic's speech was voiced in direct negotiations with the government does not strip it of First Amendment protection—otherwise, even the collective bargaining at issue in *Janus* could be recast as "conduct, not speech." U.S. Br. 9.

---

[1] *Perkins v. Lukens Steel Co.*, 310 U.S. 113 (1940), did not involve the First Amendment at all.

Defendants have no response; they do not even acknowledge *Janus.*

The Petition Clause reinforces the First Amendment's application here. Defendants say (U.S. Br. 10) that the Clause protects only "concerted efforts to influence public officials" about policy. But that is precisely what Anthropic did by urging the Secretary to maintain use restrictions based on the company's views about AI safety. Defendants' own authority confirms that the Petition Clause encompasses the right to advocate to executive branch officials in that way. *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965).

**2.      Anthropic's Speech Motivated The Challenged Actions**

Defendants contend that "Anthropic's speech was not the motivating factor for the challenged actions," U.S. Br. 11, but their factual and legal arguments fail.

Defendants insist that the Challenged Actions were motivated by the decisionmakers' asserted concerns about "National Security," threats to "our Troops," and "allowing a private vendor to 'seize veto power over the operational decisions of the United States military.'" U.S. Br. 11 (quoting AR 255A, 255B). But those statements must be read in context: the President and Secretary Hegseth themselves explained that they were acting because of Anthropic's protected expression. They pointed to Anthropic's "rhetoric," "ideology," and public advocacy as justifications. AR 255A, 255B. And Under Secretary Michael's risk assessment doubled down, treating Anthropic's "brand-building," "marketing," "public[] spat," and decision to engage "through the press" as evidence warranting the supply chain risk designation. AR 213-15. As this Court recognized after reviewing the same materials, those statements "leave little question that the measures were prompted by Anthropic's" expression. Op. 21; *see generally Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 929 (9th Cir. 2004).

Next, Defendants invoke the "'timeline of events.'" U.S. Br. 11. The timeline actually supports Anthropic. Defendants did not resolve to punish Anthropic until the week of February 23, when Anthropic met with the Department of War, respectfully declined to abandon the two use restrictions, and then publicly explained why it could not "in good conscience" accede to the Department's demand. Mongan Decl. Ex. 1; *see* Heck Decl. ¶ 17. The very next day, the President and the Secretary imposed the Challenged Actions, explicitly tying them to Anthropic's "rhetoric"

from "[t]his week" and its supposed attempt "to STRONG-ARM the Department" and impose its "Radical Left" views. AR 255B, 255A. That sequence is powerful evidence of retaliation. *See Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003).

Defendants also argue that the Challenged Actions "were rooted in DoW's risk assessment that Anthropic could manipulate or modify its model to restrict the model's usage." U.S. Br. 11 (citing AR 214-15). But that risk assessment was not prepared until *March*—and by Defendants' own telling, Secretary Hegseth's subordinates did not even "begin the process" of preparing it until *after* the two Directives on February 27. U.S. Br. 1. Moreover, the risk assessment is shot through with references to Anthropic's protected speech. *See supra* p. 4; AR 214-15. And both the administrative record and Anthropic's declarations reveal that the other concerns advanced in the assessment were arbitrary, incorrect, and pretextual. *See infra* pp. 11-18.[2]

Nor does Defendants' repeated invocation of an incident involving the CDC's use of Claude, *see* U.S. Br. 12; *see also id.* at 6, 13, 19, undermine Anthropic's showing that its speech was a substantial or motivating factor. Contrary to Defendants' suggestion, *id.* at 12, Anthropic directly acknowledged and explained this episode, Ant. Br. 19-20, which involved the use of a commercial version of Claude—not the bespoke model Anthropic built for the Department of War. Ramasamy Decl. ¶¶ 31-35. That commercial version contained safeguards that (quite sensibly) mitigated public safety risks related to biomedical research. *Id.* ¶ 63. Once the government informed Anthropic that those safeguards were interfering with CDC's research, Anthropic "worked promptly with [its] third-party partners and the government to enable use of the model in a manner appropriate to the CDC's mission and expertise." *Id.* In other words, far from corroborating or even creating a genuine dispute about Defendants' national security concerns, the example merely highlights Anthropic's

---

[2] The Ramasamy Declaration, for example, explains that Anthropic retains no post-deployment control over its models. *See infra* pp. 15, 17. Defendants argue that this declaration "is not properly before the court" because it "is not part of the administrative record." U.S. Br. 12. But the administrative record rule only governs review of APA claims. It does not bar the court from considering "affidavits or declarations" in evaluating constitutional claims challenging agency action, Fed. R. Civ. P. 56(c)(1)(A), which "may exist wholly apart from the APA," *Sierra Club v. Trump*, 929 F.3d 670, 699 (9th Cir. 2019); *see also California v. DHS*, 612 F. Supp. 3d 875, 895 (N.D. Cal. 2020) ("the APA's administrative record requirement does not govern the availability of discovery" for "a constitutional claim that exists outside of the APA").

collaboration with its federal partners and Defendants' failure of proof.[3]

Finally, Defendants unconvincingly attempt (U.S. Br. 12) to analogize to *American Federation of Government Employees v. Trump*, 167 F.4th 1247, 1257 (9th Cir. 2026) ("*AFGE*"), *amended and superseded*, 178 F.4th 456 (9th Cir. 2026). The challenged order in that case "disclose[d] no retaliatory animus on its face," and the Ninth Circuit declined to infer "the most jaundiced, retaliatory account" of the President's motive in a record containing independent evidence of a national-security rationale. *Id.* at 462, 467. No such inference is needed here. Reading those documents as dispositive evidence of retaliatory motive is not reading them in their "'worst possible light.'" U.S. Br. 12. It is reading them as Defendants wrote them.

**B.    Defendants Cannot Rebut Anthropic's Prima Facie Showing Of Retaliation**

Defendants fall back on the argument that there is no First Amendment violation because the government "would have taken the same actions" anyway notwithstanding its retaliatory animus. U.S. Br. 13. To prevail on that theory, Defendants must prove they "*would* have" reached the same decision even absent Anthropic's protected speech, not merely that they "*could* have." *CarePartners, LLC v. Lashway*, 545 F.3d 867, 877 (9th Cir. 2008); *see* Op. 23.

Defendants cannot carry that burden for much the same reasons that Anthropic's speech was a motivating factor. Defendants again say that the record is "replete" with references to national security concerns, U.S. Br. 12, but they again cite only Under Secretary Michael's March 2 risk assessment. U.S. Br. 13 (citing AR 213, 214). As explained, that memorandum post-dates the February 27 Directives and is itself steeped in criticisms of Anthropic's speech. *See supra* pp. 4-5; AR 213; Ant. Br. 13. A rationale assembled after a decision is made, moreover, cannot establish what Defendants "would have" done at the time they made the decision. *See supra* p. 5.

Defendants' plea to consider the Presidential and Hegseth Directives "as a whole" (U.S. Br. 13) does not improve their case, given the Directives' explicit focus on Anthropic's rhetoric and ideology, *see supra* p. 4. In any event, the asserted national security concerns would at most justify

---

[3] Defendants also reference a single question that an Anthropic executive purportedly raised about the use of Claude in a Department operation. U.S. Br. 6. Even if true, that does not establish any intent (or capability) to *interfere* with Department operations. *See* Heck Decl. ¶¶ 19-20.

procurement measures to end the Department's use of Claude—not the draconian sanctions imposed by Defendants here. *See* Op. 24.

Finally, Defendants are unable to explain away their own post-designation conduct, which contradicts any argument that they would have taken these actions on national security grounds even absent their retaliatory intent. *See* Ant. Br. 11. Defendants contend that the "phaseout" of Anthropic's technology "ensur[es] continuity of capabilities during active military operations." U.S. Br. 14. But a six-month phaseout would have been unthinkable if Defendants genuinely viewed Anthropic as presenting a risk of "catastrophic" (U.S. Br. 2) sabotage. Defendants also say nothing about other actions that contradict their narrative: they fail to explain the Department's testimony that it continued to use Claude to support military operations after the designation, Mongan Decl. Ex. 5 at 28, and the fact that the White House has had "productive and constructive" discussions with Anthropic regarding access to its newest models, Heck Decl. ¶ 27; *see* Mongan Decl. Ex. 7.

### C. *Pickering* Does Not Apply And Anthropic Is Entitled To Summary Judgment Even If It Does

For the first time in any filing, Defendants ask the Court (U.S. Br. 8-9) to apply the balancing framework from *Pickering v. Board of Education*, 391 U.S. 563 (1968). But *Pickering* does not apply here and Anthropic would be entitled to summary judgment even if it did.

*Pickering* does not apply to every company that contracts with the government. Instead, it applies when the government, acting as an employer, regulates employees' speech. *Pickering*, 391 U.S. at 568. It can also apply to independent contractors, *see Bd. of Cnty. Commissioners v. Umbehr,* 518 U.S. 668, 671 (1996) (cited at U.S. Br. 9), in circumstances where "'the relationship between the parties is analogous to that between an employer and employee' and 'the rationale for balancing the government's interests in efficient performance of public services against public employees' speech rights applies.'" *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 720 (9th Cir. 2022).

The relationship between Anthropic and the Department in this case is not "'analogous to that between an employer and employee.'" *Riley's*, 32 F.4th at 720. Anthropic was awarded a contract to provide the Department with AI models. *See* Ramasamy Decl. ¶ 9. That relationship "b[ears] no indicia of a typical employee-employer relationship." *Riley's*, 32 F.4th at 721. The government was

not "outsourc[ing] government services," like school field trips or weatherization services. *Id.* at 722; *see also Alpha Energy Savers*, 381 F.3d at 923. Instead, the parties' relationship is "akin to . . . a licensee-licensor relationship," to which *Pickering* does not apply. *Riley's*, 32 F.4th at 721 (citing *CarePartners*, 545 F.3d at 881-82). Moreover, the relationship between the Department and the particular individuals whose speech is at issue is certainly not analogous to an employer-employee relationship. The Department retaliated against Anthropic for statements made by the company's CEO and executives publicly and privately during contract negotiations. These individuals were not performing work that the government's own employees might otherwise perform, so *Pickering* cannot apply to Defendants' retaliation for their speech.

*Pickering* also does not apply because the Challenged Actions were an "exercise[] [of] sovereign power against [Anthropic] in response to [its] political speech"—the type of measures that *Umbehr* specifically distinguished from a government's "contractual power" and "daily management functions." *Umbehr*, 518 U.S. at 678; *see also Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 598 (2008). Defendants did not exercise any ordinary authority over contracting or management of day-to-day government activities. They designated Anthropic a risk to national security under 10 U.S.C. § 3252, directed every federal agency to sever ties to the company, and ordered all military contractors to do the same. The "rationale" behind *Pickering*—balancing the government's interests in providing efficient public services against an employee's speech rights—does not apply when the government undertakes sovereign actions like these. *Riley's*, 32 F.4th at 720.

Regardless, Anthropic would be entitled to summary judgment even if *Pickering* applied. *See* Op. 20 n.11. *Pickering* departs from the standard retaliation framework in only two respects. Neither makes a difference here. First, unlike the standard analysis, *Pickering* requires assessing whether the expression at issue addresses "'a matter of public concern.'" *See Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1137 (9th Cir. 2025). Here, the undisputed facts show that Anthropic has spoken extensively about AI safety, both before and during the parties' negotiations. *See supra* p. 2. Speech about AI safety is a paradigmatic "matter[] of social or political concern that would be of interest to others outside" the government, *Hernandez v. City of Phoenix*, 43 F.4th 966, 978 (9th Cir. 2022), and about which "'information is needed . . . to enable the members of society to make

informed decisions about the operation of their government,'" *Alpha Energy Savers*, 381 F.3d at 923. Defendants' attempt to recast these weighty questions as an "individual grievance," U.S. Br. 10, is wrong.

Second, *Pickering* ultimately involves a balancing test—but it places the burden on Defendants to demonstrate that "they had 'legitimate countervailing government interests'" supporting the adverse action that "'outweigh the free speech interests at stake.'" *Riley's*, 32 F.4th at 723-24. Defendants never even undertake that balancing. They instead vaguely invoke "national security" to argue that their interests necessarily prevail. U.S. Br. 12. That is not enough. No one disputes that the government generally has a "'compelling interest' in protecting national security." *Id.* (citing cases). But none of the cases Defendants cite suggests that invoking national security in the abstract, without specifying and supporting the government's concerns, is sufficient to carry the government's burden under *Pickering*. To the contrary, the government must show "actual injury to its legitimate interests." *Johnson v. Multnomah Cnty., Or*., 48 F.3d 420, 424 (9th Cir. 1995). Defendants have failed to do so here because (as explained, *see infra* pp. 15-17) the asserted national security concerns were vaguely articulated, unsubstantiated, and pretextual.

## II.    Secretary Hegseth's Actions Violate The APA

The Secretary's unprecedented actions against Anthropic violate the APA many times over, whether the relevant final agency action is the February 27 Directive that Secretary Hegseth himself described as "final" (AR 255B) or the March Determination.

### A.    The Secretary's February 27 Directive Is Final And Unlawful Agency Action

Defendants assert that the February 27 Directive "is *not* a final agency action," U.S. Br. 16, without acknowledging that the directive itself says otherwise. Secretary Hegseth "direct[ed] the Department of War to designate Anthropic a Supply-Chain Risk to National Security" and ordered military contractors to participate in a secondary boycott against Anthropic that was "[e]ffective immediately." AR 255B. He added that "[t]his decision is final." AR 255B. It is not apparent what more the Secretary could have done to convey that his Directive marked the consummation of his decision-making process and was "a display of 'legal force' where 'immediate compliance' was expected." *San Francisco Herring Ass'n v. Dep't of Interior*, 946 F.3d 564, 580 (9th Cir. 2019). The

Secretary's "final" action left his subordinates no choice but to execute his supply chain risk designation, and left military contractors no choice but to cut their business ties with Anthropic.

Defendants respond that the Secretary "indisputably" had not observed 10 U.S.C. § 3252's procedural requirements when he issued his Directive. U.S. Br. 16. But that just makes the Directive unlawful—it does not make it any less final. Although the Secretary's subordinates swiftly "formal[ized]" the Secretary's supply chain risk directive in the days after February 27, *id.*, that implementing step does not change the fact that the decision had already been made and announced as "final" and "immediately effective." AR 255B. And there were *no* further implementing steps for the agency to take as to the secondary boycott.

The "'definitive' statement" of the agency's position in the February 27 Directive had "a 'direct and immediate . . . effect on" Anthropic's "day-to-day business.'" *Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264 (9th Cir. 1990). "[I]mmediate compliance with its terms" by both Department officials and military contractors was clearly "expected." *Id.* For that reason, it is not remotely comparable to a "merely investigatory" action, "a request for voluntary corrective action," *Reliable Automatic Sprinkler Co. v. CPSC*, 324 F.3d 726, 731-32 (D.C. Cir. 2003), or a "[g]uide . . . establish[ing] no rule that the regulated industry must obey," *Indus. Safety Equip. Ass'n, Inc. v. EPA*, 837 F.2d 1115, 1121 (D.C. Cir. 1988).[4] While Defendants now say the Directive lacked "legal force," U.S. Br. 16, that would be news to the businesses that immediately began winding down their work with Anthropic, Smith Decl. ¶ 12; *see Indus. Customers of N.W. Utilities v. Bonneville Power Admin.*, 408 F.3d 638, 645 (9th Cir. 2005) (finality requirement "'is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an

---

[4] Defendants' other cases are also inapposite. They involved an endangered species recovery plan that had been "repeatedly" revised and did not "'mandate compliance,'" *Center for Biological Diversity v. Haaland*, 58 F.4th 412, 417-18 (9th Cir. 2023); the issuance of an administrative complaint that "require[d] only that [the parties] appear and defend themselves" and did not "constitute a definitive determination" that the agency even had jurisdiction, *Ukiah Valley Medical Center v. FTC*, 911 F.2d 261, 264 (9th Cir. 1990); and informational reports that did not purport to require anyone to do anything, *see Flue-Cured Tobacco Cooperative Stabilization Corp. v. EPA*, 313 F.3d 852, 856, 858 (4th Cir. 2002); *Parsons v. U.S. Department of Justice*, 878 F.3d 162, 168-69 (6th Cir. 2017).

actual, concrete injury'"").

Properly viewed as a final agency action, the February 27 Directive cannot survive APA review. Defendants have conceded that the secondary boycott order lacks any "statutory basis." Op. 34. They do not mention that order in their opposition brief, let alone attempt to defend it. *See Estate of Shapiro*, 634 F.3d at 1060. They do not respond to Anthropic's showing that the Secretary's February 27 supply chain risk directive cannot be sustained on the administrative record that existed at that time. *See* Ant. Br. 13. Nor do they dispute Anthropic's contention that the March Determination did not reconsider or rescind the earlier directive. *See id.*; Op. 35.

**B.    The March Determination Is Independently Unlawful**

Defendants instead focus their APA arguments on the March Determination and proffer an administrative record including materials hastily assembled by the agency after February 27. *See* U.S. Br. 16-22. But even viewing the March Determination as the relevant final agency action and assessing it in the light of the proffered record, it cannot be sustained. It violates clear-cut procedural requirements in 10 U.S.C. § 3252, in a manner that prejudiced Anthropic. It reflects an untenable understanding of the narrow authority granted in § 3252 that is untethered to the text that Congress wrote and the purpose underlying it. And it rests on arbitrary, incorrect, and pretextual explanations—underscored by Defendants' belated abandonment, three months after the Determination, of the agency's principal stated rationale.

**1.    Secretary Hegseth's Conceded Procedural Errors Prejudiced Anthropic**

Defendants do not contest that Secretary Hegseth failed to comply with mandatory procedural requirements before signing the March Determination. *See* U.S. Br. 21-22; Op. 33-34. The Secretary did not "mak[e] a determination in writing" that "less intrusive measures" could not "reduce" the purported risk. 10 U.S.C. § 3252(b)(2)(B). His congressional notifications omitted the required "summary of the basis for the determination" and the required "discussion of less intrusive measures that were considered and why they were not reasonably available." *Id.* § 3252(b)(3)(B). And he relied on a risk assessment prepared by the wrong agency official. *See* 48 C.F.R. § 239.7304(a); *see* Ant. Br. 14.

Defendants respond to this litany of procedural violations with a shrug. In their view, it

"'would be pointless' formalism" to require Secretary Hegseth to comply with federal statutes and his own agency's regulations (U.S. Br. 21) because the violations are all harmless. That is incorrect. Courts "exercise great caution in applying the harmless error rule" in this context. *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1071 (9th Cir. 2004). An error is harmless only if it "'*clearly* had *no bearing* on the procedure used or the substance of [the] decision reached.'" *Id.* That is not the case here.

To begin, the Secretary's failure to evaluate whether "less intrusive measures" were "reasonably available" (10 U.S.C. § 3252(b)(2)(B)) was plainly prejudicial. That procedural requirement forces the Secretary to engage with "an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)—*i.e.*, whether some less harmful action would be more appropriate. Defendants can hardly maintain that the Secretary's disregard of that requirement "had no bearing" on the Secretary's decision, as they cannot know what a genuine assessment of less-intrusive alternatives would have revealed. *Gifford Pinchot Task Force*, 378 F.3d at 1071. Their only response is to criticize Anthropic for "not identify[ing] any 'less intrusive measures.'" U.S. Br. 20 n.5. But Congress placed that obligation on the Secretary, not the regulated party. 10 U.S.C. § 3252(b)(2)(B). Regardless, Anthropic *has* identified a less-intrusive response: "agree[ing] to Anthropic's offer to support an orderly offboarding and replac[ing] Claude with other AI models." Dkt. 6 at 19.

Nor was it harmless when the Secretary omitted from his congressional notifications any summary of the basis for his decision or discussion of less intrusive measures. By requiring the Secretary to explain *ex ante* why less intrusive measures would not mitigate an identified risk, Congress reserved for itself an opportunity to understand and scrutinize any designation. *See* Op. 33. By flouting that requirement, the Secretary deprived Congress of information necessary to carry out its function. Because "we simply cannot know" what the Secretary would have done had he properly engaged with Congress, there is no basis for concluding that the violation "'clearly had no bearing on the procedure used or the substance of decision reached.'" *California Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1090, 1095 (9th Cir. 2011).

Defendants respond that Congress was "perfectly capable of saying so" if it "believed further

explanation was warranted." U.S. Br. 21. But Congress already *did* say so in subsection (b)(3)(B). Defendants also assert that the less-intrusive-measures requirement is only "for Congress's benefit" and "does not protect any interest of Anthropic." U.S. Br. 21. In fact, however, statutes often contain consultative requirements that protect the interests of those affected by the exercise of statutory authority. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 & n.7 (1992); *California Wilderness*, 631 F.3d at 1092. And here, when Congress prohibited the Secretary from taking action until "after" the relevant committees received an analysis of less intrusive measures, 10 U.S.C. § 3252(b), it plainly contemplated that it might use that information to take action.

Finally, it would not be "pointless" (U.S. Br. 22) to require the Under Secretary for Intelligence to perform the risk analysis Department regulations assign to him. 48 C.F.R. § 239.7304(a). The error clearly had a "*bearing* on the procedure used" by the agency. *California Wilderness*, 631 F.3d at 1090. And especially given the evident errors and inconsistencies in Under Secretary of War for Research and Engineering Michael's analysis, *see* Ant. Br. 17-21; *infra* pp. 15-17, there is good reason to believe that the substantive analysis would have been different if the Secretary followed his own regulations and obtained the risk assessment from his "principal advisor . . . on intelligence, counterintelligence, and security matters." Bradley D. Hansell, U.S. Dep't of War, https://perma.cc/DV7H-C24K (last visited July 8, 2026).

### 2.    Defendants' Interpretation Of § 3252 Is Contrary To Law

Apart from the procedural problems, the March Determination rests on a reading of § 3252 that is at odds with the statutory text and is "deeply troubling" in its scope. Op. 31. Section 3252 defines "supply chain risk" as "the risk that an adversary may sabotage, maliciously introduce unwanted function, or otherwise subvert . . . a covered system." 10 U.S.C. § 3252(d)(4). That text requires an adversary and is directed at covert, surreptitious activities. Op. 30. According to Defendants, Anthropic qualifies as an "adversary" because that term "broadly encompasses *any* 'opponent in a contest, conflict, or dispute.'" U.S. Br. 18 (emphasis added). Indeed, they even disagree with this Court's common-sense observation that "'[§] 3252 obviously does not permit DoW to designate IT vendors as "supply chain risks" whenever they ask probing questions or stubbornly insist on particular contracting terms.'" U.S. Br. 19 (quoting Op. 32). The breadth and

implications of Defendants' interpretation of § 3252 are astonishing. It would apparently empower the Secretary to apply § 3252 to any perceived "opponent" and any contractor or subcontractor engaged in a "dispute" with the Department—whether over contracting terms, a board member's public criticism of the Secretary's personnel decisions, or an executive's donation to politicians disfavored by the current administration.

Fortunately, that is not the law. "'[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *King v. Burwell*, 576 U.S. 473, 492 (2015). The text and context here demonstrate that Congress did not enact § 3252 as an all-purpose tool for punishing the Secretary's perceived opponents. Section 3252 may be exercised only when "necessary to protect national security," 10 U.S.C. § 3252(b)(2)(A), a clear indication that it does not reach every company that disagrees with the Department. As Anthropic has explained, moreover, the statute grew out of a cyber breach by a foreign intelligence agency, and both Congress and the Department have interpreted it to apply to similar actors posing similar risks—*i.e.*, covert activities that harm national security. *See* Ant. Br. 16-17 (citing S. Rep. No. 111-201, at 162 (2010) and Dep't of Def. Instruction No. 5200.44 (Nov. 5, 2012), perma.cc/TW3D-735M). Defendants offer no response to that history.

Defendants nonetheless contend that the risks § 3252 addresses are not limited to covert activities. U.S. Br. 18. As this Court has already recognized, however, "the plain text of the statute is directed at covert acts or hacks." Op. 30. The text refers to "sabotage," "subver[sion]," and "malicious[] introduc[tion of] unwanted function." 10 U.S.C. § 3252(d)(4). Dictionaries define those terms to convey an action taken or planned covertly. Ant. Br. 16 (collecting definitions). Defendants offer no response.

To be sure, frontier AI companies are not immune from supply chain risk designations. But the Department must build a supporting record and offer a reasonable, consistent, and non-arbitrary explanation for why a company has created a risk that an "adversary" will "sabotage," "subvert," or "maliciously introduce unwanted function" into its systems. 10 U.S.C. § 3252(d)(4). It did none of those things here.

### 3.     Defendants' Rationales Are Arbitrary And Capricious

The rationales offered by Defendants for the supply chain risk designation here are more of a hodgepodge—evolving as the litigation has progressed to suit the Department's needs and as certain explanations have been proven untenable. That continued evolution only confirms what has been clear from the start: this is a designation in search of a justification, which cannot satisfy the APA's requirements for reasoned decision-making.

In March, Defendants justified the designation principally by asserting that Anthropic's "unwillingness to agree to" their preferred contract term constituted a demand for a "veto" over Department operations. AR 213. That contract dispute, coupled with statements Anthropic made during negotiations, purportedly caused the Department to fear that Anthropic would "disallow[] its software to function in critical military operations." AR 213-14. Defendants leaned on the post-deployment-veto rationale throughout the early stages of this litigation. *See* AR 247 (invoking concern that Anthropic might "interfere" with Claude "during an operation"); *see also* AR 249-50; Dkt. 96 at 17. Anthropic has since explained at length why the post-deployment-veto rationale fails APA review. *See* Dkt. 113 at 11-13; Ant. Br. 17-20. In the wake of that explanation, Defendants now insist that "whether Anthropic has real-time access to its AI model after it is deployed on DoW's systems . . . is not DoW's true concern." Dkt. 213 at 4.

Their summary judgment brief instead emphasizes a fear that Anthropic will "covertly . . . 'alter the behavior of the model,'" before it is deployed, to "disrupt DoW's critical military operations" at "ill-timed moments." U.S. Br. 17-19. They explain that AI models are a "'black box'" to users, so the Department must have "'deep trust'" in its AI providers. *Id.* at 17; *see id.* at 5, 6. The Department supposedly lost trust in Anthropic because Anthropic refused the Department's proposed contract term, made statements it disliked, and caused difficulties for the CDC. *Id.* at 6, 18-21. Ergo, there was a "substantial risk" that Anthropic would "preemptively and surreptitiously alter the behavior of [its] model in advance" of military operations in "potentially 'catastrophic'" ways. *Id.* at 5, 17. In addition, notwithstanding their earlier representation that the designation "would not have occurred" if Anthropic accepted an "any lawful use" term, Dkt. 96 at 17, Defendants now assert that their concerns apply "regardless of DoW's contractual rights," U.S. Br. 19.

The fact that important premises of Defendants' rationale have shifted so completely is itself evidence that the rationale is a post hoc construct—not a product of the agency's reasoned judgment at the time of decision. *Cf. Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997). And the logical leaps in Defendants' newly emphasized rationale about pre-deployment "poisoning" of Anthropic's models each prove unsustainable under closer examination. *See* AR 215; U.S. Br. 5-6.

To start, the "'technical opacity'" of AI models (U.S. Br. 5) and the "'need to continuously update and tune'" them (*id.* at 11-12) cannot, by themselves, support the designation. As Defendants admit, these are inherent attributes of the technology and thus "'a common concern with all' AI models." *Id.* at 15. Defendants thus had to explain why Anthropic *in particular* would exploit the features of AI technology to commit catastrophic acts of sabotage. And Defendants do not come close to doing so.

Anthropic's insistence on two narrow and publicly disclosed restrictions hardly demonstrates an inclination to "surreptitiously alter the behavior of its model." U.S. Br. 17. A company intent on sabotaging and subverting future military operations would not negotiate at length with the Department, *see* AR 1-30, inviting scrutiny and the possibility of losing its access to the Department's systems. Nor would it offer to offboard its model from the Department's systems and facilitate a transition to another AI company. AR 2, 29.

Defendants' characterization of Anthropic's purported conduct does not supply the missing link. First, there is no plausible basis for tying Anthropic's supposed "brand-building" activities to "the risk that Anthropic would poison a model." U.S. Br. 6. Defendants say that Anthropic's public statements were at times "'openly hostile' to the government," *id.*, but they neither elaborate on that accusation nor draw a "rational connection" between those statements and any risk cognizable under § 3252. *Burlington Truck Lines Inc. v. United States*, 371 U.S. 156, 168 (1962). Second, even assuming that "[a]n Anthropic executive contacted DoW's prime contractor" to ask an unspecified "question[]" about "the use of their technology" in certain military operations, U.S. Br. 6, that outreach would not show that Anthropic would maliciously interfere with such operations. Finally, the oft-mentioned CDC incident (U.S. Br. 6) does not remotely establish a risk that Anthropic would deliberately sabotage military operations. *See supra* p. 5. And it is not properly a part of the APA

analysis in any event, as Defendants rely on a post hoc account in litigation declarations. *See* Ant. Br. 19; AR 246, 254. That account is not a "'fuller explanation of the agency's reasoning at the time of the agency action.'" U.S. Br. 5 n.2.

All told, there is a marked "disconnect between the decision made and the explanation given." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). That mismatch reinforces the conclusion that Defendants concocted rationales in support of a "foreordained conclusion." Op. 36. Defendants see no problem with this, appealing to the principle that an agency head may have "'policy preferences'" that he "'work[s] with' his subordinates 'to substantiate.'" U.S. Br. 21. That observation is true as far as it goes, but it is irrelevant here. The Secretary never articulated a legitimate policy preference for the Department to substantiate. To the contrary, his evident (and illegitimate) purpose was retaliation. *See supra* pp. 4-7.

### 4.    Additional Materials Reinforce The APA Violations

The Secretary's APA violations are only confirmed by the additional information that this Court may properly consider in evaluating the APA claim, as Anthropic explained in its Motion to Complete the Administrative Record. *See* Dkt. 169; Ant. Br. 20. Under Secretary Michael's March 4 email (Dkt. 114-1 at 2), which sought to reach a contractual agreement with Anthropic two days *after* he declared Anthropic a "fully mature supply chain risk" (AR 215), underscores that the asserted national security concerns were "contrived." *Dep't of Com.*, 588 U.S. at 784. The email directly "undermine[s] the Secretary's conclusion that" Anthropic's conduct "necessitated the § 3252 designation." *Contra* U.S. Br. 21. If the Department actually believed that Anthropic was "'an unacceptable national security threat,'" *id.*, it would not have attempted to continue contracting with the company for AI services.

Defendants also offer no real response to the Ramasamy Declaration, which fatally undermines their now-abandoned post-deployment veto theory and also refutes their newly elaborated rationale about pre-deployment "poisoning." Before an Anthropic model is deployed on Department systems, "[t]he Department and its cloud provider conduct a rigorous, multilayered evaluation and approval process, entirely within their own systems and under their own control." Ramasamy Decl. ¶ 36; *see also id.* ¶¶ 37-47. The Department "has the ability to directly test any

aspect of the model's behavior," and thus is equipped "to identify and address any concern it may have." *Id.* ¶ 42. Although Defendants say it "blinks reality" to suggest that the Department can "uncover any unwanted limitations through rigorous testing," their only support is a perfunctory nod at the "vast and opaque nature" of AI "technology." U.S. Br. 20. Taken to its logical conclusion, that rationale would support a supply chain risk designation for *any* frontier AI technology used in military settings. Moreover, if the Secretary was truly concerned about Anthropic's models, he could simply have accepted Anthropic's offer to offboard them and declined to procure new models in the future.

## III.     The Challenged Actions Violate Due Process

### A.     Defendants Deprived Anthropic Of Protected Liberty And Property Interests

As to due process, Defendants first argue that none of the Challenged Actions deprived Anthropic of any constitutionally protected liberty or property interest. U.S. Br. 14-15. That argument cannot be reconciled with the undisputed facts.

To begin, the Presidential Directive abridged Anthropic's liberty interest in pursuing its chosen profession by permanently "debarring" it "from government contract[ing]." *Trifax Corp. v. Dist. of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003); *see* Ant. Br. 21; Op. 25-26. Defendants disagree with that characterization, noting that some agencies "took no action against Anthropic after the Directive" and that it "effected at most a 'brief interruption.'" U.S. Br. 14. But they ignore (*see id.*) the text of the Presidential Directive: "I am directing EVERY Federal Agency in the United States Government to IMMEDIATELY CEASE all use of Anthropic's technology. We . . . will not do business with them again!" AR 255A. Many agencies immediately disabled access to Claude in response to the President's unambiguous and immediate order. *See* AR 338, 342, 521-22, 524-25, 549. The fact that some agencies did not immediately comply with a facially unlawful order cannot alter the order's explicit terms. And if the disruption at the other agencies proved "brief," U.S. Br. 14, that is a function of this Court's preliminary injunction—not a reflection on the Directive itself.

The Challenged Actions also deprived Anthropic of a cognizable liberty interest by stigmatizing it as a risk to national security while stripping it of federal contracts and depriving it of any opportunity to compete for federal contracts or do business with military contractors going

forward. *See* Ant. Br. 21; Op. 25-26. Defendants contend that Anthropic "has not shown the challenged actions actually 'stigmatize[ed]' it or impaired its reputation at all." U.S. Br. 14. That contention cannot be taken seriously on this record. In disclosing the actions, the Secretary of War accused Anthropic of "committing a cowardly act of corporate virtue-signaling that places Silicon Valley ideology above American lives," AR 255B, and the Commander in Chief described Anthropic as "A RADICAL LEFT, WOKE COMPANY"—full of "Leftwing nut jobs" whose "selfishness is putting AMERICAN LIVES at risk, our Troops in danger, and our National Security in JEOPARDY," AR 255A. Those statements, from the President and a member of his cabinet, undoubtedly impair a company's reputation in the eyes of many Americans.

Defendants nonetheless argue that Anthropic's reputation has not been harmed, pointing to extra-record news articles recounting positive public reactions to Anthropic and describing the company's overall financial performance. U.S. Br. 14. That focus is misplaced. Even though the public largely views Anthropic favorably and the company has managed (with the benefit of a swift preliminary injunction) to succeed financially despite Defendants' attempt to punish it, the Challenged Actions still harm Anthropic's "good name, reputation, honor, [and] integrity." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). The record confirms that. *See* Smith Decl. ¶¶ 5, 7 (harm to reputation and integrity); Ramasamy Decl. ¶ 68 (damage to relationships in defense sector); Smith Decl. ¶ 12 (same); Ramasamy Decl. ¶¶ 69-71 (lost contracts); Smith Decl. ¶¶ 13-14 (same). And those harms were inflicted in a manner that caused a "tangible" alteration in status. *Trifax*, 314 F.3d at 644; *see also Fikre v. FBI*, 35 F.4th 762, 776 (9th Cir. 2022).

Last, the secondary boycott order deprived Anthropic of property interests in its commercial business. Ant. Br. 21. Defendants argue (U.S. Br. 14) that Anthropic had no "legitimate claim of entitlement" to its contracts, but that conflates future business with vested contractual rights. *Lynch v. United States*, 292 U.S. 571, 579 (1934) ("Valid contracts are property" where the "obligator [is] . . . the United States"); *see Ralls Corp. v. CFIUS*, 758 F.3d 296, 316 (D.C. Cir. 2014). The record shows that the secondary boycott order upset existing contractual relationships: it led customers to terminate or materially alter commercial agreements. *See* Smith Decl. ¶¶ 11-14, 16-17. Just as in *Al Haramain Islamic Foundation v. Department of Treasury*, 686 F.3d 965, 979-80 (9th

Cir. 2012), where an entity's "significant" property interests were implicated when the government prohibited others from "conduct[ing] any business" with it, the secondary boycott expressly prohibited any defense contractor from "conduct[ing] any commercial activity" with Anthropic. AR 255B. That imperiled Anthropic's existing commercial entitlements. *See* Rao Decl. ¶ 6; Smith Decl. ¶¶ 15-16.

### B.    Anthropic Did Not Receive Sufficient Process

Turning to process, Defendants ignore (U.S. Br. 15) circuit precedent holding that "[t]he fundamental requirements of procedural due process are notice and an opportunity to be heard *before* the government may deprive a person of a protected liberty or property interest." *Conner v. City of Santa Ana*, 897 F.2d 1487, 1492 (9th Cir. 1990) (emphasis added). Anthropic was afforded precisely zero process before Defendants barred it from federal contracting, blacklisted it with military contractors, and designated it a supply chain risk. Defendants nonetheless assert that the meager post-deprivation process offered by Secretary Hegseth on March 4 for his March Determination is constitutionally "sufficient." U.S. Br. 15. It is not.

For starters, that 30-day reconsideration process is irrelevant to the Presidential and Hegseth Directives, which took effect immediately without any process, pre or post. AR 255A; *see* AR 255B. As to the March Determination, Defendants do not identify the kind of "'strong justification'" and "'particularized need'" required to depart from the constitutional baseline of pre-deprivation notice in this context. Ant. Br. 23 (quoting *Garza v. Woods*, 150 F.4th 1118, 1130 (9th Cir. 2025) and *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 208 (D.C. Cir. 2001) ("*NCRI*")). They recite a rule that pre-deprivation process may be dispensed with if advance "'notification would impinge upon the security and other foreign policy goals of the United States.'" U.S. Br. 15. But instead of making the requisite showing, they merely assert that there are "national security interests at stake here." *Id.* That was also true in many cases in which courts held post-deprivation process insufficient. *See, e.g., NCRI*, 251 F.3d at 207-09; *Ralls*, 758 F.3d at 318-20; *Al Haramain*, 686 F.3d at 982-86. Without a more particularized showing, a vague assertion of national security interests is not enough to satisfy due process.

Defendants also cite cases from unrelated contexts in which courts held that post-deprivation

process was sufficient. *See* U.S. Br. 15. But each of those cases, unlike this one, featured independent and verifiable evidence showing that pre-deprivation process would risk specific harm: a horse that an expert identified as drugged might race again, *Barry v. Barchi*, 443 U.S. 55, 63-65 (1979); a dangerous driver with an unchallenged record of driving convictions might get back on the road, *Dixon v. Love*, 431 U.S. 105, 112-15 (1977); and a state employee arrested and charged by an "independent third party" with a drug felony might return to work, *Gilbert v. Homar*, 520 U.S. 924, 934 (1997). Most of those cases also involved "temporary" actions. *Id.* at 932; *see Barry*, 443 U.S. at 64 ("interim suspension").

Defendants offer no response to Anthropic's "'show[ing] that meaningful pre-deprivation notice of DoW's concerns and an opportunity to respond . . . were necessary to avoid the risk of erroneous deprivation." Ant. Br. 23-24 (quoting Op. 27-28). The lack of process meant that Anthropic could not show in advance that the agency's rationales were factually unfounded— whether the now-abandoned theory that Anthropic would exercise an "operational veto" over its models after deployment, or the theory *du jour* that Anthropic would "poison" its models before deploying them. U.S. Br. 5-6. And Anthropic can hardly be faulted for not availing itself of the opportunity to "request . . . reconsideration." AR 238. The Secretary's post-deprivation notification letter provided no factual basis for the deprivation to reconsider—and the agency only begrudgingly disclosed that factual basis weeks later, after Anthropic filed this suit. *See* Dkt. 96-2, 96-3.

Finally, Defendants invoke § 3252(c), which allows the Secretary to "limit disclosure of information" related to supply chain risk designations. U.S. Br. 15. They argue that Congress "thereby recogniz[ed] that pre-deprivation process is not required." *Id*. But § 3252(c) has no bearing on the Presidential Directive or the secondary boycott order. *See* Op. 29 n.16. As to the supply chain risk designation, Defendants have never represented that the Secretary invoked § 3252(c) to limit disclosure of information here. Nor could he plausibly have done so: the government publicly released the same information in this Court. More fundamentally, the "right to due process 'is conferred, not by legislative grace, but by constitutional guarantee.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)*.

## IV.   The Presidential Directive Violates The Separation Of Powers

An exercise of presidential power must "stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Defendants recognize that "the Presidential Directive did not rely on any statutory authority." U.S. Br. 23. They assert instead that "it issued under Article II's vesting of '[t]he entire "executive power"'" in the President." *Id.* But Article II does not give the President unbridled authority to "'ensure that [his] subordinates serve . . . in accordance with the [President's] policies.'" *Id.* at 23-24. Rather, as Defendants recognize, the President is constrained by "applicable law," *id.* at 24, including federal statutes restricting the procurement activities of the Executive Branch, *see* Ant. Br. 24. Yet Defendants do not even try to explain how the President's permanent, government-wide debarment of Anthropic can be reconciled with those statutes.[5]

Nor do the Article II authorities invoked by Defendants allow the President to override the will of Congress in this area. Defendants point to the Executive's Article II "power . . . to determine those with whom it will deal" and the President's authority in "'military and national security affairs.'" U.S. Br. 23-24. But the "Constitution exclusively grants the power of the purse to Congress, not the President," *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018), and Congress has the "authority to determine conditions under which purchases of Government supplies shall be made." *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 116 (1940). That authority includes defense spending. *See Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019). Relevant here, procurement statutes establish the process for debarring contractors—including contractors for the Department of War—and they "do[] not give the President unrestrained authority to issue any procurement policy that he desires." *Nebraska v. Su*, 121 F.4th 1, 16 (9th Cir. 2024). The President exceeded the restraints on his authority.

## V.   Defendants Violated 5 U.S.C. § 558(b)

Defendants do not dispute (and so concede, *see Estate of Shapiro*, 634 F.3d at 1060) that the

---

[5] Defendants twice seek to rewrite the Presidential Directive after the fact, arguing that it merely required federal agencies to stop using Anthropic "consistent with any applicable contractual terms" and "in accordance with applicable law." U.S. Br. 1, 24. Those words are nowhere to be found in the categorical language of the Presidential Directive. *See* AR 255A.

Departments of Energy, Veterans Affairs, and Commerce, as well as HHS, SEC, OPM, NRC, NASA, and DHS, all violated 5 U.S.C. § 558(b) by suspending access to Claude. *See* AR 334, 340, 361, 385, 388, 522, 527, 1571, 1576. Defendants also do not dispute that the Treasury and State Departments responded to the Presidential Directive by quickly terminating use of Anthropic's models, or that GSA cut off access to the models for all federal agencies. U.S. Br. 22. Their only defense as to those three agencies is that those actions were merely "internal IT housekeeping decisions," and not an "order" or "sanction." *Id.* at 23. That is incorrect. The actions are "orders" within the meaning of 5 U.S.C. § 558(b): they are "final disposition[s] . . . of an agency in a matter other than rule making." 5 U.S.C. § 551(6). The record shows that they are final: the Treasury Department publicly stated that Anthropic's models "will no longer be utilized by @USTreasury," AR 269; the State Department announced that it "will replace the Anthropic model with a GPT model," AR 319; and GSA "remove[d] Anthropic from USAi.gov and [its] Multiple Award Schedule," AR 394. The actions are also sanctions: they imposed "limitation[s]" and "other . . . restrictive action[s]." 5 U.S.C. § 551(10). For example, GSA's removal of Claude from its platforms hindered Anthropic's ability to contract with agencies across all three branches of the federal government, *see* Ramasamy Decl. ¶ 71, and the State Department worked "to ensure that Anthropic is no longer in receipt of State funds, even as a sub," AR 319.[6]

## VI.    The Court Should Vacate The Challenged Actions And Enjoin Their Enforcement

Defendants close (U.S. Br. 24-25) with a string of remedial arguments, each one essentially asking the Court to let stand the government's unlawful conduct. Each one fails.

First, the Court should not "remand . . . without vacatur." U.S. Br. 24. Remand without vacatur is reserved for "rare circumstances." *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015). It is appropriate only where the agency's error is not "serious," *California Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012), or vacatur would cause "serious and irremediable harms that significantly outweigh the

---

[6] Anthropic does not pursue this claim against the National Endowment for the Arts, the Social Security Administration, the Federal Reserve, or the Executive Office of the President. The record does not reflect that those Defendants took steps to implement the Presidential Directive.

magnitude of" that error, *Klamath-Siskiyou Wildlands Ctr.,* 109 F. Supp. 3d at 1242. The errors here are not minor—they are "fundamental" substantive and procedural defects. *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015). And Defendants have not shown that vacatur would cause any harm. The Challenged Actions have been enjoined since April 2. *See* Dkt. 135 at 3. Defendants claim no injury from the preliminary injunction and did not even seek a stay pending appeal. Moreover, the Court can enter injunctive relief that does not "require the Department of War to use Anthropic's products or services and does not prevent the Department of War from transitioning to other artificial intelligence providers." *Id.*

Second, Anthropic has satisfied the requirements for a permanent injunction. *Contra* U.S. Br. 24. It has shown irreparable harm several times over. The retaliatory burden on its protected speech establishes irreparable harm by itself. *See Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017). The supply chain risk designation, secondary boycott, and debarment from federal contracting inflict additional independent injuries. Each is irreparable under Ninth Circuit precedent, which recognizes both the loss of professional opportunity and the loss of control over reputation and goodwill as harms that money cannot repair. *Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017); *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

Defendants' focus on Anthropic's continued speech on AI issues and current valuation misses the point. U.S. Br. 24. Constitutional injury is not defeated "because an unusually determined plaintiff persists in [its] protected activity," *Mendocino Env't Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999), or because it thrives even in the face of those harms. And the equities and public interest favor injunctive relief: "It is always in the public interest to prevent the violation of a party's constitutional rights." *Riley's*, 32 F.4th at 731. As this Court's preliminary injunction order reflects, moreover, injunctive relief would not prevent Defendants from making lawful procurement decisions or safeguarding national security through lawful means. *See* Dkt. 135 at 3.

Third, declaratory relief is appropriate where the parties dispute the legality of ongoing agency action. *See, e.g.*, *California ex rel. Becerra v. U.S. Dep't of Interior*, 381 F. Supp. 3d 1153, 1178-79 (N.D. Cal. 2019). The cases cited by Defendants (U.S. Br. 25) are inapposite: they concern relief directed at the President personally, whereas Anthropic seeks relief against agency Defendants

implementing the unlawful action.

Finally, in this context, Defendants do not need or deserve any administrative stay (U.S. Br. 25) to facilitate their decision whether to appeal.

**CONCLUSION**

Anthropic's motion for summary judgment should be granted and Defendants' cross-motion for summary judgment should be denied.

Respectfully submitted,

Date: July 8, 2026

/s/ Michael J. Mongan

KELLY P. DUNBAR (*pro hac vice*)
kelly.dunbar@wilmerhale.com
JOSHUA A. GELTZER (*pro hac vice*)
joshua.geltzer@wilmerhale.com
KEVIN M. LAMB (*pro hac vice*)
kevin.lamb@wilmerhale.com
SUSAN HENNESSEY (*pro hac vice*)
susan.hennessey@wilmerhale.com
LAUREN MOXLEY BEATTY (SBN 308333)
lauren.beatty@wilmerhale.com
MATTHEW E. MORRIS (*pro hac vice*)
matt.morris@wilmerhale.com
BARDIA VASEGHI (*pro hac vice*)
bardia.vaseghi@wilmerhale.com
DAKOTA C. FOSTER (*pro hac vice*)
dakota.foster@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAEL J. MONGAN (SBN 250374)
michael.mongan@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
Telephone: (628) 235-1000

EMILY BARNET (*pro hac vice*)
emily.barnet@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Plaintiff Anthropic PBC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of July, 2026, I electronically filed the foregoing document using the CM/ECF System, that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

By:    */s/ Michael J. Mongan*
Michael J. Mongan