BRETT A. SHUMATE
Assistant Attorney General
Civil Division
ERIC J. HAMILTON (CA Bar No. 296283)
Deputy Assistant Attorney General
KRISTINA A. WOLFE (VA Bar. No. 71570)
Assistant Director
JAMES W. HARLOW (Md. Bar, no number issued)
Senior Trial Counsel
CHRISTIAN DIBBLEE (DC Bar No. 90002557)
Trial Attorney
Federal Programs Branch
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
(202) 514-6786 (Harlow)
james.w.harlow@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ANTHROPIC PBC, | ) Case No. 3:26-cv-01996-RFL |
| | ) |
| Plaintiff, | ) **REPLY IN SUPPORT OF DEFENDANTS'** |
| | ) **CROSS-MOTION FOR SUMMARY** |
| v. | ) **JUDGMENT** |
| | ) |
| U.S. DEPARTMENT OF WAR, *et al.,* | ) Hearing Date: July 30, 2026 |
| | ) Time: 10:00 a.m. PT |
| Defendants. | ) Judge: Hon. Rita F. Lin |
| | ) Place: San Francisco Courthouse |
| | ) Courtroom 4 |
| | ) |
| | ) |

**TABLE OF CONTENTS**

**INTRODUCTION**.................................................................................................................... **1**

**ARGUMENT**........................................................................................................................... **1**

I.    NO FIRST AMENDMENT VIOLATION OCCURRED ................................................... 1

     A.    The *Pickering* framework governs here...................................................... 1

     B.    Anthropic has not established a *prima facie* case of retaliation................................. 2

     C.    Defendants have rebutted any *prima facie* showing ................................................ 5

II.   ANTHROPIC RECEIVED ALL THE PROCESS IT WAS DUE ......................................................... 5

III.  ANTHROPIC'S APA CLAIMS REMAIN FATALLY FLAWED................................................... 7

     A.    Anthropic may only challenge the Secretary's formal § 3252 determination ......................... 7

     B.    § 3252 squarely permits DoW to mitigate the risk of AI model poisoning ............................. 9

     C.    The Secretary reasonably assessed a risk to DoW's sensitive systems ................................... 10

     D.    Anthropic's 5 U.S.C. § 558(b) argument is largely forfeited and half baked ......................... 13

IV.  NO *ULTRA VIRES* REVIEW OF THE PRESIDENT'S SOCIAL MEDIA POST IS AVAILABLE ............................. 14

V.   ANTHROPIC HAS NOT ESTABLISHED A NEED FOR EQUITABLE OR DECLARATORY RELIEF .................... 14

**CONCLUSION** ........................................................................................................................ **15**

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Al Haramain Islamic Found. v. Dep't of Treasury*,
  686 F.3d 965 (9th Cir. 2012)..................................................................................................6, 7, 11

*All. for Retired Ams. v. Bessent*,
  No. CV 25-0313 (CKK), 2026 WL 622235 (D.D.C. Mar. 5, 2026) ....................................... 14

*Alpha Energy Savers, Inc. v. Hansen*,
  381 F.3d 917 (9th Cir. 2004) .................................................................................................... 2

*Am. Bankers Ins. Co. of Fla. v. Nat'l Fire Ins. Co. of Hartford*,
  517 F. Supp. 3d 1025 (N.D. Cal. 2021) ................................................................................... 13

*Am. Fed'n of Gov't Emps. v. Trump*,
  178 F.4th 456 (9th Cir. 2026) ................................................................................................... 4

*Baxter v. City of Hemet*,
  728 F. Supp. 3d 1127 (C.D. Cal. 2024) ................................................................................... 13

*Bd. of Cnty. Comm'rs v. Umbehr*,
  518 U.S. 668 (1996)................................................................................................................... 2

*Biden v. Texas*,
  597 U.S. 785 (2022) ................................................................................................................. 10

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020)................................................................................................................. 10

*CarePartners, LLC v. Lashway*,
  545 F.3d 867 (9th Cir. 2008) .................................................................................................... 2

*Connick v. Myers*,
  461 U.S. 138 (1983).................................................................................................................. 3

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)............................................................................................................11, 12

*FDA v. Wages & White Lion Invs., LLC*,
  604 U.S. 542 (2025)................................................................................................................. 12

*Fed. Election Comm'n v. Cruz*,
  596 U.S. 289 (2022).................................................................................................................. 8

*Franklin v. Mally*,
No. 17-CV-00789-HSG, 2019 WL 2548687 (N.D. Cal. June 20, 2019) ............................ 13

*Hart v. Parks*,
450 F.3d 1059 (9th Cir. 2006) .................................................................................... 6

*Havekost v. U.S. Dep't of Navy*,
925 F.2d 316 (9th Cir. 1991) ..................................................................................... 3

*Int'l Tel. & Tel. Corp. v. Loc. 134, Int'l Bhd. of Elec. Workers*,
419 U.S. 428 (1975) .................................................................................................. 13

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps. Council 31*,
585 U.S. 878 (2018) .................................................................................................... 3

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) ...................................................................................................11

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ................................................................................................... 15

*Murphy Co. v. Biden*,
65 F.4th 1122 (9th Cir. 2023) ................................................................................... 14

*Nat'l Council of Resistance of Iran v. Dep't of State*,
251 F.3d 192 (D.C. Cir. 2001) ................................................................................... 7

*Nicopure Labs, LLC v. FDA*,
944 F.3d 267 (D.C. Cir. 2019) ................................................................................... 3

*Nieves v. Bartlett*,
587 U.S. 391 (2019) .................................................................................................... 4

*Ralls Corp. v. CFIUS*,
758 F.3d 296 (D.C. Cir. 2014) ................................................................................... 7

*Riley's Am. Heritage Farms v. Elsasser*,
32 F.4th 707 (9th Cir. 2022) ..................................................................................... 2

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006) .................................................................................................. 2, 3

*San Francisco Herring Ass'n v. Dep't of the Interior*,
946 F.3d 564 (9th Cir. 2019) ..................................................................................... 8

*San Luis & Delta-Mendota Water Auth. v. Salazar*,
686 F. Supp. 2d 1026 (E.D. Cal. 2009) ..................................................................... 1

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
  605 U.S. 168 (2025).............................................................................................................. 10

*Sierra Club v. EPA*,
  955 F.3d 56 (D.C. Cir. 2020)................................................................................................ 7

*Soranno's Gasco, Inc. v. Morgan*,
  874 F.2d 1310 (9th Cir. 1989) .............................................................................................. 2

*United States* ex rel. *Wilson v. Maxxam, Inc.*,
  Civ. A. No. 06-7497, 2009 WL 322934 (N.D. Cal. Feb. 9, 2009) .......................................... 3

*United States v. O'Brien*,
  391 U.S. 367 (1968).............................................................................................................. 3

*United States v. Puerta*,
  982 F.2d 1297 (9th Cir. 1992)............................................................................................. 13

*United States v. W. T. Grant Co.*,
  345 U.S. 629 (1953)............................................................................................................ 15

*Univ. of Texas v. Camenisch*,
  451 U.S. 390 (1981)............................................................................................................ 14

*Valencia Zapata v. Kaiser*,
  801 F. Supp. 3d 919 (N.D. Cal. 2025) ............................................................................... 13

*Wayte v. United States*,
  470 U.S. 598 (1985)............................................................................................................. 4

**Statutes**

5 U.S.C. § 558............................................................................................................... 12, 13

5 U.S.C. § 706........................................................................................................................ 12

10 U.S.C. § 3252................................................................................................................ *passim*

**Other Authorities**

*Anthropic raises $65B in Series H funding at $965B post-money valuation*, Anthropic (May 28, 2026),
  https://perma.cc/3MA9-8R8C.............................................................................................. 6

## INTRODUCTION

By early March 2026, the relationship between Anthropic and the Executive Branch had "sour[ed]," to borrow Anthropic's phrase. Opp'n (ECF No. 234) 7.[1] The reason was simple: the President and the Secretary of War lost trust in Anthropic. So the President decided agencies should no longer "use Anthropic's AI models," which "[e]veryone agrees that the government may" do. *Id.* Anthropic also agrees the Department of War (DoW) "and other agencies may lawfully use procurement authorities to wind down contracts and decline to procure services from Anthropic in the future." *Id.* The Secretary did just that on March 3, authorizing the use of covered procurement actions under 10 U.S.C. § 3252, which prohibited the use of Anthropic's products and services on DoW's sensitive, national-security systems. Other agencies implemented the President's directive in different ways; none of which Anthropic contends to have violated any contractual or legal rights it possessed.

Anthropic nonetheless continues to cry foul to this Court. In so doing, the company belies its professed acceptance of the government's unilateral authority to stop using its AI models. But Anthropic cannot have its cake and eat it too. Defendants' actions neither infringe Anthropic's First Amendment right to speak about AI policy nor do they deprive it of a vested liberty or property interest. Defendants' actions also did not violate the Administrative Procedure Act (APA), no matter how much Anthropic disagrees with the Secretary of War's assessment of its trustworthiness. The Court should grant Defendants' cross-motion for summary judgment.

## ARGUMENT

### I.    No First Amendment violation occurred

#### A.    The *Pickering* framework governs here

To begin, Anthropic wrongly suggests that Defendants may not discuss *Pickering* "[f]or the first time" at summary judgment. Opp'n 13; *see* XMSJ (ECF No. 215) 18. Defendants can because "summary judgment is an entirely independent proceeding from the preliminary injunction phase." *San Luis & Delta-Mendota Water Auth. v. Salazar*, 686 F. Supp. 2d 1026, 1032 (E.D. Cal. 2009).

Anthropic next asserts that *Pickering* should not govern because Defendants exercised "sovereign

---

[1] Pincites are to the page number added by CM/ECF to the header.

1

power" rather than "contractual power." Opp'n 14 (quoting *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 678 (1996)). To be sure, a more exacting standard would apply if Defendants "exercised sovereign power against [Anthropic] as a citizen in response to [its] political speech." *Umbehr*, 518 U.S. at 678. But not where, as here, Defendants made "reasonable assessments of [their] interests *as contractor*." *Id.* (emphasis in original). Those contractual interests are plain from the face of the record. *See* AR255A (discussing whether the government will "do business with" Anthropic); AR209 (authorizing only the use of "covered procurement actions").

Furthermore, Ninth Circuit precedent is clear that "[w]hen a business vendor operates under a contract with a public agency, we analyze its First Amendment retaliation claim . . . using the same basic approach we would use if the claim had been raised by an employee of the agency." *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 923 (9th Cir. 2004). Anthropic provides contractual services to the government in the form of "AI models," Opp'n 13, therefore *Pickering* applies. Anthropic errs by relying on cases where the claims were "brought by regulated entities," *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 721 (9th Cir. 2022)—such as petroleum sellers operating under government permits, *see Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1312 (9th Cir. 1989), or proprietors of boarding houses that must abide by the terms of a state license, *see CarePartners, LLC v. Lashway*, 545 F.3d 867, 872 (9th Cir. 2008). Those entities, unlike Anthropic, did not provide services to the government; the government licensed them to provide services *to others*. In addition, the government's interest "in efficient performance of public services" related to national security corroborates the application of *Pickering* here. *Riley's*, 32 F.4th at 720 (citation omitted).

### B.    Anthropic has not established a *prima facie* case of retaliation

Anthropic says its public statements "about AI safety" are protected expression. Opp'n 8. But the relevant statements occurred "in the context of" contract negotiations with DoW. *Id.* A vendor who disagrees with the government's proposed terms—none of which addressed the company's speech—may not air that disagreement publicly and then claim First Amendment retaliation if the government refuses to agree. *See* XMSJ 18-19. In other words, Anthropic cannot "transform conduct into 'speech' simply by talking about it." *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006). Nor does the commercial act of rejecting a contract become speech simply because Anthropic "intends thereby

2

to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

Anthropic tries to distinguish these cases factually but never grapples with the Supreme Court's discussions about what is and *is not* speech. *See* Opp'n 9. Moreover, the facts of those cases match ours: Defendants have not "limit[ed] what" Anthropic "may say nor require[d]" Anthropic "to say anything," *Rumsfeld*, 547 U.S. at 60, nor sought to "restrict" Anthropic's "ability to communicate," *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 291–92 (D.C. Cir. 2019).[2] Defendants merely regulated their own, internal use of Anthropic's products or services; Anthropic remains free to speak publicly about AI safety.

Anthropic's assertion that the Petition Clause "reinforces" applicability of the First Amendment fails for the same reasons. Opp'n 10. Anthropic remains free to "urg[e] the Secretary to maintain use restrictions" on AI. *Id.* And its business negotiations are not petitions. *See United States* ex rel. *Wilson v. Maxxam, Inc.*, Civ. A. No. 06-7497, 2009 WL 322934, at *6 (N.D. Cal. Feb. 9, 2009).

Anthropic does not meaningfully respond to Defendants' point that speech about the details of a contract is not a matter of public concern. *See* XMSJ 19–20. Regardless of whether Anthropic generally speaks "about AI safety," Opp'n 14, Anthropic's specific "statements about the contractual negotiations" with DoW were in furtherance of its private, commercial interest, XMSJ 19 (citing *Havekost v. U.S. Dep't of Navy*, 925 F.2d 316, 318 (9th Cir. 1991)). Properly read in "context," *Connick v. Myers*, 461 U.S. 138, 147 (1983), Anthropic's critique of the proposed terms of a single contract was a "negotiating tactic," not a discussion of public concern, XMSJ 19.

Even if Anthropic did engage in protected expression, the Government acted based on a loss of trust and the resulting threat to national security, not Anthropic's speech. *See id.* 20–21. Anthropic disregards how the President, the Secretary of War, and the Under Secretary of War for Research and Engineering all explicitly discussed national security. *Compare* Opp'n 10–11, *with* AR255A (Anthropic's actions would jeopardize "AMERICAN LIVES," "our Troops," and "our National Security"); AR255B (effect on "America's warfighters"); AR213 (Anthropic's actions risked "put[ting] our warfighters lives in danger"). Despite Anthropic's statements about the "sequence" of events, Opp'n 11, these concerns

---

[2] Not so in the main case cited by Anthropic, which involved compelled speech by a public employee who was required under state law to subsidize a union negotiator speaking for him. *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps. Council 31*, 585 U.S. 878, 897 (2018) (cited at Opp'n 9–10).

about a loss of trust and the accompanying risks to national security were not smuggled in at the last minute; they were present from the beginning. Indeed, if this were really about speech, DoW would not have continued negotiations after Anthropic's public statements. But DoW did continue to negotiate, belying that its actions were spurred by Anthropic's mere advocacy. *See* XMSJ 20.

Anthropic minimizes its own conduct which led to the government's loss of trust. Anthropic never disavows that one of its executives questioned the use of Claude during an active military operation, *see* AR213, but buries that fact in a footnote, *see* Opp'n 12 n.3, and ignores its significance. The concern was not of immediate interference. *Id.* Rather, by questioning a clearly permitted usage, Anthropic raised "doubts" and "alarm" about its acceptance of DoW's authority and how it might surreptitiously restrict DoW's use of its AI model in future operations with "disastrous" consequences. AR213. Anthropic furthered those doubts by not preemptively disclosing to DoW how, in 2025, it "failed to inform" the Centers for Disease Control and Prevention about specific prohibitions built into the model that "limit[ed] the product's functionality" for "sensitive" research and other activities. AR254. Anthropic never refutes that it failed to inform DoW of this episode during contract negotiations and failed to inform the CDC in advance about the specific filters. *See* Opp'n 11.

Finally, contrary to Anthropic's invitation, *id.* 12, binding Ninth Circuit precedent requires that the Court not read the social media posts "in the[ir] worst possible light," *Am. Fed'n of Gov't Emps. v. Trump*, 178 F.4th 456, 467 (9th Cir. 2026). In *AFGE,* the Ninth Circuit understood that, despite a fact sheet's comments about a labor union's ideology, the document "conveys an overarching objective of protecting national security." 178 F.4th at 467 (quotation omitted). So too here. The challenged actions directly and repeatedly invoke national-security risks. *See* AR213–15; AR255A; AR255B. True, some rhetoric references Anthropic's policy positions, *see* Opp'n 10, but "as a whole," "the President's" and the Secretary's "focus [was] national security, *AFGE*, 178 F.4th at 467 (quotation omitted). Furthermore, even "protected speech" can be a "wholly legitimate consideration" underlying official action, *Nieves v. Bartlett*, 587 U.S. 391, 401 (2019); *see also Wayte v. United States*, 470 U.S. 598, 612–13 (1985) (government could consider letters of protest as "strong, perhaps conclusive evidence" of someone's "intent not to comply" with a law).

4

### C.    Defendants have rebutted any *prima facie* showing

Although Anthropic suggests Defendants never explained that national security outweighs the company's interest in speaking freely, *see* Opp'n 15, we did exactly that, s*ee* XMSJ 21–22.  Defendants also explained, with citations to the record, why their national security interest is legitimate, *see id.*, and certainly not "vague[]," Opp'n 15.  That interest is "compelling," as Anthropic admits, *see id.*, and under *Pickering* outweighs Anthropic's contrary interest, *see* XMSJ 21–22.

The record also makes clear that, even if Anthropic can show some retaliatory animus, the Government would have taken the same actions.  *See id.* 22; *contra* Opp'n 12.  Had Anthropic refused to accept DoW's contractual term without making any public statements, DoW still would have assessed the same risk of "vendor-imposed point of failure" in future AI models, AR213—*i.e.*, that Anthropic would attempt to "DICTATE" how DoW fights, AR255A.  Thanks to Anthropic's lack of prior transparency and doubt of DoW's legitimate use of its technology during an active military operation—episodes that Anthropic does not deny—the total "aggregation of risk" indicated Anthropic was unworthy of the government's trust.  AR215.  That rationale was not "assembled after" the decision was made.  Opp'n 12.  DoW indicated during negotiations that "the threat environment"—which is to say potential national security threats—requires "trust and partnership" between the government and AI companies.  AR7. National security and DoW's trust were always at stake.

Anthropic questions this based on DoW's "post-designation conduct," believing it "unthinkable" that DoW would use Anthropic during active military operations or engage in discussions with Anthropic after March 3.  Opp'n 13.  Respectfully, Anthropic does not know what is best for national security.  The Secretary determined that removing Claude in the middle of active military operations and before a suitable replacement was operational posed a greater danger than a modest transition period.  *See* AR248. That did not mean the Secretary viewed Anthropic as anything other than a risk—indeed, DoW would have removed Claude immediately if an alternative had been readily available.  *See id.*

## II.    Anthropic received all the process it was due

Anthropic has not demonstrated that it was deprived of a protected interest or denied the requisite process.  *See* XMSJ 23–24.  Anthropic was not deprived of its "liberty interest in pursuing its chosen profession."  Opp'n 24.  Anthropic admits that "[m]ultiple agencies took no action against [it]" after the

Presidential Directive, XMSJ 23, and identifies no agency that barred it from future bidding on contracts. Thus, apart from DoW's covered procurement actions, Anthropic has not shown any debarment has occurred. Opp'n 30; *see also* ECF No. 6 at 29 (discussing "the federal debarment framework").

Anthropic also does not seriously rebut Defendants' observation that the company has not been "stigmatiz[ed]." Opp'n 25; *see* XMSJ 23. Anthropic cites no evidence that the social media posts "undoubtedly impair" its "reputation in the eyes of many Americans" and indeed admits that "the public largely views Anthropic favorably" and the company is financially successful. Opp'n 25; *see also* XMSJ 23 (describing high public standing in recent months). The declarations cited by Anthropic offer only conclusory and vague statements about the company's image, *see* Smith Decl. (ECF No. 166-2) ¶ 5; Ramasamy Decl. (ECF No. 166-4) ¶ 68, which do not rise to the level of "actionable" harm, *Hart v. Parks*, 450 F.3d 1059, 1069 (9th Cir. 2006).

Anthropic's alleged deprivation of commercial contracts similarly fails. Notwithstanding that there is no entitlement to contractual relationships, *see* XMSJ 23–24, Anthropic says the challenged actions affected its "vested contractual rights" because current customers "terminate[d] or materially alter[ed]" contracts. Opp'n 25. Anthropic never supports this statement; it discusses changes and terminations but not whether the contracts in question permitted those actions. *See* Smith Decl. ¶¶ 11–14. Absent such a showing, there is no demonstrated violation of "vested" rights under those contracts. Opp'n 25.[3] And trillion-dollar Anthropic cannot seriously liken itself to the plaintiff in *Al Haramain Islamic Foundation v. Department of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012), which was rendered "financially defunct" by the government's action, *see Anthropic raises $65B in Series H funding at $965B post-money valuation*, Anthropic (May 28, 2026), https://perma.cc/3MA9-8R8C.

Regarding what process is due for a deprivation of a protected interest (and there is no deprivation, to be clear), Anthropic argues that Defendants make a "vague assertion of national security interests." Opp'n 26. The record says otherwise—Under Secretary Michael's memorandum describes the national security interest in depth, *see* AR213–15, an interest echoed by the President and the Secretary of War, *see* AR255A, AR255B. Anthropic's suggestion that Defendants lacked "independent and

---

[3] The same declaration discusses the effect on existing "contract negotiations," *see* Smith Decl. ¶¶ 16–17, but hypothetical future contracts do not create a property interest, *see* XMSJ 23–24.

verifiable evidence showing that pre-deprivation process would risk specific harm" belies the facts. Opp'n 27. Allowing Claude to remain on DoW's systems beyond a reasonable wind down period would expose those systems to Anthropic's "moral and policy judgments on the warfighting capabilities of the DoW," potentially compromising those systems going forward. AR215. Such a threat "put[s] our warfighters lives in danger," AR213, a direct infringement on "the foreign policy goals of the government" that necessitated quick action—a circumstance not present in Anthropic's best case, *see Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 208 (D.C. Cir. 2001) (cited at Opp'n 26).[4]

The "risk of erroneous deprivation" does not require otherwise because Anthropic still fails to say why it needed pre-deprivation process to show "that the agency's rationales were factually unfounded." Opp'n 27 (citation omitted). Anthropic cites a supposed lack of explanation from the Secretary for why it never sought reconsideration, but never considers how this might have been addressed through the reconsideration process itself. *See id.* Finally, Anthropic does not respond to Defendants' argument that a breach-of-contract suit under the relevant contracts or judicial review under the APA would afford sufficient process. *See* XMSJ 24 (citing cases).

## III.    Anthropic's APA claims remain fatally flawed

### A.    Anthropic may only challenge the Secretary's formal § 3252 determination

Defendants have never disputed the Secretary of War's formal determination under 10 U.S.C. § 3252, issued on March 3, constitutes a final agency action challengeable under the APA. Anthropic nonetheless tries to conjure an additional final action out of the Secretary's February 27 social media post, solely to serve its narrative about "a secondary boycott" of Anthropic by "military contractors." Opp'n 15. But only on March 3 did DoW consummate "§ 3252's formal designation process, and only then did legal consequences flow"—the two requirements for final agency action. XMSJ 25.

Anthropic continues to ignore finality's "North Star": "the unique constellation of statutes and regulations that govern the action at issue." *Sierra Club v. EPA*, 955 F.3d 56, 61 (D.C. Cir. 2020) (quotation omitted). After all, an agency "literally has no power to act—including under its regulations—unless and

---

[4] No similar urgency attended the purchase of a wind farm near a military base in *Ralls Corp. v. CFIUS*, 758 F.3d 296, 304–06 (D.C. Cir. 2014) (cited at Opp'n 26). And in *Al-Haramain*, *see* Opp'n 26, the Ninth Circuit determined that post-deprivation process *was* appropriate, *see* 686 F.3d at 985.

until Congress authorizes it to do so by statute." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 301 (2022) (quotation omitted). The governing "legal framework" here is 10 U.S.C. § 3252 and DoW's implementing regulations. XMSJ 25. Indisputably, under this framework, the Secretary's post does not satisfy the procedural prerequisites for a final action with legal consequences. The government could not, and did not, rely on the tweet alone as the legal basis for action against Anthropic or to implement a "secondary boycott." Opp'n 16; *see also* 10 U.S.C. § 3252(b) (prescribing when the Secretary "may exercise the authority" under § 3252(a)(1)). That is why DoW proceeded to undertake the consultations, notifications, and determinations called for by the statute and regulations; again, "DoW had no reason to do that if the social media post already had legal effect." XMSJ 25.

*San Francisco Herring Association v. Department of the Interior*, 946 F.3d 564 (9th Cir. 2019) (cited at Opp'n 15), illustrates why the Secretary's social media post *lacks* finality. That case found a plausible, final agency action where the agency had "issued multiple formal notices on [agency] letterhead over a period of years, . . . making clear that commercial herring fishing" in particular waters "violated federal law"; "expressly stated" during multiple meetings "its intentions to continue to enforce" a prohibition on commercial fishing; and "put its declared position into action when its uniformed officers . . . order[ed] herring fishermen to stop fishing"—the flouting of which "could be punished through fines and imprisonment" under express legal authority. 946 F.3d at 578, 580. The Secretary's solitary tweet is simply not comparable.

Anthropic feigns surprise at the social media post's lack of legal effect, claiming "that would be news to" industry. Opp'n 16. But it largely ducks Defendants' prebuttal: Caselaw holds that "'indirect' effects arising 'from the reactions and choices of industry customers' and" other third parties do not "suffice for finality." XMSJ 26 (citation omitted). Anthropic seemingly accepts this general proposition, and any quibbles (*see* Opp'n 16 n.4) about the particulars of agency actions in other cases are immaterial. Plus, the company's sole evidence of third-party reactions to the February 27 post, *see* Opp'n 16 (citing Smith Decl. ¶ 12), expressly lumps together the President's post, the Secretary's post, and the Secretary's March 3 determination, and thus cannot prove any distinct effects of the Secretary's tweet, *see* Smith Decl. ¶¶ 4, 12 (defining and discussing "the 'Government's Actions'").

Finally, "that the March Determination did not reconsider or rescind the" February 27 post, Opp'n

17, demonstrates rather than undermines Defendants' point. There was nothing for Secretary Hegseth to rescind or reconsider on March 3 because only on that date did he issue the formal determination under 10 U.S.C. § 3252. *See* AR209. It was *this* March 3 "Determination" that would "remain in effect until modified or terminated in writing by the Section 3252 Authorized Official." AR238.

**B.    § 3252 squarely permits DoW to mitigate the risk of AI model poisoning**

Turning to "the March Determination," Anthropic fails to show it "rests on a reading of § 3252 that is at odds with the statutory text." Opp'n 19. Anthropic appears to have abandoned its "cramped reading of 'adversary' as 'hostile foreign countries' and 'terrorist groups,'" properly recognizing it had "no foothold in the statutory text or the word's plain meaning." XMSJ 27. Now, the company breathlessly claims that "Defendants' interpretation of § 3252" allows "the Secretary to apply § 3252 to any perceived 'opponent' and any contractor or subcontractor engaged in a 'dispute' with" DoW, no matter how trivial or tangential to DoW operations. Opp'n 20. But Defendants of course do not—and have never—read "§ 3252 as an all-purpose tool for punishing the Secretary's perceived opponents." *Id.* That accusation distracts from the Secretary's actual determination, squarely in accordance with 10 U.S.C. § 3252(b)(2)(A), that "the use of the authority in Section 3252(a) is necessary to protect national security by reducing th[e] supply chain risk" from the presence of Anthropic's "covered products or services in any DoW covered system," AR209.

As for the definition of "supply chain risk" in § 3252(d)(4), Anthropic wrongly contends that "Defendants offer no response" to its distillation of a 51-word definition down to covert acts or hacks. Opp'n 20. Defendants noted how § 3252 more broadly "covers risks that a vendor may 'subvert the design, integrity,' or 'operation' of a covered system to 'disrupt, or otherwise degrade the function, use, or operation of such system.'" XMSJ 27 (quoting 10 U.S.C. § 3252(d)(4)). "But even if the text is as limited as Anthropic argues," Defendants then said, "DoW is concerned expressly about the 'substantial risk that Anthropic could . . . preemptively and surreptitiously'—that is, covertly—'alter the behavior of the model in advance' to reflect 'its moral and policy judgments.'" XMSJ 27 (quoting AR215). In other words, the supply chain risk identified by DoW satisfies both a fair reading of the statutory definition, as well as

Anthropic's artificially limited one.[5]

Otherwise, Anthropic admits that "frontier AI companies are not immune from supply chain risk designations" and it all depends on DoW's "explanation." Opp'n 20. That is Defendants' very point: "The question of whether a supply chain risk exists 'involves primarily issues of fact,'" not a question of law. XMSJ 28 (quoting *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180–81 (2025)). Anthropic thus has not shown the Secretary misread his authority under § 3252.

C.    **The Secretary reasonably assessed a risk to DoW's sensitive systems**

As for the application of this statutory authority to Anthropic, Defendants explained how, based on the record, the Secretary's decision was well within the APA's zone of reasonableness, especially given the great deference owed to his predictive, national security judgments. *See* XMSJ 26-30. Anthropic tries to dismiss the Secretary's "rationale" as "a post hoc construct," Opp'n 22, but DoW's position remains "anchored" in "the grounds that the agency invoked when it took the action," *Biden v. Texas*, 597 U.S. 785, 811 (2022) (quotation omitted). Defendants' arguments rest on citations to record evidence—a marked contrast from Anthropic's heavy reliance on extra-record declarations.

On the merits, Anthropic's attempt to undermine the Secretary's considered judgment about the risk to sensitive, national security systems falls short. Anthropic does not dispute DoW's methodology—"the U.S. Government standard Risk Management Framework"—under which "an individual vendor may have only limited risk in individual categories" but "the culmination of unmitigable risks lead[s] to a . . . material level of risk." AR215. Nor does it deny DoW's need for "an AI vendor [to] 'continuously provide updated versions of its model'"; that "[e]ach iteration" of a model is "a fresh opportunity for a vendor to introduce changes that 'subvert the [model's] design and/or functionality' in ways that could jeopardize DoW's 'lawful use of the [model's] capability'"; and that "'deep trust [is] required' between DoW and the vendor" given the "black box" nature of AI. XMSJ 26 (quoting AR210, AR214, AR216, AR253). Anthropic also does not deny that, as matters of company policy and technical capability, it could "develop

---

[5] Another limitation advanced by Anthropic is that § 3252 cannot apply outside the original context "of a cyber breach by a foreign intelligence agency" and "similar" situations. Opp'n 20. "The fact that a statute has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020) (cleaned up).

additional 'redlines' in the future and build those into a model without telling DoW." *Id.* 28.

Against these baseline risks, Anthropic attempts a "closer examination" of its situation, Opp'n 22, but the effort neglects or minimizes critical record evidence. For instance, the record amply "elaborate[s]," *id.*, on Anthropic's hostility towards DoW leadership, *see* XMSJ 13 (quoting AR206-AR207), and "bad faith by sharing with the press . . . sensitive details of private conversations with DoW leadership," AR246. Also, an Anthropic executive did not neutrally inquire about the use of Claude in military operations, Opp'n 22; they "questioned the propriety of" Claude's use "for a sensitive military operation abroad despite that use being permitted under the existing Terms of Service" in a manner that "led to alarm by the DoW and the prime contractor," AR213. Then, "an Anthropic executive repeated this information" during "discussions with Anthropic leaders, not all of whom have the requisite security clearances," "raising serious concerns about their processes and procedures for operational security." AR247.

In repeating that the Secretary could simply have offboarded Anthropic "and declined to procure new models," Opp'n 24, Anthropic entirely ignores how the "risk is not limited only to" Anthropic's "standalone presence in DoW systems." XMSJ 29 (quoting AR247). It equally arises when Anthropic becomes a subcontractor for "a product on DoW systems" and "[w]hen Anthropic's model is layered into other applications" of contractors and subcontractors "that ultimately perform DoW activities." *Id.* (quoting AR247, AR249). Indisputably, "Anthropic's offer to offboard," Opp'n 24, would not address any of those risks; the Secretary's exclusion of "Anthropic from supplying products or services, as a contractor or a subcontractor, for covered procurements" did, XMSJ 29.

At bottom, Anthropic disagrees with the Secretary's ultimate assessment of the risk that it poses. But neither the company nor this Court may "substitute [its] judgment for that of the Secretary." *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019). The Secretary's decision required "the weighing of incommensurables under conditions of uncertainty," *id.* at 777—*i.e.*, what actions were "necessary to protect national security by reducing supply chain risk," 10 U.S.C. § 3252(b)(2)(A)—a decision owed "unique deference," *Al Haramain*, 686 F.3d at 980. In making this decision, the Secretary enjoyed the "discretion to rely on the reasonable opinions of [his] own qualified experts, even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). Because the Secretary "consider[ed] the evidence and g[a]ve reasons for his chosen course of

action," the Court must resist Anthropic's invitation to "second-guess[] the Secretary's weighing of risks" and "substitute[] [its] judgment for that of" DoW. *Dep't of Com.*, 588 U.S. at 777.

Lastly, Anthropic defies the law, the record, and common sense by insisting the Secretary's designation should be invalidated for what amount to, at worst, harmless errors. *See* Opp'n 18; *see also* 5 U.S.C. § 706 (incorporating "the rule of prejudicial error"). DoW did not prejudicially fail "to evaluate whether less intrusive measures were reasonably available." Opp'n 18 (citation omitted). The Secretary's senior subordinates jointly recommended "enterprise-wide" action "to reduce the supply chain risk associated with the use of [Anthropic's] products or services in any DoW covered system" and "no less intrusive measures" were "reasonably available." AR210-AR211. That's because the risk of AI model poisoning by Anthropic extended beyond its "standalone presence in DoW systems" to the use of Anthropic's model by third party contractors and subcontractors in applications that "ultimately perform" activities on DoW's national security systems. XMSJ 29 (quoting AR247). The Secretary permissibly accepted that recommendation, and a remand for further explication on that score "'would be pointless' formalism." *Id.* 30 (quoting *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 590 (2025)).

Similarly, Congress permitted the Secretary to exercise his authority under 10 U.S.C. § 3252 if he "consult[ed] with procurement or other relevant officials of" DoW. *Id.* § 3252(b)(1). Here, the Secretary received reports from the Under Secretary of War for Research and Engineering—who indisputably possesses the "institutional and subject matter expertise" to prepare "Section 3252 supply chain risk assessments relating to AI issues," XMSJ 31 (quoting AR244-AR245)—as well as the Under Secretary of War for Acquisition and Sustainment and the Department of War Chief Information Officer. To demand the Secretary now go back and consult another Under Secretary is the epitome of a box checking exercise.

The same goes for the Secretary's letters to Congress. Anthropic strains credulity by suggesting "we simply cannot know what the Secretary would have done had he" written a bit more to Congress. Opp'n 18 (quotation omission). Whatever else, there is no doubt about the Secretary's commitment to his course of action. Likewise, because Congress has not even requested a revised notification letter from the Secretary, much less sought to countermand the Secretary's action, the notion that Congress would suddenly "take action" if the Court orders the Secretary to send a revised letter beggars belief. *Id.* 19.

12

**D.    Anthropic's 5 U.S.C. § 558(b) argument is largely forfeited and half baked**

It was always a stretch for Anthropic to plead the non-DoW agencies as defendants. The rubber met the road in Anthropic's opening summary-judgment brief, where it unquestionably bore the burden of introducing evidence and argument to prove the claims against each non-DoW, agency defendant. *See Am. Bankers Ins. Co. of Fla. v. Nat'l Fire Ins. Co. of Hartford*, 517 F. Supp. 3d 1025, 1029 (N.D. Cal. 2021). "Anthropic's motion cite[d] evidence about only the Treasury Department (AR259-AR266), State Department (AR319-AR332), and General Services Administration (AR403-AR410)," which Defendants addressed in a subsection titled "No agency defendant violated 5 U.S.C. § 558(b)." XMSJ 31-32.

Anthropic now declares that Defendants "concede . . . the Departments of Energy, Veterans Affairs, and Commerce, as well as HHS, SEC, OPM, NRC, NASA, and DHS, all violated 5 U.S.C. § 558(b)." Opp'n 28-29. That is preposterous. Because Anthropic "fail[ed] to carry its initial burden of production" for those agencies, Defendants had "no obligation" to say "anything" about them. *Am. Bankers*, 517 F. Supp. 3d at 1029. Furthermore, Anthropic cannot "raise new facts or arguments in [its] reply brief." *Baxter v. City of Hemet*, 728 F. Supp. 3d 1127, 1149 n.99 (C.D. Cal. 2024) (quoting *United States v. Puerta*, 982 F.2d 1297, 1300 n.1 (9th Cir. 1992)). Anthropic has forfeited any argument that the Departments of Energy, Veterans Affairs, and Commerce, as well as HHS, SEC, OPM, NRC, NASA, DHS violated the APA. *See, e.g.*, *Valencia Zapata v. Kaiser*, 801 F. Supp. 3d 919, 931 n.2 (N.D. Cal. 2025); *Franklin v. Mally*, No. 17-CV-00789-HSG, 2019 WL 2548687, at *5 n.4 (N.D. Cal. June 20, 2019).[6]

As to the Treasury Department, State Department, and GSA, Anthropic tellingly cites no case holding that an agency's internal, discretionary decision to switch from one AI model to another rises to the level of an "order" or "sanction," within the meaning of the APA. *See* Opp'n 29. Anthropic does not identify any contractual or legal rights that the agencies abridged; nor does it explain how the agencies were not within their own rights to instruct third-party vendors to activate (or deactivate) a particular AI model for employees' use. *See* XMSJ 32. At most, it gestures at a "practical effect" of agencies preferring a different AI model, which will not support an APA claim. *Int'l Tel. & Tel. Corp. v. Loc. 134, Int'l Bhd. of Elec. Workers*, 419 U.S. 428, 447 (1975). Indeed, to accept Anthropic's theory would "invit[e] judicial

---

[6] The same is true for Does 1 to 10, *see* XMSJ 31, who should join the other agency defendants against whom Anthropic no longer "pursue[s] this claim," Opp'n 29 n.6.

review of a vast array of operational choices that agencies must make in carrying out their duties." *All. for Retired Americans v. Bessent*, No. CV 25-0313 (CKK), 2026 WL 622235, at *6 (D.D.C. Mar. 5, 2026). Anthropic has not come close to justifying such a dramatic expansion of APA review.

**IV.    No *ultra vires* review of the President's social media post is available**

As Defendants noted—and Anthropic does not dispute—"[t]he Ninth Circuit permits *ultra vires* review of presidential action only for whether it clearly exceeded a delegated, statutory authority." XMSJ 32 (citing *Murphy Co. v. Biden*, 65 F.4th 1122, 1129-31 (9th Cir. 2023)).  Yet Anthropic has not demonstrated the President's February 27 social media post clearly "exceeds" *his* "statutory authority." *Murphy Co.*, 65 F.4th at 1131 (quotation omitted).  Defendants explained why that would be impossible: "the Presidential Directive did not rely on any statutory authority delegated to the President; it issued" directly under his Article II authority to superintend the actions of subordinations.  XMSJ 32-33.

In response, Anthropic vaguely alludes to "procurement statutes" and Congress's power of the purse.  Opp'n 28.  That won't suffice.  It is clear from the face of the social media post that the President did not purport to exercise directly any delegated statutory authority to debar a contractor or spend money. Under Article II, the President simply announced a policy and then left implementation to his subordinates in accordance with their own legal authorities.  *See* XMSJ 32-33.  In so doing, the President did not "exceed[]" any statutory "restraints on his authority,"[7] Opp'n 28, dooming Anthropic's *ultra vires* theory.

**V.    Anthropic has not established a need for equitable or declaratory relief**

Although Anthropic's opening brief never addressed the critical topic of remedies, in opposition to Defendants' own discussion (XMSJ 33-34), it suddenly proclaims to have "satisfied the requirements for a permanent injunction," Opp'n 30.  It has not.  Anthropic treats a permanent injunction as a foregone conclusion (if it prevails at summary judgment) because it previously obtained preliminary relief.  *See id.* That ignores key differences in context and proof, which alter the equitable calculus.[8]

Whereas the Court's preliminary injunction "merely . . . preserve[d] the relative positions of the parties until a trial on the merits can be held," *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981), for

---

[7] Nor for that matter has Anthropic shown that the President's subordinates independently exceeded their own authorities in carrying out the President's policy.

[8] Anthropic also continues to ignore the jurisdictional bar against enjoining the Federal Housing Finance Agency in its capacity as conservator.  *See* XMSJ 34 n.6 (citing 12 U.S.C. § 4617(f)).

a permanent injunction, Anthropic "must satisfy the court that relief is needed" after final judgment because "there exists some cognizable danger of recurrent violation," *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). And if "a less drastic remedy" sufficiently redresses the injury, "no recourse to the additional and extraordinary relief of an injunction [i]s warranted." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010)). The legal remedies under the APA—*i.e.*, remand of DoW's § 3252 determination with or without vacatur—fit the bill here. We know that because Anthropic never actually says what the Court must permanently enjoin Defendants from doing. It invokes the specter of "[c]onsitutional injury," Opp'n 30, but provides no details of an ongoing, unconstitutional practice at any agency defendant that must be stopped. Indeed, it concedes the government's right not "to use Anthropic's AI models," as well as "to wind down contracts and decline to procure services from Anthropic in the future." *Id.* 7; *see id.* 30. The "failure to point to circumstances compelling further relief against" Defendants "speaks for itself," *W. T. Grant Co.*, 345 U.S. at 635, especially when weighed against the adverse "public consequences" of any injunction intruding upon the government's undisputed authority to stop using Anthropic's products, *see* XMSJ 34.

Anthropic properly forswears declaratory "relief directed at the President personally" and seeks only "relief against agency Defendants implementing the unlawful actions." Opp'n 30-31. But given the agencies' conceded right not to use Anthropic's products and to wind down relations with the company, what is left for the Court to declare? Anthropic has no answer, thereby precluding any declaratory relief.

## CONCLUSION

For the foregoing reasons and those in Defendants' opening brief, this Court should grant Defendants' Cross-Motion for Summary Judgment.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

15

KRISTINA A. WOLFE (VA. Bar. 71570)
Assistant Director
Federal Programs Branch

*/s/ James W. Harlow*
JAMES W. HARLOW (Md. Bar; no number issued)
Senior Trial Counsel
CHRISTIAN DIBBLEE (D.C. Bar 90002557)
Trial Attorney
Federal Programs Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
(202) 514-6786 (Harlow)
james.w.harlow@usdoj.gov